## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

    *Plaintiffs*,

        v.

ASHLEY BROOKE MOODY, in her
official capacity as Attorney General of
the State of Florida,

    *Defendant*.

Case No. 4:24-cv-00438-MW-MAF

## <u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF<br>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... ii

INTRODUCTION ..................................................................................... 1

BACKGROUND ....................................................................................... 4

    A.    Adults and Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act. ................................ 4

    B.    Parents Have Many Ways to Supervise How Their Minor Children Use the Internet. ................................................................ 5

    C.    Florida Enacts House Bill 3. ............................................................ 12

ARGUMENT ............................................................................................ 16

I.    Plaintiffs Are Likely To Succeed On Their First Amendment Claim ..................................................................................................... 16

    A.    HB3 Restricts a Breathtaking Amount of Core First Amendment Activity .......................................................................... 16

    B.    HB3 Is Subject to Strict Scrutiny. ................................................... 23

    C.    HB3 Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny. ....................................................................... 26

II.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo. ............................................................... 32

CONCLUSION ......................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Am. Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) ........................................................................17

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ..............................................................................................24

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .............................................................. 18, 21, 29, 30

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982) ..............................................................................................22

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .............................................................................. *passim*

*Citizens United v. FEC*,
558 U.S. 310 (2010) ..............................................................................................24

*City of Austin v. Reagan Nat'l Advert. of Austin,
LLC*,
596 U.S. 61 (2022) ................................................................................................23

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ....................................................1

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ..............................................................................................21

*Elrod v. Burns*,
427 U.S. 347 (1976) ..............................................................................................32

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .............................................................. 17, 18, 23

*Floridians Protect. Freedom, Inc. v. Ladapo*,
2024 WL 4518291 (N.D. Fla. Oct. 17, 2024) ................................................. 33

*Ginsberg v. New York*,
390 U.S. 629 (1968) ..............................................................................................17

*Honeyfund.com, Inc. v. Governor*,
  94 F.4th 1272 (11th Cir. 2024).................................................................32

*Interactive Digit. Software Ass'n v. St Louis Cnty.*,
  329 F.3d 954 (8th Cir. 2003)...................................................................27

*McCullen v. Coakley*,
  573 U.S. 464 (2014).................................................................................26

*Minneapolis Star & Trib. Co.*
*v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983).................................................................................24

*Moody v. NetChoice, LLC*,
  144 S.Ct. 2383 (2024)...................................................................... 16, 22

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ................................................... 16, 32, 33

*NetChoice, LLC v. Bonta*,
  2024 WL 3838423 (9th Cir. Aug. 16, 2024)................................... 1, 19

*NetChoice, LLC v. Fitch*,
  2024 WL 3276409 (S.D. Miss. July 1, 2024) ........................... *passim*

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)......................... *passim*

*NetChoice, LLC v. Reyes*,
  2024 WL 4135626 (D. Utah Sept. 10, 2024)............................. *passim*

*NetChoice, LLC v. Yost*,
  716 F.Supp.3d 539 (S.D. Ohio 2024); ....................................... *passim*

*NIFLA v. Becerra*,
  138 S.Ct. 2361 (2018).............................................................................30

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)....................................................................... *passim*

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)....................................................................... 23, 24

iii

*Reno v. ACLU,*
    521 U.S. 844 (1997) ....................................................................... 18, 19, 21, 29

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ........................................................................................17

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ........................................................................................24

*United States v. O'Brien,*
    391 U.S. 367 (1968) ........................................................................................26

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000) ........................................................................... 19, 30, 31

**Statutes**

Fla. Stat. §501.1736(1)(e) ...............................................................................12

Fla. Stat. §501.1736(2)(a) ................................................................... 13, 19, 26

Fla. Stat. §501.1736(2)(b) ................................................................... 13, 19, 26

Fla. Stat. §501.1736(3)(a) ......................................................................... 13, 20

Fla. Stat. §501.1736(3)(b) ......................................................................... 13, 20

Fla. Stat. §501.1736(4)(a) ................................................................... 14, 20, 26

Fla. Stat. §501.1736(4)(b) ................................................................... 14, 20, 26

Fla. Stat. §501.1736(5) .............................................................................. 14, 15

Fla. Stat. §501.1736(6)(a) ...............................................................................15

Fla. Stat. §501.1737(1)(i) ................................................................................15

Fla. Stat. §501.1738(1) ....................................................................................15

**Regulations**

Fla. Admin. Code §2-43.001(12) ....................................................................14

Fla. Admin. Code §2-43.002(1) ......................................................................15

Fla. Admin. Code §2-43.002(2) ..................................................................14

Fla. Admin. Code §2-43.002(3) ..................................................................21

Fla. Admin. Code §2-43.002(3)(a) ............................................................15

Fla. Admin. Code §2-43.002(3)(b) ............................................................15

**Other Authorities**

Press Conference, *Governor Ron DeSantis Signs
    HB3 to Protect Children from the Harms of
    Social Media* (Mar. 25, 2024),
    https://tinyurl.com/5fhv2e2t ................................................................ 24, 25, 28

Press Release, *Governor DeSantis Signs Legislation
    to Protect Children and Uphold Parental Rights*
    (Mar. 25, 2024), https://tinyurl.com/28mtyp3a .................................... 26, 27, 28

**INTRODUCTION**

Florida House Bill 3 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors. Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors. Today, similar debates rage about "social media" websites. These debates are important, and the government may certainly take part in them. But the First Amendment does not take kindly to government effort to resolve them. The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs: with their parents.

Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services. Courts across the country have unanimously rejected those efforts as inconsistent with the First Amendment. *See, e.g., NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024); *NetChoice, LLC v. Bonta*, 2024 WL 3838423 (9th Cir. Aug. 16, 2024); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023). And rightly so. While states certainly have a legitimate interest in protecting

minors who use such services, restricting the ability of minors (and adults) to access them altogether is not a narrowly tailored means of advancing any such interest. In a Nation that values the First Amendment, the preferred response is to let parents decide what speech and mediums their minor children may access—including by utilizing the many available tools to monitor their activities on the Internet.

Like the laws that have preceded it, HB3 violates the First Amendment. The Act bans anyone under 14 from creating or holding an account on certain "social media platforms" altogether, and it requires 14- and 15-year-olds to obtain a parent's consent before doing so. By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Florida has "with one broad stroke" restricted—and, for those under 14, prohibited—access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

Again, while Florida certainly has a legitimate interest in protecting minors, it is not obvious what HB3 is designed to protect minors from. The law does not focus on any particular content that may pose special risk to minors. Nor does it focus on identifying specific means of or forums for communication that those seeking to take advantage of minors have proven more likely to use. HB3's definition of "social media platform" instead appears designed to restrict access to

websites that minors especially enjoy using—specifically, websites that facilitate significant amounts of First Amendment activity. Indeed, whether a service is covered turns in part on how long minors spend on it and whether it employs tools designed to bring to their attention content they might like. But by that metric, the state could restrict access to the most popular segments of nearly any medium for constitutionally protected speech, be it enticing video games, page-turning novels, or binge-worthy TV shows. Burdening protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

In all events, the state cannot begin to show that its draconian access restrictions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they can do on those services, and how often they can use them. Florida may wish that more Floridians shared its own views about whether minors should use "social media platforms." But while the state may take many steps to protect minors from harm, including by persuading parents to take advantage of tools to limit their minor children's access to "social media platforms," it may not take matters into its own hands and restrict access itself. After all, "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

For these reasons and others, the Court should preliminarily enjoin the state from enforcing HB3's access ban and parental consent requirements against CCIA and NetChoice members before the law goes into effect on January 1, 2025.[1]  CCIA and NetChoice are likely to succeed on the merits of their First Amendment claim, and all the equitable factors tip in favor of maintaining the status quo while the serious constitutional concerns about this speech-restricting measure are litigated to final judgment.

## BACKGROUND

A.      **Adults and Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act.**

CCIA and NetChoice are Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat. Those services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107.  "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104.  YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.  Veitch.Decl.¶¶3, 6-9.  And on Snapchat, users can deepen

---

[1] Specifically, the Court should enjoin the state from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), (4)(b)(1).

connections with friends and family by communicating with each other in fun and casual ways.  Boyle.Decl.¶¶3-4.

Like adults, minors use those websites to engage in an array of First Amendment activity.  Minors use them to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges.  Some use those websites to showcase their creative talents, including photography, writing, and other forms of creative expression.  Others use them to raise awareness about social causes and participate in public discussion on salient topics of the day.  Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized and are seeking support from others who understand their experiences.  Schruers.Decl.¶8; Cleland.Decl.¶23a.

**B.  Parents Have Many Ways to Supervise How Their Minor Children Use the Internet.**

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree services like Facebook, YouTube, and Snapchat are appropriate for minors.  In a Nation that values the First Amendment, the preferred response to those diverse opinions is to let parents decide what is appropriate for their minor children, including by using market-driven tools that make it easier to restrict their access should they choose to do so.  And while the

government may have some role to play in facilitating access to such tools, it has rarely needed to do so since market forces typically drive industry responses to parental concerns. That is precisely the case here: Parents who wish to limit their children's access to services like Instagram and YouTube, or to restrict or monitor the content to which they are exposed, have many options at their disposal.

*Device-level tools.* Parents can decide whether and when to let their children use computers, tablets, and smartphones. And those who choose to let their children use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long their children can spend on their iPhones, iPads, and MacBooks. Schruers.Decl.¶10; Cleland.Decl.¶8. It also provides tools to control what applications (*e.g.*, Facebook, YouTube, Snapchat) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. Schruers.Decl.¶10; Cleland.Decl.¶8. Google, Microsoft, and Samsung similarly offer parental controls for their devices. Schruers.Decl.¶10; Cleland.Decl.¶8. And many third-party applications allow parents to control and monitor minors' use of Internet-connected devices and online services. Schruers.Decl.¶10; Cleland.Decl.¶8.

