**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

      *Plaintiffs*,

      v.

ASHLEY BROOKE MOODY, in her
official capacity as Attorney General of
the State of Florida,

      *Defendant*.

Case No.: 4:24-cv-00438-MW-MAF

**<u>DECLARATION OF BARTLETT CLELAND IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

I, Bartlett Cleland, declare as follows:

1.　　I am the General Counsel and Director of Strategy Initiatives of Plaintiff NetChoice. As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of the association's objectives, as well as represent the association in public forums, at industry events, and in meetings with government officials and agencies. I work with team members to execute the association's lobbying efforts at federal and state levels, educating lawmakers and regulators on tech issues, in service of the organization's mission. I also assist in developing the association's policy agenda, working closely with the CEO, Board of Directors, and members to identify legislative and regulatory priorities. My role at NetChoice and my previous experience—which includes being a known thought leader, writer and speaker on all issues of innovation, communications and technology, having spent twenty six years in the technology and innovation public policy space—has also made me familiar with other websites, applications, and digital services more broadly.[1]

2.　　I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein.

---

[1] This Declaration will refer to all digital services covered by the Act as "covered websites," unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.    About NetChoice.

3.    NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet.

4.    For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, Prizepicks,

---

[2] NetChoice, Home, https://tinyurl.com/bdne27n.

Snap Inc., StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo![3]   Many of these members operate websites that are among the Internet's most popular destinations, disseminating billions of user-generated posts.   Other members' websites serve comparatively smaller communities.

**II.    NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.**

5.    NetChoice members' websites are full of a wide range of valuable expression and provide access to various communities.   Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech. They do so in a wide variety of ways—socially (to connect with friends from school and church, form groups, or find communities of those with likeminded interests), demonstratively (to showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or current events), politically (to participate in public discussion or raise awareness about social causes), educationally (to get help with math problems, learn about financial literacy, or listen to college course lectures), as well as a myriad of other ways.

---

[3] NetChoice, About Us, https://tinyurl.com/3vdmvstv.

3

6.      The specific communities that NetChoice members offer and foster each differ, thereby providing users with different benefits.  On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services.  On Instagram, users can share vacation pictures and short informative videos.  On Snapchat, users can share moments with friends and family.  And on YouTube, users can watch documentaries.

### III.    Parents have many tools to supervise their minor children online, and NetChoice members go to great lengths to protect minors.

7.      With existing and widely available tools, parents and guardians have many choices to monitor and supervise their minor children's use of the Internet. These tools both overlap and complement each other.  Of course, parents can also control whether their minor children have access to Internet-connected devices in the first place.

8.      **Device-level restrictions.**  When parents give their minor children access to Internet-connected devices, they can take advantage of the built-in tools in the device to restrict their children's use.  Specifically, many of the manufacturers of the most widely used mobile phones and tablets publicize the ways parents can limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings.  *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://tinyurl.com/uxfnna4y (last

visited Oct. 23, 2024); Google, Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited Oct. 18, 2024); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited Oct. 18, 2024); Samsung, Set Up Family Groups and Parental Controls with Your Samsung Account, https://tinyurl.com/3ynpc7hc (last visited Oct. 25, 2024). Likewise, third-party applications allow parents to monitor their minor children's activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2024, Tested by Our Editors*, CNN underscored (Mar. 11, 2024), https://tinyurl.com/s6bje2jd.

