# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, <br><br> *Plaintiffs*, <br><br> v. <br><br> ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida, <br><br> *Defendant*. | Case No. 4:24-cv-00438-MW-MAF |

## AMENDED JOINT REPORT ON PARTIES' MEET AND CONFER REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

As required by this Court's November 8, 2024 Order, DE30, the Parties met and conferred via email and videoconference. As the result of those conferences, the Parties amend their prior joint report (DE25) as follows:

A. The parties do not anticipate the need for live testimony at the hearing on Plaintiffs' Motion for Preliminary Injunction, DE2.

B. The parties do not object to the admissibility of each other's declarations on the ground that they are out-of-court statements, but they reserve their right to object to the admissibility of each other's declarations on other grounds and to make arguments concerning the weight to be accorded those declarations.

1

C. The Attorney General is willing to stay any enforcement of the challenged statute against Plaintiffs' members after the statute's effective date until the Preliminary Injunction Motion is resolved.

D. The parties have reached agreement on a briefing schedule:

- Plaintiffs will make their declarants available for deposition before January 1, 2025.

- Defendant's response to the Motion and her motion to dismiss are due January 13, 2025.

- Defendant will make her experts available for deposition between January 13, 2025 and February 10, 2025.

- Plaintiffs' response to Defendant's motion to dismiss and reply in support of the Motion are due February 14, 2025.

- Defendant's reply in support of her motion to dismiss is due February 21, 2025.

- Hearing will be scheduled on February 27 or 28, 2025.

E. The parties have not reached agreement on the scope of Defendant's depositions of Plaintiffs' declarants (Alexandra Veitch, YouTube; David Boyle, Snap; Bartlett Cleland, NetChoice; and Matthew Schruers, CCIA).

**<u>Defendant's Position on the Depositions</u>**

On November 8, this Court held a telephonic hearing, at which it concluded that Defendant may depose Plaintiffs' declarants before filing her response to the preliminary-injunction motion. The Court indicated that Defendant should have a meaningful opportunity to test the factual basis for the preliminary-injunction

motion and that relevancy will be the benchmark for the scope of the depositions. Plaintiffs offered the declarations to establish the facts that they believe support the extraordinary remedy of a preliminary injunction to enjoin a sovereign state's law, and Defendant should have a chance to depose the declarants about the general subjects that they have testified to, just as if the declarants testified at a hearing and opened the door to cross-examination on the subjects.

On November 13, Defendant provided Plaintiffs a list of seven topics that she intends to address at the depositions. Defendant developed the topics based on the factual allegations and legal arguments that Plaintiffs advance in their preliminary-injunction motion. In an effort to streamline the parties' meet-and-confer and provide Plaintiffs additional guidance about the scope of the topics, Defendant also listed specific matters that Defendant intends to address at each witness's deposition. The matters fit within one or more of the topics and are tailored to the applicable witness based on the witness's declaration.

Plaintiffs object to three of the seven topics and to many of the specific matters that Defendant identified. Below are the seven topics with Plaintiffs' objections and Defendant's positions both noted, pp. 4–8, and the list of specific matters with Plaintiffs' objections and Defendant's positions noted, pp. 8–45. If no objection is noted, the parties agree on the topic or matter.

**<u>Plaintiffs' Position on the Depositions</u>**

Plaintiffs maintain that no discovery is necessary to rule on their preliminary injunction motion, which raises pure questions of law.  Discovery at the preliminary injunction stage is the exception not the rule.  To obtain discovery at the preliminary injunction stage, Florida must identify "specific, limited, and identifiable pieces of information" that are "narrowly tailored to the purpose warranting expeditious treatment." *Mullane v. Almon*, 339 F.R.D. 659, 663-64 (N.D. Fla. 2021).  The state's proposed discovery is far from narrowly tailored.  Even though Plaintiffs have attempted to accommodate the state by agreeing to most of its proposed topics, the state insists on engaging in a speech-chilling fishing expedition by questioning Plaintiffs' declarants on anywhere between 26 and 37 separate topics—many of which have nothing to do with the subject matter addressed in the declarations, have no relevance to the issues raised in Plaintiffs' Preliminary Injunction Motion, or seek testimony on legal conclusions from fact witnesses.

### <u>Topics</u>

1.     Plaintiffs' standing. DE1 ¶¶ 9–11.

2.     How HB3 affects minors' access to members' platforms. *See* DE5 at 22–26 (arguing that HB3 should be enjoined because it denies minors "access" to the platforms); DE1 ¶¶ 55, 58–59.

3. How HB3 affects adult access to members' platforms. *See* DE5 at 27–28 (arguing that "HB3 also burdens the First Amendment rights of adults to access covered services"); DE1 ¶ 62.

4. Florida's interest in regulating minor accounts on the platforms. *See* DE5 at 32–35 (arguing that Florida lacks a "compelling" or "significant" governmental interest" for HB3).

- **Defendant's Position:** Plaintiffs argue that protecting minors is not an adequate governmental interest for HB3. The declarants offer testimony in support of that claim, attempting to rebut Florida's governmental interest. The declarants state that the platforms use various mechanisms to make their services safe for minors. The declarants also offer testimony about the platform features that HB3 identifies as addictive. Examining the declarants about that testimony is necessary for Defendant to properly defend against the preliminary-injunction motion. Moreover, discovery related to the State's governmental interest for a law is standard in constitutional litigation.

- **Plaintiffs' Objection:** None of the declarants discuss whether any of the state's potential interests are compelling or significant. Those are legal conclusions. And contrary to the state's suggestion,

Plaintiffs have never argued that the state lacks a governmental interest in "protecting minors." Instead, Plaintiffs argue that HB3 is not a narrowly tailored way of "protecting minors." To the extent Florida has not developed a factual basis to justify HB3, the law should not take effect. Florida is not entitled to subject Plaintiffs' declarants to lengthy and invasive depositions at the preliminary injunction stage in hopes of concocting a *post hoc* rationalization for its law.

5.    Whether HB3 is sufficiently tailored. *See* DE5 at 32–38 (arguing that HB3 is not sufficiently tailored because, among other things, "parents have ample tools at their disposal to restrict their minor children's access to 'social media platforms'").

