## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION, et al.,

      Plaintiffs,

v.                                                            Case No. 4:24-cv-00438-MW-MAF

ASHLEY MOODY, in her official
capacity as Attorney General of the
State of Florida,

      Defendant.

_____/

## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Federal courts have a "limited" role. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *Murthy v. Missouri*, 603 U.S. 43, 56-57 (2024); *Moody v. NetChoice*, 603 U.S. 707, 723 (2024). They "decide litigants' legal rights in specific cases." *Hippocratic Med.*, 602 U.S. at 379. Consequently, a plaintiff "can sue in a representative capacity" only in "narrow" circumstances, *id.* at 393 n.5, and "courts usually handle constitutional claims case by case, not en masse." *Moody*, 603 U.S. at 723.

This case runs headlong into those bedrock principles. Plaintiffs are trade associations that challenge a regulatory scheme en masse by invoking the rights of third parties with whom they have no relationship. Plaintiffs seek a ruling that

Florida Statutes "§ 501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1)" are "void and unenforceable" on their "face," DE1 at 46, based on Plaintiffs' view that they "burden[]" the rights of children and adults who want accounts on internet platforms that deploy addictive features. DE1 ¶¶ 59-63. Even if Plaintiffs were correct that internet users have a First Amendment right to accounts on platforms that addict children, they are in no position to assert users' rights. Plaintiffs—who do not operate any covered platforms and have no users—are "bystander[s]" trying to litigate the validity of an entire regulatory scheme unmoored from any "concrete factual context." *Hippocratic Med.*, 602 U.S. at 379-80.

They do not have standing. They have no injury-in-fact themselves, so they cannot assert the rights of children or adults using third-party standing or the overbreadth doctrine. *See id.* at 393 n.5. Nor can they cure that jurisdictional defect with "associational standing." DE1 ¶ 10. Associational standing allows an organization to "enforce the rights of its members"—not nonmember third parties. *NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). And at any rate, Plaintiffs have not made the showings required for associational standing. They have not even shown that a member would have standing to sue in its own right, because they have "identif[ied]" no "members . . . who will be injured by" Florida's law. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020).

But standing is not the only problem with the complaint. It is a shotgun pleading, and for several reasons, Plaintiffs' First Amendment, Fourteenth Amendment, and preemption claims fail on the merits. Chief among them: Nothing in Florida's law triggers heightened First Amendment scrutiny. The law limits children from having accounts on platforms that traffic in addiction. It leaves platforms free to present content to children and adults through non-addictive means and free to present material to children who do not hold accounts. That affects only a child's ability to "enter" certain online businesses—it does not in any way censor children on the internet. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002).

The complaint must be dismissed. Fed. R. Civ. P. 8(a)(2), 10(b), 12(b)(1), (6).

# MEMORANDUM OF LAW

Plaintiffs NetChoice and CCIA challenge HB3, which regulates the use of addictive features on internet platforms that choose to do business with children. The Florida Legislature passed HB3 in early 2024 by lopsided bipartisan votes of each of its chambers, after mounting evidence showed that companies are deploying "addictive designs" and "deceptive patterns" that harm children and cause them to "overuse" platforms. Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 2-6 (Mar. 28, 2024). By contracting with children to create personal accounts for them, platforms are able to target them with "personal interactive metrics," "[p]ush notifications," and other features that addict them, Fla. Stat. § 501.1736(1)(e), thereby ensuring that the platforms "consume as much of [their] time and conscious attention as possible."[1] HB3 protects children from those predatory practices.

Since the Legislature enacted the protections, no internet users or platforms have challenged them. Only Plaintiffs have. But Plaintiffs have no "direct stake" in the claims they bring, *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013), and their blunderbuss challenge to HB3 lacks merit in any event. Florida may protect children from businesses that addict them to screens and wreak havoc on their mental health.

---

[1] *Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology,"* CBS News, https://tinyurl.com/4zb7s9d2.

**1.** Plaintiffs are "trade association[s]" that purport to "represent[] a broad cross-section of [internet] companies." DE1 ¶¶ 7-8. They "bring[] this action on [their] members' behalf to vindicate their . . . rights and the . . . rights of their members' users." *Id.*

Plaintiffs challenge "Section 1 of HB3." DE1 ¶ 6. That section regulates commercial transactions between children "located in [Florida]" and platforms that employ addictive practices. Fla. Stat. § 501.1736(1)(a), (e). If a platform chooses to deploy "addictive features," and children begin accessing its services more than two hours per day, HB3 restricts the platform's ability to "enter[] into a contract with" a child "to become an account holder." *Id.* § 501.1736(1)(e), (2)(a). The platform must stop providing accounts to children who are younger than 14 years old, and it must obtain parental consent before providing accounts to 14- and 15-year-olds. *Id.* § 501.1736(2)-(3). Although that still allows the platform to give those children access to view or post content, it prevents the platform from branding the children with "a unique identifier" and targeting them with addictive strategies. *Id.* § 501.1736(1)(a).

HB3 deems a platform as using addictive strategies, and imposes those limits on its ability to do business with children, only if (1) "[t]en percent or more of [the platform's] daily active users who are younger than 16 years of age spend on average

2 hours per day or longer" on the platform; (2) the platform "[e]mploys algorithms that analyze user data or information on users to select content for users"; (3) the platform "[a]llows users to upload content or view the content or activity of other users"; and (4) the platform uses "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]uto-play," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content." *Id.* § 501.1736(1)(e).

The relevant portion of HB3 is codified at Florida Statutes § 501.1736. Section 501.1736(1)(e) defines platforms that engage in the above conduct as "social media platforms." Section 501.1736(2) prohibits "social media platforms" from "entering into a contract with" children under 14 years old "to become . . . account holder[s]." "Account holder[s]" include persons with an "account," "profile," or other "unique identifier." *Id.* § 501.1736(1)(a). Section 501.1736(3) requires "social media platforms" to obtain parental consent before providing an account to 14- and 15-year-olds. "If a court enjoins enforcement of" that subsection, the statute bars platforms from providing accounts to 14- and 15-year-olds regardless of parental consent. *See id.* § 501.1736(4).

