**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION, et al.,

      Plaintiffs,

v.                                 Case No. 4:24-cv-438-MW-MAF

ASHLEY MOODY, in her official
capacity as Attorney General of the
State of Florida,

      Defendant.

_____/

## OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

Social media is facing a reckoning. Because of whistleblowers and leaked internal documents, the public has learned that social-media companies for years have deployed features to addict youth with full awareness of the destruction compulsive use has on children's mental health. In the words of the Biden Administration's Surgeon General, "[o]ur children have become unknowing participants in a decades-long experiment."[1] State and federal governments have come together to take swift, bipartisan action. Numerous states have passed laws regulating platforms' addictive features, and more than 40 states—including Florida—have sued social-media

_____

[1] Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 11 (2023), https://tinyurl.com/33u2t7kn.

companies for the harm that they have caused children.[2] Several CEOs were recently subjected to "a bipartisan thrashing" in the Senate Judiciary Committee, at which Mark Zuckerberg famously apologized to parents whose children had been harmed by Meta platforms.[3]

The harm does not stop there. By using addictive features to cause constant, compulsive use by children, platforms knowingly put them at risk of exploitation. A Tampa woman was arrested last year for allegedly molesting five thirteen- and fourteen-year-old boys she met and groomed on Snapchat and TikTok.[4] Senators Blumenthal and Blackburn recently wrote Meta after receiving "reports that Instagram has harbored an open-air market for the sale of child sexual abuse material and the trafficking of children."[5] The problem is so bad that Meta and Snapchat actively warn teen users of the dangers of "sextortion" on their own platforms.[6]

---

[2] Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023), https://tinyurl.com/y882nt5f.

[3] Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024), https://tinyurl.com/2p9vvy62.

[4] Kylie Jones, *No Bond for Woman Accused of Posing as 14-Year-Old, Molesting Students*, FOX 13 Tampa Bay (Apr. 8, 2024), https://tinyurl.com/n3y6272p.

[5] Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg (June 21, 2023), https://tinyurl.com/2s4j243y.

[6] *Five Ways to Respond to Sextortion*, Meta, https://tinyurl.com/292hmv44; *What You Need to Know About Financial Sextortion*, Snap Inc., https://tinyurl.com/4vwn9f39.

Needless to say, the rosy infomercial Plaintiffs offer in their filings to portray their members' activities as altruistic is fiction. The reality is that many social-media platforms are dangerous for children because they are designed to attract as many eyeballs as possible for as long as possible. In 2023, the U.S. Surgeon General, noting that "we are experiencing a national youth mental health crisis," called on lawmakers to "act swiftly" to "limit[] the use of [addictive] features" by platforms.[7]

Florida answered that call and enacted HB3 with broad bipartisan support to limit children's exposure to platforms' addictive features. Plaintiffs sued seven months later, claiming that the First Amendment requires states to stand idly by while platforms addict children to their products and destroy their mental health in the name of their bottom lines. Plaintiffs are wrong about the First Amendment. But the Court need not even get there because Plaintiffs filed a shotgun pleading, lack standing, lack a cause of action, and have not otherwise shown that they are entitled to injunctive relief. Just as they did in *Moody v. NetChoice*, Plaintiffs stake their request for a sweeping injunction on an "underdeveloped" and "incomplete" record. 603 U.S. 707, 726, 734 (2024). Their motion should be denied.

---

[7] Surgeon General, *supra* n.1, at 13, 15.

## BACKGROUND

### A.     Children and Social Media

In recent years, mounting evidence has emerged that social-media companies deploy features designed to addict users, resulting in significant harm to mental health—particularly in children. As the U.S. Surgeon General explained in a recent advisory, social-media platforms deploy features like "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations" that lead to "excessive use and behavioral dysregulation."[8] Those features "overstimulate the reward center in the brain" and "trigger pathways comparable to addiction," resulting in "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions."[9]

Although platforms' addictive features can affect anyone, children "are particularly at risk, as their developing brains are more susceptible to the reward-driven mechanisms underlying these features."[10] Adolescents average 5 hours a day on social media with nearly half reporting "almost constant[]" online use.[11] More than a

---

[8] Surgeon General, *supra* n.1 at 9.

[9] *Id.*; *accord* Alter Dec. ¶¶ 29-45.

[10] Alter Dec. ¶ 46; *accord* Surgeon General, *supra* n.1 at 5.

[11] Twenge Dec. ¶¶ 9, 13; Alter Dec. ¶ 18.

third feel "addicted" to social media and almost 75 percent report feeling "manipu-late[d]" to spend more time on it than they intend.[12]

That manipulation has severe consequences for children. As child social-me-dia use proliferated over the last 15 years, adolescent depression rates more than doubled.[13] Associated behaviors like self-harm and suicide also "skyrocketed."[14] And studies reveal that the correlation is no coincidence; addictive social-media use is a causal factor.[15] Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression.[16]

Child social-media use is also connected to higher rates of eating disorders, "poor body image," and "low self-esteem."[17] "Compulsive or uncontrollable use" can cause "sleep problems, attention problems, and feelings of exclusion," which in turn can lead to increased "depression, anxiety, and neuroticism."[18] It also gives bad

---

[12] Surgeon General, *supra* n.1 at 9-10.

[13] Twenge Dec. ¶ 15.

[14] *Id.* ¶¶ 17-18.

[15] *Id.* ¶¶ 34, 47.

[16] *Id.* ¶¶ 39, 47; Surgeon General, *supra* n.1 at 6.

