IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

COMPUTER AND COMMUNICA-
TIONS INDUSTRY ASSOCIATION and
NETCHOICE,

*Plaintiff,*

v.

ASHLEY BROOKE MOODY, in her offi-
cial capacity as the Attorney General of
Florida,

*Defendant.*

Case No. 4:24-cv-00438

## DECLARATION OF TONY ALLEN

1. I, Tony Allen, am over the age of 18 and have personal knowledge of the facts set forth in this declaration. I have been retained by the State of Florida in *Computer and Communications Industry Association and NetChoice v. Ashley Brooke Moody*, No. 4:24-cv-00438 (N.D. Fla.), to provide testimony on the systems, processes, and procedures that may be available to social media companies to discharge their responsibilities under the Florida Statutes and Rules that were enacted pursuant to Florida House Bill 3. I have also been asked to provide definitions and context in use for some of the terminology used in the Florida Statutes and Rules.

2. I am being compensated by the Office of the Attorney General of Florida. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

3. I have reviewed the Act, Statute and Rules; CCIA's complaint, motion for preliminary injunction, memorandum in support of its motion for preliminary injunction; and four declarations in support of CCIA's Motion: one from Alexandria Veitch (dated October 24, 2024), one from Bartlett Cleland (dated October 29, 2024), one from David Boyle (dated October 24, 2024), and one from Matthew Schruers (dated October 28, 2024). In addition to these declarations, I have also had the

1

opportunity to review the depositions provided by YouTube and Snap and their latest terms of service. I may wish to supplement my opinions or the bases for them as new evidence comes to light or new research is published.

## Personal Background

4. I am a Chartered Trading Standards Practitioner and Global Subject Matter Expert on Age Assurance Systems. I am the Technical Editor of ISO/IEC DIS 27566-1 – Information security, cybersecurity, and privacy protection – Age assurance systems – Part 1: Framework. I am the author of the book "Age Restricted Sales: The Law in England and Wales."

5. I am also the Founder and Executive Director of the Age Check Certification Scheme, the leading UK Accreditation Service approved auditor and technology testing service for the age-assurance industry. I am also an audit member of the Age Verification Providers Association ("AVPA")— a global trade association representing the age-assurance industry.

6. I have personal knowledge of the history, process, and logistics of online age assurance (as defined herein).

7. I have also been closely involved in the development of age-assurance legislation in the United Kingdom and elsewhere in the world, including the United States of America.

## Summary

8. Florida's HB3 requires social media companies to verify the age of users and, if the user is under 14, to prohibit them from creating a social media account and, if the user is aged 14 or 15, to gain parental consent for that minor to become a social media account holder. The Act requires that "a social media platform shall terminate any account held by an account holder younger than 14 years

2

of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising...". In addition, by § 501.1736 (3)(b)(1) the Act requires that a "social media platform shall terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account."

9. This Act does not specify the exact way that social media companies must perform age verification. The Act is technology agnostic and enables social media companies to choose their own approach to discharging their responsibilities to verify age and consent.

10. Based on my knowledge and experience, modern technology is capable of allowing providers of social media services to verify the ages of their consumers in a variety of ways, without jeopardizing either the providers' or consumers' interests in access or privacy. Companies operating across borders face diverse legal requirements related to age verification, shaped by local regulations, consumer protection laws, and industry-specific mandates. These obligations are often sector-specific (e.g., online services, gaming, and e-commerce) and are aimed at protecting minors from inappropriate content, services, or products.

11. As examples:

(a) In the European Union, the General Data Protection Regulation (GDPR) imposes significant obligations on businesses to verify the age of users where data processing involves minors. Specifically:

   (i)     Article 8 of GDPR mandates parental consent for processing the personal data of children under 16 (or a lower age threshold, not below 13, set by member states). To

comply, companies must verify the user's age to determine whether parental consent is required.

(ii)     Many EU member states supplement GDPR with additional laws requiring age verification for access to restricted goods (e.g., alcohol, tobacco, knives) and services (e.g., gambling, adult content).

(b) In the US, age verification requirements are shaped by laws like the Children's Online Privacy Protection Act (COPPA) and other state and federal regulations:

(i)      COPPA applies to operators of websites or online services directed at children under 13 or those that knowingly collect data from children under 13. While COPPA does not explicitly require "age verification," it does require operators to:

- Obtain verifiable parental consent before collecting, using, or disclosing personal information from children under 13.

