

# Transcript of Bartlett Cleland

**Date:** December 10, 2024
**Case:** Computer & Communications Industry Associations, at al. -v- Moody, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

- - - - - - - - - - - - - - - - x

COMPUTER & COMMUNICATIONS      :

INDUSTRY ASSOCIATION and       :

NETCHOICE,                     :

          Plaintiffs,      : Case No.

   v.                          : 4:24-cv-00438-

ASHLEY BROOKE MOODY, in her    : MW-MAF

official capacity as Attorney  :

General of the State of Florida,:

          Defendant.       :

- - - - - - - - - - - - - - - - X


     Videotaped Deposition of BARTLETT CLELAND

             Washington, DC

         Tuesday, December 10, 2024

              10:12 a.m.




Job No. 562617

Pages:  1 - 224

Reported by:  Janet A. Hamilton, RDR

Videotaped Deposition of BARTLETT CLELAND,

held at the office of:



        Wilson Sonsini Goodrich & Rosati

        1700 K Street, NW

        Fifth Floor

        Washington, DC  20006

        202.973.8800









        Pursuant to Notice, before Janet A.

Hamilton, Registered Diplomate Reporter and Notary

Public in and for the State of Maryland.

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

DOUGLAS L. KILBY, ESQUIRE

STEARNS WEAVER MILLER WEISSLER

ALHADEFF & SITTERSON

Highpoint Center

106 East College Avenue, Suite 700

Tallahassee, Florida  32301

850.354.7613


ON BEHALF OF DEFENDANT:

JOHN GUARD, ESQUIRE

CHIEF DEPUTY ATTORNEY GENERAL

ANITA J. PATEL, ESQUIRE

CHRISTINE E. LAMIA, ESQUIRE

SARA SPEARS, ESQUIRE

SPECIAL COUNSEL

OFFICE OF THE ATTORNEY GENERAL

400 S. Monroe Street

PL-01 The Capitol

Tallahassee, Florida  32399

850.414.3300

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    4

ALSO PRESENT:


     MITCHELL PALLAKI, ESQUIRE

     CLEMENT & MURPHY


     PAUL TASKE, ESQUIRE

     NetChoice


     STEPHANIE JOYCE

     Senior Vice President and Chief of Staff

     Computer & Communications Industry Assoc.


     CODY HANDLIR, Videographer

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    5

C O N T E N T S

EXAMINATION OF BARTLETT CLELAND                   PAGE

  By Mr. Guard                                    10

E X H I B I T S

(Attached to the transcript)

CLELAND DEPOSITION

Exhibit 1    Declaration of                       20
             Bartlett Cleland

Exhibit 1A   Screenshot from NetChoice's          33
             web page

Exhibit 2    2023 Return of Organization          41
             Exempt from Income Tax

Exhibit 3    Pages from Meta's website            53

Exhibit 4    Amazon Conditions of Use            72

Exhibit 5    eBay's User Agreement               75

Exhibit 6    Airbnb Terms of Service             77

Exhibit 7    PrizePicks Terms of Service         78

Exhibit 8    Turo Terms of service              80

Exhibit 9    Etsy Terms of Use                  82

Exhibit 10   Pinterest Terms of Service         98

Exhibit 11   Snap's Terms of Service           100

Exhibit 12   Google Terms of Service           104

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    6

E X H I B I T S   C O N T I N U E D

Exhibit 13  Age requirements on Google        108
            Accounts
Exhibit 14  X Terms of Service                119
Exhibit 15  Facebook Terms of Service         122
Exhibit 16  Section 1 of HB 3                 126
Exhibit 17  US Surgeon General's Advisory:    161
            Social Media and Youth Mental Health
Exhibit 18  June 21, 2023 letter to           176
            Mark Zuckerberg from Senator
            Blumenthal and Senator Blackburn
Exhibit 19  National Center for Missing        179
            and Exploited Children 2023
            Cyber Tipline Reports by ESPs
Exhibit 20  National Center for Missing        185
            and Exploited Children 2023
            Cyber Tipline Reports by State
Exhibit 21  Complaint in US District Court    186
            Office of the Attorney General
            State of Florida v. Meta Platforms
            and Instagram
Exhibit 22  Printout from Meta's website      191
            "Meta's work to combat sextortion"

E X H I B I T S   C O N T I N U E D

Exhibit 23  Printout from Meta's website      193
            "Our New Education Campaign to Help
            Protect Teens From sextortion Scams"

Exhibit 24  NBC News story printout re:        198
            "Fewer than 1 percent of parents
            use social media tools to monitor
            their children's accounts, tech
            companies say"

Exhibit 25  Ipsos Aura Parental Control        201
            Survey August 4-6, 2023

Exhibit 26  Document published by Microsoft    206
            September 2023:  "Generative AI,
            Mental Health and Safety Technologies"

Exhibit 27  Printout from Google:  "Update     208
            your account to meet age requirements

Exhibit 28  Printout from Instagram:  "How     210
            does video selfie age verification
            work on Instagram

Exhibit 29  Printout from Instagram:           212
            Introducing New Ways to Verify Age
            on Instagram

Exhibit 30  X Verification Policy & Privacy     214

Exhibit 31  Printout from Yoti's website        215
            Age Verification

Transcript of Bartlett Cleland
Conducted on December 10, 2024                          8

E X H I B I T S   C O N T I N U E D


Exhibit 32   Printout from Ondato's              216

             website re age verification

Exhibit 33   Printout from Ondato:               218

             Case study for OnlyFans

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    9

THE VIDEOGRAPHER:  Here begins media number one in the videotape deposition of Bartlett Cleland in the matter of Computer and Communications Industry Associations, et al. v. Moody, et al., in the United States District Court, Northern District of Florida, Tallahassee Division, case number 4:24-cv-00438-MW-MAF.

Today's date is December 10th, 2024.  The time on the video monitor is 10:12 a.m.  The videographer today is Cody Handlir representing Planet Depos.  This video deposition is taking place at 1700 K Street, Northwest, on the fifth floor, Washington, DC.

Would counsel please voice identify themselves and state whom they represent.

MR. GUARD:  John Guard, Chief Deputy Attorney General on behalf of Ashley Moody, Attorney General.

MR. KILBY:  Doug Kilby, Stearns Weaver and Miller, on behalf of plaintiffs NetChoice and CCIA.

THE VIDEOGRAPHER:  The court reporter today is Janet Hamilton representing Planet Depos. The witness will now be sworn.

P R O C E E D I N G S

-----

BARTLETT CLELAND,

a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT                    10:13:16

Q   Mr. Cleland, can you please state and spell your first and last names for the record?

A   Bartlett, B-A-R-T-L-E-T-T, Cleland, C-L-E-L-A-N-D.

Q   All right.  Mr. Cleland, my name is John Guard.  I'm the Chief Deputy Attorney General for the State of Florida.  I'm here representing Ashley Moody who's the Attorney General for the State of Florida.

Have you ever been deposed?

A   No.

Q   All right.  Well, I'm going to give you some ground rules and some background information that will hopefully make this smoother.

We have a court reporter who's sitting to my right, to your left, who's taking down everything stenographically, and if you and I were having a coffee at Starbucks or at some other coffee shop, we would have a conversation where we would talk and probably interrupt each other and

11

talk over each other because that's how humans behave, but because we have a court reporter here who's taking everything down, you know, you have to let me finish and I have to let you finish so that she can actually make a record.  Is that fair?

A  Fair enough.

Q  Okay.  This is not the Bataan Death March. If you need to take a break to go to the bathroom or you want to talk to your counsel or whatever, if you'll just ask to take a break, after the pending question's answered we'll take a break. Is that fair?

A  Fair enough.

Q  All right.  And from time to time your counsel may disagree with how I have asked a question, and so he may speak up and do something called an objection.  Now, there's no court here to rule on objections today, and so after he makes his objection I'll probably say, unless he instructs you not to answer, that you can answer, and then you'll answer the question.  Do you understand?

A  Yes.

Q  Okay.  Are you on any medication that

10:14:01
10:14:04
10:14:07
10:14:12
10:14:16
10:14:18
10:14:18
10:14:19
10:14:24
10:14:27
10:14:30
10:14:33
10:14:35
10:14:36
10:14:36
10:14:39
10:14:42
10:14:46
10:14:49
10:14:52
10:14:56
10:14:59
10:15:01
10:15:01
10:15:02

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    12

would impair your ability to tell the truth today?    10:15:04

A  No, sir.    10:15:07

Q  All right.  In what city do you live?    10:15:07

A  Oakton, Virginia.    10:15:10

Q  Okay.  And where do you work?    10:15:13

A  At NetChoice.    10:15:14

Q  Ands where is NetChoice located?    10:15:15

A  In Washington, DC.    10:15:18

Q  Okay.  And how long have you worked at NetChoice?    10:15:19 10:15:21

A  Two months or -- I started October 1st.    10:15:22

Q  Okay.  And you are NetChoice's general counsel?    10:15:27 10:15:34

A  Yes.    10:15:34

Q  Okay.  And have you been NetChoice's general counsel the entire two months that you've worked there?    10:15:34 10:15:40 10:15:42

A  Yes.    10:15:43

Q  Okay.  And what are your duties and responsibilities as general counsel with NetChoice?    10:15:43 10:15:47 10:15:49

A  I don't have in front of me the description of the job.    10:15:50 10:15:53

Q  Okay.  Well, can you just describe generally what your duties are?    10:15:54 10:15:56

A  Sure.  Generally speaking, and while I'm still getting used to it, responsible for every, or for various things like testifying on issues, having familiarity broadly with our members, any kind of internal -- trying to think of the word -- general counsel-y work, so things like internal process procedures, et cetera.

Q  What do you mean that you have to have familiarity broadly with, I think you said your members, but NetChoice's members?

A  NetChoice's members, yes.

Q  What do you mean?

A  Awareness of the industry, trends, literally was one of the reasons I was hired for my background.

Q  Okay.  And we're going to get into your background.  That's coming.  You also have another title, director of strategy initiatives with NetChoice; is that correct?

A  Mm-hmm, yes.

Q  All right.  And what does being the director of strategy initiatives add to your job as general counsel?

A  I -- I think that pretty much means do special tasks as designated by the CEO but to be

Transcript of Bartlett Cleland
Conducted on December 10, 2024

14

honest with you we have not explored exactly the

parameters of what that will encompass.

Q   Okay.  So you have that title for two

months but you've not yet really acted under that

title yet?

A   Correct.

MR. KILBY:  Object to the form.

Q   Okay.  So I guess I should have clarified

this as well.  If you can just pause for a couple

seconds so that your counsel can have a heartbeat

to actually object before you answer.  Again,

that's -- I know that's not like we were having a

conversation, and it's hard, that would be

helpful.

Where were you employed prior to being at

NetChoice?

A   Self-employed.

Q   Okay.  And did you own your own company?

A   Yes.

Q   Okay.  And what did you do when you were

self-employed?

A   Public policy work, broadly.  Not

lobbying.

Q   And how long were you self-employed?

A   Give or take, a year and a half.

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                  15

Q   Did you do public policy work on any
specific area?                                                  10:18:54
                                                                10:18:57
A   All technology and telecommunications.                     10:19:00
Q   Did you do work for not-for-profits or                     10:19:07
for-profit companies?                                           10:19:25
A   Both.                                                       10:19:27
Q   Okay.  Going back from a year and a half                   10:19:28
ago, where were you employed prior to being                     10:19:43
self-employed?                                                  10:19:45
A   The American Legislative Exchange Council.                 10:19:46
If it makes it easier, ALEC.                                    10:19:54
Q   I was going to say, are you okay if I use                  10:19:55
the acronym ALEC?                                               10:19:58
A   I'm perfectly happy with that.                             10:19:59
Q   And what was your position with ALEC?                      10:20:03
A   General counsel.                                           10:20:06
Q   And how long were you the general counsel                  10:20:06
for ALEC?                                                       10:20:11
A   Without having the dates in front of me, I                10:20:12
believe it was four and some years.  I was there                10:20:15
longer and did other stuff prior and after, so I'm              10:20:22
just not a hundred percent sure.                                10:20:26
Q   Okay.  How long in total were you with                     10:20:28
ALEC?                                                           10:20:30
A   I knew that was the next question.  So I                   10:20:31

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    16

was there from 20, January of 2015 through              10:20:35

February/March of 2022.                                 10:20:45

    Q  And roughly you were general counsel      10:20:54

for --                                                  10:20:58

    A  About --                                 10:20:59

    Q  -- 2018 through 2022 roughly?              10:21:00

    A  Reverse that.  I was at the beginning.     10:21:04

    Q  So --                                      10:21:09

    A  It was the beginning of that period.       10:21:09

    Q  So you were general counsel 2015 to 2019?  10:21:11

    A  Yes, something like that.                  10:21:15

    Q  Okay.  And then from 2019 through 2022      10:21:17

what was your role with ALEC?                           10:21:23

    A  It was -- what was the actual title?  It   10:21:26

was director for the Center For Innovation and          10:21:29

Technology and something again with special             10:21:34

projects.  I can't remember to be honest with you.      10:21:37

It was a very long title.                               10:21:40

    Q  What was the mission of the Center For      10:21:44

Innovation and Technology?                              10:21:50

    A  To -- honestly, to help legislate state    10:21:50

legislators understand various technology trends,       10:21:57

sometimes particular technologies and what it           10:21:59

would mean in the public policy space.                  10:22:02

    Q  As the director for the center, did you    10:22:08

have interaction or involvement with for-profit

companies in that space?

    A  What do you mean by interaction?

    Q  Did you regularly deal with technology

companies who had initiatives that they wanted

ALEC to undertake?

       ALEC proposes model legislation; correct?

    A  Ultimately, yes.

    Q  And there's a whole process at ALEC

leading up to model legislation either being

adopted or not adopted; correct?

    A  Correct.

    Q  All right.  And like any kind of lobbying

industry, when they find that ALEC is looking at

an issue, gets involved; right?

    A  So I --

       MR. KILBY:  Object to form.

    A  ALEC doesn't lobby.

    Q  Well, I didn't say ALEC lobbied, but

industry goes to ALEC with its ideas or concerns

about model, particular model legislation?

    A  So to maybe correct your understanding of

how ALEC works, nonprofits and for-profits are

members in exactly the same way that a legislator

would be a member.  So if you imagine a room like

this, there might be 20 people around the table, they're all giving opinions on whatever, hashing over ultimately, to your point, language that would look good in, or that would be appropriate, that would be generally accepted and would be beat up to put in front of legislators in various states, or that they could put in front of their own legislature.

Q  Okay.  All right.  And prior to January of 2015 where were you employed?

A  Self-employed for two years?  Yeah, two years.

Q  Okay.  And how were you self-employed?

A  Same as we discussed previously.

Q  Okay.  Doing, giving public policy-related advice to for-profits and not-for-profits?

A  Yes.

MR. KILBY:  Object to form.

A  And writing op/eds like the public emanations of public policy.

Q  Was it again in kind of a technology and/or computer space?

A  Technology and telecommunications and intellectual property.

Q  Okay.

Transcript of Bartlett Cleland
Conducted on December 10, 2024

19

MR. KILBY:  John, could we take just a five-second break to discuss an issue to make the record clearer?

MR. GUARD:  Sure.

MR. KILBY:  Thanks.

THE VIDEOGRAPHER:  Stand by.  We are going off the record.  The time is 10:25 a.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:26 a.m.

MR. KILBY:  During the short break we took counsel discussed, and I believe agreed, that simple statement of objection to form preserves all such objections without needing to elaborate on what the particular objection to form is.  Is that correct, sir?

MR. GUARD:  That's correct.

MR. KILBY:  Thank you, John.

MR. GUARD:  No problem.

Q   I'm going to try to short circuit that as we're going back through your résumé.  Is it fair to say that you've spent most of your adult life in the technology and telecommunications space on public policy matters?

A   Yes.

Q   Okay.  All right.  You're also a member of the Missouri Bar Association; correct?

A   Yes.

Q   Okay.  I'm going to show you what I've marked for identification to your deposition as Exhibit 1.

(Cleland Exhibit 1 was marked for identification.)

Q   Exhibit 1 is the declaration that you executed in this case; correct?

A   It appears to be so.

Q   And it's the filed copy of it; right?

A   If that's what these markings mean, yes.

Q   Well, if you do not know -- if you're not -- if you're unsure about an answer to the question, and he'll probably tell you this on a break, you probably should answer that you don't know because, again, you're under oath here, and I don't want you to misstate or misspeak.  I'm not trying to catch you in any kind of problem.

And you have an, at least what appears to me, you have another copy of the declaration that you brought with you; is that correct?

A   Yes.

Q   All right.  For purposes of this

Transcript of Bartlett Cleland
Conducted on December 10, 2024          21

deposition let's use the exhibit copy of it, not the whatever, because I don't know if you have notes on this or anything else, and I don't want to create a problem or an issue.

Did you yourself prepare that declaration?

A   Yes.

Q   Okay.  Besides your counsel did you speak to anyone else about the contents of the declaration?

A   Yes.

Q   All right.  Again, this is beside your counsel, who did you speak to?

A   Our internal lawyers at NetChoice.

Q   Okay.  All right.  All right.  So I probably need to state that more precisely. Besides lawyers with NetChoice did you speak to anyone about the contents of the declaration?

A   No.

Q   Okay.  Besides lawyers with NetChoice and your counsel, did anyone else have input into the contents of the declaration?

A   I don't know.

Q   Okay.  In preparing Exhibit 1 did you speak to any member of NetChoice?

MR. KILBY:  Object to the form.

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    22

A   Could you tell me what you mean by member?

Q   Sure.  NetChoice is a not-for-profit trade association; correct?

A   Correct.

Q   And NetChoice has members, companies, for-profit companies that belong to it; right?

A   We have -- we have companies who provide funds to the organization.  I don't know whether we have members or not.  I don't think we're a membership designated organization.

Q   So sitting here right now you don't know if NetChoice has dues from members?

MR. KILBY:  Object to the form.

A   So I'll answer the same way, that I know that we receive funds from organizations.  I don't know about membership status.

Q   Okay.  In preparing Exhibit 1 did you -- did you speak to any for-profit organization that NetChoice receives funds from?

A   No.

Q   In preparing Exhibit 1 did you receive or review documents from any for-profit organization that NetChoice receives funds?

A   Could you restate that?

Q   In preparing Exhibit 1 did you receive or

review any documents from any for-profit

organization that NetChoice receives funds?

    A  What -- I'm just trying to be honest.

What did you mean -- what do you mean by receive

or provide?

    Q  Well, I think I used "review" but --

    A  Review.

    Q  Other than looking at those for-profit

companies' websites, did you receive or review any

documents from for-profit companies that NetChoice

receives money?

    MR. KILBY:  Object to form.

    A  No.

    Q  Okay.  Is it fair to say that Exhibit 1

references websites throughout the declaration?

    A  Yes.

    Q  Okay.  And did you yourself review each of

the web pages referred to in the declaration,

Exhibit 1?

    MR. KILBY:  Object to the form.

    A  Yes.

    Q  Okay.  Did you yourself choose the web

pages that are contained in Exhibit 1?

    MR. KILBY:  Object to the form.

    A  I don't -- could you tell me what you mean

by me choosing?

Q   All right.  Did you search the Internet and find the web pages and say:  I'm going to choose this web page and include it in the declaration?

A   I have reviewed all the web pages in the declaration, and I believe those to be the correct citations, meaning the language in the declaration, not the footnotes.

Q   But your role in creating this declaration wasn't to be the person searching the Internet?

MR. KILBY:  Object to the form.

A   Yeah, do you mean in the first instance was I the very first person that ever looked up anything?  I don't understand.

Q   As you're sitting down -- you've said that you prepared this declaration; correct?

A   Mm-hmm.

Q   All right.  As you were sitting down to prepare it and you knew what points you wanted to make in the declaration; right?

A   Yes.

Q   All right.  And you weren't the person saying:  I'm going to go look at, for example, Microsoft's website and look at its help center

Transcript of Bartlett Cleland
Conducted on December 10, 2024          25

and find the web page, the right web page; 10:34:45

correct? 10:34:50

    MR. KILBY:  Object to the form. 10:34:50

    A   As best I can answer your question, I was 10:34:54
not the original person to look for information to 10:34:57
be included. 10:35:02

    Q   In preparing Exhibit 1 did you receive any 10:35:05
information relating to how any for-profit company 10:35:15
that funds NetChoice has dealt with or currently 10:35:25
deals with users less than 18 years of age other 10:35:31
than the information contained on the websites and 10:35:35
web pages cited in this declaration? 10:35:40

    A   I'm sorry.  I'm just going to ask you to 10:35:42
say that again.  I understand why it's long. 10:35:45

    Q   Well, it's long because at least my 10:35:47
understanding from reviewing NetChoice's website 10:35:50
was that it had, had members that it charged dues 10:35:53
to be a part of, but I'm now inserting for that 10:35:57
everywhere there is a member for-profit company 10:36:02
that pays NetChoice.  So I'll try to do it again. 10:36:07
I'll try to slow it down. 10:36:10

    In preparing Exhibit 1 did you receive any 10:36:12
information relating to how any for-profit company 10:36:16
that pays NetChoice has dealt with or currently 10:36:20
deals with users less than 18 years of age other 10:36:25

Transcript of Bartlett Cleland
Conducted on December 10, 2024

26

than what is contained on the websites that are cited in Exhibit 1?

A   No.

Q   Okay.  In preparing Exhibit 1 did you receive any information other than website pages mentioned in Exhibit 1 related to how any for-profit company that pays NetChoice moderates content to users less than 18 years of age?

MR. KILBY:  Object to the form.

Q   You can answer.

MR. KILBY:  Actually I just want to make sure.  You can answer that question, but if it involves communications with attorneys, I want you to stop.

MR. GUARD:  You've got -- well, I took out that qualification because the question's -- because I'm having to do the member thing.

MR. KILBY:  Sure.

Q   You can assume that these next series of questions I am not asking anything that counsel told you or the lawyers that work for you told you.  Okay.  I'm not seeking attorney-client privileged information.  All right?  I'm seeking -- what I'm seeking in each one of these questions is information provided by for-profit

companies that provide NetChoice money.

A    Mm-hmm.

Q    All right?  So with that kind of backdrop just so that way we're clear.  Do you understand?

A    I do.

Q    Okay.

A    And by receive from, sent to me -- actually let me -- let me ask you, what do you mean by me receiving?

Q    Meaning sent to you, delivered to you, shared with you.

A    Okay.

Q    Okay.  In preparing Exhibit 1 -- I don't know if I've gotten an answer to this question, so I'm just going to ask it again, and I apologize if you've already answered it.  In preparing Exhibit 1 did you receive any information other than the website pages mentioned in Exhibit 1 related to how any for-profit company who pays NetChoice money moderates content to users less than 18 years of age?

A    No.

MR. KILBY:  Object to the form.

Q    All right.  In preparing Exhibit 1 did you receive any information other than the website

pages mentioned in Exhibit 1 on how any company, any for-profit company who pays NetChoice money complies with its obligations under the Children's Online Privacy Protection Act of 1998?

MR. KILBY: Object to form.

A No.

Q Okay. And like we did earlier for ALEC, is it okay if I, instead of saying the Children's Online Privacy Protection Act of 1998, I instead say COPPA?

A Yes, sir.

Q Okay.

A I prefer that actually.

Q And you are familiar with COPPA; right?

A Familiar.

Q Okay. In preparing Exhibit 1 did you receive any information from any for-profit company that pays NetChoice relating to how that company intends to comply with Australia's new social media law?

A No.

Q Okay. In preparing Exhibit 1 did you receive any information from any for-profit company relating to how that company intends to comply with either the European Union's General

Data Protection Regulation or the European Union's

Audiovisual Media Services Directive?

        MR. KILBY:  Object to the form.

    A  No.

    Q  Okay.  In preparing Exhibit 1 did you

receive any information from any for-profit

company that pays NetChoice relating to how that

company intends to comply with the United

Kingdom's Online Safety Act?

        MR. KILBY:  Object to the form.

    A  No.

    Q  In preparing Exhibit 1 did you receive any

information from any company, for-profit company

that pays NetChoice relating to how that company

intends to comply with France's 2023 law --

because I'm not going to try to speak French to

you -- that requires age verification and parental

consent for those under 15 to utilize social

media?

        MR. KILBY:  Object to the form.

    A  I really want to ask you -- no.  The

answer's no.

    Q  Okay.  Have you had --

        (Extraneous noise interruption)

        MR. KILBY:  Pardon?

A   Yeah.   I don't know what that is.   Sorry.

Q   Okay.

A   Nor is it 1 a.m.   Sorry.

Q   Have you had any discussions with any for-profit company that pays NetChoice money regarding how that company would comply with the State of Florida's HB 3?

A   No.

Q   Okay.   Have you had any discussion with any for-profit company that pays NetChoice money -- strike that.

I mentioned earlier Australia's new social media law; right?

A   Yes.

Q   And Australia's social media law goes in effect in now less than a year; right?

MR. KILBY:   Object to form.

A   I don't know.

Q   You don't know?   So are you aware that Australia's new social media law imposes a 50 million-dollar, Australian dollar, fine if a social media company systemically fails to prevent users under the age of 16 from holding an account?

MR. KILBY:   Object to form.

A   Do you have a copy of the law for me to

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                31

review?

Q  Okay.  So sitting here right now you're not aware that that law passed?

MR. KILBY:  Object to the form.

A  No.

Q  Okay.  Are you familiar with the obligation, the legal obligations internationally that for-profit companies that pay NetChoice have?

MR. KILBY:  Object to the form.

Q  Generally?

A  I'm generally aware there are obligations. There are a lot of countries with a lot of laws.

Q  And there are a lot of countries that have a lot of laws regarding age and the Internet; correct?

A  I don't know.

Q  Okay.  Now, the companies that pay NetChoice, well, the for-profit companies that pay NetChoice, they do business in more than just the United States; right?

A  I don't know.

Q  So sitting here right now you're unaware that Google does business around the world?

MR. KILBY:  Object to form.

A  If you're asking me some general matter do

10:42:43
10:42:44
10:42:46
10:42:50
10:42:51
10:42:52
10:43:00
10:43:06
10:43:15
10:43:18
10:43:19
10:43:22
10:43:25
10:43:28
10:43:33
10:43:33
10:43:34
10:43:43
10:43:51
10:43:58
10:44:01
10:44:03
10:44:06
10:44:11
10:44:15

I repress statements like or see news like we all do?  Sure.  I see that asserted.  I have no evidence one way or the other.

Q  So sitting here you're unaware that Amazon does business around the world?

MR. KILBY:  Object to form.

A  Same answer.

Q  Sitting here right now you're unaware that Meta does business around the world?

A  Same answer.  I don't have any evidence one way or the other.

Q  Have you ever had any discussion with any for-profit company that pays NetChoice money relating to the age verification efforts that that company is currently undertaking or plans to undertake in the future?

A  No.

Q  All right.  Now we talked earlier that NetChoice is a not-for-profit trade association; right?

A  Correct.

Q  And it's a little bit more specific than just a general trade association; correct?

A  I honestly don't know what general trade association means.

10:44:19
10:44:23
10:44:25
10:44:26
10:44:33
10:44:35
10:44:37
10:44:37
10:44:41
10:44:43
10:44:45
10:44:59
10:45:02
10:45:06
10:45:10
10:45:13
10:45:14
10:45:15
10:45:19
10:45:25
10:45:25
10:45:26
10:45:29
10:45:32
10:45:34

Q  Well, it's a trade association --
NetChoice is a trade association for technology
and computer-related companies; right?

MR. KILBY:  Object to form.

A  Our mission is free expression and free
market for those online.

Q  But all the companies, all the for-profit
companies that pay NetChoice are in the technology
and computer-related space; right?

A  I would refer you to the list of our
member companies on the website.  Depending on
what you mean by computer and computer-related
space, which I don't know what that means, it's
hard for me to answer.

Q  I'm going to mark this, and I'll have to
remark everything but --

MR. KILBY:  John, pause.  At some point
would it be okay to mark it 1A?

Q  And I don't have a copy of this.  We can
make a copy on a break.  I'm going to mark this as
Exhibit 1A to your deposition, Mr. Cleland.  This
is a screenshot from NetChoice's web page.  Do you
recognize it?

(Cleland Exhibit 1A was marked for
identification.)

A   I do.

Q   Okay.  And on it, it says association members; right?

A   It does.

Q   All right.  Does that I guess refresh your recollection that NetChoice actually has members?

A   I am aware of many definition of members, not least of which is from the tax side which I'm more familiar with, and members is a very specific definition.  So when you say members outside of colloquially, I -- that's what I was trying to give you an honest answer.

Q   Okay.  Well, for purposes of this deposition going forward, instead of having me say repeatedly for-profit companies who pay NetChoice members, is it okay if I use the word members and I mean the companies that are on Exhibit 1A?  Is that fair?

MR. KILBY:  I think, as counsel for NetChoice, I'm comfortable with using that abbreviation or that defined term as you're defining it, John, that the companies listed on this Exhibit 1A will be referred to as members of NetChoice.  Is that what you're suggesting?

MR. GUARD:  Yes.

MR. KILBY:  We can agree to refer to those companies listed on 1A as members of NetChoice.

A  Great.

Q  And would you agree with me, looking at Exhibit 1A, there are a number of extremely large international companies; right?

MR. KILBY:  Object to form.

A  What do you mean by extremely large?  And what do you mean by international?

Q  Okay.  Extremely large:  Companies that are worth more than a hundred billion dollars, and as far as international companies that do business in more than just the United States.

A  I don't know.

Q  So as the general counsel of NetChoice, you're unaware that companies like Google, Facebook, Amazon and Twitter, whether they do business internationally?

A  Well, I answered earlier the honest truth which is I don't have any evidence of where they operate, but our charter, our, as a 501(c)(6), is to be concerned with what's happening in the United States.

Q  How many employees does NetChoice have?

A  I don't know.

Q  Well, how many employees do you know work at NetChoice?

A  I don't have any knowledge of anyone's employment status at NetChoice other than my own.

Q  So you don't know who the president of NetChoice is?

A  I do know who the president of NetChoice who.

Q  Who is the president of NetChoice?

A  Steve DelBianco.

Q  Do you know who the director of public affairs for NetChoice is?

A  It sounds silly, but actually I don't know who has that title.  If you tell me their name, I can tell you I interact with them at NetChoice.

Q  Do you know who the external affairs manager is at NetChoice?

A  Same answer.

Q  Do you know who the litigation center associate is?

A  A litigation center associate?

Q  Yes.

A  I do not know who has that title.

Q  So when I -- when I say the word litigation, I usually think of lawyers; right?

10:49:45
10:49:48
10:49:50
10:49:52
10:49:56
10:49:58
10:49:58
10:50:02
10:50:02
10:50:04
10:50:12
10:50:14
10:50:17
10:50:21
10:50:25
10:50:27
10:50:29
10:50:31
10:50:32
10:50:34
10:50:37
10:50:40
10:50:40
10:50:42
10:50:45

A   Sure.

Q   And so that would -- as far as the general counsel for the company and there was someone with a title litigation center associate, that would be someone you would think that the general counsel would know; right?

MR. KILBY:  Object to form.

A   You are switching words up between people and titles.  I've told you I don't know the titles.  I don't care about title, but if you tell me who you're talking about, I can tell you.

Q   All right.  Do you know who Robert Jernigan is?

A   Yes.

Q   Who is Robert Jernigan?

A   A guy I work with at NetChoice.

Q   What does Mr. Jernigan do?

A   Broad -- my observation, broadly speaking, public affairs.

Q   Okay.  Do you know Jonathan Zuck?

A   I do know Jonathan.

Q   And what does Jonathan Zuck do at NetChoice?

A   I honestly don't have any idea.

Q   Okay.  Do you know Gerard Adam?

10:50:49
10:50:50
10:50:54
10:50:56
10:50:58
10:51:00
10:51:01
10:51:04
10:51:07
10:51:09
10:51:12
10:51:15
10:51:17
10:51:18
10:51:18
10:51:22
10:51:25
10:51:30
10:51:33
10:51:33
10:51:39
10:51:41
10:51:44
10:51:45
10:51:48

A   I don't think I do.                                    10:51:50

Q   Okay.  Do you know someone who is the CFO             10:51:51
at NetChoice, the guy who's responsible for your          10:51:54
paycheck?                                                 10:51:58

MR. KILBY:  Object to form.                           10:51:59

A   So the person responsible for my paycheck,           10:52:01
to the best of my knowledge, is a woman.                  10:52:03

Q   Okay.  All right.  Now, NetChoice itself             10:52:05
does not operate a social network; right?                 10:52:13

A   Correct.                                             10:52:17

Q   NetChoice itself does not operate a blog             10:52:18
or a microblog site like Twitter; correct?                10:52:20

A   Could you re-ask that question?                      10:52:25

Q   NetChoice itself does not operate a blog             10:52:27
or a microblog site like Twitter; correct?                10:52:29

A   NetChoice does not operate Twitter.                  10:52:35
Twitter and blogs are different.                          10:52:38

Q   My specific question to you, sir, was               10:52:42
NetChoice itself -- I'm not asking you anything           10:52:45
about Twitter.  I was giving you an example.  I           10:52:49
can remove that example if that will help you.            10:52:52
NetChoice itself does not operate a blog or               10:52:54
microblog website; right?                                 10:52:58

A   I don't know the answer to that in the way           10:53:02
you're using those terms.                                 10:53:05

Q  NetChoice itself does not operate an
Internet gaming platform; right?

A  Not to the best of my knowledge.

Q  All right.  And that's all I'm asking for
with every question, Mr. Cleland, is I'm just
asking your knowledge here.  You're not here
testifying as a 30(b)(6) witness for NetChoice,
and it is perfectly okay if you do not know an
answer to say "I don't know."  All right.  I'm not
trying to trick you.  I'm not trying to confuse
you.  I'm just trying to figure out what your
knowledge is because you filed a declaration in
this case.  Is that fair?

A  Sure.

MR. KILBY:  Object to form.

Q  All right.  And NetChoice does not itself
engage in for-profit activities; right?

MR. KILBY:  Object to form.

A  Not to the best of my knowledge.

Q  All right.  And looking back at Exhibit
1A, roughly how many members does NetChoice have?

MR. KILBY:  Object to form.

A  Looks like near 40.

Q  Okay.

A  41 maybe.

Q   All right.  And you physically are like estimating it by counting; right?

A   Yes.

Q   Okay.

A   Doing my best basic multiplication.

Q   Okay.  All right.  And I know you've only been employed for two months, but do you know how the number of members has changed over time at NetChoice?

A   Over time meaning over my two months?

Q   Over the last five years.

A   No.

Q   Okay.  Prior to coming to NetChoice what was your knowledge of that organization?

      MR. KILBY:  Object to form.

A   What do you mean by knowledge of?  Like was aware of them or.

Q   Yes.

A   Okay.

Q   How were you aware of NetChoice?

A   They would appear prominently in any number of public forum, in various spaces here in town, around the country.

Q   Okay.  Now, you are one of NetChoice's lawyers; correct?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    41

A   Yes.                                          10:55:23

Q   Okay.  And you're not a lawyer for any of    10:55:24
the members on Exhibit 1A, are you?              10:55:27

    MR. KILBY:  Object to form.                  10:55:29

A   I am not.                                     10:55:30

Q   Okay.  Now, do you know whether NetChoice    10:55:31
receives membership dues from those entities     10:55:39
listed on Exhibit 1A?                            10:55:43

A   So not to go back to our old definition,     10:55:48
we receive monies from companies.  I don't know if   10:55:51
it's -- I've no information whether it's         10:55:54
considered dues, titled dues, et cetera.         10:55:56

Q   Okay.  Other than from members listed on     10:55:59
Exhibit 1A does NetChoice receive monies from    10:56:10
other organizations or entities?                 10:56:17

A   Not to the best of my --                     10:56:20

    MR. KILBY:  Object to form.                  10:56:22

A   Not to the best of my knowledge.             10:56:23

Q   Okay.  I'm going to show you what I've       10:56:24
marked as Exhibit 2 to your deposition.          10:56:26

    (Cleland Exhibit 2 was marked for
identification.)                                 10:56:48

Q   Have you ever seen Exhibit 2 before?         10:56:48

A   I have not.                                   10:56:51

Q   Okay.  It reflects a filing date of          10:56:52

September 5th, 2024.  So that would predate your time?

A   It would.

Q   Okay.  Let's just put that aside.

A   Are we coming back to that?

Q   No.

A   Okay.

Q   Actually let's look at Exhibit 2 for one second, because you can do -- though you've not seen it before, you can do one thing for me.  If you'll look at Schedule J, it's two pages from the end.

A   Is that --

Q   It says "officers, directors, trustees, key employees and highest compensated employees."

A   Yes.

Q   Do you see that?

A   Yes.

Q   Okay.  Looking down this list of officers, directors, trustees, key employees and highest compensated employees that NetChoice filed with the Internal Revenue Service, can you identify the individuals that are listed out here that you know and the title that is listed underneath their name?

MR. KILBY:  Object to the form.

A  So you're asking me whether I --

Q  Well, let's --

A  -- simply whether I recognize these people.

Q  Yeah, if you recognize first the names?

MR. KILBY:  Object to the form.

A  Yes, but I suspect the person that you were irritated by before that I didn't know, I suspect I know who this is but I think he goes by another name, so I don't know any Gerards.

Q  So there is an employees that has the last name Adam that works at NetChoice?

A  There are -- I don't know who is an employee, and this is a little bit to the point. There are some people who are there infrequently. I don't interact with a lot of the infrequent people who are there.  So I don't know, and that's why I can't say.

Q  Okay.

A  Trying to give you honest answers.

Q  Okay.  All right.  Which names on, on Schedule J, second-to-last page in Exhibit 2, do you recognize?

A  Steve DelBianco.

10:58:20
10:58:22
10:58:24
10:58:25
10:58:26
10:58:30
10:58:39
10:58:43
10:58:46
10:58:50
10:58:52
10:58:54
10:58:57
10:59:01
10:59:03
10:59:05
10:59:08
10:59:14
10:59:15
10:59:16
10:59:18
10:59:28
10:59:33
10:59:35

Q   Okay.

A   Carl Szabo, Rob Jernigan, Jonathan Zuck, Christopher Cox, Chris Marchese, Amy Bos, Zachary Lilly, Marianne Polics, Nicole Bembridge and Krista Chavez.

Q   Okay.  Are all those employees that you just listed off, are all those people, because I understand that you don't know who is an employee, associated with NetChoice still?

A   No.

Q   Okay.  Of the people that you listed out, you listed I believe 11 people out, who is no longer associated with NetChoice?

MR. KILBY:  Object to form.

A   Nicole Bembridge, Carl Szabo, that I know of.

Q   Okay.  And Mr. Szabo held your job previously; correct?

MR. KILBY:  Object to form.

A   He -- to the best of my understanding he held a completely differently defined role, much broader.

Q   Okay.  Do you know what his title was when he was with NetChoice?

A   I don't know for sure.  I know I believe

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    45

it was general counsel.

Q   Okay.  All right.  So he had different
duties but one of the same titles that you have;
right?

A   Yes.

Q   Okay.  And Miss Bembridge?

A   Yes.

Q   All right.  Has someone taken over her
role with NetChoice to the best of your knowledge?

A   I don't have any idea.

Q   Okay.  We now put -- we now can put aside
Exhibit 2.

MR. KILBY:  John, at some point I could
use a short break, whenever it's convenient for
you and the witness.

MR. GUARD:  We can take a break now.
That's fine.

THE VIDEOGRAPHER:  We are going off the
record.  The time is 11:01 a.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the
record.  The time is 11:14 a.m.

BY MR. GUARD:

Q   You'll -- I think you have it in front of
you -- grab Exhibit 1 again which is your

declaration.

A   Yes.

Q   All right.   Now if you look at page 23 of this document, you signed this document under penalty of perjury; right?   Or page 22, sorry.

A   Okay.   I did.

Q   All right.   If you'll look at page 2 of the declaration.   Page 2, Roman numeral I, says "About NetChoice"; correct?

A   It does.

Q   All right.   And if you'll look at paragraph 4.

A   Mm-hmm.

Q   You have written out many of the companies that are reflected on Exhibit 1A; right?

A   Yes.

Q   All right.   And in this document that you yourself prepared, how did you refer to those companies in paragraph 4?

MR. KILBY:   Object to form.

A   I listed them out.

Q   All right.   If you'll read the second full sentence until the hyphen.

A   I will read --

Q   Or excuse me -- to the colon.   Sorry.

A   Reading the whole sentence, "Our members include a broad array of popular online services Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwork, eBay, Etsy" --

MR. KILBY:  That's sufficient.

Q   That's sufficient.  So you referred to those companies that are reflected on Exhibit 1A as our members; right?

A   I specifically listed out the members so that the reader of this document would understand what members meant.

Q   So you, sitting here today, know that NetChoice has members; right?

A   In the way I've defined it, yes.

Q   Okay.  And you realize sitting here today you are under the same oath that you took when you signed Exhibit 1; correct?

A   Yes.

Q   You can put Exhibit 1 aside.

Are NetChoice's members involved in making decisions on what advocacy or litigation NetChoice takes?

MR. KILBY:  Object to form.

A   I don't know.

Q   Okay.  Do NetChoice's members vote on

11:16:00
11:16:02
11:16:08
11:16:09
11:16:11
11:16:11
11:16:13
11:16:17
11:16:20
11:16:24
11:16:25
11:16:31
11:16:41
11:16:44
11:16:46
11:16:50
11:16:54
11:16:56
11:17:03
11:17:14
11:17:19
11:17:25
11:17:26
11:17:27
11:17:28

whether to file a lawsuit or lobby on a bill?

MR. KILBY: Object to form.

A I don't know.

Q Okay. Have you been involved in any decisions on what litigation to bring or what bill, bills to lobby for or against?

MR. KILBY: Object to form.

A Were those two questions?

Q No. I used an "or." So have you been involved in any decisions on what litigation to bring or what bills to lobby for or against?

MR. KILBY: Object to form.

A I have been in no conversations related to any litigation other than preparing for this deposition. That is separate and apart from any conversations that happen around lobbying. I don't -- to the best of my knowledge I've not been involved in any conversation with a member to determine which bill to lobby for or against.

Q Have you had any conversations with any member of NetChoice?

A Yes.

MR. KILBY: Object to form.

Q What members of NetChoice have you had conversations with?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    49

A   Can you tell me specifically what you're asking with regards to conversations?

Q   Well, have you spoken to any member of NetChoice -- I'm just asking just generally.  Have you spoken to any member of NetChoice?

MR. KILBY:  Object to form.

A   I have spoken to various people who are with the companies, things like receptions and at -- what's the word I'm looking for -- public policy events like panels and -- yes.

Q   Other than -- I don't need to know what you talked about at the Christmas party or other receptions, and I don't need to know about any, any panel discussions that you've had.  Have you had any other conversations with members of NetChoice?

A   Yes.

Q   Have you had any conversations with members of NetChoice regarding HB 3?

A   No.

Q   Now, NetChoice, NetChoice's membership, and I'm using Exhibit 1A, if you want to put that in front of you, it's a fairly diverse group of companies; right?

MR. KILBY:  Object to form.

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                    50

A   Depending what you mean by diverse, sure.    11:20:30

Q   Well, it ranges from electronic commerce      11:20:33
platforms like Amazon; right?                      11:20:37

A   Yes.                                           11:20:39

Q   Okay.  To a company that has a broad set       11:20:39
of businesses including owning phones, an app       11:20:44
store, search engine, map, platform, Google;        11:20:47
right?                                              11:20:52

A   Yes.                                           11:20:52

Q   And it ranges all the way to a gaming         11:20:53
company in PrizePicks; right?                       11:20:56

A   Yes.                                           11:20:58

Q   All right.  So that's -- they're not all      11:20:59
competitors with each other; right?                11:21:02

    MR. KILBY:  Object to form.                   11:21:05

A   That is true.  They are not all               11:21:07
competitors.                                       11:21:09

Q   And NetChoice's members have divergent        11:21:12
interests; right?                                  11:21:18

    MR. KILBY:  Object to form.                   11:21:19

A   I honestly don't know.                        11:21:20

Q   Okay.  Many of NetChoice's members view       11:21:22
themselves as competitors with other NetChoice      11:21:27
members; right?                                    11:21:31

    MR. KILBY:  Object to form.                   11:21:31

A   I honestly don't know.

Q   Okay.  Well, you know, for example, Airbnb and Vrbo are both NetChoice members; right?

A   Yes.

Q   And they compete against each other; right?

A   I don't know anything about -- like I can talk to you about what's in my declaration, but I don't have any idea what these companies think about who their competitive landscape is or how they would be competitive.

Q   Well, do you know anything about the businesses that any of those folks on Exhibit 1A are?

A   Yes.

Q   And you would agree with me Airbnb and Vrbo compete against each other; right?

A   I just answered that.  I've no understanding about how they, how they view themselves in the marketplace, who their competition is.  I mean, let's face it.  You can be in the same broad area and be a supplementary service in that area.  You can be a smaller player, you don't want to get bigger, so you're not viewed as competition.  Businesses are super

complicated particularly in a technology space.

Q   What is Airbnb's business?

A   Are you asking me just as a layman?  Or are you asking me within the bounds of being the general counsel at NetChoice?

Q   Sir, I'm asking what is your understanding of what Airbnb's business is?

A   I don't know.

Q   Have you ever been on Airbnb's website?

A   Yes.

Q   Okay.  What does Airbnb's website allow you to do?

A   Rent a house.

Q   Okay.  Have you ever been on Vrbo's website, sir?

A   Yes.

Q   What does Vrbo's website allow you to do?

A   Rent a place to stay.

Q   It also allows you to rent a house; right?

A   Sure, in the way I used it before, yeah.

Q   So both websites allow you to rent houses; right?

A   To the best of my knowledge.

Q   Okay.  And a consumer making a choice, a consumer who wants to rent a house making a choice

11:22:43
11:22:45
11:22:48
11:22:53
11:22:55
11:22:57
11:23:00
11:23:05
11:23:05
11:23:09
11:23:10
11:23:12
11:23:13
11:23:14
11:23:18
11:23:19
11:23:19
11:23:23
11:23:25
11:23:27
11:23:30
11:23:35
11:23:35
11:23:36
11:23:42

has a choice, among others, of going to Airbnb's        11:23:45
website or Vrbo's website; right?                       11:23:50

A    About choice of what websites to go to?            11:23:53
Sure.  They could go to whatever website they           11:23:57
wanted.                                                 11:23:59

Q    Members of NetChoice disagree regarding            11:24:02
age verification; correct?                              11:24:06

MR. KILBY:  Object to the form.                         11:24:08

A    I don't know.                                      11:24:09

Q    I'm going to show you what I marked for            11:24:11
identification as Exhibit 3 to your deposition.         11:24:13

(Cleland Exhibit 3 was introduced for
identification.)

MR. GUARD:  With the microphone thing                   11:24:25
there it doesn't slide across nicely.                   11:24:27

Q    Now you preparing your declaration visited         11:24:31
Meta's website; correct?                                11:24:34

A    Yes.                                               11:24:36

Q    All right.  Have you ever seen Exhibit 3           11:24:37
before?                                                 11:24:40

A    Pardon me.  I believe so.  Yes.  I don't           11:24:41
--                                                      11:24:46

MR. KILBY:  Would you take a moment to                  11:24:46
look at the document.                                   11:24:48

A    Yes, because I don't recognize the cover           11:24:49

necessarily.

MR. KILBY:  And John, I apologize.  Is this something from the website?

MR. GUARD:  It's from Meta's website.

A  I recognize some of this, yes.

Q  Okay.  All right.  If you'll look, it's -- technically it would be four pages from the end but the pages are double sided so it's two pages from the end.

A  Is this the right page, the squiggly?

Q  Yes.  The squiggly line with sun_77 is the picture.

A  Yes, sir.

Q  If you look right above that picture in this Meta document, Exhibit 3, what does this document indicate is Meta's position with respect to age verification?

MR. KILBY:  Object to form.

A  So you want me to read the sentence?

Q  I'm -- well, I was trying to direct you to a sentence, the last sentence of the second paragraph --

A  Mm-hmm.

Q  -- on the fourth page from the back of Exhibit 3, it contains a sentence that states

Meta's position on age verification; correct?    11:26:10

MR. KILBY:  Object to form.    11:26:13

A  I don't know.    11:26:14

Q  You don't know?  The sentence reads:  "We    11:26:16
have advocated for an approach that includes an    11:26:21
operating system or app store level technical    11:26:23
solution for age verification as the simplest,    11:26:27
most effective and most privacy protected way to    11:26:31
verify age"; correct?    11:26:35

MR. KILBY:  Object to form.    11:26:36

A  That is what that sentence says.    11:26:37

Q  Okay.  And so the "we" there is Meta;    11:26:39
correct?    11:26:43

MR. KILBY:  Object to form.    11:26:43

A  To the best of my understanding.    11:26:44

Q  Okay.  So Meta has advocated for age    11:26:46
verification approach at the operating system or    11:26:50
app store level; right?    11:26:54

MR. KILBY:  Object to form.    11:26:56

A  That's what this sentence says.    11:26:56

Q  All right.  Are you aware of what Google's    11:26:58
position on age verification is?    11:27:02

A  I am not.    11:27:03

Q  So you're unaware that Google has    11:27:04
advocated for the opposite?    11:27:08

MR. KILBY:  Object to form.

A  I am aware of NetChoice positions which is my role.

Q  Okay.  Does NetChoice make its litigation decisions based on who contributes money?

MR. KILBY:  Object to form.

A  I don't know.

Q  Who would know at NetChoice on how litigation decisions are made?

A  I don't know.

Q  Now, Meta did not file a declaration in support of NetChoice's motion for preliminary injunction; correct?

A  I don't know.

Q  So as the general counsel for NetChoice, you're unaware of who filed a declaration in support of your motion for preliminary injunction?

MR. KILBY:  Object to form.

A  Can you --

Q  You can answer.

A  Sure.  Can you restate?

MR. GUARD:  Madam court reporter, can you read it?

(Question read back.)

A  I'm unaware of what Meta did or didn't do.

Q  Have you seen a declaration from Meta in support of your motion for preliminary injunction?    11:28:37  11:28:40

A  I have not.    11:28:42

Q  Did you call Meta and ask them to file a declaration in support of your motion?    11:28:46  11:28:52

MR. KILBY:  Object to form.    11:28:54

A  No.    11:28:56

Q  Did you have any discussions with CCIA about filing a declaration in support of your motion for preliminary injunction?    11:28:59  11:29:03  11:29:05

MR. KILBY:  If it involves you discussing anything with counsel at CCIA, you should not answer the question.    11:29:09  11:29:11  11:29:14

A  I can answer.  No.    11:29:15

Q  Did you have any discussions with anyone at Google about Google filing a declaration in support of NetChoice's motion for preliminary injunction?    11:29:18  11:29:21  11:29:25  11:29:27

A  No.    11:29:28

Q  Did you have any discussions with Snapchat, or I should call it Snap, with Snap about filing a declaration in support of NetChoice's motion for preliminary injunction?    11:29:29  11:29:32  11:29:38  11:29:41

A  No.    11:29:44

Q  Now, in your long two-month experience    11:29:57

with NetChoice, to your knowledge, does NetChoice receive nonpublic information from any of its members?

MR. KILBY:  Object to the form of the question.

Q  You can answer.

A  I am not aware of any I should say.

Q  Many of the companies listed on Exhibit 1A have algorithms; right?

MR. KILBY:  Object to the form.

A  I don't know.

Q  So you're -- after spending your entire career in the technology and telecommunications space you're unaware that algorithms are used by Internet companies?

MR. KILBY:  Object to the form.

A  What I'm aware of is I'm supposed to be telling the truth, and whether or not I could speculate on what companies do I don't see as answering truthfully your questions.

Q  So sitting here right now you do not know whether or not any of the companies listed on Exhibit 1A use an algorithm?

MR. KILBY:  Object to the form.

Q  Correct?

A   I am not personally aware of whether they do or do not.

Q   Okay.  Sitting here right now you are -- are you aware whether the members on Exhibit 1A have content moderation policies?

A   What do you mean by content moderation policies?

Q   Sir, you're aware that every website has something called either a term of service or term of use?

A   I'm aware that the ones --

MR. KILBY:  Object to form.

A   I'm aware of the ones I have visited do, yes.

Q   Okay.  It's not uncommon; right?

A   Sure.

Q   They may have different names, but they all have some kind of contractual form that you have to agree with in order to get on their site or use their services; right?

MR. KILBY:  Object to form.

A   I have not viewed all websites, but yes, I take it in conversational that, and we'll say again the websites I have viewed I believe they all have terms of service.

Q   And that's not uncommon from your experience?

A   In my experience.

Q   Okay.  All right.  And as part of, of those terms of service, they have duties and responsibilities between both the user and the website provider; right?

MR. KILBY:  Object to form.

A   In the ones I've looked at, yes.

Q   And it's not uncommon for them in those circumstances to have community standards; right?

MR. KILBY:  Object to form.

A   I don't know the answer to that.

Q   So are you aware whether Facebook has community standards?

A   I am -- yes, I am aware.

Q   Are you aware of Instagram having community standards?

A   I don't know.

Q   Are you aware of Snapchat having community standards?

A   I definitely don't know.

Q   Are you unaware of whether Instagram or Snapchat have community standards because you've never utilized them?

A   I've used both.

Q   Okay.  So you're unaware of whether they don't have community standards because you can't recall?

MR. KILBY:  Object to the form of the question.

A   There's a variety of reasons why I can't say.  I've not -- best of my knowledge I've not looked at their terms of service.  When I've used them, which has been different time period, best of my knowledge no one has particularly pointed them out to me.  It's not the first thing I do when I go to websites is sit and look at all the legal and contractual material, despite being an attorney.

Q   Okay.  The purpose of terms of service or terms of use is to form a contract with the user; right?

A   Yes.

Q   Okay.  And terms of service, terms of use or whatever the document is termed is the NetChoice member's attempt to define the rights and liabilities of a user and the member; correct?

MR. KILBY:  Object to the form.

A   I don't know.  I don't know what they're

thinking when they do those.

Q   In the ones that you have viewed in your experience was that the purpose of a terms of service and terms of use where the website you were viewing was trying to define the rights and liabilities of you, the user, and it, the website provider?

MR. KILBY:  Object to form.

A   I would have to assume, but I don't honestly know.  I've not talked to their lawyers.

Q   All right.  Now, you're a lawyer.  We talked about that earlier; correct?

A   Yes.

Q   Have you ever heard of the legal term infancy?

A   Yes.

Q   In your own words, what is infancy?

A   I don't know.  I don't recall.

Q   Okay.  Can someone not of the age of majority enter into a contract?

MR. KILBY:  Object to the form.

A   Doing my best to go back to 1L, there are a bunch of exceptions, but I believe the answer is no.

Q   And are you aware that the concept that

someone that is not at the age of majority not being able to enter a contract is a common law concept?

MR. KILBY:  Object to the form.

A   I'm not sure.

Q   Are you aware whether that concept has existed prior to the founding of the United States?

MR. KILBY:  Object to the form.

A   Not sure.

Q   And are you aware whether people in the United States under the age of 18 years old can enter or not enter a valid and enforceable contract?

MR. KILBY:  Object to the form.

A   I don't know the answer, though I recall that, again, there are a lot of exceptions.  I seem to recall something where there are times that they can, but I'm not sure.

Q   So putting aside exceptions -- well, first, what are the exceptions you can recall?

A   I don't recall.

Q   Okay.  All right.  Subject to exceptions, the general rule in the United States is that someone under the age of majority cannot enter a

11:36:00
11:36:03
11:36:06
11:36:07
11:36:09
11:36:11
11:36:15
11:36:18
11:36:18
11:36:19
11:36:22
11:36:26
11:36:31
11:36:36
11:36:36
11:36:37
11:36:40
11:36:41
11:36:44
11:36:48
11:36:53
11:36:55
11:36:56
11:37:04
11:37:07

contract; correct?

MR. KILBY:  Object to the form.

A   I don't know.

Q   Okay.  Are you aware whether most of the members of NetChoice, and I'm talking about the companies on Exhibit 1A, prohibit users less than 18 years of age from utilizing their websites without parental consent?

MR. KILBY:  Object to the form.

A   Can you restate just that first part?

MR. GUARD:  Can you read it to him?

(Question read back.)

A   I am not.

Q   Now, well, NetChoice has its own website; right?

A   Yes.

Q   NetChoice in this lawsuit is not claiming that HB 3, and I'm talking about the Florida bill, applies to its website; right?

MR. KILBY:  Object to the form.

A   I don't know.

Q   So you, sitting here right now, don't know whether HB 3 applies to NetChoice's website?

MR. KILBY:  Object to the form.

A   That is the truthful answer largely

because a lot of HB 3 is written so broadly and sloppily that it's a little hard to imagine what it does or doesn't apply to.

Q Now, again, if you can get Exhibit 1 in front of you, fair to say that you use the word NetChoice throughout the 22 pages of Exhibit 1?

A Yes.

Q If you'll turn to paragraph 20 on page 14 of Exhibit 1.

A Mm-hmm.

Q In paragraph 20 you did not state under oath that you believe that HB 3 applied to NetChoice, did you?

MR. KILBY: Object to the form.

Q You can answer.

MR. KILBY: John, there's no need to yell at the witness.

MR. GUARD: I did not yell at the witness.

MR. KILBY: I would -- you can answer the question --

THE WITNESS: Thank you.

MR. KILBY: -- using your ordinary tone of voice.

MR. GUARD: You know very well that you're entitled to say "object to form" and no more.

MR. KILBY:  You can answer the question using your ordinary voice.

MR. GUARD:  Move to strike.

Q  You can answer now.

A  So 20 states:  "Although aspects of the Act's definition are vague" --

Q  Sir --

A  -- "and do not make clear the full extent of the entities governed by its provisions, I understand some NetChoice members appear to be regulated by the Act.  These include the following members:  Google, which owns and operates YouTube; and Meta which owns and operates Facebook and Instagram."

Q  In what paragraph number in this 22-page declaration did you state that HB 3 applies to NetChoice?

A  To the best of my knowledge that statement is not there.

Q  All right.  So you file a lawsuit against the State of Florida, and you claim that it violates NetChoice's members' rights; right?

A  Those are the examples we include.  Again, I say what I said before which it is so vague and broadly written and sloppily written that it's

hard to understand what it applies to.  We provided two examples where we think, I mean we say right here just black and white, "these include at least the following, at least the following."  It's not an all-inclusive list obviously just by plain English reading.

Q  So your assertion now is that HB 3 applies to NetChoice?

MR. KILBY:  Object to form.

A  I did not make that assertion.  I again will read 20 if you want me to read it again.  That is what we said and what we meant.

Q  Sir, you understand that you're in federal court; right?

A  Yes.

Q  You're making a claim against the State of Florida that it has a law that is unconstitutional.  This is a serious matter; right?

MR. KILBY:  Object to form.

A  100 percent.

Q  All right.  This is not a trivial matter, and neither in the Complaint that you have filed, that NetChoice has filed nor in the motion for preliminary injunction, nor in the declaration

under oath under penalties of perjury is there anywhere stated that HB 3 applies to NetChoice; right?

MR. KILBY: Objection.

A  I will read number 20 again. That is my answer. That is the full answer. It does not say what you are trying to assert that it's saying or not saying.

Q  I actually wasn't asking about paragraph 20. I was asking more broadly.

You understand that NetChoice filed a Complaint in this matter; correct?

A  Yes.

Q  You understand that's how litigation starts; right?

A  Yes.

Q  All right. And in that Complaint it does not state that HB 3 affects NetChoice; correct?

MR. KILBY: Object to form.

A  I have already said and answered now I believe twice that I don't see that statement here. However, the plain English reading of the section that you pointed out to me that you asked me to talk about clearly is not an exclusive paragraph.

Q  Now, you filed or NetChoice filed --
you're general counsel of the company, right, and
it filed a motion for preliminary injunction;
right?

A  Yes.

Q  And you have very talented, very
experienced lawyers representing you; right?

MR. KILBY:  Object to the form.

A  Yes.

Q  I was actually trying to be kind and
polite.

MR. KILBY:  Thank you, John.

A  I was going to be a smart Alec, but okay.

MR. KILBY:  That's what I was trying to
avoid.

Q  And you have lawyers representing you;
right?

A  Yes.

Q  And nowhere in that motion appears an
argument that HB 3 applies to NetChoice itself;
correct?

MR. KILBY:  Object to the form.

A  I'm sorry.  In the -- say the beginning of
that again.  The argument from where?

Q  The motion for preliminary injunction.

11:43:18
11:43:22
11:43:24
11:43:27
11:43:27
11:43:27
11:43:30
11:43:33
11:43:35
11:43:37
11:43:40
11:43:40
11:43:41
11:43:45
11:43:47
11:43:47
11:43:49
11:43:49
11:43:49
11:43:52
11:43:58
11:43:58
11:43:59
11:44:02
11:44:04

A   Oh.  I don't know.

Q   Would it surprise you that the motion for preliminary injunction filed in federal court by your lawyers does not contain that argument?

MR. KILBY:  Object to the form.

A   I'm rarely surprised.

Q   Now, other than the two companies who are mentioned in paragraph 20 are you aware of any other NetChoice members that are affected by HB 3?

A   I don't --

MR. KILBY:  Object to the form.

A   I don't know.

Q   How does HB 3 affect NetChoice itself?

A   I don't know.

Q   How does it -- is HB 3 going to cause NetChoice to have to shut its website down?

A   As I said earlier, I don't know.

Q   Is HB 3 going to cause NetChoice to -- strike that.

Does Net -- does HB 3 -- strike that too. Sorry.

Does NetChoice allow users to post content on its website?

A   I don't know.  I don't believe so.  If by users you mean people who are not NetChoice, like

the whatever director of communication, I don't know the answer to that.

Q  All right.  Put aside employees, even though I know you don't know who is employed by NetChoice, but putting aside people who are associated, whether it be by consulting arrangement or employment arrangement at NetChoice.  Does NetChoice allow anyone else outside of that realm to post content on its web page?

MR. KILBY:  Object to form.

A  I was trying to be helpful.  No, I don't know.

Q  Have you ever reviewed the terms of service or terms of use for the members on Exhibit 1A?

MR. KILBY:  Object to the form.

A  Do you have -- I think I understand you. Do you use that in the singular?  You mean any of their terms of service, like any member's terms of service?

Q  Yes?

A  Yes.

Q  Which members of terms of service or terms of use have you reviewed?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                72

MR. KILBY:  Object to form.    11:47:23

A  Oh geez, it's been a long time ago for some of them, so I'm not sure I know.  More -- I don't know.    11:47:24 11:47:27 11:47:33

Q  Okay.  All right.  I'm going to show you what I'm going to mark for identification as Exhibit 4 to your deposition.    11:47:33 11:47:42 11:47:45

(Cleland Exhibit 4 was marked for identification.)    11:47:51

A  Did we have an Exhibit 2?    11:47:51

MR. KILBY:  Yeah.  It's right here.    11:47:53

A  Oh okay.  Sorry.    11:47:56

Q  And usually it's better if you flip them over, and then just if you keep on piling them on top and that way you don't shuffle the deck incorrectly, and it will be easier that way if I go back to another one to find the right one.    11:47:59 11:48:01 11:48:05 11:48:08 11:48:11

All right.  Exhibit 4 are the conditions, they call it the conditions of use for Amazon; right?    11:48:15 11:48:22 11:48:26

A  Appears so, yes.    11:48:26

Q  Okay.  Have you ever reviewed the conditions of use for Amazon?    11:48:28 11:48:30

A  I don't know.    11:48:34

Q  Okay.  Amazon is an Ecommerce platform;    11:48:35

correct?

A   Yes.

Q   And Amazon sells products and services to its users; right?

MR. KILBY:   Object to form.

A   I'm -- I don't know.

MR. KILBY:   I'm going to elaborate on that objection.  Compound question.

Q   Amazon sells products to its users; right?

A   My understanding is Amazon has some products that they sell to users.

Q   And then Amazon allows others to post products to sell to users as well; right?

A   Yes.

Q   All right.  And Amazon itself has services that it provides or sells to users; right?

A   I don't know.  I don't know what you mean by services honestly.

Q   Like music services and video services --

A   Oh yes, yes.

Q   -- and I think it also does Internet services; right?

A   Yes to the music.  I'm not sure about the web service.  That's AWS.  I don't know if that's a separate corporation.  I don't know.

11:48:40
11:48:40
11:48:40
11:48:43
11:48:45
11:48:49
11:48:56
11:48:58
11:49:02
11:49:08
11:49:11
11:49:14
11:49:18
11:49:20
11:49:21
11:49:24
11:49:28
11:49:30
11:49:31
11:49:34
11:49:35
11:49:38
11:49:41
11:49:43
11:49:47

Q  All right.  And Amazon is a NetChoice member; correct?

A  Yes.

Q  All right.  And if you look at since -- have you ever looked at Exhibit 4 before?

A  No.

Q  Okay.  If you look to the second page of Exhibit 4, under the section of Your Account, and you can take a moment if you want to read it but let me -- it might be helpful if I ask you the question first and then you can read it.  Amazon requires someone to be 18 years of age or older to have their own Amazon account; right?

MR. KILBY:  Object to the form.

A  I don't know, even reading this.

Q  All right.

A  Because it says "If you're under 18, you may use Amazon services only with the involvement of parent or guardian.  Parents and guardians create profiles for teenagers in their Amazon" --

THE REPORTER:  Slow down, please.

A  Oops, sorry.  "If you are under 18, you may use the Amazon services only with involvement of a parent or guardian.  Parents and guardians may create profiles for teenagers in their Amazon

11:49:49
11:49:55
11:49:56
11:49:56
11:49:59
11:50:02
11:50:02
11:50:06
11:50:16
11:50:18
11:50:21
11:50:27
11:50:30
11:50:35
11:50:37
11:50:41
11:50:43
11:50:45
11:50:48
11:50:53
11:50:55
11:51:00
11:51:05

household.  Alcohol listings on Amazon are intended for adults."

Q  Okay.  So if you're under 18, a parent has to be involved; right?

MR. KILBY:  Object to the form.

A  My understanding of what I read here.

Q  And do you know how Amazon requires parents to be involved in the creation of account?

A  No.

Q  Okay.  Do you know who at Amazon would know how --

A  No.

Q  -- parents have to be involved to create an account?

A  No.

Q  Okay.  And do you know how many persons less than 18 years of age have Amazon accounts in the United States?

A  No.

Q  I'm going to show you what I've marked for identification as Exhibit 5 to your deposition. You can put Exhibit 4 to the side.  I am going to show you what I've marked for identification as Exhibit 5 to your deposition.

(Cleland Exhibit 5 was marked for

identification.)

Q   And Exhibit 5 is the user agreement for eBay; right?

MR. KILBY:  Object to form.

A   It appears to be so, yes.

Q   Okay.  And eBay is also an Ecommerce platform that allows users to sell products to other users; right?

A   To the best of my understanding.

Q   Okay.  And eBee -- excuse me -- eBay is a NetChoice member; right?

A   Yes.

Q   All right.  And if you look to the second page, in order to be an eBay user you have to be able to form a legally binding contract; is that correct?

A   I'm sorry.  Can you show me where you're reading?

Q   Second page --

A   Yes.  It's a lot of stuff.

Q   -- under 3, using eBay, second bullet point of Exhibit 5, page 2.

A   So I'm sorry.  Now what is your question again?

Q   In order to be a user of eBay according to

the user agreement, Exhibit 5, you have to be able to be able to form a legally binding contract; right?

MR. KILBY:  Object to the form.

A  So I will happily read what it says here. I don't know anything beyond that.

Q  All right.  But according -- that's all I'm asking you.  According to this document you have to be able to form a legally binding contract in order to use eBay; right?

A  That's what it says here.

Q  Okay.  And in parentheses there it says that -- the statement actually says "If you're not able to form legally binding contracts (for example if you're not -- if you are under 18 years old)"; right?

A  Correct.  It says that.

Q  Okay.  All right.  Put Exhibit 5 aside.  I show you what I marked for identification as Exhibit 6.

(Cleland Exhibit 6 was marked for identification.)

A  Whoosh.

Q  And you said "geesh" because this terms of service is 113 pages long; right?

A   I actually said that because I feel like it's a war on trees in Florida printing all these, but yes.

Q   If you flip to page 18 of Exhibit 6, first I think we talked about earlier, Airbnb allows short-term rentals of homes; right?

A   To the best of my knowledge.

Q   Okay.  And Airbnb is a NetChoice member; right?

A   Yes.

Q   Okay.  If you look, looking at paragraph 16 on page 18 of Exhibit 6, Airbnb only allows users to register if they're for natural persons if they're 18 years or older; correct?

A   I again only know what is here.  It says you must register account and registration is only permitted for legal entities, partnerships and natural persons who are 18 years or older.

Q   Let me show you what I've marked for identification as Exhibit 7 to your deposition.

        (Cleland Exhibit 7 was marked for identification.)

        MR. GUARD:  I'm sorry to throw it but otherwise it just stops on those microphones.

        MR. KILBY:  No offense.

Q   Exhibit 7 is terms of service for PrizePicks; right?

MR. KILBY:   Object to the form.

A   That's what the document is titled, yes.

Q   And PrizePicks is a gambling or fantasy sports website; correct?

A   Fantasy sports.

Q   Okay.   So you're unaware that they have gaming activities?

A   Gaming activities, fantasy sports, yes. Gambling, no.

Q   Okay.   I guess maybe that's the -- is gaming somehow -- word somehow different to you than gambling?

A   Yes.   Under federal law, UEFA, and following court cases which I can't remember the name of.

Q   So PrizePicks is a NetChoice member; right?

A   Yes.

Q   Okay.   If you look at page 4 of Exhibit 7, number 5, PrizePick accounts.   In order to register as a user on PrizePicks you either have to be 18, 19 or 21 years old based on the law of the state where you reside; right?

MR. KILBY: Object to the form.

A   Yes. Again, I know what's here. It says "As of the effective date users must be at least 18, 19 or 21 years of age to open an account depending on the user's eligible jurisdiction as defined later in the document of residence."

Q   All right. And if you look down at the next paragraph, PrizePicks requires users to provide, among other things, a mailing address, a phone number, a driver's license, a date of birth and a Social Security number to set up account according to this document; right?

A   That's --

MR. KILBY: Object to form.

A   That's what it says here.

Q   You can put Exhibit 7 to the side. I'm going to show you what I marked for identification as Exhibit 8 to your deposition.

(Cleland Exhibit 8 was marked for identification.)

Q   Exhibit 8 is a document entitled Terms of Service by a company known as Turo; right?

MR. KILBY: Object to form.

A   That's what the document says, yes.

Q   Okay. All right. And Turo is a car

Transcript of Bartlett Cleland
Conducted on December 10, 2024                81

rental company; right?          12:00:08

A  Not to the best of my understanding.   12:00:11

Q  What is your understanding what Turo does?   12:00:13

A  So car rental brings to mind Hertz or   12:00:16
Avis.  My understanding what Turo does is if   12:00:20
people have down time of their own car, you can,   12:00:23
whatever, not renting, or that I understand it, as   12:00:27
a rental car; that you can use their car for   12:00:31
exchange of monies.   12:00:33

Q  All right.  So I'm not going to quibble   12:00:35
with you over whether using a car for monies is   12:00:44
renting a car or not, but it involves cars and   12:00:46
paying for using a car; right?   12:00:53

A  Yes, and my broader point was it's not a   12:00:54
rental company, rental car company as colloquially   12:00:57
would be understood.   12:01:02

Q  Well, all right.  And Turo is a NetChoice   12:01:02
member; right?   12:01:10

A  Yes.   12:01:11

Q  And if you look at page 2 under   12:01:12
eligibility, registration and verification under   12:01:18
the eligibility paragraph, in order to be a guest   12:01:21
who has the ability to use a car for money, you   12:01:27
have to be 21 or older except if you happen to be   12:01:32
in the United Kingdom or France; correct?   12:01:36

MR. KILBY:  Object to form.    12:01:40

A  Without clicking through what is clearly a    12:01:47
link to eligibility requirements, that sentence as    12:01:50
you said it is here.    12:01:53

Q  Okay.  All right.  Put aside Exhibit 8.    12:01:55
I'm going to show you what I marked for    12:02:02
identification as Exhibit 9 to your deposition.    12:02:05

(Cleland Exhibit 9 was marked for
identification.)    12:02:16

Q  So we don't quibble on what words I use,    12:02:16
what is your understanding of what Etsy is?    12:02:25

A  A platform for artisans to sell things    12:02:31
they create I think.  That's the extent of my    12:02:38
knowledge.  It could be more.  It could be less.    12:02:41

Q  It's an Ecommerce platform where people    12:02:44
who make things sell their things; right?    12:02:48

A  Sure.  In a colloquial way, sure.    12:02:50

Q  Okay.  All right.  I take from your answer    12:02:53
that it's not a platform that you've spent any    12:02:56
time on?    12:02:58

A  No.  I've made several purchases from    12:02:59
there.    12:03:01

Q  Okay.  All right.  Well --    12:03:01

A  It makes great Christmas gifts if you guys    12:03:02
haven't looked at it.    12:03:05

Q  All right.  So looking at Exhibit 9, and if you look at page 3, look at the top of the page, it indicates that you must be 18 years old or older to use the services except for people between the ages of 13 and 18 are permitted to use it through an account owned by a parent with the parent's permission and supervision; correct?

MR. KILBY:  Object to form.

A  That is what this document says.

Q  Okay.  And children under 13 aren't permitted to use Etsy; correct?

MR. KILBY:  Object to the form.

A  That is what the next sentence says, yes.

Q  Okay.

A  Next sentence even asks for adults to be involved.

Q  Now this is the first time I think that we've encountered the age of 13 in one of these documents; correct?

A  I think that's right.

MR. KILBY:  Object to form.

Q  All right.  And the reason why, and we're going to see it going forward in more of these documents, that 13 is referenced is because of COPPA; correct?

MR. KILBY:  Object to form.

A   That is my assumption, but I don't know that for sure.

Q   If a website allows users who are 12 or less, COPPA imposes additional requirements; right?

A   Correct.

MR. KILBY:  Object to form.

Q   It requires verifiable parental consent.

MR. KILBY:  Object to form.

Q   Correct?

A   The law has much more to do with collection of data and the use of that data.

Q   Okay.

A   Especially when advertising to under 13.

Q   Okay.  And if a website and you're going to create an account at a website and then that website is going to collect data and potentially utilize that data of someone who is 12 or less, they have to obtain verifiable parental consent?

MR. KILBY:  Object to form.

A   That part I don't know.

Q   So you're not familiar that COPPA requires verifiable parental consent?

A   I --

MR. KILBY:  Object to form.          12:05:43

A  -- don't have it in front of me, no.          12:05:45

Q  You've been in the computer and Internet          12:05:46
and telecommunications area for your entire adult          12:05:51
life; right?          12:05:55

MR. KILBY:  Object to form.          12:05:56

A  I have.          12:05:58

Q  All right.  And COPPA is a not          12:05:59
insignificant regulatory burden on the Internet;          12:06:03
right?          12:06:08

A  Correct.          12:06:08

Q  Okay.  And you're not familiar with what          12:06:08
COPPA requires?          12:06:11

MR. KILBY:  Object to form.          12:06:13

A  So you could probably relate to this.  It          12:06:15
would be a lot like asking you if you know the          12:06:17
intimacies of tax law.  There's a lot of different          12:06:20
areas.  There's some areas that people specialize          12:06:22
in that are -- I get you're painting all this as          12:06:24
one issue.  These are not one issue.          12:06:27

Technology and telecommunications issues          12:06:30
are sprawling.  They've been sprawling even          12:06:33
further since I got involved, and they are          12:06:35
complicated, and so to sit here and have instant          12:06:39
recall on every law, even ones that I wrote when I          12:06:43

was on Capitol Hill, I would be hard-pressed to be able to tell you all those details.

Q You filed a declaration in this case, Exhibit 1, and part of that declaration refers to the burdens that age verification and parental consent cause; correct?

A Yes.

Q All right. But in preparing that declaration and signing it under oath you didn't take it upon yourself to look at something that you've acknowledged is a large regulatory burden based on age on the Internet?

MR. KILBY: Object to the form.

A I did not take time to memorize all laws related to the Internet for purposes of this deposition, no.

Q I didn't ask whether you memorized all laws regarding the Internet, did I?

A That's what I hear you implying, yes, and I gave you an example. We got into a tax question earlier, and there was some confusion about what membership under tax. Clearly something not reviewed. I wouldn't have expected you to have reviewed that, but here we are. So I will answer truthfully again and say I did not memorize all

the ins and outs of COPPA.

Secondly, I've got to say if I had one thing beaten into my head in law school is you never do everything by recall. Take a look at what's there, take a look at the core case or since then. I don't know all of that jurisprudence.

Q Sir, in your declaration which you now had your lawyer handed to you --

A Yes.

Q -- you give an opinion regarding the burdens of HB 3.

A Yes.

Q Correct?

A Yes.

Q And -- well, let me ask this question. Before you prepared your declaration, Exhibit 1, did you review COPPA?

A Not, not in preparation of the declaration. Have I reviewed COPPA? Yes.

Q Okay. When you say you have reviewed COPPA, what do you mean?

A When it passed, I don't remember what year that was --

Q It was 1998, sir.

A   Great.   So the year I left Capitol Hill. I'm sure I read it then before it ever passed. I've read it since then.   I've read a number of articles, et cetera, none of which gets me up to date on recent jurisprudence or memorization of particular items.   If you provide it for me, I'm happy to look at it and give you an opinion.

Q   So before -- so you've provided an opinion regarding the burden of age verification, and I want to make sure.   I don't want to misstate.

MR. KILBY:   John, while you're looking can we ask to get to the end of this topic --

MR. GUARD:   We can take a break now and I'll come back to it.

MR. KILBY:   I was just wondering if people wanted to have lunch at some point or how do people --

MR. GUARD:   I'm fine with us breaking now because I need to review this because I don't want to misstate something here.

MR. KILBY:   Okay.

MR. GUARD:   Let's take a break.

THE VIDEOGRAPHER:   We are going off the record.   The time is 12:10 p.m.

(A lunch recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:47 p.m.

BY MR. GUARD:

Q All right. I believe you have Exhibit 1 of your declaration in front of you?

A Yes.

Q If you could turn to paragraph 21 on page 14 of Exhibit 1, and if you could read to yourself, not out loud, the first sentence.

A The first sentence of 21, correct?

Q Yes.

A Yes.

Q Okay. In that sentence it says "We are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike."

Did I read that correctly?

A You did.

Q Okay. When -- when you used "we" in that sentence, you did not mean you, yourself; correct?

A Correct.

Q All right. You, yourself, aren't intimately familiar with any of the business models of any of NetChoice's members, are you?

MR. KILBY: Object to the form.

A   That's not a true statement.

Q   Okay.   What member -- what members of
NetChoice are you intimately familiar with?

        MR. KILBY:   Object to the form.

A   So you have read it incorrectly as to be
about individual members when it says "business
models of our members."   So there's a wide --
agreement's not the right word -- a wide
similarity of business models amongst many of the
members which includes -- most are single-sided
markets, some have double-sided markets, but
largely advertising as a way to drive revenue for
the company which means you have to get eyeballs.
So it's collection of eyeballs, observing
advertisement and then pay for those
advertisements.

Q   Now, is it your testimony that of the 40
members that NetChoice has, roughly, because you
didn't count them exactly --

A   Yeah.

Q   -- that most of them use an advertising
model?

A   Ooh, most of them?   I don't know.

Q   Okay.   If you want to look at Exhibit 1A.

A   Can we say several of them just for

purposes of not ticking off each of these?

Q   Which -- let me ask it this way because I'm not -- again, I'm not trying to trick you here.  I'm not trying to do anything, but you have 40-some-odd members, and there are some members who are traditional social media kind of website companies; right?

MR. KILBY:  Object to the form.

Q   Like Facebook, Meta, like --

A   Well, Meta -- Facebook is owned by Meta.

Q   But Meta has multiple products; right?

A   Correct.

Q   Facebook is a product; right?

A   Yes, yeah, product line, yeah.

Q   Yeah.  And Facebook uses advertising, from your experience, and if you don't have experience with Facebook, but I think you told me you did, Facebook is one where it has either the, as you were describing it, these either single-sided or double-sided with you selling advertisements; right?  It sells ads.  That's how it makes its money?

A   To the best of my knowledge some part of their revenue is ad based, yes.

Q   Okay.  All right.

A   I should add, that is not to the exclusion of all others.  I don't want it to be taken that way.  There are different ways companies make money.

Q   I'm sure.  I'm sure they're making money in all kinds of ways that I can't even imagine.  Google.  Google actually owns an ad company; right?  It sells ads --

A   Sells ads.

Q   It buys and sells ads?

A   Creates an ad market, is what I would call that --

Q   Sure.

A   -- from my advertising experience.

Q   That's what we claimed in an antitrust lawsuit against them that is still pending, but putting that aside, they are kind of the double-sided thing that you were mentioning; right?

A   Yes.

Q   Okay.  All right.  Twitter or X, yeah, whichever version of it you want to call it, is one that makes money, makes money based on advertisements; right?

A   At least in part from my understanding.

Q   Okay.  All right.  Snapchat, Snap --          12:52:10

A   Mm-hmm.          12:52:14

Q   -- is one that, at least in part, makes          12:52:15
its money on advertisements; right?          12:52:18

A   From my understanding.          12:52:20

Q   Okay.  Other than those that I've          12:52:21
mentioned are there other members of NetChoice          12:52:24
that make money or at least some money on          12:52:29
advertisements, to your knowledge?          12:52:32

A   Yes.          12:52:34

Q   Okay.  Which ones?          12:52:35

A   So I'll just pick an obvious one.          12:52:37
Netflix.          12:52:39

Q   Okay.          12:52:41

A   In fact, as I look, if your question was          12:52:44
in part, which I think it was, a lot of these do.          12:52:51

Q   Okay.          12:52:55

A   But I don't know to what greater or lesser          12:52:56
extent as compared to anything else.  I also don't          12:52:59
necessarily know how many provide space for          12:53:02
advertisement on their site that is provided by          12:53:05
other methods or how much is their ads, et cetera.          12:53:09

Q   Okay.          12:53:13

A   And it all matters.          12:53:14

Q   All right.  So in Exhibit 21 when you were          12:53:17

talking about intimate familiarity, you were just talking about in general --

MR. KILBY:  I'm sorry.  Is there an Exhibit 21?

Q  Sorry.  Paragraph 21 of Exhibit 1, when you were talking about intimate familiarity, you're just talking about in general how websites make money regarding advertisements; right?

MR. KILBY:  Object to the form.

A  No.  I did not just mean that.

Q  Okay.  What did you mean then?

A  There are -- well, as I pointed out, that's one way to make money.  Other members make money in other ways.

Q  Other members sell products; right?

A  Sure, to the question earlier where there was some confusion that I was asking you to correct, some of these members sell products themselves.  Some allow others to sell products on their platform which you pay a fee for, and you might actually also advertise as the website as part of that.

Q  Okay.  And there it would be something like on Amazon being in like a spotlight or on -- they have different things on the, kind of the

side of the web page that give you a higher     12:54:26

priority or put you up in the order of things when     12:54:28

someone searches for shoes or whatever they happen     12:54:31

to be looking for at the store; right?     12:54:35

MR. KILBY:  Object to the form.     12:54:37

A  I've seen things on Amazon's website but I     12:54:38

only know from -- I don't know what the back end     12:54:42

decision is on that.     12:54:44

Q  All right.  Now, before we left, in your     12:54:48

declaration you talk about the burdens and harms     12:54:57

that age verification and parental verification     12:55:01

would cause.     12:55:07

A  Yes.     12:55:08

Q  In order to know the relative harm,     12:55:08

wouldn't you have to know the current existing     12:55:12

regulatory environment?     12:55:14

MR. KILBY:  Object to the form.     12:55:18

A  I am broadly aware of the current     12:55:18

regulatory environment, but no.     12:55:24

Q  If you'll look at Exhibit 1, paragraph 12,     12:55:29

first sentence.     12:55:43

A  Mm-hmm.     12:55:46

Q  It reads:  "All NetChoice members prohibit     12:55:47

minors younger than 13 from accessing their main     12:55:51

services."     12:55:55

A   That is what it says.

Q   Okay.  How do you know that?

A   Because from my understanding they're all compliant with COPPA.

Q   Okay.  And COPPA requires additional, imposes additional regulatory burdens if you collect data from someone who is less than or who is 12 years or less; right?

A   Correct.

Q   Okay.  And so how we end up, I thought started going down this track, was with a question that -- never mind.  Strike that.  I'll just move on.

To your knowledge, does   well, let me ask you this.  In your lawsuit are you claiming that the rights of users 12 or less are infringed?

MR. KILBY:  Object to the form.

A   I don't have the lawsuit in front of me to reference.  If you have it, I'm happy to look.

Q   So sitting here right now you don't know?

A   I don't have it in front of me, and I don't want to depend on my recall.

Q   So you do not recall, sitting here right now, the lawsuit that you, that whether someone -- well, strike that.

12:55:55
12:55:56
12:55:59
12:56:01
12:56:04
12:56:10
12:56:14
12:56:19
12:56:20
12:56:21
12:56:26
12:56:39
12:56:41
12:56:42
12:56:48
12:56:54
12:56:59
12:57:00
12:57:03
12:57:06
12:57:09
12:57:11
12:57:17
12:57:20
12:57:24

You brought suit against the State of
Florida; right?

MR. KILBY:  Object to the form.

A  It's my understanding.

Q  Your understanding?  So you don't know?

A  It is my understanding.

Q  Is -- does understanding to you mean
something different than the word know?

A  My answer is it is my understanding we
brought a lawsuit against Florida.

Q  Okay.  And --

A  I think you want truthful answers.  I'm
trying to answer truthfully.  You'd like -- it's
like you're trying to get other --

Q  Respectfully, sir.  I'm not going to -- we
don't need to debate this.  I don't think that's
helpful.  I don't think that's productive.

MR. KILBY:  Just wait for the question and
then answer the question.

Q  I think earlier we were talking about
Etsy, and Etsy was the first member that we had
come across as far as terms of use or services --
well, strike that.  It wasn't the first.  It was
one of the first that we had come across that
allowed someone who was older than 13 or 13 or

older to use its website; right?  Do you recall that?                                                    12:58:40 / 12:58:44

MR. KILBY:  Object to the form.                                            12:58:44

A  As best I recall, yes.                                                  12:58:45

Q  Okay.  Do you know how much time 13- to 18-year-olds in the United States spend on Etsy's website?                              12:58:50 / 12:58:56 / 12:59:00

MR. KILBY:  Object to the form.                                           12:59:00

A  No, I do not.                                                          12:59:02

Q  So you don't know if they spend an hour or two hours or three hours; correct?                          12:59:03 / 12:59:05

MR. KILBY:  Object to the form.                                           12:59:07

A  I do not know.                                                         12:59:09

Q  All right.  I'm going to show you what I marked for identification as Exhibit 10.                      12:59:10 / 12:59:13

(Cleland Exhibit 10 was marked for identification.)                                                       12:59:39

Q  Exhibit 10 is terms of service for Pinterest; correct?                                                12:59:39 / 12:59:44

A  Yes.  That's what it's marked as.                                      12:59:46

Q  All right.  What is your understanding of what Pinterest is?                                          12:59:48 / 12:59:50

A  My understanding of Pinterest is a place to post pictures, recipes.  I don't know.  I honestly don't use Pinterest.            12:59:54 / 12:59:57 / 13:00:04

Q  All right.  According to its website it is a visual discovery engine and content sharing platform.

A  Great words.  I'll concede to that.

Q  Does that seem like what you were trying to describe?

A  Yes, it does.

Q  And Pinterest is a member of NetChoice?

A  Yes.

Q  All right.  Now, if you look at page 3 of Exhibit 10, Pinterest prohibits anyone under 13 from using its website; correct?

MR. KILBY:  Object to the form.

A  What it says is:  "Any use or access to Pinterest by anyone under the age of 13 is not allowed."  So yes, that's written there.

Q  Do you know how Pinterest checks users' age when an account is created?

A  No.

Q  All right.  Do you know what, how it determines whether someone is under 13 or over 13?

A  No.

Q  Okay.  And then that same paragraph talks about 13- to 18-year-olds; correct?

A  Yes.  It says "If you are 13 to 18, you

may use the service -- the service with the                    13:01:28

permission of your parent or legal guardian."                    13:01:30

    Q   Do you know how Pinterest checks whether                    13:01:33

a, someone 13 to 18 has permission of their parent                    13:01:38

or guardian?                    13:01:43

    A   I do not.                    13:01:44

    Q   Put Exhibit 10 aside.  Let me show you                    13:01:46

what I marked for identification as Exhibit 11 to                    13:01:57

your deposition.                    13:01:59

      (Cleland Exhibit 11 was marked for

identification.)                    13:02:11

    Q   Exhibit 11 is Snap terms of service;                    13:02:11

correct?                    13:02:15

      MR. KILBY:  Object to the form.                    13:02:15

    A   Yes.  That's what it says.                    13:02:16

    Q   Okay.  And Snap is a company that owns                    13:02:18

Snapchat; right?                    13:02:24

    A   Yes.                    13:02:27

    Q   Does Snap own any other applications?                    13:02:27

    A   I believe -- I'm not sure.                    13:02:32

    Q   Okay.  All right.  And Snapchat allows                    13:02:35

users to exchange photos and videos; right?                    13:02:42

    A   The best of my understanding.                    13:02:45

    Q   Okay.  And Snap is a NetChoice member?                    13:02:46

    A   Yes.                    13:02:49

Q  All right.  If you look at page 2, Who Can Use Our Services, about halfway down on that page.

A  Mm-hmm.

Q  It indicates that you -- that a user has to confirm that they are 13 or older to use, to create an account; correct?

A  Yes.

Q  All right.  And do you know how Snapchat account creation collects whether someone is 13 or older?

MR. KILBY:  Object to the form.

A  I do not know.

Q  Do you know what, how or in what way Snapchat attempts to determine if someone lied when they put in their age?

A  I don't know.

Q  Okay.  According to this paragraph it mentions parental consent.

A  I'm sorry.  I don't see where you are.  If you just --

Q  "If we have actual knowledge that you are under the age of 13 (or the minimum age at which a person may use the services in your state, province or country without parental consent if greater)."  You see where I am?

13:02:49
13:02:56
13:02:59
13:03:05
13:03:08
13:03:13
13:03:14
13:03:14
13:03:22
13:03:26
13:03:26
13:03:27
13:03:30
13:03:35
13:03:47
13:03:49
13:03:49
13:04:06
13:04:11
13:04:13
13:04:14
13:04:16
13:04:21
13:04:23
13:04:26

A    Yeah.  So actual knowledge, yes.                    13:04:30

Q    Do you know how Snapchat collects or Snap    13:04:32
collects or determines parental consent?                13:04:36

A    I don't.                                            13:04:39

Q    If you'll look down at the first bullet      13:04:53
point under 1, Who Can Use Service --                   13:04:56

A    Still on the same?                                  13:05:01

Q    Yes, on the same exhibit, Exhibit 11, the    13:05:02
first bullet point says "You can form a binding         13:05:07
contract with Snap"; right?                             13:05:10

    MR. KILBY:  Object to the form.                      13:05:12

A    So "By using the services you represent,     13:05:13
warrant and agree that you can form a binding           13:05:16
contract with Snap."  Yes, it says that.                13:05:20

Q    All right.  If someone under 18 can't form   13:05:23
a binding contract with Snap, can they be a user?       13:05:26

    MR. KILBY:  Object to form.                          13:05:31

A    I don't know.                                       13:05:32

Q    All right.  If you look at the third         13:05:34
bullet point down on number 1, it says, again, "By      13:05:36
using the services you represent, warrant and           13:05:43
agree that you are not a convicted sex offender."       13:05:45
This is the first time in a terms of use or terms       13:05:51
of service we have seen that term; right?               13:05:53

    MR. KILBY:  Object to the form.                      13:05:55

A   In what you've provided me, yes.                    13:05:56

Q   All right.  Does Snapchat have a problem            13:05:59
with convicted sex offenders using its services?        13:06:03

    MR. KILBY:  Object to the form.                      13:06:06

A   I have no idea.                                      13:06:07

Q   Do you know what, if anything, Snap does            13:06:21
to make sure that convicted sex offenders do not        13:06:23
use Snap's products?                                     13:06:27

A   I don't.                                             13:06:28

Q   Why would Snap need to include a provision          13:06:32
prohibiting convicted sex offenders from utilizing      13:06:36
its platform?                                            13:06:41

    MR. KILBY:  Object to the form.                      13:06:42

A   I don't know.                                        13:06:43

Q   Do you know how many users Snap has?                13:06:45

A   I don't.                                             13:06:47

Q   Do you know how many users Snap has in the          13:06:48
United States?                                           13:06:52

A   I don't.                                             13:06:53

Q   Do you know how many users Snap has under           13:06:54
the age of 18 in the United States?                     13:06:58

A   I do not.                                            13:07:00

Q   Do you know how many users Snap has                 13:07:01
between the ages of 13 and 18 years old in the          13:07:04
United States?                                           13:07:09

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    104

A   I do not.                                          13:07:09

Q   Do you know how many users Snap has less           13:07:11
than 13 years of age in the United States?            13:07:15

A   I do not.                                          13:07:17

Q   Do you know how many users Snap has in the        13:07:18
State of Florida?                                      13:07:21

A   I do not.                                          13:07:22

Q   Do you know how many users Snap has under         13:07:25
the age of 18 years old in the State of Florida?      13:07:28

A   No.                                                13:07:30

Q   Do you know how many users Snap has in the        13:07:31
State of Florida that are 15 or 16 years old           13:07:33
currently?                                             13:07:36

A   No.                                                13:07:37

Q   Do you know how many users Snap has in the        13:07:38
State of Florida that are 14 years old or less?       13:07:41

A   No.                                                13:07:44

Q   Do you know who at Snap would know the            13:07:45
information to those questions?                        13:07:48

A   I have no idea.                                    13:07:50

Q   All right.  I'm going to show you what I          13:07:51
marked for identification as Exhibit 12 to your       13:07:54
deposition.                                            13:07:56

    (Cleland Exhibit 12 was marked for                13:08:05
identification.)

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    105

Q   Oh sorry.  Thought you had it.                    13:08:05

A   That's all right.                                 13:08:08

Q   Exhibit 12 is a document titled Google            13:08:26
Terms of Service; right?                              13:08:30

      MR. KILBY:  Object to form.                      13:08:32

A   It is entitled that, yes.                         13:08:34

Q   And it's effective May 22nd, 2024; right?         13:08:36

A   Yes, or as it's marked here, yes.                 13:08:41

Q   Okay.  And I think we talked about                13:08:44
earlier, but Google has a number of products that     13:08:46
it offers to the public; right?                       13:08:48

A   It does, yes.                                     13:08:50

Q   It has, among other things, YouTube;              13:08:51
correct?                                              13:08:55

A   Correct.                                          13:08:55

Q   All right.  And it also operates an app           13:08:55
store; correct?                                       13:09:00

A   Yes, it does.                                     13:09:00

Q   And it also has or it sells a line of             13:09:02
Android smartphones; correct?                         13:09:06

A   Yes.                                              13:09:08

Q   And compared to the other companies that         13:09:09
are NetChoice members, and we've gone over, Google    13:09:14
has kind of a broader based business than they do;    13:09:18
right?                                                13:09:22

MR. KILBY:  Object to the form.                    13:09:22

A   I don't know the answer to that.              13:09:23

Q   Well, it has more products across             13:09:25
different things.  It has like an app -- do any of  13:09:29
the other members that we talked about today have   13:09:31
an app store?                                       13:09:34

A   No, not app store.                            13:09:36

Q   Do any of the other members we talked         13:09:38
about sell cell phones?                             13:09:40

A   That we've talked about?  No.                 13:09:42

Q   Okay.  Do any other members of NetChoice      13:09:44
that are on Exhibit 1A sell cell phones?            13:09:48

A   Other than Google?                            13:09:51

Q   Yeah, other than Google.                      13:09:52

A   I'm not -- I don't know the answer.  I'm      13:09:53
not aware of it.                                    13:09:55

Q   Okay.  Do -- is there -- Apple is not a       13:09:56
NetChoice member; right?                            13:10:01

A   Correct.                                      13:10:02

Q   And there are primarily two app stores        13:10:03
that are operated in the United States; correct?    13:10:06

MR. KILBY:  Object to the form.                    13:10:09

A   I understood you to ask a much broader        13:10:12
question:  Does Google have this broad, the         13:10:14
broadest available amount of products out there of  13:10:16

any members?  I don't know the answer to that.    13:10:20

    For example, we talked about Amazon    13:10:22
earlier.  Amazon has a pretty broad selection of    13:10:24
products and services.  I don't know how they    13:10:27
stack up and compare as far as who has more, who    13:10:29
has less.    13:10:32

    Q  It has a different -- would you agree with    13:10:32
me that Google has a different set of offerings    13:10:34
than all the other members that we talked about?    13:10:39

    A  It -- in some ways.  The members are    13:10:41
not -- again, I think some of the questions fall    13:10:47
victim to this very -- what's the word I'm looking    13:10:50
for -- compartmentalized view of the world that is    13:10:55
often not at all how member companies view    13:10:58
themselves.  So there's competition in part.    13:11:01
There might not be competition in other places.    13:11:03
It's all over the place.    13:11:06

    Q  All right.  If you'll look at page 2 of    13:11:07
Exhibit 12.  Now here they don't express an age.    13:11:10
Google does not express an age; correct?    13:11:23

    MR. KILBY:  Object to the form.    13:11:26

    A  I don't see an age on this page, but I see    13:11:27
a couple hyperlinks that seem to indicate that    13:11:30
there might be an age beneath this.    13:11:33

    Q  Okay.  All right.    13:11:37

A    Actually I'll say that's true for a lot of these documents.  A lot of hyperlinks that I'm not able to review.

Q    And it says if you are -- we'll give you the hyperlink document in a second here -- if you are under the age required that is in the hyperlink, you must have your parent or legal guardian's permission to use a Google account; correct?  That's what the document reads?

A    Yeah.  You did a pretty good job of paraphrasing that.  "If you're under the age required to manage your own Google account, you must have your parent or legal guardian's permission to use a Google account."  That's what it says.

Q    Do you know how Google knows whether a parent or legal guardian's permission has been obtained?

A    I do not.

Q    I'm going to show you what I have marked as Exhibit 13.

(Cleland Exhibit 13 was marked for identification.)

Q    You can probably keep 12 there for a second.  All right.  So on Exhibit 12 there is a

hyperlink saying "Age required to manage your own Google accounts," and Exhibit 13 at the top has a title Age Requirements on Google Accounts; correct?

A  Correct.

Q  All right.  And, and then Exhibit 13 sets -- says as kind of the initial position "For all countries not listed below 13 is the minimum age to manage your own Google account"; right?

MR. KILBY:  Object to the form.

A  Let's see.  For what I see "For all countries not listed below 13 is the minimum age to manage your own."  Okay.  So it's in -- okay.  Yeah.  So as compared to the note above that says younger children can create accounts.  Okay.  Yes.

Q  Okay.  All right.  So if you're younger than 13, looking at Exhibit 12, then you have to have parental permission; correct?

MR. KILBY:  Object to the form.

A  I --

Q  Looking at Exhibit 12.  You're looking at 13.  That's why I'm --

A  12, and where in 12?

Q  Page 2?

A  Yes.  That would be my assumption given

those two statements.    13:14:12

Q    Okay.  So if you're 12 or under, you have    13:14:13
to have parental permission, you know, say because    13:14:17
the United States is not listed in this list of    13:14:22
countries; right?    13:14:26

A    That's what I was looking for.  Correct.    13:14:26
I don't see United States on this list.    13:14:28

Q    So United States is in the default, and    13:14:29
under the default you have to have parental    13:14:32
permission.    13:14:35

Do you know how many users have a Google    13:14:38
account and are in the United States and are 12    13:14:42
years or younger?    13:14:46

A    I don't.    13:14:47

Q    All right.  Now, if you look at the list    13:14:48
in Exhibit 13, there's roughly 30 countries    13:14:53
listed?    13:14:59

A    I can count them if you want me to.    13:15:02

Q    Sure.  Go ahead and count them.    13:15:04

A    Okay.  31.    13:15:06

Q    Sorry.    13:15:21

A    Ooh sorry, 32.  I missed poor Spain.    13:15:21

Q    Okay.  So 32 -- we'll be precise -- and in    13:15:26
order to operate in those -- well, strike that.    13:15:30

So those 32 countries have a minimum age    13:15:40

that is higher than 13; correct?

    MR. KILBY: Object to the form.

A As what is listed here? That's what it says.

Q Okay. And at least Google thinks that you have to have a higher age to have an account; right?

A Google has these ages listed. I don't know for what reason.

Q Okay. All right. And the 32 countries listed in Exhibit -- I think we're on 13?

A Yes.

Q -- include major European countries; right?

A Do you mind telling me what you mean by major European countries? Recognizable European countries?

Q Germany?

A Yes.

Q Greece?

A Yes.

Q Ireland?

A Yes.

Q Poland, Spain?

A Those are all on the list, yes.

Q  All right.  Doesn't have all the European countries but it has a number of them; right?

A  It -- yes.  It has several European countries, yes.

Q  And Exhibit 13, the 32 countries listed includes both what would be normally considered a developed, or normally considered developed countries; right?

A  I don't know international economic definitions.  I'm sorry.

Q  So you don't know what a developed country is?

A  I have -- if you want to rephrase the question or put something that I can read in front of me.

Q  No.  Well, I'll just move on.  There are more than 15 countries on this list that require or that appear to require, according to Google, a minimum age of 16 or over; right?

MR. KILBY:  Object to the form.

A  Require 16 or over?

Q  Yeah, 16 plus.

A  16 are marked here by Google with a 16 plus behind it.

Q  So half of the 32?

A   16 is half of 32, yes.

Q   All right.  And in order to operate in those 32 countries, assuming that Google's correct about the country's age requirement, every one of the websites that we've talked about today would also have to meet the same or comply with the age requirement; right?

MR. KILBY:  Object to the form.

A   I don't know.

Q   Would you agree that the minimum age requirement across the globe to have accounts on websites or applications is not uniform?

MR. KILBY:  Object to the form.

A   I don't know.  I know what is on this document.

Q   You can put that aside.

A   And 12?

Q   Yes.  Do you know what YouTube does to establish age at the time of account creation?

A   No.

Q   Do you know if YouTube does anything to ensure that an age or a birthday provided or obtained in account creation is correct after account creation?

A   No.  I'm not aware.

Q  Do you know how many users YouTube has?        13:19:25

A  No.                                            13:19:28

Q  Do you know how many users YouTube has in      13:19:29
the United States?                               13:19:32

A  No.                                            13:19:32

Q  Do you know how many users YouTube has         13:19:32
under the age of 18 years old in the United      13:19:35
States?                                          13:19:38

A  No.                                            13:19:38

Q  Do you know how many users YouTube has         13:19:38
between the ages of 13 and 18 years old in the   13:19:41
United States?                                   13:19:44

A  No.                                            13:19:44

Q  Do you know how many users YouTube has         13:19:44
that are under the age of 13?                    13:19:47

A  No.                                            13:19:49

Q  Do you know how many users YouTube has in      13:19:53
the State of Florida?                            13:19:57

A  No.                                            13:19:58

Q  Do you know how many users YouTube has         13:19:58
under the age of 18 years old in the State of    13:20:03
Florida?                                         13:20:06

A  No.                                            13:20:06

Q  Do you know how many users YouTube has in      13:20:07
the State of Florida that are 15 or 16 years of  13:20:11

age?

A    No.

Q    Do you know how many users YouTube has in the State of Florida that are 14 years old or less?

A    No.

Q    Do you know who at YouTube would have knowledge of how many users it has in response to each one of these questions?

A    I have no idea.

Q    Okay.  Do you know what, if anything, YouTube does to verify user's age after account creation?

A    No.

Q    Now, going back to COPPA for a second. COPPA has been on the books for more than 25 years; correct?

A    What year did you say it passed?

Q    '98.

A    Yes.

Q    All right.  And COPPA violations can lead to penalties; right?

MR. KILBY:  Object to the form.

A    I don't know.  I assume so.

Q    Well, are you aware that Google fairly

recently settled a COPPA matter with the Federal                13:21:15
Trade Commission for $170 million?                              13:21:18

    A  I am not.                   13:21:20

    Q  And I think we talked earlier, but the    13:21:24
effect of COPPA was that most websites in the                   13:21:26
United States set their minimum age requirements                13:21:29
to 13; right?                                                   13:21:32

        MR. KILBY:  Object to the form.    13:21:33

    A  Could you restate that question?    13:21:35

    Q  Sure.  The effect of the passage of COPPA    13:21:36
in 1998 is that most websites set their minimum                 13:21:41
ages to 13 in the United States?                                13:21:45

        MR. KILBY:  Object to the form.    13:21:48

    A  No, or I don't know.    13:21:50

    Q  Well, is it no or I don't know?  Because    13:21:54
those are two different answers.  I just want to                13:21:57
make sure it's clear.                                           13:22:00

    A  I would be speculating, so the answer is I    13:22:01
don't know.                                                     13:21:--

    Q  Okay.  You look back at Exhibit 1, at    13:22:14
least with respect to NetChoice members, did COPPA             13:22:23
cause them to set the minimum ages, minimum age                 13:22:28
for use of their website to 13?                                 13:22:32

    A  I don't know.    13:22:35

        MR. KILBY:  John, are you pointing to a    13:22:37

specific provision?

Q   Paragraph 12.

I thought he had testified earlier that with respect to the first incidence of paragraph 12 where it says "All NetChoice members prohibit minors younger than 13 from accessing their main services," that that was because of COPPA, but maybe I'm mistaken.

Do you now not know whether, or why NetChoice members prohibit minors younger than 13 from utilizing or accessing their main services?

A   I believe -- if we talked about it at all, which I don't recall, but if we did, 13 sets a statutory age for users being treated differently. You were not stating that.  So my answer is I don't know or no.

Q   Okay.  All right.  Now, NetChoice has existed for over two decades; right?

A   Did we say over two decades?  Yes.  I know we say two decades but...

Q   Well, if you want to look at your and make sure we get it right.  I'm not trying to trick you.

A   Do you remember where it is in here?

Q   No.  Frankly, I didn't think it was going

to be controversial.                                              13:23:57

A   Hold on.  For over two decades, not two             13:23:57
decades.                                                          13:23:57

Q   Which is what I said.                               13:23:58

A   So I'd -- again, trying to give truthful            13:23:59
answers.                                                          13:24:02

Q   All right.  And COPPA has existed the               13:24:03
entire time NetChoice has existed; correct?                       13:24:05

MR. KILBY:  Object to the form.                    13:24:07

A   I believe, yes.  I believe NetChoice was            13:24:10
founded in '99, but I can't swear to that.                        13:24:14

Q   To your knowledge has NetChoice ever               13:24:19
challenged COPPA for violating the First Amendment                13:24:21
rights of persons less than 12 years old?                         13:24:25

A   No.                                                 13:24:30

Q   And no court to your knowledge has ever            13:24:32
enjoined COPPA for violating the First Amendment                  13:24:36
rights of persons less than 12 years old in the 26                13:24:38
years since it passed; correct?                                   13:24:42

A   Correct to the best of my knowledge.               13:24:44

Q   Okay.                                               13:24:46

A   But I don't know.                                   13:24:47

Q   And at least from the terms of service             13:24:51
we've looked at so far and we have one more to                    13:24:54
look at, the only NetChoice member that we've                     13:24:57

encountered yet who will allow an account of someone less than 13 years old is Google; right?

MR. KILBY:  Object to the form.

A  That was -- that was in what we read, yes.

Q  Okay.  Are you aware of any other NetChoice member that will allow an account holder less than 13 years old?

A  I don't know.  I'm not aware.

Q  Okay.  Let me show you what I'll mark as I think it's 15, or --

A  14.

Q  -- 14.  What did I do?  Oh, I had 14 here.

(Cleland Exhibit 14 was marked for identification.)

Q  I'm showing you what I marked for identification as Exhibit 14 to your deposition. Exhibit 14 purports to be the terms of service for X?

A  So it is largely marked.

Q  Okay.  If you flip to page 4 of Exhibit 14.

A  Page 4, yes.

Q  In order to use X you must be at least 13 years old according to this document; correct?

MR. KILBY:  Object to form.

13:25:02
13:25:09
13:25:14
13:25:15
13:25:18
13:25:20
13:25:26
13:25:29
13:25:31
13:25:41
13:25:44
13:25:45
13:26:14
13:26:14
13:26:16
13:26:28
13:26:32
13:26:33
13:26:37
13:26:43
13:26:45
13:26:51
13:26:55
13:26:58

A   That is what it says, yes.    13:27:09

Q   Okay.  If you look at the next sentence    13:27:11
after that, it talks about accepting the terms of    13:27:13
service.  Do you see that?    13:27:17

A   The one that starts with "if you are,    13:27:18
little i, accepting"?    13:27:20

Q   Yes.

A   Yes.    13:27:21

Q   It goes on --    13:27:21

A   Yes.    13:27:22

Q   -- and has several little i's?    13:27:22

A   Yes.    13:27:24

Q   Okay.  And it actually -- if a minor is    13:27:25
accepting, do you see that, which is two i's?    13:27:31

A   Yes.    13:27:35

Q   Okay.  When it talks about a minor, which    13:27:36
is any person under the age of majority in any    13:27:40
given country; right?    13:27:44

A   That is how it defines it, yes.    13:27:46

Q   Okay.  So if -- in order for a minor --    13:27:49
well, a minor can't accept the terms of service,    13:27:55
and so someone has to accept the terms of service    13:27:57
on behalf of the minor; right?    13:28:00

MR. KILBY:  Object to the form.    13:28:03

A   And I don't know.  I guess.    13:28:05

Q   Well --

A   I don't know.

Q   Okay.  All right.  2 i or double 2 ii, however you want to say it, little i, says? "Accepting these terms in order to authorize the use of services on behalf of a minor"; right?

A   Yes.

Q   "Being any person under the age of majority in any given country," and then it continues on.  I'm not going to read about company, organization, government or other legal entity; "You represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these terms"; right?

MR. KILBY:  Object to the form.

A   That is what this document says.

Q   Okay.  And so in order for a minor to have an account, a parent or guardian or someone with authority has to be able to bind them to the terms; right?

MR. KILBY:  Object to the form.

A   That is what this says here.

Q   Okay.  Do you know how Twitter collects those permissions or that acceptance?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                122

A   No.                                                    13:29:22

Q   I'm going to show you what I marked for               13:29:36
identification to your deposition as Exhibit 15.          13:29:38

    (Cleland Exhibit 15 was marked for                    13:29:53
identification.)

Q   And Exhibit 15 purports to be Facebook's              13:29:53
term of service; correct?                                 13:29:57

A   That is what it says here.                            13:29:59

Q   Okay.  And --                                         13:30:01

A   Or actually let me rephrase that.  What it            13:30:03
says here is that will be terms of service                13:30:05
starting next month.                                      13:30:08

Q   Okay.  You are correct.  If you'll flip to            13:30:09
page 4 of Exhibit 15.  It indicates that someone          13:30:18
under 13 years of age cannot use Facebook; right?         13:30:28

    MR. KILBY:  Object to the form.                       13:30:36

A   The language here is "We try to make                  13:30:38
Facebook broadly available to everyone, but you           13:30:42
cannot use Facebook if you are under 13 years             13:30:44
old."                                                     13:30:47

Q   Okay.                                                 13:30:48

A   If that's where you intended me to read.              13:30:49

Q   That's where I intended you to read.  So              13:30:51
Facebook is not offering its services to                  13:30:54
individuals who are under 13 years of age; right?         13:30:58

MR. KILBY:  Object to the form.    13:31:01

A  What it says here is you cannot use    13:31:03
Facebook if you are under 13 years old.    13:31:05

Q  Do you know how Facebook collects age at    13:31:07
account creation?    13:31:14

A  No.    13:31:15

Q  Do you know what Facebook does after    13:31:16
account creation to ensure that someone under 13    13:31:18
is not using its applications or websites?    13:31:22

A  No.    13:31:24

Q  The next bullet point says "You cannot use    13:31:26
Facebook if you are a convicted sex offender";    13:31:30
right?    13:31:35

A  That's what it says.    13:31:35

Q  Okay.  Does Facebook or Meta have a    13:31:37
problem with convicted sex offenders utilizing its    13:31:59
products?    13:32:03

MR. KILBY:  Object to the form.    13:32:05

A  I have no idea.    13:32:05

Q  Do you know how Meta detects or ensures    13:32:08
convicted sex offenders are not utilizing its    13:32:11
products?    13:32:15

A  I do not.    13:32:15

MR. KILBY:  Object to form.    13:32:16

Q  For X and Facebook do you have any    13:32:17

knowledge on how many users they have, either of them?

A  I do not.

Q  All right.  Do you know how many users X or Facebook have in the United States?

A  No.

Q  Do you know how many users X or Facebook have under the age of 18 years old in the United States?

A  No.

Q  Do you know how many users X or Facebook have that are between the ages of 13 and 18 years old in the United States?

A  No.

Q  Do you know how many users X or Facebook have that are less than 13 years of age?

A  No.

Q  Do you know how many users Facebook has in the State of Florida?

A  No.

Q  Do you know how many users X has in the State of Florida?

A  I do not.

Q  Do you know how many users Facebook or X have under that are under the age of 18 in the

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    125

State of Florida?

    A  I do not.

    Q  Do you know how many users Facebook has in the State of Florida that are 15 or 16 years of age --

    A  I do not.

    Q  -- in the State of Florida?

    A  Yes.

    MR. KILBY:  Just please make sure you let him --

    A  Yeah.  I'm sorry.  I thought he was finished.  I get it.

    MR. KILBY:  And also just another reminder.  Let me have an opportunity to object.  You're doing fine in that regard.  I'm just -- a reminder.  Thank you.

    Q  Do you know how many users Facebook or X has in the State of Florida that are 14 years old or less?

    A  I do not.

    Q  Do you know who at X would have knowledge of those numbers?

    A  Absolutely no idea.

    Q  Do you know who at Facebook or at Meta would have knowledge of those numbers?

A   No idea.                                                    13:34:06

Q   I'm going to show you what I marked for                     13:34:26
identification as Exhibit 16 to your deposition.               13:34:29

A   Are we finished with 15?                                    13:34:33

Q   We are.                                                     13:34:36

    (Cleland Exhibit 16 was marked for
identification.)                                               13:34:54

Q   Have you ever seen Exhibit 16 before?                       13:34:54

A   I have not.                                                 13:34:56

Q   Exhibit 16 is section 1 of HB 3.  Have you                  13:34:58
seen -- you may have seen it in the format of HB               13:35:03
3?  You've reviewed that bill?                                 13:35:07

A   Yes.                                                        13:35:09

Q   Okay.  All right.  After it was enacted it                  13:35:09
got enrolled and placed in statute.  You                       13:35:15
understand that's kind of the legislative process.             13:35:17
You worked in Congress; right?                                 13:35:19

A   I did work in Congress.                                     13:35:22

Q   But you understand that after Congress                      13:35:23
passes a law and the Executive signs it, it goes               13:35:25
into effect and it goes into a statute back;                   13:35:29
right?                                                         13:35:33

A   Yes.  I thought you forgot that part.                       13:35:33

Q   All right.  And I think we were referring                   13:35:36
to this statute earlier when we were having a                  13:35:41

discussion; right?    13:35:45

A  We referred to the bill, yes.    13:35:45

Q  All right.  And the bill and the statute    13:35:48
contains a definition for what a social media    13:35:52
platform is; right?    13:35:55

A  Do you mean 501.1736(1)(e)?    13:35:59

Q  Yes.  That's what I was referring to.    13:36:06

A  Just wanted to be clear.  The answer's    13:36:08
yes.    13:36:11

Q  Okay.  All right.  If you look at sub (2)    13:36:11
of (e).    13:36:15

A  Yes.    13:36:24

Q  Sitting here right now do you know what    13:36:24
applications, forums and websites meet sub (e)(2)?    13:36:33

A  I unfortunately don't.  Just like I said    13:36:41
earlier, it's a horrible thing to try to figure    13:36:44
out.    13:36:47

Q  Well, do you know whether any of the    13:36:47
websites in any of the other -- do you need to    13:36:52
take a break?    13:36:59

A  Sorry.  No.  That was some spam.  I don't    13:36:59
know how to turn my phone off, or my watch off.    13:37:01
Sorry.    13:37:05

MR. KILBY:  Do we want to --    13:37:05

THE WITNESS:  Remove my watch?    13:37:06

MR. KILBY: Yeah. I just don't want it to be a distraction.

THE WITNESS: I'm comfortable doing that. I don't know where -- if someone can do it, I'm happy to have them do it.

MR. KILBY: Sorry. I violated the rule. I walked.

MR. GUARD: I was going to say, I was waiting for it to pull you back and you need to fall on your friend there, having done that before, but you didn't do it, so that's a good thing.

Q All right. Going back. All right. Do you know for any of the websites or platforms that we've talked about today, because we talked about a number of them, whether they have 10 percent or more of the daily active users who are younger than 16 years of age spending two hours per day or longer on their -- and I am paraphrasing. I am not reading it. So if you want to read it back to me exactly, but I'm paraphrasing it -- the two is a test, right, and it's a test whether you have 10 percent of the users that are 16 or younger than 16 years, so we're talking 15 years old or less; right? If 10 percent of them are spending two

hours or longer on their application, site or forum; right?

MR. KILBY: Object to form.

A I understand that's your reading interpretation. I have -- I don't know.

Q Well, for all of the -- my question is, for all of the websites and applications, terms of service that we looked at for all those companies, are you aware of any of them where their users 15 or less are spending two hours or more on average a day?

A I'm not aware.

Q Okay. For all of the members that we've talked about so far today are you, as you sit here right now, do you know which ones allow users to upload content or view content or activity of other users?

A I'm sorry. Phrase that some other way. I'm not sure I understand what you're asking.

Q Okay. Well, for NetChoice's -- for the members we talked about, so I'm not -- I don't want to get -- you saying, well, I don't know the entire Internet. I'm just trying to narrow it down for you, so I'm trying to avoid a bunch of quibbling between us.

For the companies we talked about, all right, do you know which ones allow users to upload content or view content or activity of other users?

A   I'm not sure I would get every one if I were to rattle off a list.  I could give an example.

Q   Well, can you give me maybe several examples?  Let's start there.

A   If I understand your question correctly and your definitions of what you're using, something like Facebook can upload content.  Other people can see that content.  I think that's the heart of your question.  Is that correct?

Q   Well, yes.

A   Okay.  So then YouTube would be another example.

Q   Okay.  What about Instagram?

A   Yes.

Q   Okay.  What about Snapchat?

A   I'm -- I'm not sure.

Q   Okay.  Why are you not sure?

A   I seem to remember that they have provisions that limit who can see your data, and so I'm not sure that meets your definition.

Q  Well, it -- does Snapchat allow users to upload content?                                          13:41:02
13:41:07

A  To the best of my knowledge.                     13:41:08

Q  Okay.  And you would agree with me on -- if you look at (e)(1), it has an "or"; right?            13:41:11
13:41:13

A  Yes.                                             13:41:22

Q  And that's usually a disjunctive; right?         13:41:22

A  Yes, but the first time you referred to 1, so I see where you're pulling it from.                 13:41:31
13:41:35

Q  All right.  For, again, I'm just -- we're going to talk broader in a minute, but I'm just going to -- I want to talk about the companies that we've already kind of gone over the terms of service for.       13:41:38
13:41:41
13:41:44
13:41:47
13:41:50

For the companies we've talked about, how many of them employ algorithms that analyze user data or information on users to select content for users?   13:41:53
13:41:59
13:42:06
13:42:12

A  I don't know.                                    13:42:14

Q  Okay.  So you don't know whether Facebook does that?                                              13:42:15
13:42:18

MR. KILBY:  Object to the form.                    13:42:19

A  I'm not an engineer -- I'm not an electrical -- I'm sorry -- well, or any kind of engineer for that matter, so no.               13:42:20
13:42:23
13:42:26

Transcript of Bartlett Cleland
Conducted on December 10, 2024                           132

Q  You're not a computer scientist?                    13:42:28

A  I'm not.                                             13:42:30

Q  All right.  All right.  So you don't know.          13:42:31
All right.  And then the fourth requirement of (e)     13:42:34
lists out five features; correct?                      13:42:41

A  I'm sorry.  Where -- 4?                              13:42:47

Q  Yeah, 4.  We're at 4, (e)(4) of the                 13:42:50
statute there's (a), (b), (c), (d) and (e).            13:42:54

A  Yes.  With a couple subparts, yes.                  13:42:57

Q  All right.  All right.  So (a) talks about           13:43:00
infinite scrolling.  Do you know what infinite         13:43:04
scrolling is?                                           13:43:07

A  I -- I don't.  I can read this definition,           13:43:08
but I don't know.                                       13:43:11

Q  Okay.  All right.  (b) says push                    13:43:12
notifications.  Do you know what push                  13:43:20
notifications are?                                      13:43:21

A  Yes.                                                 13:43:22

Q  What are push notifications?                         13:43:22

A  We'd call them alerts.                               13:43:25

Q  All right.  (c), displays personal                  13:43:30
interactive metrics.  Do you know what that is         13:43:36
referring to?                                           13:43:41

A  No.                                                  13:43:41

Q  Have you ever used an app that has                   13:43:42

streaks?        13:43:46

A  No.        13:43:47

Q  Or likes?        13:43:47

A  Or likes?  Yes.  Is that what that means        13:43:49
by the definition somewhere else?  That's why I'm        13:43:53
confused.        13:43:56

Q  Well, if -- you can read -- I -- again, I        13:43:57
apologize.  I was trying not to read the entire        13:43:59
(c) because you had your finger and you were        13:44:02
looking at there.  It says -- I'll read the entire        13:44:05
thing so that you're not confused.  "Displays        13:44:09
personal interactive metrics that indicate the        13:44:13
number of times other users have clicked a button        13:44:16
to indicate their reaction to content or have        13:44:18
shared or reposted a content."        13:44:22

A  That's likes.  All right.        13:44:25

Q  That's likes.  That's retweets, if it's        13:44:27
still called that now, and it's X.  It's shares;        13:44:31
right?  It's things like that?        13:44:36

A  Okay.        13:44:38

Q  Well, but --        13:44:38

MR. KILBY:  What was the question?  Sorry.        13:44:45

Q  Well, let's ask the question again because        13:44:47
I don't think "okay" is a normal answer here.        13:44:49

All right.  So we're talking about (c).        13:44:52

A   Mm-hmm.                                          13:44:56

Q   That includes likes, retweets and shares;       13:44:56
right?                                               13:45:04

A   If that is your --                              13:45:04

MR. KILBY:  Object to the form.  Go ahead.          13:45:05

A   If that is your understanding.  That is         13:45:08
not what it says here.                              13:45:10

Q   Okay.  Sir, you're familiar -- I mean you       13:45:12
talk about your familiarity in this area, all       13:45:17
right, the things with the Internet.  Now you've    13:45:21
used personally websites and the Internet.  You     13:45:23
talked about using multiple of them; right?         13:45:27

A   I have.                                          13:45:29

Q   Okay.  All right.  Is the number of times       13:45:30
something is either shared or liked or retweeted a  13:45:35
personal interactive metric within the meaning of   13:45:42
this definition?  If you don't think it is, you     13:45:46
can answer no.                                       13:45:50

A   I have no idea.                                  13:45:51

Q   Okay.  That's fine.  That's a fair answer.      13:45:51

The next one is "autoplay video or video            13:45:57
that begins to play without the user first          13:46:00
clicking on video or on a play button for the       13:46:02
video."  Do you see that?                           13:46:06

A   I do.                                            13:46:09

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    135

Q  Okay.  For the NetChoice members that we talked about today, do any of them have autoplay, to your knowledge?

A  I'm not aware.

Q  So you're not aware that YouTube has an autoplay feature?

A  I -- no, I'm not aware.

Q  Have you ever been on X or Twitter and had a video just start playing, usually at an inopportune time with the volume high?

A  No, not without me doing something --

Q  Okay.

A  -- to cause it to play.

Q  All right.  Well, I guess it's just me. All right.  All right.  For 2(e), "live-streaming or a function that allows a user or advertiser to broadcast live video content in real-time."

All the NetChoice members that we talked about, do any of them allow for live-streaming?

A  Sorry.  Wracking my brain.  I don't know immediately.  If you give me a second.

Q  Take your time.

A  Okay.  Yes.  Google, or YouTube allows live-streaming.

Q  Any others allow live-streaming, to your

13:46:11
13:46:14
13:46:19
13:46:22
13:46:24
13:46:28
13:46:30
13:46:32
13:46:36
13:46:40
13:46:43
13:46:46
13:46:47
13:46:50
13:46:56
13:47:02
13:47:04
13:47:06
13:47:15
13:47:19
13:47:21
13:47:23
13:47:28
13:47:29

knowledge?                                          13:47:34

A  I don't know.                                    13:47:34

Q  Okay.  Now, trying to figure out the            13:47:35

entire -- so I'm going to move on past just the    13:47:48

NetChoice members that we've talked about today.   13:47:52

Okay.  Moving -- and I understand -- again, it's   13:47:55

an acceptable answer if you just don't know to say 13:47:58

don't know.  All right.  Again, I'm not trying to  13:48:02

trick you here.  I'm trying to move out to the     13:48:05

entire possible universe of the Internet and       13:48:09

determine what section 501.1736 could apply to.    13:48:13

Do -- and you got the definition in front    13:48:22

of you.  Do video stream serving, services like    13:48:24

YouTube possibly meet the four-part test contained 13:48:29

in section 501.1736?                               13:48:35

MR. KILBY:  Object to the form.             13:48:38

A  I don't know.  I'm not an expert on        13:48:39

501.1736 or its application within the State of     13:48:43

Florida.                                            13:48:46

Q  I'm not asking whether you're an expert.   13:48:46

I was just asking whether 501.1736, based on your   13:48:48

experience, your 20-plus years experience in this  13:48:54

industry, all right, whether video streaming        13:48:59

services could possibly be -- have the statute      13:49:03

apply to it?                                        13:49:09

MR. KILBY: Object to the form.

A  Is it possible? Possible's a huge word. I don't know. I just don't know.

Q  Okay. If you'll look at your declaration, Exhibit No. 1, paragraph 20.

A  Mm-hmm.

Q  All right. If you want to read the entire thing, you can. I'm just paraphrasing it trying -- for time's sake. You say "I understand that some NetChoice members appear to be regulated," and I think you left out the word "by," but "regulated by the Act. These include at least the following members." The first one you list was Google; correct?

A  Could you restate the question?

Q  What -- the question that's pending is that paragraph 20 here --

A  Is Google listed here? Yes.

Q  You listed Google; right? And then you write, "which owns and operates YouTube"; right?

A  Correct. Here's why I'm balking. You skipped the very critical piece of this paragraph: "Although aspects of the Act's definition are vague and do not make clear the full extent of the entities governed by its provisions, I

understand," that's where we get to that part, "I understand that some NetChoice members appear to be regulated the act, by the Act.  These include at least the following."

It is confusing.  It is poorly written, all the things I've said before, and that is why I have a difficulty saying yes or no because it is utterly unclear.

Q  All right, sir.  You wrote down in your declaration that it appeared the Act applied to Google; right?

A  No.

Q  And then you wrote YouTube.

A  No.  Please stop yelling.

Q  I'm not yelling, sir.

A  You're raising your voice.

Q  The word YouTube appears there; correct?

A  Yes.

Q  Okay.  All right.  And so for some reason you decided just out of random, randomness to write down YouTube right here; right?

MR. KILBY:  Object to the form.

Q  I'll withdraw it.

All right.  Is it possible that section 501.1736 applies to gaming applications like

13:50:43
13:50:46
13:50:48
13:50:50
13:50:53
13:50:57
13:50:59
13:51:02
13:51:03
13:51:06
13:51:12
13:51:13
13:51:18
13:51:21
13:51:22
13:51:24
13:51:26
13:51:29
13:51:29
13:51:32
13:51:37
13:51:39
13:51:40
13:51:42
13:51:51

Roblox, Stream, Twitch or Call of Duty?

    A  I have no idea.

    Q  Do you know what those gaming applications are?

    A  Yes.

    Q  All right.  Are you familiar with those applications?

    A  Familiar meaning I know they exist?  Yes.

    Q  Are you familiar with their features?

    A  Not particularly.

    Q  Okay.  You're not a Call of Duty player?

    A  Regardless, I don't know how they operate the business.

    Q  Okay.  All right.  All right.  Well, but if you were a user, you might know what features they have; right?

    A  I'm here as general counsel of NetChoice. They're not a member.

    MR. KILBY:  Answer the question that's posted to you.  Okay?

    Q  If you were a user -- you're here in your individual capacity right now; right?

    A  Yes.

    Q  Okay.  You're not NetChoice's 30(b)(6) representative.

Transcript of Bartlett Cleland
Conducted on December 10, 2024

140

A   Correct.

Q   Okay.  All right.  From your background, utilizing different Internet platforms and programs, do you know if gaming applications like Roblox, Steam, Twitch or Call of Duty possibly could be within 501.1736?

A   No.

Q   All right.  And there are -- I mean I named four that are popular, but there are, you'd agree with me, there are hundreds of gaming applications out there; right?

A   Sure.  I suspect so.  I don't know.

Q   Well, I mean have you ever spent time on either Apple or Google's play store?  They have a whole section on games; right?

A   Yes.

Q   And the expressiveness of each of those game applications, or the expressive content of each of those game applications would be different; right?

A   What do you mean by --

MR. KILBY:  Object to the form.

A   What do you mean by expressive content?

Q   Well, like a video of how a, you know, shoot and kill a nonplayer combatant in Call of

Duty that is shared with another participant, that has a different expressive content than say Candy Crush; right, and whatever it may arise?

MR. KILBY:  John, is this tied to one of the topics in --

MR. GUARD:  Yes.  You brought up facial challenge here, and I'm exploring what could be within the facial, the stream of the facial challenge.

MR. KILBY:  Like we all want to help get the deposition wrapped up, but I just want to see if it's tied to one of the 30 topics that the AG's office indicated it wanted to explore in the depo.

Q  I'll move on.  Do blogging or microblogging applications like Twitter and Threads possibly meet the four-part test that's contained in 501.1736?

A  I don't know.

Q  Do Internet-based chat thread applications like Reddit and Discord possibly meet the test of section 501.1736?

A  I don't know.

Q  Do traditional video image sharing social media applications like Instagram, TikTok, Facebook and Snapchat possibly meet the test

contained in 501.1736?                           13:55:22

A  I don't --                                     13:55:25

   MR. KILBY:  Object to the form.                13:55:26

A  I don't know.                                  13:55:28

Q  In addition to -- we've talked a little        13:55:32
bit about international age restrictions, infancy, 13:55:35
COPPA which all deal with age, and that we spoke  13:55:39
about earlier.  There are also numerous specific  13:55:43
state laws that impose other minimum ages for     13:55:48
buying or utilizing products and services --      13:55:52

   MR. KILBY:  Object to form.                    13:55:55

Q  -- on --                                       13:55:57

   MR. KILBY:  Go ahead.                          13:55:58

Q    on NetChoice members; right?                 13:55:58

   MR. KILBY:  Object to the form.                13:56:00

A  I don't know.                                  13:56:01

Q  Well, you have to be 21 years of age to        13:56:01
purchase tobacco products online like you do to go 13:56:04
into a store; right?                              13:56:07

   MR. KILBY:  Object to the form.                13:56:10

A  I have no idea.                                13:56:11

Q  You have to be 21 years of age to purchase     13:56:12
alcohol products online like you do from a brick  13:56:15
and mortar store; right?                          13:56:19

   MR. KILBY:  Object to the form.                13:56:20

A  To the best of my knowledge.

Q  All right.  You have to -- and at least in many states you have to be at least 21 years of age to gamble, whether online or in person; right?

A  I don't know.

MR. KILBY:  Object to the form.

Q  I'll move on.  At least in some states you have to be over 18 years of age to view pornography; right?

A  I don't know.

Q  Age verification of products and services is not a new or novel concept; right?

MR. KILBY:  Object to the form.

A  I have no idea how long such idea's been around.

Q  Well, I mean you and I are of roughly the same vintage.  You know, when you were growing up and you wanted to buy a beer, you had to show your ID; right?

MR. KILBY:  Object to the form.

A  At least in my experience.

Q  Okay.  So I mean, you know, I'm not asking your age but, you know, for -- you had to show your age at least or show your ID at some point in time to verify your age; right?

A   Well, of anything in life let's say?   13:57:29

Q   Yes.   13:57:33

A   Yes.   13:57:33

Q   Okay.  So it's not new or novel that ID or age verification are being required for certain products and services; right?   13:57:34 / 13:57:39 / 13:57:41

MR. KILBY:  Object to the form.   13:57:43

A   I suppose in the content, or the box in which you put it which within our vintage.   13:57:45 / 13:57:49

Q   Well, I guess I was just saying that -- well, I guess -- you can be -- I mean Romans versus, you know, the United States.  So I stand by -- I'll just -- but for the last 20 or 30 years that ID verification has existed; right?   13:57:55 / 13:57:57 / 13:58:02 / 13:58:04 / 13:58:08

A   For some things in some aspects of life, yes.   13:58:12 / 13:58:15

Q   Okay.  And at least for those, those members of NetChoice that sell those kind of restricted products or services, they are under some form of compliance obligation to verify age; right?   13:58:15 / 13:58:20 / 13:58:24 / 13:58:27 / 13:58:31

A   I don't know.   13:58:31

Q   Okay.  Now, looking back at the statute for a minute, Exhibit --   13:58:32 / 13:58:51

A   Exhibit 16?   13:58:54

Q   -- Exhibit 16, yes.          13:58:55

A   Okay.          13:58:57

Q   Now, can you point to where in Exhibit 16 that the statute regulates what someone can say?          13:58:57 / 13:59:04

A   Well --          13:59:12

MR. KILBY:  Object to the form.          13:59:13

A   Could you ask that in a different way or re-ask that?          13:59:16 / 13:59:19

Q   Sure.  Exhibit 16 doesn't discriminate based on whether you have a liberal message or a conservative message or you're talking about recipes or art or movies, does it?          13:59:20 / 13:59:29 / 13:59:32 / 13:59:35

A   I -- without reviewing this with more time, I don't know the answer to that.          13:59:41 / 13:59:44

Q   All right.  So you're unaware of it as you sit here?          13:59:46 / 13:59:48

A   That is true.          13:59:49

Q   All right.  Fair enough.  What exhibit 16 or the statute that is in Exhibit 16 does is it modifies the ability of certain individuals to make a contract; right?          13:59:50 / 13:59:57 / 14:00:00 / 14:00:04

MR. KILBY:  Object to the form.          14:00:06

A   No.  I don't understand that to be the case at all.          14:00:09 / 14:00:11

Q   Okay.  All right.  Well, let's talk about          14:00:11

that. If you look at on the second page section 3, sub (a)?

MR. KILBY: So I'm sorry, John --

Q Well, let's just start at 2(a). So second page, section 2, sub (a), top of the page. Section 2(a) prohibits a minor who's younger than 14 years of age from entering into a contract with a social media platform; right?

A This one includes that. Your -- the implication the way you phrased before was that was all, and that's not true at all.

Q Section -- let's just talk about section 2(a).

A Okay.

Q Section 2(a) prohibits someone who is younger than 14 years old, which means 13 or less, from entering into a contract with a social media platform; right?

A That's what that says, yes.

Q Okay. Section 3(a) prohibits a minor who is 14 or 15 years of age from entering into a contract with a social media platform; right?

MR. KILBY: Object to the form.

Q Unless the minor's parent or guardian consents?

A    Actually the wording here is the reverse I think or the flip of what you said.  It says "The social media platform shall prohibit."  It doesn't prohibit the minor.  It prohibits the platform.

Q    Okay.  Is there a difference to you?

A    There absolutely is because this whole law restricts what platforms can do and whether they can assent to their First Amendment rights.

Q    So your understanding of this lawsuit is it's the platform's First Amendment rights that are being infringed?

A    No, it's not --

MR. KILBY:  Object to form.

A    No.  It's not just that.

Q    Okay.  So how are the platform's First Amendment rights being infringed?

A    So as we are aware, companies have a right to speech, both into organizing speech, speaking, not speaking, how they deliver that speech, basically right to an expression which is the better word under First Amendment.

Q    All right.  What companies do you believe are infringed?

A    All of them under this law.

Q    So you believe all companies are

14:01:46
14:01:49
14:01:52
14:01:54
14:01:58
14:02:00
14:02:03
14:02:07
14:02:08
14:02:10
14:02:13
14:02:14
14:02:15
14:02:16
14:02:18
14:02:24
14:02:25
14:02:31
14:02:35
14:02:38
14:02:40
14:02:42
14:02:45
14:02:47
14:02:48

infringed?

A  Yes, because the government is putting in place a restriction on their First Amendment rights.  It also infringes First Amendment rights of some of the users, but that's not what you asked.

Q  And how does it restrict the platforms that you're speaking of?  Can you give me a list of every company that you think is being infringed by this law?

A  No, because I just answered that is that all of them are because when any of the First Amendment rights are infringed, it infringes on everyone, but I will give you an example if you like.

Q  No, I -- I asked you to name, name the companies that this, you're claiming this bill infringes on.

A  All companies.

Q  Okay.  So it infringes on the Hilton Hotel that I stayed in last night?

A  Well, I assume you stayed here, so it's not in the State of Florida, but yes, it could. It's a problem with messing with the First Amendment.

Q   And it infringes on Waste Management garbage company that has facilities in Florida?

A   I don't know.  Depends on their business model.

Q   Well, you just said it infringed on all companies, and I'm giving you a couple examples, and you're now saying that you're not sure with Waste Management?

A   I'm not saying I'm not sure or not. You're putting words in my mouth.  What I said was that with this law in place you limit a company's, a corporate, as an individual, that fiction, ability to be expressive.  Once you have that kind of impingement on First Amendment, yes, it can go all kinds of place.  I have no idea what future business models people will pursue, but they won't be able to pursue them, and that's before you eliminate -- YouTube is a great example.  You say that all the law says is that there can be no accounts under whatever age is deemed in here and they already allow accounts, as we read, as I read out loud to you, I made sure to read that piece that you left out.

Q   Now, could YouTube allow individuals younger than 14 years of age to use its services

14:03:55
14:04:00
14:04:03
14:04:05
14:04:06
14:04:09
14:04:13
14:04:15
14:04:16
14:04:19
14:04:22
14:04:26
14:04:30
14:04:34
14:04:37
14:04:40
14:04:44
14:04:46
14:04:49
14:04:51
14:04:53
14:04:56
14:05:00
14:05:01
14:05:09

without a contract?

    A  What do you mean by services?

    Q  YouTube by -- at least my understanding is that it has videos on it that it allows people to use.  Could YouTube allow users younger than 14 years of age to use its video services without an account, without a contract?

    A  So YouTube has videos that maybe there's a misunderstanding what they do, but they have a main part of YouTube and then they have an area that is designed and defined for, I believe it's under 13, it might be 13 and under, but under 13. You do of course need an account, as we saw earlier, but this lawsuit eliminates those accounts in the first instance, and I believe it eliminates them 13, 14 and 15, though I might not be a hundred percent on that.

    Q  In 2(a), and maybe I'm just missing it here, 2(a) doesn't mention the word account at all; right?  Well, it says account holder.

    A  Right.

    Q  All right.  It's talking about a contract. All right.

    A  To become an account holder.  So sure.  If you want to say a contract to become an account

holder, I'll agree to that, but the way you become an account holder is to have a contract, so.

Q   But could YouTube, if it wanted to continue to allow 13-year-olds or less to utilize its products, just not require a contract?

A   After the State of Florida has eliminated the contracts or --

MR. KILBY:  I think you may have interrupted.

A   I'm sorry.  I'm sorry.

Q   I'm just asking you if it's a possibility whether, complying with this, law YouTube could just not require a contract with people that are 13 years of age or younger?

A   Only --

MR. KILBY:  Object to the form.

A   Only after the accounts for 13, 14 and 15, as I recall, are all eliminated.

Q   So it could allow 13 years -- 13-year persons or younger to utilize and have access to its service without a contract; right?

MR. KILBY:  Object to the form.

A   I'm sorry.  Actually I don't -- I don't understand what you're asking.  Could 13 -- let me say it back and use -- just help me understand

what you're asking.

Q  I'm just asking you -- all right.  We looked at a whole bunch of terms of service; right?

A  Mm-hmm.

Q  And those are things that the companies are contractually requiring of people to use their products and services; right?

A  Yes, under their own business models, yes.

Q  All right.  If you eliminated that requirement, you eliminated the contracting requirement --

A  If government eliminated the requirement?

Q  No.  In order so that it could still offer the service because they really want to show videos to 13 or less, all right, and not require 13-year-old people or younger to enter into a contract, could they do that?

MR. KILBY:  Object to the form.

A  Could they --

Q  Could they being YouTube?

A  Could they as a free market company without government interfering into their First Amendment rights do that?  Yes.

Q  Okay.  All right.  And that would be

YouTube's choice, right, to do that?

A   In a free market, I think, I think you are saying without government interference, then the answer would be yes.  It would be their choice.

Q   Okay.  All right.  So could YouTube, looking back to the first page of 501.1736 and looking at 1(e)(4), where it lists out those five features, right?

A   Mm-hmm.

Q   Okay.  You with me?  I just want to make sure before I ask a question that we're on the same page.  Could YouTube -- I'm not meaning to beat up on YouTube but I think we were talking about it earlier and it's in your declaration

A   Mm-hmm.

Q   -- could YouTube disable to the extent it has it because you weren't even sure if it had these features, but could it disable these features and not be affected by section 501.1736?

MR. KILBY:  Object to the form.

A   I have no idea.

Q   All right.  Are you aware that YouTube has disabled its autoplay feature for people younger than 13?

MR. KILBY:  Object to the form.

A   I am not.

Q   Okay.

MR. KILBY:  John, at some point when you get to the end of a topic if we can take a very short break.

MR. GUARD:  We can take a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:10 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:21 p.m.

BY MR. GUARD:

Q   All right.  I want to go back again just for a brief moment to Exhibit 1, paragraph 20.  In paragraph 20 you state "I understand"; right?  And I understand that there is a phrase that follows a comma, and there's a phrase before it, but my question to you is, what is the basis of your understanding?

A   So I'm going to read this again since you referenced it, but "Although the Act's definitions are vague and do not make clear the full extent of the entities governed by a provision, I understand" -- so there's a very important phrase -- "I understand that some NetChoice

14:10:06
14:10:07
14:10:07
14:10:09
14:10:12
14:10:14
14:10:16
14:10:18
14:10:21
14:21:22
14:21:38
14:21:41
14:21:42
14:21:44
14:21:55
14:22:01
14:22:07
14:22:09
14:22:14
14:22:19
14:22:21
14:22:25
14:22:29
14:22:30
14:22:32

members appear to be regulated by the Act."  So what did I mean by that?  I meant exactly what it says.

Q  I didn't ask you -- how do you understand?

A  Taking just a broad construction of the words here, many of which are not defined, many of which don't have meaning in the law.

Q  But --

MR. KILBY:  I'm going to ask you to let Mr. Guard ask his question again and listen to how he asks it.

Q  My question to you is, how do you understand that NetChoice's members are regulated by the Act when earlier today you indicated when I asked you that you did not know about 10 percent or more of the daily active users who are younger than 16 years of age who are spending two hours or more per day longer on the online forum website or application -- I'm not reading it -- but for when I asked you -- I'm just making sure I'm not missing something -- you have said in a declaration signed under penalties of perjury that you understand that NetChoice members appear to be regulated, but then when I went through the Act and asked you, like, who met the different

components, your answer was you did not know. So I'm just trying to bridge the apparent disconnect that seems to exist here.

So how do you understand that NetChoice members appear to be regulated?

MR. KILBY: Object to the form.

A  The way to know as best I can reading the law as loose and as difficult as it is to understand, looking at what members do, and if some part of this law or other could potentially apply to them. I mean I would take almost the exact same words you used and flip it back to the law and say, there's a lot of I don't understand; I don't know what this is in the law.

Q  Okay. So if I, if I understand you, what I think you're saying is in paragraph 20 you looked at the law and then, though you don't really know what many or most of the members do as far as the points that are in this law, I mean you know what they do maybe more generally, but you don't know, you know, how often, or the, how many users they have that are under 16 that are using it for more than two hours, you don't know details like that. You're just making an assumption or your best guess? No? You're shaking your head no

so --

MR. KILBY:  Are you at the end of the question yet?

Q  MR. KILBY:  Object --

MR. GUARD:  We're going to get to the end of the question, but he was shaking his head no.

MR. KILBY:  Object to the form.

A  I was actually curling my lip and grimacing, but the -- you keep going back to having to grasp some understanding of number of users in a particular place.  Number one, that is not the only way this law could be applied. Number two, and I think more broadly, as I said before, the First Amendment implications are still much broader than any, whether any particular company is in or not in whatever these definitions mean.

Q  Sir, if you look at 1(e) of the statute and you look at sub part (3) at the end of it, it has a semicolon and an "and."  "And" typically is a conjunctive; right?  It means you have to have all of the previous parts and the next part; right?

A  Yes.

Q  Okay.  So in order for something to be

considered a social media platform, all four parts of this definition would have to be met; right?

A  Yes.

Q  Okay.  And so if one part is missing, then a company is not a social media company as, or social media platform as defined in this statute; right?

A  I -- sure.  Yes.

Q  Okay.  All right.  So when I asked your basis when you said in your declaration "I understand that some NetChoice members appear to be regulated by" -- "regulated" -- I keep on adding the word "by."  That's causing a problem -- "by the Act," did you have, did you have knowledge of all four of these components that are contained in the statute?

A  Yes, and let me pick on the one that you keep going back to.  I don't know which is the (e) little 2, 10 percent more direct and da-da-da -- sorry.  Et cetera, et cetera.  I don't have any understanding -- honestly, this goes back to the vague and hard-to-understand point that I've made repeatedly.  I don't know who's measuring that, where it's measured by.  You keep asking whether I have knowledge of what my members, how they keep

track, et cetera.  Obviously the answer's no, but be protected any number of ways to Sunday, and so that is the context in which I'm answering these questions.

Q  All right.  Do your members share with NetChoice data or stats relating to usage by anyone?

MR. KILBY:  Object to the form.

A  Not to the best of my knowledge.

Q  Okay.  And none of them have shared any data or stats about usage with you yourself; right?

A  Correct.

Q  All right.  And to your best of your knowledge NetChoice doesn't know how long its members' users use their apps each day; right?

A  To the best of my knowledge, and it goes back to that first sentence in 20:  "Aspects of the Act's definition are vague and do not make clear the full extent," and the next sentence "best, best efforts.  These include the following."

Q  All right.  Do you know if any of your members use tools to increase the amount of time a user spends on their app?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                160

A   No.                                                        14:30:13

Q   All right.  Have you ever heard of the                    14:30:17
term rabbit holing?                                           14:30:21

A   Not in the -- no, not in this context                     14:30:24
anyway.                                                       14:30:27

Q   All right.  Have you heard about it in                    14:30:28
another context?                                              14:30:31

A   Like going down a rabbit hole like                        14:30:31
referring to Alice in Wonderland, yes.                        14:30:34

Q   Have you ever heard of rabbit holing in                   14:30:35
the social media context?                                     14:30:38

A   No.  Remind me to ask you about that                      14:30:39
afterward.  I don't know what that means.                     14:30:45

Q   Now I talked to you before the break about                14:31:10
social media companies in order so that the                   14:31:14
statute did not apply to them could turn off the              14:31:18
features listed in section 4 or I guess it's                  14:31:21
(e)(1)(4) of the statute.  The social media                   14:31:26
companies to which the statute could apply could              14:31:32
also turn off the algorithms that select content              14:31:35
for users; correct?                                           14:31:39

    MR. KILBY:  Object to the form.                           14:31:41

A   I don't know the answer.                                  14:31:43

Q   Okay.  All right.  If they shut off the                   14:31:44
algorithms that select content for users, the                 14:31:49

statute would no longer apply to them; right?                14:31:53

MR. KILBY:  Object to the form.                14:31:56

A  Where -- if you point me to that language,                14:31:58
I'll -- employs algorithms that analyze the --

Q  Yes.                14:32:05

A  If it didn't employ any algorithm?                14:32:05

Q  If it didn't employ algorithms for that                14:32:06
purpose.  I'm not saying they have to turn off all                14:32:09
algorithms.  I'm talking about algorithms for                14:32:11
those, for purposes that are listed in the                14:32:14
statute.                14:32:15

A  I suppose they'd always have the                14:32:20
marketability to turn off an algorithm.  I don't                14:32:25
know the answer.                14:32:27

Q  Okay.  I'm going to show you what I've                14:32:27
marked for identification as Exhibit 17 to your                14:32:29
deposition.                14:32:31

(Cleland Exhibit 17 was marked for
identification.)                14:32:34

A  Are we finished with 16 or?                14:32:34

Q  Yes.  We're finished with 16, at least I                14:32:36
hope so.                14:32:39

Have you seen Exhibit 17 before?                14:32:48

A  I have.                14:32:49

Q  All right.  This is actually something                14:32:50

that you attached a link to in your declaration;
right?

A   Correct.

Q   All right.  And in your Exhibit 17 -- I
guess I should do this before I start -- is the
Social Media and Youth Mental Health Advisory
published by the US Surgeon General in 2023;
correct?

MR. KILBY:  Object.

A   That's what it says, yes.

Q   And Exhibit 17 was published before,
whether you want to call it HB 3 or 501.1736 was
passed; right?

A   I don't know the answer to that.

Q   So you're not aware of when HB 3 passed?

A   I'm not aware of the date it passed, no.

Q   You're not aware that it passed in the
last legislative session in Florida?

A   No.

Q   Okay.

MR. KILBY:  Object to form.

Q   Now, in your declaration you cited only
part of Exhibit 17; right?

A   I quoted from here, yes, like we did with
other documents, yes.

Q  And the part of it that you actually quoted from is the benefits of social media; right?

A  I believe --

Q  If you want to look at your declaration, you have it in front of you.  I'm not trying to trick you.

A  Do you remember where it's quoted?  And then I'll just refer to exactly where it is here.

Q  I have it marked.  I just have to find the marking.

A  Well, maybe not.

Q  Page 16 -- oh, I didn't look far enough back.  It's

A  Oh, there it is.

Q  -- 23 sub (a) which starts on 15, goes to 16 of Exhibit 1.

A  Yes.  Okay.  So it's paraphrased, not quoted.  Okay.  So.

Q  Would you agree it's from the section of Exhibit 17 that deals with the benefits of social media, which I'm paraphrasing?

A  Yes.  I believe from page 5, but I'm not sure.  Yes.

Q  Okay.

Transcript of Bartlett Cleland
Conducted on December 10, 2024                              164

A   Or no, I'm sorry.  Page 6.  I was on the wrong page.

Q   Would you agree that the Surgeon General would not have sent out a health advisory to just document the benefits of social media?

MR. KILBY:  Object to the form.

A   I don't have any idea.

Q   Okay.  Are you aware of how often or how frequently the Surgeon General sends out health advisories?

A   They change often, and so, no, I don't know how often this Surgeon General did or any other.

Q   Okay.

MR. KILBY:  John, I apologize.  I need to plug my laptop in.  Could you give me nine seconds?

MR. GUARD:  We'll take a quick break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:37 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:38 p.m.

BY MR. GUARD:

Q   All right.  So you cited and paraphrased

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    165

from Exhibit 17 the benefits of social media;
correct?

    A  Yes.

    Q  All right.  Would you agree with me that
the bulk of Exhibit 17 details the potential harms
of social media to minors, does it not?

        MR. KILBY:  Object to the form.

    A  No, I don't agree.

    Q  Okay.  Well, it has a paragraph on page 6
about harm -- or benefits; right?

    A  With lots of footnotes, yes.

    Q  Okay.  And then on the bottom of page 6 it
starts a several page, goes one, two, three,
almost four pages, about the harms; right?

        MR. KILBY:  Object to the form.

    A  Factually it does cover that many pages.

    Q  Okay.  All right.  So it has a single
paragraph about benefits, and then the bulk of the
discussion here is about harms; right?

        MR. KILBY:  Object to the form.

    Q  And it has many footnotes, as you said,
about the benefits; right?

    A  No.  I disagree with your -- other than
the factual how many pages it covers.  That's kind
of like the professor throwing the paper down the

Transcript of Bartlett Cleland
Conducted on December 10, 2024

166

steps to see who gets the A.  It had a lot more to do with the content that's in here, and I might add it also ends or part of what you cited actually talks about excessive and problematic use, which is not normal use obviously, and then ends with known evidence gaps, so.

Q  All right.  Would you agree with me that Exhibit 17 identifies two risks of harm from social media?

MR. KILBY:  Object to the form.

A  Identifies two risks of harm?

Q  Risks of harm, or potential risk of harm, if you want to quibble with me?

A  I honestly don't know if it identifies two or more or less.

Q  It has two headings that are bolded and are a bigger type face about two different types of potential risk of harm; correct?

A  I understand that.

Q  So that's a yes?

A  It has -- these do not appear to be different risks of harm to me, no.

Q  All right.  The document itself has two subheadings.  One reads:  "Potential risk of harm from content exposure"; right?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                     167

A   Correct.                                            14:40:54

Q   And then it has a separate second heading          14:40:54
that says "Potential risk of harm from excessive       14:40:59
and problematic use"; right?                           14:41:03

A   It does have both those headings.                  14:41:05

Q   All right.  So it has -- it has identified         14:41:08
two categories of harm at least that this advisory     14:41:10
is deciding to bold and put into a heading; right?     14:41:15

    MR. KILBY:  Object to form.                         14:41:18

A   It has both of those headings, yes.                14:41:19

Q   Would you agree the State of Florida has           14:41:25
an interest in preventing its minor citizens from      14:41:27
suffering either of the harms identified by the        14:41:31
United States Surgeon General?                         14:41:34

    MR. KILBY:  Object to the form.                     14:41:37

A   I just didn't understand a word.  Either           14:41:39
of the harms?  Is that what you said?                  14:41:42

Q   Yes.

A   I don't know.                                       14:41:43

Q   Would you agree the State of Florida has a         14:41:43
substantial interest in preventing its minor           14:41:45
citizens from suffering either of the harms            14:41:47
identified by the Surgeon General in Exhibit 17?       14:41:50

    MR. KILBY:  Object to the form.                     14:41:53

A   I don't know.                                       14:41:54

Q  Would you agree the State of Florida has a

compelling interest in preventing its minors from

suffering either of the harms identified by the

United States Surgeon General in Exhibit 17?

     MR. KILBY:  Object to the form.

A  I don't know.

Q  Do your members believe that protecting

the health and safety of minors is a compelling

interest?

     MR. KILBY:  Object to the form.

A  I don't know.

Q  Do you personally believe that your

members have a duty to protect the health and

safety of the minors who use their platforms?

     MR. KILBY:  Object to form.

A  I don't know.

Q  Do you believe that your members should be

free to harm or cause minors to die?

     MR. KILBY:  Are you at the end of the

question?

     MR. GUARD:  I am.

     MR. KILBY:  Okay.  Object to the form.

A  I don't know.

Q  So you don't -- you don't know whether

you're okay with one of your members killing

14:42:02
14:42:05
14:42:08
14:42:11
14:42:13
14:42:14
14:42:15
14:42:19
14:42:22
14:42:22
14:42:23
14:42:27
14:42:31
14:42:34
14:42:37
14:42:39
14:42:47
14:42:52
14:43:00
14:43:02
14:43:02
14:43:02
14:43:05
14:43:06
14:43:10

someone?

        MR. KILBY:  I'm objecting to the form.

    A  So your question is whether I don't know
that if I'm okay with?

        MR. GUARD:  Please read the question back
to him.

        (The Reporter read from the record as
follows:  "So you don't -- you don't know whether
you're okay with one of your members killing
someone?"

        MR. KILBY:  I will repeat my objection to
the form of the question.

    A  I don't know.

    Q  Now, throughout your declaration you talk
about how your members are taking steps to protect
minors; right?

    A  Yes.

    Q  Okay.  So doesn't that indicate that your
members do not want to harm minors?

        MR. KILBY:  Object to the form.

    A  I don't know.

    Q  Did you see -- one of your members is
Meta; right?

    A  Yes.

    Q  Mark Zuckerberg is the CEO of Meta; right?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    170

A   Yes, to the best of my knowledge.                 14:44:18

Q   Okay.  Is there --                                14:44:20

A   I don't know what his title.  I have no           14:44:21
idea.                                                 14:44:24

Q   All right.                                        14:44:24

A   He could be chairman, for example.                14:44:26

Q   Okay.                                             14:44:28

A   I have no idea.                                   14:44:28

Q   Fair enough.  I'll move on.                       14:44:29
Mr. Zuckerberg last year was summoned in front of     14:44:34
the United States Senate, a committee of the          14:44:38
United States Senate; right?                          14:44:40

    MR. KILBY:  Object to form.                       14:44:42

A   I have no idea if he was summoned.                14:44:44

Q   All right.  Well, he appeared in front of         14:44:46
the --                                                14:44:48

A   Best of my knowledge, yes.                        14:44:48

Q   Okay.  And during his testimony, I believe        14:44:50
after some questions and statements by Senator        14:44:55
Hawley, he stood up and apologized to people in       14:44:59
the audience whose children had suffered harm;        14:45:02
right?                                                14:45:09

A   I don't know, and I certainly don't know          14:45:09
the stories behind any potential people suffering     14:45:11
harm.                                                 14:45:15

Q  Well, assume just for a moment that Mark Zuckerberg at a hearing, a United States Senate committee hearing, apologized to parents of minors who had suffered some harm on either Instagram or Facebook.  Just assume that for a moment.  Would that indicate that at least Mr. Zuckerberg and Meta cared about the health and well-being of its users, its minor users?

MR. KILBY:  Object to form.

A  I have no idea.

Q  All right.  Now you're -- I think it's obvious by now, but you're not a doctor, Mr. Cleland, are you?

A  Medical?

Q  Yes.

A  No.

Q  You're not a neurologist; right?

A  No.

Q  You're not a psychologist; correct?

A  Correct.

Q  All right.  And so you have no -- you don't have the background or expertise to dispute anything that the United States Surgeon General may have said in his warning; right?

MR. KILBY:  Object to the form.

A   Could you ask that a different way?  Do I have any expertise that could allow me to -- that's -- I have no medical knowledge, that is true.

Q   I asked if you had any medical or scientific experience to contradict what the United States Surgeon General said in this report.

A   I do not.

Q   Okay.  On page 5 --

MR. KILBY:  Of Exhibit --

Q   -- of Exhibit 17, the bottom of the page, last two sentences, it reads:  "Adolescent social media use is predictive of a subsequent decrease in life satisfaction for certain developmental stages including for girls 11 to 13 years old and boys 14 to 15 years old.  Because adolescence is a vulnerable period of brain development, social media exposure during this period warrants additional scrutiny."  That's what I -- did I read that correctly?

A   That is what it says.

Q   And HB 3 or 501.1736 gives additional scrutiny to kids, to social media kids who have users that are those ages; right?

MR. KILBY:  Object to the form.

A    No.

Q    So 501.1736 covers children under what age?

A    I believe 15, 14, 13 are the ages named, or enumerated.

Q    So under the age of 13, right --

A    Mm-hmm.

Q    -- it prevents accounts, and for under 15 it only allows accounts with parental consent; right?

A    Yes.

Q    And that is higher than the current minimum ages that exist for social media companies which, at least as we've seen today, most of them are 13 years of age; right?

MR. KILBY:    Object to form.

A    Yes, factually, yes.

Q    All right.  On page 15 of Exhibit 17 --

A    Page 15.

Q    -- in addition to talking about the benefits and the harms of social media, okay, youth, the Surgeon General had a series of recommendations for a variety of different stakeholders; right?

A    Yes, yes.

Q   Okay.  And on page 15 are the recommendations for policymakers; right?

A   Correct.

Q   And that would be, include law makers; right?

A   That is my understanding of policymakers, yes.

Q   Okay.  All right.  And he made a series of recommendations here, right, to law makers?

A   Yes, yes.

Q   All right.  And if you look at, there's two columns.

A   Yes.

Q   Look at the bottom column, or the first column, bottom of it.

A   Yes.

Q   The last bullet -- I don't know if it's a bullet point or an arrow point.  I don't know what you call that.  It says "Pursue policies that further limit access in ways that minimize the risk of harm to social media for all children including strengthening and enforcing age minimums"; right?

A   That is what it says.

Q   All right.  Strengthening age minimums

would be increasing age minimums; right?

MR. KILBY: Object to the form.

A I have no idea.

Q And enforcing age minimums would mean actually enforcing whatever the age minimum is; right?

MR. KILBY: Object to the form.

A On its face that appears to be what it means.

Q Okay. And doesn't HB 3 do exactly what the Surgeon General recommended? It strengthens age minimums by increasing the age to utilize certain social media platforms?

MR. KILBY: Object to the form.

A So again, I think we're cherry-picking language. "Pursue policies that further limit access" -- dash -- could be a comma -- "in ways that minimize the risk of harm" -- dash -- "to social media for all children. So the break in that sentence as you read it, you chose the last clause only, is ways that minimize risk of harm for one, so we can figure out what the harm is, and number two, I'm not sure what they mean by children here.

Q Would you agree that the word "including"

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                    176

indicates or provides an example of what the

Surgeon General is talking about in that

paragraph?

        MR. KILBY:  Object to the form.

    A  I understand that to modify what was

listed, the main -- that's a dependent clause.  I

would look at the main clause in, to my point, to

minimize the risk of harm.

    Q  And HB 3 provides a basis for Florida to

enforce age minimums; correct?

    A  My understanding of HB 3 is that, as I

stated earlier, wipes out all sorts of accounts

which is not minimizing risk of harm, and again, I

don't know what all children means, or I should

say forget all.  I'll even say children.  I don't

know what age they're talking about.

    Q  All right.  I'm going to show you what

I've marked for identification as Exhibit 18.

        (Cleland Exhibit 18 was marked for

identification.)

    Q  Exhibit 18 purports to be a letter from

Senators Blackburn and Blumenthal to Mark

Zuckerberg dated June 21st, 2023; correct?

    A  Yes.  That's the date.

        MR. KILBY:  Object to the form.

A  That's the date, and those are, as best I know, the signatures.

Q  Okay.  And here it indicates that Mark Zuckerberg is indeed the chief executive officer of Meta Platforms, Inc.; right?

A  That's how it addresses him.

Q  Okay.

A  Although I'll say, having worked in a senator's office, I'm not sure I'd always trust what's on the heading.

Q  And Meta again is one of NetChoice's members; right?

A  Yes.

Q  And is it fair to say that Exhibit 18 is fairly inflammatory and accusatory about Meta's alleged conduct?  If you want to take a minute, you can read it.

A  I don't have any idea.

Q  Let me ask you first, have you ever seen this before?

A  No.

Q  Okay.  You can read it.

Finished reading?

A  Yeah.

Q  Now, Exhibit 18 --

A  18.                                                          15:00:16

Q  Sorry.  I went blank there for a minute --           15:00:18
was sent before HB 3 was passed; right?                        15:00:20

A  I believe you told me it passed this year,           15:00:26
so yes.                                                        15:00:28

Q  Okay.  And again, Exhibit 18 is a fairly             15:00:29
inflammatory and accusatory letter about Meta's                15:00:40
supposed conduct; right?                                       15:00:45

MR. KILBY:  Object to the form.                      15:00:48

A  I agree it is an inflammatory letter.                15:00:49

Q  I'm not trying to -- I'm not trying to               15:00:52
spend a lot of time on this, at least I wasn't.                15:00:55
Part of the letter indicates that Instagram                    15:00:58
harbored an open-air market for child sexual abuse             15:01:01
material and the trafficking of children.  It's in             15:01:05
the first line.  It indicates that; right?                     15:01:08

A  It does not indicate that.  I see that               15:01:13
that is written there, yes.                                    15:01:16

Q  Well, at least according to these two                15:01:18
senators who sent this letter and then published               15:01:22
it, that was their accusation; right?                          15:01:23

A  Yeah.  That seems to be more based on                15:01:28
assertions from that third paragraph, but                      15:01:30
that's --                                                      15:01:33

Q  Okay.  But the letter says that; right?              15:01:34

A   The letter says that based on assertions, as I read the letter.

Q   Okay.  All right.  Well, you put that aside.  I'm going to show you now what I've marked for identification as Exhibit 19 to your deposition.

(Cleland Exhibit 19 was marked for identification.)

Q   Are you familiar with the National Center For Missing and Exploited Children?

A   I am.

Q   And are you okay if I refer to the National Center For Missing and Exploited Children as NCMEC?

A   Please do.

Q   Otherwise it's going to take a long time and I'm going to butcher it a bunch.

A   And I like the way NCMEC sounds, so that's good.

Q   And Exhibit 19 is the 2023 report by NCMEC by electronic service provider or providers; right?  Would you look -- that's the title of the document.

A   Yes, whatever that is.

Q   All right.  And it's for 2023, I think I

15:01:36
15:01:38
15:01:38
15:01:42
15:01:45
15:01:47
15:01:54
15:01:54
15:01:57
15:01:59
15:02:00
15:02:02
15:02:06
15:02:07
15:02:08
15:02:12
15:02:13
15:02:16
15:02:16
15:02:23
15:02:29
15:02:31
15:02:31
15:02:32

said, if you look at the top?

A   Oh.  Yes, reports made in 2023, yes.

Q   Look at the title.

A   Oh, up here.  Yeah.

Q   Okay.  All right.  And again, that would have been the year before HB 3 was enacted; right?

A   Yes.

Q   Okay.  And if you look at kind of the third line of the text of the report, it indicates that NCMEC received 36.2 million reports to the Cyber Tipline; is that right?

MR. KILBY:  Object to the form.

A   That is what it says here.  My understanding is most of those actually come from social media companies, yes.

Q   Okay.  And it also indicates in that text the vast majority of those Cyber Tipline tips were child sexual abuse material; correct?

MR. KILBY:  Object to the form.

A   That is what it says here, yes.

Q   Okay.  And to your point, and I'm not trying to be unfair, it indicates that 35.9 million of the reports were from the electronic service providers.  So 35.9 out of 36.2 million were from the providers themselves, and they were

of instances of apparent child sexual abuse material; right?

MR. KILBY: Object to the form.

A That they became aware of on their systems, yes, with this note. I'm not exact -- I'm not familiar with the definition of electronic service providers. I will assume for purposes of our conversation that includes social media but I don't know if that's true.

Q Well, we're going to -- we can look at it.

A Okay.

Q I mean this report lists, one, two, three, four, five, six -- it looks like it's eight pages of company names; right?

A It appears to.

Q Okay. All right. And among the company names that are listed here are social media companies; right? Facebook's listed?

A It is.

Q Okay. And Google's listed?

A It is.

Q And Instagram's listed?

A Yes.

Q And I'm sorry to make you go through a spelling challenge here. Snapchat's listed, if

you turn to page 6?    15:05:11

A   It is.    15:05:17

Q   Twitter and Vine are -- Twitter/Vine is    15:05:18
listed?    15:05:22

A   It is.    15:05:25

Q   WhatsApp which is another Facebook app is    15:05:26
listed?    15:05:30

A   Yes.    15:05:31

Q   And X Corp is listed on the last page.    15:05:32

A   Yes, it is.    15:05:37

Q   Okay.  And it's alphabetical listing of    15:05:37
companies; right?    15:05:41

A   It appears to be, yes.    15:05:41

Q   All right.  And is it -- and you can take    15:05:42
a minute -- but is it fair to say that the social    15:05:44
media companies that I just ran through are the    15:05:48
vast majority of submissions?  We were talking 36    15:05:50
million -- I'll run it through.    15:05:57

A   Right, right, right.    15:05:58

Q   I'll do it the long way.  Facebook had    15:06:00
17,838,422 reports.  That's the number that's    15:06:05
listed here; correct?    15:06:12

A   Yes.    15:06:13

MR. KILBY:  Object to the form.    15:06:13

A   Yes.  That's the number listed there.    15:06:15

Q  And that alone would be almost half; right?

A  Of reports made by ESPs --

Q  Yeah.

A  -- electronic service providers, yes.

Q  All right.  And Google's another 1,470,958?

A  Yes.

MR. KILBY:  Object to form.

Q  All right.  And we're now easily over probably 50 percent of the reports?

A  19-3 thereabouts.

Q  And if you turn the page to Instagram, Instagram reported 11,430,007 reports?

A  Yes.

Q  All right.  So we're now over 30 million of the 36 million.  And Snapchat, just so they're not left out, had 713,055 reports; right?

MR. KILBY:  Object to the form.

A  Yes.

Q  And Twitter before, I guess before Elon Musk purchased it, had 597,087 reports?

MR. KILBY:  Object to the form.

A  Yes.  That's what it says.

Q  And WhatsApp had 1,389,618 reports?

15:06:17
15:06:22
15:06:22
15:06:25
15:06:27
15:06:33
15:06:34
15:06:35
15:06:36
15:06:39
15:06:40
15:06:44
15:06:46
15:06:51
15:06:52
15:06:55
15:07:00
15:07:07
15:07:08
15:07:08
15:07:11
15:07:16
15:07:17
15:07:19

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    184

MR. KILBY:  Object to the form.    15:07:26

A  That's what's listed.    15:07:26

Q  And X Corp had 273,416 reports?    15:07:28

MR. KILBY:  Object to the form.    15:07:34

A  That's what's here.    15:07:35

Q  So we're talking --    15:07:37

A  Do I have a duplicate, by the way, or is    15:07:38
this more information that's different?  Because    15:07:41
I've got a second run of numbers.    15:07:43

Q  You have a duplicate.  I'm sorry.    15:07:45

A  Okay.  I just wanted to make sure I wasn't    15:07:46
missing something.    15:07:49

Q  If you can pull that off so the record is    15:07:49
correct.    15:07:53

A  Okay.  Sorry.  Just want to make sure I    15:07:53
was answering correctly.    15:07:56

Q  No, that's fine.  I'd rather it be correct    15:07:57
than to have an error.  So, you know, fair to say    15:08:00
that probably more than say 90 percent of the    15:08:03
reports are by those social media companies?    15:08:07

MR. KILBY:  Object to the form.    15:08:09

A  Yes.  It is fair to say that most of them,    15:08:11
of the 35.9 million that are self-reported, yes.    15:08:16

Q  Okay.  All right.  You can put that aside.    15:08:19

A  This staple went that way.    15:08:26

Q  Oh here.  Well, we'll --     15:08:29

A  That one has the label on the front.     15:08:31

Q  I'll find another label and we'll sub it on a break.     15:08:33 / 15:08:36

Would you turn that sideways for me, Doug? That way we'll --     15:08:38 / 15:08:40

Now I'm going to show you what I've marked for identification as Exhibit 20 to your deposition.     15:08:45 / 15:08:48 / 15:08:51

(Cleland Exhibit 20 was marked for identification.)     15:09:05

Q  And this is a different report from NCMEC. It's a 2023 Cyber Tipline reports by state report.     15:09:05 / 15:09:09

A  Mm-hmm.     15:09:16

Q  All right.  And so this indicates a connection with a particular state in the United States; correct?     15:09:16 / 15:09:19 / 15:09:22

A  Yes.  That's what it appears to be.     15:09:23

Q  And it lists again alphabetically the states from Alaska through Wyoming, and then it has an unspecified category at the end; right?     15:09:25 / 15:09:29 / 15:09:33

A  Yes.  Understood.     15:09:36

Q  Okay.  And it shows that there were 66,861 reports in the State of Florida?     15:09:37 / 15:09:43

A  Yes.     15:09:45

Q  Okay.  All right.  You can put Exhibit 20 aside.

I'm going to show you what I marked for identification as Exhibit 21 to your deposition.

(Cleland Exhibit 21 was marked for identification.)

Q  Exhibit 21 is a filed copy of the Complaint filed by the office of Attorney General, State of Florida, Department of Legal Affairs against Meta Platforms and Instagram; correct?

A  And that's the heading, yes.

Q  Okay.  All right.  And if you look at the date on the top, it says it was filed on October 24th, 2023; correct?

A  That's it.

Q  And that would have been before HB 3 passed; right?

A  Yes, because you said it passed in 2024, correct?

Q  Yes.

A  Yes.

Q  All right.  If you look at, just briefly, at pages, though you can take as much time as you want but my question's going to be kind of short, pages 9 and 11 of Exhibit 21.

A   Anywhere on 9 particularly?                    15:11:02

Q   If you'll start at (a)(1), infinite scroll    15:11:05
and autoplay features, and my question for you is,    15:11:11
you know, Florida in October of 2023 sued Meta for    15:11:17
some of the addictive features that are listed in    15:11:24
HB 3.   So you can take as much time as you want to    15:11:28
read it, but that is the question I'm going to ask    15:11:31
you.   So with that in mind I don't know if you    15:11:34
can --                    15:11:36

MR. KILBY:   Could we have the court    15:11:36
reporter read the question back?                    15:11:38

MR. GUARD:   Sure.                    15:11:39

THE REPORTER:   I'm not sure which you're
--

(The Reporter read from the record as
follows:   "If you look at, just briefly, at pages,
though you can take as much time as you want but
my question's going to be kind of short, pages 9
and 11 of Exhibit 21.

"Anywhere on 9 particularly?

"If you'll start at (a)(1), infinite
scroll and autoplay features, and my question for
you is, you know, Florida in October of 2023 sued
Meta for some of the addictive features that are
listed in HB 3.   So you can take as much time as

you want to read it, but that is the question I'm going to ask you."

MR. GUARD:  I'm going to ask him the question but I didn't want him to spend his three pages of reading that he's free to read the entire thing again.

MR. KILBY:  I don't know what the question is.

MR. GUARD:  The question I'm going to ask him is Florida sued Meta for its addictive features in October 2023, and those same addictive features, or at least some of them, are contained in HB 3?

MR. KILBY:  Okay.

Q  And if you want to look back at HB3 --

A  I'm still not sure of the question, but okay.  I'll read and you can ask the question.

Q  The addictive -- I can simplify it.  The addictive features listed in HB 3 are the same as the addictive features complained about in Exhibit 21, the complaint that Florida filed against Meta?

MR. KILBY:  So take a moment if you need to read that.

A  Yes.  I've never seen this.

MR. KILBY:  And while the witness is

reading I will assert an objection to the question.

Where do you want him to stop?

MR. GUARD:  Page 11 at --

A   Ephemeral content format?

Q   Yes.

A   Which stop before that, or is that inclusive?

Q   All the way down to footnote 13.

A   Got it.

Q   Paragraph 37.

A   Okay.

Q   We talked about addictive features earlier as part of HB 3; right?  In sub (4) of HB 3 contained a list of addictive features; right?

MR. KILBY:  Object to the form.

A   If I may look.

Q   Yeah.

A   Which, which document is it?

MR. KILBY:  I'm going to guess 16.

A   Oh.  Oh, here it is.

Q   And the addictive features listed in (4) are some of the same addictive features listed in Florida's Complaint; right?

MR. KILBY:  Object to the form.

A   I'll say no.                                        15:16:07

Q   Okay.  It has about the live feature;              15:16:09
right?  So live-streaming in there on page 11,          15:16:14
paragraph 37?                                           15:16:18

A   I will say no and further that with, yes,          15:16:20
I see that there are some similar words, but they       15:16:22
don't seem to match up as far as explanations.          15:16:24

Q   Okay.  All right.  You can put it aside.           15:16:27
Now, are you aware that other states sued Meta?         15:16:37

A   No.                                                 15:16:40

Q   Are you aware that New Mexico has sued             15:16:41
Snap --                                                 15:16:43

A   No.                                                 15:16:44

Q    for similar allegations?                          15:16:45

A   No.                                                 15:16:47

Q   Are you aware that the State of Arkansas           15:16:47
has sued YouTube?                                       15:16:49

A   No.                                                 15:16:51

Q   All right.  Are you aware that 19 states           15:16:52
sued TikTok?                                            15:16:55

A   No.                                                 15:16:58

Q   Okay.  Are you aware that there is a               15:16:59
multi-district litigation proceeding suing all the      15:17:01
major social media companies in the United States       15:17:05
District Court for the Northern District of             15:17:09

California?

A   No.

Q   So you're not aware that there are literally hundreds, if not thousands, of lawsuits against social media companies for their practices?

A   I am not.

Q   Okay.  All right.  I'm going to show you what I have marked for identification as Exhibit 22 to your deposition.

(Cleland Exhibit 22 was marked for identification.)

Q   Exhibit 22 is a printout from Meta's website titled Meta's work to combat sextortion. If you look at the second page.

A   Sorry.

Q   Has a larger than usual banner?

A   Yes.  Yes, it says that.

Q   Okay.  What is sextortion?

A   I have no idea.

Q   Do you know who the typical targets are of a sextortion scam?

A   No.

Q   Do you know if minors are typically targeted by sextortion?

Transcript of Bartlett Cleland
Conducted on December 10, 2024                              192

A   I don't.

Q   Do you know if Meta has a significant sextortion problem?

MR. KILBY:  Object to form.

A   No.

Q   Well, it has -- it evidently is combatting it; right?

MR. KILBY:  Object to the form.

A   What it asserts, but it's kind of like saying I protect my two girls from clowns and ice cream mobiles, but I'm not a clown and ice cream mobile.

Q   Is sextortion -- well, I guess you don't know what it is.  I would urge you not to be analogizing sextortion to clowns and ice cream mobiles because it's horrific but --

A   I'm happy to look at the definition.

Q   -- but in your off-time you can look it up.  I'm not going to push that, but I just -- to be, to be fair to you.

If you look at the, on the bottom of page 4 of Exhibit 22, it indicates that -- it talks about expert partnerships.  Look at that first bullet point.  It indicates that Meta's evidently been combatting it or fighting it since at least

2017 because they formed a partnership with a company in that year; correct?

MR. KILBY:  Object to the form.

A   I don't know.

Q   Well, that bullet point indicates "We worked with Thorn" -- do you know what Thorn is?

A   I have no idea.

Q   -- "to launch Stop Sextortion in 2017"; right?  That's what it says?

A   That's what it says, yes.

Q   "And partnered with them to adapt these resources onto our safety center"; correct?

A   Yes.

Q   Okay.  All right.  I'm going to show you what I've marked as Exhibit 23 to your deposition.

(Cleland Exhibit 23 was marked for identification.)

Q   Exhibit 23 is another printout from Meta's website.  This is from its Newsroom.  It is a release.  It appears to be from Instagram dated October 17th, 2024, so just a little over a month ago; correct?

MR. KILBY:  Object to form.

A   I agree that's what it appears to be, yes.

Q   All right.  And at least as of that date

Instagram is launching a new campaign related to                    15:21:13

sextortion; right?                                                  15:21:18

    MR. KILBY:  Object to form.                                     15:21:20

    A  If you give me one second, I'll read this                    15:21:22

sentence.                                                           15:21:26

        Yes.  "Instagram is launching a new                         15:21:30

campaign, informed by NCMEC and Thorn, to help                      15:21:32

teens spot sextortion scans and help parents                       15:21:34

support their teens in avoiding these scams."                       15:21:38

    Q  All right.  You can put that aside.  Now,                    15:21:40

kind of changing topics here, most of the                          15:21:45

declaration, your declaration, Exhibit 1, that you                 15:21:47

executed in this case you discussed parental                       15:21:50

controls and tools that are available to --                        15:21:56

available; right?                                                  15:21:58

    A  Yes.                                                         15:21:59

    Q  And you talked about device level                            15:22:00

restrictions; right?                                                15:22:03

    A  I did, yes.                                                  15:22:04

    Q  All right.  And you cited to web pages for                   15:22:05

Apple, Microsoft and Samsung; correct?                              15:22:09

    A  Could you point me to the right paragraph                    15:22:13

here?                                                               15:22:14

    Q  Sure.                                                        15:22:16

    A  Oh, here it is.  It's page 4.                                15:22:20

Q  Paragraph 8.                                    15:22:22

A  Yes to Apple, yes to Google, yes to            15:22:28
Microsoft, yes to Samsung.  I don't remember who   15:22:33
all you said.                                      15:22:35

Q  Okay.  Those are the three that I named.       15:22:36
How many people in the United States use Apple      15:22:40
devices?                                           15:22:43

A  I have no idea.                                 15:22:44

Q  How many children in the United States         15:22:45
under the age of 18 utilize Apple devices?          15:22:47

A  I don't know.                                   15:22:50

Q  How many Apple devices belonging to            15:22:51
children under the age of 18 in the United States   15:22:53
utilize parental controls?                         15:22:55

A  I don't know.                                   15:22:57

Q  How many people in the United States use       15:22:58
Microsoft devices?                                 15:23:00

A  I don't know.                                   15:23:02

Q  How many children in the United States         15:23:03
under the age of 18 utilize Microsoft devices?      15:23:05

A  I don't know.                                   15:23:09

Q  How many Microsoft devices belonging to        15:23:09
children under the age of 18 in the United States   15:23:12
utilize parental controls?                         15:23:15

A  I don't know.                                   15:23:17

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    196

Q  How many people in the United States use Samsung devices?

A  I don't know.

Q  How many children in the United States under the age of 18 utilize Samsung devices?

A  I don't know.

Q  How many Samsung devices belonging to children under the age of 18 in the United States utilize parental controls?

A  I don't know.

Q  All right.  If you look next page, paragraph 9, you also talked in your declaration about network level restrictions; right?

A  Yes.

Q  All right.  Same kind of questions.  How many people in the United States utilize Verizon, the Verizon network?

A  I don't know.

Q  How many children in the United States under the age of 18 utilize the Verizon network?

A  I don't know.

Q  How many Verizon devices in the United States utilized by someone who's under the age of 18 utilize Verizon parental controls?

A  I don't know.

| | |
|---|---|
| 15:23:17 | |
| 15:23:20 | |
| 15:23:21 | |
| 15:23:22 | |
| 15:23:24 | |
| 15:23:27 | |
| 15:23:28 | |
| 15:23:31 | |
| 15:23:33 | |
| 15:23:35 | |
| 15:23:36 | |
| 15:23:42 | |
| 15:23:48 | |
| 15:23:53 | |
| 15:23:54 | |
| 15:24:00 | |
| 15:24:06 | |
| 15:24:08 | |
| 15:24:09 | |
| 15:24:11 | |
| 15:24:15 | |
| 15:24:17 | |
| 15:24:22 | |
| 15:24:26 | |
| 15:24:29 | |

Q  Okay.  Same questions with respect to -- you list out -- let me try to simplify this.  You also in paragraph 9 have AT&T, T-Mobile and Comcast.  For those three devices would it be fair to say that you do not know any numbers about usage of parental controls?

MR. KILBY:  Object to the form.

A  Yes.  That would be fair.

Q  Okay.  All right.  If you turn to page 6 of your declaration to paragraph 10, here you have browser level restrictions; correct?

A  I'm sorry.  Yes.

Q  All right.  For all the various browsers, because there is I think more of them here, and trying to streamline this, do you know how many parent, parents utilize the parental controls that you were referencing?

MR. KILBY:  Object to the form.

A  I do not.

Q  Okay.  And same question, though I will ask it again.  On page 7, paragraph 11, you have a paragraph that has a lot of subparts for application level restrictions.  Do you know how many parents utilize any of the tools that you have listed or parental controls that you've

15:24:30
15:24:33
15:24:37
15:24:43
15:24:47
15:24:52
15:24:53
15:24:55
15:24:57
15:25:04
15:25:16
15:25:23
15:25:26
15:25:28
15:25:32
15:25:35
15:25:39
15:25:40
15:25:41
15:25:42
15:25:46
15:25:50
15:25:53
15:25:58
15:26:01

listed in paragraph 11?                                    15:26:05

    MR. KILBY:  Object to the form.            15:26:08

A  One second for me just to flip through     15:26:10
here and make sure I remember what we're talking    15:26:12
about.                                                     15:26:14

Q  Take your time.                                15:26:14

A  Sorry.  Would you repeat the question.        15:26:33

Q  It's the same question.  Do you know how     15:26:35
many parents utilize the parental controls that     15:26:37
are listed in the application level restrictions    15:26:41
paragraph of your declaration?                            15:26:45

A  I do not.                                      15:26:47

Q  Okay.  I'm going to move on to what I've      15:26:48
marked as Exhibit 24 to your deposition.            15:26:54

    (Cleland Exhibit 24 was marked for
identification.)                                          15:27:03

Q  This is an NBC News story.  Have you ever     15:27:03
seen this news story before?                              15:27:09

A  I have not.                                    15:27:10

Q  The title of the news story is "Fewer than    15:27:12
1 percent of parents use social media tools to      15:27:15
monitor their children's accounts, tech companies   15:27:17
say."  Did I get the title right?                         15:27:21

A  That is what it says.                          15:27:24

Q  And this was published on March 29th,         15:27:25

2024; correct?

MR. KILBY:  Object to form.

A  Yes.

Q  All right.  And if you look on page 2 of Exhibit 24, it indicates that, bottom of the page, "Discord CEO Jason Citron noted that out of the 150 million global users with approximately 2.7 million monthly active users under age 18 in the United States alone only 15,000 parents are connected to 15,500 children's accounts through the Discord Family Center."

Did I read that correctly?

A  Yes.  You read what was there.

Q  Okay.

A  I'm just puzzled by what's there.

Q  Well, so only 15,000 parents use Discord parental controls out of 2.7 million kid accounts?

MR. KILBY:  Object to form.

A  I'm not sure that's what it says.  It says only 15,000 parents are connected to 15,500 children's accounts?

Q  Mm-hmm.

A  Okay.  That sounds like almost all of them are connected, but besides that I certainly don't know.  I'm just reading what's here.

Q  Well, it says there are 2.7 million active users under the age of 18; right?

A  Yes.

Q  All right.  And you understand that parents sometimes have more than one kid?

A  I do.  I also understand that children is not being defined here.

Q  Well, I don't --

A  For example, I have two kids.  They get treated different or have been treated differently at different ages.

Q  Okay.  All right.  Well, it's reporting only 15,000 parents are utilizing that service; right?

MR. KILBY:  Object to the form.

A  So maybe I'm not getting basic English, but only 15,000 parents are connected to 15,500 children's accounts.  Again, I feel like this was cherry-picking language.  I think that what it's referring to here is 15,000 are connected to 15,500 children's accounts, but I'm not here to defend Discord.  I'm just reading what you put in front of me.

Q  All right.  If you look to page 3, Snapchat, that's actually a member of your

company.  It indicates out of 60 million global daily active users under the age of 18 only 200,000 parents are linked to 400,000 teens' accounts using Snapchat's Family Center, and it indicates that's still less than 1 percent of underage Snapchat users are being monitored by their parents using Snapchat tools; correct?

MR. KILBY:  Object to form.

A  You again left out a really important piece.  It seems from the article -- I've not reviewed it -- but you left out that's slightly better than Discord's rate of adoption.

Q  It's still 1 percent; right?

A  I don't know because when I look back that other page, 15,000 out of 15,500, doing basic math, I think is higher than 1 percent.  So I don't know.  I don't have any idea.  I'm just reading what you've put in front of me.

Q  All right.  I'm going to show you what I've marked for identification as Exhibit 25.

(Cleland Exhibit 25 was marked for identification.)

Q  Exhibit 25 is an Ipsos Aura Parental Control survey dated August 4th through the 6th, 2023, and it's a survey of American general

population ages 18 plus.  Is that what this

exhibit purports to be?

    A  With one slight modifica --

        MR. KILBY:  Object to form.

    A  Sorry.  With one slight modification.  I

think it's September 14th was the date.  Those are

interview dates of the August 4th.

    Q  So again, that's before HB 3 passed;

correct?

    A  From what you've told me, yes.

    Q  All right.  If you'll turn to page 8.

    A  Top line of methodology?  Is that the --

    Q  Yes.  It's that -- well, the top line

methodology is on every page.  I'm looking at --

    A  Oh sorry.

    Q  I'm looking at question 4.

    A  4.

    Q  All right?  And there are subparts because

they have segmented the different kinds of apps;

right?

    A  I've no idea.

    Q  Okay.  Well, you see a sub (A) that says

microblogging apps, sub (B) that says

Internet-based [sic] chat/thread apps, sub (C)

video/image sharing social media apps, sub (D)

video streaming services all right.  You see
they've segmented it?

A  Yes.  It says what you say it says, yes.

Q  Okay.  All right.  And the question that
was asked:  "To the best of your knowledge do any
of the following services have parental controls?"
And 81 percent of the individual or the adults
that were surveyed answered no or they did not
know whether microblogging apps like Twitter had
parental controls; right?

MR. KILBY:  Object to the form.

A  That's what the paper says in front of me.

Q  Okay.  And 50 -- if you look down, it
indicates that 57 percent answered no or they
didn't know if video/image sharing social media
apps like Instagram, TikTok, Snapchat and Facebook
had parental controls; correct?

A  Do you mean --

MR. KILBY:  Object to the form.

A  Do you mean 37 percent?

Q  No.  37 percent is "I don't know," and
then right above it, it has "no."

A  Right.

Q  It does not have -- and that's 20.  37
plus 20 is 57; correct?

A   Okay.  And so restate the question.

15:33:33

Q   All right.  I'll ask you the question again.  57 percent answered no or they didn't know if video/image sharing social media apps (e.g., Instagram, TikTok, Snapchat, Facebook) had parental controls?

15:33:36
15:33:38
15:33:42
15:33:51
15:33:54

MR. KILBY:  Object to the form.

15:33:56

A   That's what's written here on the paper.

15:33:56

Q   Okay.  All right.  If you look at page 9, this survey in question 5 asked:  "Do you use parental controls on these services?"  And then on -- if you look down at subpart (A) on microblogging apps, e.g., Twitter and Thread, 73 percent said no.  On (B) Internet-based chat/thread apps 73 percent said no; right?

15:33:58
15:34:01
15:34:09
15:34:16
15:34:20
15:34:25
15:34:32

MR. KILBY:  Object to the form.

15:34:36

A   You asked compound questions.  I'm not sure you're --

15:34:38
15:34:40

Q   Let me break it up.  I apologize.  All right.  73 percent answered no on whether they used parental controls on microblogging apps, e.g., Twitter and Threads; right?

15:34:40
15:34:43
15:34:49
15:34:55

MR. KILBY:  Object to the form.

15:34:57

A   I see that listed here.  I've no -- because I've not ever seen this I don't know what

15:34:58
15:35:01

purpose (A) serves as a subservient to 5, but I    15:35:03
see the line you're reading, yes.    15:35:08

Q   Okay.  And when it came to Internet-based    15:35:10
chat/thread apps Reddit and Discord, no got, was    15:35:13
73 percent again; right?    15:35:19

MR. KILBY:  Object to the form.    15:35:21

A   With the same answer as before.  I don't    15:35:22
know what this -- I've not had a chance to review    15:35:24
any of this, much less what 5 means or anything    15:35:27
that's superior to that.    15:35:32

Q   And (C) for video/image sharing social    15:35:33
media apps, e.g., Instagram, TikTok, Snapchat,    15:35:36
Facebook, 66 percent said no; right?    15:35:39

MR. KILBY:  Object to the form.    15:35:41

A   Same answer as before.  That is what is    15:35:43
written here but with all the other stipulation.    15:35:46

Q   And (D), with respect to video streaming    15:35:48
services/e.g., or excuse me, (e.g. YouTube,    15:35:51
Netflix, Apple TV, no got slightly better.  It was    15:35:57
only 47 percent said no; right?    15:36:02

MR. KILBY:  Object to form.    15:36:05

A   I see that no is listed as 47 percent,    15:36:07
subject to all the things I said before.    15:36:10

Q   All right.  You can put that aside.  I'm    15:36:12
going to show you what I've marked for    15:36:14

identification as Exhibit 26.                    15:36:16

    (Cleland Exhibit 26 was marked for          15:36:34

identification.)                                 15:36:34

    (A discussion was held off the record.)      15:36:34

Q  All right.  Exhibit 23 is a document          15:36:35

published by Microsoft in September 2023 titled   15:36:38

Generative AI, Mental Health and Safety           15:36:45

Technologies; right?                              15:36:46

    MR. KILBY:  Object to the form.           15:36:48

A  Yes.                                           15:36:50

Q  And Microsoft is a technology company;         15:36:51

right?                                            15:36:53

A  I would certainly understand them to be,        15:36:53

yes.                                             15:36:55

Q  Okay.  If you'll turn -- just going to do       15:36:55

this a little quick -- to 61.                     15:37:00

A  Page 61?                                        15:37:02

Q  Page 61.                                        15:37:04

A  Did they have -- oh, yes, okay.                 15:37:05

Q  At the very bottom it's kind of small.          15:37:07

A  Yes, I see it.                                  15:37:09

Q  It says safety tool usage, just so you're       15:37:10

getting to the right page.                        15:37:13

A  There's a lot of them.                          15:37:14

Q  That's why I'm holding it up to make sure       15:37:17

it's the right one.

A  Whew, and it's confidential even.  All right.

Q  Well, it's on their website so I don't know how confidential that makes it.

A  We can quibble what confidential means.

MR. KILBY:  That would not be confidential.

Q  All right.  And this is kind of the results of a survey that Microsoft conducted; right?  And it has -- this was -- you know, and it has percentages and columns; right?

A  It has percentages.

MR. KILBY:  Object to the form.

A  Yeah.  I don't understand what you're asking me.

Q  Okay.  All right.  There's a column for the United States; correct?

A  On this piece of paper?  Yes.

Q  Okay.  And if you look at parental controls tools and follow it across for the United States, what percentage is indicated?

MR. KILBY:  Object to the form.

A  56 percent.

Q  Okay.  All right.  You can put that aside.

A    I mean I have never seen this before, so I have no idea.  Same stipulations as before.  I don't know the context or any of that for that.

Q    Okay.  Now, in your declaration you talked about the burden that age verification would cause; correct?

A    Yes.

Q    Isn't it true that most social media companies are already performing some age verification?

A    They are performing perhaps some sort of age verification.  It is not what is listed in HB 3.

Q    Okay.  I'm going to show you what I marked for identification as Exhibit 27 to your deposition.

(Cleland Exhibit 27 was marked for identification.)

Q    Exhibit 27 is a printout from Google for a page that is titled Update your account to meet age requirements; right?

MR. KILBY:  Object to the form.

A    Yes.  It appears to be from Google.

Q    Well, it says support.google.com; right?

A    Okay.

Q  All right.  And it talks about Google accounts; right?    15:39:27 15:39:28

A  It does, yes.    15:39:28

Q  All right.  And at least in some instances it provides that Google is doing some form of age verification; right?    15:39:30 15:39:36 15:39:41

MR. KILBY:  Object to the form.    15:39:42

A  As described in HB 3?  Is that your definition of age --    15:39:44 15:39:46

Q  I asked you, sir, is Google performing age verification?    15:39:48 15:39:51

A  Please define age verification.    15:39:51

MR. KILBY:  And object to the form.    15:39:54

Q  Does this document indicate that Google is performing age verification?    15:39:55 15:39:58

A  I don't see those words anywhere, but I've never seen this document.  I'm happy to read through it.    15:40:00 15:40:03 15:40:10

Q  If you look halfway down the page, it says "Verify you're old enough to manage your account"; right?  And then at the next line it says "If you meet the minimum age requirements, you can use a government ID or credit card to verify your age"; correct?    15:40:11 15:40:16 15:40:22 15:40:25 15:40:28 15:40:32

A  It does.  So that seems to be for the age    15:40:32

of majority, whatever the minimum age requirements are.  As best I know, government ID, I think driver's license --

Q  If you'd like to take the time and look back at, I believe it's Exhibits 12 and 13, I believe Exhibit 13 is the minimum ages that Google has, and it's less than 16, sir.

A  Do you have whatever is linked to verify your age?  Which someone clicked through obviously.  Different color.

Q  Sir, you have Exhibit 13, the minimum age requirements.

A  I understand that.  Is that what is behind verify your age?

Q  I -- sitting here right now, sir, just put it aside, but the point is Google does some age verification; correct?

    MR. KILBY:  Objection.  Form.

A  I don't know.

Q  Okay.  Luckily we have someone from Google coming in.

    I'm going to show you what I marked for identification as Exhibit 28.

    (Cleland Exhibit 28 was marked for identification.)

Q  Exhibit 28 is a document titled How Does Video Selfie age verification work on Instagram; correct?

A  It is titled that, yes.

Q  And this purports to be a method that Instagram is utilizing to verify age; right?

MR. KILBY:  Object to the form.

A  I -- I don't know.  I've not read it.

MR. KILBY:  Why don't you pause and read it.

A  All right.

Q  Exhibit, I think it's 28, it is an age verification process that Instagram is utilizing; correct?

MR. KILBY:  Object to the form.

A  While the word "verified" isn't here, I feel like we're cherry-picking language again instead of getting to the truth, and it says over and over in here it's estimate of age.  Your age has been estimated.  We used AI to estimate, Yoti's technology estimates.

Q  It also allows you to upload an ID; correct?

A  It appears so, but I don't think I have the link for that.

15:41:31
15:41:36
15:41:41
15:41:41
15:41:43
15:41:47
15:41:50
15:41:51
15:41:55
15:41:58
15:42:37
15:42:39
15:42:51
15:42:54
15:42:54
15:42:55
15:42:58
15:43:00
15:43:02
15:43:06
15:43:10
15:43:10
15:43:14
15:43:14
15:43:17

Q    Okay.    Exhibit 29.                                    15:43:18

(Cleland Exhibit 29 was marked for                           15:43:20
identification.)

Q    Let me show you what I marked for                       15:43:20
identification as Exhibit 29 to your deposition.             15:43:22
Exhibit 29 is a, is some form of release by                  15:43:28
Instagram dated June 23rd, 2022, and it indicates            15:43:31
on or about June 23rd, 2022, Instagram introduced            15:43:38
new ways to verify age on Instagram; correct?                15:43:45

MR. KILBY:    Object to form.                                 15:43:51

Q    You can take the time to read it.                       15:43:52

A    Okay.    There are lots of words missing.               15:43:55

Q    That's how it printed out.                              15:44:50

A    Okay.    Yeah, more words missing over here.            15:44:58
Ooh, a lot of words missing over here.                       15:45:24

MR. KILBY:    John, do we need this exhibit?                  15:45:30

MR. GUARD:    The question I asked is -- I                    15:45:32
thought it was an easy one, but he wants to talk             15:45:34
about how many words are missing.    My question to          15:45:37
him was:    Was this was an announcement by                  15:45:39
Instagram that they were testing new ways to                 15:45:44
verify age, and he's free to read it all, and I              15:45:46
don't think that should be that controversial of a           15:45:52
question, but whatever.                                      15:45:54

A    I'd point to missing words because we've                15:45:56

had very, very many cherry-picked phrases, and I have no idea what's missing from here. So I don't really know what some of this stuff says. I see the title, and included on partnering with Yoti which we just referenced over here which was all an estimation, I'm assuming maybe that's some of the missing words here, so that's really critical to answering your question honestly and there --

MR. KILBY: John, I'm just concerned about an exhibit that, through no fault of anybody, is the way it printed out, is missing words, and I --

MR. GUARD: You're free to -- I've asked him a question.

MR. KILBY: Sure.

MR. GUARD: And is this document about age verification. I think on its face in reading the words that are there you can tell it's about age verification, but he wants to quibble on everything today. If I asked him if the sky was blue outside, he would give me a 50-word answer and never say "no."

Q So with that my question that is pending, and I'm happy to let it pend, because I'm going to play this video at some point in time, does the document in front of you indicate -- it's a

release by Instagram saying they're testing age

verification methods?

     MR. KILBY:  Object to the form.

  A  I understand that is the title.  You have

provided me an incomplete document.  I cannot

opine on what is in there or not, just like in the

last document that contradicted what was asserted.

  Q  I'm going to show you what I marked for

identification as Exhibit 30 to your deposition.

     (Cleland Exhibit 30 was marked for

identification.)

  Q  Exhibit 30 purports to be a document from

X relating to ID verification policy and privacy

overview; correct?  Dated June 20, 2024?

     MR. KILBY:  Object to the form.

  A  Yes, that is what it says.

  Q  Okay.  And X purports to use ID

verification for various purposes; right?

     MR. KILBY:  Object to the form.

  A  I'd like a minute to read it, make sure.

  Q  Sure.  Take your time.

  A  Okay.  Sorry.  The question again?

  Q  The question is, according to this

document, Twitter is using age verification for

different purposes?

MR. KILBY:  Object to the form.

Q   Correct?

A   Well, what I read is it's voluntary.

Q   It may be voluntary, sir, but is Twitter utilizing ID verification methods?

A   I believe to attach an -- here, ID verification, not -- accounts that are -- darn it. Let me find it.  Our ID verification process focuses on ensuring that a real person with valid ID is the owner of the account.  So yes, from that narrow scope, but it's also voluntary.

MR. KILBY:  Make sure you speak slowly for the court reporter.

A   Oh sorry.  Did I speak a little too fast too?

Q   You can put that document aside.  I'm going to show you what I'm going to mark as -- you mentioned Yoti.  Do you know what Yoti is?

A   I have no idea other than it's apparently not great.

Q   I'm going to show you what I've marked for identification as Exhibit 31.

(Cleland Exhibit 31 was marked for identification.)

Q   It's a copy of Yoti's website; correct?

MR. KILBY: Object to the form.

A  I have no idea.  I have no idea.

Q  Okay.  And this document Yoti appears to be a company that offers age verification services?

MR. KILBY: Object to form.

A  That appears to be right.

Q  Okay.

A  But I've not reviewed this before.

Q  Okay.  And Yoti evidently is doing some business with Facebook; right?

MR. KILBY: Object to the form.

A  I believe -- I believe that was Facebook that we read, yes.

Q  All right.  Are you aware that there are numerous other companies that perform age verification services for websites?

MR. KILBY: Object to the form.

A  I am not.

Q  Okay.  I'm going to show you what I've marked for identification as Exhibit 32.

(Cleland Exhibit 32 was marked for identification.)

A  And after this one could I take a powder?

Q  Sure.  32 purports to be a copy of a

website for a company known as Ondato; correct?

MR. KILBY:  Object to the form.

A  Yes, as best I can tell.

Q  Okay.  And Ondato's another company that provides age verification services?

MR. KILBY:  Object to the form.

A  I don't have any idea who they are, so I don't know.

Q  Okay.  Well, it purports to be, quote, "a global leader in age verification," according to the first page?

MR. KILBY:  Object to form.

A  I've worked for software companies way too long to believe what they put on their website, but that's what it says.

Q  Okay.  It indicates that it has a number of companies including OnlyFans?

MR. KILBY:  Object to the form.

A  Where am I looking?

Q  Bottom of the page, three-quarters of the way down, on page 1 of 32, says OnlyFans?

A  Okay.  Yes.

Q  Okay.  All right.  I'm going show you what I've marked for identification --

A  May I take a break?

Q  Oh, sorry.  I was in a roll.                    15:53:11

THE VIDEOGRAPHER:  We are going off the           15:53:18
record.  The time is 3:53 p.m.                     15:53:20

(A recess was taken.)                             16:01:15

THE VIDEOGRAPHER:  We are back on the             16:01:15
record.  The time is 4:01 p.m.                     16:01:31

BY MR. GUARD:                                      16:01:34

Q  All right.  I'm going to show you what I        16:01:34
marked for identification as Exhibit 33 to your    16:01:36
deposition.                                        16:01:38

(Cleland Exhibit 33 was marked for                16:01:41
identification.)                                   16:01:41

MR. KILBY:  Oh, thank you.                        16:01:41

Q  A minute ago we were looking at a website       16:01:46
with Exhibit 32 from a company called Ondato, and  16:01:50
this is a case study, or this purports to be a     16:01:57
case study for OnlyFans.  Exhibit 33 is a case     16:02:01
study for OnlyFans; correct?                       16:02:06

MR. KILBY:  Object to the form.                   16:02:08

A  Yes.  Sorry, yes, or it appears to be so.       16:02:11

Q  Okay.  And OnlyFans is a website that           16:02:13
allows a variety of different folks, including     16:02:17
what I'll call euphemistically as adult models, to 16:02:22
post content to its site and allows subscribers to 16:02:27
view it; correct?                                  16:02:30

MR. KILBY:  Object to the form.

A  I have no idea.

Q  Okay.  That's fair enough.  I only know because I read actually the first paragraph of this case study, or the second paragraph I guess.

MR. KILBY:  Is there a question?

MR. GUARD:  Oh, he was reading and I was just letting him finish, and I was trying to be polite.

A  Do you need me to go beyond --

Q  No.

A  -- beyond the two paragraph?  That's what you were referencing?

Q  No I was just trying to be polite.

A  You're fine.

Q  All right.  Exhibit 33 indicates that OnlyFans had more than 220 million registered users?

A  That's what it says here.

Q  Okay.  And it had 1.5 million content creators; correct?

A  That's --

MR. KILBY:  Object to form.

A  -- what it says here.

Q  Okay.  And if you flip to the fourth page

of this case study, and you're free to, if you want to read about all the great work that allegedly or purportedly Ondato did for OnlyFans, it purports that it can provide identity verification in less than 60 seconds.

A   That's what it says here.

Q   Okay.  Now, you talked about the burden of age verification in your declaration; right?

A   Correct.

Q   All right.  Would a -- would making an adult or a minor spend less than 60 seconds to verify their age violate that adult or child's First Amendment rights?

MR. KILBY:  Object to the form.

A   Yes, it could.

Q   Now, are you familiar with how long we allow law enforcement to detain someone on a reasonable suspicion?

A   I'm not.

Q   Okay.  All right.  Well, then I will move on.

Do you believe NetChoice's members have a responsibility to ensure their websites are safe for users?

MR. KILBY:  Object to the form.

16:03:40
16:03:42
16:03:45
16:03:49
16:03:53
16:03:58
16:03:59
16:04:06
16:04:09
16:04:10
16:04:16
16:04:22
16:04:30
16:04:31
16:04:35
16:04:38
16:04:43
16:04:46
16:04:47
16:04:48
16:04:51
16:04:53
16:04:55
16:05:02
16:05:05

A  I don't know.

Q  Do you believe NetChoice members have a responsibility to ensure the Internet is safe for minors?

A  I don't know.

MR. KILBY:  Object to form.

Q  Does NetChoice have a relationship with children and adults who use its members' platform?

A  Not --

MR. KILBY:  Object to form.

A  Not the best of my knowledge

MR. GUARD:  I have no further questions.

THE WITNESS:  Oh.

MR. KILBY:  Why don't I take just a break, confer with my colleagues and see if we have any redirect.

MR. GUARD:  Okay.

THE WITNESS:  Do I stay here?

THE VIDEOGRAPHER:  We are going off the record.  The time is 4:05 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 4:11 p.m.

MR. KILBY:  Thank you, Mr. Guard.  We have no redirect.  Appreciate your time here today.

MR. GUARD:  And you're going to read or you want to explain read or waive to him?    16:11:51 16:11:53

MR. KILBY:  We'll read.  So thank you.    16:11:55

THE VIDEOGRAPHER:  Stand by while I read us off.  This marks the end of the deposition of Bartlett Cleland.  We are going off the record at 4:12 p.m.    16:11:58 16:12:02 16:12:04 16:12:07

THE REPORTER:  And transcript orders, counsel?    16:12:11 16:12:14

MR. KILBY:  Go ahead, John.    16:12:14

MR. GUARD:  I think we're going to ask for it expedited.  Our paralegal will call and take care of it.    16:12:15 16:12:17 16:12:23

THE REPORTER:  And counsel?    16:12:47

MR. KILBY:  We want an expedite and rough turnaround.    16:12:48 16:12:55

(Off the record at 4:14 p.m.)

* * *

ACKNOWLEDGMENT OF DEPONENT

I, BARTLETT CLELAND, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.


(DATE)                    (SIGNATURE)

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

          I, Janet A. Hamilton, Registered Diplomate

Reporter and Notary Public before whom the

foregoing deposition was taken, do hereby certify

that the foregoing transcript is a true and

correct record of the testimony given; that said

testimony was taken by me stenographically and

thereafter reduced to typewriting under my

direction; that review was requested; and that I

am neither counsel for, related to, nor employed

by any of the parties to this case and have no

interest, financial or otherwise, in its outcome.

          IN WITNESS WHEREOF, I have hereunto set my

hand this 15th day of December 2024.

*Janet A. Hamilton*

Registered Diplomate Reporter

My commission expires

February 4, 2028.

Transcript of Bartlett Cleland
Conducted on December 10, 2024

225

| A | | | |
|---|---|---|---|
| **a) (1** | 74:8, 74:13, | 113:11, 207:21 | 166:3 |
| 187:2, 187:21 | 75:8, 75:14, | **act** | **addictive** |
| **abbreviation** | 78:16, 80:4, | 28:4, 28:9, | 187:5, 187:24, |
| 34:21 | 80:11, 83:6, | 29:9, 66:11, | 188:10, 188:11, |
| **ability** | 84:17, 99:18, | 137:12, 138:3, | 188:18, 188:19, |
| 12:1, 81:23, | 101:6, 101:9, | 138:10, 155:1, | 188:20, 189:13, |
| 145:20, 149:13 | 108:8, 108:12, | 155:14, 155:24, | 189:15, 189:22, |
| **able** | 108:14, 110:12, | 158:14 | 189:23 |
| 63:2, 76:15, | 111:6, 113:19, | **act's** | **adding** |
| 77:1, 77:2, | 113:23, 113:24, | 66:6, 137:23, | 158:13 |
| 77:9, 77:14, | 115:12, 119:1, | 154:21, 159:19 | **addition** |
| 86:2, 108:3, | 119:6, 121:19, | **acted** | 142:5, 173:20 |
| 121:20, 149:17 | 123:5, 123:8, | 14:4 | **additional** |
| **above** | 150:7, 150:13, | **active** | 84:5, 96:5, |
| 54:14, 109:14, | 150:19, 150:20, | 128:17, 155:16, | 96:6, 172:19, |
| 203:22 | 150:24, 150:25, | 199:8, 200:1, | 172:22 |
| **absolutely** | 151:2, 208:20, | 201:2 | **address** |
| 125:23, 147:6 | 215:10 | **activities** | 80:9 |
| **abuse** | **account"** | 39:17, 79:9, | **addresses** |
| 178:14, 180:18, | 109:9, 209:20 | 79:10 | 177:6 |
| 181:1 | **accounts** | **activity** | **adolescence** |
| **accept** | 6:3, 7:8, | 129:16, 130:3 | 172:16 |
| 120:21, 120:22 | 75:17, 79:22, | **actual** | **adolescent** |
| **acceptable** | 109:2, 109:3, | 16:14, 101:21, | 172:12 |
| 136:7 | 109:15, 113:11, | 102:1 | **adopted** |
| **acceptance** | 149:20, 149:21, | **actually** | 17:11 |
| 121:25 | 150:15, 151:17, | 11:5, 14:11, | **adoption** |
| **accepted** | 173:8, 173:9, | 26:11, 27:8, | 201:12 |
| 18:5 | 176:12, 198:22, | 28:13, 34:6, | **ads** |
| **accepting** | 199:10, 199:17, | 36:13, 42:8, | 91:21, 92:8, |
| 120:3, 120:6, | 199:21, 200:18, | 68:9, 69:10, | 92:9, 92:10, |
| 120:14, 121:5 | 200:21, 201:4, | 77:13, 78:1, | 93:22 |
| **access** | 209:2, 215:7 | 92:7, 94:21, | **adult** |
| 99:14, 151:20, | **accusation** | 108:1, 120:13, | 19:22, 85:4, |
| 174:20, 175:17 | 178:21 | 122:10, 147:1, | 218:23, 220:11, |
| **accessing** | **accusatory** | 151:23, 157:8, | 220:12 |
| 95:24, 117:6, | 177:15, 178:7 | 161:25, 163:1, | **adults** |
| 117:11 | **acknowledge** | 166:4, 175:5, | 75:2, 83:15, |
| **according** | 223:4 | 180:14, 200:25, | 203:7, 221:8 |
| 76:25, 77:7, | **acknowledged** | 219:4 | **advertise** |
| 77:8, 80:12, | 86:11 | **ad** | 94:21 |
| 99:1, 101:17, | **acknowledgment** | 91:24, 92:7, | **advertisement** |
| 112:18, 119:24, | 223:3 | 92:11 | 90:15, 93:21 |
| 178:19, 214:23, | **acronym** | **adam** | **advertisements** |
| 217:10 | 15:13 | 37:25, 43:13 | 90:16, 91:20, |
| **account** | **across** | **adapt** | 92:24, 93:4, |
| 7:16, 30:23, | 53:15, 97:22, | 193:11 | 93:9, 94:8 |
| | 97:24, 106:3, | **add** | **advertiser** |
| | | 13:22, 92:1, | 135:16 |

advertisers
89:16
advertising
84:15, 90:12,
90:21, 91:15,
92:14
advice
18:16
advisories
164:10
advisory
6:7, 162:6,
164:4, 167:7
advocacy
47:21
advocated
55:5, 55:16,
55:25
affairs
36:12, 36:16,
37:19, 186:9
affect
70:13
affected
70:9, 153:19
affects
68:18
after
11:11, 11:19,
15:21, 58:12,
113:23, 115:12,
120:3, 123:7,
126:14, 126:19,
151:6, 151:17,
170:19, 216:24
afterward
160:13
ag's
141:12
again
14:11, 16:16,
18:21, 20:18,
21:11, 25:14,
25:20, 27:15,
45:25, 59:24,
63:17, 65:4,
66:23, 67:10,
67:11, 68:5,

69:24, 76:24,
78:15, 80:2,
86:25, 91:3,
102:20, 107:11,
118:5, 131:10,
133:7, 133:23,
136:6, 136:8,
154:13, 154:20,
155:10, 175:15,
176:13, 177:11,
178:6, 180:5,
185:19, 188:6,
197:21, 200:18,
201:9, 202:8,
204:3, 205:5,
211:17, 214:22
against
48:6, 48:11,
48:19, 51:5,
51:17, 66:20,
67:16, 92:16,
97:1, 97:10,
186:10, 188:21,
191:5
age"
55:9, 209:23
ages
83:5, 103:24,
111:8, 114:11,
116:12, 116:22,
124:12, 142:9,
172:24, 173:4,
173:13, 200:11,
202:1, 210:6
ago
15:8, 72:2,
193:22, 218:14
agree
35:1, 35:4,
51:16, 59:19,
102:13, 102:22,
107:7, 113:10,
131:4, 140:10,
151:1, 163:20,
164:3, 165:4,
165:8, 166:7,
167:11, 167:20,
168:1, 175:25,

178:10, 193:24
agreed
19:12
agreement
5:18, 76:2,
77:1
agreement's
90:8
ahead
110:19, 134:5,
142:13, 222:10
ai
7:13, 206:7,
211:20
airbnb
5:19, 47:3,
51:2, 51:16,
78:5, 78:8,
78:12
airbnb's
52:2, 52:7,
52:9, 52:11,
53:1
al
9:4, 9:5
alaska
185:20
alcohol
75:1, 142:23
alec
15:11, 15:13,
15:15, 15:18,
15:24, 16:13,
17:6, 17:7,
17:9, 17:14,
17:18, 17:19,
17:20, 17:23,
28:7, 69:13
alerts
132:20
algorithm
58:23, 161:6,
161:13
algorithms
58:9, 58:14,
131:16, 160:20,
160:25, 161:4,
161:7, 161:9

alhadeff
3:5
alibaba
47:3
alice
160:9
alike
89:16
all-inclusive
67:5
allegations
190:14
alleged
177:16
allegedly
220:3
allow
52:11, 52:17,
52:21, 70:22,
71:8, 94:19,
119:1, 119:6,
129:15, 130:2,
131:1, 135:19,
135:25, 149:21,
149:24, 150:5,
151:4, 151:19,
172:2, 220:17
allowed
97:25, 99:16
allows
52:19, 73:12,
76:7, 78:5,
78:12, 84:4,
100:21, 135:16,
135:23, 150:4,
173:9, 211:22,
218:22, 218:24
almost
156:11, 165:14,
183:1, 199:23
alone
183:1, 199:9
alphabetical
182:11
alphabetically
185:19
already
27:16, 68:20,

**131:13, 149:21, 208:9**

**also**
4:1, 13:17, 20:1, 52:19, 73:21, 76:6, 93:19, 94:21, 105:16, 105:19, 113:6, 125:13, 142:8, 148:4, 160:20, 166:3, 180:16, 196:12, 197:3, 200:6, 211:22, 215:11

**although**
66:5, 137:23, 154:21, 177:8

**always**
161:12, 177:9

**amazon**
5:17, 32:4, 35:17, 47:3, 50:3, 72:19, 72:23, 72:25, 73:3, 73:9, 73:10, 73:12, 73:15, 74:1, 74:11, 74:13, 74:18, 74:20, 74:23, 74:25, 75:1, 75:7, 75:10, 75:17, 94:24, 107:2, 107:3

**amazon's**
95:6

**amendment**
118:13, 118:17, 147:8, 147:10, 147:16, 147:21, 148:3, 148:4, 148:13, 148:25, 149:14, 152:24, 157:14, 220:13

**american**
15:10, 201:25

**among**
53:1, 80:9,

**105:13, 181:16**

**amongst**
90:9

**amount**
106:25, 159:24

**amy**
44:3

**analogizing**
192:15

**analyze**
131:16, 161:4

**android**
105:20

**ands**
12:7

**anita**
3:14

**announcement**
212:20

**another**
13:17, 20:22, 43:11, 72:17, 125:13, 130:16, 141:1, 160:7, 182:6, 183:6, 185:3, 193:18, 217:4

**answer**
11:21, 11:22, 14:11, 20:15, 20:17, 22:14, 25:4, 26:10, 26:12, 27:14, 32:7, 32:10, 33:14, 34:12, 36:18, 38:24, 39:9, 56:20, 57:13, 57:14, 58:6, 60:13, 62:23, 63:16, 64:25, 65:15, 65:19, 66:1, 66:4, 68:6, 71:2, 82:18, 86:24, 97:9, 97:13, 97:19, 106:2, 106:15, 107:1, 116:18,

**117:15, 133:24, 134:18, 134:20, 136:7, 139:19, 145:14, 153:4, 156:1, 160:23, 161:14, 162:14, 205:7, 205:15, 213:20**

**answer's**
29:22, 127:8, 159:1

**answered**
11:12, 27:16, 35:19, 51:18, 68:20, 148:11, 203:8, 203:14, 204:3, 204:20

**answering**
58:20, 159:3, 184:16, 213:8

**answers**
43:21, 97:12, 116:16, 118:6

**antitrust**
92:15

**anybody**
213:10

**anyone**
21:8, 21:17, 21:20, 57:15, 71:8, 99:11, 99:15, 159:7

**anyone's**
36:3

**anything**
21:3, 24:15, 26:20, 38:19, 51:7, 51:12, 57:12, 77:6, 91:4, 93:19, 103:6, 113:21, 115:11, 144:1, 171:23, 205:9

**anyway**
160:5

**anywhere**
68:2, 187:1, 187:20, 209:16

**aol**
47:3

**apart**
48:15

**apologize**
27:15, 54:2, 133:8, 164:15, 204:19

**apologized**
170:20, 171:3

**app**
50:6, 55:6, 55:18, 105:16, 106:4, 106:6, 106:7, 106:20, 132:25, 159:25, 182:6

**apparent**
156:2, 181:1

**apparently**
215:19

**appear**
40:21, 66:10, 112:18, 137:10, 138:2, 155:1, 155:23, 156:5, 158:11, 166:21, 223:8

**appeared**
138:10, 170:15

**appears**
20:11, 20:21, 69:19, 72:21, 76:5, 138:17, 175:8, 181:15, 182:13, 185:18, 193:20, 193:24, 208:23, 211:24, 216:3, 216:7, 218:20

**apple**
106:17, 140:14, 194:21, 195:2, 195:6, 195:10, 195:12, 205:19

**application**
129:1, 136:18, 155:19, 197:23,

198:10
**applications**
100:19, 113:12,
123:9, 127:14,
129:7, 138:25,
139:3, 139:7,
140:4, 140:11,
140:18, 140:19,
141:15, 141:19,
141:24
**applied**
65:12, 138:10,
157:12
**applies**
64:19, 64:23,
66:16, 67:1,
67:7, 68:2,
69:20, 138:25
**apply**
65:3, 136:11,
136:25, 156:11,
160:16, 160:19,
161:1
**appreciate**
221:25
**approach**
55:5, 55:17
**appropriate**
18:4
**approximately**
199:7
**apps**
159:16, 202:19,
202:23, 202:24,
202:25, 203:9,
203:16, 204:4,
204:13, 204:15,
204:21, 205:4,
205:12
**area**
15:2, 51:22,
51:23, 85:4,
134:9, 150:10
**areas**
85:18
**aren't**
83:10, 89:22
**argument**
69:20, 69:24,

70:4
**arise**
141:3
**arkansas**
190:16
**around**
18:1, 31:23,
32:5, 32:9,
40:23, 48:16,
143:15
**arrangement**
71:7
**array**
47:2
**arrow**
174:18
**art**
145:12
**article**
201:10
**articles**
88:4
**artisans**
82:12
**ashley**
1:10, 9:17,
10:13
**aside**
42:4, 45:11,
47:19, 63:20,
71:3, 71:5,
77:18, 82:5,
92:17, 100:7,
113:16, 179:4,
184:24, 186:2,
190:8, 194:10,
205:24, 207:25,
210:16, 215:16
**asked**
11:16, 68:23,
148:6, 148:16,
155:15, 155:20,
155:25, 158:9,
172:5, 203:5,
204:10, 204:17,
209:10, 212:17,
213:12, 213:19
**asking**
26:20, 31:25,

38:19, 39:4,
39:6, 43:2,
49:2, 49:4,
52:3, 52:4,
52:6, 68:9,
68:10, 77:8,
85:16, 94:17,
129:19, 136:20,
136:21, 143:22,
151:11, 151:24,
152:1, 152:2,
158:24, 207:16
**asks**
83:15, 155:11
**aspects**
66:5, 137:23,
144:15, 159:18
**assent**
147:8
**assert**
68:7, 189:1
**asserted**
32:2, 214:7
**assertion**
67:7, 67:10
**assertions**
178:23, 179:1
**asserts**
192:9
**assoc**
4:11
**associate**
36:20, 36:21,
37:4
**associated**
44:9, 44:13,
71:6
**association**
1:6, 20:2,
22:3, 32:19,
32:23, 32:25,
33:1, 33:2, 34:2
**associations**
9:4
**assume**
26:19, 62:9,
115:24, 148:22,
171:1, 171:5,

181:7
**assuming**
113:3, 213:6
**assumption**
84:2, 109:25,
156:24
**at&t**
197:3
**attach**
215:6
**attached**
5:8, 162:1,
223:8
**attempt**
61:22
**attempts**
101:14
**attorney**
1:11, 3:13,
3:18, 6:19,
9:17, 9:18,
10:11, 10:13,
61:15, 186:8
**attorney-client**
26:22
**attorneys**
26:13
**audience**
170:21
**audiovisual**
29:2
**august**
7:11, 201:24,
202:7
**aura**
7:10, 201:23
**australia's**
28:19, 30:12,
30:15, 30:20
**australian**
30:21
**authority**
121:14, 121:20
**authorize**
121:5
**authorized**
121:13
**autoplay**
134:21, 135:2,

135:6, 153:23,
187:3, 187:22
**available**
106:25, 122:18,
194:14, 194:15
**avenue**
3:7
**average**
129:10
**avis**
81:5
**avoid**
69:15, 129:24
**avoiding**
194:9
**aware**
30:19, 31:3,
31:11, 34:7,
40:17, 40:20,
55:21, 56:2,
58:7, 58:17,
59:1, 59:4,
59:8, 59:11,
59:13, 60:14,
60:16, 60:17,
60:20, 62:25,
63:6, 63:11,
64:4, 70:8,
95:18, 106:16,
113:25, 115:25,
119:5, 119:8,
129:9, 129:12,
135:4, 135:5,
135:7, 147:17,
153:22, 162:15,
162:16, 162:17,
164:8, 181:4,
190:9, 190:11,
190:16, 190:19,
190:22, 191:3,
216:15
**awareness**
13:13
**aws**
73:24

**B**

**b**
132:8, 132:15,

202:23, 204:14
**b) (6**
39:7, 139:24
**b-a-r-t-l-e-t-t**
10:8
**back**
15:7, 19:9,
19:21, 39:20,
41:9, 42:5,
45:21, 54:24,
56:24, 62:22,
64:12, 72:17,
88:14, 89:1,
95:7, 115:15,
116:20, 126:21,
128:9, 128:13,
128:20, 144:23,
151:25, 153:6,
154:10, 154:13,
156:12, 157:9,
158:18, 158:21,
159:18, 163:14,
164:22, 169:5,
187:11, 188:15,
201:14, 210:5,
218:5, 221:22
**backdrop**
27:3
**background**
10:18, 13:15,
13:17, 140:2,
171:22
**balking**
137:21
**banner**
191:17
**bar**
20:2
**bartlett**
1:16, 2:1, 5:2,
5:11, 9:2, 10:2,
10:8, 222:6,
223:4
**based**
56:5, 79:24,
86:12, 91:24,
92:23, 105:24,
136:21, 145:10,

178:22, 179:1
**basic**
40:5, 200:16,
201:15
**basically**
147:20
**basis**
154:18, 158:10,
176:9
**bataan**
11:8
**bathroom**
11:9
**beat**
18:5, 153:13
**beaten**
87:3
**became**
181:4
**because**
11:1, 11:2,
20:18, 21:2,
25:15, 26:16,
26:17, 29:16,
39:12, 42:9,
44:7, 53:25,
60:24, 61:3,
65:1, 74:17,
77:24, 78:1,
83:24, 88:19,
90:18, 91:2,
96:3, 110:3,
116:15, 117:7,
128:15, 133:9,
133:23, 138:7,
147:6, 148:2,
148:11, 148:12,
152:15, 153:17,
172:16, 184:8,
186:18, 192:16,
193:1, 197:14,
201:14, 202:18,
204:25, 212:25,
213:23, 219:4
**become**
150:24, 150:25,
151:1
**been**
10:15, 12:15,

40:7, 48:4,
48:9, 48:13,
48:17, 52:9,
52:14, 61:10,
72:2, 85:3,
85:22, 108:17,
115:16, 135:8,
143:14, 180:6,
186:16, 192:25,
200:10, 211:20
**beer**
143:18
**before**
2:14, 14:11,
41:23, 42:10,
43:9, 52:20,
53:20, 66:24,
74:5, 87:17,
88:2, 88:8,
95:9, 126:8,
128:11, 138:6,
146:10, 149:17,
153:11, 154:17,
157:14, 160:14,
161:23, 162:5,
162:11, 177:20,
178:3, 180:6,
183:21, 186:16,
189:7, 198:18,
202:8, 205:7,
205:15, 205:23,
208:1, 208:2,
216:9, 224:4
**beginning**
16:7, 16:9,
69:23
**begins**
9:1, 134:22
**behalf**
3:2, 3:11,
9:17, 9:20,
120:23, 121:6
**behave**
11:2
**behind**
112:24, 170:24,
210:13
**being**
10:3, 13:21,

Transcript of Bartlett Cleland
Conducted on December 10, 2024
230

14:15, 15:8, 17:10, 52:4, 61:14, 63:2, 94:24, 117:14, 121:8, 144:5, 147:11, 147:16, 148:9, 152:21, 200:7, 201:6

**believe**
15:20, 19:12, 24:7, 44:12, 44:25, 53:21, 59:24, 62:23, 65:12, 68:21, 70:24, 89:4, 100:20, 117:12, 118:10, 147:22, 147:25, 150:11, 150:15, 163:4, 163:23, 168:7, 168:12, 168:17, 170:18, 173:4, 178:4, 210:5, 210:6, 215:6, 216:13, 217:14, 220:22, 221:2

**belong**
22:6

**belonging**
195:12, 195:22, 196:7

**below**
109:8, 109:12

**bembridge**
44:4, 44:15, 45:6

**beneath**
107:24

**benefits**
163:2, 163:21, 164:5, 165:1, 165:10, 165:18, 165:22, 173:21

**beside**
21:11

**besides**
21:7, 21:16, 21:19, 199:24

**best**
25:4, 38:7, 39:3, 39:19, 40:5, 41:16, 41:18, 44:20, 45:9, 48:17, 52:23, 55:15, 61:8, 61:10, 62:22, 66:18, 76:9, 78:7, 81:2, 91:23, 98:4, 100:23, 118:20, 131:3, 143:1, 156:7, 156:25, 159:9, 159:14, 159:17, 159:21, 170:1, 170:17, 177:1, 203:5, 210:2, 217:3, 221:11

**better**
72:13, 147:21, 201:12, 205:19

**between**
37:8, 60:6, 83:5, 103:24, 114:11, 124:12, 129:25

**beyond**
77:6, 219:10, 219:12

**bigger**
51:24, 166:17

**bill**
48:1, 48:6, 48:19, 64:18, 126:12, 127:2, 127:3, 148:17

**billion**
35:11

**bills**
48:6, 48:11

**bind**
121:14, 121:20

**binding**
76:15, 77:2, 77:9, 77:14, 102:9, 102:13,

102:16

**birth**
80:10

**birthday**
113:22

**bit**
32:22, 43:15, 142:6

**black**
67:3

**blackburn**
6:11, 176:22

**blank**
178:2

**blog**
38:11, 38:14, 38:22

**blogging**
141:14

**blogs**
38:17

**blue**
213:20

**blumenthal**
6:11, 176:22

**bold**
167:8

**bolded**
166:16

**books**
115:16

**bos**
44:3

**both**
15:6, 51:3, 52:21, 60:6, 61:1, 112:6, 147:18, 167:5, 167:10

**bottom**
165:12, 172:11, 174:14, 174:15, 192:21, 199:5, 206:20, 217:20

**bounds**
52:4

**box**
144:8

**boys**
172:16

**brain**
135:20, 172:17

**break**
11:9, 11:11, 11:12, 19:2, 19:11, 20:17, 33:20, 45:14, 45:16, 88:13, 88:22, 127:20, 154:5, 154:6, 160:14, 164:18, 175:19, 185:4, 204:19, 217:25, 221:14

**breaking**
88:18

**brick**
142:23

**bridge**
156:2

**brief**
154:14

**briefly**
186:22, 187:16

**bring**
48:5, 48:11

**brings**
81:4

**broad**
37:18, 47:2, 50:5, 51:22, 106:24, 107:3, 155:5

**broadcast**
135:17

**broader**
44:22, 81:14, 105:24, 106:23, 131:11, 157:15

**broadest**
106:25

**broadly**
13:4, 13:9, 14:22, 37:18, 65:1, 66:25, 68:10, 95:18,

122:18, 157:13
**brooke**
1:10
**brought**
20:23, 97:1,
97:10, 141:6
**browser**
197:11
**browsers**
197:13
**bulk**
165:5, 165:18
**bullet**
76:21, 102:5,
102:9, 102:20,
123:11, 174:17,
174:18, 192:24,
193:5
**bunch**
62:23, 129:24,
152:3, 179:17
**burden**
85:9, 86:11,
88:9, 208:5,
220:7
**burdens**
86:5, 87:12,
95:10, 96:6
**business**
31:19, 31:23,
32:5, 32:9,
35:12, 35:18,
52:2, 52:7,
89:14, 89:23,
90:6, 90:9,
105:24, 139:13,
149:3, 149:16,
152:9, 216:11
**businesses**
50:6, 51:13,
51:25
**butcher**
179:17
**button**
133:13, 134:23
**buy**
143:18
**buying**
142:10

**buys**
92:10

---

**C**

**c**
132:8, 132:21,
133:9, 133:25,
202:24, 205:11
**c) (6**
35:21
**c-l-e-l-a-n-d**
10:9
**california**
191:1
**call**
57:4, 57:21,
72:19, 92:11,
92:22, 132:20,
139:1, 139:11,
140:5, 140:25,
162:12, 174:19,
218:23, 222:12
**called**
11:18, 59:9,
133:18, 218:15
**came**
205:3
**campaign**
7:3, 194:1,
194:7
**can't**
16:17, 43:19,
61:3, 61:7,
79:16, 92:6,
102:15, 118:11,
120:21
**candy**
141:2
**cannot**
63:25, 122:15,
122:19, 123:2,
123:11, 214:5
**capacity**
1:11, 139:22
**capitol**
3:20, 86:1,
88:1
**car**
80:25, 81:4,

81:6, 81:8,
81:11, 81:12,
81:13, 81:15,
81:23
**card**
209:23
**care**
37:10, 222:13
**cared**
171:7
**career**
58:13
**carl**
44:2, 44:15
**cars**
81:12
**case**
1:8, 8:6, 9:7,
20:10, 39:13,
86:3, 87:5,
121:13, 145:24,
194:13, 218:16,
218:17, 219:5,
220:1, 224:12
**cases**
79:16
**catch**
20:20
**categories**
167:7
**category**
185:21
**cause**
70:15, 70:18,
86:6, 95:12,
116:22, 135:13,
168:18, 208:6
**causing**
158:13
**ccia**
9:21, 57:8,
57:12
**cell**
106:9, 106:12
**center**
3:6, 6:12,
6:15, 16:15,
16:19, 16:25,

24:25, 36:19,
36:21, 37:4,
179:9, 179:13,
199:11, 201:4
**center"**
193:12
**ceo**
13:25, 169:25,
199:6
**certain**
144:5, 145:20,
172:14, 175:13
**certainly**
170:23, 199:24,
206:13
**certificate**
224:1
**certify**
224:5
**cetera**
13:7, 41:12,
88:4, 93:22,
158:20, 159:1
**cfo**
38:2
**chairman**
170:6
**challenge**
141:7, 141:9,
181:25
**challenged**
118:13
**chance**
205:8
**change**
164:11
**changed**
40:8
**changing**
194:11
**charged**
25:17
**charter**
35:21
**chat**
141:19, 202:24,
204:15, 205:4
**chavez**
44:5

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    232

checks
99:17, 100:3
cherry-picked
213:1
cherry-picking
175:15, 200:19,
211:17
chief
3:13, 4:10,
9:16, 10:11,
177:4
child
178:14, 180:18,
181:1
child's
220:12
children
6:13, 6:16,
83:10, 109:15,
170:21, 173:2,
174:21, 175:19,
175:24, 176:14,
176:15, 178:15,
179:10, 179:13,
195:9, 195:13,
195:19, 195:23,
196:4, 196:8,
196:19, 200:6,
221:8
children's
7:8, 28:3,
28:8, 198:22,
199:10, 199:21,
200:18, 200:21
choice
52:24, 52:25,
53:1, 53:3,
153:1, 153:4
choose
23:22, 24:4
choosing
24:1
chose
175:20
chris
44:3
christine
3:15

christmas
49:12, 82:24
christopher
44:3
circuit
19:20
circumstances
60:11
citations
24:8
cited
25:12, 26:2,
162:22, 164:25,
166:3, 194:20
citizens
167:12, 167:22
citron
199:6
city
12:3
claim
66:21, 67:16
claimed
92:15
claiming
64:17, 96:15,
148:17
clarified
14:8
clause
175:21, 176:6,
176:7
clear
27:4, 66:8,
116:17, 127:8,
137:24, 154:22,
159:20
clearer
19:3
clearly
68:24, 82:2,
86:22
cleland
1:16, 2:1, 5:2,
5:9, 5:11, 9:3,
10:2, 10:6,
10:8, 10:10,
20:7, 33:21,

33:24, 39:5,
41:21, 53:12,
72:8, 75:25,
77:21, 78:21,
80:19, 82:8,
98:16, 100:10,
104:24, 108:22,
119:13, 122:4,
126:6, 161:18,
171:13, 176:19,
179:7, 185:10,
186:5, 191:11,
193:16, 198:15,
201:21, 206:2,
208:17, 210:24,
212:2, 214:10,
215:23, 216:22,
218:11, 222:6,
223:4
clement
4:4
clicked
133:13, 210:9
clicking
82:2, 134:23
clown
192:11
clowns
192:10, 192:15
cody
4:13, 9:10
coffee
10:23, 10:24
colleagues
221:15
collect
84:18, 96:7
collection
84:13, 90:14
collects
101:9, 102:2,
102:3, 121:24,
123:4
college
3:7
colloquial
82:17
colloquially
34:11, 81:15

colon
46:25
color
210:10
column
174:14, 174:15,
207:17
columns
174:12, 207:12
com
47:3, 208:24
combat
6:23, 191:14
combatant
140:25
combatting
192:6, 192:25
comcast
197:4
come
88:14, 97:22,
97:24, 180:14
comfortable
34:20, 128:3
coming
13:17, 40:13,
42:5, 210:21
comma
154:17, 175:17
commerce
50:2
commission
116:2, 224:24
committee
170:11, 171:3
common
63:2
communication
71:1
communications
1:5, 4:11, 9:4,
26:13
community
60:11, 60:15,
60:18, 60:20,
60:24, 61:3
companies
7:9, 15:5,

17:2, 17:5,
22:5, 22:6,
22:7, 23:9,
23:10, 27:1,
31:8, 31:17,
31:18, 33:3,
33:7, 33:8,
33:11, 34:15,
34:17, 34:22,
35:2, 35:6,
35:10, 35:12,
35:16, 41:10,
46:14, 46:19,
47:7, 49:8,
49:24, 51:9,
58:8, 58:15,
58:19, 58:22,
64:6, 70:7,
91:7, 92:3,
105:22, 107:14,
129:8, 130:1,
131:12, 131:15,
147:17, 147:22,
147:25, 148:17,
148:19, 149:6,
152:6, 160:15,
160:19, 173:13,
180:15, 181:18,
182:12, 182:16,
184:20, 190:24,
191:5, 198:22,
208:9, 216:16,
217:13, 217:17

**company**
14:18, 25:8,
25:19, 25:23,
26:7, 27:19,
28:1, 28:2,
28:18, 28:19,
28:24, 29:7,
29:8, 29:13,
29:14, 30:5,
30:6, 30:10,
30:22, 32:13,
32:15, 37:3,
50:5, 50:11,
69:2, 80:22,
81:1, 81:15,

90:13, 92:7,
100:16, 121:11,
148:9, 149:2,
152:22, 157:16,
158:5, 181:14,
181:16, 193:2,
201:1, 206:11,
216:4, 217:1,
217:4, 218:15

**company's**
149:11

**compare**
107:5

**compared**
93:19, 105:22,
109:14

**compartmentalized**
107:13

**compelling**
168:2, 168:8

**compensated**
42:15, 42:21

**compete**
51:5, 51:17

**competition**
51:21, 51:25,
107:15, 107:16

**competitive**
51:10, 51:11

**competitors**
50:14, 50:17,
50:23

**complained**
188:20

**complaint**
6:18, 67:23,
68:12, 68:17,
186:8, 188:21,
189:24

**complete**
223:7

**completely**
44:21

**compliance**
144:20

**compliant**
96:4

**complicated**
52:1, 85:24

**complies**
28:3

**comply**
28:19, 28:25,
29:8, 29:15,
30:6, 113:6

**complying**
151:12

**components**
156:1, 158:15

**compound**
73:8, 204:17

**computer**
1:5, 4:11, 9:3,
18:22, 33:12,
85:3, 132:1

**computer-related**
33:3, 33:9,
33:12

**concede**
99:4

**concept**
62:25, 63:3,
63:6, 143:12

**concerned**
35:22, 213:9

**concerns**
17:20

**conditions**
5:17, 72:18,
72:19, 72:23

**conduct**
177:16, 178:8

**conducted**
207:10

**confer**
221:15

**confidential**
207:2, 207:5,
207:6, 207:8

**confirm**
101:5

**confuse**
39:10

**confused**
133:6, 133:11

**confusing**
138:5

**confusion**
86:21, 94:17

**congress**
126:17, 126:18,
126:19

**conjunctive**
157:21

**connected**
199:10, 199:20,
199:24, 200:17,
200:20

**connection**
185:16

**consent**
29:18, 64:8,
84:9, 84:20,
84:24, 86:6,
101:18, 101:24,
102:3, 173:9

**consents**
146:25

**conservative**
145:11

**considered**
41:12, 112:6,
112:7, 158:1

**construction**
155:5

**consulting**
71:6

**consumer**
52:24, 52:25

**contain**
70:4

**contained**
23:23, 25:11,
26:1, 136:14,
141:17, 142:1,
158:15, 188:12,
189:15

**contains**
54:25, 127:4

**content**
26:8, 27:20,
59:5, 59:6,
70:22, 71:9,
99:2, 129:16,
130:3, 130:12,

130:13, 131:2,
131:17, 133:14,
133:15, 135:17,
140:18, 140:23,
141:2, 144:8,
160:20, 160:25,
166:2, 166:25,
189:5, 218:24,
219:20
**contents**
21:8, 21:17,
21:21
**context**
159:3, 160:4,
160:7, 160:11,
208:3
**continue**
151:4
**continues**
121:10
**contract**
61:17, 62:20,
63:2, 63:14,
64:1, 76:15,
77:2, 77:9,
102:10, 102:14,
102:16, 145:21,
146:7, 146:17,
146:22, 150:1,
150:7, 150:22,
150:25, 151:2,
151:5, 151:13,
151:21, 152:18
**contracting**
152:11
**contracts**
77:14, 151:7
**contractual**
59:18, 61:14
**contractually**
152:7
**contradict**
172:6
**contradicted**
214:7
**contributes**
56:5
**control**
7:10, 201:24

**controls**
194:14, 195:14,
195:24, 196:9,
196:24, 197:6,
197:16, 197:25,
198:9, 199:17,
203:6, 203:10,
203:17, 204:6,
204:11, 204:21,
207:21
**controversial**
118:1, 212:23
**convenient**
45:14
**conversation**
10:24, 14:13,
48:18, 181:8
**conversational**
59:23
**conversations**
48:13, 48:16,
48:20, 48:25,
49:2, 49:15,
49:18
**convicted**
102:22, 103:3,
103:7, 103:11,
123:12, 123:16,
123:21
**coppa**
28:10, 28:14,
83:25, 84:5,
84:23, 85:8,
85:13, 87:1,
87:18, 87:20,
87:22, 96:4,
96:5, 115:15,
115:16, 115:21,
116:1, 116:5,
116:10, 116:21,
117:7, 118:7,
118:13, 118:17,
142:7
**copy**
20:12, 20:22,
21:1, 30:25,
33:19, 33:20,
186:7, 215:25,

216:25
**core**
87:5
**corp**
182:9, 184:3
**corporate**
149:12
**corporation**
73:25
**corrections**
223:8
**correctly**
89:17, 130:10,
172:20, 184:16,
199:12
**could**
18:7, 19:1,
22:1, 22:24,
23:25, 38:13,
45:13, 53:4,
58:18, 82:14,
85:15, 89:7,
89:8, 116:9,
130:6, 136:11,
136:24, 137:15,
140:6, 141:7,
145:7, 148:23,
149:24, 150:5,
151:3, 151:12,
151:19, 151:24,
152:14, 152:18,
152:20, 152:21,
152:22, 153:5,
153:12, 153:16,
153:18, 156:10,
157:12, 160:16,
160:19, 164:16,
170:6, 172:1,
172:2, 175:17,
187:10, 194:22,
216:24, 220:15
**council**
15:10
**counsel**
3:17, 9:14,
10:5, 11:10,
11:16, 12:13,
12:16, 12:20,

13:23, 14:10,
15:16, 15:17,
16:3, 16:10,
19:12, 21:7,
21:12, 21:20,
26:20, 34:19,
35:15, 37:3,
37:5, 45:1,
52:5, 56:15,
57:12, 69:2,
139:17, 222:9,
222:14, 224:11
**counsel-y**
13:6
**count**
90:19, 110:18,
110:19
**counting**
40:2
**countries**
31:12, 31:13,
109:8, 109:12,
110:5, 110:16,
110:25, 111:10,
111:13, 111:16,
111:17, 112:2,
112:4, 112:5,
112:8, 112:17,
113:3
**country**
40:23, 101:24,
112:11, 120:18,
121:9
**country's**
113:4
**couple**
14:9, 107:23,
132:9, 149:6
**course**
150:13
**court**
1:1, 6:18, 9:6,
9:22, 10:20,
11:2, 11:18,
56:22, 67:14,
70:3, 79:16,
118:16, 187:10,
190:25, 215:13

Transcript of Bartlett Cleland
Conducted on December 10, 2024                    235

cover
53:25, 165:16
covers
165:24, 173:2
cox
44:3
cream
192:11, 192:15
create
21:4, 74:20,
74:25, 75:13,
82:13, 84:17,
101:6, 109:15
created
99:18
creates
92:11
creating
24:10
creation
75:8, 101:9,
113:19, 113:23,
113:24, 115:13,
123:5, 123:8
creators
219:21
credit
209:23
critical
137:22, 213:7
crush
141:3
curling
157:8
current
95:15, 95:18,
173:12
currently
25:9, 25:24,
32:15, 104:13
cyber
6:14, 6:17,
180:11, 180:17,
185:13

D

d
132:8, 202:25,

205:17
da-da-da
158:19
daily
128:17, 155:16,
201:2
darn
215:7
dash
175:17, 175:18
data
29:1, 84:13,
84:18, 84:19,
96:7, 130:24,
131:17, 159:6,
159:11
date
9:8, 41:25,
80:3, 80:10,
88:5, 162:16,
176:24, 177:1,
186:13, 193:25,
202:6, 223:13
dated
176:23, 193:20,
201:24, 212:7,
214:14
dates
15:19, 202:7
day
128:18, 129:11,
155:18, 159:16,
224:15
dc
1:17, 2:8,
9:13, 12:8
deal
17:4, 142:7
deals
25:10, 25:25,
163:21
dealt
25:9, 25:24
death
11:8
debate
97:16
decades
117:18, 117:19,

117:20, 118:2,
118:3
december
1:18, 9:8,
224:15
decided
138:20
deciding
167:8
decision
95:8
decisions
47:21, 48:5,
48:10, 56:5,
56:9
deck
72:15
declaration
5:10, 20:9,
20:22, 21:5,
21:9, 21:17,
21:21, 23:15,
23:18, 24:5,
24:7, 24:9,
24:10, 24:17,
24:21, 25:12,
39:12, 46:1,
46:8, 51:8,
53:16, 56:11,
56:16, 57:1,
57:5, 57:9,
57:16, 57:22,
66:16, 67:25,
86:3, 86:4,
86:9, 87:8,
87:17, 87:20,
89:5, 95:10,
137:4, 138:10,
153:14, 155:22,
158:10, 162:1,
162:22, 163:5,
169:14, 194:12,
196:12, 197:10,
198:11, 208:4,
220:8
decrease
172:13
deemed
149:20

default
110:8, 110:9
defend
200:22
defendant
1:13, 3:11,
10:5
define
61:22, 62:5,
209:12
defined
34:21, 44:21,
47:14, 80:6,
150:11, 155:6,
158:6, 200:7
defines
120:19
defining
34:22
definitely
60:22
definition
34:7, 34:10,
41:9, 66:6,
127:4, 130:25,
132:13, 133:5,
134:17, 136:12,
137:23, 158:2,
159:19, 181:6,
192:17, 209:9
definitions
112:10, 130:11,
154:21, 157:16
delbianco
36:10, 43:25
deliver
147:19
delivered
27:10
department
186:9
depend
96:22
dependent
176:6
depending
33:11, 50:1,
80:5

Transcript of Bartlett Cleland
Conducted on December 10, 2024

236

depends
149:3
depo
141:13
deponent
223:3
depos
9:11, 9:23
deposed
10:15
deposition
1:16, 2:1, 5:9,
9:2, 9:11, 20:5,
21:1, 33:21,
34:14, 41:20,
48:15, 53:11,
72:7, 75:21,
75:24, 78:20,
80:18, 82:7,
86:16, 100:9,
104:23, 119:16,
122:3, 126:3,
141:11, 161:17,
179:6, 185:9,
186:4, 191:10,
193:15, 198:14,
208:16, 212:5,
214:9, 218:10,
222:5, 224:5
deputy
3:13, 9:16,
10:11
describe
12:24, 99:6
described
209:8
describing
91:19
description
12:23
designated
13:25, 22:10
designed
150:11
despite
61:14
details
86:2, 156:23,

165:5
detain
220:17
detects
123:20
determine
48:19, 101:14,
136:11
determines
99:21, 102:3
developed
112:7, 112:11
development
172:17
developmental
172:14
device
194:17
devices
195:7, 195:10,
195:12, 195:17,
195:20, 195:22,
196:2, 196:5,
196:7, 196:22,
197:4
die
168:18
difference
147:5
different
38:17, 45:2,
59:17, 61:10,
79:13, 85:17,
92:3, 94:25,
97:8, 106:4,
107:7, 107:8,
116:16, 140:3,
140:20, 141:2,
145:7, 155:25,
166:17, 166:22,
172:1, 173:23,
184:8, 185:12,
200:10, 200:11,
202:19, 210:10,
214:25, 218:22
differently
44:21, 117:14,
200:10

difficult
156:8
difficulty
138:7
diplomate
2:15, 224:3,
224:23
direct
54:20, 158:19
direction
224:10
directive
29:2
director
13:18, 13:22,
16:15, 16:25,
36:11, 71:1
directors
42:14, 42:20
disable
153:16, 153:18
disabled
153:23
disagree
11:16, 53:6,
165:23
disconnect
156:2
discord
141:20, 199:6,
199:11, 199:16,
200:22, 205:4
discord's
201:12
discovery
99:2
discriminate
145:9
discuss
19:2
discussed
18:14, 19:12,
194:13
discussing
57:11
discussion
19:8, 30:9,
32:12, 127:1,

164:21, 165:19,
206:4
discussions
30:4, 49:14,
57:8, 57:15,
57:20
disjunctive
131:7
displays
132:21, 133:11
dispute
171:22
distraction
128:2
district
1:1, 1:2, 6:18,
9:5, 9:6, 190:25
divergent
50:18
diverse
49:23, 50:1
division
1:3, 9:7
doctor
171:12
document
7:12, 46:4,
46:17, 47:10,
53:24, 54:15,
54:16, 61:21,
77:8, 79:4,
80:6, 80:12,
80:21, 80:24,
83:9, 105:3,
108:5, 108:9,
113:15, 119:24,
121:17, 164:5,
166:23, 179:23,
189:19, 206:5,
209:14, 209:17,
211:1, 213:15,
213:25, 214:5,
214:7, 214:12,
214:24, 215:16,
216:3
documents
22:22, 23:1,
23:10, 83:19,

Transcript of Bartlett Cleland
Conducted on December 10, 2024

237

83:24, 108:2,
162:25
**doing**
18:15, 40:5,
62:22, 125:15,
128:3, 135:11,
201:15, 209:5,
216:10
**dollar**
30:21
**dollars**
35:11
**done**
128:10
**double**
54:8, 121:3
**double-sided**
90:11, 91:20,
92:18
**doug**
9:19, 185:5
**douglas**
3:3
**down**
10:21, 11:3,
24:16, 24:19,
25:21, 42:19,
70:16, 74:21,
80:7, 81:6,
96:11, 101:2,
102:5, 102:20,
129:24, 138:9,
138:21, 160:8,
165:25, 189:9,
203:13, 204:12,
209:19, 217:21
**dreamwork**
47:3
**drive**
90:12
**driver's**
80:10, 210:3
**dues**
22:12, 25:17,
41:7, 41:12
**duly**
10:3
**duplicate**
184:7, 184:10

**during**
19:11, 170:18,
172:18
**duties**
12:19, 12:25,
45:3, 60:5
**duty**
139:1, 139:11,
140:5, 141:1,
168:13

--- E ---

**e**
127:11, 132:4,
132:8, 158:18,
204:4, 205:18
**e) (1**
131:5
**e) (1) (4**
160:18
**e) (2**
127:14
**e) (4**
132:7
**each**
10:25, 11:1,
23:17, 26:24,
50:14, 51:5,
51:17, 91:1,
115:9, 140:17,
140:19, 159:16
**earlier**
28:7, 30:12,
32:18, 35:19,
62:12, 70:17,
78:5, 86:21,
94:16, 97:20,
105:10, 107:3,
116:4, 117:3,
126:25, 127:16,
142:8, 150:14,
153:14, 155:14,
176:12, 189:13
**easier**
15:11, 72:16
**easily**
183:10
**east**
3:7

**easy**
212:18
**ebay**
47:4, 76:3,
76:6, 76:10,
76:14, 76:21,
76:25, 77:10
**ebay's**
5:18
**ebee**
76:10
**ecommerce**
72:25, 76:6,
82:15
**economic**
112:9
**eds**
18:19
**education**
7:3
**effect**
30:16, 116:5,
116:10, 126:21
**effective**
55:8, 80:3,
105:7
**efforts**
32:14, 159:21
**eight**
181:13
**either**
17:10, 28:25,
59:9, 79:23,
91:18, 91:19,
124:1, 134:15,
140:14, 167:13,
167:16, 167:22,
168:3, 171:4
**elaborate**
19:14, 73:7
**electrical**
131:24
**electronic**
50:2, 179:21,
180:23, 181:6,
183:5
**eligibility**
81:21, 81:22,

82:3
**eligible**
80:5
**eliminate**
149:18
**eliminated**
151:6, 151:18,
152:10, 152:11,
152:13
**eliminates**
150:14, 150:16
**elon**
183:21
**else**
21:3, 21:8,
21:20, 71:8,
93:19, 133:5
**emanations**
18:20
**employ**
131:16, 161:6,
161:7
**employed**
14:15, 15:8,
18:10, 40:7,
71:4, 224:11
**employee**
43:15, 44:8
**employees**
35:24, 36:1,
42:15, 42:20,
42:21, 43:12,
44:6, 71:3
**employment**
36:4, 71:7
**employs**
161:4
**enacted**
126:14, 180:6
**encompass**
14:2
**encountered**
83:18, 119:1
**end**
42:12, 54:7,
54:9, 88:12,
95:7, 96:10,
154:4, 157:2,

Transcript of Bartlett Cleland
Conducted on December 10, 2024

238

157:5, 157:19, 168:19, 185:21, 222:5
**ends**
166:3, 166:6
**enforce**
176:10
**enforceable**
63:13
**enforcement**
220:17
**enforcing**
174:22, 175:4, 175:5
**engage**
39:17
**engine**
50:7, 99:2
**engineer**
131:23, 131:25
**english**
67:6, 68:22, 200:16
**enjoined**
118:17
**enough**
11:7, 11:14, 145:18, 163:13, 170:9, 209:20, 219:3
**enrolled**
126:15
**ensure**
113:22, 123:8, 220:23, 221:3
**ensures**
123:20
**ensuring**
215:9
**enter**
62:20, 63:2, 63:13, 63:25, 152:17
**entering**
146:7, 146:17, 146:21
**entire**
12:16, 58:12,

85:4, 118:8, 129:23, 133:8, 133:10, 136:4, 136:10, 137:7, 188:5
**entities**
41:7, 41:15, 66:9, 78:17, 137:25, 154:23
**entitled**
65:25, 80:21, 105:6
**entity**
121:12, 121:14
**enumerated**
173:5
**environment**
95:16, 95:19
**ephemeral**
189:5
**errata**
223:9
**error**
184:18
**especially**
84:15
**esps**
6:14, 183:3
**esquire**
3:3, 3:12, 3:14, 3:15, 3:16, 4:3, 4:6
**establish**
113:19
**estimate**
211:19, 211:20
**estimated**
211:20
**estimates**
211:21
**estimating**
40:2
**estimation**
213:6
**et**
9:4, 9:5, 13:7, 41:12, 88:4, 93:22, 158:20,

159:1
**etsy**
5:22, 47:4, 82:11, 83:11, 97:21
**etsy's**
98:6
**euphemistically**
218:23
**european**
28:25, 29:1, 111:13, 111:16, 112:1, 112:3
**even**
71:3, 74:15, 83:15, 85:22, 85:25, 92:6, 153:17, 176:15, 207:2
**events**
49:10
**ever**
10:15, 24:14, 32:12, 41:23, 52:9, 52:14, 53:19, 62:14, 71:14, 72:22, 74:5, 88:2, 118:12, 118:16, 126:8, 132:25, 135:8, 140:13, 160:2, 160:10, 177:19, 198:17, 204:25
**every**
13:2, 39:5, 59:8, 85:25, 113:4, 130:5, 148:9, 202:14
**everyone**
122:18, 148:14
**everything**
10:22, 11:3, 33:16, 87:4, 213:19
**everywhere**
25:19
**evidence**
32:3, 32:10,

35:20, 166:6
**evidently**
192:6, 192:24, 216:10
**exact**
156:12, 181:5
**exactly**
14:1, 17:24, 90:19, 128:21, 155:2, 163:9, 175:10
**examination**
5:2, 10:5
**examined**
223:5
**example**
24:24, 38:20, 38:21, 51:2, 77:15, 86:20, 107:2, 130:7, 130:17, 148:14, 149:18, 170:6, 176:1, 200:9
**examples**
66:23, 67:2, 130:9, 149:6
**except**
81:24, 83:4
**exceptions**
62:23, 63:17, 63:20, 63:21, 63:23
**excessive**
166:4, 167:3
**exchange**
15:10, 81:9, 100:22
**exclusion**
92:1
**exclusive**
68:24
**excuse**
46:25, 76:10, 205:18
**executed**
20:10, 194:13
**executive**
126:20, 177:4

exempt
5:15
exhibits
210:5
exist
139:8, 156:3,
173:13
existed
63:7, 117:18,
118:7, 118:8,
144:14
existing
95:15
expected
86:23
expedite
222:15
expedited
222:12
experience
57:25, 60:2,
60:3, 62:3,
91:16, 92:14,
136:22, 143:21,
172:6
experienced
69:7
expert
136:17, 136:20,
192:23
expertise
171:22, 172:2
expires
224:24
explain
222:2
explanations
190:7
exploited
6:13, 6:16,
179:10, 179:13
explore
141:13
explored
14:1
exploring
141:7
exposure
172:18

exposure"
166:25
express
107:19, 107:20
expression
33:5, 147:20
expressive
140:18, 140:23,
141:2, 149:13
expressiveness
140:17
extent
66:8, 82:13,
93:19, 137:24,
153:16, 154:22,
159:20
external
36:16
extraneous
29:24
extremely
35:5, 35:8,
35:10
eyeballs
90:13, 90:14

**F**

face
51:21, 166:17,
175:8, 213:16
facebook
6:5, 35:17,
60:14, 66:13,
91:9, 91:10,
91:13, 91:15,
91:17, 91:18,
122:15, 122:18,
122:19, 122:24,
123:3, 123:4,
123:7, 123:12,
123:15, 123:25,
124:5, 124:7,
124:11, 124:15,
124:18, 124:24,
125:3, 125:17,
125:24, 130:12,
131:20, 141:25,
171:5, 182:6,

182:20, 203:16,
204:5, 205:13,
216:11, 216:13
facebook's
122:6, 181:18
facial
141:6, 141:8
facilities
149:2
fact
93:15
factual
165:24
factually
165:16, 173:17
fails
30:22
fair
11:6, 11:7,
11:13, 11:14,
19:21, 23:14,
34:18, 39:13,
65:5, 134:20,
145:18, 170:9,
177:14, 182:15,
184:18, 184:22,
192:20, 197:4,
197:8, 219:3
fairly
49:23, 115:25,
177:15, 178:6
fall
107:11, 128:10
familiar
28:14, 28:15,
31:6, 34:9,
84:23, 85:12,
89:14, 89:23,
90:3, 134:8,
139:6, 139:8,
139:9, 179:9,
181:6, 220:16
familiarity
13:4, 13:9,
94:1, 94:6,
134:9
family
199:11, 201:4

fantasy
79:5, 79:7,
79:10
far
35:12, 37:2,
97:22, 107:5,
118:24, 129:14,
156:19, 163:13,
190:7
fast
215:14
fault
213:10
feature
135:6, 153:23,
190:2
features
132:5, 139:9,
139:15, 153:8,
153:18, 153:19,
160:17, 187:3,
187:5, 187:22,
187:24, 188:11,
188:12, 188:19,
188:20, 189:13,
189:15, 189:22,
189:23
february
16:2, 224:25
federal
67:13, 70:3,
79:15, 116:1
fee
94:20
feel
78:1, 200:18,
211:17
fewer
7:6, 198:20
fiction
149:12
fifth
2:7, 9:12
fighting
192:25
figure
39:11, 127:16,
136:3, 175:22

Transcript of Bartlett Cleland
Conducted on December 10, 2024

240

file
48:1, 56:11,
57:4, 66:20
filed
20:12, 39:12,
42:21, 56:16,
67:23, 67:24,
68:11, 69:1,
69:3, 70:3,
86:3, 186:7,
186:8, 186:13,
188:21
filing
41:25, 57:9,
57:16, 57:22
financial
224:13
find
17:14, 24:3,
25:1, 72:17,
163:10, 185:3,
215:8
fine
30:21, 45:17,
88:18, 125:15,
134:20, 184:17,
219:15
finger
133:9
finish
11:4, 219:8
finished
125:12, 126:4,
161:20, 161:21,
177:23
first
10:7, 24:13,
24:14, 43:6,
61:12, 63:21,
64:10, 74:11,
78:4, 83:17,
89:9, 89:10,
95:21, 97:21,
97:23, 97:24,
102:5, 102:9,
102:23, 117:4,
118:13, 118:17,
131:8, 134:22,

137:13, 147:8,
147:10, 147:15,
147:21, 148:3,
148:4, 148:12,
148:24, 149:14,
150:15, 152:23,
153:6, 157:14,
159:18, 174:14,
177:19, 178:16,
192:23, 217:11,
219:4, 220:13
five
40:11, 132:5,
153:7, 181:13
five-second
19:2
flip
72:13, 78:4,
119:20, 122:13,
147:2, 156:12,
198:3, 219:25
floor
2:7, 9:13
florida
1:2, 1:12, 3:8,
3:21, 6:20, 9:6,
10:12, 10:14,
64:18, 66:21,
67:17, 78:2,
97:2, 97:10,
104:6, 104:9,
104:12, 104:16,
114:18, 114:22,
114:25, 115:4,
124:19, 124:22,
125:1, 125:4,
125:7, 125:18,
136:19, 148:23,
149:2, 151:6,
162:18, 167:11,
167:20, 168:1,
176:9, 185:24,
186:9, 187:4,
187:23, 188:10,
188:21
florida's
30:7, 189:24
focuses
215:9

folks
51:13, 218:22
follow
207:21
following
66:11, 67:4,
67:5, 79:16,
137:13, 138:4,
159:22, 203:6
follows
10:4, 154:16,
169:8, 187:16
footnote
189:9
footnotes
24:9, 165:11,
165:21
for-profit
15:5, 17:1,
22:6, 22:18,
22:22, 23:1,
23:8, 23:10,
25:8, 25:19,
25:23, 26:7,
26:25, 27:19,
28:2, 28:17,
28:23, 29:6,
29:13, 30:5,
30:10, 31:8,
31:18, 32:13,
33:7, 34:15,
39:17
for-profits
17:23, 18:16
foregoing
223:5, 224:5,
224:6
forget
176:15
forgot
126:23
format
126:11, 189:5
formed
193:1
forum
40:22, 129:2,
155:18

forums
127:14
forward
34:14, 83:23
founded
118:11
founding
63:7
four
15:20, 54:7,
140:9, 158:1,
158:15, 165:14,
181:13
four-part
136:14, 141:16
fourth
54:24, 132:4,
219:25
france
81:25
france's
29:15
frankly
117:25
free
33:5, 152:22,
153:2, 168:18,
188:5, 212:22,
213:12, 220:1
french
29:16
frequently
164:9
friend
128:10
front
12:22, 15:19,
18:6, 18:7,
45:24, 49:23,
65:5, 85:2,
89:5, 96:18,
96:21, 112:14,
136:12, 163:6,
170:10, 170:15,
185:2, 200:23,
201:18, 203:12,
213:25
full
46:22, 66:8,

68:6, 137:24,
154:22, 159:20
**function**
135:16
**funds**
22:8, 22:15,
22:19, 22:23,
23:2, 25:9
**further**
85:23, 174:20,
175:16, 190:5,
221:12
**future**
32:16, 149:15

---

**G**

**gamble**
143:4
**gambling**
79:5, 79:11,
79:14
**game**
140:18, 140:19
**games**
140:15
**gaming**
39:2, 50:10,
79:9, 79:10,
79:13, 138:25,
139:3, 140:4,
140:10
**gaps**
166:6
**garbage**
149:2
**gave**
86:20
**geesh**
77:24
**geez**
72:2
**general**
1:12, 3:13,
3:18, 6:19,
9:17, 9:18,
10:11, 10:13,
12:12, 12:16,
12:20, 13:6,

13:23, 15:16,
15:17, 16:3,
16:10, 28:25,
31:25, 32:23,
32:24, 35:15,
37:2, 37:5,
45:1, 52:5,
56:15, 63:24,
69:2, 94:2,
94:7, 139:17,
162:7, 164:3,
164:9, 164:12,
167:14, 167:23,
168:4, 171:23,
172:7, 173:22,
175:11, 176:2,
186:8, 201:25
**general's**
6:7
**generally**
12:25, 13:1,
18:5, 31:10,
31:11, 49:4,
156:20
**generative**
7:13, 206:7
**gerard**
37:25
**gerards**
43:11
**germany**
111:18
**getting**
13:2, 200:16,
206:23, 211:18
**gifts**
82:24
**girls**
172:15, 192:10
**give**
10:17, 14:25,
34:12, 43:21,
87:11, 88:7,
95:1, 108:4,
118:5, 130:6,
130:8, 135:21,
148:8, 148:14,
164:16, 194:4,

213:20
**given**
109:25, 120:18,
121:9, 223:7,
224:7
**gives**
172:22
**giving**
18:2, 18:15,
38:20, 149:6
**global**
199:7, 201:1,
217:10
**globe**
113:11
**go**
11:9, 24:24,
41:9, 53:3,
53:4, 61:13,
62:22, 72:17,
110:19, 134:5,
142:13, 142:18,
149:14, 154:13,
181:24, 219:10,
222:10
**goes**
17:20, 30:15,
43:10, 120:9,
126:20, 126:21,
158:21, 159:17,
163:16, 165:13
**going**
10:17, 13:16,
15:7, 15:12,
19:6, 19:20,
19:21, 20:4,
24:3, 24:24,
25:13, 27:15,
29:16, 33:15,
33:20, 34:14,
41:19, 45:18,
53:1, 53:10,
69:13, 70:15,
70:18, 72:5,
72:6, 73:7,
75:20, 75:22,
80:17, 81:10,
82:6, 83:23,

84:16, 84:18,
88:23, 96:11,
97:15, 98:14,
104:21, 108:20,
115:15, 117:25,
121:10, 122:2,
126:2, 128:8,
128:13, 131:11,
131:12, 136:4,
154:7, 154:20,
155:9, 157:5,
157:9, 158:18,
160:8, 161:15,
164:19, 176:17,
179:4, 179:16,
179:17, 181:10,
185:7, 186:3,
186:24, 187:7,
187:18, 188:2,
188:3, 188:9,
189:20, 191:8,
192:19, 193:14,
198:13, 201:19,
205:25, 206:15,
208:14, 210:22,
213:23, 214:8,
215:17, 215:21,
216:20, 217:23,
218:2, 218:8,
221:19, 222:1,
222:6, 222:11
**gone**
105:23, 131:13
**good**
18:4, 108:10,
128:11, 179:19
**goodrich**
2:5
**google**
5:25, 6:2,
7:15, 31:23,
35:16, 50:7,
55:24, 57:16,
66:12, 92:7,
105:3, 105:10,
105:23, 106:13,
106:14, 106:24,
107:8, 107:20,

108:8, 108:12,
108:14, 108:16,
109:2, 109:3,
109:9, 110:11,
111:5, 111:8,
112:18, 112:23,
115:25, 119:2,
135:23, 137:14,
137:18, 137:19,
138:11, 195:2,
208:19, 208:23,
208:24, 209:1,
209:5, 209:10,
209:14, 210:6,
210:16, 210:20

**google's**
55:21, 113:3,
140:14, 181:20,
183:6

**gotten**
27:14

**governed**
66:9, 137:25,
154:23

**government**
121:11, 148:2,
152:13, 152:23,
153:3, 209:23,
210:2

**grab**
45:25

**grasp**
157:10

**great**
35:3, 82:24,
88:1, 99:4,
149:18, 215:20,
220:2

**greater**
93:18, 101:25

**greece**
111:20

**grimacing**
157:9

**ground**
10:18

**group**
49:23

**growing**
143:17

**guard**
3:12, 5:3,
9:16, 10:11,
19:4, 19:17,
19:19, 26:15,
34:25, 45:16,
45:23, 53:14,
54:4, 56:22,
64:11, 65:18,
65:24, 66:3,
78:23, 88:13,
88:18, 88:22,
89:3, 128:8,
141:6, 154:6,
154:12, 155:10,
157:5, 164:18,
164:24, 168:21,
169:5, 187:12,
188:3, 188:9,
189:4, 212:17,
213:12, 213:15,
218:7, 219:7,
221:12, 221:17,
221:24, 222:1,
222:11

**guardian**
74:19, 74:24,
100:2, 100:5,
121:19, 146:24

**guardian's**
108:8, 108:13,
108:17

**guardians**
74:19, 74:24

**guess**
14:8, 34:5,
79:12, 120:25,
135:14, 144:10,
144:11, 156:25,
160:17, 162:5,
183:21, 189:20,
192:13, 219:5

**guest**
81:22

**guy**
37:16, 38:3

**guys**
82:24

---
**H**
---

**half**
14:25, 15:7,
112:25, 113:1,
183:1

**halfway**
101:2, 209:19

**hamilton**
1:25, 2:15,
9:23, 224:3

**hand**
224:15

**handed**
87:9

**handlir**
4:13, 9:10

**happen**
48:16, 81:24,
95:3

**happening**
35:22

**happily**
77:5

**happy**
15:14, 88:7,
96:19, 128:5,
192:17, 209:17,
213:23

**harbored**
178:14

**hard**
14:13, 33:14,
65:2, 67:1

**hard-pressed**
86:1

**hard-to-understa-nd**
158:22

**harm**
95:14, 165:10,
166:8, 166:11,
166:12, 166:18,
166:22, 166:24,
167:3, 167:7,
168:18, 169:19,

170:21, 170:25,
171:4, 174:21,
175:18, 175:21,
175:22, 176:8,
176:13

**harms**
95:10, 165:5,
165:14, 165:19,
167:13, 167:17,
167:22, 168:3,
173:21

**hashing**
18:2

**hawley**
170:20

**hb**
6:6, 30:7,
49:19, 64:18,
64:23, 65:1,
65:12, 66:16,
67:7, 68:2,
68:18, 69:20,
70:9, 70:13,
70:15, 70:18,
70:20, 87:12,
126:10, 126:11,
162:12, 162:15,
172:22, 175:10,
176:9, 176:11,
178:3, 180:6,
186:16, 187:6,
187:25, 188:13,
188:19, 189:14,
202:8, 208:13,
209:8

**hb3**
188:15

**he'll**
20:16

**head**
87:3, 156:25,
157:6

**heading**
167:2, 167:8,
177:10, 186:11

**headings**
166:16, 167:5,
167:10

**health**
6:8, 7:14, 162:6, 164:4, 164:9, 168:8, 168:13, 171:7, 206:7
**hear**
86:19
**heard**
62:14, 160:2, 160:6, 160:10
**hearing**
171:2, 171:3
**heart**
130:14
**heartbeat**
14:10
**held**
2:2, 19:8, 44:17, 44:21, 164:21, 206:4
**help**
7:3, 16:21, 24:25, 38:21, 141:10, 151:25, 194:7, 194:8
**helpful**
14:14, 71:12, 74:10, 97:17
**here's**
137:21
**hereby**
223:4, 224:5
**herein**
10:3
**hereunto**
224:14
**hertz**
81:4
**high**
135:10
**higher**
95:1, 111:1, 111:6, 173:12, 201:16
**highest**
42:15, 42:20
**highpoint**
3:6

**hill**
86:1, 88:1
**hilton**
148:20
**hired**
13:14
**hold**
118:2
**holder**
119:6, 150:20, 150:24, 151:1, 151:2
**holding**
30:23, 206:25
**hole**
160:8
**holing**
160:3, 160:10
**homes**
78:6
**honest**
14:1, 16:17, 23:3, 34:12, 35:19, 43:21
**honestly**
16:21, 32:24, 37:24, 50:21, 51:1, 62:10, 73:18, 98:25, 158:21, 166:14, 213:8
**hope**
161:22
**hopefully**
10:19
**horrible**
127:16
**horrific**
192:16
**hotel**
148:20
**hour**
98:10
**hours**
98:11, 128:18, 129:1, 129:10, 155:17, 156:23
**house**
52:13, 52:19,

52:25
**household**
75:1
**houses**
52:21
**however**
68:22, 121:4
**huge**
137:2
**humans**
11:1
**hundred**
15:22, 35:11, 150:17
**hundreds**
140:10, 191:4
**hyperlink**
108:5, 108:7, 109:1
**hyperlinks**
107:23, 108:2
**hyphen**
46:23

---
**I**
---

**i's**
120:11, 120:14
**ice**
192:10, 192:11, 192:15
**id**
143:19, 143:24, 144:4, 144:14, 209:23, 210:2, 211:22, 214:13, 214:17, 215:5, 215:6, 215:8, 215:10
**idea**
37:24, 45:10, 51:9, 103:5, 104:20, 115:10, 123:19, 125:23, 126:1, 134:19, 139:2, 142:21, 143:14, 149:15, 153:21, 164:7, 170:4, 170:8,

170:14, 171:10, 175:3, 177:18, 191:20, 193:7, 195:8, 201:17, 202:21, 208:2, 213:2, 215:19, 216:2, 217:7, 219:2
**idea's**
143:14
**ideas**
17:20
**identification**
20:5, 20:8, 33:25, 41:22, 53:11, 53:13, 72:6, 72:9, 75:21, 75:23, 76:1, 77:19, 77:22, 78:20, 78:22, 80:17, 80:20, 82:7, 82:9, 98:15, 98:17, 100:8, 100:11, 104:22, 104:25, 108:23, 119:14, 119:16, 122:3, 122:5, 126:3, 126:7, 161:16, 161:19, 176:18, 176:20, 179:5, 179:8, 185:8, 185:11, 186:4, 186:6, 191:9, 191:12, 193:17, 198:16, 201:20, 201:22, 206:1, 206:3, 208:15, 208:18, 210:23, 210:25, 212:3, 212:5, 214:9, 214:11, 215:22, 215:24, 216:21, 216:23, 217:24, 218:9, 218:12
**identified**
167:6, 167:13,

167:23, 168:3
**identifies**
166:8, 166:11,
166:14
**identify**
9:14, 42:22
**identity**
220:4
**ii**
121:3
**image**
141:23, 202:25,
203:15, 204:4,
205:11
**imagine**
17:25, 65:2,
92:6
**immediately**
135:21
**impair**
12:1
**impingement**
149:14
**implication**
146:10
**implications**
157:14
**implying**
86:19
**important**
154:24, 201:9
**impose**
142:9
**imposes**
30:20, 84:5,
96:6
**inc**
177:5
**incidence**
117:4
**include**
24:4, 47:2,
66:11, 66:23,
67:4, 103:10,
111:13, 137:12,
138:3, 159:21,
174:4
**included**
25:6, 213:4

**includes**
55:5, 90:10,
112:6, 134:2,
146:9, 181:8
**including**
50:6, 172:15,
174:22, 175:25,
217:17, 218:22
**inclusive**
189:8
**income**
5:15
**incomplete**
214:5
**incorrectly**
72:16, 90:5
**increase**
159:24
**increasing**
175:1, 175:12
**indeed**
177:4
**indicate**
54:16, 107:23,
133:12, 133:14,
169:18, 171:6,
178:17, 209:14,
213:25
**indicated**
141:13, 155:14,
207:22
**indicates**
83:3, 101:4,
122:14, 176:1,
177:3, 178:13,
178:16, 180:9,
180:16, 180:22,
185:15, 192:22,
192:24, 193:5,
199:5, 201:1,
201:5, 203:14,
212:7, 217:16,
219:16
**individual**
90:6, 139:22,
149:12, 203:7
**individuals**
42:23, 122:25,

145:20, 149:24
**industry**
1:6, 4:11, 9:4,
13:13, 17:14,
17:20, 136:23
**infancy**
62:15, 62:17,
142:6
**infinite**
132:11, 187:2,
187:21
**inflammatory**
177:15, 178:7,
178:10
**information**
10:18, 25:5,
25:8, 25:11,
25:23, 26:5,
26:23, 26:25,
27:17, 27:25,
28:17, 28:23,
29:6, 29:13,
41:11, 58:2,
104:19, 131:17,
184:8
**informed**
194:7
**infrequent**
43:17
**infrequently**
43:16
**infringed**
96:16, 147:11,
147:16, 147:23,
148:1, 148:9,
148:13, 149:5
**infringes**
148:4, 148:13,
148:18, 148:20,
149:1
**initial**
109:7
**initiatives**
13:18, 13:22,
17:5
**injunction**
56:13, 56:17,
57:2, 57:10,

57:18, 57:23,
67:25, 69:3,
69:25, 70:3
**innovation**
16:15, 16:20
**inopportune**
135:10
**input**
21:20
**ins**
87:1
**inserting**
25:18
**insignificant**
85:9
**instagram**
6:21, 7:17,
7:19, 7:20,
7:22, 60:17,
60:23, 66:14,
130:18, 141:24,
171:4, 178:13,
183:13, 183:14,
186:10, 193:20,
194:1, 194:6,
203:16, 204:5,
205:12, 211:2,
211:6, 211:13,
212:7, 212:8,
212:9, 212:21,
214:1
**instagram's**
181:22
**instance**
24:13, 150:15
**instances**
181:1, 209:4
**instant**
85:24
**instead**
28:8, 28:9,
34:14, 211:18
**instructs**
11:21
**intellectual**
18:24
**intended**
75:2, 122:22,

122:23
**intends**
28:19, 28:24,
29:8, 29:15
**interact**
36:15, 43:17
**interaction**
17:1, 17:3
**interactive**
132:22, 133:12,
134:16
**interest**
167:12, 167:21,
168:2, 168:9,
224:13
**interests**
50:19
**interference**
153:3
**interfering**
152:23
**internal**
13:5, 13:6,
21:13, 42:22
**international**
35:6, 35:9,
35:12, 112:9,
142:6
**internationally**
31:7, 35:18
**internet**
24:2, 24:11,
31:14, 39:2,
58:15, 73:21,
85:3, 85:9,
86:12, 86:15,
86:18, 129:23,
134:10, 134:11,
136:10, 140:3,
221:3
**internet-based**
141:19, 202:24,
204:14, 205:3
**interpretation**
129:5
**interrupt**
10:25
**interrupted**
151:9

**interruption**
29:24
**interview**
202:7
**intimacies**
85:17
**intimate**
94:1, 94:6
**intimately**
89:14, 89:23,
90:3
**introduced**
53:12, 212:8
**introducing**
7:21
**involved**
17:15, 47:20,
48:4, 48:10,
48:18, 75:4,
75:8, 75:13,
83:16, 85:23
**involvement**
17:1, 74:18,
74:23
**involves**
26:13, 57:11,
81:12
**ipsos**
7:10, 201:23
**ireland**
111:22
**irritated**
43:9
**issue**
17:15, 19:2,
21:4, 85:20
**issues**
13:3, 85:21
**items**
88:6
**itself**
38:8, 38:11,
38:14, 38:19,
38:22, 39:1,
39:16, 69:20,
70:13, 73:15,
166:23

---
**J**
---

**janet**
1:25, 2:14,

9:23, 224:3
**january**
16:1, 18:9
**jason**
199:6
**jernigan**
37:13, 37:15,
37:17, 44:2
**job**
1:23, 12:23,
13:22, 44:17,
108:10
**john**
3:12, 9:16,
10:10, 19:1,
19:18, 33:17,
34:22, 45:13,
54:2, 65:16,
69:12, 88:11,
116:25, 141:4,
146:3, 154:3,
164:15, 212:16,
213:9, 222:10
**jonathan**
37:20, 37:21,
37:22, 44:2
**joyce**
4:9
**june**
6:9, 176:23,
212:7, 212:8,
214:14
**jurisdiction**
80:5
**jurisprudence**
87:7, 88:5

---
**K**
---

**keep**
72:14, 108:24,
157:9, 158:12,
158:18, 158:24,
158:25
**key**
42:15, 42:20
**kid**
199:17, 200:5
**kids**
172:23, 200:9

**kill**
140:25
**killing**
168:25, 169:9
**kind**
13:5, 17:13,
18:21, 20:20,
27:3, 59:18,
69:10, 91:6,
92:17, 94:25,
105:24, 109:7,
126:16, 131:13,
131:24, 144:18,
149:13, 165:24,
180:8, 186:24,
187:18, 192:9,
194:11, 196:15,
206:20, 207:9
**kinds**
92:6, 149:15,
202:19
**kingdom**
81:25
**kingdom's**
29:9
**knew**
15:25, 24:20
**knowledge**
36:3, 38:7,
39:3, 39:6,
39:12, 39:19,
40:14, 40:16,
41:18, 45:9,
48:17, 52:23,
58:1, 61:8,
61:11, 66:18,
78:7, 82:14,
91:23, 93:9,
96:14, 101:21,
102:1, 115:8,
118:12, 118:16,
118:20, 124:1,
125:21, 125:25,
131:3, 135:3,
136:1, 143:1,
158:14, 158:25,
159:9, 159:15,
159:17, 170:1,

170:17, 172:3,
203:5, 221:11
**known**
80:22, 166:6,
217:1
**knows**
108:16
**krista**
44:5

**L**

**label**
185:2, 185:3
**lamia**
3:15
**landscape**
51:10
**language**
18:3, 24:8,
122:17, 161:3,
175:16, 200:19,
211:17
**laptop**
164:16
**large**
35:5, 35:8,
35:10, 86:11
**largely**
64:25, 90:12,
119:19
**larger**
191:17
**last**
10:7, 40:11,
43:12, 54:21,
144:13, 148:21,
162:18, 170:10,
172:12, 174:17,
175:20, 182:9,
214:7
**later**
80:6
**launch**
193:8
**launching**
194:1, 194:6
**law**
28:20, 29:15,

30:13, 30:15,
30:20, 30:25,
31:3, 63:2,
67:17, 79:15,
79:24, 84:12,
85:17, 85:25,
87:3, 126:20,
147:6, 147:24,
148:10, 149:11,
149:19, 151:12,
155:7, 156:8,
156:10, 156:13,
156:14, 156:17,
156:19, 157:12,
174:4, 174:9,
220:17
**laws**
31:12, 31:14,
86:14, 86:18,
142:9
**lawsuit**
48:1, 64:17,
66:20, 92:16,
96:15, 96:18,
96:24, 97:10,
147:9, 150:14
**lawsuits**
191:4
**lawyer**
41:2, 62:11,
87:9
**lawyers**
21:13, 21:16,
21:19, 26:21,
36:25, 40:25,
62:10, 69:7,
69:16, 70:4
**layman**
52:3
**lead**
115:21
**leader**
217:10
**leading**
17:10
**least**
20:21, 25:15,
34:8, 67:4,

80:3, 92:25,
93:3, 93:8,
111:5, 116:21,
118:23, 119:23,
137:13, 138:4,
143:2, 143:3,
143:7, 143:21,
143:24, 144:17,
150:3, 161:21,
167:7, 171:6,
173:14, 178:12,
178:19, 188:12,
192:25, 193:25,
209:4
**left**
10:21, 88:1,
95:9, 137:11,
149:23, 183:18,
201:9, 201:11
**legal**
31:7, 61:14,
62:14, 78:17,
100:2, 108:7,
108:13, 108:17,
121:11, 186:9
**legally**
76:15, 77:2,
77:9, 77:14
**legislate**
16:21
**legislation**
17:7, 17:10,
17:21
**legislative**
15:10, 126:16,
162:18
**legislator**
17:24
**legislators**
16:22, 18:6
**legislature**
18:8
**less**
25:10, 25:25,
26:8, 27:20,
30:16, 64:6,
75:17, 82:14,
84:5, 84:19,

96:7, 96:8,
96:16, 104:2,
104:16, 107:6,
115:5, 118:14,
118:18, 119:2,
119:7, 124:16,
125:19, 128:24,
129:10, 146:16,
151:4, 152:16,
166:15, 201:5,
205:9, 210:7,
220:5, 220:11
**lesser**
93:18
**let's**
21:1, 42:4,
42:8, 43:3,
51:21, 88:22,
109:11, 130:9,
133:23, 144:1,
145:25, 146:4,
146:12
**letter**
6:9, 176:21,
178:7, 178:10,
178:13, 178:20,
178:25, 179:1,
179:2
**letting**
219:8
**level**
55:6, 55:18,
194:17, 196:13,
197:11, 197:23,
198:10
**liabilities**
61:23, 62:6
**liberal**
145:10
**license**
80:10, 210:3
**lied**
101:14
**life**
19:22, 85:5,
144:1, 144:15,
172:14
**liked**
134:15

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                247

| | | | |
|---|---|---|---|
| **likes** | 182:22, 182:25, | **located** | 192:23, 196:11, |
| 133:3, 133:4, | 184:2, 187:5, | 12:7 | 199:4, 200:24, |
| 133:16, 133:17, | 187:25, 188:19, | **long** | 201:14, 203:13, |
| 134:2 | 189:22, 189:23, | 12:9, 14:24, | 204:9, 204:12, |
| **lilly** | 197:25, 198:1, | 15:17, 15:23, | 207:20, 209:19, |
| 44:4 | 198:10, 204:24, | 16:18, 25:14, | 210:4 |
| **limit** | 205:22, 208:12 | 25:15, 57:25, | **looked** |
| 130:24, 149:11, | **listen** | 72:2, 77:25, | 24:14, 60:9, |
| 174:20, 175:16 | 155:10 | 143:14, 159:15, | 61:9, 74:5, |
| **line** | **listing** | 179:16, 182:20, | 82:25, 118:24, |
| 54:11, 91:14, | 182:11 | 217:14, 220:16 | 129:8, 152:3, |
| 105:19, 178:16, | **listings** | **longer** | 156:17 |
| 180:9, 202:12, | 75:1 | 15:21, 44:13, | **looking** |
| 202:13, 205:2, | **lists** | 128:19, 129:1, | 17:14, 23:8, |
| 209:21 | 132:5, 153:7, | 155:18, 161:1 | 35:4, 39:20, |
| **link** | 181:12, 185:19 | **look** | 42:19, 49:9, |
| 82:3, 162:1, | **literally** | 18:4, 24:24, | 78:11, 83:1, |
| 211:25 | 13:14, 191:4 | 24:25, 25:5, | 88:11, 95:4, |
| **linked** | **litigation** | 42:8, 42:11, | 107:12, 109:17, |
| 201:3, 210:8 | 36:19, 36:21, | 46:3, 46:7, | 109:21, 110:6, |
| **lip** | 36:25, 37:4, | 46:11, 53:24, | 133:10, 144:23, |
| 157:8 | 47:21, 48:5, | 54:6, 54:14, | 153:6, 153:7, |
| **list** | 48:10, 48:14, | 61:13, 74:4, | 156:9, 202:14, |
| 33:10, 42:19, | 56:4, 56:9, | 74:7, 76:13, | 202:16, 217:19, |
| 67:5, 110:4, | 68:14, 190:23 | 78:11, 79:21, | 218:14 |
| 110:7, 110:15, | **little** | 80:7, 81:20, | **looks** |
| 111:25, 112:17, | 32:22, 43:15, | 83:2, 86:10, | 39:23, 181:13 |
| 130:6, 137:14, | 65:2, 120:6, | 87:4, 87:5, | **loose** |
| 148:8, 189:15, | 120:11, 121:4, | 88:7, 90:24, | 156:8 |
| 197:2 | 142:5, 158:19, | 93:15, 95:20, | **lot** |
| **listed** | 193:21, 206:16, | 96:19, 99:10, | 31:12, 31:13, |
| 34:22, 35:2, | 215:14 | 101:1, 102:5, | 31:14, 43:17, |
| 41:8, 41:13, | **live** | 102:19, 107:18, | 63:17, 65:1, |
| 42:23, 42:24, | 12:3, 135:17, | 110:15, 116:20, | 76:20, 85:16, |
| 44:7, 44:11, | 190:2 | 117:21, 118:25, | 85:17, 93:16, |
| 44:12, 46:21, | **live-streaming** | 120:2, 127:10, | 108:1, 108:2, |
| 47:9, 58:8, | 135:15, 135:19, | 131:5, 137:4, | 156:13, 166:1, |
| 58:22, 109:8, | 135:24, 135:25, | 146:1, 157:18, | 178:12, 197:22, |
| 109:12, 110:4, | 190:3 | 157:19, 163:5, | 206:24, 212:15 |
| 110:17, 111:3, | **lobbied** | 163:13, 174:11, | **lots** |
| 111:8, 111:11, | 17:19 | 174:14, 176:7, | 165:11, 212:12 |
| 112:5, 137:18, | **lobby** | 179:22, 180:1, | **loud** |
| 137:19, 160:17, | 17:18, 48:1, | 180:3, 180:8, | 89:9, 149:22 |
| 161:10, 176:6, | 48:6, 48:11, | 181:10, 186:12, | **luckily** |
| 181:17, 181:18, | 48:19 | 186:22, 187:16, | 210:20 |
| 181:20, 181:22, | **lobbying** | 188:15, 189:17, | **lunch** |
| 181:25, 182:4, | 14:23, 17:13, | 191:15, 192:17, | 88:16, 88:25 |
| 182:7, 182:9, | 48:16 | 192:18, 192:21, | **M** |
| | | | **madam** |
| | | | 56:22 |

Transcript of Bartlett Cleland
Conducted on December 10, 2024

248

| | | | |
|---|---|---|---|
| **made** 56:9, 82:21, 149:22, 158:22, 174:8, 180:2, 183:3 **mailing** 80:9 **main** 95:24, 117:6, 117:11, 150:10, 176:6, 176:7 **major** 111:13, 111:16, 190:24 **majority** 62:20, 63:1, 63:25, 120:17, 121:9, 180:17, 182:17, 210:1 **make** 10:19, 11:5, 19:2, 24:21, 26:11, 33:20, 56:4, 66:8, 67:10, 82:16, 88:10, 92:3, 93:8, 94:8, 94:13, 103:7, 116:17, 117:21, 122:17, 125:9, 137:24, 145:21, 153:10, 154:22, 159:19, 181:24, 184:11, 184:15, 198:4, 206:25, 214:20, 215:12 **makers** 174:4, 174:9 **makes** 11:19, 15:11, 82:24, 91:21, 92:23, 93:3, 207:5 **making** 47:20, 52:24, 52:25, 67:16, 92:5, 155:20, 156:24, 220:10 | **manage** 108:12, 109:1, 109:9, 109:13, 209:20 **management** 149:1, 149:8 **manager** 36:17 **many** 34:7, 35:24, 36:1, 39:21, 46:14, 50:22, 58:8, 75:16, 90:9, 93:20, 103:15, 103:17, 103:20, 103:23, 104:2, 104:5, 104:8, 104:11, 104:15, 110:11, 114:1, 114:3, 114:6, 114:10, 114:14, 114:17, 114:20, 114:24, 115:3, 115:8, 124:1, 124:4, 124:7, 124:11, 124:15, 124:18, 124:21, 124:24, 125:3, 125:17, 131:16, 143:3, 155:6, 156:18, 156:21, 165:16, 165:21, 165:24, 195:6, 195:9, 195:12, 195:16, 195:19, 195:22, 196:1, 196:4, 196:7, 196:16, 196:19, 196:22, 197:15, 197:24, 198:9, 212:19, 213:1 **map** 50:7 **march** 11:8, 16:2, 198:25 **marchese** 44:3 | **marianne** 44:4 **mark** 6:10, 33:15, 33:18, 33:20, 72:6, 119:9, 169:25, 171:1, 176:22, 177:3, 215:17 **marked** 20:5, 20:7, 33:24, 41:20, 41:21, 53:10, 72:8, 75:20, 75:23, 75:25, 77:19, 77:21, 78:19, 78:21, 80:17, 80:19, 82:6, 82:8, 98:15, 98:16, 98:20, 100:8, 100:10, 104:22, 104:24, 105:8, 108:20, 108:22, 112:23, 119:13, 119:15, 119:19, 122:2, 122:4, 126:2, 126:6, 161:16, 161:18, 163:10, 176:18, 176:19, 179:4, 179:7, 185:7, 185:10, 186:3, 186:5, 191:9, 191:11, 193:15, 193:16, 198:14, 198:15, 201:20, 201:21, 205:25, 206:2, 208:14, 208:17, 210:22, 210:24, 212:2, 212:4, 214:8, 214:10, 215:21, 215:23, 216:21, 216:22, 217:24, 218:9, 218:11 **market** 33:6, 92:11, | 152:22, 153:2, 178:14 **marketability** 161:13 **marketplace** 51:20 **markets** 90:11 **marking** 163:11 **markings** 20:13 **marks** 222:5 **maryland** 2:16 **match** 190:7 **material** 61:14, 178:15, 180:18, 181:2 **math** 201:16 **matter** 9:3, 31:25, 67:18, 67:22, 68:12, 116:1, 131:25 **matters** 19:24, 93:24 **maybe** 17:22, 39:25, 79:12, 117:8, 130:8, 150:8, 150:18, 156:20, 163:12, 200:16, 213:6 **mean** 13:8, 13:12, 16:24, 17:3, 20:13, 22:1, 23:4, 23:25, 24:13, 27:9, 33:12, 34:17, 35:8, 35:9, 40:16, 50:1, 51:21, 59:6, 67:2, 70:25, |

71:19, 73:17, 87:22, 89:20, 94:10, 94:11, 97:7, 111:15, 127:6, 134:8, 140:8, 140:13, 140:21, 140:23, 143:16, 143:22, 144:11, 150:2, 155:2, 156:11, 156:19, 157:17, 175:4, 175:23, 181:12, 203:18, 203:20, 208:1

**meaning**
24:8, 27:10, 40:10, 134:16, 139:8, 153:12, 155:7

**means**
13:24, 32:25, 33:13, 90:13, 133:4, 146:16, 157:21, 160:13, 175:9, 176:14, 205:9, 207:6

**meant**
47:11, 67:12, 155:2

**measured**
158:24

**measuring**
158:23

**media**
6:8, 7:7, 9:1, 28:20, 29:2, 29:19, 30:13, 30:15, 30:20, 30:22, 91:6, 127:4, 141:24, 146:8, 146:17, 146:22, 147:3, 158:1, 158:5, 158:6, 160:11, 160:15, 160:18, 162:6, 163:2, 163:22, 164:5, 165:1, 165:6,

166:9, 172:13, 172:18, 172:23, 173:13, 173:21, 174:21, 175:13, 175:19, 180:15, 181:8, 181:17, 182:16, 184:20, 190:24, 191:5, 198:21, 202:25, 203:15, 204:4, 205:12, 208:8

**medical**
171:14, 172:3, 172:5

**medication**
11:25

**meet**
7:16, 113:6, 127:14, 136:14, 141:16, 141:20, 141:25, 208:20, 209:22

**meets**
130:25

**member**
17:25, 20:1, 21:24, 22:1, 25:19, 26:17, 33:11, 48:18, 48:21, 49:3, 49:5, 61:23, 74:2, 76:11, 78:8, 79:18, 81:18, 90:2, 97:21, 99:8, 100:24, 106:18, 107:14, 118:25, 119:6, 139:18, 200:25

**member's**
61:22, 71:20

**members**
13:4, 13:10, 13:11, 17:24, 22:5, 22:9, 22:12, 25:17, 34:3, 34:6, 34:7, 34:9,

34:10, 34:16, 34:23, 35:2, 39:21, 40:8, 41:3, 41:13, 47:1, 47:8, 47:9, 47:11, 47:13, 47:20, 47:25, 48:24, 49:15, 49:19, 50:18, 50:22, 50:24, 51:3, 53:6, 58:3, 59:4, 64:5, 66:10, 66:12, 66:22, 70:9, 71:15, 71:24, 89:15, 89:24, 90:2, 90:6, 90:7, 90:10, 90:18, 91:5, 93:7, 94:13, 94:15, 94:18, 95:23, 105:23, 106:5, 106:8, 106:11, 107:1, 107:9, 107:10, 116:21, 117:5, 117:10, 129:13, 129:21, 135:1, 135:18, 136:5, 137:10, 137:13, 138:2, 142:14, 144:18, 155:1, 155:13, 155:23, 156:5, 156:9, 156:18, 158:11, 158:25, 159:5, 159:16, 159:24, 168:7, 168:13, 168:17, 168:25, 169:9, 169:15, 169:19, 169:22, 177:12, 220:22, 221:2, 221:8

**membership**
22:10, 22:16, 41:7, 49:21, 86:22

**memorization**
88:5

**memorize**
86:14, 86:25

**memorized**
86:17

**mental**
6:8, 7:14, 162:6, 206:7

**mention**
150:19

**mentioned**
26:6, 27:18, 28:1, 30:12, 70:8, 93:7, 215:18

**mentioning**
92:18

**mentions**
101:18

**message**
145:10, 145:11

**messing**
148:24

**met**
155:25, 158:2

**meta**
6:20, 32:9, 54:15, 55:12, 55:16, 56:11, 56:25, 57:1, 57:4, 66:13, 91:9, 91:10, 91:11, 123:15, 123:20, 125:24, 169:23, 169:25, 171:7, 177:5, 177:11, 186:10, 187:4, 187:24, 188:10, 188:21, 190:9, 192:2

**meta's**
5:16, 6:22, 6:23, 7:2, 53:17, 54:4, 54:16, 55:1, 177:15, 178:7, 191:13, 191:14,

192:24, 193:18
method
211:5
methodology
202:12, 202:14
methods
93:22, 214:2,
215:5
metric
134:16
metrics
132:22, 133:12
mexico
190:11
microblog
38:12, 38:15,
38:23
microblogging
141:15, 202:23,
203:9, 204:13,
204:21
microphone
53:14
microphones
78:24
microsoft
7:12, 194:21,
195:3, 195:17,
195:20, 195:22,
206:6, 206:11,
207:10
microsoft's
24:25
might
18:1, 74:10,
94:21, 107:16,
107:24, 139:15,
150:12, 150:16,
166:2
miller
3:4, 9:20
million
116:2, 180:10,
180:23, 180:24,
182:18, 183:16,
183:17, 184:23,
199:7, 199:8,
199:17, 200:1,

201:1, 219:17,
219:20
million-dollar
30:21
mind
81:4, 96:12,
111:15, 187:8
minimize
174:20, 175:18,
175:21, 176:8
minimizing
176:13
minimum
101:22, 109:8,
109:12, 110:25,
112:19, 113:10,
116:6, 116:11,
116:22, 142:9,
173:13, 175:5,
209:22, 210:1,
210:6, 210:11
minimums
174:25, 175:1,
175:4, 175:12,
176:10
minimums"
174:23
minor
120:13, 120:16,
120:20, 120:21,
120:23, 121:14,
121:18, 146:6,
146:20, 147:4,
167:12, 167:21,
171:8, 220:11
minor"
121:6
minor's
146:24
minors
95:24, 117:6,
117:10, 165:6,
168:2, 168:8,
168:14, 168:18,
169:16, 169:19,
171:3, 191:24,
221:4
minute
131:11, 144:24,

177:16, 178:2,
182:15, 214:20,
218:14
miss
45:6
missed
110:22
missing
6:12, 6:15,
150:18, 155:21,
158:4, 179:10,
179:13, 184:12,
212:12, 212:14,
212:15, 212:19,
212:25, 213:2,
213:7, 213:11
mission
16:19, 33:5
missouri
20:2
misspeak
20:19
misstate
20:19, 88:10,
88:20
mistaken
117:8
misunderstanding
150:9
mitchell
4:3
mm-hmm
13:20, 24:18,
27:2, 46:13,
54:23, 65:10,
93:2, 95:22,
101:3, 134:1,
137:6, 152:5,
153:9, 153:15,
173:7, 185:14,
199:22
mobile
192:12
mobiles
192:11, 192:16
model
17:7, 17:10,
17:21, 90:22,

149:4
models
89:14, 89:24,
90:7, 90:9,
149:16, 152:9,
218:23
moderates
26:7, 27:20
moderation
59:5, 59:6
modifica
202:3
modification
202:5
modifies
145:20
modify
176:5
moment
53:23, 74:9,
154:14, 171:1,
171:5, 188:22
money
23:11, 27:1,
27:20, 28:2,
30:5, 30:10,
32:13, 56:5,
81:23, 91:22,
92:4, 92:5,
92:23, 93:4,
93:8, 94:8,
94:13, 94:14
monies
41:10, 41:14,
81:9, 81:11
monitor
7:7, 9:9,
198:22
monitored
201:6
monroe
3:19
month
122:12, 193:21
monthly
199:8
months
12:11, 12:16,

14:4, 40:7, 40:10
**moody**
1:10, 9:5, 9:17, 10:13
**more**
21:15, 31:19, 32:22, 34:9, 35:11, 35:13, 65:25, 68:10, 72:3, 82:14, 83:23, 84:12, 106:3, 107:5, 112:17, 115:16, 118:24, 128:17, 129:10, 145:13, 155:16, 155:18, 156:20, 156:23, 157:13, 158:19, 166:1, 166:15, 178:22, 184:8, 184:19, 197:14, 200:5, 212:14, 219:17
**mortar**
142:24
**most**
19:22, 55:8, 64:4, 90:10, 90:21, 90:23, 116:5, 116:11, 156:18, 173:14, 180:14, 184:22, 194:11, 208:8
**motion**
56:12, 56:17, 57:2, 57:5, 57:10, 57:17, 57:23, 67:24, 69:3, 69:19, 69:25, 70:2
**mouth**
149:10
**move**
66:3, 96:12, 112:16, 136:4, 136:9, 141:14, 143:7, 170:9,

198:13, 220:20
**movies**
145:12
**moving**
136:6
**much**
13:24, 44:21, 84:12, 93:22, 98:5, 106:23, 157:15, 186:23, 187:6, 187:17, 187:25, 205:9
**multi-district**
190:23
**multiple**
91:11, 134:12
**multiplication**
40:5
**murphy**
4:4
**music**
73:19, 73:23
**musk**
183:22
**must**
78:16, 80:3, 83:3, 108:7, 108:13, 119:23
**mw-maf**
1:10

---
**N**
---

**name**
10:10, 36:14, 42:25, 43:11, 43:13, 79:17, 148:16
**named**
140:9, 173:4, 195:5
**names**
10:7, 43:6, 43:22, 59:17, 181:14, 181:17
**narrow**
129:23, 215:11
**national**
6:12, 6:15,

179:9, 179:13
**natural**
78:13, 78:18
**nbc**
7:5, 198:17
**ncmec**
179:14, 179:18, 179:20, 180:10, 185:12, 194:7
**nd**
105:7
**near**
39:23
**necessarily**
54:1, 93:20
**need**
11:9, 21:15, 49:11, 49:13, 65:16, 88:19, 97:16, 103:10, 127:19, 128:9, 150:13, 164:15, 188:22, 212:16, 219:10
**needing**
19:14
**neither**
67:23, 224:11
**net**
70:20
**netchoice"**
46:9
**netchoice's**
5:12, 12:12, 12:15, 13:10, 13:11, 25:16, 33:22, 40:24, 47:20, 47:25, 49:21, 50:18, 50:22, 56:12, 57:17, 57:23, 64:23, 66:22, 89:24, 129:20, 139:24, 155:13, 177:11, 220:22
**netflix**
93:13, 205:19
**network**
38:9, 196:13,

196:17, 196:20
**neurologist**
171:17
**never**
60:25, 87:4, 96:12, 188:24, 208:1, 209:17, 213:21
**new**
7:3, 7:21, 28:19, 30:12, 30:20, 143:12, 144:4, 190:11, 194:1, 194:6, 212:9, 212:21
**news**
7:5, 32:1, 198:17, 198:18, 198:20
**newsroom**
193:19
**next**
15:25, 26:19, 80:8, 83:13, 83:15, 120:2, 122:12, 123:11, 134:21, 157:22, 159:20, 196:11, 209:21
**nicely**
53:15
**nicole**
44:4, 44:15
**night**
148:21
**nine**
164:16
**noise**
29:24
**none**
88:4, 159:10
**nonplayer**
140:25
**nonprofits**
17:23
**nonpublic**
58:2
**normal**
133:24, 166:5

normally
112:6, 112:7
northern
1:2, 9:6,
190:25
northwest
9:12
not-for-profit
22:2, 32:19
not-for-profits
15:4, 18:16
notary
2:15, 224:4
note
109:14, 181:5
noted
199:6
notes
21:3
notice
2:14
notifications
132:16, 132:17,
132:19
novel
143:12, 144:4
nowhere
69:19
number
9:2, 9:7, 35:5,
40:8, 40:22,
66:15, 68:5,
79:22, 80:10,
80:11, 88:3,
102:20, 105:10,
112:2, 128:16,
133:13, 134:14,
157:10, 157:11,
157:13, 159:2,
175:23, 182:21,
182:25, 217:16
numbers
125:22, 125:25,
184:9, 197:5
numeral
46:8
numerous
142:8, 216:16

nw
2:6

O

oakton
12:4
oath
20:18, 47:16,
65:12, 68:1,
86:9
objecting
169:2
objection
11:18, 11:20,
19:13, 19:15,
68:4, 73:8,
169:11, 189:1,
210:18
objections
11:19, 19:14
obligation
31:7, 144:20
obligations
28:3, 31:7,
31:11
observation
37:18
observing
90:14
obtain
84:20
obtained
108:18, 113:23
obvious
93:12, 171:12
obviously
67:6, 159:1,
166:5, 210:10
october
12:11, 186:13,
187:4, 187:23,
188:11, 193:21
off-time
192:18
offender
102:22
offender"
123:12

offenders
103:3, 103:7,
103:11, 123:16,
123:21
offense
78:25
offer
152:14
offering
122:24
offerings
107:8
offers
105:11, 216:4
office
2:2, 3:18,
6:19, 141:13,
177:9, 186:8
officer
177:4
officers
42:14, 42:19
official
1:11
often
107:14, 156:21,
164:8, 164:11,
164:12
oh
70:1, 72:2,
72:12, 73:20,
105:1, 119:12,
163:13, 163:15,
180:2, 180:4,
185:1, 189:21,
194:25, 202:15,
206:19, 215:14,
218:1, 218:13,
219:7, 221:13
old
41:9, 63:12,
79:24, 83:3,
103:24, 104:9,
104:12, 104:16,
114:7, 114:11,
114:21, 115:4,
118:14, 118:18,
119:2, 119:7,

119:24, 122:20,
123:3, 124:8,
124:13, 125:18,
128:24, 146:16,
172:15, 172:16,
209:20
old)"
77:16
older
74:12, 78:14,
78:18, 81:24,
83:4, 97:25,
98:1, 101:5,
101:10
once
149:13
ondato
8:5, 217:1,
218:15, 220:3
ondato's
8:3, 217:4
one
9:2, 13:14,
26:24, 32:3,
32:11, 40:24,
42:8, 42:10,
45:3, 61:11,
72:17, 83:18,
85:20, 87:2,
91:18, 92:23,
93:3, 93:12,
94:13, 97:24,
113:4, 115:9,
118:24, 120:5,
130:5, 134:21,
137:13, 141:4,
141:12, 146:9,
157:11, 158:4,
158:17, 165:13,
166:24, 168:25,
169:9, 169:22,
175:22, 177:11,
181:12, 185:2,
194:4, 198:3,
200:5, 202:3,
202:5, 207:1,
212:18, 216:24
ones
59:11, 59:13,

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                    253

60:9, 62:2,
85:25, 93:11,
129:15, 130:2
**online**
28:4, 28:9,
29:9, 33:6,
47:2, 142:18,
142:23, 143:4,
155:18
**only**
40:6, 74:18,
74:23, 78:12,
78:15, 78:16,
95:7, 118:25,
151:15, 151:17,
157:12, 162:22,
173:9, 175:21,
199:9, 199:16,
199:20, 200:13,
200:17, 201:2,
205:20, 219:3
**onlyfans**
8:6, 217:17,
217:21, 218:17,
218:18, 218:21,
219:17, 220:3
**ooh**
90:23, 110:22,
212:15
**oops**
74:22
**op**
18:19
**open**
80:4
**open-air**
178:14
**operate**
35:21, 38:9,
38:11, 38:14,
38:16, 38:22,
39:1, 110:24,
113:2, 139:12
**operated**
106:21
**operates**
66:12, 66:13,
105:16, 137:20

**operating**
55:6, 55:17
**opine**
214:6
**opinion**
87:11, 88:7,
88:8
**opinions**
18:2
**opportunity**
125:14
**opposite**
55:25
**or"**
131:5
**order**
59:19, 76:14,
76:25, 77:10,
79:22, 81:22,
95:2, 95:14,
110:24, 113:2,
119:23, 120:20,
121:5, 121:18,
152:14, 157:25,
160:15
**orders**
222:8
**ordinary**
65:22, 66:2
**organization**
5:14, 22:8,
22:10, 22:18,
22:22, 23:2,
40:14, 121:11
**organizations**
22:15, 41:15
**organizing**
147:18
**original**
25:5
**other**
10:23, 10:25,
11:1, 15:21,
23:8, 25:10,
25:25, 26:5,
27:17, 27:25,
32:3, 32:11,
36:4, 41:13,

41:15, 48:14,
49:11, 49:12,
49:15, 50:14,
50:23, 51:5,
51:17, 70:7,
70:9, 76:8,
80:9, 93:6,
93:7, 93:22,
94:13, 94:14,
94:15, 97:14,
100:19, 105:13,
105:22, 106:5,
106:8, 106:11,
106:13, 106:14,
107:9, 107:16,
119:5, 121:11,
127:19, 129:17,
129:18, 130:4,
130:12, 133:13,
142:9, 156:10,
162:25, 164:13,
165:23, 190:9,
201:15, 205:16,
215:19, 216:16
**others**
53:1, 73:12,
92:2, 94:19,
135:25
**otherwise**
78:24, 179:16,
224:13
**out**
26:15, 39:11,
42:23, 44:11,
44:12, 46:14,
46:21, 47:9,
61:12, 68:23,
89:9, 94:12,
106:25, 127:17,
132:5, 136:3,
136:9, 137:11,
138:20, 140:11,
149:22, 149:23,
153:7, 164:4,
164:9, 175:22,
176:12, 180:24,
183:18, 197:2,
199:6, 199:17,

201:1, 201:9,
201:11, 201:15,
212:13, 213:11
**outcome**
224:13
**outs**
87:1
**outside**
34:10, 71:9,
213:20
**over**
11:1, 18:3,
40:8, 40:10,
40:11, 45:8,
72:14, 81:11,
99:21, 105:23,
107:17, 112:19,
112:21, 117:18,
117:19, 118:2,
131:13, 143:8,
183:10, 183:16,
193:21, 211:18,
211:19, 212:14,
212:15, 213:5
**overview**
214:14
**own**
14:18, 18:8,
36:4, 62:17,
64:14, 74:13,
81:6, 100:19,
108:12, 109:1,
109:9, 109:13,
152:9
**owned**
83:6, 91:10
**owner**
215:10
**owning**
50:6
**owns**
66:12, 66:13,
92:7, 100:16,
137:20

--- P ---

**page**
5:2, 5:13,

24:4, 25:1,
33:22, 43:23,
46:3, 46:5,
46:7, 46:8,
54:10, 54:24,
65:8, 66:15,
71:10, 74:7,
76:14, 76:19,
76:22, 78:4,
78:12, 79:21,
81:20, 83:2,
83:3, 89:7,
95:1, 99:10,
101:1, 101:2,
107:18, 107:22,
109:24, 119:20,
119:22, 122:14,
146:1, 146:5,
153:6, 153:12,
163:13, 163:23,
164:1, 164:2,
165:9, 165:12,
165:13, 172:9,
172:11, 173:18,
173:19, 174:1,
182:1, 182:9,
183:13, 189:4,
190:3, 191:15,
192:21, 194:25,
196:11, 197:9,
197:21, 199:4,
199:5, 200:24,
201:15, 202:11,
202:14, 204:9,
206:17, 206:18,
206:23, 208:20,
209:19, 217:11,
217:20, 217:21,
219:25
**pages**
1:24, 5:16,
23:18, 23:23,
24:3, 24:6,
25:12, 26:5,
27:18, 28:1,
42:11, 54:7,
54:8, 65:6,
77:25, 165:14,

165:16, 165:24,
181:13, 186:23,
186:25, 187:16,
187:18, 188:5,
194:20
**painting**
85:19
**pallaki**
4:3
**panel**
49:14
**panels**
49:10
**paper**
165:25, 203:12,
204:8, 207:19
**paragraph**
46:12, 46:19,
54:22, 65:8,
65:11, 66:15,
68:9, 68:25,
70:8, 78:11,
80:8, 81:22,
89:7, 94:5,
95:20, 99:23,
101:17, 117:2,
117:4, 137:5,
137:17, 137:22,
154:14, 154:15,
156:16, 165:9,
165:18, 176:3,
178:23, 189:11,
190:4, 194:22,
195:1, 196:12,
197:3, 197:10,
197:21, 197:22,
198:1, 198:11,
219:4, 219:5,
219:12
**paralegal**
222:12
**parameters**
14:2
**paraphrased**
163:18, 164:25
**paraphrasing**
108:11, 128:19,
128:21, 137:8,

163:22
**pardon**
29:25, 53:21
**parent**
74:19, 74:24,
75:3, 83:6,
100:2, 100:4,
108:7, 108:13,
108:17, 121:19,
146:24, 197:16
**parent's**
83:7
**parental**
7:10, 29:17,
64:8, 84:9,
84:20, 84:24,
86:5, 95:11,
101:18, 101:24,
102:3, 109:18,
110:3, 110:9,
173:9, 194:13,
195:14, 195:24,
196:9, 196:24,
197:6, 197:16,
197:25, 198:9,
199:17, 201:23,
203:6, 203:10,
203:17, 204:6,
204:11, 204:21,
207:20
**parentheses**
77:12
**parents**
7:6, 74:19,
74:24, 75:8,
75:13, 171:3,
194:8, 197:16,
197:24, 198:9,
198:21, 199:9,
199:16, 199:20,
200:5, 200:13,
200:17, 201:3,
201:7
**part**
25:18, 60:4,
64:10, 84:22,
86:4, 91:23,
92:25, 93:3,

93:16, 94:22,
107:15, 126:23,
138:1, 150:10,
156:10, 157:19,
157:22, 158:4,
162:23, 163:1,
166:3, 178:13,
189:14
**participant**
141:1
**particular**
16:23, 17:21,
19:15, 88:6,
157:11, 157:15,
185:16
**particularly**
52:1, 61:11,
139:10, 187:1,
187:20
**parties**
224:12
**partnered**
193:11
**partnering**
213:4
**partnership**
193:1
**partnerships**
78:17, 192:23
**parts**
157:22, 158:1
**party**
49:12
**passage**
116:10
**passed**
31:3, 87:23,
88:2, 115:18,
118:19, 162:13,
162:15, 162:16,
162:17, 178:3,
178:4, 186:17,
186:18, 202:8
**passes**
126:20
**past**
136:4
**patel**
3:14

paul
4:6
pause
14:9, 33:17,
211:9
pay
31:8, 31:17,
31:18, 33:8,
34:15, 90:15,
94:20
paycheck
38:4, 38:6
paying
81:13
pays
25:20, 25:24,
26:7, 27:19,
28:2, 28:18,
29:7, 29:14,
30:5, 30:10,
32:13
penalties
68:1, 115:22,
155:22
penalty
46:5
pend
213:23
pending
11:12, 92:16,
137:16, 213:22
people
18:1, 37:8,
43:5, 43:16,
43:18, 44:7,
44:11, 44:12,
49:7, 63:11,
70:25, 71:5,
81:6, 82:15,
83:4, 85:18,
88:15, 88:17,
130:13, 149:16,
150:4, 151:13,
152:7, 152:17,
153:23, 170:20,
170:24, 195:6,
195:16, 196:1,
196:16

percent
7:6, 15:22,
67:21, 128:16,
128:23, 128:25,
150:17, 155:15,
158:19, 183:11,
184:19, 198:21,
201:5, 201:13,
201:16, 203:7,
203:14, 203:20,
203:21, 204:3,
204:14, 204:15,
204:20, 205:5,
205:13, 205:20,
205:22, 207:24
percentage
207:22
percentages
207:12, 207:13
perfectly
15:14, 39:8
perform
216:16
performing
208:9, 208:11,
209:10, 209:15
perhaps
208:11
period
16:9, 61:10,
172:17, 172:18
perjury
46:5, 68:1,
155:22
permission
83:7, 100:2,
100:4, 108:8,
108:14, 108:17,
109:18, 110:3,
110:10
permissions
121:25
permitted
78:17, 83:5,
83:11
person
24:11, 24:14,
24:23, 25:5,

38:6, 43:8,
101:23, 120:17,
121:8, 143:4,
215:9
personal
132:21, 133:12,
134:16
personally
59:1, 134:11,
168:12
persons
75:16, 78:13,
78:18, 118:14,
118:18, 151:20
phone
80:10, 127:22
phones
50:6, 106:9,
106:12
photos
100:22
phrase
129:18, 154:16,
154:17, 154:25
phrased
146:10
phrases
213:1
physically
40:1
pick
93:12, 158:17
picture
54:12, 54:14
pictures
98:24
piece
137:22, 149:22,
201:10, 207:19
piling
72:14
pinterest
5:23, 98:19,
98:22, 98:23,
98:25, 99:8,
99:11, 99:15,
99:17, 100:3
pl
3:20

place
9:12, 52:18,
98:23, 107:17,
148:3, 149:11,
149:15, 157:11
placed
126:15
places
107:16
plain
67:6, 68:22
plaintiffs
1:8, 3:2, 9:20
planet
9:11, 9:23
plans
32:15
platform
39:2, 50:7,
72:25, 76:7,
82:12, 82:15,
82:19, 94:20,
99:3, 103:12,
127:5, 146:8,
146:18, 146:22,
147:3, 147:4,
158:1, 158:6,
221:8
platform's
147:10, 147:15
platforms
6:20, 50:3,
128:14, 140:3,
147:7, 148:7,
168:14, 175:13,
177:5, 186:10
play
134:22, 134:23,
135:13, 140:14,
213:24
player
51:24, 139:11
playing
135:9
please
9:14, 10:6,
74:21, 125:9,
138:14, 169:5,

179:15, 209:12
plug
164:16
plus
112:22, 112:24,
136:22, 202:1,
203:25
point
18:3, 33:17,
43:15, 45:13,
76:22, 81:14,
88:16, 102:6,
102:9, 102:20,
123:11, 143:24,
145:3, 154:3,
158:22, 161:3,
174:18, 176:7,
180:21, 192:24,
193:5, 194:22,
210:16, 212:25,
213:24
pointed
61:11, 68:23,
94:12
pointing
116:25
points
24:20, 156:19
poland
111:24
policies
59:5, 59:7,
174:19, 175:16
polics
44:4
policy
7:23, 14:22,
15:1, 16:24,
18:20, 19:24,
49:10, 214:13
policy-related
18:15
policymakers
174:2, 174:6
polite
69:11, 219:9,
219:14
poor
110:22

poorly
138:5
popular
47:2, 140:9
population
202:1
pornography
143:9
position
15:15, 54:16,
55:1, 55:22,
109:7
positions
56:2
possibility
151:11
possible
136:10, 137:2,
138:24
possible's
137:2
possibly
136:14, 136:24,
140:5, 141:16,
141:20, 141:25
post
70:22, 71:9,
73:12, 98:24,
218:24
posted
139:20
potential
165:5, 166:12,
166:18, 166:24,
167:3, 170:24
potentially
84:18, 156:10
powder
216:24
practices
191:6
precise
110:23
precisely
21:15
predate
42:1
predictive
172:13

prefer
28:13
preliminary
56:12, 56:17,
57:2, 57:10,
57:17, 57:23,
67:25, 69:3,
69:25, 70:3
preparation
87:19
prepare
21:5, 24:20
prepared
24:17, 46:18,
87:17
preparing
21:23, 22:17,
22:21, 22:25,
25:7, 25:22,
26:4, 27:13,
27:16, 27:24,
28:16, 28:22,
29:5, 29:12,
48:14, 53:16,
86:8
present
4:1
preserves
19:13
president
4:10, 36:5,
36:7, 36:9
pretty
13:24, 107:3,
108:10
prevent
30:22
preventing
167:12, 167:21,
168:2
prevents
173:8
previous
157:22
previously
18:14, 44:18
primarily
106:20

printed
212:13, 213:11
printing
78:2
printout
6:22, 7:2, 7:5,
7:15, 7:17,
7:20, 7:24, 8:3,
8:5, 191:13,
193:18, 208:19
prior
14:15, 15:8,
15:21, 18:9,
40:13, 63:7
priority
95:2
privacy
7:23, 28:4,
28:9, 55:8,
214:13
privileged
26:23
prizepick
79:22
prizepicks
5:20, 50:11,
79:2, 79:5,
79:18, 79:23,
80:8
probably
10:25, 11:20,
20:16, 20:17,
21:15, 85:15,
108:24, 183:11,
184:19
problem
19:19, 20:20,
21:4, 103:2,
123:16, 148:24,
158:13, 192:3
problematic
166:4, 167:4
procedures
13:7
proceeding
190:23
process
13:7, 17:9,

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                    257

126:16, 211:13, 215:8
**product**
91:13, 91:14
**productive**
97:17
**products**
73:3, 73:9, 73:11, 73:13, 76:7, 91:11, 94:15, 94:18, 94:19, 103:8, 105:10, 106:3, 106:25, 107:4, 123:17, 123:22, 142:10, 142:18, 142:23, 143:11, 144:6, 144:19, 151:5, 152:8
**professor**
165:25
**profiles**
74:20, 74:25
**programs**
140:4
**prohibit**
64:6, 95:23, 117:5, 117:10, 147:3, 147:4
**prohibiting**
103:11
**prohibits**
99:11, 146:6, 146:15, 146:20, 147:4
**projects**
16:17
**prominently**
40:21
**property**
18:24
**proposes**
17:7
**protect**
7:4, 168:13, 169:15, 192:10
**protected**
55:8, 159:2

**protecting**
168:7
**protection**
28:4, 28:9, 29:1
**provide**
22:7, 23:5, 27:1, 80:9, 88:6, 89:15, 93:20, 220:4
**provided**
26:25, 67:2, 88:8, 93:21, 103:1, 113:22, 214:5
**provider**
60:7, 62:7, 179:21
**providers**
179:21, 180:24, 180:25, 181:7, 183:5
**provides**
73:16, 176:1, 176:9, 209:5, 217:5
**province**
101:24
**provision**
103:10, 117:1, 154:23
**provisions**
66:9, 130:24, 137:25
**psychologist**
171:19
**public**
2:16, 14:22, 15:1, 16:24, 18:15, 18:19, 18:20, 19:24, 36:11, 37:19, 40:22, 49:9, 105:11, 224:1, 224:4
**published**
7:12, 162:7, 162:11, 178:20,

198:25, 206:6
**pull**
128:9, 184:13
**pulling**
131:9
**purchase**
142:18, 142:22
**purchased**
183:22
**purchases**
82:21
**purportedly**
220:3
**purports**
119:17, 122:6, 176:21, 202:2, 211:5, 214:12, 214:17, 216:25, 217:9, 218:16, 220:4
**purpose**
61:16, 62:3, 161:8, 205:1
**purposes**
20:25, 34:13, 86:15, 91:1, 161:10, 181:7, 214:18, 214:25
**pursuant**
2:14
**pursue**
149:16, 149:17, 174:19, 175:16
**push**
132:15, 132:16, 132:19, 192:19
**put**
18:6, 18:7, 42:4, 45:11, 47:19, 49:22, 71:3, 75:22, 77:18, 80:16, 82:5, 95:2, 100:7, 101:15, 112:14, 113:16, 144:9, 167:8, 179:3, 184:24, 186:1, 190:8,

194:10, 200:22, 201:18, 205:24, 207:25, 210:15, 215:16, 217:14
**putting**
63:20, 71:5, 92:17, 148:2, 149:10
**puzzled**
199:15

---
**Q**
---

**qualification**
26:16
**question**
11:17, 11:22, 15:25, 20:16, 25:4, 26:12, 27:14, 38:13, 38:18, 39:5, 56:24, 57:13, 58:5, 61:6, 64:12, 65:20, 66:1, 73:8, 74:11, 76:23, 86:20, 87:16, 93:15, 94:16, 96:11, 97:18, 97:19, 106:24, 112:14, 116:9, 129:6, 130:10, 130:14, 133:22, 133:23, 137:15, 137:16, 139:19, 153:11, 154:18, 155:10, 155:12, 157:3, 157:6, 168:20, 169:3, 169:5, 169:12, 187:3, 187:7, 187:11, 187:22, 188:1, 188:4, 188:7, 188:9, 188:16, 188:17, 189:2, 197:20, 198:7, 198:8, 202:16, 203:4, 204:1, 204:2,

Transcript of Bartlett Cleland
Conducted on December 10, 2024

258

204:10, 212:17,
212:19, 212:24,
213:8, 213:13,
213:22, 214:22,
214:23, 219:6
**question's**
11:12, 26:16,
186:24, 187:18
**questions**
26:20, 26:25,
48:8, 58:20,
104:19, 107:11,
115:9, 159:4,
170:19, 196:15,
197:1, 204:17,
221:12
**quibble**
81:10, 82:10,
166:13, 207:6,
213:18
**quibbling**
129:25
**quick**
164:18, 206:16
**quote**
217:9
**quoted**
162:24, 163:2,
163:8, 163:19

**R**

**rabbit**
160:3, 160:8,
160:10
**raising**
138:16
**ran**
182:16
**random**
138:20
**randomness**
138:20
**ranges**
50:2, 50:10
**rarely**
70:6
**rate**
201:12

**rather**
184:17
**rattle**
130:6
**rd**
212:7, 212:8
**rdr**
1:25
**re-ask**
38:13, 145:8
**reaction**
133:14
**read**
46:22, 46:24,
54:19, 56:23,
56:24, 64:11,
64:12, 67:11,
68:5, 74:9,
74:11, 75:6,
77:5, 88:2,
88:3, 89:8,
89:17, 90:5,
112:14, 119:4,
121:10, 122:22,
122:23, 128:20,
132:13, 133:7,
133:8, 133:10,
137:7, 149:21,
149:22, 154:20,
169:5, 169:7,
172:19, 175:20,
177:17, 177:22,
179:2, 187:7,
187:11, 187:15,
188:1, 188:5,
188:17, 188:23,
194:4, 199:12,
199:13, 209:17,
211:8, 211:9,
212:11, 212:22,
214:20, 215:3,
216:14, 219:4,
220:2, 222:1,
222:2, 222:3,
222:4, 223:5
**reader**
47:10
**reading**
47:1, 67:6,

68:22, 74:15,
76:18, 128:20,
129:4, 155:19,
156:7, 177:23,
188:5, 189:1,
199:25, 200:22,
201:18, 205:2,
213:16, 219:7
**reads**
55:4, 95:23,
108:9, 166:24,
172:12
**real**
215:9
**real-time**
135:17
**realize**
47:15
**really**
14:4, 29:21,
152:15, 156:18,
201:9, 213:3,
213:7
**realm**
71:9
**reason**
83:22, 111:9,
138:19
**reasonable**
220:18
**reasons**
13:14, 61:7
**recall**
61:4, 62:18,
63:16, 63:18,
63:21, 63:22,
85:25, 87:4,
96:22, 96:23,
98:1, 98:4,
117:13, 151:18
**receive**
22:15, 22:21,
22:25, 23:4,
23:9, 25:7,
25:22, 26:5,
27:7, 27:17,
27:25, 28:17,
28:23, 29:6,

29:12, 41:10,
41:14, 58:2
**received**
180:10
**receives**
22:19, 22:23,
23:2, 23:11,
41:7
**receiving**
27:9
**recent**
88:5
**recently**
116:1
**receptions**
49:8, 49:13
**recess**
45:20, 88:25,
154:9, 218:4,
221:21
**recipes**
98:24, 145:12
**recognizable**
111:16
**recognize**
33:23, 43:4,
43:6, 43:24,
53:25, 54:5
**recollection**
34:6
**recommendations**
173:23, 174:2,
174:9
**recommended**
175:11
**record**
10:7, 11:5,
19:3, 19:7,
19:8, 19:10,
45:19, 45:22,
88:24, 89:2,
154:8, 154:11,
164:20, 164:21,
164:23, 169:7,
184:13, 187:15,
206:4, 218:3,
218:6, 221:20,
221:23, 222:6,

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                          259

222:17, 224:7
**reddit**
141:20, 205:4
**redirect**
221:16, 221:25
**reduced**
224:9
**refer**
33:10, 35:1,
46:18, 163:9,
179:12
**reference**
96:19
**referenced**
83:24, 154:21,
213:5
**references**
23:15
**referencing**
197:17, 219:13
**referred**
23:18, 34:23,
47:6, 127:2,
131:8
**referring**
126:24, 127:7,
132:23, 160:9,
200:20
**refers**
86:4
**reflected**
46:15, 47:7
**reflects**
41:25
**refresh**
34:5
**regard**
125:15
**regarding**
30:6, 31:14,
49:19, 53:6,
86:18, 87:11,
88:9, 94:8
**regardless**
139:12
**regards**
49:2
**register**
78:13, 78:16,

79:23
**registered**
2:15, 219:17,
224:3, 224:23
**registration**
78:16, 81:21
**regularly**
17:4
**regulated**
66:11, 137:11,
137:12, 138:3,
155:1, 155:13,
155:24, 156:5,
158:12
**regulates**
145:4
**regulation**
29:1
**regulatory**
85:9, 86:11,
95:16, 95:19,
96:6
**relate**
85:15
**related**
26:6, 27:18,
48:13, 86:15,
194:1, 224:11
**relating**
25:8, 25:23,
28:18, 28:24,
29:7, 29:14,
32:14, 159:6,
214:13
**relationship**
221:7
**relative**
95:14
**release**
193:20, 212:6,
214:1
**rely**
89:15
**remark**
33:16
**remember**
16:17, 79:16,
87:23, 117:24,

130:23, 163:8,
195:3, 198:4
**remind**
160:12
**reminder**
125:14, 125:16
**remove**
38:21, 127:25
**rent**
52:13, 52:18,
52:19, 52:21,
52:25
**rental**
81:1, 81:4,
81:8, 81:15
**rentals**
78:6
**renting**
81:7, 81:12
**repeat**
169:11, 198:7
**repeatedly**
34:15, 158:23
**rephrase**
112:13, 122:10
**report**
172:7, 179:20,
180:9, 181:12,
185:12, 185:13
**reported**
1:25, 183:14
**reporter**
2:15, 9:22,
10:20, 11:2,
56:22, 74:21,
169:7, 187:11,
187:13, 187:15,
215:13, 222:8,
222:14, 224:4,
224:23
**reporter-notary**
224:1
**reporting**
200:12
**reports**
6:14, 6:17,
180:2, 180:10,
180:23, 182:21,

183:3, 183:11,
183:14, 183:18,
183:22, 183:25,
184:3, 184:20,
185:13, 185:24
**reposted**
133:15
**represent**
9:15, 102:12,
102:21, 121:12
**representative**
139:25
**representing**
9:10, 9:23,
10:12, 69:7,
69:16
**repress**
32:1
**requested**
224:10
**require**
112:17, 112:18,
112:21, 151:5,
151:13, 152:16
**required**
108:6, 108:12,
109:1, 144:5
**requirement**
113:4, 113:7,
113:11, 132:4,
152:11, 152:12,
152:13
**requirements**
6:2, 7:16,
82:3, 84:5,
109:3, 116:6,
208:21, 209:22,
210:1, 210:12
**requires**
29:17, 74:12,
75:7, 80:8,
84:9, 84:23,
85:13, 96:5
**requiring**
152:7
**reside**
79:25
**residence**
80:6

resources
193:12
respect
54:16, 116:21,
117:4, 197:1,
205:17
respectfully
97:15
response
115:8
responsibilities
12:20, 60:6
responsibility
220:23, 221:3
responsible
13:2, 38:3,
38:6
restate
22:24, 56:21,
64:10, 116:9,
137:15, 204:1
restrict
148:7
restricted
144:19
restriction
148:3
restrictions
142:6, 194:18,
196:13, 197:11,
197:23, 198:10
restricts
147:7
results
207:10
return
5:14
retweeted
134:15
retweets
133:17, 134:2
revenue
42:22, 90:12,
91:24
reverse
16:7, 147:1
review
22:22, 23:1,

23:6, 23:7,
23:9, 23:17,
31:1, 87:18,
88:19, 108:3,
205:8, 224:10
reviewed
24:6, 71:14,
71:25, 72:22,
86:23, 86:24,
87:20, 87:21,
126:12, 201:11,
216:9
reviewing
25:16, 145:13
rights
61:22, 62:5,
66:22, 96:16,
118:14, 118:18,
147:8, 147:10,
147:16, 148:4,
148:13, 152:24,
220:13
risk
166:12, 166:18,
166:24, 167:3,
174:21, 175:18,
175:21, 176:8,
176:13
risks
166:8, 166:11,
166:12, 166:22
rob
44:2
robert
37:12, 37:15
roblox
139:1, 140:5
role
16:13, 24:10,
44:21, 45:9,
56:3
roll
218:1
roman
46:8
romans
144:11
room
17:25

rosati
2:5
rough
222:15
roughly
16:3, 16:6,
39:21, 90:18,
110:16, 143:16
rule
11:19, 63:24,
128:6
rules
10:18
run
182:18, 184:9
résumé
19:21

---
S
---

safe
220:23, 221:3
safety
7:14, 29:9,
168:8, 168:14,
193:12, 206:7,
206:22
said
13:9, 24:16,
66:24, 67:12,
68:20, 70:17,
77:24, 78:1,
82:4, 118:4,
127:15, 138:6,
147:2, 149:5,
149:10, 155:21,
157:13, 158:10,
165:21, 167:17,
171:24, 172:7,
180:1, 186:18,
195:4, 204:14,
204:15, 205:13,
205:20, 205:23,
224:7
sake
137:9
same
17:24, 18:14,
22:14, 32:7,

32:10, 36:18,
45:3, 47:16,
51:22, 99:23,
102:7, 102:8,
113:6, 143:17,
153:12, 156:12,
188:11, 188:19,
189:23, 196:15,
197:1, 197:20,
198:8, 205:7,
205:15, 208:2,
223:6
samsung
194:21, 195:3,
196:2, 196:5,
196:7
sara
3:16
satisfaction
172:14
saw
150:13
say
7:9, 11:20,
15:12, 17:19,
19:22, 23:14,
24:3, 25:14,
28:10, 34:10,
34:14, 36:24,
39:9, 43:19,
58:7, 59:23,
61:8, 65:5,
65:25, 66:24,
67:3, 68:6,
69:23, 86:25,
87:2, 87:21,
90:25, 108:1,
110:3, 115:18,
117:19, 117:20,
121:4, 128:8,
136:7, 137:9,
141:2, 144:1,
145:4, 149:18,
150:25, 151:25,
156:13, 176:15,
177:8, 177:14,
182:15, 184:18,
184:19, 184:22,

190:1, 190:5,
197:5, 198:23,
203:3, 213:21
**saying**
24:24, 28:8,
68:7, 68:8,
109:1, 129:22,
138:7, 144:10,
149:7, 149:9,
153:3, 156:16,
161:8, 192:10,
214:1
**says**
34:2, 42:14,
46:8, 55:11,
55:20, 74:17,
77:5, 77:11,
77:12, 77:13,
77:17, 78:15,
80:2, 80:15,
80:24, 83:9,
83:13, 89:13,
90:6, 96:1,
99:14, 99:25,
100:15, 102:9,
102:14, 102:20,
108:4, 108:15,
109:7, 109:14,
111:4, 117:5,
120:1, 121:4,
121:17, 121:23,
122:8, 122:11,
123:2, 123:11,
123:14, 132:15,
133:10, 134:7,
146:19, 147:2,
149:19, 150:20,
155:3, 162:10,
167:3, 172:21,
174:19, 174:24,
178:25, 179:1,
180:13, 180:20,
183:24, 186:13,
191:18, 193:9,
193:10, 198:24,
199:19, 200:1,
202:22, 202:23,
203:3, 203:12,

206:22, 208:24,
209:19, 209:21,
211:18, 213:3,
214:16, 217:15,
217:21, 219:19,
219:24, 220:6
**scam**
191:22
**scams**
7:4, 194:9
**scans**
194:8
**schedule**
42:11, 43:23
**school**
87:3
**scientific**
172:6
**scientist**
132:1
**scope**
215:11
**screenshot**
5:12, 33:22
**scroll**
187:2, 187:22
**scrolling**
132:11, 132:12
**scrutiny**
172:19, 172:23
**search**
24:2, 50:7
**searches**
95:3
**searching**
24:11
**second**
42:9, 46:22,
54:21, 74:7,
76:13, 76:19,
76:21, 108:5,
108:25, 115:15,
135:21, 146:1,
146:4, 167:2,
184:9, 191:15,
194:4, 198:3,
219:5
**second-to-last**
43:23

**secondly**
87:2
**seconds**
14:10, 164:17,
220:5, 220:11
**section**
6:6, 68:23,
74:8, 126:10,
136:11, 136:15,
138:24, 140:15,
141:21, 146:1,
146:5, 146:6,
146:12, 146:15,
146:20, 153:19,
160:17, 163:20
**security**
80:11
**see**
32:1, 32:2,
42:17, 58:19,
68:21, 83:23,
101:19, 101:25,
107:22, 109:11,
110:7, 120:4,
120:14, 130:13,
130:24, 131:9,
134:24, 141:11,
166:1, 169:22,
178:17, 190:6,
202:22, 203:1,
204:24, 205:2,
205:22, 206:21,
209:16, 213:3,
221:15
**seeking**
26:22, 26:24
**seem**
63:18, 99:5,
107:23, 130:23,
190:7
**seems**
156:3, 178:22,
201:10, 209:25
**seen**
41:23, 42:10,
53:19, 57:1,
95:6, 102:24,
126:8, 126:11,

161:23, 173:14,
177:19, 188:24,
198:18, 204:25,
208:1, 209:17
**segmented**
202:19, 203:2
**select**
131:17, 160:20,
160:25
**selection**
107:3
**self-employed**
14:17, 14:21,
14:24, 15:9,
18:11, 18:13
**self-reported**
184:23
**selfie**
7:18, 211:2
**sell**
73:11, 73:13,
76:7, 82:12,
82:16, 94:15,
94:18, 94:19,
106:9, 106:12,
144:18
**selling**
91:20
**sells**
73:3, 73:9,
73:16, 91:21,
92:8, 92:9,
92:10, 105:19
**semicolon**
157:20
**senate**
170:11, 170:12,
171:2
**senator**
6:10, 6:11,
170:19
**senator's**
177:9
**senators**
176:22, 178:20
**sends**
164:9
**senior**
4:10

Transcript of Bartlett Cleland
Conducted on December 10, 2024                                    262

sent
27:7, 27:10,
164:4, 178:3,
178:20
sentence
46:23, 47:1,
54:19, 54:21,
54:25, 55:4,
55:11, 55:20,
82:3, 83:13,
83:15, 89:9,
89:10, 89:13,
89:20, 95:21,
120:2, 159:18,
159:20, 175:20,
194:5
sentences
172:12
separate
48:15, 73:25,
167:2
september
7:13, 42:1,
202:6, 206:6
series
26:19, 173:22,
174:8
serious
67:18
serves
205:1
service
5:19, 5:20,
5:21, 5:23,
5:24, 5:25, 6:4,
6:5, 42:22,
51:23, 59:9,
59:25, 60:5,
61:9, 61:16,
61:20, 62:4,
71:15, 71:20,
71:21, 71:24,
73:24, 77:25,
79:1, 80:22,
98:18, 100:1,
100:12, 102:6,
102:24, 105:4,
118:23, 119:17,

120:4, 120:21,
120:22, 122:7,
122:11, 129:8,
131:14, 151:21,
152:3, 152:15,
179:21, 180:24,
181:7, 183:5,
200:13
services
29:2, 47:2,
59:20, 73:3,
73:15, 73:18,
73:19, 73:22,
74:18, 74:23,
83:4, 89:15,
95:25, 97:22,
101:2, 101:23,
102:12, 102:21,
103:3, 107:4,
117:7, 117:11,
121:6, 122:24,
136:13, 136:24,
142:10, 143:11,
144:6, 144:19,
149:25, 150:2,
150:6, 152:8,
203:1, 203:6,
204:11, 205:18,
216:5, 216:17,
217:5
serving
136:13
session
162:18
set
50:5, 80:11,
107:8, 116:6,
116:11, 116:22,
224:14
sets
109:7, 117:13
settled
116:1
several
82:21, 90:25,
112:3, 120:11,
130:8, 165:13
sex
102:22, 103:3,

103:7, 103:11,
123:12, 123:16,
123:21
sextortion
6:23, 7:4,
191:14, 191:19,
191:22, 191:25,
192:3, 192:13,
192:15, 193:8,
194:2, 194:8
sexual
178:14, 180:18,
181:1
shaking
156:25, 157:6
shall
147:3
share
159:5
shared
27:11, 133:15,
134:15, 141:1,
159:10
shares
133:18, 134:2
sharing
99:2, 141:23,
202:25, 203:15,
204:4, 205:11
sheet
223:9
shoes
95:3
shoot
140:25
shop
10:24
short
19:11, 19:20,
45:14, 154:5,
186:24, 187:18
short-term
78:6
shorthand
224:1
should
14:8, 20:17,
57:12, 57:21,

58:7, 92:1,
162:5, 168:17,
176:14, 212:23
show
20:4, 41:19,
53:10, 72:5,
75:20, 75:23,
76:17, 77:19,
78:19, 80:17,
82:6, 98:14,
100:7, 104:21,
108:20, 119:9,
122:2, 126:2,
143:18, 143:23,
143:24, 152:15,
161:15, 176:17,
179:4, 185:7,
186:3, 191:8,
193:14, 201:19,
205:25, 208:14,
210:22, 212:4,
214:8, 215:17,
215:21, 216:20,
217:23, 218:8
showing
119:15
shows
185:23
shuffle
72:15
shut
70:16, 160:24
sic
202:24
side
34:8, 75:22,
80:16, 95:1
sided
54:8
sideways
185:5
signature
223:13
signature-oso
224:20
signatures
177:2
signed
46:4, 47:17,

155:22, 223:9
**significant**
192:2
**signing**
86:9
**signs**
126:20
**silly**
36:13
**similar**
190:6, 190:14
**similarity**
90:9
**simple**
19:13
**simplest**
55:7
**simplify**
188:18, 197:2
**simply**
43:4
**since**
74:4, 85:23,
87:6, 88:3,
118:19, 154:20,
192:25
**single**
165:17
**single-sided**
90:10, 91:19
**singular**
71:19
**sir**
12:2, 19:16,
28:11, 38:18,
52:6, 52:15,
54:13, 59:8,
66:7, 67:13,
87:8, 87:25,
97:15, 134:8,
138:9, 138:15,
157:18, 209:10,
210:7, 210:11,
210:15, 215:4
**sit**
61:13, 85:24,
129:14, 145:16
**site**
38:12, 38:15,

59:19, 93:21,
129:1, 218:24
**sitterson**
3:5
**sitting**
10:20, 22:11,
24:16, 24:19,
31:2, 31:22,
32:4, 32:8,
47:12, 47:15,
58:21, 59:3,
64:22, 96:20,
96:23, 127:13,
210:15
**six**
181:13
**skipped**
137:22
**sky**
213:19
**slide**
53:15
**slight**
202:3, 202:5
**slightly**
201:11, 205:19
**sloppily**
65:2, 66:25
**slow**
25:21, 74:21
**slowly**
215:12
**small**
206:20
**smaller**
51:23
**smart**
69:13
**smartphones**
105:20
**smoother**
10:19
**snap**
57:21, 93:1,
100:12, 100:16,
100:19, 100:24,
102:2, 102:14,
102:16, 103:6,

103:10, 103:15,
103:17, 103:20,
103:23, 104:2,
104:5, 104:8,
104:11, 104:15,
104:18, 190:12
**snap"**
102:10
**snap's**
5:24, 103:8
**snapchat**
57:21, 60:20,
60:24, 93:1,
100:17, 100:21,
101:8, 101:14,
102:2, 103:2,
130:20, 131:1,
141:25, 183:17,
200:25, 201:6,
201:7, 203:16,
204:5, 205:12
**snapchat's**
181:25, 201:4
**social**
6:8, 7:7,
28:20, 29:18,
30:12, 30:15,
30:20, 30:22,
38:9, 80:11,
91:6, 127:4,
141:23, 146:8,
146:17, 146:22,
147:3, 158:1,
158:5, 158:6,
160:11, 160:15,
160:18, 162:6,
163:2, 163:21,
164:5, 165:1,
165:6, 166:9,
172:12, 172:17,
172:23, 173:13,
173:21, 174:21,
175:13, 175:19,
180:15, 181:8,
181:17, 182:15,
184:20, 190:24,
191:5, 198:21,
202:25, 203:15,

204:4, 205:11,
208:8
**software**
217:13
**solution**
55:7
**some**
10:18, 10:23,
15:20, 31:25,
33:17, 43:16,
45:13, 54:5,
59:18, 66:10,
72:3, 73:10,
85:18, 86:21,
88:16, 90:11,
91:5, 91:23,
93:8, 94:17,
94:18, 94:19,
107:10, 107:11,
127:21, 129:18,
137:10, 138:2,
138:19, 143:7,
143:24, 144:15,
144:20, 148:5,
154:3, 154:25,
156:10, 157:10,
158:11, 170:19,
171:4, 187:5,
187:24, 188:12,
189:23, 190:6,
208:9, 208:11,
209:4, 209:5,
210:16, 212:6,
213:3, 213:6,
213:24, 216:10
**some-odd**
91:5
**somehow**
79:13
**someone**
37:3, 37:5,
38:2, 45:8,
62:19, 63:1,
63:25, 74:12,
84:19, 95:3,
96:7, 96:24,
97:25, 99:21,
100:4, 101:9,

101:14, 102:15,
119:2, 120:22,
121:19, 122:14,
123:8, 128:4,
145:4, 146:15,
169:1, 169:10,
196:23, 210:9,
210:20, 220:17
**something**
11:17, 16:11,
16:16, 54:3,
59:9, 63:18,
86:10, 86:22,
88:20, 94:23,
97:8, 112:14,
130:12, 134:15,
135:11, 155:21,
157:25, 161:25,
184:12
**sometimes**
16:23, 200:5
**somewhere**
133:5
**sonsini**
2:5
**sorry**
25:13, 30:1,
30:3, 46:5,
46:25, 69:23,
70:21, 72:12,
74:22, 76:17,
76:23, 78:23,
94:3, 94:5,
101:19, 105:1,
110:21, 110:22,
112:10, 125:11,
127:21, 127:23,
128:6, 129:18,
131:24, 132:6,
133:22, 135:20,
146:3, 151:10,
151:23, 158:20,
164:1, 178:2,
181:24, 184:10,
184:15, 191:16,
197:12, 198:7,
202:5, 202:15,
214:22, 215:14,

218:1, 218:20
**sort**
208:11
**sorts**
176:12
**sounds**
36:13, 179:18,
199:23
**space**
16:24, 17:2,
18:22, 19:23,
33:9, 33:13,
52:1, 58:14,
93:20
**spaces**
40:22
**spain**
110:22, 111:24
**spam**
127:21
**speak**
11:17, 21:7,
21:12, 21:16,
21:24, 22:18,
29:16, 215:12,
215:14
**speaking**
13:1, 37:18,
147:18, 147:19,
148:8
**spears**
3:16
**special**
3:17, 13:25,
16:16
**specialize**
85:18
**specific**
15:2, 32:22,
34:9, 38:18,
117:1, 142:8
**specifically**
47:9, 49:1
**speculate**
58:19
**speculating**
116:18
**speech**
147:18, 147:19

**spell**
10:7
**spelling**
181:25
**spend**
98:6, 98:10,
178:12, 188:4,
220:11
**spending**
58:12, 128:18,
128:25, 129:10,
155:17
**spends**
159:25
**spent**
19:22, 82:19,
140:13
**spoke**
142:7
**spoken**
49:3, 49:5,
49:7
**sports**
79:6, 79:7,
79:10
**spot**
194:8
**spotlight**
94:24
**sprawling**
85:22
**squiggly**
54:10, 54:11
**st**
176:23
**stack**
107:5
**staff**
4:10
**stages**
172:15
**stakeholders**
173:24
**stand**
19:6, 144:12,
222:4
**standards**
60:11, 60:15,

60:18, 60:21,
60:24, 61:3
**staple**
184:25
**starbucks**
10:23
**start**
130:9, 135:9,
146:4, 162:5,
187:2, 187:21
**started**
12:11, 96:11
**starting**
122:12
**starts**
68:15, 120:5,
163:16, 165:13
**state**
1:12, 2:16,
6:17, 6:20,
9:15, 10:6,
10:12, 10:14,
16:21, 21:15,
30:7, 65:11,
66:16, 66:21,
67:16, 68:18,
79:25, 97:1,
101:23, 104:6,
104:9, 104:12,
104:16, 114:18,
114:21, 114:25,
115:4, 124:19,
124:22, 125:1,
125:4, 125:7,
125:18, 136:18,
142:9, 148:23,
151:6, 154:15,
167:11, 167:20,
168:1, 185:13,
185:16, 185:24,
186:9, 190:16
**stated**
68:2, 176:12
**statement**
19:13, 66:18,
68:21, 77:13,
90:1
**statements**
32:1, 110:1,

| | | | |
|---|---|---|---|
| 170:19 | statutory | 198:18, 198:20 | 202:18 |
| **states** | 117:14 | **strategy** | **subscribers** |
| 1:1, 9:5, 18:7, | **stay** | 13:18, 13:22 | 218:24 |
| 31:20, 35:13, | 52:18, 221:18 | **streaks** | **subsequent** |
| 35:23, 54:25, | **stayed** | 133:1 | 172:13 |
| 63:8, 63:12, | 148:21, 148:22 | **stream** | **subservient** |
| 63:24, 66:5, | **steam** | 136:13, 139:1, | 205:1 |
| 75:18, 98:6, | 140:5 | 141:8 | **substantial** |
| 103:18, 103:21, | **stearns** | **streaming** | 167:21 |
| 103:25, 104:3, | 3:4, 9:19 | 136:23, 203:1, | **sued** |
| 106:21, 110:4, | **stenographically** | 205:17 | 187:4, 187:23, |
| 110:7, 110:8, | 10:22, 224:8 | **streamline** | 188:10, 190:9, |
| 110:12, 114:4, | **stephanie** | 197:15 | 190:11, 190:17, |
| 114:8, 114:12, | 4:9 | **street** | 190:20 |
| 116:6, 116:12, | **steps** | 2:6, 3:19, 9:12 | **suffered** |
| 124:5, 124:9, | 166:1, 169:15 | **strengthening** | 170:21, 171:4 |
| 124:13, 143:3, | **steve** | 174:22, 174:25 | **suffering** |
| 143:7, 144:12, | 36:10, 43:25 | **strengthens** | 167:13, 167:22, |
| 167:14, 168:4, | **still** | 175:11 | 168:3, 170:24 |
| 170:11, 170:12, | 13:2, 44:9, | **strike** | **sufficient** |
| 171:2, 171:23, | 92:16, 102:7, | 30:11, 66:3, | 47:5, 47:6 |
| 172:7, 185:17, | 133:18, 152:14, | 70:19, 70:20, | **suggesting** |
| 185:20, 190:9, | 157:14, 188:16, | 96:12, 96:25, | 34:24 |
| 190:19, 190:24, | 201:5, 201:13 | 97:23, 110:24 | **suing** |
| 195:6, 195:9, | **stipulation** | **study** | 190:23 |
| 195:13, 195:16, | 205:16 | 8:6, 218:16, | **suit** |
| 195:19, 195:23, | **stipulations** | 218:17, 218:18, | 97:1 |
| 196:1, 196:4, | 208:2 | 219:5, 220:1 | **suite** |
| 196:8, 196:16, | **stood** | **stuff** | 3:7 |
| 196:19, 196:23, | 170:20 | 15:21, 76:20, | **summoned** |
| 199:9, 207:18, | **stop** | 213:3 | 170:10, 170:14 |
| 207:22 | 26:14, 138:14, | **sub** | **sun** |
| **stating** | 189:3, 189:7, | 127:10, 127:14, | 54:11 |
| 117:15 | 193:8 | 146:2, 146:5, | **sunday** |
| **stats** | **stops** | 157:19, 163:16, | 159:2 |
| 159:6, 159:11 | 78:24 | 185:3, 189:14, | **super** |
| **status** | **store** | 202:22, 202:23, | 51:25 |
| 22:16, 36:4 | 50:7, 55:6, | 202:24, 202:25 | **superior** |
| **statute** | 55:18, 95:4, | **subheadings** | 205:10 |
| 126:15, 126:21, | 105:17, 106:6, | 166:24 | **supervision** |
| 126:25, 127:3, | 106:7, 140:14, | **subject** | 83:7 |
| 132:8, 136:24, | 142:19, 142:24 | 63:23, 205:23 | **supplementary** |
| 144:23, 145:4, | **stores** | **submissions** | 51:22 |
| 145:19, 157:18, | 106:20 | 182:17 | **support** |
| 158:6, 158:16, | **stories** | **subpart** | 56:12, 56:17, |
| 160:16, 160:18, | 170:24 | 204:12 | 57:2, 57:5, |
| 160:19, 161:1, | **story** | **subparts** | 57:9, 57:17, |
| 161:11 | 7:5, 198:17, | 132:9, 197:22, | 57:22, 194:9, |

208:24
**suppose**
144:8, 161:12
**supposed**
58:17, 178:8
**sure**
13:1, 15:22,
19:4, 22:2,
26:12, 26:18,
32:2, 37:1,
39:14, 44:25,
50:1, 52:20,
53:4, 56:21,
59:16, 63:5,
63:10, 63:19,
72:3, 73:23,
82:17, 84:3,
88:2, 88:10,
92:5, 92:13,
94:16, 100:20,
103:7, 110:19,
116:10, 116:17,
117:22, 125:9,
129:19, 130:5,
130:21, 130:22,
130:25, 140:12,
145:9, 149:7,
149:9, 149:22,
150:24, 153:11,
153:17, 155:20,
158:8, 163:24,
175:23, 177:9,
184:11, 184:15,
187:12, 187:13,
188:16, 194:24,
198:4, 199:19,
204:18, 206:25,
213:14, 214:20,
214:21, 215:12,
216:25
**surgeon**
6:7, 162:7,
164:3, 164:9,
164:12, 167:14,
167:23, 168:4,
171:23, 172:7,
173:22, 175:11,
176:2

**surprise**
70:2
**surprised**
70:6
**survey**
7:11, 201:24,
201:25, 204:10,
207:10
**surveyed**
203:8
**suspect**
43:8, 43:10,
140:12
**suspicion**
220:18
**swear**
118:11
**switching**
37:8
**sworn**
9:24, 10:3
**system**
55:6, 55:17
**systemically**
30:22
**systems**
181:5
**szabo**
44:2, 44:15,
44:17

---
**T**
---

**t-mobile**
197:3
**table**
18:1
**take**
11:9, 11:11,
11:12, 14:25,
19:1, 45:16,
53:23, 59:23,
74:9, 82:18,
86:10, 86:14,
87:4, 87:5,
88:13, 88:22,
127:20, 135:22,
154:4, 154:6,
156:11, 164:18,

177:16, 179:16,
182:14, 186:23,
187:6, 187:17,
187:25, 188:22,
198:6, 210:4,
212:11, 214:21,
216:24, 217:25,
221:14, 222:12
**taken**
45:8, 45:20,
88:25, 92:2,
154:9, 218:4,
221:21, 224:5,
224:8
**takes**
47:22
**taking**
9:11, 10:21,
11:3, 155:5,
169:15
**talented**
69:6
**talk**
10:25, 11:1,
11:10, 51:8,
68:24, 95:10,
131:11, 131:12,
134:9, 145:25,
146:12, 169:14,
212:18
**talked**
32:18, 49:12,
62:10, 62:12,
78:5, 105:9,
106:5, 106:8,
106:10, 107:2,
107:9, 113:5,
116:4, 117:12,
128:15, 129:14,
129:21, 130:1,
131:15, 134:12,
135:2, 135:18,
136:5, 142:5,
160:14, 189:13,
194:17, 196:12,
208:4, 220:7
**talking**
37:11, 64:5,

64:18, 94:1,
94:2, 94:6,
94:7, 97:20,
128:24, 133:25,
145:11, 150:22,
153:13, 161:9,
173:20, 176:2,
176:16, 182:17,
184:6, 198:4
**talks**
99:23, 120:3,
120:16, 132:10,
166:4, 192:22,
209:1
**tallahassee**
1:3, 3:8, 3:21,
9:6
**targeted**
191:25
**targets**
191:21
**taske**
4:6
**tasks**
13:25
**tax**
5:15, 34:8,
85:17, 86:20,
86:22
**tech**
7:8, 198:22
**technical**
55:6
**technically**
54:7
**technologies**
7:14, 16:23,
206:8
**technology**
15:3, 16:16,
16:20, 16:22,
17:4, 18:21,
18:23, 19:23,
33:2, 33:8,
52:1, 58:13,
85:21, 206:11,
211:21
**teenagers**
74:20, 74:25

teens
7:4, 194:8,
194:9, 201:3
telecommunicatio-
ns
15:3, 18:23,
19:23, 58:13,
85:4, 85:21
tell
12:1, 20:16,
22:1, 23:25,
36:14, 36:15,
37:10, 37:11,
49:1, 86:2,
213:17, 217:3
telling
58:18, 111:15
term
34:21, 59:9,
62:14, 102:24,
122:7, 160:3
termed
61:21
terms
5:19, 5:20,
5:21, 5:22,
5:23, 5:24,
5:25, 6:4, 6:5,
38:25, 59:25,
60:5, 61:9,
61:16, 61:17,
61:20, 62:3,
62:4, 71:14,
71:15, 71:20,
71:24, 77:24,
79:1, 80:21,
97:22, 98:18,
100:12, 102:23,
105:4, 118:23,
119:17, 120:3,
120:21, 120:22,
121:5, 121:21,
122:11, 129:7,
131:13, 152:3
terms"
121:15
test
128:22, 136:14,

141:16, 141:20,
141:25
testified
10:3, 117:3
testifying
13:3, 39:7
testimony
90:17, 170:18,
223:6, 223:7,
224:7, 224:8
testing
212:21, 214:1
text
180:9, 180:16
th
9:8, 186:14,
193:21, 198:25,
202:6, 224:15
thank
19:18, 65:21,
69:12, 125:16,
218:13, 221:24,
222:3
thanks
19:5
themselves
9:15, 50:23,
51:20, 94:19,
107:15, 180:25
thereabouts
183:12
thereafter
224:9
they'd
161:12
thing
26:17, 42:10,
53:14, 61:12,
87:3, 92:18,
127:16, 128:12,
133:11, 137:8,
188:6
things
13:3, 13:6,
49:8, 80:9,
82:12, 82:16,
94:25, 95:2,
95:6, 105:13,

106:4, 133:19,
134:10, 138:6,
144:15, 152:6,
205:23
think
13:5, 13:9,
13:24, 22:9,
23:6, 34:19,
36:25, 37:5,
38:1, 43:10,
45:24, 51:9,
67:2, 71:18,
73:21, 78:5,
82:13, 83:17,
83:20, 91:17,
93:16, 97:12,
97:16, 97:17,
97:20, 105:9,
107:11, 111:11,
116:4, 117:25,
119:10, 126:24,
130:13, 133:24,
134:17, 137:11,
147:2, 148:9,
151:8, 153:2,
153:13, 156:16,
157:13, 171:11,
175:15, 179:25,
197:14, 200:19,
201:16, 202:6,
210:2, 211:12,
211:24, 212:23,
213:16, 222:11
thinking
62:1
thinks
111:5
third
102:19, 178:23,
180:9
thorn
193:6, 194:7
thought
96:10, 105:1,
117:3, 125:11,
126:23, 212:18
thousands
191:4

thread
141:19, 202:24,
204:13, 204:15,
205:4
threads
141:16, 204:22
three
98:11, 165:13,
181:12, 188:4,
195:5, 197:4
three-quarters
217:20
through
16:1, 16:6,
16:12, 19:21,
82:2, 83:6,
155:24, 181:24,
182:16, 182:18,
185:20, 198:3,
199:10, 201:24,
209:18, 210:9,
213:10
throughout
23:15, 65:6,
169:14
throw
78:23
throwing
165:25
ticking
91:1
tied
141:4, 141:12
tiktok
141:24, 190:20,
203:16, 204:5,
205:12
time
9:9, 11:15,
19:7, 19:10,
40:8, 40:10,
42:2, 45:19,
45:22, 61:10,
72:2, 81:6,
82:20, 83:17,
86:14, 88:24,
89:2, 98:5,
102:23, 113:19,

Transcript of Bartlett Cleland
Conducted on December 10, 2024

268

118:8, 131:8,
135:10, 135:22,
140:13, 143:25,
145:14, 154:8,
154:11, 159:24,
164:20, 164:23,
178:12, 179:16,
186:23, 187:6,
187:17, 187:25,
198:6, 210:4,
212:11, 213:24,
214:21, 218:3,
218:6, 221:20,
221:23, 221:25
**time's**
137:9
**times**
63:18, 133:13,
134:14
**tipline**
6:14, 6:17,
180:11, 180:17,
185:13
**tips**
180:17
**title**
13:18, 14:3,
14:5, 16:14,
16:18, 36:14,
36:23, 37:4,
37:10, 42:24,
44:23, 109:3,
170:3, 179:22,
180:3, 198:20,
198:23, 213:4,
214:4
**titled**
41:12, 79:4,
105:3, 191:14,
206:6, 208:20,
211:1, 211:4
**titles**
37:9, 37:10,
45:3
**tobacco**
142:18
**today**
9:10, 9:23,

11:19, 12:1,
47:12, 47:15,
106:5, 113:5,
128:15, 129:14,
135:2, 136:5,
155:14, 173:14,
213:19, 221:25
**today's**
9:8
**told**
26:21, 37:9,
91:17, 178:4,
202:10
**tone**
65:22
**took**
19:11, 26:15,
47:16
**tool**
206:22
**tools**
7:7, 159:24,
194:14, 197:24,
198:21, 201:7,
207:21
**top**
72:15, 83:2,
109:2, 146:5,
180:1, 186:13,
202:12, 202:13
**topic**
88:12, 154:4
**topics**
141:5, 141:12,
194:11
**total**
15:23
**town**
40:23
**track**
96:11, 159:1
**trade**
22:2, 32:19,
32:23, 32:24,
33:1, 33:2,
116:2
**traditional**
91:6, 141:23

**trafficking**
178:15
**transcript**
5:8, 222:8,
224:6
**transcription**
223:7
**treated**
117:14, 200:10
**trees**
78:2
**trends**
13:13, 16:22
**trick**
39:10, 91:3,
117:22, 136:9,
163:7
**trivial**
67:22
**true**
50:16, 90:1,
108:1, 145:17,
146:11, 172:4,
181:9, 208:8,
223:6, 224:6
**trust**
177:9
**trustees**
42:14, 42:20
**truth**
12:1, 35:19,
58:18, 211:18
**truthful**
64:25, 97:12,
118:5
**truthfully**
58:20, 86:25,
97:13
**try**
19:20, 25:20,
25:21, 29:16,
122:17, 127:16,
197:2
**trying**
13:5, 20:20,
23:3, 34:11,
39:10, 39:11,
43:21, 54:20,

62:5, 68:7,
69:10, 69:14,
71:12, 91:3,
91:4, 97:13,
97:14, 99:5,
117:22, 118:5,
129:23, 129:24,
133:8, 136:3,
136:8, 136:9,
137:9, 156:2,
163:6, 178:11,
180:22, 197:15,
219:8, 219:14
**tuesday**
1:18
**turn**
65:8, 89:7,
127:22, 160:16,
160:20, 161:8,
161:13, 182:1,
183:13, 185:5,
197:9, 202:11,
206:15
**turnaround**
222:16
**turo**
5:21, 80:22,
80:25, 81:3,
81:5, 81:17
**tv**
205:19
**twice**
68:21
**twitch**
139:1, 140:5
**twitter**
35:17, 38:12,
38:15, 38:16,
38:17, 38:20,
92:21, 121:24,
135:8, 141:15,
182:3, 183:21,
203:9, 204:13,
204:22, 214:24,
215:4
**two**
12:11, 12:16,
14:3, 18:11,

Transcript of Bartlett Cleland
Conducted on December 10, 2024

269

40:7, 40:10, 42:11, 48:8, 54:8, 67:2, 70:7, 98:11, 106:20, 110:1, 116:16, 117:18, 117:19, 117:20, 118:2, 120:14, 128:18, 128:21, 128:25, 129:10, 155:17, 156:23, 157:13, 165:13, 166:8, 166:11, 166:14, 166:16, 166:17, 166:23, 167:7, 172:12, 174:12, 175:23, 178:19, 181:12, 192:10, 200:9, 219:12

**two-month**
57:25

**type**
166:17

**types**
166:17

**typewriting**
224:9

**typical**
191:21

**typically**
157:20, 191:24

**U**

**uefa**
79:15

**ultimately**
17:8, 18:3

**unaware**
31:22, 32:4, 32:8, 35:16, 55:24, 56:16, 56:25, 58:14, 60:23, 61:2, 79:8, 145:15

**unclear**
138:8

**uncommon**
59:15, 60:1,

60:10

**unconstitutional**
67:18

**under**
14:4, 20:18, 28:3, 29:18, 30:23, 46:4, 47:16, 63:12, 63:25, 65:11, 68:1, 74:8, 74:17, 74:22, 75:3, 76:21, 77:15, 79:15, 81:20, 81:21, 83:10, 84:15, 86:9, 86:22, 99:11, 99:15, 99:21, 101:22, 102:6, 102:15, 103:20, 104:8, 108:6, 108:11, 110:2, 110:9, 114:7, 114:15, 114:21, 120:17, 121:8, 122:15, 122:19, 122:25, 123:3, 123:8, 124:8, 124:25, 144:19, 147:21, 147:24, 149:20, 150:12, 152:9, 155:22, 156:22, 173:2, 173:6, 173:8, 195:10, 195:13, 195:20, 195:23, 196:5, 196:8, 196:20, 196:23, 199:8, 200:2, 201:2, 224:9

**underage**
201:6

**underneath**
42:24

**understand**
11:23, 16:22, 24:15, 25:14, 27:4, 44:8,

47:10, 66:10, 67:1, 67:13, 68:11, 68:14, 71:18, 81:7, 126:16, 126:19, 129:4, 129:19, 130:10, 136:6, 137:9, 138:1, 138:2, 145:23, 151:24, 151:25, 154:16, 154:24, 154:25, 155:4, 155:13, 155:23, 156:4, 156:9, 156:13, 156:15, 158:11, 166:19, 167:16, 176:5, 200:4, 200:6, 206:13, 207:15, 210:13, 214:4

**understand"**
154:15

**understanding**
17:22, 25:16, 44:20, 51:19, 52:6, 55:15, 73:10, 75:6, 76:9, 81:2, 81:3, 81:5, 82:11, 92:25, 93:5, 96:3, 97:4, 97:5, 97:6, 97:7, 97:9, 98:21, 98:23, 100:23, 134:6, 147:9, 150:3, 154:19, 157:10, 158:21, 174:6, 176:11, 180:14

**understood**
81:16, 106:23, 185:22

**undertake**
17:6, 32:16

**undertaking**
32:15

**unfair**
180:22

**unfortunately**
127:15

**uniform**
113:12

**union's**
28:25, 29:1

**united**
1:1, 9:5, 29:8, 31:20, 35:13, 35:23, 63:7, 63:12, 63:24, 75:18, 81:25, 98:6, 103:18, 103:21, 103:25, 104:3, 106:21, 110:4, 110:7, 110:8, 110:12, 114:4, 114:7, 114:12, 116:6, 116:12, 124:5, 124:8, 124:13, 144:12, 167:14, 168:4, 170:11, 170:12, 171:2, 171:23, 172:7, 185:16, 190:24, 195:6, 195:9, 195:13, 195:16, 195:19, 195:23, 196:1, 196:4, 196:8, 196:16, 196:19, 196:22, 199:9, 207:18, 207:21

**universe**
136:10

**unless**
11:20, 146:24

**unspecified**
185:21

**unsure**
20:15

**until**
46:23

**update**
7:15, 208:20

**upload**
129:16, 130:3,

Transcript of Bartlett Cleland
Conducted on December 10, 2024

270

130:12, 131:2, 211:22
**urge**
192:14
**usage**
159:6, 159:11, 197:6, 206:22
**use**
5:17, 5:22, 7:7, 15:12, 21:1, 34:16, 45:14, 58:23, 59:10, 59:20, 61:17, 61:20, 62:4, 65:5, 71:15, 71:19, 71:25, 72:19, 72:23, 74:18, 74:23, 77:10, 81:8, 81:23, 82:10, 83:4, 83:5, 83:11, 84:13, 89:15, 90:21, 97:22, 98:1, 98:25, 99:14, 100:1, 101:2, 101:5, 101:23, 102:6, 102:23, 103:8, 108:8, 108:14, 116:23, 119:23, 121:6, 122:15, 122:19, 123:2, 123:11, 149:25, 150:5, 150:6, 151:25, 152:7, 159:16, 159:24, 166:5, 168:14, 172:13, 195:6, 195:16, 196:1, 198:21, 199:16, 204:10, 209:22, 214:17, 221:8
**use"**
167:4
**user**
5:18, 60:6, 61:17, 61:23,

62:6, 76:2, 76:14, 76:25, 77:1, 79:23, 101:4, 102:16, 131:16, 134:22, 135:16, 139:15, 139:21, 159:25
**user's**
80:5, 115:12
**users**
25:10, 25:25, 26:8, 27:20, 30:23, 64:6, 70:22, 70:25, 73:4, 73:9, 73:11, 73:13, 73:16, 76:7, 76:8, 78:13, 80:3, 80:8, 84:4, 89:16, 96:16, 99:17, 100:22, 103:15, 103:17, 103:20, 103:23, 104:2, 104:5, 104:8, 104:11, 104:15, 110:11, 114:1, 114:3, 114:6, 114:10, 114:14, 114:17, 114:20, 114:24, 115:3, 115:8, 117:14, 124:1, 124:4, 124:7, 124:11, 124:15, 124:18, 124:21, 124:24, 125:3, 125:17, 128:17, 128:23, 129:9, 129:15, 129:17, 130:2, 130:4, 131:1, 131:17, 131:18, 133:13, 148:5, 150:5, 155:16, 156:22, 157:11, 159:16, 160:21, 160:25, 171:8, 172:24, 199:7,

199:8, 200:2, 201:2, 201:6, 219:18, 220:24
**uses**
91:15
**using**
34:20, 38:25, 49:22, 65:22, 66:2, 76:21, 81:11, 81:13, 99:12, 102:12, 102:21, 103:3, 123:9, 130:11, 134:12, 156:22, 201:4, 201:7, 214:24
**usual**
191:17
**usually**
36:25, 72:13, 131:7, 135:9
**utilize**
29:18, 84:19, 151:4, 151:20, 175:12, 195:10, 195:14, 195:20, 195:24, 196:5, 196:9, 196:16, 196:20, 196:24, 197:16, 197:24, 198:9
**utilized**
60:25, 196:23
**utilizing**
64:7, 103:11, 117:11, 123:16, 123:21, 140:3, 142:10, 200:13, 211:6, 211:13, 215:5
**utterly**
138:8

—————— **V** ——————

**vague**
66:6, 66:24, 137:24, 154:22, 158:22, 159:19

**valid**
63:13, 215:9
**variety**
61:7, 173:23, 218:22
**various**
13:3, 16:22, 18:6, 40:22, 49:7, 197:13, 214:18
**vast**
180:17, 182:17
**verifiable**
84:9, 84:20, 84:24
**verification**
7:18, 7:23, 7:25, 8:4, 29:17, 32:14, 53:7, 54:17, 55:1, 55:7, 55:17, 55:22, 81:21, 86:5, 88:9, 95:11, 143:11, 144:5, 144:14, 208:5, 208:10, 208:12, 209:6, 209:11, 209:12, 209:15, 210:17, 211:2, 211:13, 213:16, 213:18, 214:2, 214:13, 214:18, 214:24, 215:5, 215:7, 215:8, 216:4, 216:17, 217:5, 217:10, 220:5, 220:8
**verified**
211:16
**verify**
7:21, 55:9, 115:12, 143:25, 144:20, 209:20, 209:23, 210:8, 210:14, 211:6, 212:9, 212:22, 220:12

verizon
196:16, 196:17,
196:20, 196:22,
196:24
version
92:22
versus
144:12
vice
4:10
victim
107:12
video
7:18, 9:9,
9:11, 73:19,
134:21, 134:23,
134:24, 135:9,
135:17, 136:13,
136:23, 140:24,
141:23, 150:6,
202:25, 203:1,
203:15, 204:4,
205:11, 205:17,
211:2, 213:24
videographer
4:13, 9:1,
9:10, 9:22,
19:6, 19:9,
45:18, 45:21,
88:23, 89:1,
154:7, 154:10,
164:19, 164:22,
218:2, 218:5,
221:19, 221:22,
222:4
videos
100:22, 150:4,
150:8, 152:16
videotape
9:2
videotaped
1:16, 2:1
view
50:22, 51:19,
107:13, 107:14,
129:16, 130:3,
143:8, 218:25
viewed
51:25, 59:22,

59:24, 62:2
viewing
62:5
vine
182:3
vintage
143:17, 144:9
violate
220:12
violated
128:6
violates
66:22
violating
118:13, 118:17
violations
115:21
virginia
12:4
visited
53:16, 59:13
visual
99:2
voice
9:14, 65:23,
66:2, 138:16
volume
135:10
voluntary
215:3, 215:4,
215:11
vote
47:25
vrbo
51:3, 51:17
vrbo's
52:14, 52:17,
53:2
vulnerable
172:17

**W**

wait
97:18
waiting
128:9
waive
222:2

walked
128:7
want
11:10, 20:19,
21:3, 26:11,
26:13, 29:21,
49:22, 51:24,
54:19, 67:11,
74:9, 88:10,
88:19, 90:24,
92:2, 92:22,
96:22, 97:12,
110:18, 112:13,
116:16, 117:21,
121:4, 127:24,
128:1, 128:20,
129:22, 131:12,
137:7, 141:10,
141:11, 150:25,
152:15, 153:10,
154:13, 162:12,
163:5, 166:13,
169:19, 177:16,
184:15, 186:24,
187:6, 187:17,
188:1, 188:4,
188:15, 189:3,
220:2, 222:2,
222:15
wanted
17:5, 24:20,
53:5, 88:16,
127:8, 141:13,
143:18, 151:3,
184:11
wants
52:25, 212:18,
213:18
war
78:2
warning
171:24
warrant
102:13, 102:21,
121:12
warrants
172:18
washington
1:17, 2:8,

9:13, 12:8
waste
149:1, 149:8
watch
127:22, 127:25
way
17:24, 22:14,
27:4, 32:3,
32:11, 38:24,
47:14, 50:10,
52:20, 55:8,
72:15, 72:16,
82:17, 90:12,
91:2, 92:3,
94:13, 101:13,
129:18, 145:7,
146:10, 151:1,
156:7, 157:12,
172:1, 179:18,
182:20, 184:7,
184:25, 185:6,
189:9, 213:11,
217:13, 217:21
ways
7:21, 92:3,
92:6, 94:14,
107:10, 159:2,
174:20, 175:17,
175:21, 212:9,
212:21
we'll
11:12, 59:23,
108:4, 110:23,
164:18, 185:1,
185:3, 185:6,
222:3
we're
13:16, 19:21,
22:9, 27:4,
83:22, 111:11,
128:24, 131:10,
132:7, 133:25,
153:11, 157:5,
161:21, 175:15,
181:10, 183:10,
183:16, 184:6,
198:4, 211:17,
222:11

Transcript of Bartlett Cleland
Conducted on December 10, 2024

272

| | | | |
|---|---|---|---|
| **we've** 83:18, 105:23, 106:10, 113:5, 118:24, 118:25, 128:15, 129:13, 131:13, 131:15, 136:5, 142:5, 173:14, 212:25 | 52:21, 53:3, 59:22, 59:24, 61:13, 64:7, 94:7, 113:5, 113:12, 116:5, 116:11, 123:9, 127:14, 127:19, 128:14, 129:7, 134:11, 216:17, 220:23 | 117:9, 127:18, 128:16, 128:22, 131:20, 136:20, 136:21, 136:23, 143:4, 145:10, 147:7, 151:12, 157:15, 158:24, 162:12, 168:24, 169:3, 169:8, 203:9, 204:20 | 221:13, 221:18, 224:14 |
| **weaver** 3:4, 9:19 | **weissler** 3:4 | **whew** 207:2 | **woman** 38:7 |
| **web** 5:13, 23:18, 23:22, 24:3, 24:4, 24:6, 25:1, 25:12, 33:22, 71:9, 73:24, 95:1, 194:20 | **well-being** 171:7 | **whichever** 92:22 | **wondering** 88:15 |
| | **went** 155:24, 178:2, 184:25 | **white** 67:3 | **wonderland** 160:9 |
| **website** 5:16, 6:22, 7:2, 7:24, 8:4, 24:25, 25:16, 26:5, 27:18, 27:25, 33:11, 38:23, 52:9, 52:11, 52:15, 52:17, 53:2, 53:4, 53:17, 54:3, 54:4, 59:8, 60:7, 62:4, 62:6, 64:14, 64:19, 64:23, 70:16, 70:23, 79:6, 84:4, 84:16, 84:17, 84:18, 91:6, 94:21, 95:6, 98:1, 98:7, 99:1, 99:12, 116:23, 155:18, 191:14, 193:19, 207:4, 215:25, 217:1, 217:14, 218:14, 218:21 | **weren't** 24:23, 153:17 | **whole** 17:9, 47:1, 140:15, 147:6, 152:3 | **word** 13:5, 34:16, 36:24, 49:9, 65:5, 79:13, 90:8, 97:8, 107:12, 137:2, 137:11, 138:17, 147:21, 150:19, 158:13, 167:16, 175:25, 211:16, 213:20 |
| | **whatever** 11:10, 18:2, 21:2, 53:4, 61:21, 71:1, 81:7, 95:3, 141:3, 149:20, 157:16, 175:5, 179:24, 210:1, 210:8, 212:24 | **whoosh** 77:23 | **wording** 147:1 |
| | | **wide** 90:7, 90:8 | **words** 37:8, 62:17, 82:10, 99:4, 149:10, 155:6, 156:12, 190:6, 209:16, 212:12, 212:14, 212:15, 212:19, 212:25, 213:7, 213:11, 213:17 |
| | | **wilson** 2:5 | |
| | **whatsapp** 182:6, 183:25 | **wipes** 176:12 | |
| | **whenever** 45:14 | **withdraw** 138:23 | **work** 6:23, 7:19, 12:5, 13:6, 14:22, 15:1, 15:4, 26:21, 36:1, 37:16, 126:18, 191:14, 211:2, 220:2 |
| | **whereof** 224:14 | **within** 52:4, 134:16, 136:18, 140:6, 141:8, 144:9 | |
| | **whether** 22:8, 35:17, 41:6, 41:11, 43:2, 43:4, 48:1, 58:18, 58:22, 59:1, 59:4, 60:14, 60:23, 61:2, 63:6, 63:11, 64:4, 64:23, 71:6, 81:11, 86:17, 96:24, 99:21, 100:3, 101:9, 108:16, | **without** 15:19, 19:14, 64:8, 82:2, 101:24, 134:22, 135:11, 145:13, 150:1, 150:6, 150:7, 151:21, 152:23, 153:3 | **worked** 12:9, 12:17, 126:17, 177:8, 193:6, 217:13 |
| **websites** 23:9, 23:15, 25:11, 26:1, | | **witness** 9:24, 10:3, 39:7, 45:15, 65:17, 65:18, 65:21, 127:25, 128:3, 188:25, | **works** 17:23, 43:13 |
| | | | **world** 31:23, 32:5, 32:9, 107:13 |

Transcript of Bartlett Cleland
Conducted on December 10, 2024

273

**worth**
35:11
**wouldn't**
86:23, 95:15
**wracking**
135:20
**wrapped**
141:11
**write**
137:20, 138:21
**writing**
18:19
**written**
46:14, 65:1,
66:25, 99:16,
138:5, 178:18,
204:8, 205:16
**wrong**
164:2
**wrote**
85:25, 138:9,
138:13
**wyoming**
185:20

**Y**

**yeah**
18:11, 24:13,
30:1, 43:6,
52:20, 72:11,
90:20, 91:14,
91:15, 92:21,
102:1, 106:14,
108:10, 109:14,
112:22, 125:11,
128:1, 132:7,
177:24, 178:22,
180:4, 183:4,
189:18, 207:15,
212:14
**year**
14:25, 15:7,
30:16, 87:23,
88:1, 115:18,
151:19, 170:10,
178:4, 180:6,
193:2
**year-old**
152:17

**year-olds**
98:6, 99:24,
151:4
**years**
15:20, 18:11,
18:12, 25:10,
25:25, 26:8,
27:21, 40:11,
63:12, 64:7,
74:12, 75:17,
77:15, 78:14,
78:18, 79:24,
80:4, 83:3,
96:8, 103:24,
104:3, 104:9,
104:12, 104:16,
110:13, 114:7,
114:11, 114:21,
114:25, 115:4,
115:17, 118:14,
118:18, 118:19,
119:2, 119:7,
119:24, 122:15,
122:19, 122:25,
123:3, 124:8,
124:12, 124:16,
125:4, 125:18,
128:18, 128:24,
136:22, 142:17,
142:22, 143:3,
143:8, 144:13,
146:7, 146:16,
146:21, 149:25,
150:6, 151:14,
151:19, 155:17,
172:15, 172:16,
173:15
**yell**
65:16, 65:18
**yelling**
138:14, 138:15
**yoti**
213:4, 215:18,
216:3, 216:10
**yoti's**
7:24, 211:21,
215:25
**younger**
95:24, 109:15,

109:16, 110:13,
117:6, 117:10,
128:17, 128:23,
146:6, 146:16,
149:25, 150:5,
151:14, 151:20,
152:17, 153:23,
155:16
**yourself**
21:5, 23:17,
23:22, 46:18,
86:10, 89:9,
89:20, 89:22,
159:11
**youth**
6:8, 162:6,
173:22
**youtube**
66:12, 105:13,
113:18, 113:21,
114:1, 114:3,
114:6, 114:10,
114:14, 114:17,
114:20, 114:24,
115:3, 115:7,
115:12, 130:16,
135:5, 135:23,
136:14, 138:13,
138:17, 138:21,
149:18, 149:24,
150:3, 150:5,
150:8, 150:10,
151:3, 151:12,
152:21, 153:5,
153:12, 153:13,
153:16, 153:22,
190:17, 205:18
**youtube"**
137:20
**youtube's**
153:1

**Z**

**zachary**
44:3
**zuck**
37:20, 37:22,
44:2

**zuckerberg**
6:10, 169:25,
170:10, 171:2,
171:6, 176:23,
177:4

**$**

**$170**
116:2

**.**

**.3300**
3:22
**.7613**
3:9
**.8800**
2:9

**0**

**00438**
1:9, 9:7
**01**
3:20, 45:19,
218:6
**05**
221:20

**1**

**1**
47:17
**1(e**
157:18
**1(e)(4**
153:7
**1)(e**
127:6
**1,389,618**
183:25
**1,470,958**
183:7
**1.5**
219:20
**10**
1:18, 1:19,
5:3, 5:23, 9:8,
9:9, 19:7,
19:10, 88:24,
98:15, 98:16,

Transcript of Bartlett Cleland
Conducted on December 10, 2024
274

98:18, 99:11,
100:7, 128:16,
128:22, 128:25,
154:8, 155:15,
158:19, 197:10
**100**
5:24, 67:21
**104**
5:25
**106**
3:7
**108**
6:2
**11**
5:24, 44:12,
45:19, 45:22,
100:8, 100:10,
100:12, 102:8,
172:15, 186:25,
187:19, 189:4,
190:3, 197:21,
198:1, 221:23
**11,430,007**
183:14
**113**
77:25
**119**
6:4
**12**
1:19, 5:25,
9:9, 84:4,
84:19, 88:24,
89:2, 95:20,
96:8, 96:16,
104:22, 104:24,
105:3, 107:19,
108:24, 108:25,
109:17, 109:21,
109:23, 110:2,
110:12, 113:17,
117:2, 117:5,
118:14, 118:18,
210:5, 222:7
**122**
6:5
**126**
6:6
**13**
6:2, 83:5,

83:10, 83:18,
83:24, 84:15,
95:24, 97:25,
98:5, 99:11,
99:15, 99:21,
99:24, 99:25,
100:4, 101:5,
101:9, 101:22,
103:24, 104:3,
108:21, 108:22,
109:2, 109:6,
109:8, 109:12,
109:17, 109:22,
110:16, 111:1,
111:11, 112:5,
114:11, 114:15,
116:7, 116:12,
116:23, 117:6,
117:10, 117:13,
119:2, 119:7,
119:23, 122:15,
122:19, 122:25,
123:3, 123:8,
124:12, 124:16,
146:16, 150:12,
150:16, 151:4,
151:14, 151:17,
151:19, 151:24,
152:16, 152:17,
153:24, 172:15,
173:4, 173:6,
173:15, 189:9,
210:5, 210:6,
210:11
**14**
6:4, 45:22,
65:8, 89:8,
104:16, 115:4,
119:11, 119:12,
119:13, 119:16,
119:17, 119:21,
125:18, 146:7,
146:16, 146:21,
149:25, 150:5,
150:16, 151:17,
172:16, 173:4,
202:6, 222:17
**15**
6:5, 16:1,

29:18, 104:12,
112:17, 114:25,
119:10, 122:3,
122:4, 122:6,
122:14, 125:4,
126:4, 128:24,
129:9, 146:21,
150:16, 151:17,
163:16, 172:16,
173:4, 173:8,
173:18, 173:19,
174:1, 224:15
**15,000**
199:9, 199:16,
199:20, 200:13,
200:17, 200:20,
201:15
**15,500**
199:10, 199:20,
200:17, 200:21,
201:15
**150**
199:7
**16**
6:6, 30:23,
78:12, 104:12,
112:19, 112:21,
112:22, 112:23,
113:1, 114:25,
125:4, 126:3,
126:6, 126:8,
126:10, 128:18,
128:23, 128:24,
144:25, 145:1,
145:3, 145:9,
145:18, 145:19,
155:17, 156:22,
161:20, 161:21,
163:13, 163:17,
189:20, 210:7
**161**
6:7
**17**
6:7, 161:16,
161:18, 161:23,
162:4, 162:11,
162:23, 163:21,
165:1, 165:5,

166:8, 167:23,
168:4, 172:11,
173:18, 193:21
**17,838,422**
182:21
**1700**
2:6, 9:12
**176**
6:9
**179**
6:12
**18**
6:9, 25:10,
25:25, 26:8,
27:20, 63:12,
64:7, 74:12,
74:17, 74:22,
75:3, 75:17,
77:15, 78:4,
78:12, 78:14,
78:18, 79:24,
80:4, 83:3,
83:5, 98:6,
99:24, 99:25,
100:4, 102:15,
103:21, 103:24,
104:9, 114:7,
114:11, 114:21,
124:8, 124:12,
124:25, 143:8,
176:18, 176:19,
176:21, 177:14,
177:25, 178:1,
178:6, 195:10,
195:13, 195:20,
195:23, 196:5,
196:8, 196:20,
196:24, 199:8,
200:2, 201:2,
202:1
**185**
6:15
**186**
6:18
**19**
6:12, 79:24,
80:4, 179:5,
179:7, 179:20,

183:12, 190:19
**191**
6:22
**193**
7:2
**198**
7:5
**1998**
28:4, 28:9,
87:25, 116:11
**1a**
5:12, 33:18,
33:21, 33:24,
34:17, 34:23,
35:2, 35:5,
39:21, 41:3,
41:8, 41:14,
46:15, 47:7,
49:22, 51:13,
58:8, 58:23,
59:4, 64:6,
71:16, 90:24,
106:12
**11**
62:22
**1st**
12:11

---
**2**
---

**2**
127:10, 154:8,
154:11, 164:20,
164:23
**2(a**
146:4, 146:6,
146:13, 146:15,
150:18, 150:19
**2(e**
135:15
**2.7**
199:7, 199:17,
200:1
**20**
5:10, 6:15,
16:1, 18:1,
65:8, 65:11,
66:5, 67:11,
68:5, 68:10,

70:8, 136:22,
137:5, 137:17,
144:13, 154:14,
154:15, 156:16,
159:18, 185:8,
185:10, 186:1,
203:24, 203:25,
214:14
**200,000**
201:3
**20006**
2:8
**201**
7:10
**2015**
16:1, 16:10,
18:10
**2017**
193:1, 193:8
**2018**
16:6
**2019**
16:10, 16:12
**202.973**
2:9
**2022**
16:2, 16:6,
16:12, 212:7,
212:8
**2023**
5:14, 6:9,
6:13, 6:16,
7:11, 7:13,
29:15, 162:7,
176:23, 179:20,
179:25, 180:2,
185:13, 186:14,
187:4, 187:23,
188:11, 201:25,
206:6
**2024**
1:18, 9:8,
42:1, 105:7,
186:18, 193:21,
199:1, 214:14,
224:15
**2028**
224:25

**206**
7:12
**208**
7:15
**21**
6:9, 6:18,
79:24, 80:4,
81:24, 89:7,
89:10, 93:25,
94:4, 94:5,
142:17, 142:22,
143:3, 154:11,
176:23, 186:4,
186:5, 186:7,
186:25, 187:19,
188:21
**210**
7:17
**212**
7:20
**214**
7:23
**215**
7:24
**216**
8:3
**218**
8:5
**22**
6:22, 46:5,
65:6, 66:15,
105:7, 191:10,
191:11, 191:13,
192:22
**220**
219:17
**224**
1:24
**23**
7:2, 46:3,
163:16, 193:15,
193:16, 193:18,
206:5, 212:7,
212:8
**24**
1:9, 7:5, 9:7,
186:14, 198:14,
198:15, 199:5,

214:14
**25**
7:10, 19:7,
115:16, 201:20,
201:21, 201:23
**26**
7:12, 19:10,
118:18, 206:1,
206:2
**27**
7:15, 208:15,
208:17, 208:19
**273,416**
184:3
**28**
7:17, 210:23,
210:24, 211:1,
211:12
**29**
7:20, 198:25,
212:1, 212:2,
212:5, 212:6

---
**3**
---

**3**
157:19, 183:12,
189:14, 218:3
**3(a**
146:20
**30**
7:23, 39:7,
110:16, 139:24,
141:12, 144:13,
183:16, 214:9,
214:10, 214:12
**31**
7:24, 110:20,
215:22, 215:23
**32**
8:3, 110:22,
110:23, 110:25,
111:10, 112:5,
112:25, 113:1,
113:3, 216:21,
216:22, 216:25,
217:21, 218:15
**32301**
3:8

Transcript of Bartlett Cleland
Conducted on December 10, 2024

**32399**
3:21
**33**
5:12, 8:5,
218:9, 218:11,
218:17, 219:16
**35.9**
180:22, 180:24,
184:23
**36**
182:17, 183:17
**36.2**
180:10, 180:24
**37**
164:20, 189:11,
190:4, 203:20,
203:21, 203:24
**38**
164:23

---
**4**
---

**4**
189:14, 189:22,
218:6, 221:20,
221:23, 222:7,
222:17
**4-6**
7:11
**40**
39:23, 90:17,
91:5
**400**
3:19
**400,000**
201:3
**41**
5:14, 39:25
**47**
89:2, 205:20,
205:22
**4:-cv-**
1:9
**4:-cv--mw-maf**
9:7
**4th**
201:24, 202:7

---
**5**
---

**50**
30:20, 183:11,

203:13, 213:20
**501**
35:21
**501.1736**
127:6, 136:11,
136:15, 136:18,
136:21, 138:25,
140:6, 141:17,
141:21, 142:1,
153:6, 153:19,
162:12, 172:22,
173:2
**53**
5:16, 218:3
**56**
207:24
**562617**
1:23
**57**
203:14, 203:25,
204:3
**597,087**
183:22
**5th**
42:1

---
**6**
---

**60**
201:1, 220:5,
220:11
**61**
206:16, 206:17,
206:18
**66**
205:13
**66,861**
185:23
**6th**
201:24

---
**7**
---

**700**
3:7
**713,055**
183:18
**72**
5:17
**73**
204:13, 204:15,

204:20, 205:5
**74**
224:20
**75**
5:18
**77**
5:19, 54:11
**78**
5:20

---
**8**
---

**80**
5:21
**81**
203:7
**82**
5:22
**850.354**
3:9
**850.414**
3:22

---
**9**
---

**90**
184:19
**98**
5:23, 115:19
**99**
118:11

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

|  |  |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE,<br><br>　　　*Plaintiffs,*<br><br>　　　v.<br><br>ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida,<br><br>　　　*Defendant.* | Case No.: 4:24-cv-00438-MW-MAF |

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

EXHIBIT

1

Cleland

I, Bartlett Cleland, declare as follows:

1.      I am the General Counsel and Director of Strategy Initiatives of Plaintiff NetChoice.  As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of the association's objectives, as well as represent the association in public forums, at industry events, and in meetings with government officials and agencies.  I work with team members to execute the association's lobbying efforts at federal and state levels, educating lawmakers and regulators on tech issues, in service of the organization's mission.  I also assist in developing the association's policy agenda, working closely with the CEO, Board of Directors, and members to identify legislative and regulatory priorities.  My role at NetChoice and my previous experience—which includes being a known thought leader, writer and speaker on all issues of innovation, communications and technology, having spent twenty six years in the technology and innovation public policy space—has also made me familiar with other websites, applications, and digital services more broadly.[1]

2.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction.  I am over the age of 18 and am competent to make the statements herein.

---

[1] This Declaration will refer to all digital services covered by the Act as "covered websites," unless necessary to distinguish among different kinds of digital services.  Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

1

I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.    About NetChoice.

3.    NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet.

4.    For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, Prizepicks,

---

[2] NetChoice, Home, https://tinyurl.com/bdne27n.

Snap Inc., StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!.[3] Many of these members operate websites that are among the Internet's most popular destinations, disseminating billions of user-generated posts. Other members' websites serve comparatively smaller communities.

## II. NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.

5.     NetChoice members' websites are full of a wide range of valuable expression and provide access to various communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech. They do so in a wide variety of ways—socially (to connect with friends from school and church, form groups, or find communities of those with likeminded interests), demonstratively (to showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or current events), politically (to participate in public discussion or raise awareness about social causes), educationally (to get help with math problems, learn about financial literacy, or listen to college course lectures), as well as a myriad of other ways.

---

[3] NetChoice, About Us, https://tinyurl.com/3vdmvstv.

6.    The specific communities that NetChoice members offer and foster each differ, thereby providing users with different benefits. On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services. On Instagram, users can share vacation pictures and short informative videos. On Snapchat, users can share moments with friends and family. And on YouTube, users can watch documentaries.

## III.    Parents have many tools to supervise their minor children online, and NetChoice members go to great lengths to protect minors.

7.    With existing and widely available tools, parents and guardians have many choices to monitor and supervise their minor children's use of the Internet. These tools both overlap and complement each other. Of course, parents can also control whether their minor children have access to Internet-connected devices in the first place.

8.    **Device-level restrictions.** When parents give their minor children access to Internet-connected devices, they can take advantage of the built-in tools in the device to restrict their children's use. Specifically, many of the manufacturers of the most widely used mobile phones and tablets publicize the ways parents can limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://tinyurl.com/uxfnna4y (last

4

visited Oct. 23, 2024); Google, Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited Oct. 18, 2024); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited Oct. 18, 2024); Samsung, Set Up Family Groups and Parental Controls with Your Samsung Account, https://tinyurl.com/3ynpc7hc (last visited Oct. 25, 2024). Likewise, third-party applications allow parents to monitor their minor children's activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2024, Tested by Our Editors*, CNN underscored (Mar. 11, 2024), https://tinyurl.com/s6bje2jd.

9.    **Network-level restrictions.** Many cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access; to block certain apps, sites, and contacts from their children's phones; and to restrict screen time on devices. *See, e.g.*, Verizon, Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family, https://tinyurl.com/ycyxy6x6 (last visited Oct. 18, 2024); AT&T, AT&T Secure Family App, https://tinyurl.com/d995ya2u (last visited Oct. 23, 2024); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac (last visited Oct. 18, 2024); Comcast Xfinity, Parental Controls for Xfinity Internet and TV, https://tinyurl.com/2rwyt7mv (last visited Oct. 23, 2024). Similarly, many wireless routers (the devices that provide wireless Internet in homes) publicize their parental control settings that parents can use to block specific online services; allow

only those online services that a parent specifies; limit the time that their children spend on the Internet by turning off the home Internet at specified hours, by pausing Internet access for specific devices or users, or by limiting the amount of time a particular website or service may be accessed; set individualized content filters; and monitor the online services that their children visit. *See* Molly Price & Ry Crist, *Take a Moment to Set Up Parental Controls on Your Router*, CNET (Sept. 24, 2024), https://tinyurl.com/mtvdwypu; Netgear, NETGEAR Smart Parental Controls, https://tinyurl.com/me3ksfvu (last visited Oct. 23, 2024).

10.    **Browser-level restrictions.**    Internet browsers also allow parents to control what online services their minor children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022). Some of these browsers permit parents to set up a "Kids Mode," which allows children to access only a pre-approved list of websites. *See* Microsoft, Learn More About Kids Mode in Microsoft Edge, https://tinyurl.com/59wsev2k (last visited Oct. 18, 2024); Google, Google's Parental Controls – Google Safety Center, https://tinyurl.com/kwkeej9z (last visited Oct. 18, 2024). Some even provide "activity reports" to notify parents which applications and websites a child accesses most often. *Id.* Similarly, third-party software and browser extensions are also widely available to reinforce these tools

6

on browsers. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://tinyurl.com/mwz58dcr.

11.    **Application-level restrictions.** On top of all that, NetChoice members provide parents with many tools to decide what their children can see and do on their services, as their declarations explain. They have devoted extensive resources to developing policies and practices to protect minors who use them. These tools serve as the tangible examples of NetChoice's position—that the best solution to protect children online is a private solution—at work. NetChoice members give parents, as the proper decisionmakers, an array of tools to guide and oversee their children's online access without barring children from accessing important educational and creative resources. And because parents are in the driver's seat, parents can make independent decisions about their children based on their family's unique needs in the privacy of their own homes—they can choose how and when to access the protected speech environments NetChoice members have created without divulging sensitive or private information.

a.    For example, Meta has supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week, and their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook

friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://tinyurl.com/mvm234vn (last visited Oct. 21, 2024).

b.       Instagram currently offers Supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time their teen has spent on Instagram; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://tinyurl.com/zxxmmbhb (last visited Oct. 4, 2024). Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections     for     Teens,     Peace     of     Mind     for     Parents, https://tinyurl.com/22fwuzz9 (last visited Oct. 23, 2024). Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less-strict settings. *Id.* Via Teen Accounts, parents will have added supervision features, including ways to get insights into whom

their minors are chatting with and whom they have blocked, as well as seeing topics their minors are looking at. *Id.*

    c.    And for teenage users, Snapchat provides parents and guardians the "Family Center," where parents and guardian can see with whom their teens have communicated in the last seven days; review their teens' existing friends and any they have recently added; limit their teens' ability to view certain content from public sources; review their teens' safety and privacy setting; and report any accounts that might be of concern to parents. *See* Snap Inc., Snapchat Support, What is Family Center?, https://tinyurl.com/yck6j6sz (last visited Oct. 23, 2024); Snap Inc., Snapchat Safeguards for Teens, https://tinyurl.com/mvas8784 (last visited Oct. 23, 2024).

12.    All NetChoice members prohibit minors younger than 13 from accessing their main services. However, some members, like YouTube via YouTube Kids and its "Supervised Experience" on YouTube, offer separate experiences for users under 13 geared for that specific age group. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Oct. 23, 2024); YouTube Help, What Is a Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Oct. 23, 2024). These youth-specific services also allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

13.    NetChoice members also implement other measures that further promote minors' safety while accessing these services.

    a.    For example, Instagram and YouTube have implemented "age gating" features to ensure that users are able to view only age-appropriate content. *See* Instagram, Updates to the Sensitive Content Control (June 6, 2022), https://tinyurl.com/y8y8ds7p; YouTube Help, Age-Restricted Content, https://tinyurl.com/52hmx4ze (last visited Oct. 23, 2024).

    b.    Others, like Snapchat and Instagram, automatically impose default privacy settings for minors' accounts. *See* Snap Inc., Snapchat Safeguards for Teens, https://tinyurl.com/mvas8784 (last visited Oct. 22, 2024); Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, https://tinyurl.com/22fwuzz9 (last visited Oct. 23, 2024).

    c.    Instagram further protects minors through safety notices that encourage them to be cautious when interacting with other users and that notify them if another user has exhibited suspicious behavior, such as sending a large number of messages or friend requests to users under 18. Instagram, Continuing to Make Instagram Safe for the Youngest Members of Our Community (Mar. 17, 2021), https://tinyurl.com/3mzwpj4s. Instagram also

10

gives minors the option to end their interaction with the flagged user or to block them. *Id.*

14.    And any minor-specific policies and parental tools exist alongside the websites' overall features and generally applicable "content-moderation" policies that help foster the communities and unique user experiences these services offer.

15.    NetChoice members provide users with the option and the tools to control the content they see and the users they interact with. This generally comes in the form of tools that allow users to decide whom to follow, whether to block or mute users they wish to restrict their interactions with, and to search or hide content based on their personal preferences. For example, Facebook permits users to customize the content they see by hiding posts or content from specific users and groups. Facebook, Help Center: Control What You See in Feed on Facebook, https://tinyurl.com/y6x9sd8b (last visited Oct. 23, 2024). Similarly, Instagram gives them options to filter the content they see by using keyword filters or using the "not interested" button. Instagram, How to See More of What You Want on Instagram (Aug. 30, 2022), https://tinyurl.com/4ax2849b. These tools promote opportunities for users to better engage with NetChoice members' services and the unique communities they offer.

16.    And NetChoice members limit publication of speech that they consider harmful, objectionable, or simply not conducive to their communities.

11

Consequently, NetChoice members publish and enforce bespoke content-moderation policies that address the publication of such prohibited content. Through these policies, members remove, restrict, or add warning labels to content deemed to violate the policies as well as suspend or ban accounts that post such content. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://tinyurl.com/yc7mm3hm ("By the Numbers"). By removing such content, NetChoice members have also curated the material on their websites to further ensure that minors are protected from objectionable content. By way of example, YouTube has implemented policies and procedures to protect minors from content promoting eating disorders and to limit their access to content likely to cause teens to have a negative self-image regarding their body types. YouTube, Building Content Recommendations to Meet the Unique Needs of Teens and Tweens, https://tinyurl.com/dcyz9uv3 (last visited Oct. 23, 2024).

17.    Broadly, NetChoice members have pursued measures to help promote minors' safety on their services and to promote parents' ability to control and monitor the activities of their children. This empowers families to make decisions that fit their particular needs and experiences about how their children should interact with

12

and access members' services. This reflects NetChoice's commitment to protecting and respecting families' private choices about how to use online services, knowing that they are best situated to make the appropriate decisions for themselves.

## IV.   The Act's effect on NetChoice members and the Internet.

18.   I understand that Florida House Bill 3 ("the Act") was signed into law on March 25, 2024, and that it takes effect January 1, 2025.

19.   I understand that the Act regulates "social media platform[s]." Fla. Stat. §501.1736(1)(e). I understand that the Act defines "social media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activities of other users." *Id.* But it does not sweep in all potential services that enable users to share and view content. Rather, the Act limits its coverage to online services that facilitate the most First Amendment protected activity. An online service qualifies as a "social media platform" only if (1) "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the service "on the days when using" the service; (2) it "[e]mploys algorithms that analyze user data or information on users to select content for users"; and (3) has one or more "addictive features." *Id.* HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play" functions, and "[l]ive-

13

streaming ... functions." *Id.* The Act excludes any service on which "the exclusive function is e-mail or direct messaging." *Id.*

20.    Although aspects of the Act's definition are vague and do not make clear the full extent of the entities governed by its provisions, I understand that some NetChoice members appear to be regulated the Act. These include, at least the following members: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram.

21.    NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that the Act, should it take effect, would irreparably harm our members and their business models by repelling both adult and non-adult users. This could lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.

22.    Additionally, as explained below, many of NetChoice members will face significant difficulty in implementing the Act's provisions, thereby hindering their business interests. These burdens on speech and business of NetChoice members are imposed even though, as this Declaration details, NetChoice members

14

already have detailed policies and features in place allowing parents to monitor their children's online activities, to limit what they may access or whom they may contact, and to stop their children from spending too much time on these covered websites (however their parents see fit). Put differently, HB3's blunt denial of access to minors displaces the more nuanced tools NetChoice members already have in place that empower parents and give them greater control over their children's online usage.

23.     ***Restrictions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platform[s]" altogether. Fla. Stat. §501.1736(2)(a). It also requires "social media platform[s]" to terminate any existing accounts held by minors under the age of 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b).

a.     The ban on minors under 14 significantly burdens their First Amendment rights by denying them all access to the myriads of resources available on NetChoice members' social media sites. They will no longer be able to use these sites for art, education, gaming, general interest, information gathering, professional activities, research, political engagement, and participation in religious services and communities. And it will deny certain

15

minors the benefits that social media provides by giving them a community to explore their personal interests and identity. Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), available at https://tinyurl.com/t2rejxyx.

b.      Not only will these rules impede access to protected speech, but compliance with the ban will also be burdensome on NetChoice members. Given covered members will need to assess the age of existing account holders before they access the covered websites to ensure no minor under 14 creates an account, Fla. Stat. §501.1736(2)(a), they will need to implement procedures that accurately determine the age of future account holders. Accuracy is particularly important as HB3's implementing regulations impose liability a covered website's "fail[ure] to perform reasonable age verification" after learning that an accountholder may in fact be a minor. Fla. Admin. Code §2-43.002(3)(a).

c.      Given these regulations deem "reasonable age verification" procedures as state-approved methods for complying with HB3, NetChoice members will be compelled to implement such age verification processes if the law takes effect. Designing and maintaining comprehensive systems to comply with the regulations implementing the Act will be extremely costly, time-consuming, and resource intensive. The burdens increase with the level

of certainty with which companies must verify ages. These costs will hamper both NetChoice members by requiring that they expend significant resources that cannot be recouped. And adding additional processes at sign up inevitably affect account-holder growth, as cumbersome registration processes can dissuade people from signing up. Any decline in account-holder signups or current accounts will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality. And of course, decline in usage means fewer people avail themselves of the valuable speech available on the websites.

24.    ***Restrictions on 14- and 15-year-olds.*** HB3 also prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). It also requires "social media platform[s]" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." HB3 specifies that if the parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §501.1736(4).

a.    As was the case with the restrictions on minors under 14, these provisions burden the speech rights of 14- and 15-year-olds. By requiring prior parental approval before these minors may access any of covered members' services, HB3 directly denies them their First Amendment right to connect with communities holding shared interests, express themselves, and find educational or valuable content, even if their parents do not oppose or would like them to be able to access such information.

b.    The parental consent restriction would also impose significant costs on NetChoice members who seek to comply with its provisions. Because the parental consent provision covers both accountholders who actually are 14- or 15-year-olds and those who are "likely" that age, Fla. Stat. §501.1736(3)(a), (b), and because the implementing regulations similarly require age verifications for such accountholders as well, Fla. Admin. Code §2-43.002(3)(a), members will again be forced in practice to verify each accountholder's age. That imposes the costs noted above applicable to the restrictions for minors under 14.

c.    The parental consent component adds another layer of costs and burdens. Under the Act's implementing regulations, covered websites must "conduct reasonable parental verification before allowing [the parent to] exercise ... any right [under HB3]." *Id.* §2-43.002(2). Developing and

deploying such procedures is also costly, time consuming, and resource intensive. And verifying a genuine parent-child relationship to ensure that the parent may properly provide consent for the child will require covered websites to identify both the minor and the parent (or guardian), which intrudes on both of their privacy rights. It will create friction impeding users' willingness and ability to use the services.

d.    Covered websites also face many difficulties in securing parental consent. For example, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed, families are nontraditional (like foster families), families have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

25.    Furthermore, HB3 further chills online First Amendment protected speech when it imposes significant costs on online services that currently serve minors (i.e., by requiring covered services to implement cost-prohibitive procedures to comply and by threatening significant penalties, up to $50,000, for each violation, Fla. Stat. §501.1736(5)). There is a serious risk that NetChoice members, when confronted with these costs, will be discouraged from providing child-appropriate online services or disseminating content geared to such minors. And there is an equally serious risk that they might also institute higher age barriers than required

for all users, even though doing so would prevent their services from reaching all who would benefit from their communities and content. These ancillary costs to speech as a result of HB3 hamper members' ability to disseminate the valuable expression found on their websites and conflict with NetChoice's mission to promote free expression on the Internet.

26.    In addition to restricting the speech of minors, the restrictions on minors under 14 and those imposed on minors who are 14 and 15 years old would also burden the speech of adults. The Act requires covered members to terminate the accounts of those who are "treat[ed] or categorize[d] as belonging to an account holder who is likely younger than 14 years of age" or "is likely 14 or 15 years of age." Fla. Stat. §501.1736(2)(b), (3)(b). In both instances, the Act puts the onus on the account holder to contest the termination. *Id.* Further, regulations implementing HB3 require covered members to conduct "reasonable age verification" if the "facts or circumstance readily available to" them "should reasonably have [] aroused [a] question whether the person was a child." Fla. Admin. Code §2-43.002(3)(a). Such restrictions imperil the speech rights of adults, who could be forced to provide documentation to ensure they can maintain access to NetChoice members' services. These and the costs attendant to implementing procedures that will be needed to comply with these provisions are likely to dissuade many adults from using the

website, which further undermines the ability for those interested to access the valuable expressive content available on these covered websites.

27. In addition to the burdens applicable to each provision, HB3's strictures across the board implicate those rights held by NetChoice members. By restricting who may access covered members' services, HB3 directly abridges members' ability to disseminate information. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2401-02 (2024). And yet, HB3 prohibits NetChoice members from exercising their rights to disseminate their speech and the speech of others to the audience that wishes to interact with their services. HB3 therefore does further harm by impinging on the valuable speech rights of covered websites.

28. And these irreparable harms and burdens on free speech caused by HB3 are particularly notable given it targets only the most (so-called) "addictive" websites—a euphemism for the most popular social media services. *See* Fla. Stat. §501.1736(1)(e); Press Conference, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media*, 6:00-6:23 (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. By denying minors and adults access to these popular websites and the expressive content they carry, HB3 ultimately burdens substantial amounts of protected speech where that speech is most abundant. Such a result flies

21

in the face of the First Amendment, which protects against the government's "tilt[ing] public debate" in its favored direction by selectively regulating only "those actors [who] possess [the most] enviable vehicle[s] for expression." *Moody*, 144 S.Ct. at 2407 (quotation marks omitted).

\* \* \*

29.     In short, NetChoice members would incur substantial, unrecoverable costs in complying with HB3's burdensome requirements. These costs could not be recouped even if NetChoice's challenge to the law were ultimately successful on the merits. And if the Act takes effect on January 1, 2025, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially impaired—as would its affected members' minor and adult account holders and users (both current and prospective).

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 29 day of October, 2024, in Washington, DC.

Bartlett Cleland

22

 NetChoice

Issues ∨    About Us ∨    Our Work ∨    Campaigns ∨    Litigation Center ∨

Contact Us

# Association Members

       

       

       

      

    

EXHIBIT
1A
Clerking






EXHIBIT
15
Cleland

Log In

# Terms of Service

We're updating the Meta Terms of Service. These updates will go into effect on January 1, 2025. **Read the new Terms**.

Meta builds technologies and services that enable people to connect with each other, build communities, and grow businesses. These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the **Meta Products** or **Products**), except where we expressly state that separate terms (and not these) apply. These Products are provided to you by Meta Platforms, Inc.

We don't charge you to use Facebook or the other products and services covered by these Terms, unless we state otherwise. Instead, businesses and organizations, and other persons pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think may be relevant to you and your interests. We use your personal data to help determine which personalized ads to show you.

We don't sell your personal data to advertisers, and we don't share information that directly identifies you (such as your name, email address or other contact information) with advertisers unless you give us specific permission. Instead, advertisers can tell us things like the kind of audience they want to see their ads, and we show those ads to people who may be interested. We provide advertisers with reports about the performance of their ads that help them understand how people are interacting with their content. See Section 2 below to learn more about how personalized advertising under these Terms works on the Meta Products.

Our **Privacy Policy** explains how we collect and use your personal data to determine some of the ads you see and provide all of the other services described below. You can also go to your **settings** pages of the relevant Meta Product at any time to review the privacy choices you have about how we use your data.

## 1. The services we provide

Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you:

- **Provide a personalized experience for you:** Your experience on Facebook is unlike anyone else's: from the posts, stories, events, ads, and other content you see in Facebook News Feed or our video platform to the Facebook Pages you follow and other features you might use, such as Facebook Marketplace, and search. For example, we use data about the connections you make, the choices and settings you select, and what you share and do on and off our Products - to personalize your experience.

# facebook

- **Connect you with people and organizations you care about:** We help you find and connect with people, groups, businesses, organizations, and others that matter to you across the Meta Products you use. We use data to make suggestions for you and others - for example, groups to join, events to attend, Facebook Pages to follow or send a message to, shows to watch, and people you may want to become friends with. Stronger ties make for better communities, and we believe our services are most useful when people are connected to people, groups, and organizations they care about.

- **Empower you to express yourself and communicate about what matters to you:** There are many ways to express yourself on Facebook to communicate with friends, family, and others about what matters to you - for example, sharing status updates, photos, videos, and stories across the Meta Products (consistent with your settings), sending messages or making voice or video calls to a friend or several people, creating events or groups, or adding content to your profile as well as showing you insights on how others engage with your content. We have also developed, and continue to explore, new ways for people to use technology, such as augmented reality and 360 video to create and share more expressive and engaging content on Meta Products.

- **Help you discover content, products, and services that may interest you:** We show you personalized ads, offers, and other sponsored or commercial content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Meta Products. Section 2 below explains this in more detail.

- **Promote the safety, security, and integrity of our services, combat harmful conduct and keep our community of users safe:** People will only build community on Meta Products if they feel safe and secure. We work hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of our Products and services. We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, we may take appropriate action based on our assessment that may include - notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data across **Meta Companies** when we detect misuse or harmful conduct by someone using one of our Products or to help keep Meta Products, users and the community safe. For example, we share information with Meta Companies that provide financial products and services to help them promote safety, security and integrity and comply with applicable law. Meta may access, preserve, use and share any information it collects about you where it has a good faith belief it is required or permitted by law to do so. For more information, please review our **Privacy Policy**.

  In some cases, the Oversight Board may review our decisions, subject to its terms and bylaws. Learn more here.

- **Use and develop advanced technologies to provide safe and functional services for everyone:** We use and develop advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location. For example, technology like this helps people who have visual impairments understand what or who is in photos or videos shared on Facebook or Instagram. We

facebook                                                                    Log In

integrity of our Products.

- **Research ways to make our services better:** We engage in research to develop, test, and improve our Products. This includes analyzing data we have about our users and understanding how people use our Products, for example by conducting surveys and testing and troubleshooting new features. Our **Privacy Policy** explains how we use data to support this research for the purposes of developing and improving our services.

- **Provide consistent and seamless experiences across the Meta Company Products:** Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you. We design our systems so that your experience is consistent and seamless across the different **Meta Company Products** that you use. For example, we use data about the people you engage with on Facebook to make it easier for you to connect with them on Instagram or Messenger, and we enable you to communicate with a business you follow on Facebook through Messenger.

- **Ensuring access to our services:** To operate our global services and enable you to connect with people around the world, we need to transfer, store and distribute content and data to our data centers, partners, service providers, vendors and systems around the world, including outside your country of residence. The use of this global infrastructure is necessary and essential to provide our services. This infrastructure may be owned, operated, or controlled by Meta Platforms, Inc., Meta Platforms Ireland Limited, or its affiliates.

## 2. How our services are funded

Instead of paying to use Facebook and the other products and services we offer, by using the Meta Products covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off **Meta Company Products**. We use your personal data, such as information about your activity and interests, to show you personalized ads and sponsored content that may be more relevant to you.

Protecting people's privacy is central to how we've designed our personalized ads system. This means that we can show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data. We allow advertisers to tell us things like their business goal, and the kind of audience they want to see their ads (for example, people between the age of 18-35 who like cycling). We then show their ad to people who we think might be interested.

We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Meta Products. For example, we provide general demographic and interest information to advertisers to help them better understand their audience, like the fact that women between the ages of 25 and 34 who live in Madrid and like software engineering have seen an ad. We don't share information that directly identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us specific permission. Learn more about how Meta ads work **here.**

We collect and use your personal data in order to provide the services described above to you. You can learn about how we collect and use your data in our **Privacy Policy.** You have controls over the types of ads and advertisers you see, and the types of information we use to determine which ads we show you. **Learn more.**

# facebook

Log In

We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments:

1. Who can use Facebook

   When people stand behind their opinions and actions, our community is safer and more accountable. For this reason, you must:

   - Provide for your account the same name that you use in everyday life.

   - Provide accurate information about yourself.

   - Create only one account (your own) and use it for personal purposes.

   - Not share your password, give access to your Facebook account to others, or transfer your account to anyone else (without our permission).

   We try to make Facebook broadly available to everyone, but you cannot use Facebook if:

   - You are under 13 years old.

   - You are a convicted sex offender.

   - We've previously disabled your account for violations of our Terms or the **Community Standards**, or other terms and policies that apply to your use of Facebook. If we disable your account for a violation of our Terms, the Community Standards, or other terms and policies, you agree not to create another account without our permission. Receiving permission to create a new account is provided at our sole discretion, and does not mean or imply that the disciplinary action was wrong or without cause.

   - You are prohibited from receiving our products, services, or software under applicable laws.

2. What you can share and do on Meta Products

   We want people to use Meta Products to express themselves and to share content that is important to them, but not at the expense of the safety and well-being of others or the integrity of our community. You therefore agree not to engage in the conduct described below (or to facilitate or support others in doing so):

   1. You may not use our Products to do or share anything:

      - That violates these Terms, the **Community Standards**, or other terms and policies that apply to your use of our Products.

      - That is unlawful, misleading, discriminatory or fraudulent (or assists someone else in using our Products in such a way).

      - That you do not own or have the necessary rights to share.

      - That infringes or violates someone else's rights, including their intellectual property rights (such as by infringing another's copyright or trademark, or distributing or selling counterfeit or pirated goods), unless an exception or limitation applies under applicable law.

   2. You may not upload viruses or malicious code, use the services to send spam, or do anything else that could disable, overburden, interfere with, or impair the proper working, integrity, operation, or appearance of our services, systemes, or Products.

   3. You may not access or collect data from our Products using automated means (without our

4. You may not proxy, request, or collect Product usernames or passwords, or misappropriate access tokens.

5. You may not sell, license, or purchase any data obtained from us or our services, except as provided in the Platform Terms.

6. You may not misuse any reporting, flagging, dispute, or appeals channel, such as by making fraudulent, duplicative, or groundless reports or appeals.

We can remove or restrict access to content that is in violation of these provisions. We can also suspend or disable your account for conduct that violates these provisions, as provided in Section 4.B.

If we remove content that you have shared in violation of the Community Standards, we'll let you know and explain any options you have to request another review, unless you seriously or repeatedly violate these Terms or if doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons. For information on account suspension or termination, see Section 4.B below.

To help support our community, we encourage you to **report** content or conduct that you believe violates your rights (including **intellectual property rights**) or our terms and policies, if this feature exists in your jurisdiction.

We also can remove or restrict access to content features, services, or information if we determine that doing so is reasonably necessary to avoid or mitigate misuse of our services or adverse legal or regulatory impacts to Meta.

3. The permissions you give us

We need certain permissions from you to provide our services:

1. Permission to use content you create and share: Some content that you share or upload, such as photos or videos, may be protected by intellectual property laws.

You retain ownership of the intellectual property rights (things like copyright or trademarks) in any such content that you create and share on Facebook and other **Meta Company Products** you use. Nothing in these Terms takes away the rights you have to your own content. You are free to share your content with anyone else, wherever you want.

However, to provide our services we need you to give us some legal permissions (known as a "license") to use this content. This is solely for the purposes of providing and improving our Products and services as described in Section 1 above.

Specifically, when you share, post, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your **privacy** and **application** settings). This means, for example, that if you share a photo on Facebook, you give us permission to store, copy, and share it with others (again, consistent with your settings) such as Meta Products or service providers that support those products

# facebook

content posted to your personal account will be deleted if you delete your account. **Learn more** about how to delete your account. Account deletion does not automatically delete content that you post as an admin of a page or content that you create collectively with other users, such as photos in Shared Albums which may continue to be visible to other album members.

It may take up to 90 days to delete content after we begin the account deletion process or receive a content deletion request. If you send content to trash, the deletion process will automatically begin in 30 days unless you chose to delete the content sooner. While the deletion process for such content is being undertaken, the content is no longer visible to other users. After the content is deleted, it may take us up to another 90 days to remove it from backups and disaster recovery systems.

Content will not be deleted within 90 days of the account deletion or content deletion process beginning in the following situations:

- where your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted);
- where deletion within 90 days is not possible due to technical limitations of our systems, in which case, we will complete the deletion as soon as technically feasible; or
- where immediate deletion would restrict our ability to:
  - investigate or identify illegal activity or violations of our terms and policies (for example, to identify or investigate misuse of our Products or systems);
  - protect the safety, integrity, and security of our Products, systems, services, our employees, and users, and to defend ourselves;
  - comply with legal obligations for the preservation of evidence, including data Meta Companies providing financial products and services preserve to comply with any record keeping obligations required by law; or
  - comply with a request of a judicial or administrative authority, law enforcement or a government agency;

in which case, the content will be retained for no longer than is necessary for the purposes for which it has been retained (the exact duration will vary on a case-by-case basis).

In each of the above cases, this license will continue until the content has been fully deleted.

2. Permission to use your name, profile picture, and information about your actions with ads and sponsored or commercial content: You give us permission to use your name and profile picture and information about actions you have taken on Facebook next to or in connection with ads, offers, and other sponsored or commercial content that we display across our Products, without any compensation to you. For example, we may show your friends that you are interested in an advertised event or have liked a Facebook Page created by a brand that has paid us to display its ads on Facebook. Ads and content like this can be seen only by people who have your permission to see the actions you've taken on Meta Products. You can **learn more** about your ad settings and preferences.

3. Permission to update software you use or download: If you download or use our software, you give us permission to download and install updates to the software where available.

facebook

4. Limits on using our intellectual property

If you use content covered by intellectual property rights that we have and make available in our Products (for example, images, designs, videos, or sounds we provide that you add to content you create or share on Facebook), we retain all rights to that content (but not yours). You can only use our copyrights or trademarks (or any similar marks) as expressly permitted by our Brand Usage Guidelines or with our prior written permission. You must obtain our written permission (or permission under an open source license) to modify, translate, create derivative works of, decompile, or reverse engineer our products or their components, or otherwise attempt to extract source code from us, unless an exception or limitation applies under applicable law or your conduct relates to the Meta Bug Bounty Program.

## 4. Additional provisions

1. Updating our Terms

We work constantly to improve our services and develop new features to make our Products better for you and our community. As a result, we may need to update these Terms from time to time to accurately reflect our services and practices, to promote a safe and secure experience on our Products and services, and/or to comply with applicable law. Unless otherwise required by law, we will notify you before we make changes to these Terms and give you an opportunity to review them before they go into effect. Once any updated Terms are in effect, you will be bound by them if you continue to use our Products.

We hope that you will continue using our Products, but if you do not agree to our updated Terms and no longer want to be a part of the Facebook community, you can **delete** your account at any time.

2. Account suspension or termination

We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas.

If we determine, in our discretion, that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular the Community Standards, we may suspend or permanently disable your access to Meta Company Products, and we may permanently disable or delete your account. We may also disable or delete your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.

We may disable or delete your account if after registration your account is not confirmed, your account is unused and remains inactive for an extended period of time, or if we detect someone may have used it without your permission and we are unable to confirm your ownership of the account. **Learn more** about how we disable and delete accounts.

Where we take such action we'll let you know and explain any options you have to request a review, unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

You can **learn more** about what you can do if your account has been disabled and how to contact

**facebook**                                                                                              Log In

If you delete or we disable or delete your account, these Terms shall terminate as an agreement between you and us, but the following provisions will remain in place: 3, 4.2-4.5.

3. Limits on liability

We work hard to provide the best Products we can and to specify clear guidelines for everyone who uses them. Our Products, however, are provided "as is," and we make no guarantees that they always will be safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections. To the extent permitted by law, we also DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content).

We cannot predict when issues might arise with our Products. Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products (however caused and on any theory of liability, including negligence), even if we have been advised of the possibility of such damages. Our aggregate liability arising out of or relating to these Terms or the Meta Products will not exceed the greater of $100 or the amount you have paid us in the past twelve months.

4. Disputes

We try to provide clear rules so that we can limit or hopefully avoid disputes between you and us. If a dispute does arise, however, it's useful to know up front where it can be resolved and what laws will apply.

You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions. Without prejudice to the foregoing, you agree that, in its sole discretion, Meta may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction over the claim.

5. Other

1. These Terms (formerly known as the Statement of Rights and Responsibilities) make up the entire agreement between you and Meta Platforms, Inc. regarding your use of our Products. They supersede any prior agreements.

2. Some of the Products we offer are also governed by supplemental terms. If you use any of those Products, supplemental terms will be made available and will become part of our

**facebook**                                                                    Log In

**Commercial Terms**. If you post or share content containing music, you must comply with our **Music Guidelines**. To the extent any supplemental terms conflict with these Terms, the supplemental terms shall govern to the extent of the conflict.

3. If any portion of these Terms is found to be unenforceable, the unenforceable portion will be deemed amended to the minimum extent necessary to make it enforceable, and if it can't be made enforceable, then it will be severed and the remaining portion will remain in full force and effect. If we fail to enforce any of these Terms, it will not be considered a waiver. Any amendment to or waiver of these Terms must be made in writing and signed by us.

4. You will not transfer any of your rights or obligations under these Terms to anyone else without our consent.

5. You may designate a person (called a legacy contact) to manage your account if it is memorialized. If you enable it in your settings, only your legacy contact or a person who you have identified in a valid will or similar legal document expressing clear consent to disclose your content to that person upon death or incapacity will be able to seek limited **disclosure** of information from your account after it is memorialized.

6. These Terms do not confer any third-party beneficiary rights. All of our rights and obligations under these Terms are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.

7. We may need to change the username for your account in certain circumstances (for example, if someone else claims the username and it appears unrelated to the name you use in everyday life).

8. We always appreciate your feedback and other suggestions about our products and services. But we may use feedback and other suggestions without any restriction or obligation to compensate you, and we are under no obligation to keep them confidential.

9. We reserve all rights not expressly granted to you.

## 5. Other terms and policies that may apply to you

- **Community Standards**: These guidelines outline our standards regarding the content you post to Facebook and your activity on Facebook and other Meta Products.

- **Commercial Terms**: These terms apply if you also access or use our Products for any commercial or business purpose, including advertising, operating an app on our Platform, using our measurement services, managing a group or a Page for a business, or selling goods or services.

- **Community Payment Terms**: These terms apply to payments made on or through Meta Products.

- **Commerce Policies**: These guidelines outline the policies that apply when you offer products or services for sale on Facebook, Instagram, and WhatsApp.

- **Music Guidelines**: These guidelines outline the policies that apply if you post or share content containing music on any Meta Products.

- Advertising Policies: These policies apply to partners who advertise across the Meta Products and specify what types of ad content are allowed by partners who advertise across the Meta Products

**facebook**

Log In

- **Facebook Pages, Groups and Events Policy**: These guidelines apply if you create or administer a Facebook Page, group, or event, or if you use Facebook to communicate or administer a promotion.
- Meta Platform Policy: These terms apply to the use of the set of APIs, SDKs, tools, plugins, code, technology, content, and services that enables others to develop functionality, retrieve data from MetaProducts, or provide data to us.
- Developer Payment Terms: These terms apply to developers of applications that use Facebook Payments.
- Meta Brand Resources: These guidelines outline the policies that apply to use of Meta trademarks, logos, and screenshots.
- Recommendations Guidelines: The **Facebook Recommendations Guidelines** and Instagram Recommendations Guidelines outline our standards for recommending and not recommending content.
- **Live Policies**: These policies apply to all content broadcast to Facebook Live.

Date of Last Revision: July 26 2022

English (US)  Español  Français (France)  中文(简体)  العربية  Português (Brasil)  Italiano  한국어  Deutsch  हिन्दी  日本語

Sign Up  Log In  Messenger  Facebook Lite  Video  Places  Games  Marketplace  Meta Pay  Meta Store  Meta Quest
Ray-Ban Meta  Meta AI  Instagram  Threads  Fundraisers  Services  Voting Information Center  Privacy Policy
Consumer Health Privacy  Privacy Center  Groups

Privacy · Consumer Health Privacy · Terms · Advertising · Ad Choices  · Cookies · More · Meta © 2024



EXHIBIT
16
Cleland

# The 2024 Florida Statutes

| | | |
|---|---|---|
| Title XXXIII REGULATION OF TRADE, COMMERCE, INVESTMENTS, AND SOLICITATIONS | Chapter 501 CONSUMER PROTECTION | View Entire Chapter |

**501.1736    Social media use for minors.—**

(1)   As used in this section, the term:

(a)   "Account holder" means a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state.

(b)   "Daily active users" means the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous 12 months, or, if the online forum, website, or application did not exist during the previous 12 months, the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous month.

(c)   "Department" means the Department of Legal Affairs.

(d)   "Resident" means a person who lives in this state for more than 6 months of the year.

(e)   "Social media platform" means an online forum, website, or application that satisfies each of the following criteria:

1.   Allows users to upload content or view the content or activity of other users;

2.   Ten percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the online forum, website, or application on the days when using the online forum, website, or application during the previous 12 months or, if the online forum, website, or application did not exist during the previous 12 months, during the previous month;

3.   Employs algorithms that analyze user data or information on users to select content for users; and

4.   Has any of the following addictive features:

a.   Infinite scrolling, which means either:

(I)   Continuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page; or

(II)   Seamless content, or the use of pages with no visible or apparent end or page breaks.

b.   Push notifications or alerts sent by the online forum, website, or application to inform a user about specific activities or events related to the user's account.

c.   Displays personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content.

d.   Auto-play video or video that begins to play without the user first clicking on the video or on a play button for that video.

e.   Live-streaming or a function that allows a user or advertiser to broadcast live video content in real-time.

The term does not include an online service, website, or application where the exclusive function is e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender.

(2)(a)    A social media platform shall prohibit a minor who is younger than 14 years of age from entering into a contract with a social media platform to become an account holder.

(b)    A social media platform shall:

1.    Terminate any account held by an account holder younger than 14 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.

2.    Allow an account holder younger than 14 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3.    Allow the confirmed parent or guardian of an account holder younger than 14 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

4.    Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

(3)(a)    A social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent for the minor to become an account holder.

(b)    A social media platform shall:

1.    Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account. The social media platform shall provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.

2.    Allow an account holder who is 14 or 15 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3.    Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

4.    Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

(4)    If a court enjoins the enforcement of subsection (3) or would otherwise enjoin enforcement of any other provision of this section due to subsection (3), then subsection (3) shall be severed, and the following shall come into effect:

(a)    A social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder.

(b)    A social media platform shall:

1.    Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of 90 days if the account holder fails to effectively dispute the termination.

2.    Allow an account holder who is 14 or 15 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3.    Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

4.    Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

(5)    Any knowing or reckless violation of subsection (2), subsection (3), or, if in effect, subsection (4) is deemed an unfair and deceptive trade practice actionable under part II of this chapter solely by the department against a

Case 4:24-cv-00438-MW-MAF    Document 51-4    Filed 01/13/25    Page 314 of 324

social media platform. If the department has reason to believe that a social media platform is in violation of subsection (2), subsection (3), or, if in effect, subsection (4), the department, as the enforcing authority, may bring an action against such platform for an unfair or deceptive act or practice. For the purpose of bringing an action pursuant to this section, ss. 501.211 and 501.212 do not apply. In addition to other remedies under part II of this chapter, the department may collect a civil penalty of up to $50,000 per violation and reasonable attorney fees and court costs. When the social media platform's failure to comply with subsection (2), subsection (3), or, if in effect, subsection (4) is a consistent pattern of knowing or reckless conduct, punitive damages may be assessed against the social media platform.

(6)(a)   A social media platform that knowingly or recklessly violates subsection (2), subsection (3), or, if in effect, subsection (4) is liable to the minor account holder, including court costs and reasonable attorney fees as ordered by the court. Claimants may be awarded up to $10,000 in damages.

(b)   A civil action for a claim under this subsection must be brought within 1 year from the date the complainant knew, or reasonably should have known, of the alleged violation.

(c)   Any action brought under this subsection may only be brought on behalf of a minor account holder.

(7)   For purposes of bringing an action under this section, a social media platform that allows a minor account holder younger than 14 years of age or a minor account holder who is 14 or 15 years of age to create an account on such platform is considered to be both engaged in substantial and not isolated activities within this state and operating, conducting, engaging in, or carrying on a business and doing business in this state, and is therefore subject to the jurisdiction of the courts of this state.

(8)   If a social media platform allows an account holder to use the social media platform, the parties have entered into a contract.

(9)   This section does not preclude any other available remedy at law or equity.

(10)(a)   If, by its own inquiry or as a result of complaints, the department has reason to believe that an entity or person has engaged in, or is engaging in, an act or practice that violates this section, the department may administer oaths and affirmations, subpoena witnesses or matter, and collect evidence. Within 5 days, excluding weekends and legal holidays, after the service of a subpoena or at any time before the return date specified therein, whichever is longer, the party served may file in the circuit court in the county in which it resides or in which it transacts business and serve upon the enforcing authority a petition for an order modifying or setting aside the subpoena. The petitioner may raise any objection or privilege which would be available upon service of such subpoena in a civil action. The subpoena shall inform the party served of its rights under this subsection.

(b)   If the matter that the department seeks to obtain by subpoena is located outside the state, the entity or person subpoenaed may make it available to the department or its representative to examine the matter at the place where it is located. The department may designate representatives, including officials of the state in which the matter is located, to inspect the matter on its behalf and may respond to similar requests from officials of other states.

(c)   Upon failure of an entity or person without lawful excuse to obey a subpoena and upon reasonable notice to all persons affected, the department may apply to the circuit court for an order compelling compliance.

(d)   The department may request that an entity or person that refuses to comply with a subpoena on the ground that testimony or matter may incriminate the entity or person be ordered by the court to provide the testimony or matter. Except in a prosecution for perjury, an entity or individual that complies with a court order to provide testimony or matter after asserting a valid privilege against self-incrimination shall not have the testimony or matter so provided, or evidence derived therefrom, received against the entity or person in any criminal investigation or proceeding.

(e)   Any entity or person upon whom a subpoena is served pursuant to this section shall comply with the terms thereof unless otherwise provided by order of the court. Any entity or person that fails to appear with the intent to avoid, evade, or prevent compliance in whole or in part with any investigation under this part or who removes from any place, conceals, withholds, mutilates, alters, or destroys, or by any other means falsifies any documentary material in the possession, custody, or control of any entity or person subject to any such subpoena, or knowingly

conceals any relevant information with the intent to avoid, evade, or prevent compliance shall be liable for a civil penalty of not more than $5,000 per week in violation, reasonable attorney fees, and costs.

(11)(a)   All information held by the department pursuant to a notification of a violation of this section or an investigation of a violation of this section is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution, until such time as the investigation is completed or ceases to be active. This exemption shall be construed in conformity with s. 119.071(2)(c).

(b)   During an active investigation, information made confidential and exempt pursuant to paragraph (a) may be disclosed by the department:

1.   In the furtherance of its official duties and responsibilities;

2.   For print, publication, or broadcast if the department determines that such release would assist in notifying the public or locating or identifying a person that the department believes to be a victim of an improper use or disposal of customer records, except that information made confidential and exempt by paragraph (c) may not be released pursuant to this subparagraph; or

3.   To another governmental entity in the furtherance of its official duties and responsibilities.

(c)   Upon completion of an investigation or once an investigation ceases to be active, the following information held by the department shall remain confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution:

1.   Information that is otherwise confidential or exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution.

2.   Personal identifying information.

3.   A computer forensic report.

4.   Information that would otherwise reveal weaknesses in the data security of a social media platform.

5.   Information that would disclose the proprietary information of a social media platform.

(d)   For purposes of this section, the term "proprietary information" means information that:

1.   Is owned or controlled by the social media platform.

2.   Is intended to be private and is treated by the social media platform as private because disclosure would harm the social media platform or its business operations.

3.   Has not been disclosed except as required by law or a private agreement that provides that the information will not be released to the public.

4.   Is not publicly available or otherwise readily ascertainable through proper means from another source in the same configuration as received by the department.

5.   Reveals competitive interests, the disclosure of which would impair the competitive advantage of the social media platform that is the subject of the information.

(e)   This subsection is subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2029, unless reviewed and saved from repeal through reenactment by the Legislature.

(12)   The department may adopt rules to implement this section.

History.—s. 1, ch. 2024-42; s. 1, ch. 2024-54.

---

Copyright © 1995-2024 The Florida Legislature • Privacy Statement • Contact Us


 **Help Center**

# How does video selfie age verification work on Instagram?



This feature is only available in some countries.

If you are under 18 and trying to change your age on Instagram to over 18, you will be asked to give us additional information to help verify your age.

There are a few different ways you can verify your age:

- Take a video selfie

- Upload your ID

## How your age is verified

If you choose to take a video selfie, we use Yoti's technology to estimate your age. Yoti is a company that specializes in age verification while maintaining privacy. After you take a video selfie, we share an image from the selfie with Yoti.

Yoti uses artificial intelligence (AI) to estimate your age. Their AI does this by looking at facial features in an image, and it was trained using images of many people around the world of different ages. The only thing the AI was trained to do is to estimate age, it can't identify specific people.

Yoti's AI analyzes the face for features that correspond with a specific age. Learn more about how Yoti's technology estimates age on our blog.

Once your age has been estimated and shared with us, both Instagram and Yoti delete the image. We don't share any other information about you with Yoti.

Yoti's age estimation maintains your privacy because it doesn't require any personal details or documents. To read more about Yoti and their technology, visit their website.

## How to take the selfie

If you choose to take a video selfie to verify your age, you'll see instructions on your screen for how to take the selfie. If you haven't used the camera on Instagram before, we'll ask you for permission to use the camera so you can take the selfie.

When you take the selfie, make sure your whole face is visible and that you have enough light for the camera. Avoid wearing anything that blocks your face, like a mask or hat. You'll be asked to move your face in different directions, such as to the right and left and up and down.

Once you have taken the selfie, you'll see a screen to submit your selfie. Once you have submitted your selfie, you can keep using Instagram or exit the app.

 **Help Center**

## Was this helpful?

☐ Yes                                                    ☐ No

### Related Articles

How using your ID to verify your age works on Instagram

Confirming your age on Instagram

Why Instagram has age requirements

Why you might be asked to upload a video selfie to confirm your identity on Instagram

Set up a minimum age for your Instagram account

☐ English (US) ☐

About Us

API

Jobs

Terms

Privacy

from ∞ Meta                                                    © 2024 Meta

Introducing New Ways to Verify Age on Instagram

# Introducing New Ways to Verify Age on Instagram

🕐 June 23, 2022

    

**Update on March 2, 2023 at 6 am PT:** Starting today, we're beginning to expand our age verification test on Instagram to more countries in Europe, Mexico, Canada, South Korea, Australia, and Japan. We plan to make our age verification tools available in even more countries globally within the next few months.

**Update on October 13, 2022:** Starting today, we're expanding this test to additional countries including India and Brazil. We plan to expand to the UK and EU before the end of the year. We're also removing Social Vouching as an option to verify age from the test to make some improvements.

**EXHIBIT**
29
Toland

- We're testing new options for people to verify their age on Instagram, allowing us to provide age-appropriate experiences.

- In addition to providing an ID, people will now be able to ask others to vouch for their age, or use technology that can confirm their age based on a video selfie.

- We're partnering with ____, a company that specializes in privacy-preserving ways to verify age.

Starting today, we're testing new options for people on Instagram to verify their age, starting with people based in the US. If someone attempts to edit their date of birth on Instagram from under the age of 18 to 18 or over, we'll require them to verify their age using one of three options: upload their ID, record a video selfie or ask mutual friends to verify their age. We're testing this so we can make sure teens and adults are in the right experience for their age group. We are also partnering with Yoti, a company that specializes in online age verification, to help ensure people's privacy.

In 2019, we began asking people to ____ when signing up for Instagram. Since then, ____. Knowing people's age allows us to provide appropriate experiences to different age groups, specifically teens.

We require people to be at least 13 years old to sign up for Instagram. In some countries, our minimum age is higher. When we know if someone is a teen (13-17), we provide them with age-appropriate experiences like defaulting them into private accounts, preventing unwanted contact from adults they don't know and limiting the options advertisers have to reach them with ads.

# Testing new ways to verify age

In addition to having someone upload their ID, we're testing two new ways to verify a person's age:

1    Video Selfie: You can choose to upload a video selfie to verify your age. If you choose this option, you'll see instructions on your screen to guide you. After you take a video selfie, we share the image with Yoti, and nothing else. Yoti's technology estimates your age based on your facial features and shares that estimate with us. Meta

12/3/24, 2:43 PM
Introducing New Ways to Verify Age on Instagram
Case 4:24-cv-00438-MW-MAF    Document 51-4    Filed 01/13/25    Page 321 of 324

and Yoti then delete the image.

– just your age.

2    Social Vouching: This option allows you to ask mutual followers to confirm how old you are. The person vouching must be at least 18 years old, must not be vouching for anyone else at that time and will need to meet other safeguards we have in place. The three people you select to vouch for you will receive a request to confirm your age and will need to respond within three days.

You will still be able to upload your ID to verify your age with                          like a driver's license or ID card. We will use your ID to confirm your age and help keep our community safe. Your ID will be stored securely on our servers and is deleted within 30 days.



We worked with international youth, privacy and safety             to inform our approach. You can learn more about these three options and how to set them up        .

Case 4:24-cv-00438-MW-MAF     Document 51-4     Filed 01/13/25     Page 322 of 324

# Partnering with Yoti

We're partnering with         , a company that offers privacy-preserving ways to verify age. Yoti is verified by the                                              and is the leading age verification provider for several industries around the world including social media, gaming and age restricted e-commerce. Expert and governmental organizations in youth and privacy, including

, have publicly endorsed Yoti for their approach and expertise in responsible artificial intelligence (AI).

on anonymous images of diverse people from around the world who have transparently allowed Yoti to use their data and who can ask Yoti to delete their data at any time. For people under the age of 13, Yoti collected data using specific data collection exercises where parents or guardians have given explicit consent.

0:00 / 1:30

# Using AI to understand people's ages

In addition to testing the new menu of options to verify people's ages,                    to understand if someone is a teen or an adult. AI helps us prevent teens from accessing Facebook Dating, adults from messaging teens and helps teens from receiving

, for example. Our goal is to expand the use of this technology more widely across our

Case 4:24-cv-00438-MW-MAF    Document 51-4    Filed 01/13/25    Page 323 of 324

technologies. To learn more about how our technology works, and the advancements we're making in artificial intelligence, you can review our                    .

# Our approach to privacy

The information provided in each age verification option is used to confirm your age and won't be visible on your profile, to friends or other people on Instagram. If you choose to upload a video selfie to verify your age, Meta and Yoti delete it once your age is confirmed. Your video is not used for anything else other than to verify your age. If you choose to upload an ID, after you send us a copy of your ID, it'll be encrypted and stored securely.

Understanding someone's age online is a complex, industry-wide challenge. We want to work with others in our industry, and with governments, to set clear standards for age verification online. Many people, such as teens, don't always have access to the forms of ID that make age verification clear and simple. As an industry, we have to explore novel ways to approach the dilemma of verifying someone's age when they don't have an ID.

We still believe an effective way of addressing this problem is for devices or App Stores to provide apps with people's ages, allowing teens to be placed in age-appropriate experiences across all the apps they use. In the absence of industry standards or regulation on how to effectively verify age online, we've invested in a combination of technologies that are more equitable, provide more options to verify age and that protect the privacy of people using our technologies.

RELATED ARTICLES

# Check out more announcements about product

#PRODUCT  #SAFETY  #ANNOUNCEMENTS  #INSTAGRAM

## New on Instagram: How to Reset Your Content Suggestions →

#PRODUCT  #INSTAGRAM  #ANNOUNCEMENTS

## Introducing Trending Now on Threads →

#PRODUCT  #INSTAGRAM  #ANNOUNCEMENTS

## Instagram Announces New Messaging Improvements →

     

## Our Story

## Features

## Safety

## News

## Meta

English (US)     Instagram from Meta     API     Privacy     Terms     Sitemap