*Network-level tools*. Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices, ensure that

they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours.  Schruers.Decl.¶11; Cleland.Decl.¶9.  Most wireless routers (the devices that provide wireless Internet throughout a home) contain parental control settings as well.  Schruers.Decl.¶11; Cleland.Decl.¶9.  Parents can use those settings to block specific websites and applications (Facebook, YouTube, etc.) if they do not want their minors to access them.  Schruers.Decl.¶11; Cleland.Decl.¶9.  They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long a minor can spend on a particular website or service.  Schruers.Decl.¶11; Cleland.Decl.¶9.  And they can set individualized content filters for their minors and monitor the websites they visit and services they use.  Schruers.Decl.¶11; Cleland.Decl.¶9.

*Browser-level tools.*  Parental controls on Internet browsers offer another layer of protection.  Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites minors can access.  Schruers.Decl.¶12; Cleland.Decl.¶10.  Microsoft offers "Kids Mode," which allows access to only a pre-approved list of websites.  Schruers.Decl.¶12; Cleland.Decl.¶10.  Google has a similar feature.  It also provides parents with "activity reports," allowing them to see what apps and websites their minors are accessing the most.  Cleland.Decl.¶10.

***Application-level tools.*** CCIA and NetChoice members themselves provide parents with tools to decide what their children can see and do on their services. And they have devoted extensive resources to developing policies and practices to protect minors who use them. Facebook, Instagram, and Snapchat prohibit minors under 13 from accessing their main services. Schruers.Decl.¶13a; Cleland.Decl.¶12; Boyle.Decl.¶5. Some members offer separate experiences for users under 13 geared for that age group. Schruers.Decl.¶13a; Cleland.Decl.¶12. YouTube, for example, has worked with specialists and trusted partners to curate educational and other age-appropriate content through YouTube Kids, which is a "family-friendly place for kids to explore their imagination and curiosity." Veitch.Decl.¶¶16a, 17. And its "supervised accounts" give parents, whose "children are ready to explore some of YouTube's vast universe of user-generated content," tools to manage what content their children view. Veitch.Decl.¶¶16b-17. These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services. Veitch.Decl.¶¶16-18.

CCIA and NetChoice members also expend significant resources curating the content on their services to ensure that it is appropriate for adults and teens alike. Schruers.Decl.¶¶5, 13-15; Cleland.Decl.¶¶11-17. Members restrict the publication of violent and sexual content, bullying, and harassment. Schruers.Decl.¶14; Cleland.Decl.¶16. Some prohibit content that encourages body shaming and

8

promote content that encourages a positive self-image. Cleland.Decl.¶16; Veitch.Decl.¶¶17-18. Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens. Schruers.Decl.¶13b; Cleland.Decl.¶13a; Veitch.Decl.¶20. If a member determines that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it. Schruers.Decl.¶14; Cleland.Decl.¶16; Veitch.Decl.¶¶21-25, 29. And members can (and do) suspend or ban accounts that violate their policies. Cleland.Decl.¶16; Veitch.Decl.¶26.

CCIA and NetChoice members also provide users with tools to curate the content they wish to see. Cleland.Decl.¶¶14-15; *see* Schruers.Decl.¶7. Users can generally choose whom to follow. Cleland.Decl.¶¶14-15; *see* Schruers.Decl.¶7. They can generally block or mute other users and control who may see and interact with their own content. Cleland.Decl.¶15. Some members provide users with tools to exclude specific categories of content they wish to avoid. Cleland.Decl.¶15. Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group. Cleland.Decl.¶15. Instagram users can select a "not interested" button to filter out content they do not wish to see. Cleland.Decl.¶15. They can use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same. Cleland.Decl.¶15.

CCIA and NetChoice members empower parents to monitor teens' activities on their services. Snapchat's "Family Center" allows parents to see their teen's friends list and who they have been messaging, review their privacy settings, and manage parental controls. Boyle.Decl.¶¶7-8; Cleland.Decl.¶11c. Facebook offers supervision tools that parents and guardians can use. Schruers.Decl.¶13d; Cleland.Decl.¶11a. Parents can see how much time their teens have spent on the Facebook app, schedule breaks for them, and see their Facebook friends. *Id.* Parents can also review some of their teens' privacy settings and content preferences and the people and pages they have blocked. *Id.* Instagram enables parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and monitor accounts followed by their teens and the accounts that follow them. Cleland.Decl.¶11b; Schruers.Decl.¶13d. Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive content settings. Cleland.Decl.¶11b; Schruers.Decl.¶13d. YouTube offers a "Supervised Experience" for teens (separate from the supervised experience for minors younger than 13), where parents can (1) receive email notifications when a teen uploads a video or starts a livestream; (2) monitor their teens' channel activity (such as uploads, comments, and subscriptions); and (3) link their accounts to their teen's. Veitch.Decl.¶¶14-15; Schruers.Decl.¶13a; Cleland.Decl.¶12. YouTube has also developed features and policies to promote digital wellbeing among teens:

turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and providing reminders for teens to take a break or go to bed. Veitch.Decl.¶¶17, 20b.

CCIA and NetChoice members also restrict communications between adults and teens on their services, if they allow such communications at all. Facebook, Instagram, and Snapchat, for example, all take steps to limit adults from messaging teens to whom they are not connected. Cleland.Decl.¶¶11b, 13b-c; Boyle.Decl.¶6. Snapchat's default settings permit direct messages only between people who are already friends on the service or established contacts in their phones. Boyle.Decl.¶6. Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults. Cleland.Decl.¶13c. And "Instagram Teen Accounts" take this a step further by restricting direct messaging from people teens do not follow or are not connected to. Cleland.Decl.¶11b. Some CCIA and NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them. Cleland.Decl.¶13c. If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult. Cleland.Decl.¶13c. YouTube and other members do not offer private messaging between users at all. Compl.¶40.