9. **Network-level restrictions.** Many cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access; to block certain apps, sites, and contacts from their children's phones; and to restrict screen time on devices. *See, e.g.*, Verizon, Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family, https://tinyurl.com/ycyxy6x6 (last visited Oct. 18, 2024); AT&T, AT&T Secure Family App, https://tinyurl.com/d995ya2u (last visited Oct. 23, 2024); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac (last visited Oct. 18, 2024); Comcast Xfinity, Parental Controls for Xfinity Internet and TV, https://tinyurl.com/2rwyt7mv (last visited Oct. 23, 2024). Similarly, many wireless routers (the devices that provide wireless Internet in homes) publicize their parental control settings that parents can use to block specific online services; allow

5

only those online services that a parent specifies; limit the time that their children spend on the Internet by turning off the home Internet at specified hours, by pausing Internet access for specific devices or users, or by limiting the amount of time a particular website or service may be accessed; set individualized content filters; and monitor the online services that their children visit. *See* Molly Price & Ry Crist, *Take a Moment to Set Up Parental Controls on Your Router*, CNET (Sept. 24, 2024), https://tinyurl.com/mtvdwypu; Netgear, NETGEAR Smart Parental Controls, https://tinyurl.com/me3ksfvu (last visited Oct. 23, 2024).

10.   **Browser-level restrictions.**   Internet browsers also allow parents to control what online services their minor children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022). Some of these browsers permit parents to set up a "Kids Mode," which allows children to access only a pre-approved list of websites. *See* Microsoft, Learn More About Kids Mode in Microsoft Edge, https://tinyurl.com/59wsev2k (last visited Oct. 18, 2024); Google, Google's Parental Controls – Google Safety Center, https://tinyurl.com/kwkeej9z (last visited Oct. 18, 2024). Some even provide "activity reports" to notify parents which applications and websites a child accesses most often. *Id.* Similarly, third-party software and browser extensions are also widely available to reinforce these tools

6

on browsers. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://tinyurl.com/mwz58dcr.

11.    **Application-level restrictions.** On top of all that, NetChoice members provide parents with many tools to decide what their children can see and do on their services, as their declarations explain. They have devoted extensive resources to developing policies and practices to protect minors who use them. These tools serve as the tangible examples of NetChoice's position—that the best solution to protect children online is a private solution—at work. NetChoice members give parents, as the proper decisionmakers, an array of tools to guide and oversee their children's online access without barring children from accessing important educational and creative resources. And because parents are in the driver's seat, parents can make independent decisions about their children based on their family's unique needs in the privacy of their own homes—they can choose how and when to access the protected speech environments NetChoice members have created without divulging sensitive or private information.

a.    For example, Meta has supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week, and their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook

friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://tinyurl.com/mvm234vn (last visited Oct. 21, 2024).

b.     Instagram currently offers Supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time their teen has spent on Instagram; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://tinyurl.com/zxxmmbhb (last visited Oct. 4, 2024). Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, https://tinyurl.com/22fwuzz9 (last visited Oct. 23, 2024). Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less-strict settings. *Id.* Via Teen Accounts, parents will have added supervision features, including ways to get insights into whom

8

their minors are chatting with and whom they have blocked, as well as seeing topics their minors are looking at. *Id.*

      c.    And for teenage users, Snapchat provides parents and guardians the "Family Center," where parents and guardian can see with whom their teens have communicated in the last seven days; review their teens' existing friends and any they have recently added; limit their teens' ability to view certain content from public sources; review their teens' safety and privacy setting; and report any accounts that might be of concern to parents. *See* Snap Inc., Snapchat Support, What is Family Center?, https://tinyurl.com/yck6j6sz (last visited Oct. 23, 2024); Snap Inc., Snapchat Safeguards for Teens, https://tinyurl.com/mvas8784 (last visited Oct. 23, 2024).

12.    All NetChoice members prohibit minors younger than 13 from accessing their main services. However, some members, like YouTube via YouTube Kids and its "Supervised Experience" on YouTube, offer separate experiences for users under 13 geared for that specific age group. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Oct. 23, 2024); YouTube Help, What Is a Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Oct. 23, 2024). These youth-specific services also allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

13.    NetChoice members also implement other measures that further promote minors' safety while accessing these services.

a.    For example, Instagram and YouTube have implemented "age gating" features to ensure that users are able to view only age-appropriate content. *See* Instagram, Updates to the Sensitive Content Control (June 6, 2022), https://tinyurl.com/y8y8ds7p; YouTube Help, Age-Restricted Content, https://tinyurl.com/52hmx4ze (last visited Oct. 23, 2024).