- **Defendant's Position:** Plaintiffs argue that HB3 is not sufficiently tailored because the platforms already employ tools that protect minors. The declarants testify in support of that claim, opining on various tools and policies related to minors. Examining the declarants about that testimony is necessary for Defendant to properly defend against the preliminary-injunction motion.

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state limits its questions to the tools discussed in the declarations. But to

the extent the state intends to ask questions about tools not discussed in the declarations, *see, e.g.*, Veitch topic #4, such questions sweep beyond the subject matters raised in the declarations.

6.    The status quo for the members and users, including the extent to which members already must comply with legal requirements related to minors. *See* DE5 at 38–40 (arguing that if HB3 goes into effect, platforms will have to alter their services).

- **Defendant's Position:** Plaintiffs argue that "complying with HB3's burdensome requirements would require significant changes to existing services and impose significant costs that cannot be recouped at the conclusion of this lawsuit." DE5 at 39. The declarants offer testimony in support of this claim, emphasizing that if HB3 goes into effect, the platforms will incur compliance costs. Defendant disputes those assertions. Examining the declarants about that testimony is necessary for Defendant to properly defend against the preliminary-injunction motion. The present legal-compliance obligations of Plaintiffs' members are plainly relevant to the marginal burdens HB3 would create.

- **Plaintiffs' Objection:** Questions about the extent to which members comply with legal requirements elsewhere sweep far beyond the subject matters raised in the declarations. They also have nothing to do with the First Amendment issues in the case. There is no dispute that some of Plaintiffs' members will incur some compliance costs, which suffices to establish that at least one CCIA member and at least one NetChoice member has standing to challenge HB3. To the extent the state wants to know the *extent* of those compliance costs, that is irrelevant to any of the issues raised in the preliminary injunction motion. On the merits of the First Amendment issue, the relevant burden is the burden HB3 imposes on the First Amendment rights of minors, adults, and CCIA and NetChoice members. On irreparable harm, the principal irreparable harm is the harm to First Amendment rights.

7.    Witness credibility and the veracity of the allegations in the declarations.

## **Witness-Specific Matters**

### **Alexandra Veitch**
### **(YouTube's Declarant)**

1.    Her background, experience, and biases.

2.    Involvement in drafting her declaration.

- **Defendant's Position:** This line of questioning is standard in a deposition in which the deponent has submitted a declaration.

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state seeks to inquire about Ms. Veitch's personal knowledge of what is included in her declaration.  Plaintiffs object to questions related to the drafting process, which is privileged and irrelevant to the issues raised in the preliminary injunction motion.

3.    The legislative and regulatory landscape facing YouTube, including the Children's Online Privacy Protection Act (COPPA), the European Union's General Data Protection Regulation and Digital Services Act, and the Federal Trade Commission's Consent Order against Google LLC and YouTube in case no. 1:19-cv-02642, in the United States District Court for the District of Columbia.

- **Defendant's Position:** The regulatory landscape is relevant to Plaintiffs' argument that HB3 will burden platforms and impose new compliance costs on them. Both those matters are disputed. And Ms. Veitch offers testimony in support of Plaintiffs' argument, stating

that "if the Act takes effect . . . , Google and YouTube will suffer . . . [new] unrecoverable compliance costs." DE5-1 ¶ 42. Ms. Veitch also attests that she has knowledge of regulatory matters. DE-5 at ¶ 1 (providing that Ms. Veitch "monitors and assesses the U.S. legislative and regulatory landscape" for purposes of assessing "YouTube's ability to provide services and content").

- **Plaintiffs' Objection:** Ms. Veitch never mentions COPPA, the EU laws, or the FTC's order against Google and YouTube in her declaration. Questions about those topics go far beyond the state's request to ask about the subject matters raised in her declaration. They also have nothing to do with the First Amendment issues raised in the preliminary injunction motion. There is no dispute that Google and YouTube will suffer some compliance costs, which suffices to establish that at least one CCIA member and at least one NetChoice member has standing to challenge HB3. To the extent the state wants to know the *extent* of the costs, that is beyond the scope of the declaration and irrelevant to any of the issues raised in the preliminary injunction motion. On the merits of the First Amendment issue, the relevant burden is the burden HB3 imposes on the First Amendment rights of minors, adults, and CCIA and

10

NetChoice members.  *See* DE5 at 19-22.  On irreparable harm, the principal irreparable harm is the injury to First Amendment rights. *Id.* at 32.

4.    Google's operation of an applications store, and its market power toward device manufacturers.

- **Defendant's Position:** Plaintiffs allege that their members, such as Google, employ various measures to protect minors, including "[a]pplication-level tools." DE5 at 14. The extent to which Google deploys age-related tools in operating its applications store is relevant to that allegation. That topic is appropriate for Ms. Veitch because she has offered testimony about Google and YouTube's use of age-related tools. DE5-1 ¶¶ 12–16.

- **Plaintiffs' Objection:** Ms. Veitch never mentions tools related to the Play Store—which is a separate application and not related to or part of YouTube—or Google's supposed "market power toward device manufacturers" in her declaration.  While Plaintiffs do not object to questions about the "application-level tools" actually discussed in the declaration (e.g., YouTube Kids and Supervised Accounts, *see* DE5-1 ¶¶ 12-16), questions about Google's Play Store and supposed "market power" go far beyond the state's request to

ask about the subject matters raised in her declaration and are irrelevant to the First Amendment issues discussed in the preliminary injunction motion.

5. Google's "Legislative Framework."

6. Google's lobbying activities on federal and state legislation.

- **Defendant's Position:** Ms. Veitch makes several representations about Google and YouTube's support for regulation protecting minors. DE5-1 ¶ 7 (representing that YouTube "invest[s] immense resources" in protecting minors); DE5-1 ¶ 30 ("Google and YouTube support regulations designed to protect the well-being of minors online[.]" (citing Google's Legislative Framework to Protect Children and Teens Online)); *see also* DE5-1 ¶ 1 (providing that Ms. Veitch "monitors and assesses the U.S. legislative and regulatory landscape" for purposes of assessing "YouTube's ability to provide services and content"). That testimony is relevant to Plaintiffs' assertion that the platforms are committed to voluntarily protecting minors, such that state regulation is unnecessary. Examining Ms. Veitch about the testimony is also necessary to test the veracity of her claims about Google's commitment to protecting minors.