If a platform "knowingly and recklessly violates" the statute, either "the minor accountholder" or the Florida Department of Legal Affairs may sue the platform. *Id.* § 501.1736(5)-(6). The statute does not penalize platform users; it regulates only

platforms. *See id.* Nor does it prohibit platforms from providing access to children. Section 501.1736 requires only that platforms either (1) refrain from the conduct that makes it a covered "social media platform," or (2) not require children to become "account holder[s]" to access their services. *Id.* § 501.1736(2)(a).

**2.** Plaintiffs contend that this regulatory scheme conflicts with the First Amendment (Count I), the Fourteenth Amendment (Count II), and the Children's Online Privacy Protection Act (COPPA) (Count III). Their Fourteenth Amendment and preemption claims invoke the rights of their members. *See* DE1 ¶¶ 90, 99. Their First Amendment claims, by contrast, invoke the rights of children under age 16 and adults who want accounts on platforms that deploy addictive features. DE1 ¶¶ 58-62. In passing, Plaintiffs mention "their own First Amendment rights," DE1 ¶ 11, and the "First Amendment rights" of their members, DE1 ¶¶ 63, 82, but they do not plead any claims based on their or their members' rights.[2]

Plaintiffs jam into those three counts a host of First Amendment, Fourteenth Amendment, and preemption claims:

---

[2] Plaintiffs note that "HB3's access restrictions interfere with the First Amendment rights of . . . members to disseminate both their own and third-party speech." DE1 ¶ 63. But Plaintiffs do not explain why that is so. Their bare "legal conclusion" unsupported by "factual content" is insufficient to plead any claims based on members' rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even if they had pleaded a claim, they would lack associational standing because no member has an injury-in-fact and member participation would be necessary to adjudicate the claim. *Infra* pp. 14-15; MTD at 13-18, *NetChoice v. Moody*, No. 21-cv-220 (N.D. Fla.), ECF No. 173.

### *First Amendment*

- Section 501.1736(2) violates the First Amendment rights of children under age 14 because it "restrict[s] the[ir] ability" to "speak[] and listen[]" on "certain social media platforms," DE1 ¶ 3, by "prohibiting [them] from creating accounts." DE1 ¶¶ 58-59.

- Section 501.1736(3) violates the First Amendment rights of 14- and 15-year-olds because it "restrict[s] the[ir] ability" to "speak[] and listen[]" on "certain social media platforms," DE1 ¶ 3, by requiring them to "obtain parental consent" before creating an account. DE1 ¶¶ 58, 60.

- Section 501.1736(4) violates the First Amendment rights of 14- and 15-year-olds because it "restrict[s] the[ir] ability" to "speak[] and listen[]" on "certain social media platforms," DE1 ¶ 3, by "prohibiting [them] from creating accounts." DE1 ¶¶ 58, 61.

- Section 501.1736(2), (3), and (4) violate the First Amendment rights of adults because they "effectively require[] adults to prove their age to" access "protected speech." DE1 ¶¶ 58, 62.

### *Fourteenth Amendment*

- Section 501.1736(2), (3), and (4) are each facially unconstitutional because the phrases "upload content," "algorithm," and "push notification" are impermissibly vague. DE1 ¶¶ 86-91.

## *Preemption*

- Section 501.1736(2)(b)(4) is facially preempted by COPPA and its implementing regulations because it requires platforms to delete the personal information of children who are younger than 14 years old. DE1 ¶ 99.

- Section 501.1736(3)(b)(4) and (4)(b)(4) are facially preempted by COPPA and its implementing regulations because they require platforms to delete the personal information of 14- and 15-year-olds. DE1 ¶ 99.

Plaintiffs say they "have standing" because they have "associational standing," DE1 ¶ 10, and because they can "assert both their own First Amendment rights and the First Amendment rights of their members' current and prospective users." DE1 ¶ 11. Plaintiffs, however, do not allege that any members operate platforms that meet the criteria of a covered "social media platform" under Section 501.1736.

Plaintiffs request an order enjoining the Attorney General "from enforcing Section 1 of HB3 against" any "members who operate 'social media platforms' as defined by the Act," though they do not allege which of their members that would include. DE1 at 46.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter" to establish standing and "state a claim to relief that is plausible on its face."

*Iqbal*, 556 U.S. at 678. The plaintiff must plead "factual content that allows the court to draw the reasonable inference" that all the elements of standing and the cause of action are met. *Id.* "[G]eneralizations" and "mere assertion[s]" are not enough. *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220-21 (11th Cir. 2010).

## ARGUMENT

Plaintiffs' complaint fails three times over. It is a shotgun pleading, committing sins that the Eleventh Circuit has "railed against." *Dunn v. Shoppes at Edgewater*, 2019 WL 13162434, at *1 (N.D. Fla. May 1, 2019) (Hinkle, J.). Next, Plaintiffs do not have standing for any of their claims. All the claims invoke the rights of third parties (children, adults, and Plaintiffs' members), yet Plaintiffs have established neither that they have associational or third-party standing nor that they can rely on the overbreadth doctrine. Finally, Plaintiffs have not stated any First Amendment, Fourteenth Amendment, or preemption claims.

## I.    THE COMPLAINT IS A SHOTGUN PLEADING.

The complaint commits two shotgun-pleading "sin[s]" that each require dismissal. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). First, Counts II and III "carry all that came before" them, *id.* at 1321, by "re-alleg[ing] and incorporat[ing] by reference" all prior allegations. DE1 ¶¶ 83, 93.

That makes the complaint "a quintessential 'shotgun' pleading." *Weiland*, 792 F.3d at 1321 n.11.

Second, the complaint does "not separat[e] into a different count each cause of action or claim for relief." *Id.* at 1323. All three counts advance multiple claims. Count I challenges multiple statutory provisions, requesting injunctions of each provision. DE1 ¶ 82. It also asserts First Amendment claims premised on the rights of children who are younger than 14, DE1 ¶ 59; children who are 14 and 15 years old, DE1 ¶ 60; and adults, DE1 ¶ 62. *See Scott v. City of Daytona Beach*, 2023 WL 1765652, at *1 (M.D. Fla. Feb. 3, 2023) (dismissing complaint that "set[] forth several different First Amendment causes of action in a single count"). Similarly, Count II asserts that three different provisions must be enjoined. DE1 ¶¶ 86-88, 91. And Count III includes at least two claims for relief, seeking injunctions of two sets of provisions based on the Supremacy Clause. DE1 ¶ 99.