[17] Surgeon General, *supra* n.1 at 7; *see also* Twenge Dec. ¶ 59.

[18] Surgeon General, *supra* n.1 at 10; *see also* Twenge Dec. ¶ 20; Alter Dec. ¶ 16.

actors more access to children. Rates of "sexual solicitation" targeting children increase as they spend more time on social media.[19]

Much like tobacco companies years ago, platforms have resisted any effort to research or mitigate their products' effects. As the U.S. Surgeon General explained, comprehensive research on the danger that addictive design features pose to children has proven difficult because the platforms do not allow "access to data" and insist on a "lack of transparency."[20] Only because of whistleblowers and accidental leaks do Americans now know that platforms have long been aware of the dangers their product designs pose to children.

Take Meta, which owns Facebook and Instagram. A whistleblower revealed internal research showing that many of Instagram's youngest users "felt addicted to the app and lacked the wherewithal to limit their use of it" and reported "that the app contributed to their depression and anxiety."[21] Meta also acknowledged—internally—that Instagram was causing nearly one third of adolescent girls to develop body-image issues.[22] Instead of rolling back the features it was privately acknowledging were addictive and destructive, Meta pressed on and even sought to expand

---

[19] Twenge Dec. ¶ 22; *see also* Surgeon General, *supra* n.1 at 9.

[20] Surgeon General, *supra* n.1 at 11.

[21] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[22] *Id.*

its products to younger children. "[T]weens," as Meta called them, "[were] a valuable but untapped audience."[23]

Leaked documents from TikTok showed that it too "was aware its many features designed to keep young people on the app led to a constant and irresistible urge to keep opening the app" and that such "compulsive usage correlates with a slew of negative mental health effects like loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and increased anxiety."[24] TikTok acknowledged that features like infinite scroll were most likely to addict children, stating that "across most engagement metrics, the younger the user, the better the performance" because "[m]inors do not have executive function to control their screen time."[25] And although TikTok has publicly touted some features ostensibly aimed at reducing the platform's addictive effects—like allowing parents to set time limits and prompting users to take a break—TikTok determined that those features "had little impact" and are "not altogether effective."[26] But that did not matter

---

[23] *Id.*

[24] Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://tinyurl.com/4e5un4ru.

[25] *Id.*

[26] *Id.*

because TikTok adopted the features solely to give it "a good talking point with policymakers."[27]

Deceptive practices like Meta's and TikTok's have fueled the Nation's "youth mental health crisis."[28] The U.S. Surgeon General has thus called on policymakers to develop "health and safety standards" for platforms, including "limiting the use of features that attempt to maximize time, attention, and engagement" and to adopt "policies that further limit access . . . to social media for all children"—like "strengthening and enforcing age minimums."[29]

## B.    HB3

HB3 protects children from platforms with addictive features by regulating those platforms' commercial transactions with children. When a platform transacts with a child to create a personal account, it can target the child with addictive features like "personal interactive metrics," "push notifications," "infinite scrolling," and "auto-play video." Fla. Stat. § 501.1736(1)(e); Surgeon General, *supra* n.1 at 9. Those features play on "psychological hooks" like "the elimination of natural stopping cues" and increased "environmental feedback" that "increas[e] the risk of behavioral addiction." Alter Dec. ¶¶ 28-45. If a platform engages in those practices,

---

[27] *Id.*

[28] Surgeon General, *supra* n.1 at 13; *accord* Twenge Dec. ¶ 26.

[29] Surgeon General, *supra* n.1 at 15.

HB3 limits its ability to "enter[] into a contract" with a child "to become an account holder." Fla. Stat. § 501.1736(2)(a), (3)(a).

Codified at Florida Statutes § 501.1736, HB3 defines the "social media platforms" subject to its provisions as those that: (1) allow "users to upload content or view the content or activity of other users"; (2) employ "algorithms that analyze user data or information on users to select content for users"; (3) use an "addictive feature[]," defined as "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]utoplay," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content"; and (4) have at least 10 percent of their "daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the platform. *Id.* § 501.1736(1)(e). If a platform satisfies those criteria, Section 501.1736(2) prohibits it from "entering into a contract with" a child under 14 "to become an account holder." And Section 501.1736(3) requires the platform to obtain parental consent before "entering into a contract" with "a minor who is 14 or 15" "to become an account holder." An "account holder" is anyone with an "account," "profile," or other "unique identifier while using or accessing" the platform. *Id.* § 501.1736(1)(a).

Platforms therefore have several options for compliance with HB3 that do not require them to bar anyone from accessing their services. HB3 provides platforms a

choice: Refrain from using addictive features, refrain from contracting with children to become account holders, or ensure that less than ten percent of their daily active users under age 16 use the platform more than two hours a day. Any platform that wants to permit child access need only do one of those.

## C.     Plaintiffs' lawsuit

Plaintiffs are "trade association[s]" that purport to "represent[] a broad cross-section of [internet] companies." DE1 ¶¶ 7-8. Seven months after HB3 was passed and two months before it went into effect, Plaintiffs sued "on [their] members' behalf." DE1 ¶¶ 7-8. Plaintiffs challenge HB3's under-14 account prohibition and 14-and-15-parental-consent requirement under the First Amendment (Count I) and the Fourteenth Amendment (Count II). They also challenge HB3's data-privacy provisions under the Children's Online Privacy Protection Act (COPPA) (Count III). Though not a model of clarity, Plaintiffs' complaint appears to bring First Amendment claims invoking the rights of children and adults who want accounts on platforms that deploy addictive features.[30] DE1 ¶¶ 58-62. Plaintiffs move for a preliminary injunction based only on those First Amendment claims. DE5 at 4.