- Implement mechanisms to identify users under 13, often necessitating some form of age screening to determine whether parental consent is required.

(ii)     Several states impose age-related restrictions for purchasing specific products or accessing services

12. Further, the burden and cost of verifying age is minimal and is reduced every day as technology evolves. Social media companies already provide age-verification tools for the creation of accounts, to authorize the upload of content, or to verify the age of participants in video content. This was confirmed during the deposition on behalf of YouTube (See, e.g., Depn Veitch ¶¶ 13:14:04 relating to age estimation technologies for participants in video content uploaded)

13. Based on my knowledge and experience, device-based restrictions (See, e.g., Compl. (Doc. 1) ¶¶ 24), network-based restrictions (*ibid* ¶¶ 25), browser-level restrictions (*ibid* ¶¶ 26) and application-

4

level restrictions (*ibid* ¶¶ 27), when properly installed, provide only a partial solution to gaining assurance about the age of users. The availability of these restrictions is further enhanced where the social media company is age aware of its users, so these technology stack level filters are less effective on their own than, and not a substitute for, website-based age assurance.

14. Many of CCIA & NetChoice's members already have tools to assist parents, and already have rules (typically at age 13) that restrict children's access to their services. *See, e.g.,* Compl. (Doc. 1) ¶¶ 23- 39; Cleland Decl. (Doc. 5-2) ¶ 8-11. Often, the enforcement of these rules is retrospective—*i.e.,* access is granted and then, if information becomes available that the user is, in fact, under their self-declared age, restrictions may be applied. The Act is an improvement by requiring the age-verification process to pre-date, and not post-date, the account-creation process. *See* §501.1736 (2)(a), for minor's under 14 and §501.1736 (3)(a) for minor's aged 14 or 15. Because the Act requires pre-account-creation verification, the parental tools and controls would apply to all minors aged 14 and 15 from the start of their social media use rather than never (if the social media company never detects that the user is a minor) or some period of time after the minor has used social media unsupervised (if the social media company detects or is notified that the user is a minor). And because the Act requires parental consent for teens ages 14 and 15, parents are more likely to be involved in their child's social-media use.

## *Age Assurance Services*

15. In my experience, the Act's definitions of "social media platform", §501-1736 (1)(e), uses terms commonly used and understood by social-media companies and others in this industry. In my opinion, for example, the terms used in the statute like "upload content"; "algorithms that analyze

data and select content for users" and "push notifications about activities or events related to user's account" are regularly used in the industry to refer to common features of social-media platforms.

16. The Act requires social media companies that use addictive features to bar certain underage children from being account holders. It does not dictate processes or approaches on how to comply with that. It is expected that social media companies would turn to the existing field of 'age assurance'.

17. I am the Technical Editor of the International Standard on Age Assurance Systems, and extracts from those standards will help the Court understand what age assurance is. These global standards are also endorsed by the industry trade body the Digital Trust and Safety Partnership[1].

18. I start with some definitions from ISO/IEC DIS 27566-1 – Age assurance systems – Part 1: Framework, clause 3:

> "**Age assurance** is a set of processes and methods used to verify, estimate or infer the age or age range of an individual, enabling organizations to make age-related eligibility decisions with varying degrees of certainty."

> "An **age assurance result** is information produced by an age assurance system indicating that an individual is a certain age, over or under a certain age or within an age range."

19. Age assurance is not a new or rare technology. It is widely used by thousands of sellers and their consumers on a daily basis around the world in various contexts, such as alcohol and tobacco sales, gambling, gaming, social media, and, to a growing extent, accessing pornography.

20. Age assurance technologies have evolved significantly over the past two decades, particularly in the online environment. In the early days of online age verification, static age gates were used (c.2000s) these simple "age gates" on websites, particularly for adult content, alcohol and gaming, typically required users to self-declare their date of birth or check a box confirming they were above

---

[1] https://dtspartnership.org/wp-content/uploads/2023/09/DTSP_Age-Assurance-Best-Practices.pdf

a specific age. They lacked sophistication and relied heavily on user honesty. There were no mechanisms, or very limited mechanisms to verify the accuracy of declared ages, making these methods easily circumvented.