### C. Florida Enacts House Bill 3.

Notwithstanding the many cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict Internet access, Florida has taken it upon itself to decide what is appropriate for minors on the Internet. Florida enacted HB3, which dramatically restricts minors' access to certain "social media platforms," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services.

HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activit[ies] of other users." Fla. Stat. §501.1736(1)(e). But instead of regulating all online services that allow users to share and view content, the Act limits the definition to the online services that minors enjoy using the most—i.e., the services that facilitate the most First Amendment activity. An online service qualifies as a "social media platform" only if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on it "on the days when using" the service, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has "one or more addictive features." *Id.* HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play

functions," and "[l]ive-streaming functions." *Id.* The Act excludes any service on which "the exclusive function is e-mail or direct messaging." *Id.*

The Act imposes several restrictions on access to "social media platforms" that are relevant here:[2]

***Restrictions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platforms" altogether. *Id.* §501.1736(2)(a). It also requires "social media platforms" to terminate any existing accounts held by minors under age 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b)(1). Account holders have 90 days to dispute the termination. *Id.*

***Restrictions on 14- and 15-year-olds.*** HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). It also requires "social media platforms" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or

---

[2] CCIA and NetChoice ask the Court to preliminarily enjoin the state from enforcing only HB3's access ban and parental consent requirements—i.e., the provisions that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), (4)(b)(1). For ease of reference, future references to "HB3" or "the Act" refer only to these provisions unless otherwise stated.

15 years of age for purposes of targeting content or advertising." *Id.* §501.1736(3)(b)(1). The account holder has 90 days to dispute the termination. *Id.* HB3 specifies that if its parental-consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §§501.1736(4)(a), (4)(b)(1).

HB3 does not explain how a "social media platform" is supposed to identify who is a "parent or guardian." But regulations enacted by the Florida Attorney General require "social media platform[s]" to "conduct reasonable parental verification" in "determining whether someone is a parent." Fla. Admin. Code §2-43.002(2). "Reasonable parental verification" means "any method that is reasonably calculated at determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means," which "may include" "requesting from a child the child's parent's name, address, phone number, and e-mail address," "contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship," and "utilizing any commercially reasonable method regularly used by the government or business to verify that parent's identity and age." *Id.* §2-43.001(12).

HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or reckless[ly]" violate its provisions. Fla. Stat. §501.1736(5). HB3 authorizes the Florida Attorney General to enforce the law, imposing a civil penalty of up to $50,000 per violation. *Id.* §501.1736(5). HB3's implementing regulations specify that a "social media platform" commits a "knowing or reckless violation" if "it, based on the facts or circumstances readily available to" it, "should reasonably have been aroused to question whether the person was a child and thereafter failed to perform reasonable age verification." Fla. Admin. Code §2-43.002(3)(a).

The implementing regulations all but mandate that a "social media platform" implement whatever the state deems to be "reasonable age verification procedures" for all users, as the regulations state that the Attorney General "will not find [a knowing or reckless violation] … has occurred if a social media platform establishes it has utilized a reasonable age verification method with respect to all who access the social media platform." *Id.* §2-43.002(3)(b). "Age verification" methods that satisfy this standard are "any commercially reasonable method of age verification approved by the commercial entity," Fla. Stat. §501.1737(1)(i); "commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party," *id.* §501.1738(1); or "method of verifying age that is regularly used by the

government or businesses for the purpose of age and identity verification."  Fla. Admin. Code §2-43.002(1).

HB3 also includes a private right of action authorizing minors and their representatives to enforce the law.  Fla. Stat. §501.1736(6)(a).  A minor account holder may recover up to $10,000 in damages for each violation of the Act.  *Id.*

HB3 is set to take effect on January 1, 2025.  HB3 §5.

## ARGUMENT

To obtain a preliminary injunction, CCIA and NetChoice must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest.  *See Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020).  CCIA and NetChoice have made all those showings.

## I.    Plaintiffs Are Likely To Succeed On Their First Amendment Claim.

### A.    HB3 Restricts a Breathtaking Amount of Core First Amendment Activity.

"'Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'"  *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2403 (2024) (quoting *Brown*, 564 U.S. at 790).  And "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak

and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet." *Id.* The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors. *Id.* at 106-08.

That rule applies with full force to efforts to restrict minors' access to such services. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975), and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). So just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable to them." *Erznoznik*, 422 U.S. at 209, 213-14. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.

To be sure, there are some exceptions to those general principles. The government may, for example, "adjust the boundaries of an existing category of

unprotected speech to ensure that a definition designed for adults is not uncritically applied to children." *Id.* at 794. After all, something that is not obscene for adults may still be obscene for minors. *See Ginsberg v. New York*, 390 U.S. 629, 636 (1968); *Am. Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990). But that does not give the government carte blanche to restrict wide swaths of protected speech or "to create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794. In short, "only in relatively narrow and well-defined circumstances may [the] government bar public dissemination of protected materials to minors." *Erznoznik*, 422 U.S. at 212-13.