b.    Others, like Snapchat and Instagram, automatically impose default privacy settings for minors' accounts. *See* Snap Inc., Snapchat Safeguards for Teens, https://tinyurl.com/mvas8784 (last visited Oct. 22, 2024); Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, https://tinyurl.com/22fwuzz9 (last visited Oct. 23, 2024).

c.    Instagram further protects minors through safety notices that encourage them to be cautious when interacting with other users and that notify them if another user has exhibited suspicious behavior, such as sending a large number of messages or friend requests to users under 18. Instagram, Continuing to Make Instagram Safe for the Youngest Members of Our Community (Mar. 17, 2021), https://tinyurl.com/3mzwpj4s. Instagram also

gives minors the option to end their interaction with the flagged user or to block them. *Id.*

14.    And any minor-specific policies and parental tools exist alongside the websites' overall features and generally applicable "content-moderation" policies that help foster the communities and unique user experiences these services offer.

15.    NetChoice members provide users with the option and the tools to control the content they see and the users they interact with. This generally comes in the form of tools that allow users to decide whom to follow, whether to block or mute users they wish to restrict their interactions with, and to search or hide content based on their personal preferences. For example, Facebook permits users to customize the content they see by hiding posts or content from specific users and groups. Facebook, Help Center: Control What You See in Feed on Facebook, https://tinyurl.com/y6x9sd8b (last visited Oct. 23, 2024). Similarly, Instagram gives them options to filter the content they see by using keyword filters or using the "not interested" button. Instagram, How to See More of What You Want on Instagram (Aug. 30, 2022), https://tinyurl.com/4ax2849b. These tools promote opportunities for users to better engage with NetChoice members' services and the unique communities they offer.

16.    And NetChoice members limit publication of speech that they consider harmful, objectionable, or simply not conducive to their communities.

11

Consequently, NetChoice members publish and enforce bespoke content-moderation policies that address the publication of such prohibited content. Through these policies, members remove, restrict, or add warning labels to content deemed to violate the policies as well as suspend or ban accounts that post such content. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://tinyurl.com/yc7mm3hm ("By the Numbers"). By removing such content, NetChoice members have also curated the material on their websites to further ensure that minors are protected from objectionable content. By way of example, YouTube has implemented policies and procedures to protect minors from content promoting eating disorders and to limit their access to content likely to cause teens to have a negative self-image regarding their body types. YouTube, Building Content Recommendations to Meet the Unique Needs of Teens and Tweens, https://tinyurl.com/dcyz9uv3 (last visited Oct. 23, 2024).

17.    Broadly, NetChoice members have pursued measures to help promote minors' safety on their services and to promote parents' ability to control and monitor the activities of their children. This empowers families to make decisions that fit their particular needs and experiences about how their children should interact with

and access members' services.  This reflects NetChoice's commitment to protecting

and respecting families' private choices about how to use online services, knowing

that they are best situated to make the appropriate decisions for themselves.

**IV.    The Act's effect on NetChoice members and the Internet.**

18.    I understand that Florida House Bill 3 ("the Act") was signed into law

on March 25, 2024, and that it takes effect January 1, 2025.

19.    I understand that the Act regulates "social media platform[s]." Fla. Stat.

§501.1736(1)(e).  I understand that the Act defines "social media platform" as "an

online forum, website, or application" that "[a]llows users to upload content or view

the content or activities of other users." *Id.*   But it does not sweep in all potential

services that enable users to share and view content.  Rather, the Act limits its

coverage to online services that facilitate the most First Amendment protected

activity.  An online service qualifies as a "social media platform" only if (1) "[t]en

percent or more of the daily active users who are younger than 16 years of age spend

on average 2 hours per day or longer" on the service "on the days when using" the

service; (2) it "[e]mploys algorithms that analyze user data or information on users

to select content for users"; and (3) has one or more "addictive features." *Id.*  HB3's

list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush

notifications," "personal interactive metrics," "[a]uto-play" functions, and "[l]ive-

streaming ... functions." *Id.* The Act excludes any service on which "the exclusive function is e-mail or direct messaging." *Id.*

20.    Although aspects of the Act's definition are vague and do not make clear the full extent of the entities governed by its provisions, I understand that some NetChoice members appear to be regulated the Act. These include, at least the following members: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram.