- **Plaintiffs' Objection:**    Ms. Veitch never mentions Google's lobbying efforts, and those efforts have nothing to do with the First Amendment issues raised in the preliminary injunction motion. Defendant may ask questions about Google's "Legislative Framework" and support of other regulations designed to protect minors, which are actually discussed in the declaration. DE5-1 ¶ 30. But questions about Google's general lobbying efforts anywhere in the country sweep far beyond the subject matters raised in the declaration, and whether Google is voluntarily committed to protecting minors does not bear on the First Amendment issues raised in the preliminary injunction motion.

7.    YouTube's use in Florida by adults and children.

8.    YouTube's "addictive features" under HB3 (*see* Fla. Stat. § 501.1736(1)(e)); the algorithms utilized; and YouTube's ability to turn those features off.

- **Defendant's Position:** Ms. Veitch testifies about YouTube's features, including "autoplay" and its automated "recommendation system," which Florida submits are addictive and contribute to HB3's governmental interest. DE5-1 ¶ 17 (discussing "autoplay" and YouTube's "recommendation system," which is operated by

13

algorithms and "expose[s]" children to content); ¶ 24 (discussing YouTube's "automated effort" to filter content); *see also* Fla. Stat. § 501.1736(1)(e)3., (e)4.d. To properly defend against the preliminary-injunction motion, Defendant requires an opportunity to examine Ms. Veitch about this testimony, which attempts to rebut Florida's interest in protecting minors. Discovery related to the State's governmental interest for a law is standard in constitutional litigation.

- **Plaintiffs' Objection:**
  - Plaintiffs do not object to questions about the representations made in the declaration about the availability of "digital wellbeing tools to encourage teens to be mindful of their screen time." DE5-1 at ¶17 (e.g., turning off autoplay by default, take-a-break reminders, etc.). Plaintiffs do object to questions about the alleged "addictiveness" of YouTube's features. Ms. Veitch's declaration makes no representations about whether any of YouTube's features are "addictive." And whether they are in fact "addictive" has nothing to do with the specific First Amendment arguments that Plaintiffs raise in their preliminary injunction motion. While Plaintiffs

of course dispute that YouTube is "addictive," they have principally argued that, "*[e]ven assuming the state could produce evidence that its concerns [about addiction] are real rather than conjectural*, HB3 is not remotely tailored" to the state's interest in preventing addiction because it restricts all manner of constitutionally protected speech while leaving other services with the same allegedly "addictive" features uncovered.  DE5 at 28-29 (citation omitted).  But even setting that aside, Florida is not entitled to subject Plaintiffs' declarants to lengthy and invasive depositions at the preliminary injunction stage in hopes of concocting a *post hoc* rationalization for its law.  Florida should have developed a factual record to support its asserted governmental interest before it enacted HB3.  To the extent it has not, that is all the more reason to preliminarily enjoin the state from enforcing the law.

o  As for YouTube's recommendation system, Plaintiffs object to the extent Defendant intends to ask about the source code, engineering, confidential and competitively sensitive data about how the system works, etc.  Such questions sweep

beyond the subject matter discussed in the declaration and are also irrelevant to the First Amendment issues raised in the preliminary injunction motion.

9.    YouTube's Terms of Service, including for YouTube Kids, and how it meets and enforces them.

- **Defendant's Position:** YouTube's terms of service, and how it enforces them, are relevant to Plaintiffs' argument that Florida's law is not sufficiently tailored because YouTube (and other platforms) already have protections for minors. *See* DE5 at 14–15 (discussing the platforms' content-moderation policies). Ms. Veitch testifies about "Community Guidelines" and other terms of service that YouTube purportedly enforces to protect children and others. DE5-1 ¶¶ 21–29.

- **Plaintiffs' Objection:** Plaintiffs do not object to questions related to the specific provisions of YouTube's Terms of Service that are pertinent to the YouTube features described in the declaration. Plaintiffs object to questions about other provisions of YouTube's Terms of Service that have nothing to do with anything in Ms. Veitch's declaration or the First Amendment issues raised in the preliminary injunction motion.    Plaintiffs likewise object to

16

questions about the enforcement of provisions YouTube's Terms of Service that are not mentioned in the declaration.  The enforcement of such Terms has nothing to do with the First Amendment issues raised in the preliminary injunction motion.

10.    Age verification and parental consent that YouTube currently does.

11.    YouTube principled approach for children and teenagers and policies for minors, including their development and implementation.

12.    The actual use of tools and their effectiveness by parents referred to in her declaration.

- **Defendant's Position:** This matter is relevant to Plaintiffs' argument that HB3 is not sufficiently tailored, and their argument that Florida lacks a sufficient governmental interest for HB3. Ms. Veitch discusses at length the "tools" that YouTube offers parents. DE5-1 ¶¶ 12–16 (asserting that Google and YouTube provide "tools" that allow parents to manage their child's experience on the platforms); DE5-1 ¶ 29 (further elaborating on YouTube's "diverse set of tools").

- **Plaintiffs' Objection:**  Plaintiffs do not object to questions about the specific tools referred to in paragraphs 12-16 and 29 of the declaration.  To the extent the state wishes to ask about tools that are

not referenced in those paragraphs, that sweeps far beyond the state's request to ask about the subject matters raised in her declaration.

13. The promotion of and access to the resources referred to in her declaration.

- **Defendant's Position:** This matter is relevant to Plaintiffs' argument that HB3 is not sufficiently tailored, and their argument that Florida lacks a sufficient governmental interest for HB3. Ms. Veitch testifies about the "robust resources" that YouTube offers parents and children. DE5-1 ¶¶ 12–16, 29.

- **Plaintiffs' Objection:** Plaintiffs do not object to questions about the specific resources referred to in paragraphs 12-16 and 29 of the declaration. To the extent the state wishes to ask about resources that are not referenced in those paragraphs, that sweeps far beyond the state's request to ask about the subject matters raised in her declaration.