Plaintiffs thus leave it to Defendant and this Court to "parse out" their myriad claims rather than pleading a "short and plain statement of [each] claim." *Est. of Bass v. Regions Bank*, 947 F.3d 1352, 1358 (11th Cir. 2020). In this Circuit, that requires dismissal. *See id.*

## II.    PLAINTIFFS LACK STANDING.

Plaintiffs invoke the rights of third parties (children, adults, and their members). So for each claim they press, they must not only satisfy Article III but

also overcome the prudential "prohibition o[n] asserting third-party rights." *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1264 (11th Cir. 2023); *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("[P]laintiffs must demonstrate standing for each claim that they press."). There are a few "limited" exceptions to the prohibition, including third-party standing, the overbreadth doctrine, and associational standing. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Mata Chorwadi*, 66 F.4th at 1264. Plaintiffs allude to all three in their complaint. DE1 ¶¶ 10-11.

Third-party "standing allows litigants who challenge a statute in their own right to assert 'concomitant' rights of third parties when those third parties' rights would be violated by the enforcement of the challenged restriction against the litigant." *Mata Chorwadi*, 66 F.4th at 1265. The overbreadth doctrine "allows a litigant to challenge a statute" that "deters others from engaging in protected expression" because it subjects them to a credible threat of enforcement. *Id.* And associational standing allows organizations to "enforce the rights of [their] members." *NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008).

Each exception has different requirements. If a plaintiff invokes third-party standing or the overbreadth doctrine, it must first satisfy Article III by showing that it has an injury-in-fact that is traceable to the defendant and redressable with judicial relief, and then it must meet various prudential requirements. *Virginia v. Am.*

*Booksellers Ass'n*, 484 U.S. 383, 392 (1988); *Mata Chorwadi*, 66 F.4th at 1264. For third-party standing, the plaintiff must show that it "has a 'close' relationship with" the third parties and that "there is a 'hindrance' to" them "protect[ing] [their] own interests." *Kowalski*, 543 U.S. at 130. For overbreadth, the plaintiff must show, among other things, that the challenged law can be enforced against the third parties. *Mata Chorwadi*, 66 F.4th at 1265. By contrast, if an association seeks to enforce the rights of its members, it need not establish its own injury-in-fact. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555-56 (1996). Instead, it can rely on "its members' injury." *Id.* at 551. The association can satisfy Article III and overcome the prohibition on third-party claims by establishing that its members would have standing "in their own right" to bring the claims, that "the interests it seeks to protect are germane to [its] purpose," and that "neither the claim[s] asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions (SFFA) v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

None of those exceptions applies here. Plaintiffs do not have standing for their First Amendment, Fourteenth Amendment, or preemption claims.

### A.  Plaintiffs lack standing for their First Amendment claims.

Plaintiffs contend that (1) they have "associational standing" to bring First Amendment claims asserting the rights of children and adults, DE1 ¶ 10, and (2)

they can sue "in their own right"—rather than on behalf of their members—using third-party standing and the overbreadth doctrine. *Mata Chorwadi*, 66 F.4th at 1265; DE1 ¶ 11. They are wrong on both scores.

**1.** Plaintiffs have not made the showings required for associational standing. They have shown neither that their members would have standing "in their own right" nor that "the participation of individual members in th[is] lawsuit" is unnecessary. *SFFA*, 600 U.S. at 199.

**a.** Plaintiffs have not shown that any member would have standing to challenge Section 501.1736. To begin with, they have not plausibly alleged that any member has an injury-in-fact—that is, that a member faces "a real and immediate threat of future" enforcement under Section 501.1736. *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006). Plaintiffs do not allege that any member operates a platform with all the features necessary to be "regulated under" Section 501.1736. *Pernell v. Fla. Bd. of Govs.*, 641 F. Supp. 3d 1218, 1253-54 (N.D. Fla. 2022) (Walker, C.J.) (no injury-in-fact because the plaintiff did not demonstrate that he "[wa]s regulated under the" challenged law). Plaintiffs mention "Facebook" and "YouTube" throughout the complaint, *see, e.g.*, DE1 ¶¶ 15, 17, 37, 68, but they plead no "factual content that [would] allow[] the [C]ourt to draw the reasonable inference" that Facebook, YouTube, or any other platform meets all the criteria in Section 501.1736(1)(e). *Iqbal*, 556 U.S. at 678. They do not allege, for instance, that

"[t]en percent or more of the daily active users who are younger than 16 years of age [on Facebook, YouTube, or another platform] spend on average 2 hours per day or longer" on the platform. Fla. Stat. § 501.1736(1)(e). As a result, it is "speculation" that "one [member platform] will meet all of the[] criteria" in Section 501.1736. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Nor have Plaintiffs established that a member would have standing to bring the "type of claim[s]" that they "plead[]": third-party claims asserting the rights of users. *Brown Grp.*, 517 U.S. at 555. To do so, Plaintiffs had to allege that a member has not only an injury-in-fact but also standing to assert the rights of its users. *See Mata Chorwadi*, 66 F.4th at 1264. They have not done that.

First, no member would have third-party standing to assert the rights of its users. Plaintiffs plead no facts suggesting that there is a "hindrance" to children and adults "protect[ing] [their] own" First Amendment "interests." *Kowalski*, 543 U.S. at 130. Nor could they: From *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) to *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021), individuals— including children—have sued to protect their First Amendment rights over and over again. Indeed, an adult recently invoked his own First Amendment rights in a lawsuit challenging the section of HB3 that requires adult-oriented websites to verify that users are 18 or older. Complaint, *Free Speech Coal. v. Moody*, No. 24-cv-514 (N.D. Fla.), ECF No. 1.