---

[30] In passing, Plaintiffs mention "their own First Amendment rights," DE1 ¶ 11, and the "First Amendment rights" of their members, DE1 ¶¶ 63, 82, but they do not plead any claims based on their or their members' rights.

## ARGUMENT

Plaintiffs have not carried their burden for the "extraordinary and drastic remedy" of a preliminary injunction. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). They have not shown a substantial likelihood of success on their First Amendment claims, and the equities do not favor injunctive relief.

## I.   Plaintiffs have not shown a substantial likelihood of success on their First Amendment claims.

For several reasons, Plaintiffs cannot succeed on their First Amendment claims. Their complaint is a shotgun pleading, they lack standing, and they have no cause of action. But even if they could clear those hurdles, HB3 does not violate the First Amendment. The statute regulates purely commercial activity—transacting with children while using harmful features to addict them. Minors have no First Amendment right to contract for products designed to addict them. HB3 is also a reasonable, content-neutral time, place, and manner restriction. It regulates only the manner in which children engage with social media.

## A.   The complaint is a shotgun pleading.

As explained in the Attorney General's motion to dismiss (at 10-11), Plaintiffs' complaint must be dismissed as a shotgun pleading because "each count adopts the allegations of all preceding counts," and the complaint fails to "separat[e] into a different count each . . . claim for relief." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321, 1323 (11th Cir. 2015). Because the complaint suffers from

those dismissible defects, Plaintiffs are not likely to succeed on their claims. *See Magluta v. Samples*, 256 F.3d 1282, 1284-85 (11th Cir. 2001) (vacating merits judgment because complaint was a shotgun pleading); *Lottery.com, Inc., v. Brier*, 2023 WL 10448531, at *3 (M.D. Fla. Nov. 14, 2023) (denying preliminary-injunction motion because complaint was a shotgun pleading).

**B.      Plaintiffs lack standing.**

To bring First Amendment claims "on [their] members' behalf," DE1 ¶¶ 7-8, Plaintiffs must establish that they have associational standing. Associational standing is an exception to traditional standing rules that allows an association to assert the rights and injuries of its members if (1) the members themselves would have standing, (2) the interests to be protected by the suit are "germane to the organization's purpose," and (3) the suit will not "require[] the participation of individual members." *Students for Fair Admissions (SFFA) v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Plaintiffs fail at the first and third elements.

First, Plaintiffs have not shown that any of their members has suffered an injury-in-fact to support standing. To establish injury-in-fact, Plaintiffs must show that one of their members is subject to HB3 and faces a "credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Yet Plaintiffs have not even alleged—let alone shown—that any member meets all the criteria necessary to be regulated as a "social media platform" under HB3. *See*

*Pernell v. Fla. Bd. of Govs.*, 641 F. Supp. 3d 1218, 1253-54 (N.D. Fla. 2022) (Walker, C.J.). Plaintiffs' declarants offer nothing but equivocal legal conclusions that Meta, Google, and Snap might operate "social media platforms" within the meaning of HB3. DE5-1 ¶ 5; DE5-2 ¶ 20; DE5-3 ¶ 9; DE5-4 ¶ 4. They offer no evidence that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average" at least "2 hours per day . . . on the days when using" a platform operated by those companies. Fla. Stat. § 501.1736(1)(e)2. They also offer no evidence that those companies "[e]mploy[] algorithms that analyze user data or information on users to select content for users." *Id.* § 501.1736(1)(e)3.

Nor did Plaintiffs' declarants provide that evidence in their depositions. Some even conceded that they do not know whether any of Plaintiffs' members meet HB3's criteria. NetChoice's general counsel testified that he "do[es]n't know" whether any members even use algorithms. Cleland Tr. 58:8-59:2, 131:15-25. Nor could he or other declarants say whether any member has at least 10 percent of its daily active users under 16 spending at least 2 hours per day on its platform. Cleland Tr. 127:13-17, 128:13-129:12; Veitch Tr. 20:14-22:3; Schruers Tr. 114:6-115:18. When asked why, then, he stated in his declaration that he understood Google and Meta to be subject to HB3, he first denied saying it (Cleland Tr. 138:9-14), then avoided the question (Cleland Tr. 154:13-157:17), before finally conceding that he "[o]bviously" does not know whether any of "[his] members" satisfy HB3's criteria

(Cleland Tr. 157:18-159:4). Plaintiffs have also been unable to provide such evidence in written discovery; they have only vaguely cited their declarations and depositions, which as demonstrated, do not show that any member meets all HB3's criteria. Discovery Resp. at 2-3, 24-25. With no evidence that any of Plaintiffs' members satisfy the statute's criteria, Plaintiffs have not met their burden for standing.[31]

Second, Plaintiffs' claims require the "participation of individual members," *SFFA*, 600 U.S. at 199, because they "depend[] upon the [members'] circumstances," *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). Motion to Dismiss at 17-20. If this Court were to conclude that HB3 is subject to heightened scrutiny, it would have to make a variety of factual determinations about internet platforms to resolve Plaintiffs' claims.