21. By the early 2010s, document-based verification began to emerge as online services expanded, and some industries began requiring users to upload government-issued IDs (e.g., passports, driver's licenses) to verify age. These methods were primarily used in regulated industries like gambling and certain e-commerce platforms. These document-based methods improved accuracy but introduced friction for users and raised concerns about data privacy, as sensitive personal information was often stored insecurely.

22. By the mid-2010s the science behind biometric age estimation began to emerge with AI-powered algorithms to estimate a user's age based on physical attributes such as facial features. Early adopters included online gaming platforms and video streaming services. These methods improved user experience by providing non-intrusive and real-time verification while reducing reliance on sensitive documents. However, some privacy issues became a concern around consent, data retention and algorithmic bias.

23. In the late 2010s the development of frameworks such as the UK's PAS 1296:2018 Code of Practice for Age Check Services formalized industry practices. These frameworks established best practices for ensuring accuracy, privacy and transparency in age assurance. Now in the mid 2020s we have Real-Time, Privacy-Preserving Age Assurance leveraging deep learning models for highly accurate age estimation. These age assurance services can verify age in real-time using just a webcam or smartphone camera, without requiring the storage of sensitive personal data. Technologies now incorporate privacy-preserving methods such as edge computing and anonymized data processing. Companies are increasingly adopting standards like ISO/IEC 27566 for age assurance to align with

7

global privacy regulations (e.g., GDPR). Age assurance has expanded into mainstream applications, including social media platforms, video games and live-streaming services, driven by societal and regulatory demands to protect minors online.

24. As a result, age assurance has evolved from rudimentary self-declaration methods to sophisticated, AI-powered systems capable of real-time, privacy-preserving verification. This technological evolution has been driven by advancements in biometrics, regulatory requirements and growing societal expectations for protecting minors in the digital environment.

25. In April 2024, a Global Age Assurance Standards Summit was held in Manchester, UK, and included representation from social media providers like Meta, Google and Microsoft; together with US agencies like NIST and ANSI. This Summit generated a full compendium of the approaches to age assurance, the state of standards development, and the latest state-of-the-art. *Compendium*, Global Age Assurance Standards Summit 2024 (Apr. 2024),(https://accscheme.com/wp-content/uploads/ACCS-GlobalSummit-Compendium-.pdf).

26. The Global Summit concluded with a consensus statement, including input from social media companies established through an open consultative process led by the British Standards Institution, that:

a.    Age assurance **can** be done.

b.    Age assurance **can** be deployed, with the right process for the right use cases, in a manner that is privacy preserving, secure, effective, and efficient.

c.    Age assurance **can** be a valuable tool among a range of measures deployed to protect children in the digital environment.

d.    Age assurance is assisted by securing International Standards, which are implemented and respected by providers of services that are required to make age-related eligibility decisions.

e.   Laws and regulations **can** create the legal framework with robust enforcement procedures in place to secure the protection of children from harm.

*Communique*, Global Age Assurance Standards Summit (Apr. 12, 2024), (https://safeonline.global/wp-content/uploads/2024/05/Global-Age-Assurance-Standards-Summit-Communique-Final.pdf).

27. Further, third-party servicers continue to grow in number and improve the age-verification technology. The AVPA began in 2018 with just six members. It now has thirty members and there are at least forty providers competing in the global market.

28. A number of methods have been developed, initially to verify age exactly, and more recently, to estimate it with an ever-increasing degree of accuracy.

29. ISO/IEC DIS 27566-1 defines five core characteristics of age-assurance systems: functionality, performance, privacy, security, and acceptability. Plaintiffs' members could either develop their own age-assurance systems in accordance with the characteristics of ISO/IEC DIS 27566-1 or procure from the marketplace age-assurance systems that are built to those characteristics. I produce, as Exhibit A, a copy of ISO/IEC DIS 27566-1 for the record.

30. ISO/IEC 27566-1 defines three different methods of age assurance:

9



| | | |
|---|---|---|
| **Age verification methods** | **Age estimation methods** | **Age inference methods** |
| Calculating the difference between a verified year or date of birth of an individual and a subsequent date | Analysis of biological or behavioural features of humans that vary with age | Verified information which indirectly implies that an individual is over or under a certain age or within an age range |

31. The Act does not require that social media companies to establish the date of birth of the user, merely that they determine they are not aged under 14, or are aged 14 or 15, or are aged 16 or older.