Courts have therefore routinely invalidated government efforts to protect minors from the purportedly harmful effects of new forms of media. In *Brown*, for example, the Supreme Court held that a California law prohibiting the sale of violent video games to minors without parental consent violated the First Amendment. 564 U.S. at 804-05. And in *Erznoznik*, the Court held the First Amendment prohibited Jacksonville from enforcing a local ordinance barring the display of movies containing nudity at drive-in theaters. 422 U.S. at 217-18.

Even when the government restricts access to speech that is *not* protected as to minors, courts have struck such laws down if they impede the First Amendment rights of adults. In *Ashcroft v. ACLU*, 542 U.S. 656 (2004), for example, the Court

upheld an injunction prohibiting the government from enforcing a federal statute that prohibited the dissemination of material that is "harmful to minors" over the Internet without first verifying the recipient's age in part because it burdened the rights of adults. *Id.* at 673. In *Reno v. ACLU*, 521 U.S. 844 (1997), the Court held that a federal statute that prohibited the dissemination of "indecent" material to minors over the Internet violated the First Amendment in part because it burdened the rights of adults. *Id.* at 874. And in *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000), the Court held that a federal statute restricting sexual programming on cable television violated the First Amendment in part because it restricted speech "between speakers and willing adult listeners." *Id.* at 812.

Unsurprisingly, given that body of precedent, courts around the country have universally enjoined recent state efforts to restrict minors' access to "social media platforms," including laws that require teens to obtain parental consent to access them. *See, e.g., Reyes*, 2024 WL 4135626; *Bonta*, 2024 WL 3838423; *Fitch*, 2024 WL 3276409; *Yost*, 716 F.Supp.3d 539; *Griffin*, 2023 WL 5660155. The Court should enjoin HB3 for the same reasons.

HB3 restricts core First Amendment activity. It completely prohibits minors under age 14 from creating accounts on the websites it covers. Fla. Stat. §§501.1736(2)(a), (2)(b)(1). As the Supreme Court explained in *Packingham*, "to foreclose access to social media altogether is to prevent the user from engaging in

the legitimate exercise of First Amendment rights." 582 U.S. at 108. By prohibiting minors under age 14 from creating accounts at all, Florida has "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 107.

Requiring 14- and 15-year-olds to obtain parental consent before creating accounts likewise restricts core First Amendment activity. Fla. Stat. §§501.1736(3)(a), (3)(b)(1). As numerous courts have concluded, requiring minors to obtain parental consent before accessing "social media" abridges First Amendment rights. *See, e.g.*, *Reyes*, 2024 WL 4135626 at *20; *Fitch*, 2024 WL 3276409 at *14; *Yost*, 716 F.Supp.3d at 551; *Griffin*, 2023 WL 5660155 at *17. After all, the government lacks "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. Otherwise, "it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* It could even "be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.*[3]

---

[3] HB3 specifies that if the court enjoins the parental-consent requirement, then it shall be severed and replaced with a provision banning 14- and 15-year-olds from

HB3 also burdens the First Amendment rights of *adults* to access covered services, as it effectively requires adults to verify their age before accessing those services. *See* Fla. Admin. Code §2-43.002(3). As courts have repeatedly reaffirmed, requiring adults to verify their age before accessing speech significantly burdens First Amendment rights. *See, e.g.*, *Griffin*, 2023 WL 5660155 at *17; *Yost*, 716 F.Supp.3d at 552; *Fitch*, 2024 WL 3276409 at *12. In *Ashcroft*, for example, the Court concluded that a statute requiring Internet users to "identify themselves or provide their credit card information" before accessing certain sexually explicit websites impermissibly burdened the right of adults to "gain access to speech they have a right to see." 542 U.S. at 667. Likewise, in *Reno*, the Court held that a federal statute that required age verification via credit card to access "indecent" or "patently offensive" material on the Internet violated the First Amendment even assuming such content was unprotected as to minors because it "would completely bar adults who do not have a credit card and lack the resources to obtain one" from accessing protected speech. 521 U.S. at 856. By forcing adults either to surrender sensitive personal information to access protected speech or forgo that First Amendment activity entirely, such requirements "discourage users from accessing" online

---

creating accounts on "social media platforms." Fla. Stat. §§501.1736(4)(a), (4)(b)(1). But that would be unconstitutional for the same reasons as the prohibition on access by minors under age 14. And it confirms that the state's real goal is not to aid parental authority, but to override it.

services and "completely bar" some adults from doing so. *Id.*; *cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198-99 (2008).

The unique aspects of services like Facebook and YouTube only heighten the First Amendment values at stake. While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, HB3 also restricts users' ability to engage in their own speech and associate with like-minded individuals. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982). On top of that, HB3's access restrictions interfere with the First Amendment rights of CCIA and NetChoice members to disseminate both their own and third-party speech to their users—restricting their First Amendment rights as well. *See Moody*, 144 S.Ct. at 2404; *Reyes*, 2024 WL 4135626 at *9-10; *Yost*, 716 F.Supp.3d at 551-52.