21.    NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that the Act, should it take effect, would irreparably harm our members and their business models by repelling both adult and non-adult users. This could lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.

22.    Additionally, as explained below, many of NetChoice members will face significant difficulty in implementing the Act's provisions, thereby hindering their business interests. These burdens on speech and business of NetChoice members are imposed even though, as this Declaration details, NetChoice members

14

already have detailed policies and features in place allowing parents to monitor their children's online activities, to limit what they may access or whom they may contact, and to stop their children from spending too much time on these covered websites (however their parents see fit). Put differently, HB3's blunt denial of access to minors displaces the more nuanced tools NetChoice members already have in place that empower parents and give them greater control over their children's online usage.

23.  ***Restrictions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platform[s]" altogether. Fla. Stat. §501.1736(2)(a). It also requires "social media platform[s]" to terminate any existing accounts held by minors under the age of 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b).

a.  The ban on minors under 14 significantly burdens their First Amendment rights by denying them all access to the myriads of resources available on NetChoice members' social media sites. They will no longer be able to use these sites for art, education, gaming, general interest, information gathering, professional activities, research, political engagement, and participation in religious services and communities. And it will deny certain

minors the benefits that social media provides by giving them a community to explore their personal interests and identity. Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), available at https://tinyurl.com/t2rejxyx.

b.    Not only will these rules impede access to protected speech, but compliance with the ban will also be burdensome on NetChoice members. Given covered members will need to assess the age of existing account holders before they access the covered websites to ensure no minor under 14 creates an account, Fla. Stat. §501.1736(2)(a), they will need to implement procedures that accurately determine the age of future account holders. Accuracy is particularly important as HB3's implementing regulations impose liability a covered website's "fail[ure] to perform reasonable age verification" after learning that an accountholder may in fact be a minor. Fla. Admin. Code §2-43.002(3)(a).

c.    Given these regulations deem "reasonable age verification" procedures as state-approved methods for complying with HB3, NetChoice members will be compelled to implement such age verification processes if the law takes effect. Designing and maintaining comprehensive systems to comply with the regulations implementing the Act will be extremely costly, time-consuming, and resource intensive. The burdens increase with the level

of certainty with which companies must verify ages. These costs will hamper both NetChoice members by requiring that they expend significant resources that cannot be recouped. And adding additional processes at sign up inevitably affect account-holder growth, as cumbersome registration processes can dissuade people from signing up. Any decline in account-holder signups or current accounts will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality. And of course, decline in usage means fewer people avail themselves of the valuable speech available on the websites.

24.    ***Restrictions on 14- and 15-year-olds.*** HB3 also prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). It also requires "social media platform[s]" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." HB3 specifies that if the parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §501.1736(4).

a.    As was the case with the restrictions on minors under 14, these provisions burden the speech rights of 14- and 15-year-olds. By requiring prior parental approval before these minors may access any of covered members' services, HB3 directly denies them their First Amendment right to connect with communities holding shared interests, express themselves, and find educational or valuable content, even if their parents do not oppose or would like them to be able to access such information.

b.    The parental consent restriction would also impose significant costs on NetChoice members who seek to comply with its provisions. Because the parental consent provision covers both accountholders who actually are 14- or 15-year-olds and those who are "likely" that age, Fla. Stat. §501.1736(3)(a), (b), and because the implementing regulations similarly require age verifications for such accountholders as well, Fla. Admin. Code §2-43.002(3)(a), members will again be forced in practice to verify each accountholder's age. That imposes the costs noted above applicable to the restrictions for minors under 14.