14. The use of "Supervised Experiences for Teens" referred to in her declaration.

15. Establishment and setting up an account by a minor (someone under 18 years of age) currently for a new YouTube user.

16.    Efforts by YouTube to detect bad actors on its platform.

17.    YouTube Kids, including what features are included, removed, and can be turned off.

18.    Supervised Accounts, including what features are included, removed, and can be turned off.

19.    The removal or disabling of autoplay for users under 18.

20.    YouTube's suite of digital wellbeing tools.

21.    YouTube's Community Guidelines and their evolution.

22.    YouTube's General Content Moderation Policies.

23.    What YouTube believes its obligations are under HB3 versus pre-existing law.

- **Defendant's Position:** *See* Veitch No. 3 above.

- **Plaintiffs' Objection:**  Plaintiffs object to the extent the state's questions on this topic will call for testimony on legal conclusions. Plaintiffs do not object to the extent the state seeks to ask questions about the basis of Ms. Veitch's understanding of YouTube's compliance obligations under the Act.  *See* DE5-1 ¶¶ 31-42.

24.    YouTube and YouTube Kids as "social media platforms" under HB3.

- **Defendant's Position:** Ms. Veitch testifies that YouTube is a "social media platform" under HB3 and discusses how HB3 will affect YouTube. DE5-1 ¶¶ 31–42.

- **Plaintiffs' Objection:** Plaintiffs object to the extent the state's questions on this topic will call for testimony on legal conclusions. Plaintiffs do not object to the extent the state seeks to ask questions about the basis of Ms. Veitch's understanding of YouTube's compliance obligations under the Act. *See* DE5-1 ¶¶ 31-42.

25. Ability of minors to access YouTube without an account.

26. Technological capacity for age and parental verification.

- **Defendant's Position:** YouTube's ability to verify a person's age and require parental verification, including its ability to access age-verification tools it has refused to use, is relevant to Plaintiffs' argument that HB3 will be burdensome for YouTube and its users. That bears on both the merits and Plaintiffs' assertion that YouTube will suffer irreparable harm absent a preliminary injunction. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 876–77 (1997) (considering whether "existing technology . . . include[d] any effective method for a sender to prevent minors from obtaining access to its communications on the Internet without also denying access to

20

adults"). Ms. Veitch has offered testimony about this issue, making various allegations about Google and YouTube's age-related efforts. DE5-1 ¶¶ 12–16. She asserts, for example, that YouTube requires users "under the age of 13" to have "their parent's consent" to have an account. DE5-1 ¶ 16.

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state seeks to ask about the representations made in the declaration about the specific tools and resources discussed in paragraphs 12-16. To the extent they seek to ask general and broad questions about the technological capacity or feasibility for age and parental verification, that sweeps beyond the subject matters discussed in the declaration and is irrelevant to the First Amendment issues raised in the preliminary injunction motion. *See* Objection to Veitch topic #3.

27. Any sources referenced in the declaration.

**David Boyle**
**(Snap's Declarant)**

1. His background, experience, and biases.

2. Involvement in drafting his declaration.

- **Defendant's Position:** This line of questioning is standard in a deposition in which the deponent has submitted a declaration.

- **Plaintiffs' Objection:** *See* Objection to Veitch topic #2.

3.     Snapchat as an application.

- **Defendant's Position:** Defendant seeks to ask questions about the features and functions of Snapchat, both of which Mr. Boyle discusses. Because Plaintiffs contend that HB3 covers Snapchat, its features and functions are relevant to Plaintiffs' facial First Amendment claims. DE5-3 ¶¶ 3–8; *see also Moody v. NetChoice*, 144 S. Ct. 2383, 2398 (2024).

- **Plaintiffs' Objection:**   This topic is extraordinarily broad and encompasses virtually all of Snap's operations as a business. Plaintiffs do not object to questions about the specific features and functions of Snapchat that Mr. Boyle discusses in paragraphs 3-9 of his declaration.  To the extent the state intends to ask questions about features and functions that are not discussed in those paragraphs, that sweeps far beyond the state's request to ask about the subject matters raised in his declaration.

4.     Ability for Snapchat to restrict or determine age at either device or applications-store level.

- **Defendant's Position:** Mr. Boyle represents that Snapchat age gates. DE5-3 ¶ 5. That is relevant to Plaintiffs' tailoring argument. Moreover, Snapchat's ability to restrict or determine a person's age,

including using tools it does not currently use, is relevant to Plaintiffs' argument that HB3 will be burdensome for Snapchat.

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state seeks to ask about Mr. Boyle's representation that Snapchat prohibits individuals under 13 from creating an account. DE5-3 ¶ 5. To the extent they seek to ask general and broad questions about the technological capacity or feasibility for age and parental verification, that sweeps beyond the subject matters discussed in the declaration and is irrelevant to the First Amendment issues raised in the preliminary injunction motion. *See* Objection to Veitch topics #3 and 26.

5.    Alternative products to Snapchat.

- **Defendant's Position:** Mr. Boyle indicates that Snap has "applications" other than Snapchat. *See* DE5-3 ¶ 3. Whether Snap offers non-addictive alternatives is relevant to Plaintiffs' assertions that HB3 burdens Snap and restricts access to Snap's services.

- **Plaintiffs' Objection:** Mr. Boyle's declaration does not make any representations about alternative products to Snapchat, nor does the presence of alternative products have anything to do with the First Amendment issues raised in the preliminary injunction motion.

Even if Snap offered "alternatives," HB3 would still require Snap to make certain changes to Snapchat and burden the First Amendment rights of minors and adults alike to access Snapchat.

6.  Snapchat's terms of service.

- **Defendant's Position:** Snapchat's terms of service, and how it enforces them, are relevant to Plaintiffs' argument that HB3 is not sufficiently tailored because platforms already have protections for minors. And Mr. Boyle discusses Snapchat's policies in his declaration. DE5-3 ¶¶ 5–8.