Plaintiffs have also failed to allege that any member has a "close relationship" with children and adults who use its services. *Kowalski*, 543 U.S. at 130. The complaint makes no allegation that internet conglomerates and their users have "aligned" interests on Section 501.1736. *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994). Users may have chosen not to "challenge the [law] themselves" because "they like it." *Id.* Many adults who use platforms, for example, are parents who might well applaud Section 501.1736—which again was enacted with broad bipartisan support—and object to Plaintiffs' unilateral decision to invoke their rights to invalidate the law. "[T]he standing doctrine serves to protect the 'autonomy'" of those adults from litigants like Plaintiffs who "roam the country in search of" internet regulations that they dislike. *Hippocratic Med.*, 602 U.S. at 379-80.

Second, Plaintiffs' members cannot invoke the rights of children and adults using the overbreadth doctrine. *Mata Chorwadi* is on point. There, "hotel owners" asserted the rights of their "guests," but the Eleventh Circuit held that the owners could not "rely on the overbreadth doctrine" because the challenged law did not "apply to guests." 66 F.4th at 1265. "[O]n its face," the law "impose[d] penalties only on the owners." *Id.*; *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40-41 (1999) (plaintiff could not use overbreadth to assert the rights of "potential customers" because they faced "[n]o threat of prosecution"). Same here. Section

501.1736 does not apply to children and adults who want an account on a covered platform—it imposes penalties only on platforms. Fla. Stat. § 501.1736(5)-(6).

**b.** Plaintiffs' claims "require[] the "participation of individual members," *SFFA*, 600 U.S. at 199, because they "depend[] upon the [members'] circumstances." *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). If this Court were to conclude that Section 501.1736 triggers more than rational-basis scrutiny, *but see infra* pp. 25-31, it would have to make a variety of factual determinations about platforms to resolve Plaintiffs' First Amendment claims.

The Court would first have to identify the platforms that Section 501.1736 applies to, which turns on the specifics of each platform's operations. *See* Fla. Stat. § 501.1736(1)(e). Then, the Court would have to examine the nature of each covered platform, assessing how applying each challenged provision to each platform affects different users' First Amendment rights. *See Moody v. NetChoice*, 603 U.S. 707, 724-26 (2024); *NetChoice v. Bonta*, 2024 WL 5264045, at *18 (N.D. Cal. Dec. 31, 2024) (denying associational standing because it was "necessary for NetChoice's individual members to participate in th[e] lawsuit . . . for the purpose of conducting discovery into how" they operate), *appeal pending*, No. 24-7879 (9th Cir.). That is a fact-intensive inquiry because "platforms are diverse." *Moody*, 603 U.S. at 789 (Alito, J., concurring in the judgment). Some platforms might already age-verify or require parental consent for their services. Others might not provide "account[s]" to

any users, such that Section 501.1736's account requirements do not affect children at all. Fla. Stat. § 501.1736(2)(a). And others might provide accounts but still allow users to access their services without an account.

On top of that, the First Amendment analysis will depend on the circumstances of each platform's users. Because "the State is entitled to adjust its legal system to account for children's vulnerability," *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality op.), the First Amendment analysis will differ for 15-year-old and 5-year-old users, for instance. *See Walker-Serrano v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003) ("[A]ny analysis of the students' rights to expression . . . must necessarily take into account the age and maturity of the student."); *Minor I v. Sch. Bd. for Santa Rosa Cnty.*, 264 F.R.D. 670, 688 (N.D. Fla. 2010) (requiring member participation because claim that "speech rights" were chilled was "highly dependent on a showing of individual and particularized factual circumstances").

After identifying each application of each provision that affects the First Amendment rights of users, this Court would have to apply the appropriate level of scrutiny to every application. *See Moody*, 603 U.S. at 724-26. "Given the diversity of circumstances presented by" platforms and users, that too is an "individualized inquiry." *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 422 (3d Cir. 2020) (denying associational standing for as-applied First Amendment claims because they "require[d] an individualized inquiry for each . . . member"). Because the platforms

have different "tools and technologies" for limiting children's access to their services, DE1 ¶¶ 23-40, Section 501.1736's provisions might be sufficiently tailored for "one association member" but not another. *Free Speech Coal.*, 974 F.3d at 422.

Any one of those platform-specific inquiries would make associational standing improper.[3] All of them together make it utterly unworkable. The preliminary-injunction litigation in *Moody* is telling. The Court was forced to rely on untested representations from Plaintiffs about how their members operate, and on declarations from a few platform personnel handpicked by Plaintiffs. *See* Plaintiffs' Declarations, *NetChoice*, No. 21-cv-220, ECF Nos. 23-26. The lack of any direct involvement of a platform contributed to the "underdeveloped" and "incomplete" record that led to the Supreme Court's vacatur, *Moody*, 603 U.S. at 706, 734—the very situation the member-participation requirement is intended to prevent.

Plaintiffs believe that the member-participation requirement is flexible, affording courts "discretion" to ignore it "at the pleadings stage," because it is a "prudential" requirement. Resp. to MTD at 18-19, *NetChoice*, No. 21-cv-220, ECF

---

[3] *See, e.g.*, *Harris v. McRae*, 448 U.S. 297, 321 (1980) (no associational standing for Free Exercise claims because they required determinations about individuals' religious views); *Ga. Cemetery Ass'n*, 353 F.3d at 1322 (same for a facial takings claim because it was necessary to consider how the law "economically impact[ed]" individual members); *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018, 1023 (10th Cir. 1992) (same for claim for injunctive relief, which required the court to determine whether the law had a "detrimental effect on" individual entities).

No. 181. But the requirement is "prudential and malleable by Congress"—not courts. *Brown Grp.*, 517 U.S. at 551, 558. Congress can "abrogate" the requirement by "authoriz[ing]" an association "to sue for its members." *Id.* at 558. Congress has not done that here. Because Plaintiffs bring claims that require extensive factual determinations about individual platforms, they lack associational standing.