The Court would first have to determine the platforms that Section 501.1736 applies to, which depends on the specifics of each platform's operations. *See* Fla. Stat. § 501.1736(1)(e). Then the Court would have to examine the nature of each covered platform, assessing how applying each challenged provision to each platform affects users' First Amendment rights. *See Moody*, 603 U.S. at 724-25. That is a fact-intensive inquiry because "platforms are diverse." *Id.* at 789 (Alito, J.,

---

[31] Even if Plaintiffs had established injury-in-fact, they still would not satisfy this element of associational standing because they have failed to show that any member would have prudential standing to assert its users' rights. *See* Motion to Dismiss at 15-16.

concurring in the judgment). Platforms, for example, have different approaches to "accounts," DE1 ¶ 44, and "parental controls," DE1 ¶ 24. On top of that, even as applied to the same platform, the First Amendment analysis will depend on the circumstances of the platform's users. Because "the State is entitled to adjust its legal system to account for children's vulnerability," *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality op.), the First Amendment analysis will differ for 15-year-old and 5-year-old users, for example. *See, e.g.*, *Walker-Serrano v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003) ("[A]ny analysis of the students' rights to expression . . . must necessarily take into account the age and maturity of the student.").

The depositions of Plaintiffs' declarants confirmed that Plaintiffs are in no position to litigate those fact-intensive questions on behalf of their members. NetChoice's general counsel testified that he did not even know whether Meta and Google do business outside the United States, much less what the current age-verification and parental-consent practices of NetChoice members are. Cleland Tr. 31:17-32:11, 113:18-115:14, 122:13-126:1, 211:1-214:7. He did not know which, if any, platforms have the features that would subject them to HB3. Cleland Tr. 141:14-142:4. CCIA's president and CEO similarly had little knowledge of member platforms. Schruers Tr. 89:10-132:6. Merits discovery will not be any more illuminating. For example, Plaintiffs have already admitted that even after a "reasonable inquiry"

into all information "reasonably obtainable by" them, they cannot answer why certain members use particular features. Discovery Resp. at 16-18, 38-40.

Those fatal defects notwithstanding, Plaintiffs cannot even rely on associational standing in the first place because they are not "enforc[ing] the rights of [their] members." *NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008); Motion to Dismiss at 20-22. The only First Amendment rights Plaintiffs assert are those of social-media users.[32] But Plaintiffs are not associations of social-media users. Associational standing is a "strand" of "representational standing" that allows an organization to enforce the rights of *members*—even though they are "absent third parties"—because the organization has a "particular," "recognized" "relationship[]" with them. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). No "concrete adverseness" exists when an organization brings claims enforcing the rights of nonmembers with whom it has no relationship—the organization's interest in the claims is too attenuated. *UAW v. Brock*, 477 U.S. 274, 289 (1986).

---

[32] Count I's only mention of members' First Amendment rights is a conclusory assertion that "HB3's access restrictions interfere with the First Amendment rights of [Plaintiffs'] members." DE1 ¶ 63. The preliminary-injunction motion repeats that assertion, DE5 at 22, but otherwise raises only the rights of users. And since filing the motion, Plaintiffs have disclaimed any assertion of members' rights. DE48 at 4 ("The question is not how HB3 impacts a website's editorial discretion . . . .").

**C.    Plaintiffs have no Section 1983 cause of action to sue for violations of others' rights.**

Plaintiffs are also unlikely to succeed on their First Amendment claims because 42 U.S.C. § 1983 does not grant surrogates a cause of action to sue for violations of others' rights. *See* DE1 at 24, 39, 43 (raising the claims under "42 U.S.C. § 1983"). Section 1983 confers only on "the party injured," i.e., the party suffering a rights violation, the right to bring "an action." Under the statute, "[e]very [state actor who] subjects . . . any citizen . . . to the deprivation of any rights . . . secured by [federal law], shall be liable to *the party injured* in an action at law [or] suit in equity." 42 U.S.C. § 1983 (emphasis added). But Plaintiffs do not claim that they stand to suffer a deprivation of First Amendment rights because of HB3—only that social-media users do. Motion to Dismiss at 24-25.

**D.    HB3 does not violate the First Amendment.**

At any rate, HB3 is not subject to heightened scrutiny because it does not regulate speech—it regulates the ability of internet companies who infuse their products with addictive features to engage in commercial transactions with children. And even if heightened scrutiny did apply, HB3 would survive as a reasonable, content-neutral time, place, and manner restriction.

### 1.    HB3 is not subject to heightened scrutiny.

HB3 is not subject to heightened scrutiny because it regulates commercial activity—not expression—and "presents [no] danger of suppressing[] particular

17

ideas." *Leathers v. Medlock*, 499 U.S. 439, 453 (1991). HB3 is neither "directed at" speech nor has the effect of burdening any internet users' right to expression. *Id.*

**a.** HB3 regulates "entering into a contract" with a child "to become an account holder." Fla. Stat. § 501.1736(2)(a), (3)(a). That activity involves an exchange of value. By creating a personal "profile" or otherwise using a platform under a "unique identifier," *id.* § 501.1736(1)(a), the child gives the platform the opportunity to collect his valuable personal data, advertise to him, and license the content that he generates. *See* Fed. Trade Comm'n, *How Websites and Apps Collect and Use Your Information* (Sept. 2023), https://tinyurl.com/ykcdtwm4. In exchange, the platform gives the child access to its services.

On social-media platforms, that commercial transaction is accomplished through an express contract. Platforms require users to create personal accounts and agree to terms of service that entitle the platforms to collect user data in exchange for full access. Such "clickwrap agreements" are enforceable contracts under Florida law. *Vitacost.com, Inc. v. McCants*, 210 So.3d 761, 762 (Fla. 4th DCA 2017).[33] HB3

---

[33] Even if a hypothetical platform accomplished the exchange of access for data without an express contract, the exchange could still constitute a contract. *See Commerce P'ship 8098 v. Equity Contracting Co.*, 695 So.2d 383, 385 (Fla. 4th DCA 1997) (recognizing that a contract may be implied by the parties' conduct); Fla. Stat. § 501.1736(8).

simply regulates the extent to which platforms that design their products with addictive features may engage in that commercial activity with children.