32. Age verification and age inference can be achieved by, among other methods, reference to drivers' licenses, passports, electoral rolls, credit reports, cellphone-network records, banking, and credit-card records. Users can also choose to create a digital identity and selectively release just their age attributes. This approach enables users to verify their age without disclosing other personal information, such as their name or address, enhancing privacy and control. By leveraging digital identity systems, users can securely authenticate their age for various online services while minimizing the risk of data misuse or unnecessary exposure.

33. Age estimation, on the other hand, can be achieved by analyzing facial images, voiceprints, or other personalized evidence. The most advanced of these, facial estimation, is accurate to within +/-0.8 to 1.2 years mean absolute error, according to the latest published data by a certified age-

assurance provider, Yoti Limited. *See Yoti Facial Age Estimation*, Yoti (Sept. 2024), https://www.yoti.com/wp-content/uploads/2024/10/Yoti-Age-Estimation-White-Paper-September-2024-PUBLIC.pdf. My certification team has independently verified and validated the results of Yoti's testing. Yoti's White Paper also explains the performance levels at different age gateways, including 13, 14, 15, 16 and 18.

34. The value of age estimation for social media companies and consumers is that it does not require consumers to submit any personal information other than a photograph or voiceprint, which is then instantly discarded. This system is already deployed for the purpose of verifying the age of users on social media site Instagram. *Introducing New Ways to Verify Age on Instagram*, Meta (June 23, 2022), (https://about.fb.com/news/2022/06/new-ways-to-verify-age-on-instagram/). To prevent misuse, advanced age estimation technologies often include anti-spoofing measures, such as liveness detection, which verifies that the image or voice is coming from a real, live person rather than a static photo, video, or recording. Additionally, some systems incorporate continuous authentication techniques, periodically verifying the user's identity during use to ensure the account is not being shared or accessed by someone else.

35. It is important to be clear from the outset that age-*estimation* technology is not *recognition* technology; it detects and assesses information, to give an age estimation, but it does not seek to identify who the person in the image or recording is. No image matching takes place for the purpose of estimating age.

36. A number of features and characteristics of people change with age. This allows for them to be analyzed to estimate age. An example of this is facial features. When facial age estimation is applied, users are either prompted to share a still or video image, or an existing profile picture can be used; and software then estimates their age. Systems learn how to do this by reviewing thousands of images of

11

people with a known age to spot patterns common to those of the same age, which means the technology is becoming better by the day. A live face is detected using liveness detection and then a pixel level review of the face is undertaken. The image generated by this method does not uniquely recognize any individual.

37. Although social media companies can perform age assurance themselves, they can, and often do, contract with third-party companies to perform the service (see p.75 *post* for some examples).

38. When using a third-party service, a social media company directs the applicant for or holder of a user account to provide information directly to the third-party servicer who performs the age assurance and then informs the social media company of only the check's result—"under 14"; "age 14 or 15"; "over 16" etc. It does not pass on any other information.

39. The third-party servicer does not retain a consumer's personal information other than the date of birth, which can be used to respond to subsequent enquiries about that user's age.

40. The verification process need only be performed once per user if they return "over 16", and the verification results for any individual user may be shared within the ecosystem of the social media company, thereby minimizing the need for multiple age-verification checks of the same individual. For results returning "under 16", the age verification process would need to proceed to establish if they were under 14, or aged 14 or 15. It would be likely in a scenario returning an age 14 or 15 that a date of birth would be retained to ensure the correct application of the appropriate requirements for parental consent and when such requirements would expire.

41. Age assurance may be performed online from home or anywhere the user has access to the internet and can usually be completed in less than a minute. The production of ID documents is just one way to do age verification but it is not the most popular method and, as a result, age-assurance systems have evolved that do not rely on this method.

12

## Cost of Age Assurance

42. The leading sector requiring robust age verification was initially online gambling. As an industry with a strong return per customer, it tolerated relatively high costs per age check, perhaps as much as a dollar each. Naturally, as the age-assurance industry grew, competition put downward pressure on pricing, and it halved relatively quickly. Age assurance is not advanced ID document verification or know-your-customer checks often used for anti-money laundering or counterterrorist financing controls. These can be much more expensive—perhaps as much as two or three dollars—but are wholly unnecessary to demonstrate compliance with laws, like the Act, that merely require verification of age. Services will do that function at a considerably lower cost.