In fact, HB3 is even more problematic than the laws invalidated in *Brown*, *Erznoznik*, *Ashcroft*, and *Playboy*. Some of those laws at least involved an attempt (albeit an unsuccessful one) to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. But HB3 does not endeavor to confine its restrictions to anything that even arguably approaches "unprotected speech." It restricts (and sometimes even prohibits) access to "social media platforms" even if all a teenager wants to do is to attend church services on Facebook or view educational materials on YouTube.

## B. HB3 Is Subject to Strict Scrutiny.

Because HB3 restricts access to large swaths of constitutionally protected speech, it is subject to heightened scrutiny. *See Packingham*, 582 U.S. at 103. Indeed, the sweeping nature of its restrictions demands strict scrutiny. If California had restricted access to *all* video games, that would have made the First Amendment violation even more glaring. *See Brown*, 564 U.S. at 794. Likewise, if Jacksonville had prohibited the public display of *all* movies, the First Amendment violation would have been even more palpable. *See Erznoznik*, 422 U.S. at 206-07. HB3's restrictions, moreover, are not only expansive; they also discriminate on the basis of content and speaker, triggering strict scrutiny yet again.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Laws that are content neutral on their face will nevertheless "be considered content-based regulations of speech" if they "cannot be justified without reference to the content of the regulated speech." *Id.* at 164. If "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction … that restriction may be content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022).

That is just the case here. HB3 singles out certain "social media platforms" because the state is concerned about the *content* minors may encounter on those services. The Act targets so-called "addictive" features and "functionalities allowing users to post, comment and privately chat," which are "inextricable from the *content* produced by those features." *Yost*, 716 F.Supp.3d at 557 (emphasis added). Indeed, as the House Speaker explained at the bill's signing ceremony (which the Governor livestreamed on Facebook), HB3 is aimed at the concern that covered services are "curating *content* for your children which is encouraging them to stay on just a few more hours longer every day *and is leading them and nudging them in a particular direction*." Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* ("Press Conf.") (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t (emphasis added).

HB3's speaker distinctions reinforce that conclusion. Courts are deeply skeptical of laws that "distinguish[] among different speakers," as "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). That principle has particular force when a law singles out for disfavored treatment some but not all those in the business of disseminating speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of*

*Revenue*, 460 U.S. 575 (1983); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60, 661 (1994).

HB3 facially "distinguish[es] among different speakers." *Citizens United*, 558 U.S. at 340. The definition of "social media platform" singles out a subset of online services for disfavored treatment, and those speaker distinctions are an obvious proxy for content discrimination. *See Reed*, 576 U.S. at 163-64. While the law purports to address "addictive features," it does not restrict access to all mediums that employ similar features to engage their audience. The law leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they employ the same so-called "addictive features." *See Reyes*, 2024 WL 4135626 at *15 & n.157. The state's only evident justification for restricting access to Facebook and YouTube while leaving many other mediums for speech untouched is its apparent belief the covered websites deliver *content* it thinks is particularly harmful. *See* Gov. Press Conf., *supra*, at 6:00-6:23. But that runs straight into the bedrock rule that the government cannot suppress constitutionally protected speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795.

Regulations based on so-called "addictive features"—i.e., how long users remain engaged—are particularly suspect, as the judgment that minors are spending too much time on certain media, whether it be comic books, video games, television,

or websites, is inherently content based. And singling out forms of speech that have proven particularly popular imposes a particularly significant First Amendment burden, as that distinctly burdens the content that people find most valuable. The impact on First Amendment values is devastating—which is why whether and what limits to put on screen time or video games or the like is a matter that has traditionally been reserved to parents, not to the government "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

## C. HB3 Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny.

To satisfy strict scrutiny, Florida must demonstrate that HB3 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Even intermediate scrutiny would require Florida to demonstrate that HB3 is "narrowly tailored to serve a significant governmental interest," *Packingham*, 582 U.S. at 105-06, that is "unrelated to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Florida cannot make either showing.

To the extent Florida seeks to justify HB3 on the theory that it "gives parents a greater ability to protect their children," Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a ("Gov. Press Release"), that argument fails at least twice over. For one thing, that interest would not justify barring minors under 14

from creating accounts on "social media platform[s]" altogether, *even if their parents approve*.  Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (4)(a), (4)(b)(1).  That Florida has taken that extreme step raises a serious concern that its true goal is to impose "what the State thinks parents *ought* to want," which is not a permissible ground for government interference with First Amendment rights.  *Brown*, 564 U.S. at 804.