c.    The parental consent component adds another layer of costs and burdens. Under the Act's implementing regulations, covered websites must "conduct reasonable parental verification before allowing [the parent to] exercise … any right [under HB3]." *Id.* §2-43.002(2). Developing and

18

deploying such procedures is also costly, time consuming, and resource intensive. And verifying a genuine parent-child relationship to ensure that the parent may properly provide consent for the child will require covered websites to identify both the minor and the parent (or guardian), which intrudes on both of their privacy rights. It will create friction impeding users' willingness and ability to use the services.

d.    Covered websites also face many difficulties in securing parental consent. For example, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed, families are nontraditional (like foster families), families have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

25.    Furthermore, HB3 further chills online First Amendment protected speech when it imposes significant costs on online services that currently serve minors (i.e., by requiring covered services to implement cost-prohibitive procedures to comply and by threatening significant penalties, up to $50,000, for each violation, Fla. Stat. §501.1736(5)). There is a serious risk that NetChoice members, when confronted with these costs, will be discouraged from providing child-appropriate online services or disseminating content geared to such minors. And there is an equally serious risk that they might also institute higher age barriers than required

19

for all users, even though doing so would prevent their services from reaching all who would benefit from their communities and content. These ancillary costs to speech as a result of HB3 hamper members' ability to disseminate the valuable expression found on their websites and conflict with NetChoice's mission to promote free expression on the Internet.

26.     In addition to restricting the speech of minors, the restrictions on minors under 14 and those imposed on minors who are 14 and 15 years old would also burden the speech of adults. The Act requires covered members to terminate the accounts of those who are "treat[ed] or categorize[d] as belonging to an account holder who is likely younger than 14 years of age" or "is likely 14 or 15 years of age." Fla. Stat. §501.1736(2)(b), (3)(b). In both instances, the Act puts the onus on the account holder to contest the termination. *Id.* Further, regulations implementing HB3 require covered members to conduct "reasonable age verification" if the "facts or circumstance readily available to" them "should reasonably have [] aroused [a] question whether the person was a child." Fla. Admin. Code §2-43.002(3)(a). Such restrictions imperil the speech rights of adults, who could be forced to provide documentation to ensure they can maintain access to NetChoice members' services. These and the costs attendant to implementing procedures that will be needed to comply with these provisions are likely to dissuade many adults from using the

20

website, which further undermines the ability for those interested to access the valuable expressive content available on these covered websites.

27.    In addition to the burdens applicable to each provision, HB3's strictures across the board implicate those rights held by NetChoice members. By restricting who may access covered members' services, HB3 directly abridges members' ability to disseminate information. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2401-02 (2024). And yet, HB3 prohibits NetChoice members from exercising their rights to disseminate their speech and the speech of others to the audience that wishes to interact with their services. HB3 therefore does further harm by impinging on the valuable speech rights of covered websites.

28.    And these irreparable harms and burdens on free speech caused by HB3 are particularly notable given it targets only the most (so-called) "addictive" websites—a euphemism for the most popular social media services. *See* Fla. Stat. §501.1736(1)(e); Press Conference, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media*, 6:00-6:23 (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. By denying minors and adults access to these popular websites and the expressive content they carry, HB3 ultimately burdens substantial amounts of protected speech where that speech is most abundant. Such a result flies

21

in the face of the First Amendment, which protects against the government's "tilt[ing] public debate" in its favored direction by selectively regulating only "those actors [who] possess [the most] enviable vehicle[s] for expression." *Moody*, 144 S.Ct. at 2407 (quotation marks omitted).

*       *       *

29.    In short, NetChoice members would incur substantial, unrecoverable costs in complying with HB3's burdensome requirements. These costs could not be recouped even if NetChoice's challenge to the law were ultimately successful on the merits. And if the Act takes effect on January 1, 2025, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially impaired—as would its affected members' minor and adult account holders and users (both current and prospective).

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 29 day of October, 2024, in Washington, DC.

Bartlett Cleland