- **Plaintiffs' Objection:**  Plaintiffs do not object to questions related to the specific provisions of Snapchat's Terms of Service that are pertinent to the facts described in the declaration.  Plaintiffs object to questions about other provisions of Snapchat's Terms of Service that have nothing to do with anything in Mr. Boyle's declaration or the First Amendment issues raised in the preliminary injunction motion.   Plaintiffs likewise object to questions about the enforcement of provisions Snapchat's Terms of Service that are not mentioned in the declaration.  The enforcement of such Terms has nothing to do with the First Amendment issues raised in the preliminary injunction motion.

7. The use of Snapchat by bad actors.

- **Defendant's Position:** This topic is relevant to Florida's governmental interest for HB3. Mr. Boyle attests that Snapchat has policies designed to protect children from bad actors. DE5-3 ¶¶ 6–8 (testifying, for example, that "minors can only view direct messages from users with whom they are already friends"). The effectiveness of those policies is relevant.

- **Plaintiffs' Objection:** Mr. Boyle makes zero representations in his declaration about the "use of Snapchat by bad actors." And whether bad actors do in fact use Snapchat has nothing to do with the specific First Amendment arguments that Plaintiffs raise in their preliminary injunction motion. Plaintiffs have principally argued that, even if bad actors use "social media platforms," restricting innocent users from accessing "social media platforms" is not a remotely tailored way of protecting minors from those bad actors. *See* DE5 at 27-28; *see also Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) (barring convicted sex offenders from accessing social media was not a narrowly tailored way to protect minors on the internet). But even setting that aside, Florida is not entitled to subject Plaintiffs' declarants to lengthy and invasive depositions at the preliminary

injunction stage in hopes of concocting a *post hoc* rationalization for its law. Florida should have developed a factual record to support its asserted governmental interest before it enacted HB3. To the extent it has not, that is all the more reason to preliminarily enjoin the state from enforcing the law.

8.    The New Mexico Attorney General's complaint against Snapchat.

- **Defendant's Position:** The complaint is relevant to Florida's governmental interest for HB3 and the need for state regulation to protect minors. It also bears on the veracity of Plaintiffs' allegations that platforms already protect minors and is relevant to exploring their suggestions that they and their members have adopted policies to protect minors without the need for government regulation similar to HB3. Mr. Boyle makes such allegations about Snapchat. DE5-3 ¶¶ 6–8.

- **Plaintiffs' Objection:** Mr. Boyle makes zero representations in his declaration about New Mexico's complaint against Snapchat, so questions about pending litigation in another state sweep far beyond the state's request to ask about the subject matters raised in his declaration. To the extent Florida has not developed a factual basis to justify HB3, the law should not take effect. Florida is not entitled

to subject Plaintiffs' declarants to lengthy and invasive depositions at the preliminary injunction stage in hopes of concocting a *post hoc* rationalization.

9.    Family Center and other child protection features.

10.    Snapchat's features and the definition of "social media platform" under HB3.

11.    How HB3 implicates Snapchat's services.

12.    Snapchat's "addictive features" under HB3 (*see* Fla. Stat. 501.1736(e)); the algorithms utilized; and Snapchat's ability to turn those features off.

- **Defendant's Position:** Mr. Boyle testifies about Snapchat's features, which Florida submits are addictive and contribute to HB3's governmental interest. DE5-3 ¶¶ 3–8. Those features include algorithms, including algorithms that prioritize, recommend, and remove content for minors who use Snapchat. *See Moody*, 144 S. Ct. at 2409–10 (Barrett, J., concurring) (discussing the relevance of Plaintiffs' members' "algorithms" to the First Amendment standards applicable to regulating them).

- **Plaintiffs' Objection:**
  - To the extent Defendant wishes to ask Mr. Boyle about the representations made in his declaration about specific

Snapchat features, Plaintiffs do not object. Plaintiffs do object to questions about the alleged "addictiveness" of Snapchat's features. Mr. Boyle's declaration makes no representations about whether any of Snapchat's features are "addictive." And whether they are in fact "addictive" has nothing to do with the specific First Amendment arguments that Plaintiffs raise in their preliminary injunction motion. While Plaintiffs of course dispute that Snapchat is "addictive," they have principally argued that HB3 is not narrowly tailored *even assuming* the state could produce evidence that its concerns about addiction are real rather than conjectural. DE5 at 28-29 (citation omitted). *See* Objection to Veitch topic #8.

o Plaintiffs also object to questions about Snapchat's "algorithms." Mr. Boyle makes zero representations about Snapchat's use of "algorithms," so questions about them sweep far beyond the subject matters raised in the declaration.

13. Snapchat, age verification, and compliance with the Children's Online Privacy Protection Act (COPPA).

- **Defendant's Position:** *See* Boyle No. 4; Veitch No. 3; DE5-3 ¶ 5 (stating that Snapchat age gates); DE5-3 ¶ 9 (testifying that HB3 will force Snapchat to make "changes" that will be "costly").

- **Plaintiffs' Objection:**  Mr. Boyle never mentions COPPA in his declaration.  Questions about this topic go far beyond the state's request to ask about the subject matters raised in his declaration.  They also have nothing to do with the First Amendment issues in the case.  *See* Objection to Veitch topics #3 and 26 and Boyle topic #4.

14.    Compliance costs of HB3.

15.    Parent and legal guardians and Snapchat features.

16.    Snapchat's use in the European Union and age verification and parental consent under the European Union's General Data Protection Regulation and Digital Services Act.

- **Defendant's Position:** *See* Veitch No. 3; DE5-3 ¶ 9 (testifying that HB3 will force Snapchat to make "changes" that will be "costly").

- **Plaintiffs' Objection:**  Mr. Boyle never mentions any EU laws in his declaration.  To the extent the state wishes to ask questions about the specific representations made in the declaration about compliance costs, Plaintiffs do not object.  Questions about this topic, however, go far beyond the state's request to ask about the

subject matters raised in his declaration. They also have nothing to do with the First Amendment issues in the case. *See* Objection to Veitch topics #3 and 26 and Boyle topics #4 and 13.