**c.** Even apart from those fatal flaws, Plaintiffs could not use associational standing to press their claims because associational standing is a vehicle only for "enforc[ing] the rights of . . . members"—not nonmember third parties. *Browning*, 522 F.3d at 1160. Associational standing is a "strand" of "representational standing" that allows an organization to enforce the rights of members—even though they are "absent third parties"—because the organization has a "particular," "recognized" "relationship[]" with them. *Brown Grp.*, 517 U.S. at 557. Given the close relationship between an organization and its members, the "concrete adverseness" that federal courts require is presumed when an organization brings a claim "on behalf of its directly affected members." *UAW v. Brock*, 477 U.S. 274, 289 (1986). That "adverseness," however, does not exist when an organization sues to enforce the rights of nonmembers with whom it has no relationship. *See id.* The

organization's interest in the nonmembers' claims is too attenuated to "assure" a "sharp[] . . . presentation of [the] issues."[4] *Id.*

Courts that held otherwise in Plaintiffs' other cases erred. *See* DE1 ¶ 10 (citing *NetChoice v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023); *CCIA v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024), *appeal pending*, No. 24-50721 (5th Cir.)). Those courts concluded that Plaintiffs could use associational standing to bring nonmember claims because their members would have had third-party standing to bring them. *See Griffin*, 2023 WL 5660155, at *10-12; *Paxton*, 2024 WL 4051786, at *8-9. Yet that both stretches the associational-standing doctrine well "outside the bounds of [its] traditional" limits, *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring), and ignores the basis for the doctrine. Again, the presumption driving the narrow exception of associational standing is that the organization has a "direct stake" in its members' legal controversies. *See Hollingsworth*, 570 U.S. at 705-06. That assumption stretches to its breaking point when an organization seeks to

---

[4] *See, e.g.*, *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1178 n.4 (11th Cir. 2009) ("[A]n organization" does not have associational standing to bring "claims . . . on behalf of non-members."); *Interactive Media Ent. & Gaming Ass'n v. Att'y Gen.*, 580 F.3d 113, 117-18 & n.7 (3d Cir. 2009) (organization could not "assert standing for [a] claim based on principles of associational standing because it" sought to vindicate the rights of its members' customers, "as opposed to" the rights of its members); *but see Council of Ins. Agents & Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1308-09 (N.D. Fla. 2003).

represent members who would, in turn, be representing the interests of someone else if they filed suit.

**2.** Plaintiffs do not have standing "in their own right" either. *Mata Chorwadi*, 66 F.4th at 1265. They cannot use third-party standing or the overbreadth doctrine to assert the rights of children and adults, *see* DE1 ¶ 11, because they do not have Article III standing themselves. *See Am. Booksellers Ass'n*, 484 U.S. at 392 (litigants must have Article III standing to rely on the overbreadth doctrine); *Hippocratic Med.*, 602 U.S. at 393 n.5 (same for third-party standing). Plaintiffs have no injury-in-fact. They—trade associations that do not operate any covered platforms—proclaim that enforcement of Section 501.1736 against platforms "will irreparably harm" them, DE1 ¶ 82, but they provide no "detailed factual allegations" in support. *Iqbal*, 556 U.S. at 678. Their "mere assertion" of harm does not establish injury. *Dermer*, 599 F.3d at 1220-21.

Even if Plaintiffs had Article III standing, they still could not assert the rights of users. They could not rely on the overbreadth doctrine because Section 501.1736 does not apply to users. *Supra* pp. 16-17. And they lack third-party standing both because there is no "hindrance" to users "protect[ing] [their] own" First Amendment "interest[s]" and because they have no relationship with users. *Kowalski*, 543 U.S. at 130.

**B. Plaintiffs do not have standing for their Fourteenth Amendment or preemption claims.**

Plaintiffs' Fourteenth Amendment and preemption claims seek to enforce the rights of their members, *see* DE1 ¶¶ 92, 99, but Plaintiffs do not have standing to bring the claims in their own right or on their members' behalf. They do not have standing in their own right because they lack an injury-in-fact, and they do not have associational standing because they have not demonstrated injury-in-fact for any members. *Supra* pp. 14-15.

**III. PLAINTIFFS FAIL TO STATE A CLAIM.**

Plaintiffs do not state First Amendment, Fourteenth Amendment, or preemption claims. First off, they have no cause of action under Section 1983 to sue over the violation of others' rights. Even if they did, all their claims fail. Plaintiffs fail to allege a First Amendment claim because Section 501.1736 does not infringe the rights of children or adults. Plaintiffs fail to allege a facial vagueness challenge because Section 501.1736 is not impermissibly vague in any—let alone all— applications. And Plaintiffs lack a cause of action for their preemption claims because COPPA does not create rights in platforms, and only the federal government

can enforce COPPA in any event. Finally, even putting all that aside, Plaintiffs fail to state a claim for injunctive relief.

### A. Plaintiffs do not have a cause of action under Section 1983 to assert the rights of others.

Plaintiffs lack a cause of action under Section 1983 because they do not allege a deprivation of their own rights. *See* DE1 at 24, 39, 43 (raising their claims under "42 U.S.C. § 1983"). To enjoy a cause of action under Section 1983, a plaintiff must belong to the "particular class of persons" on which the statute confers a "right to sue." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 127 (2014). But the only class of persons on which Section 1983 confers a right to sue is those who have personally suffered a deprivation of federal rights.

Section 1983 states: "Every [state actor who] subjects . . . any citizen . . . to the deprivation of any rights . . . secured by [federal law], shall be liable to *the party injured* in an action." 42 U.S.C. § 1983 (emphasis added). The statute thus grants only "the party injured" the right to bring "an action." *Id.* It does not give trade associations a derivative action to assert the rights of others. *See Shaw v. Garrison*, 545 F.2d 980, 983 n.4 (5th Cir. 1977) (Wisdom, J.) (noting that this is "not an attempt to sue under the civil rights statutes for deprivation of another's constitutional rights" and that "[s]uch suits are impermissible"), *rev'd on other grounds*, 436 U.S. 584 (1978); *Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1973) (Friendly, J.) ("Neither [Section 1983's] language nor [its] history . . . suggests that an

organization may sue under the Civil Rights Act for the violation of rights of members."); *People Organized for Welfare & Emp. Rts. v. Thompson*, 727 F.2d 167, 170 (7th Cir. 1984) (Posner, J.) ("[S]ection 1983 contains no suggestion that Congress wanted to allow an association to sue to enforce not only its own civil rights but those of its members."); *Vote.org v. Callanen*, 39 F.4th 297, 304-05 (5th Cir. 2022) (association lacked "statutory standing" because Section 1983's text "precludes an action premised on the deprivation of another's rights"); *Vote.org v. Byrd*, 700 F. Supp. 3d 1047, 1052-53 (N.D. Fla. 2023) (finding this textual analysis of Section 1983 "persuasive"); *but see Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023).[5]

### B. Plaintiffs fail to state a First Amendment claim.

Plaintiffs do not plausibly allege a violation of the First Amendment rights of children or adults.