Consider Facebook. In exchange for full access to its product, Facebook requires users to "agree that [Facebook] can show [them] ads that [Facebook] think[s] may be relevant to [them]" and may "use [their] personal data to help determine which personalized ads to show."[34] The scope of personal data users must allow Facebook to collect includes "the connections [users] make, the choices and settings [they] select, and what [they] share and do on and off [Facebook]."[35] Users must also agree that Facebook may use their personal data to conduct "research for the purposes of developing and improving [its] services."[36] And users must grant Facebook the right to share their personal data.[37]

The commercial transaction does not end with sensitive personal data. Account holders also "grant [Facebook] a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of" all intellectual

---

[34] *Terms of Service*, Facebook (Jan. 1, 2025), https://tinyurl.com/zf86f89r.

[35] *Id.*

[36] *Id.*

[37] *Id.*

property they upload.[38] The contract also releases Facebook from all warranties and liability "to the fullest extent permitted by" law."[39]

That is an ordinary commercial transaction, and "the State is free to impose any rational regulation on the commercial transaction itself." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and concurring in judgment). Contracts have been subject to state regulation—and even prohibition when deemed against public policy—throughout the Nation's history. *See Ogden v. Saunders*, 25 U.S. 213, 347 (1827) (Marshall, C.J., dissenting) ("The [State's] right to regulate contracts, to prescribe rules by which they shall be evidenced, to prohibit such as may be deemed mischievous, is unquestionable, and has been universally exercised."). Parties have never had a right to enter a "contract which the laws of that community forbid." *Id.* at 283 (opinion of Johnson, J.). That is especially true of contracts involving minors, which have been heavily regulated for centuries. *See* Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 264-71 (2005).

That is all HB3 does. It prevents platforms using addictive features from engaging in a commercial transaction with children who lack the capacity to adequately weigh the transaction's risks and benefits. Children's lack of capacity to contract is

---

[38] *Id.*

[39] *Id.*

nothing new. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("When faced with a dispute about the Constitution's meaning or application, long settled and established practice is a consideration of great weight.").

Contrary to Plaintiffs' assertions (e.g., DE5 at 2), HB3 does not prohibit "access" to any platform, nor does it prohibit children from engaging in speech. A covered platform may provide access to children; it just may not require them to become "account holders." Nothing in HB3 prevents a covered platform from granting access to children who are not account holders. *See* DE5-1 ¶ 35 (acknowledging that YouTube can and does provide access to users without accounts).

And if a covered platform refuses to permit access to children without personal accounts, then the platform—not HB3—has denied access. Platforms may prefer requiring users to have accounts as a condition of access so that they can collect user data and maximize revenue. But that preferred business model is not constitutionally protected. The First Amendment protects speech—not contracting to hold an account, much less an account on platforms that successfully addict children.

**b.** Regardless, the account-holding restriction applies only if the platform chooses to infuse its product with addictive features—also commercial activity. HB3 thus at most affects only children's "right to enter" online businesses that have chosen to pair speech-hosting with harmful commercial practices. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002). By restricting children's

ability to have accounts on platforms that deploy addictive features, HB3 limits their exposure to the features, but that does not in any way affect their expression. HB3 limits children's exposure to "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play video," and "[l]ive-streaming." Fla. Stat. § 501.1736(1)(e). Whether users must actively load more content rather than reading an infinite stream of it, click "play" on a video rather than having it play automatically, or open an app to receive account notifications rather than receiving them directly on their phones has no effect on their expression. Users have no general right of access to social-media content at all, *see Murthy v. Missouri*, 603 U.S. 43, 74-75 (2024), let alone a First Amendment right to addictive features.

The Eleventh Circuit has long rejected claims that a regulation of harmful commercial activity implicates the First Amendment simply because the regulation may incidentally limit expression. For example, in *Gary*, businesses offering nude dancing and alcohol could not admit anyone under 21 because an ordinance barred anyone under 21 from entering "any establishment which sells alcohol." 311 F.3d at 1336. An adult under 21 argued that the ordinance violated "her First Amendment right to engage in nude dancing" because it stopped her from dancing in the many establishments that sold alcohol in conjunction with their nude-dancing performances. *Id.* at 1340. Even though nude dancing is "expressive conduct," the Eleventh Circuit rejected the claim because granting access while selling alcohol is

regulable business activity, even if done in conjunction with a speech product like dance shows. *See id.* As the court noted, the plaintiff "remain[ed] free to observe and engage in nude dancing, but she simply [could not] do so in . . . establishments that" sold alcohol. *Id.* HB3 likewise restricts only a child's "right to enter" online businesses that engage in certain business activities. *Id.* Children "remain free to observe and engage in" speech on social media—they "simply cannot do so in . . . establishments that" use addictive features and require users to be account holders. *Id.*; *accord Indigo Room v. City of Fort Myers*, 710 F.3d 1294, 1299-1300 (11th Cir. 2013) (holding that a similar ordinance did not implicate the First Amendment even though it prevented a business from admitting underage persons to political rallies).