43. Alongside competitive pressures, underlying costs have also fell. The earliest age-verification methods almost always relied on accessing third-party databases, such as credit reports, for which there was a substantial cost per check. The more successful providers secured volume discounts but were still facing a high fixed cost base. Naturally, providers looked for cheaper ways to deliver their services, so they looked beyond credit reports to banking and telecoms where good quality data was available at a much lower cost, or even at no variable cost at all.

44. As a leader of an independent conformity assessment body, I cannot speak to the specific pricing offered by individual providers. But the UK Government published an Impact Assessment in 2022 for the Online Safety Bill (as it was at the time), which estimated the cost per check to be 12 cents (converted from pence), with a caveat that this cost is expected to continue to fall through innovation, competition, and interoperability. In the UK Government's most recent update (October 2024) preparing for (what is now) the Online Safety Act 2023, they now estimate that the cost could be as low as 0.8 cents per check (converted from pence).

13

## The Security of Data

45. Age-assurance providers that are members of the AVPA, and thus sign up to its code of conduct, do not create new databases when conducting age checks. There are, of course, sectors such as online gambling where regulators require audit trails, but the industry's general practice is *not* to retain any personal information after an age check is completed. These audited providers do not create new databases of personal data, nor track the behavior of individuals online.

46. During age-verification processes, age-verification providers apply the same degree of security you would expect in financial transactions.

47. Specifically, age verification companies adhere to a duty to protect personal data and demonstrate their adherence to this duty through various forms of global certification (*e.g.*, ISO 27001, SOC2, Cyber Essentials, BSI PAS 1296, etc.) to ensure personal data is dealt with securely, which are recognized in the US.

48. There is now a global standard in IEEE 2089.1 and an emerging global certification process under it. There is also considerable work progressing on ISO/IEC DIS 27566-1 – Age assurance systems – Part 1: Framework, which will form part of global certification of age-assurance systems.

49. Though age-verification providers share the same risk of attacks as a bank or healthcare provider, these risks are inherent to the internet, not unique to age verification. However, unlike banks and healthcare providers, age-verification providers hold considerably less valuable data, if any data at all, that would be useful to a hacker.

50. In addition to local laws, such as General Data Protection Regulations ("GDPR") in the UK and European Union, there is an industry-wide certification protocol, operated by government-approved auditors, which tests providers against international standards. This not only assesses the

14

efficacy of the age check, but also data-security and privacy measures. Social media companies governed by the Act may choose to use commercially available age-verification providers certified by these regulatory bodies, not only to consolidate their defense against potential legal claims but also to build consumer trust and confidence.

### Ineffectiveness of Other Methods

51. Other existing methods for protecting children on the internet, including parental controls and web-filtering technology, are not mutually exclusive with age assurance. For example, both content filtering and age verification could be deployed consecutively or concurrently. Content filtering, however, has flaws and is no substitute for age verification and parental consent.

52. A neutral analysis of content filtering can be found in a report for the European Parliament's Policy Department for Citizens' Rights and Constitutional Affairs. *The Impact of Algorithms for Online Content Filtering or Moderation*, European Parliament (Sept. 2020), bit.ly/3A6jKNK.

53. Filtering applied in the home, on the router or on laptops, tablets, and smartphones, is generally managed by parents. We know from repeated research by the UK's telecom's regulator, OFCOM, that many parents are unaware of this technology. And those aware of it often do not know how to use it, or discover their children also know how to use it and circumvent it. And those who know about it and how to use it must still choose to use it. "Just over a quarter of parents used content filters provided by their broadband supplier, where the filters apply to all devices using that service (27%). A much larger proportion (61%) said they were aware of this feature, showing that not all parents are adopting this potentially useful control." *Children and Parents: Media Use and Attitudes Report 2022*, OFCOM (Mar. 30, 2022), https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf). A survey of U.S.