But that aside, Florida's conception of how it may help parents "protect their children" reflects a fundamental misunderstanding of the proper role of government in family decision-making.  The Supreme Court has consistently held that parents— not the state—have the primary right and responsibility to guide their minor children's upbringing.  And the Court has expressed serious "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority."  *Id.* at 802.  Simply put, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority."  *Interactive Digit. Software Ass'n v. St Louis Cnty.*, 329 F.3d 954, 960 (8th Cir. 2003).  To accept such an interest "would be to invite legislatures to undermine the First Amendment rights of minors willy-nilly under the guise of promoting parental authority."  *Id.*

To the extent Florida seeks to justify HB3 on the ground that it helps protect minors from "predators," *see* Gov. Press Release, *supra*, that does not work either, as the law is again radically over-restrictive judged by that interest.  *See Fitch*, 2024

WL 3276409, at *14. In *Packingham*, North Carolina argued that barring convicted sex offenders from accessing "social media" was necessary to protect minors from predators. 582 U.S. at 106. The Court acknowledged the importance of that interest, but it nevertheless concluded that the law could not withstand even intermediate scrutiny because the state had narrower ways to achieve its goals. *Id.* at 108. If the First Amendment prohibits barring *convicted sex offenders* from using websites, laws restricting or even prohibiting innocent users' access to those same websites cannot possibly be narrowly tailored. And the state allows 14- and 15-year-olds unfettered access to the same services "so long as one parent … says it's OK," which again raises serious doubts HB3 is really motivated by concerns about potential predators. *Brown*, 564 U.S. at 802; *see also Yost*, 716 F.Supp.3d at 558; *Griffin*, 2023 WL 5660155 at *19-20.

Nor can Florida justify HB3 on the theory that it has an important interest in protecting minors from alleged "dangers" of "social media," such as "addiction," "higher rates of depression" and "self-harm." *See* Gov. Press Release, *supra*; Press Conference, *supra*, at 6:54-6:58. Even assuming the state could produce evidence that its concerns are real rather than conjectural, *but see Reyes*, 2024 WL 4135626 at *15 (finding that Utah could not), HB3 is not remotely tailored to that interest. The law does not single out any particular speech (let alone any *unprotected* speech) that might pose special risks to minors. It instead restricts (and sometimes

forecloses) minors' ability to access any speech on these services at all, regardless of whether the content has *any* capacity to lead to "depression" or "self-harm." HB3 thus hinders access not just to potentially harmful content, but to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Indeed, it would even preclude minors from accessing content and resources on these services that could help them cope with mental health struggles. On top of that, the Act has the practical effect of hindering adults from accessing the same services, even though the state has no legitimate reason to do so. *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57. While protecting minors from harm is certainly a laudable goal, the state's chosen means of achieving that interest are breathtakingly overbroad. *See Fitch*, 2024 WL 3276409, at *12.

Conversely, HB3 is "wildly underinclusive when judged against" any of the justifications the state has proffered. *Brown*, 564 U.S. at 802. The Act leaves online services with materially indistinguishable—indeed, sometimes identical—content and functionality uncovered just because they are preferred by a smaller percentage of minors and/or typically used for fewer hours a day. The law exempts services like Disney+, Hulu, and Roblox, even though they employ many of the same features HB3 denigrates as "addictive." The legislative record contains no evidence that "requiring social media companies to compel minors to push 'play,' hit 'next,' and

log in for updates will meaningfully reduce the amount of time they spend on social media platforms." *Reyes*, 2024 WL 4135626, at *15. And Florida is "perfectly willing" to let minors access supposedly harmful services "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802.

All of that "raises serious doubts about whether the government is in fact pursuing the interest[s] it invokes." *NIFLA v. Becerra*, 138 S.Ct. 2361, 2376 (2018). At bottom, the law really seems to be animated by a belief that minors are spending "too much" time on certain "social media platforms." In a word, HB3 is an Internet-rationing statute. But the state has no legitimate interest in restricting minors' ability to access and interact with mediums for protected speech just because it thinks they are spending too much time engaged in quintessential First Amendment activity. If it did, then the state could limit how much time minors spend reading graphic novels, playing video games, or binging TV shows too.

What is more, Florida cannot begin to demonstrate that it lacks less restrictive alternatives than restricting minors' (and adults') access to "social media platforms." When it comes to concerns about the Internet, the Supreme Court has repeatedly emphasized that enabling people to voluntarily restrict content at the *receiving* end is less restrictive than restricting access at the source. In *Ashcroft*, for example, the Court held that "[b]locking and filtering software is an alternative that is less restrictive than" an age-verification requirement because it "impose[s] selective

restrictions on speech at the receiving end, not universal restrictions at the source."
542 U.S. at 666-67. Similarly, in striking down an access restriction in *Playboy*, the
Court emphasized that cable systems "have the capacity to block unwanted channels
on a household-by-household basis," and that such "targeted blocking is less
restrictive than banning." 529 U.S. at 815. After all, "targeted blocking enables the
Government to support parental authority without affecting the First Amendment
interests of speakers and willing listeners." *Id.*[4]

Here, too, parents have ample tools at their disposal to restrict their minor
children's access to "social media platforms"—which unlike the services in those
cases, involve speech that is constitutionally *protected* as to minors—should they
want to do so. To be sure, parents may not always choose to utilize those tools in
the ways Florida wishes they would. But to the extent Florida is concerned that
parents do not understand how to utilize them, it "cannot show that the Act's
restrictions meet a substantial need of parents who wish to restrict their children's
access … but cannot do so." *Brown*, 564 U.S. at 803. After all, it is manifestly less
restrictive to educate parents about what tools are available and how to use them,

---

[4] In fact, Florida appears to take just this approach when it comes to limiting
minors' access to "social media" in schools. Florida recently passed a law restricting
the use of cell phones during instruction time and requiring school officials to block
"social media" websites on school devices. *See* Fla. H.B. 379 (2023). Florida has
not explained why parents cannot adopt a similar approach if they wish to limit their
children's access at home—which suggests that its real goal is to substitute its *own*
judgment about whether "social media" is appropriate for minors.

and "a court should not presume parents, given full information, will fail to act."