17.    Snapchat's existing parental verification in Family Center.

18.    Technological capacity for age and parental verification.

- **Defendant's Position:** Snap's ability to verify a person's age and require parental verification, including using tools it has chosen not to use, is relevant to Plaintiffs' argument that HB3 will be burdensome for Snap and its users. That bears on both the merits and Plaintiffs' assertion that Snap will suffer irreparable harm absent a preliminary injunction. *See Reno*, 521 U.S. at 876–77.

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state seeks to ask about the representations made in paragraph 10 of the declaration about the difficulty of parental verification (which is encompassed by topic #17). To the extent they seek to ask general and broad questions about the technological capacity or feasibility for age and parental verification, that sweeps beyond the subject matters discussed in the declaration and is irrelevant to the First Amendment issues raised in the preliminary injunction motion. *See* Objection to Veitch topics #3 and 26.

19.   Any sources referenced in the declaration.

## Bartlett Cleland
### (NetChoice's Declarant)

1.   His background, experience, and biases.

2.   Involvement in drafting his declaration.

- **Defendant's Position:** This line of questioning is standard in a deposition in which the deponent has submitted a declaration.

- **Plaintiffs' Objection:** *See* Objection to Veitch topic #2.

3.   NetChoice's history and growth.

- **Defendant's Position:** Mr. Cleland testifies about NetChoice's mission and work over the past "two decades." DE5-2 ¶¶ 1, 3–4, 21. That is relevant to NetChoice's standing as a trade association.

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state seeks to ask questions about NetChoice's mission. But general questions about NetChoice's "history and growth" sweep far beyond the subject matters discussed in the declaration and have nothing to do with NetChoice's "standing as a trade association."

4.   NetChoice's lobbying activities.

- **Defendant's Position:** Mr. Cleland discusses NetChoice's mission and "advoca[cy] for online businesses," both of which are relevant

to standing. DE5-2 ¶¶ 1, 3–4, 21. NetChoice's lobbying is also relevant to the current regulatory landscape and the veracity of Mr. Cleland's claims that the platforms are committed to voluntarily protecting minors, such that state regulation is unnecessary.

- **Plaintiffs' Objection:**  Plaintiffs do not object to the extent the state seeks to ask questions about NetChoice's mission.  But questions about NetChoice's general "lobbying activities" sweep far beyond the subject matters discussed in the declaration and have nothing to do with questions about standing or the First Amendment issues raised in the preliminary injunction motion.  Nor does the "current regulatory landscape" have anything to do with the issues raised in the preliminary injunction motion.

5.    NetChoice's communications with its members relating to HB3.

- **Defendant's Position:** Defendant seeks no communications protected by NetChoice's attorney-client privilege.

- **Plaintiffs' Objection:**  Plaintiffs object to the extent the state intends to ask questions about privileged communications.

6.    NetChoice's members, their products and services, and their terms of services and the law existing prior to HB3 (Defendant will not ask about Snap or Google).

7.      The Children's Online Privacy Protection Act (COPPA), the European Union's General Data Protection Regulation and Digital Services Act impact on NetChoice members (again, Defendant will not ask about Snap or Google).

- **Defendant's Position:** *See* Veitch No. 3; DE5-2 ¶¶ 12, 18–24, 29 (arguing that HB3 will impose new burdens on NetChoice's members, and representing that he is "intimately familiar" with the members' "business models"); ¶ 1 (attesting to his deep knowledge of "regulatory" issues affecting members).

- **Plaintiffs' Objection:**  Mr. Cleland's declaration never mentions COPPA or the EU laws.  Questions about those topics go far beyond the state's request to ask about the subject matters raised in his declaration.  They also have nothing to do with the First Amendment issues in the case.  *See* Objection to Veitch topic #3 and Boyle topics #4, 13, and 16.

8.      NetChoice members' compliance with COPPA.

- **Defendant's Position:** *See* Cleland No. 7.

- **Plaintiffs' Objection:**  *See* Cleland No. 7.

9.      Scope of HB3.

10.     HB3's impact on NetChoice members, including which members are covered.

11.    Device-level restrictions and their effectiveness and use.

12.    Network-level restrictions and their effectiveness and use.

13.    Browser-level restriction and their effectiveness and use.

14.    Application-level restrictions and their effectiveness and use.

15.    Meta and Instagram effect on teenagers and evolution of features.

- **Defendant's Position:** This matter is relevant to Florida's governmental interest for HB3 and Plaintiffs' tailoring argument. *See* DE5-2 ¶¶ 7–17 (contending that Meta and Instagram "protect[] minors" and "promote minors' safety" through their policies, features, and tools); DE5-2 ¶¶ 1, 21 (attesting to his deep knowledge of "regulatory" issues affecting members, and his "intimate[] familiar[ity]" with their "business models").

- **Plaintiffs' Objection:** Plaintiffs do not object to questions related to the features of Meta's products that are actually discussed in Mr. Cleland's declaration.  Mr. Cleland's declaration, however, never discusses Meta's and Instagram's "effect" on teenagers, or the "evolution" of their features.  Questions on this topic do not fall within the subject matters discussed in the declaration.  Again, to the extent Florida has not developed a factual basis to justify HB3, the law should not take effect.  Florida is not entitled to subject

34

Plaintiffs' declarants to lengthy and invasive depositions at the preliminary injunction stage in hopes of concocting a *post hoc* rationalization. Nor are these issues relevant to Plaintiffs' narrow tailoring argument. Again, Plaintiffs have principally argued that HB3 is not narrowly tailored *even assuming* the state could produce evidence that its concerns are real rather than conjectural. DE5 at 28-29. *See* Objections to Veitch topic #8 and Boyle topics #12.

16. 42 Attorneys General's lawsuit against Meta.

- **Defendant's Position:** Mr. Cleland contends that NetChoice's members "protect[] minors" and "promote minors' safety" through their policies, features, and tools—which are issues at the heart of the lawsuit. DE5-2 ¶¶ 7–17. The lawsuit bears on Florida's governmental interest, Plaintiffs' tailoring argument, and the veracity of Mr. Cleland's allegations that NetChoice's members seek to protect minors.