**1.** Plaintiffs' allegations do "not implicate the First Amendment" rights of children. *Norwegian Cruise Line Holdings Ltd. v. Fla. Dep't of Health*, 50 F.4th 1126, 1137 (11th Cir. 2022). Section 501.1736 "has no relevance to" the First Amendment rights of children because it limits only "nonexpressive activity" by

---

[5] The Eleventh Circuit has passed on Section 1983 claims alleging a violation of other's rights without considering whether the text affords a cause of action. *See, e.g.*, *Young Apartments v. Town of Jupiter*, 529 F.3d 1027, 1032 (11th Cir. 2008). Those "drive-by" decisions are not controlling. *Cf. Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1325 n.2 (11th Cir. 2020).

them: Entering a contract to become an account holder on platforms with addictive features. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986). Obtaining a personal "profile," "account," or other "unique identifier" on a platform involves a transaction, Fla. Stat. § 501.1736(1)(a): The platform gives the user access in exchange for the opportunity to track him, collect his personal data, advertise to him, and license the content that he generates.[6] "Nothing about" Section 501.1736's regulation of that exchange "suggest[s] an interest in censoring the expressive activities of" children. *Leathers v. Medlock*, 499 U.S. 439, 453 (1991). The limitation is "directed at" commercial transactions—not children's speech—and it "presents [no] danger of suppressing[] particular ideas." *Id.* It affects all children's access to the platforms "*regardless of*" why they want to create an account or what content is on the platforms. *Virginia v. Hicks*, 539 U.S. 113, 123 (2003); DE1 ¶ 4 ("The law does not focus on any particular content . . . .").

Plaintiffs assert that Section 501.1736 violates the rights of children because it has the effect of "restricting the[ir] ability" to "speak[] and listen[]" on "certain social media platforms," DE1 ¶ 3, by either "prohibiting [them] from creating accounts" or requiring them to "obtain parental consent" before doing so. DE1 ¶ 58. But even assuming that children have a "broad" First Amendment right to speak and

---

[6] *See* Fed. Trade Comm'n, *How Websites and Apps Collect and Use Your Information* (Sept. 2023), https://tinyurl.com/ykcdtwm4.

listen on the internet, *but see Murthy*, 603 U.S. at 74-75, laws limiting a child's ability to obtain an account on platforms that deploy addictive features "do[] not restrict [that] right." *Gary*, 311 F.3d at 1340. The laws affect only a child's "right to enter" online businesses that have chosen to pair speech-hosting with activities deemed addictive and harmful to children. *Id.*; *Indigo Room v. City of Fort Myers*, 710 F.3d 1294, 1299-1300 (11th Cir. 2013).

Section 501.1736 is similar to the laws in *Gary* and *Indigo Room*, which the Eleventh Circuit held did not implicate the First Amendment. In *Gary*, an ordinance "prohibit[ed] persons under the age of twenty-one from entering . . . any establishment which sells alcohol." 311 F.3d at 1336. The plaintiff, who was under 21, argued that the ordinance violated "her First Amendment right to engage in nude dancing" because it stopped her from dancing in particular establishments. *Id.* at 1340. Although nude dancing is "expressive conduct," the Eleventh Circuit rejected the claim. *Id.* It explained that the ordinance did not implicate the First Amendment because the plaintiff "remain[ed] free to observe and engage in nude dancing, but she simply [could not] do so in . . . establishments that" sold alcohol. *Id.* Section 501.1736 likewise restricts only a child's "right to enter" businesses that engage in particular activities. *Id.* Children remain free to speak and listen on the internet, including on platforms that deploy addictive features—they simply cannot "contract with [those platforms] to become an account holder." Fla. Stat. § 501.1736(2)(a).

In *Indigo Room*, the Eleventh Circuit relied on *Gary* in rejecting a similar First Amendment challenge. 710 F.3d at 1299-1300. The plaintiff, a 19-year-old, went to a "commercial establishment" that "host[ed] political events and activities" to "sign [a] petition." *Id.* at 1297. Police cited him "for violating" an ordinance "prohibit[ing] persons under the age of 21 from entering . . . establishments while alcohol [wa]s being served." *Id.* at 1297-98. The Eleventh Circuit held that, even though the ordinance may have "incidentally" affected the plaintiff's speech, it did "not regulate speech." *Id.* at 1300. "Instead," it regulated "the admittance of underage individuals into" establishments "while alcohol [wa]s being served." *Id.* Section 501.1736 too regulates the admittance of children into businesses that host speech while they are engaging in activities deemed harmful to children.

The Supreme Court has also found the First Amendment irrelevant to regulations that merely affect access to businesses that integrate speech with activities that jeopardize public safety. In *Arcara*, for example, the Court upheld an administrative order closing an adult bookstore that allowed customers to engage in "sexual activit[ies]" on its "premises." 478 U.S. at 704-06. The order, the Court concluded, regulated sexual activity—not adult books. *Id.* And any "burden" on the speech of the store's owners was "dubious," particularly since they "remain[ed] free to sell the same materials at another location." *Id.*; *see also Breard v. City of Alexandria*, 341 U.S. 622, 644-45 (1951) (upholding ordinance that prohibited an

"obnoxious" method of selling magazines but left consumers free to "receiv[e] the magazines"), *abrogated on other grounds*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980); *City of Dallas v. Stanglin*, 490 U.S. 19, 21-22 (1989) (upholding age restriction on "dance halls" designed to protect children from the "detrimental influences of older teenagers").