The Supreme Court has also found the First Amendment irrelevant to regulations that merely affect access to a business that integrates speech with activities that jeopardize public safety. In *Arcara v. Cloud Books, Inc.*, for example, the Court upheld an administrative order closing an adult bookstore that allowed customers to engage in "sexual activities" on its "premises." 478 U.S. 697, 702-06 (1986). The order, the Court concluded, regulated sexual activity—not adult books. *Id.* And any "burden" on the speech of the store's owners was "dubious," particularly since they "remain[ed] free to sell the same materials at another location." *Id.* at 705-06; *see also Breard v. City of Alexandria*, 341 U.S. 622, 644-45 (1951) (upholding an ordinance that prohibited an "obnoxious" method of selling magazines but left

consumers free to "receiv[e] the magazines"), *abrogated on other grounds*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980); *City of Dallas v. Stanglin*, 490 U.S. 19, 21-22 (1989) (upholding an age restriction on "dance halls" designed to protect children from the "detrimental influences of older teenagers").

Like that law—and the laws in *Gary* and *Indigo Room*—Section 501.1736 does not interfere with expressive activity by the relevant rightsholder. Just as the store owners in *Arcara* remained free to sell adult books despite being barred from running a bookstore that permitted sexual activity, children remain free under HB3 to access social media despite being barred from contracting to hold accounts on platforms that use addictive features. That limitation on "access" to some platforms' "business operations" does not trigger heightened scrutiny. *Norwegian Cruise Line Holdings Ltd. v. Fla. Dep't of Health*, 50 F.4th 1126, 1137 (11th Cir. 2022).

**c.** Plaintiffs assert that HB3 triggers heightened scrutiny because it "restrict[s] minors' access" to social media. DE5 at 17. But that runs headlong into *Gary*, *Indigo Room*, and other precedents rejecting the notion that limiting access to businesses based on harms posed by their commercial activity triggers heightened scrutiny simply because they also host speech. Regardless, Plaintiffs offer no evidence that by requiring platforms to either remove addictive features or grant access to children who are not account holders, HB3 necessarily restricts children's speech on social media. And even if Plaintiffs had demonstrated some effect, "[t]he First Amendment

does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018). Regulations of commercial activity are subject to "rational basis" review even if they "incidentally burden speech." *Otto v. City of Boca Raton*, 41 F.4th 1271, 1276 (11th Cir. 2022) (Grant, J., concurring in the denial of rehearing en banc).

Plaintiffs err in repeatedly invoking *Packingham v. North Carolina*, 582 U.S. 98 (2017) and *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) to support heightened scrutiny. *Packingham* applied heightened scrutiny because the challenged law "foreclose[d] access to social media altogether" for certain individuals. DE1 ¶ 54 (quoting *Packingham*). As explained above, HB3 does no such thing. It only bans platforms using addictive features from making underage children into account holders. *See United States v. Bobal*, 981 F.3d 971, 977 (11th Cir. 2020) (finding *Packingham* irrelevant because the challenged "restriction" did "not leave [the defendant] without" avenues to exercise "his First Amendment rights"). And the violent-video-game ban in *Brown* was not a restriction on children's access to businesses engaged in harmful commercial activity but a "restriction on the content of protected speech" designed "to restrict the ideas to which children may be

exposed." 564 U.S. at 794, 799. HB3 does not bar children from accessing speech at all, let alone particular content or ideas.

>**2.** **Even if HB3 regulated speech, it would be a permissible time, place, or manner restriction that survives any level of scrutiny.**

The First Amendment does not prevent the government from "regulat[ing] only the time, place, or manner of speech." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980). Such regulations are permissible if "they are justified without reference to the content of the regulated speech," "are narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

Even if HB3's restrictions were a regulation of speech, they would at most be a regulation of the *manner* of speech. Again, HB3 does not prohibit anyone from accessing social media. It requires only that platforms provide access without addictive features or without requiring children to be account holders. If platforms provide access in either *manner*, HB3 imposes no restrictions.

>**a)** **Content-Neutrality**

HB3 is content-neutral. A regulation is content-based only if "by [its] terms," it distinguishes "favored speech from disfavored speech on the basis of the ideas or views expressed" or if the government adopted the regulation "because of

disagreement with the message [the speech] conveys." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

HB3 applies to all covered platforms regardless of content. Plaintiffs concede as much. DE5 at 2, 28 ("The law does not focus on any particular content . . . ."). Nor does HB3 reflect Florida's "disagreement with the message" conveyed by any speech. It protects children from the health risks posed by platforms that use features designed to addict them, regardless of the content on those platforms. Whether a platform consists entirely of Bill Nye the Science Guy videos or depictions of graphic violence, HB3's application turns on whether the platform uses addictive features.

Without explanation, Plaintiffs declare that HB3's focus on platforms' addictive features is "inextricable from the *content*" on those platforms. DE5 at 24. But features like "personal interactive metrics," "[p]ush notifications," "[i]nfinite scrolling," "[a]uto-play video," and "[l]ive streaming," Fla. Stat. § 501.1736(1)(e)4., do not depend on content. They can be applied to any content and removed without regard to content. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

27

Equally unpersuasive is Plaintiffs' attempt to characterize HB3 as content-based because its "definition of 'social media platform' singles out a subset of online services" and thus "distinguishes among different speakers." DE5 at 25. Setting aside that "online services" are not the relevant "speakers" here because Plaintiffs base their claims only on the speech rights of social-media *users*, speaker distinctions are not content distinctions unless the "speaker preference reflects a content preference" or the objective of the distinction is "the suppression of certain ideas." *Turner*, 512 U.S. at 658-60; *accord NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1225-26 (11th Cir. 2022) (rejecting NetChoice's argument that heightened scrutiny applied if the law regulated only the largest platforms), *vacated on other grounds sub nom. Moody*, 603 U.S. 707. Other than declaring the matter "obvious," DE5 at 25, Plaintiffs offer nothing to support the groundless suggestion that HB3's facially content-neutral definition of "social media platform" is really a stealth content regulation.