15

parents by Kapersky in 2021 found just 50% used any kind of parental controls. *See Study Finds 50% of Parents Use Parental Control Apps*, Kaspersky (Dec. 2, 2021), (https://usa.kaspersky.com/about/press-releases/2021_study-finds-50-of-parents-use-parental-control-apps).

54. Directions on how to circumvent parental controls are easily available on the internet, and children are succeeding at getting around parental-control features. *See, e.g.*, Yoree Koh, *Tech-Savvy Kids Defeat Apple's and Others' Parental-Control Features*, Wall St. J. (Dec. 19, 2021), (https://www.foxbusiness.com/features/tech-savvy-kids-defeat-apples-and-others-parental-control-features).

55. Some parents describe supervising the children's internet usage as "a full-time job," *id.*, and that they are losing the "technological arms race over parental controls in the home," Stephen Johnson, *How Your Kids Are Outsmarting All Your Parental Controls*, Lifehacker (Dec. 21, 2021), https://lifehacker.com/how-your-kids-are-outsmarting-all-your-parental-control-1848249586.

56. One study has found that 86% of parents support laws restricting children's access to social media. Brett Cruz, *50% of American Parents Think a TikTok Ban Would Make Kids Safer Online*, Security.org (last updated June 10, 2024), https://www.security.org/digital-safety/parents-react-to-social-media-legislation/.. Another found that 81% of adults in the United States "favor parental consent for minors to use social media." Monica Anderson & Michelle Faverio, *81% of U.S. Adults – Versus 46% of Teens – Favor Parental Consent for Minors to Use Social Media*, Pew Research Ctr. (Oct. 31, 2023), (https://www.pewresearch.org/short-reads/2023/10/31/81-of-us-adults-versus-46-of-teens-favor-parental-consent-for-minors-to-use-social-media/).

57. Children today are adept at leveraging technological tools and exploiting system vulnerabilities to bypass parental controls. Here is an overview of the main strategies employed across various levels of restrictions:

58. Device-level restrictions, such as parental controls or default operating system settings, aim to limit access to inappropriate content or apps. However, children often circumvent these through:

    a.   Factory resetting the device to remove parental control settings. Android and Apple devices both deactivate the parental control settings if the device is reset (Apple says this can be stopped by enabling Activation Lock in the Find My feature) (https://discussions.apple.com/thread/253247939).

    b.   Creating secondary or "ghost" accounts without restrictions to access unrestricted content (https://www.parentingwithfocus.org/post/the-complete-guide-to-parental-controls).

    c.   Using shared payment methods or family accounts to bypass content filters or download restricted apps.

    d.   Gaining administrative control to remove restrictions set by manufacturers or guardians – this is sometimes called 'Jailbreaking'.

59. Network-Based Restrictions, such as firewalls or DNS-based filtering, are implemented to block inappropriate websites across devices connected to the network. Children bypass these using:

    a.   Masking their location and bypassing content filtering through encrypted connections, such as the use of virtual private networks.

    b.   Accessing restricted content through publicly available proxy sites. It is not impossible to identify these services (they have been blocked for the purpose of content licensing by the likes of Netflix, news sites and subscription TV channels)

    c.   Connecting to unrestricted networks, such as mobile data, public Wi-Fi, or a friend's hotspot (the phenomenon of hotspot sharing in schools for popularity, means that

17

pupils with less attentive parents to their online browsing can offer connection for other pupils where parents have set up controls).

60. Browser-Level Restrictions such as safe search configurations, or extensions aim to restrict access to adult or harmful content. Common circumvention tactics include:

    a. Downloading browsers that do not enforce the same restrictions or limitations (such as the Opera (https://www.opera.com/) which has built in tools to avoid restrictions.

    b. Avoiding detection and restrictions by using modes that do not save browsing history such as Incognito Mode (https://support.google.com/chrome/answer/95464).

    c. Manipulating URLs to access content without triggering keyword-based restrictions.

61. Applications often include built-in self-declaration tools to limit access to certain features or content. Children evade these using:

    a. Entering incorrect birthdates to meet the minimum age requirements for apps or services - A third of children claim to be 18 or older on social media, and 22% of 8–17 year olds lie about their age on social media apps (https://www.ofcom.org.uk/online-safety/protecting-children/a-third-of-children-have-false-social-media-age-of-18/)

    b. Using adult or older sibling accounts to access restricted content.

    c. Downloading unauthorized versions of applications (called cracked apps) without restrictions from third-party app stores.

    d. Using exploits, such as trial resets or in-app loopholes, to access restricted content without parental approval.