*Playboy*, 529 U.S. at 824.  To the extent Florida's real concern is that parents do not

share its views about the propriety of "social media platforms" for minors, the law's

"effect is only in support of what the State thinks parents *ought* to want," which,

again, is not a permissible ground for government interference with First

Amendment rights.  *Brown*, 564 U.S. at 804.

## II.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo.

The other preliminary injunction factors favor maintaining the status quo

while this case is litigated to final judgment.  Because CCIA and NetChoice "have

shown a likelihood of success on the merits, the remaining requirements necessarily

follow."  *See Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024).

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373

(1976); *see also Otto*, 981 F.3d at 870.  And the harm here is not just to member

companies, but to millions of minors who will be cut off from vital channels of

communication, education, and self-expression.    Schruers.Decl.¶¶20-24;

Cleland.Decl.¶¶21-23a, 24a, 25-28; Boyle.Decl.¶¶9-10; Veitch.Decl.¶30.   In fact,

some members, like YouTube, may be forced to quit providing family-friendly

versions of their service (e.g., YouTube Kids) altogether, degrading the value of their

services.    Veitch.Decl.¶¶34-35, 39, 42.    If HB3 is allowed to take effect, its

restrictions will cause an irreparable loss of First Amendment freedoms on a massive scale and would restrict minors in Florida from accessing speech that their peers in other states may access.

The harm is especially acute because the Act imposes severe sanctions for knowing and reckless violations. Violators face up to $50,000 in civil penalties per violation for each new account. As CCIA and NetChoice members explain in their declarations, complying with HB3's burdensome requirements would require significant changes to existing services and impose significant costs that cannot be recouped at the conclusion of this lawsuit. Schruers.Decl.¶¶25-28; Cleland.Decl.¶¶23b-c, 24b-26, 29; Boyle.Decl.¶¶9-10; Veitch.Decl.¶¶41-42. So unless the Attorney General is preliminary enjoined from enforcing HB3 while the lawsuit proceeds, CCIA and NetChoice members who are covered by the law will face a perilous choice between exposing themselves to massive liability for disseminating speech to minors or taking costly and burdensome steps that will drastically curtail access to their services—all before a court decides the merits of their claims. *See Floridians Protect. Freedom, Inc. v. Ladapo*, 2024 WL 4518291, at *5 (N.D. Fla. Oct. 17, 2024).

The balance of equities and the public interest both favor an injunction. "It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional" law. *Otto*, 981 F.3d at 870. And the state has not

proceeded as if its interests demand immediate enforcement, as the legislature delayed the effective date of HB3 by more than nine months. Maintaining the status quo until the glaring constitutional problems with HB3 can be fully adjudicated will cause little if any harm to the state. The remaining preliminary injunction factors thus favor maintaining the status quo.

## CONCLUSION

The Court should preliminarily enjoin the Attorney General, as well as all officers, agents, and employees subject to her supervision, direction, or control, from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1), against CCIA's and NetChoice's members.

Respectfully submitted,

/s/ *Douglas L. Kilby*

Paul D. Clement
Erin E. Murphy
James Y. Xi (*PHV application forthcoming*)
Joseph J. DeMott (*PHV application forthcoming*)
Mitchell K. Pallaki (*PHV application forthcoming*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Douglas L. Kilby
Florida Bar No. 73407
Hannah E. Murphy
Florida Bar No. 1032756
Abby Corbett
Florida Bar No. 31332
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com
acorbett@stearnsweaver.com
boneal@stearnsweaver.com
lrussell@stearnsweaver.com
mperez@stearnsweaver.com

*Counsel for Plaintiffs Computer & Communications Industry Association and NetChoice*

October 29, 2024

**CERTIFICATE OF CONFERENCE**

I certify that, pursuant to Local Rule 7.1(B), I attempted in good faith to resolve the issues presented in this motion through a meaningful conference with counsel for the Defendant on October 28, 2024.  Defendant does <u>not</u> consent to the relief requested.

October 29, 2024                                    */s/ Douglas L. Kilby*
                                                                Douglas L. Kilby


**CERTIFICATE OF COMPLIANCE**

This memorandum complies with the type-volume limitation of Local Rule 7.1(F) because this memorandum contains 7,708 words, excluding the parts of the memorandum exempted by Local Rule 7.1(F).

October 29, 2024                                    */s/ Douglas L. Kilby*
                                                                Douglas L. Kilby


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 29, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.  In addition, because counsel for

the Defendant has not yet appeared in this case, I caused a copy of this filing to be

hand delivered on Defendant at:

> ASHLEY BROOKE MOODY, in her official
> capacity as Attorney General of the State of Florida
> Office of the Attorney General
> State of Florida
> PL-01 The Capitol
> 400 S. Monroe Street
> Tallahassee, FL 32399-1050

*/s/ Douglas L. Kilby*
Douglas L. Kilby