- **Plaintiffs' Objection:** Mr. Cleland never discusses these lawsuits in his declaration. The state's request therefore reaches far beyond its request to probe the subject matters raised in his declaration. Nor are the lawsuits relevant to the constitutionality of HB3. To the extent Florida has not developed a factual basis to justify HB3, the

law should not take effect. Florida is not entitled to subject Plaintiffs' declarants to lengthy and invasive depositions at the preliminary injunction stage in hopes of concocting a *post hoc* rationalization. Nor are the lawsuits relevant to Plaintiffs' narrow tailoring argument. Again, Plaintiffs have principally argued that HB3 is not remotely tailored *even assuming* the state could produce evidence that its concerns are real rather than hypothetical. DE5 at 28-29 (citation omitted). *See* Objection to Boyle topic #8 and Cleland topic #15.

17. New Mexico lawsuit against Snap.

- **Defendant's Position:** *See* Cleland No. 16.

- **Plaintiffs' Objection:** *See* Cleland No. 16.

18. Attorneys General lawsuit against TikTok.

- **Defendant's Position:** *See* Cleland No. 16. Defendant also notes that Plaintiffs assert a facial challenge that seeks to invalidate the law in all its applications, including its applications to platforms that are not currently members of Plaintiffs. Moreover, TikTok was a member of Plaintiffs in recent years. Complaint at 15 n.23, *NetChoice v. Moody*, 4:21-cv-220-RH-MAF (N.D. Fla. May 7, 2021), ECF No. 1.

- **Plaintiffs' Objection:** *See* Cleland No. 16.  Plaintiffs also note that TikTok is not currently a member of CCIA or NetChoice.   While Plaintiffs' *complaint* challenges HB3 on its face, their *preliminary injunction motion* seeks relief only on behalf of their *members* who are affected by the Act.  Questions about lawsuits against TikTok have nothing to do with the preliminary injunction motion in this case.

19.    How NetChoice members prohibit under 13 from using their services.

20.    Age gating use by NetChoice members (Defendant will not ask about Snap).

21.    Burden on NetChoice members' First Amendment rights.

22.    NetChoice members' content moderation policies (Defendant will not ask about Snap).

23.    Ability of minors to use and see content without being accountholders.

- **Defendant's Position:** Minors' ability to access platforms without an account is directly relevant to Plaintiffs' claim that HB3 violates minors' First Amendment rights by denying them access to platform services. And Mr. Cleland discusses minors' access to platforms. DE5-2 ¶¶ 7–17.

- **Plaintiffs' Objection:**  Mr. Cleland's declaration does not discuss whether minors can see content without being accountholders.  This topic strays beyond the scope of the subject matters discussed in the declaration.  Nor is this topic relevant to the First Amendment issues.  There is no serious dispute that the Act restricts access to numerous online services.  That is the point of the law.  To the extent the state thinks that HB3's effort to restrict access is ineffective because minors can "see content without being accountholders," that is another reason the law is underinclusive and not narrowly tailored.

24.   Burden on NetChoice members caused by HB3.

25.   Addictiveness of social media platforms.

- **Defendant's Position:** This matter is directly relevant to Florida's governmental interest for HB3, and Mr. Cleland alleges not only that platforms are safe for minors but also that he is knowledgeable about platforms' operations. DE5-2 ¶¶ 7–17 (representing that the platforms "protect[] minors" and "promote minors' safety"); DE5-2 ¶¶ 1, 21 (attesting to his knowledge of "websites, applications, and digital services," and his "intimate[] familiar[ity]" with members' "business models").

- **Plaintiffs' Objection:**    Mr. Cleland's declaration makes no representations about whether "social media platforms" are "addictive."  And whether they are in fact "addictive" has nothing to do with the specific First Amendment arguments that Plaintiffs raise in their preliminary injunction motion.  *See* Objection to Veitch topic #8 and Boyle topic #12.

26.    Internal research by NetChoice's members on harms their products cause youth.

- **Defendant's Position:** *See* Cleland No. 25.

- **Plaintiffs' Objection:**  *See* Cleland No. 25.

27.    Technological capacity for age verification.

- **Defendant's Position:** *See* Veitch No. 26; Boyle No. 18.

- **Plaintiffs' Objection.**  Plaintiffs do not object to the extent the state seeks to ask about the representations made in the declaration about the difficulty of implementing age verification.  To the extent they seek to ask general and broad questions about the technological capacity or feasibility for age verification, that sweeps beyond the subject matters discussed in the declaration and is irrelevant to the First Amendment issues raised in the preliminary injunction motion.  *See* Objection to Veitch topics #3 and 26 and Boyle topic #18.

28.    Ability of members to operate platforms without addictive features.

- **Defendant's Position:** The ability of platforms to operate platforms without addictive features is relevant to the burden that HB3 purportedly imposes on platforms. And Mr. Cleland testifies both that HB3 will be burdensome and that he is "intimately familiar" with platforms' operations. DE5-2 ¶¶ 1, 21.

- **Plaintiffs' Objection:**  Mr. Cleland's declaration does not discuss whether NetChoice members are able to provide the same services without the so-called "addictive" features that HB3 regulates. Questions on this topic thus fall outside the subject matters discussed in his declaration.  They also have nothing to do with the First Amendment issues raised in the preliminary injunction motion. *See* Objection to Veitch topics #3 and 26 and Boyle topic #18.

29.    Members that allow access without requiring an account.

- **Defendant's Position:** Minors' ability to access platforms without an account is directly relevant to Plaintiffs' claim that HB3 violates minors' First Amendment rights by denying them access to platform services. Mr. Cleland testifies about minors' access to platforms, setting himself out as knowledgeable about that matter. DE5-2 ¶¶ 7–17.

- **Plaintiffs' Objection:** *See* Objection to Cleland topic #23.

30.   Any sources referenced in the declaration.

**Matthew Schruers**
**(CCIA's Declarant)**

1.   His background, experience, and biases.

2.   Involvement in drafting his declaration.

- **Defendant's Position:** This line of questioning is standard in a deposition in which the deponent has submitted a declaration.

- **Plaintiffs' Objection:** *See* Objection to Veitch topic #2.

3.   Computer & Communications Industry Association (CCIA) history.

- **Defendant's Position:** Mr. Schruers is the "President & CEO" of CCIA and has worked there "for nearly twenty years." DE5-4 ¶ 1. He explains CCIA's mission and its focus over the past "fifty years." DE5-4 ¶ 3. That is relevant to CCIA's standing as a trade association.