Like that law—and the laws in *Gary* and *Indigo Room*—Section 501.1736 does not interfere with expressive activity by the relevant rightsholder (children). Just as the store owners in *Arcara* remained free to sell adult books despite being barred from running a bookstore that permitted sexual activity, so too here children remain free to speak and listen on the internet. Section 501.1736 affects only their access to accounts on certain platforms. That limitation on "access" to some platforms' "business operations" does not trigger heightened scrutiny. *Norwegian*, 50 F.4th at 1137. And not even Plaintiffs dispute that the law has a rational basis. DE1 ¶ 2 ("[S]tates certainly have a legitimate interest in protecting minors who use" platforms.).

Plaintiffs' arguments for heightened scrutiny are unavailing. For starters, it does not matter that Section 501.1736 applies to only "some" platforms. DE1 ¶ 67. The law does not "control content" because it "singl[es] out" some platforms, *id.*, based on whether they deploy features that addict children. The First Amendment does not require close scrutiny when the government singles businesses out on such

a basis. The prohibition in *Gary*, after all, applied to only "some" nude-dancing clubs (those that sold alcohol). Even more, the platforms are not the relevant "speakers" here because Plaintiffs base their claims only on the rights of children. And that aside, "differential [treatment] of First Amendment speakers is constitutionally suspect [only] when it threatens to suppress the expression of particular ideas or viewpoints." *Leathers*, 499 U.S. at 447; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 660-61 (1994) ("[H]eightened scrutiny is unwarranted when the differential treatment is justified by some special characteristic of the particular medium being regulated."); *NetChoice v. Att'y Gen. of Fla.*, 34 F.4th 1196, 1226 (11th Cir. 2022) (rejecting NetChoice's argument that heightened scrutiny would apply if the law regulated "only the largest social-media platforms"), *vacated on other grounds sub nom.*, *Moody*, 603 U.S. 707. Section 501.1736 does not target ideas or viewpoints. It targets child addiction.

Plaintiffs gain nothing from trumpeting *Packingham v. North Carolina*, 582 U.S. 98 (2017) and *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011). *See generally* DE1 (citing *Packingham* and *Brown* two dozen times). *Packingham* found a First Amendment violation because the law "foreclose[d] access to social media altogether" for certain individuals. DE1 ¶ 54; *see also United States v. Bobal*, 981 F.3d 971, 977 (11th Cir. 2020) (finding *Packingham* irrelevant because the challenged "restriction" did "not leave [the defendant] without" avenues

to exercise "his First Amendment rights"). Florida's law does not do that. Any platform that wants to provide children access can simply refrain from integrating into its product the addictive features in Section 501.1736, and even if a platform wants to use addictive features, the law only restricts it from letting children become account holders. *Brown*, for its part, did not even consider a restriction on access to businesses—it considered a content-based speech regulation. *Brown* passed on a "violent-speech regulation" that "prohibit[ed] the sale or rental of 'violent video games' to minors." 564 U.S. at 789, 792. That law restricted "video-game" companies' speech by "censoring" their distribution of "violent entertainment [to] minors." *Id.* at 803-04. Section 501.1736 does not single out any speech.

Finally, even if Plaintiffs were right that Section 501.1736 triggers heightened scrutiny in some applications, their challenges against Section 501.1736(2) would still fail because that provision has a plainly legitimate sweep. It can be validly enforced against an addictive platform when it provides accounts to children of "tender years." *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944). Five-year-olds have no First Amendment interest in internet accounts. *Cf. Ginsberg v. New York*, 390 U.S. 629, 638 & n.6 (1968); *Bellotti*, 443 U.S. at 635.

That defeats not only Plaintiffs' facial claims but also their "as applied" claims. DE1 ¶ 58. Those claims challenge Section 501.1736(2) "as applied to . . . members who operate 'social media platform[s]' [under] the Act." *Id.* That is a

"quasi-facial challenge," not an as-applied challenge. *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022). Plaintiffs do not challenge Section 501.1736(2) as applied to a "particular" set of "facts," *id.*—they do not argue, for instance, that the provision would violate the First Amendment if enforced against a platform that gives a 13-year-old an account. Instead, Plaintiffs' "as applied" claims seek to altogether enjoin enforcement against certain members, DE1 at 47, which would prevent the Attorney General from enforcing Section 501.1736(2) against all the members' platforms when they provide a 13-year-old an account, a 3-year-old an account, and so on. The claims are thus "'as applied' in the sense that [they do] not seek to strike the [provision] in all its applications, but only to the extent it covers" Plaintiffs' members. *John Doe v. Reed*, 561 U.S. 186, 194 (2010). But the claims are "'facial' in that [they are] not limited to [a] particular case, but challenge[] [enforcement] of the [provision] more broadly to all" user accounts. *Id.* That makes the claims quasi-facial, and Plaintiffs must "satisfy the standard for a facial challenge to the extent" of the claims' "reach[]." *McGuire*, 50 F.4th at 1003. Plaintiffs cannot do that because the claims reach children of tender years.

**2.** Nor have Plaintiffs plausibly alleged that Section 501.1736 violates adults' First Amendment rights. They argue that the statute "effectively requires adults to prove their age to" operate an account on a covered platform, which violates their First Amendment rights by "forcing [them] to either surrender sensitive personal

information . . . or forgo" accessing "protected speech." DE1 ¶ 62. But Plaintiffs offer no "factual enhancement" in support of those "naked assertion[s]." *Iqbal*, 556 U.S. at 678.

For example, they do not explain what "protected speech" Section 501.1736 restricts adults from accessing. DE1 ¶ 62. Yet to state a claim alleging a violation of the "First Amendment right to receive information and ideas," Plaintiffs had to identify "concrete, specific" speech to which the provisions restrict access. *Murthy*, 603 U.S. at 75. Adults do not have a freewheeling "interest in reading and engaging with the content of other speakers on social media." *Id.* at 74-75. The "right to receive information and ideas" is implicated only when a "listener has a concrete, specific connection to the speaker." *Id.* at 75.

The complaint also includes no allegations about platforms' age-verification and data-collection practices, or what existing laws might already require of the platforms, so it is wholly speculative that Section 501.1736 will result in platforms imposing new "burdens" on adults who want accounts. DE1 ¶ 62. Covered platforms might already collect personal information or engage in age-verification— particularly since they already must identify which users are children to comply with COPPA. *See* 15 U.S.C. § 6502.