According to Plaintiffs, HB3 purportedly "leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they employ the same so-called 'addictive features.'" *Id.* That differential treatment, Plaintiffs tell us, can only mean that Florida prefers the content on Disney+ and Hulu to the content on Facebook and YouTube. *See id.* But a law does not trigger heightened scrutiny just because it places "differential

burdens" on different forms of media. *Leathers*, 499 U.S. at 452. And social-networking platforms where users upload their own content and interact with the content of others is "categorically different" than a streaming service where users passively watch TV and movies. Alter Dec. ¶ 19. Social media is more addictive and associated with higher rates of depression, *id.*; Twenge Dec ¶ 37, which is why states and federal agencies across the country and across the political spectrum have focused on harm caused specifically by social media. *E.g.*, Surgeon General, *supra* n.1. If HB3 swept in every conceivable internet service, Plaintiffs would claim that it was wildly overinclusive. That HB3 is tailored to the services posing the greatest risk of the harm it seeks to mitigate is a feature—not a bug.

### b) Governmental Interest

HB3's account-holder restrictions on platforms that use addictive features serve a compelling interest: protecting children from addiction. As explained in more detail above, *supra* pp. 4-10, adolescents almost universally use social media and are particularly susceptible to compulsive use that resembles addictions to drugs and gambling. Alter Dec. ¶ 10. That in turn has disastrous consequences for their mental health. Twenge Dec. ¶ 6. The Florida Legislature relied heavily on that evidence in enacting HB3. *See, e.g.*, Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 2-7 (Mar. 28, 2024). Plaintiffs do not even dispute that the State has a compelling interest in protecting children from that harm. *See* DE5 at 1-2, 29; Nov. 19, 2024 Status Conf. Tr.

16:17-17:18; *see also Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (States have "a compelling interest in protecting the physical and psychological well-being of minors.").

### c) Tailoring

The tailoring requirement for content-neutral time, place, or manner restrictions is more forgiving relative to other forms of heightened scrutiny. The regulation need not be the least restrictive means of achieving the government's interest; rather, it is sufficiently tailored if the State's interest "would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799; *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477-78 (1989). The regulation also must avoid burdening "a substantial portion of" speech in a manner that "does not serve to advance" the State's interest and must leave open "ample alternative channels for communication." *Bloedorn v. Grube*, 631 F.3d 1218, 1238, 1241 (11th Cir. 2011).

HB3 easily satisfies that standard. Indeed, it would survive any form of heightened scrutiny. First, children plainly "would be more exposed to" addictive features without HB3. *Clark*, 468 U.S. at 297. HB3 ensures that any platform that children access regularly will either not use addictive features or will not allow children to be "account holders," making it more difficult for platforms to target them with addictive features.

Second, "[n]one of [HB3's] provisions" are "unrelated to the ends that it was designed to serve," and it both avoids burdening a substantial amount of speech and leaves open alternative avenues of communication. *Id.* HB3 protects children from the addictive use of social media, yet it does not altogether prohibit them from using social media. It instead enumerates the specific features found by the Legislature (and the U.S. Surgeon General) to be addictive, *see* Alter Dec. ¶¶ 29-45; Surgeon General, *supra* n.1 at 9; and applies solely to platforms that use those features to addict children. Fla. Stat. § 501.1736(1)(e)4. Among those platforms, the Legislature tailored HB3 by targeting only platforms that present a higher risk of addicting children: platforms where 10 percent of daily active users under 16 use the platform more the 2 hours a day. *Id.* § 501.1736(1)(e)2. Even then, HB3 does not prohibit children from accessing the platform. Instead, it prohibits the platform from giving them accounts or otherwise tracking them with a unique identifier so that the platform cannot easily target them with addictive features. *Id.* § 501.1736(1)(a), (2)(a), (3)(a). And that restriction is further tailored to a child's age: HB3 recognizes that "a 7-year-old is not a 1[4]-year-old" and allows older children (14- and 15-year-olds) to have an account if their parents consent. *J.D.B. v. North Carolina*, 564 U.S. 261, 280 (2011).

Plaintiffs suggest that HB3 may not serve the State's interest because "[t]he legislative record contains no evidence that" eliminating HB3's addictive features

will "reduce" the identified harms to children. DE5 at 29-30. But the question is whether the Legislature "could reasonably have determined that" limiting children's exposure to those features would reduce harm. *Ward*, 491 U.S. at 783. And there is ample evidence that those features do in fact contribute to child social-media addiction. *See* Surgeon General, *supra* n.1 at 9. Research shows that those features "activate[] neural circuits associated with reward processing," "inevitably contributing to overuse . . . and increasing the risk of behavioral addiction." Alter Dec. ¶¶ 29, 36.

██████████████████████████████████████████████

██████████████████████████████████████████████

Plaintiffs also argue that HB3 is not sufficiently tailored because "parents have ample tools at their disposal to restrict their minor children's access to 'social media platforms.'" DE5 at 31. But the Legislature "could reasonably have determined that" Plaintiffs' proposal to simply trust platforms to provide parental tools is nowhere near as "effective[]" as HB3 in preventing addiction. *Ward*, 491 U.S. at 783. The Legislature considered and rejected the adequacy of parental controls, finding them in some cases to even be counterproductive. *See* Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 6-7 (Mar. 28, 2024). That accords with platforms' own internal studies. Allyn, *supra* n.24. Parental controls are difficult to use and easy to circumvent, Allen Dec. ¶¶ 51-63, and do not even address the features that make platforms addictive, Alter Dec. ¶¶ 48-50.█████████████████████████

Parents alone cannot prevent exposure to addictive features—government regulation is necessary. *See* Surgeon General, *supra* n.1 at 13.