62. These attack vectors can be applicable to age assurance systems too, however, where the age assurance process is conducted by specialist third party age verification providers, their systems are developed and designed to recognize these attack vectors and mitigate them. Children's ability to

circumvent restrictions underscores the need for a multi-layered approach that combines technical solutions with active parental involvement and education. Solutions that evolve with technological advancements and incorporate behavioral insights can better address these challenges. As age assurance has technologically evolved over the last few years, its role in the holistic protection of children from online harm has become more paramount.

63. Research for the Federal Trade Commission (https://www.ftc.gov/system/files/documents/public_events/1582978/betrayed_by_the_guardian_-_security_and_privacy_risk_of_parental_control_solutions.pdf) examines the Security and Privacy Risks of Parental Control Solutions. The report concludes that:

> "Our cross-platform comprehensive analysis of popular solutions shows systematic problems in the design and deployment of all the analyzed solutions (with some exceptions) from a security and privacy point of view. Indeed several of these solutions can undermine children's online and real-world safety. As these solutions are viewed as an essential instrument to provide children a safer online experience by many parents, these solutions should be subjected to more rigorous and systematic evaluation, and more stringent regulations."

64. Filtering software is also an imperfect solution. Many filtering tools collect data on browsing habits. This information can be mishandled or accessed by unauthorized parties. The privacy-infringement concerns raised about age verification also apply to content filtering. Research on Internet Filtering and Adolescent Exposure to Online Sexual Material concluded that caregiver's use of internet filtering had inconsistent and practically insignificant links with young people's reports of encountering sexual material online. Przybylski & Nash, Cyberpsychol Behav Soc Netw. 2018 Jul 1;21(7):405-10,(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6101267/)

65. Filtering software can reflect the biases of its developers, resulting in the blocking of content based on cultural or ideological standards that may not align with the values of all users.

66. The dynamic nature of the internet requires constant updates to filtering algorithms to keep up with new websites and changing content. This maintenance is resource-intensive and often lags behind the creation of new harmful content.

67. High-quality filtering software can be expensive, typically in the range of $4-5 per month per license.

68. Relying solely on content-filtering software can lead to complacency among parents and guardians, who mistakenly believe that the software provides complete protection. This can result in a lack of active engagement and communication with children about safe online behaviors.

69. Content filtering is not a replacement for what the Act requires of social media companies: age verification and parental consent. In short, content filtering is a less effective approach than the one the Act adopts.

### *Parental Consent*

70. Parental consent is generally done separately from age assurance or verification. This process generally occurs after an age-assurance process determines that a user is a minor.

71. There are numerous commercial providers of parental-consent services in the United States through the Children's Online Privacy Protection Act (COPPA) Safe Harbor Program. *See COPPA Safe Harbor Program*, Federal Trade Comm'n (last accessed Oct. 30, 2024), https://www.ftc.gov/enforcement/coppa-safe-harbor-program.

72. In implementing COPPA, the Federal Trade Commission set up a process that enables industry groups to seek safe harbor for how they gain parental consent. The list of currently approved Safe Harbor organizations is:

- Children's Advertising Review Unit (CARU)

- Entertainment Software Rating Board (ESRB)

- iKeepSafe

- kidSAFE

- Privacy Vaults Online, Inc. (d/b/a PRIVO)

- TRUSTe

73. There are many methods of verifying parental consent, including:

    a.    Email Verification: This is one of the simplest methods, where a parent receives an email requesting consent and must respond or click a link to confirm.

    b.    Knowledge-Based Authentication: Here, the parent answers questions only they are likely to know, such as financial or historical details, which are verified against public records.

    c.    Credit Card or Payment Verification: Many systems verify parental consent by requiring a small charge (often refundable) on a parent's credit card. This method leverages the fact that payment cards are usually only available to adults.

    d.    Government ID Verification: This method asks parents to upload a scanned ID (such as a driver's license) for identity verification.

    e.    Video Verification: In this approach, parents participate in a live video verification or upload a short video of themselves providing consent. This method can be reliable, especially if paired with AI for identity matching.

    f.    Third-Party Verification Services: Some companies use third-party age-assurance providers specializing in parental-consent verification. These services manage verification across various methods (such as ID verification, payment, or biometric checks), and ensure compliance with data protection and privacy laws like GDPR and COPPA.