- **Plaintiffs' Objection:** *See* Objection to Cleland topic #3.

4.   CCIA membership (Depending on who goes first and whether Defendant's questions are answered, Defendant will try not to duplicate questions regarding the joint members with NetChoice).

5.   Communications with CCIA members re HB3.

- **Defendant's Position:** Mr. Schruers testifies that he "communicate[s] often with CCIA members," and he discusses how HB3 will affect the members. DE5-4 ¶¶ 1–5. Defendant seeks no communications protected by CCIA's attorney-client privilege.

- **Plaintiffs' Objection:** *See* Objection to Cleland topic #5.

6.  The Children's Online Privacy Protection Act (COPPA), the European Union's General Data Protection Regulation and Digital Services Act impact on CCIA members).

- **Defendant's Position:** *See* Veitch No. 3; DE5-4 ¶¶ 1, 25–28 (arguing that HB3 will impose new burdens on CCIA's members, and attesting to his knowledge of "legal, legislative, and policy matters" affecting members).

- **Plaintiffs' Objection:** *See* Objection to Cleland topic #7.

7.  CCIA members compliance with COPPA.

- **Defendant's Position:** *See* Schruers No. 6.

- **Plaintiffs' Objection:** *See* Schruers No. 6.

8.  Scope of HB3.

9.  HB3's impact on CCIA members, including which members are covered.

10. CCIA members' content moderation.

42

11.    Source of speech referenced in declaration.

- **Defendant's Position:** Plaintiffs argue in their motion that "HB3's access restrictions interfere with the First Amendment rights of CCIA and NetChoice members." DE5 at 22. And Mr. Schruers testifies in support of that allegation, stating that HB3 will burden CCIA members' "speech." DE5-4 ¶¶ 23–24.

- **Plaintiffs' Objection:** Plaintiffs object to the extent the state intends to ask Mr. Schruers to opine on legal conclusions.

12.    United States Surgeon General's Report on Social Media and CCIA members.

13.    Device-level restrictions and their effectiveness and use.

14.    Network-level restrictions and their effectiveness and use.

15.    Browser-level restriction and their effectiveness and use.

16.    Application-level restrictions and their effectiveness and use.

17.    CCIA members and age gating and age verification.

18.    Prohibitions on under 13 from using CCIA member products.

19.    Meta and CCIA members content moderation activities.

20.    Burdens of HB3 going into effect on CCIA members' operations.

21.    Burden on CCIA members' First Amendment rights.

22.    Compliance costs of HB3.

23.    Members' use of addictive features and ability to operate without.

- **Defendant's Position:** The addictive features are relevant to Florida's governmental interest, and the ability of platforms to operate platforms without addictive features is relevant to the burden that HB3 purportedly imposes on platforms. Mr. Schruers opines on those matters. *See* DE5-4 ¶¶ 4, 9–15.

- **Plaintiffs' Objection:** *See* Objections to Cleland topics #25 and 28.

24.    Technological capacity for age-verification, which members have it, which members would be able to get it, and which would not.

- **Defendant's Position:** *See* Veitch No. 26; Boyle No. 18; DE5-4 ¶ 13 (discussing the platforms' "effort to implement settings and parental tools," including efforts to "prohibit minors younger than 13 from accessing their main services").

- **Plaintiffs' Objection:** Plaintiffs do not object to the extent the state seeks to ask about the representations made in the declaration about the difficulty of implementing age verification.  To the extent they seek to ask general and broad questions about the technological capacity or feasibility for age verification, that sweeps beyond the subject matters discussed in the declaration and is irrelevant to the First Amendment issues raised in the preliminary injunction motion.

*See* Objection to Veitch topics #3 and 26, Boyle topic #18, and

Cleland topic #27.

25.   Technological capacity for parental consent.

- **Defendant's Position:** *See* Veitch No. 26; Boyle No. 18; DE5-4 ¶ 13

  (discussing the platforms' "effort to implement settings and parental

  tools," including efforts to "prohibit minors younger than 13 from

  accessing their main services").

- **Plaintiffs' Objection:** *See* Objection to Veitch topics #3 and 26,

  Boyle topic #18, Cleland topic #27, and Schruers topic #24.

26.   Members that allow access without requiring an account.

- **Defendants' Position:** *See* Veitch No. 25; Cleland No. 23; DE5-4

  ¶¶ 4, 9–15 (discussing platforms' operations, and tools for protecting

  minors).

- **Plaintiffs' Objection.** *See* Objection to Cleland topics #23 and 29.

27.   Any sources referenced in the declaration.

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Douglas L. Kilby*                          */s/ Kevin A. Golembiewski*
Douglas L. Kilby                                JOHN M. GUARD
Florida Bar No. 73407                             *Chief Deputy Attorney General*
Hannah E. Murphy                                HENRY C. WHITAKER
Florida Bar No. 1032756                           *Solicitor General*
Abby Corbett                                    DANIEL W. BELL
Florida Bar No. 31332                             *Chief Deputy Solicitor General*
STEARNS WEAVER MILLER                           KEVIN A. GOLEMBIEWSKI
WEISSLER ALHADEFF                                 *Senior Deputy Solicitor General*
& SITTERSON, P.A.                               DARRICK W. MONSON
Highpoint Center                                  *Assistant Solicitor General*
106 East College Avenue, Suite 700              Office of the Attorney General
Tallahassee, FL 32301                           The Capitol, PL-01
(850) 580-7200                                  Tallahassee, Florida 32399
dkilby@stearnsweaver.com                        (850) 414-3300
                                                kevin.golembiewski@myfloridalegal.
Paul D. Clement                                   com
Erin E. Murphy
James Y. Xi                                     *Counsel for Defendant*
Joseph J. DeMott
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
mitchell.pallaki@clementmurphy.com

*Counsel for Plaintiffs CCIA and NetChoice,*
*LLC*

November 18, 2024

46

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 18th day of November, 2024, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

<u>*/s/ Kevin A. Golembiewski*</u>
Counsel for Defendant