At any rate, Section 501.1736 does not implicate adults' First Amendment rights any more than the rights of children. The statute does not restrict adults from

"access[ing] protected speech" on the internet. DE1 ¶ 62. Section 501.1736

contemplates age-verification only if an adult wants to go beyond accessing speech

and become an account holder.

The statute is thus far different from the laws in *Ashcroft v. ACLU*, 542 U.S.

656 (2004) and *Reno v. ACLU*, 521 U.S. 844 (1997). *See* DE1 ¶ 62. Those laws

"regulate[d] the content of speech," imposing internet-wide restrictions on children's

access to "sexual" materials, which had the effect of also "denying [adults] access"

to those materials. *Reno*, 521 U.S. at 874; *Ashcroft*, 542 U.S. at 659-60. Section

501.1736 does not regulate content that children or adults can access.

### C. Plaintiffs fail to state a Fourteenth Amendment claim.

Plaintiffs claim that Section 501.1736(2), (3), and (4) are unconstitutionally

vague on their face because the phrases "upload content," "algorithms," and "push

notifications . . . about specific activities or events related to the user's account"

contain "ambiguities." DE1 ¶ 85. But Plaintiffs offer no allegations suggesting that

those phrases are "impermissibly vague in all . . . applications." *Stardust, 3007 LLC

v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018). "[A] plaintiff who

engages in some conduct that is clearly proscribed" by a statute cannot challenge the

statute on vagueness grounds—even if the statute might be vague as to other

conduct. *Id.* And Plaintiffs do not identify a single member that suffers from a

hopeless lack of clarity about whether Section 501.1736 would apply to it. The vagueness claims fail for that reason alone.

Even so, the phrases are not "so vague that persons of ordinary intelligence [must] guess at [their] meaning." *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1271 (11th Cir. 2007). Plaintiffs' principal gripes are that the phrases are "undefined" and that Section 501.1736 "does not answer" every hypothetical they can dream up. DE1 ¶ 86. But the Legislature "is not required to define each and every word in a piece of legislation," and Plaintiffs' hypotheticals ignore the statutory context, attempting to manufacture vagueness by reading the phrases in a vacuum. *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021). Plaintiffs object to the term "algorithms" because "*all* computer code can be considered an algorithm at some level," DE1 ¶ 87, but the statute does not use "algorithms" in isolation—it describes "algorithms that analyze user data or information on users to select content for users." Fla. Stat. § 501.1736(1)(e)3. Apparently, Plaintiffs would have the Court conclude that *Moody* is hopelessly vague. *See* 603 U.S. at 734-35 (using the word "algorithms" without defining it). Nor do "upload content" and "push notifications" require anyone to guess at their meaning: They are common concepts across platforms.

**D. Section 1983 does not provide a right of action for COPPA preemption.**

Plaintiffs' preemptions claims fail because Section 1983 does not provide a "right of action" for COPPA preemption. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107-08 (1989). Section 1983 can serve as the vehicle for a preemption claim only if the allegedly preemptive statute "unambiguously secures rights" and Congress "intend[ed] that [Section] 1983 be available to enforce those rights." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 186 (2023). But COPPA neither secures individual rights for internet companies nor "authorize[s] a private right of action." *Jones v. Google*, 73 F.4th 636, 641 (9th Cir. 2023). "Rather," COPPA imposes disclosure obligations on companies, and it "confers enforcement authority" exclusively "on the [Federal Trade Commission]" and "state attorneys general." *Id.* (citing 15 U.S.C. § 6505(a)-(b)).

Plaintiffs have no equitable cause of action either. Because Congress has made clear its "intent to foreclose" private enforcement of COPPA, equity provides no cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-29 (2015). That is doubly true since COPPA grants companies no "right[s] of [their] own." *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017).

**E. Plaintiffs fail to state a claim for injunctive relief.**

Last, to state a claim for relief for a constitutional violation, a plaintiff must allege that it suffered "a violation of a specific . . . right," *Robertson v. Hecksel*, 420

F.3d 1254, 1256 (11th Cir. 2005), and plead facts sufficient to support the remedy sought. *See, e.g.*, *Gill v. Whitford*, 585 U.S. 48, 68 (2018). A plaintiff cannot succeed on a claim for injunctive relief without showing both that a "legal right has been infringed" and that the relief it seeks is necessary to avoid "irreparable injury." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005). But Plaintiffs have not made those allegations. They request injunctive relief for all "members who operate 'social media platforms' as defined by the Act." DE1 at 46. By failing to identify those members—much less plausibly allege that they face a violation of their rights or irreparable harm—Plaintiffs fail to state a claim for injunctive relief on their behalf.

## CONCLUSION

The complaint must be dismissed.

Dated: January 13, 2025

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Kevin A. Golembiewski*
JOHN GUARD (FBN 374600)
  *Chief Deputy Attorney General*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*
DANIEL W. BELL (FBN 1016188)
  *Chief Deputy Solicitor General*
KEVIN A. GOLEMBIEWSKI (FBN 1002339)
  *Senior Deputy Solicitor General*
DARRICK W. MONSON (FBN 1041273)
  *Assistant Solicitor General*
ANITA J. PATEL (FBN 0070214)
  *Special Counsel*
CHRISTINE E. LAMIA (FBN 745103)
  *Special Counsel*
JAMES WACZEWSKI (FBN 0154989)
  *Senior Assistant Attorney General*
SARA E. SPEARS (FBN 1054270)
  *Assistant Attorney General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
kevin.golembiewski@myfloridalegal.com

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

This motion complies with Local Rule 7.1(F) because it has 490 words, and the memorandum of law complies with the rule because it has 7,994 words.

Because this motion will "determine the outcome of a . . . claim," no attorney conference was required. L.R. 7.1(D).

*/s/ Kevin A. Golembiewski*
Counsel for Defendants

## CERTIFICATE OF SERVICE

I certify that on this 13th day of January, 2025, the foregoing motion and memorandum of law were served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ Kevin A. Golembiewski*
Counsel for Defendants