Finally, Plaintiffs argue that HB3 is not sufficiently tailored because it burdens adult access by effectively requiring adults to verify their ages. DE5 at 29-30. But HB3 does not require age verification: Any platform that does not want to verify ages can simply refrain from using addictive features or refrain from requiring users to be account holders. Even so, in today's digital world, age-verification does not burden adult access. Unlike in *Reno v. ACLU*, there is no longer an "absence of a viable verification process"; companies have many "effective way[s] to determine the identity or the age of a user" over the internet. 521 U.S. 844, 855, 876 (1997); *see* Allen Dec. ¶¶ 10-50 (describing the methods developed since *Reno*). "[T]echnological evolution" has led to many viable methods, including "digital identity systems" that release a user's "age attributes" "without disclosing other personal information." *Id.* ¶¶ 24, 32. █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████; Veitch Tr. 134:24-148:6.

HB3 is thus a reasonable time, place, or manner restriction—it restricts only the manner by which children access social media. It is also sufficiently tailored and serves a compelling enough interest to survive any level of heightened scrutiny.

**E.  At a minimum, Plaintiffs have not shown clear entitlement to a preliminary injunction.**

In addition to the above flaws, Plaintiffs' request for a preliminary injunction suffers from the same defects as their request in *Moody*. They again seek to enjoin an entire regulatory scheme before any enforcement based on an "underdeveloped" and "incomplete" record. *Moody*, 603 U.S. at 726, 734. Like in *Moody*, Plaintiffs stake their request on a few self-serving—and now discredited, *supra* pp. 13-14— declarations even though they bring First Amendment claims implicating a host of platforms and users.[40] The claims depend on not only the operations of individual platforms (e.g., their approach to account-holding, age-verification, and child access), *cf. Moody*, 603 U.S. at 725-26, but also the circumstances of each platform's users because Plaintiffs invoke users' rights. Yet Plaintiffs present no platform-specific evidence showing that a bar on using addictive features or giving personal accounts to children is effectively an access ban. They do not demonstrate each platform's existing age-gating or parental-consent practices. And they present no evidence about specific platforms' users. It may be the case that some covered platforms

---

[40] Tellingly, Plaintiffs do not desire to have their declarants testify at a hearing. Nov. 19, 2024 Status Conf. Tr. 9:23-25.

transact with children "of tender years." *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944). That alone would foreclose an injunction barring all enforcement against such platforms. The Attorney General can certainly enforce the law against addictive platforms when they give accounts to 4- and 5-year-olds. Those children have no First Amendment interest in an internet account. *Cf. id.*; *Ginsberg v. New York*, 390 U.S. 629, 638 & n.6 (1968); *Bellotti*, 443 U.S. at 635-36.

Plaintiffs, however, blow by those issues and offer nothing but "generalities." *Moody*, 603 U.S. at 788-89 (Alito, J., concurring in the judgment). If nothing else, the measly record Plaintiffs present is too "underdeveloped" to support injunctive relief. *Id.* at 726 (majority op.).

## II. The balance of the equities does not favor an injunction.

Merits aside, Plaintiffs fail to show that the equities favor injunctive relief. Their claim of irreparable harm is belied by their inexplicable delay in seeking relief. HB3 was signed into law on March 25, 2024, with an effective date of January 1, 2025. Plaintiffs had nine months to challenge the statute before it went into effect, yet they did not sue until October 28, 2024—seven months after HB3 became law and just two months before it was set to go into effect. *See Tallahassee Bail Fund v. Marshall*, 2022 WL 22804776, at *3 (N.D. Fla. Oct. 11, 2022) (Walker, C.J.). Plaintiffs unnecessarily forced the State into choosing between litigating the preliminary injunction at breakneck pace or agreeing to stay enforcement of its law for a more

orderly schedule. That "unexplained [seven]-month delay . . . by itself[] fatally undermine[s] any showing of irreparable injury." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016).

## CONCLUSION

Plaintiffs' motion should be denied.

Dated: January 13, 2025

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Darrick W. Monson*
John Guard (FBN 374600)
  *Chief Deputy Attorney General*
Henry C. Whitaker (FBN 1031175)
  *Solicitor General*
Daniel W. Bell (FBN 1016188)
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski (FBN 1002339)
  *Senior Deputy Solicitor General*
Darrick W. Monson (FBN 1041273)
  *Assistant Solicitor General*
Anita J. Patel (FBN 0070214)
  *Special Counsel*
Christine E. Lamia (FBN 745103)
  *Special Counsel*
James Waczewski (FBN 0154989)
  *Senior Assistant Attorney General*
Sara E. Spears (FBN 1054270)
  *Assistant Attorney General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
darrick.monson@myfloridalegal.com

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

This memorandum in opposition complies with Local Rule 7.1(F) because it contains 7,982 words.

/s/ Darrick W. Monson
Assistant Solicitor General

## CERTIFICATE OF SERVICE

I certify that on this 13th day of January, 2025, the foregoing memorandum in opposition was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

/s/ Darrick W. Monson
Assistant Solicitor General