### What We've Learned

74. Age-assurance methods do not necessarily add a new step to a user's visit to a new website or app because, through re-usability and interoperability, one age check can be used across multiple sites seamlessly.

75. Some social media companies are already using age-assurance technology in some contexts. For example:

a. Meta has deployed age-assurance measures on Instagram, using Yoti as a provider. *See Introducing New Ways to Verify Age on Instagram*, Meta (June 23, 2022), https://about.fb.com/news/2022/06/new-ways-to-verify-age-on-instagram/. This is also being applied to Instagram Teen accounts.

b. TikTok scans public videos of users to help determine account holders' ages. *See* Sarah Perez, *TikTok CEO Says Company Scans Public Videos to Determine Users' Ages*, TechCrunch (Mar. 23, 2023), https://techcrunch.com/2023/03/23/tiktok-ceo-says-company-scans-public-videos-to-determine-users-ages/.

c. Google's YouTube Official Blog states, "If our systems are unable to establish that a viewer is above the age of 18, we will request that they provide a valid ID or credit card to verify their age. We've built our age-verification process in keeping with Google's Privacy and Security Principles." *Using Technology to More Consistently Apply Age Restrictions*, YouTube Official Blog (Sept. 22, 2020), https://blog.youtube/news-and-events/using-technology-more-consistently-apply-age-restrictions/.

d. If a user tries to change their self-reported age or has been identified as being underage, platforms, including Pinterest, Discord, TikTok, and Google, require users to verify their age with a government-issued ID, credit card, or a live photo.

e. PlayStation has deployed age-assurance measures with Yoti. *Age Verification Frequently Asked Questions*, PlayStation (last accessed Oct. 29, 2024), https://www.playstation.com/en-gb/support/account/age-verification-faq/#:~:text=Age%20verification%20allows%20us%20to,by%20our%20service%20provider%2C%20Yoti.

f. Age assurance is also now available on social media websites through services like VerifyMy. *VerifyMyAge*, VerifyMy (last accessed Oct. 29, 2024), https://verifymy.io/.

76. Over the past 25 years, the age-verification industry has developed a wider range of ways to verify age that offer users choice, including alternatives to document-based approaches. Users can choose, for example, age-estimation techniques, which do not require ownership or use of a document and where the image is instantly deleted. Many hundreds of millions of age-assurance checks are now undertaken globally each year. The cost has dropped dramatically, with reusability likely to lead to that

trend continuing so there are no undue burdens on social media companies due to the high costs of implementing full ID-document and know-your-customer level verification technologies. Nor would there necessarily be any significant loss of traffic resulting from the use of these technologies, except, of course, from minors who do not have parental consent.

77. The UK Government estimate in the Impact Assessment for the Online Safety Act 2023 puts the cost per check at 12 cents and possibly as low as 0.8 cents for high volume platforms, but notes that the cost may reduce further through interoperability and growing competition. Those 12 cents also may be defrayed across 100 websites before the check needs to be repeated to maintain the on-going integrity of the age-verification ecosystem, and that is only if businesses determine that periodic re-validation is prudent.

78. Concerns about anonymity have also been addressed. The age-verification sector was created specifically to enable users to access the sites they wished to access through the data-minimized sharing of age. By selecting a trusted third party, even when selective disclosure from full identity documents or a digital-identity wallet is used to prove age, the provider then only confirms "yes" or "no" when a website enquires "is this user an adult?" In Europe, users are given further reassurance by the enforcement of the General Data Protection Regulations; but in the United States, contractual commitments to maintain secrecy and the threat of civil damages claims if that is not applied offer similar protection.

79. Whether or not privacy laws apply, globally AVPA members must adhere to a Code of Conduct that requires privacy and data security. *See Code of Conduct*, Age Verification Provider's Ass'n (last accessed Oct. 29, 2024), https://avpassociation.com/membership/avpa-code-of-conduct/.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based on my personal knowledge.

23

24

Executed    **Jan 09, 2025**

*Tony Allen*
Tony Allen (Jan 9, 2025 21:29 GMT)

Tony Allen