

## CONFIDENTIAL

# Transcript of David Boyle

**Date:** December 12, 2024
**Case:** Computer & Communications Industry Associations, at al. -v- Moody, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF FLORIDA

                       TALLAHASSEE DIVISION

-------------------------------X

COMPUTER & COMMUNICATIONS          :

INDUSTRY ASSOCIATED and            :

NETCHOICE,                         :

                    Plaintiffs,    :

          v.                       : CASE NUMBER

ASHLEY BROOKE MOODY, in her        : 4:24-CV-00438-MW-MAF

official capacity as Attorney :

General of the State of            :

Florida,                           :

                    Defendant.     :

-------------------------------X



                       CONFIDENTIAL

        Videotaped Deposition of DAVID BOYLE

              Los Angeles, California

              Thursday, December 12, 2024

                      10:02 a.m.



Job No.:  564591

Pages 1 - 153

Reported by:  Cynthia Lichtman, CSR No. 14601, CVR

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024 2

Videotaped deposition of DAVID BOYLE, held at the offices of:

Skadden, Arps, Slate, Meagher & Flom LLP

(Los Angeles)

2000 Avenue of the Stars, Suite 300N

Los Angeles, California 90067

(213) 687-5000

Pursuant to agreement, before Cynthia Lichtman, Notary Public in and for the State of California.

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                    3

A P P E A R A N C E S


ON BEHALF OF THE DEFENDANT:

        JOHN GUARD, ESQUIRE

        ANITA J. PATEL, ESQUIRE

        SARA E. SPEARS, ESQUIRE

        OFFICE OF THE ATTORNEY GENERAL

        PL-01 The Capitol

        Tallahasee, Florida 32399

        (850) 414-3300


ON BEHALF OF THE DEPONENT:

        FAYE PAUL TELLER, ESQUIRE

        ROWLEY RICE, ESQUIRE

        JULIA KONSTANTINOVSKY, ESQUIRE

        MUNGER, TOLLES & OLSON LLP

        350 South Grand Avenue, 50th Floor

        Los Angeles, California 90071

        (213) 683-9583

(Appearances continued on next page)

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    4

(Appearances continued from previous page)


                    A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

          MITCHELL PALLAKI, ESQUIRE

          CLEMENT & MURPHY

          706 Duke Street

          Alexandria, Virginia 22314

          (202) 742-8900



ALSO PRESENT

Suzanne Nero, Snapchat

Charlie McGrath - Videographer, Planet Depos

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    5

C O N T E N T S

EXAMINATION OF DAVID BOYLE                        PAGE

        By Mr. Guard                                8


                E X H I B I T S

                (Attached.)

DAVID BOYLE    DEPOSITION EXHIBITS              PAGE

Exhibit 1    David Boyle Declaration             51

Exhibit 2    Snap Terms of Service               76

Exhibit 3    Financial Sextortion Document       92

Exhibit 4    Snapchat 101                        98

Exhibit 5    2024 Florida Statutes, Social      116

             Media Use for Minors

Exhibit 6    Transparency Report,               127

             January 1, 2021 - June 30, 2021

Exhibit 7    Transparency Report, July 1,       128

             2021 - December 31, 2021

Exhibit 8    Transparency Report, July 1,       130

             2023 - December 31, 2023

Exhibit 9    2022 Digital Well-Being Index      131

             Research Findings

Exhibit 10   Digital Well-Being Index,          133

             Wave 2, Research Findings,

             June 2023

(Exhibits continued on next page)

(Exhibits continued from previous page)

E X H I B I T S

(Attached.)

DAVID BOYLE     DEPOSITION EXHIBITS                PAGE

Exhibit 11    National Center for Missing &    134
              Exploited Children, 2023
              CyberTipline Reports by
              Electronic Service Providers

Exhibit 12    Plaintiff's Amended Complaint    135
              For Abatement and Civil Penalty
              and Demand for Jury Trial

Exhibit 13    Article, Tampa Woman Accused     136
              of Pretending to be a Teeanager,
              Molesting Young Boys Denied

Exhibit 14    Article, Half of Online Child    143
              Grooming Cases Now Happen on
              Snapchat, Reports UK Charity

Exhibit 15    Article, Fewer than 1% of        149
              Parents Use Social Media Tools
              to Monitor Their Children's
              accounts

THE VIDEOGRAPHER:  Here begins media number one in the videotaped deposition of David Boyle in the matter of Computer & Communications Industry Associations, et al. versus Moody, et al., in the United States District Court, Northern District of Florida, Tallahassee Division, Case Number 4:24-CV-00438-MW-MAF.

Today's date is December 12th, 2024.  The time on the video monitor is 10:02 a.m.  The videographer today is Charlie McGrath, representing Planet Depos.  This video deposition is taking place at Skadden, Arps, Slate, Meagher, and Flom LLP, 2000 Avenue of the Stars, Suite 200 North, Los Angeles, California 90067 -- 76.  My apologies.

Would counsel please voice identify themselves and state whom they represent.

MR. GUARD:  John Guard, Chief Deputy Attorney General for -- for Ashley Moody.

MS. TELLER:  Faye Paul Teller for the witness, David Boyle, from Snapchat.

THE VIDEOGRAPHER:  The court reporter today is Cynthia Lichtman, representing Planet Depos.  The witness will now be sworn.

P R O C E E D I N G S

Whereupon,

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    8

DAVID BOYLE,

being first duly sworn or affirmed to testify to the

truth, the whole truth, and nothing but the truth,

was examined and testified as follows:

    EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. GUARD:

    Q   Good morning -- or, I guess, it's morning.

        Can you please state your name and spell your first and last name for the record?

        MS. TELLER:  Sorry to interrupt, John, but just, I -- I think we're going to put on the record, the confidentiality designation.

        MR. GUARD:  Oh, I was going to do that next, but --

        MS. TELLER:  Oh, sorry.  I didn't mean to interrupt your flow.  Go ahead.

        MR. GUARD:  That's fine.  No.  We'll go ahead and do that.

        The plaintiff and defendant were -- are negotiating a protective order, and it is not finalized.  The draft got sent over to the defendants last night.  So because of that, we are going to hold this transcript as confidential at which -- at -- after the court reporter produces it.

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    9

The witness' lawyers will have seven days to designate what portions of the transcript are confidential. And obviously, it will be subject to whatever protective order is finally worked out between the parties.

          MS. TELLER: Understood. Yeah. And we agree to -- to keeping it confidential pending whatever agreement the parties come to in terms of designations of the transcripts.

     Q    All right. Now, good morning, again. If you could please state your name and spell your first and last name for the record.

     A    Yeah. My name is David Boyle, spelled D-A-V-I-D, Boyle, B-O-Y-L-E. Thank you.

     Q    All right. And again, my name is John Guard. I'm the Chief Deputy Attorney General for the State of Florida. Have you ever been deposed before?

     A    I have, yes.

     Q    How many times have you been deposed?

     A    Including this time, I -- I think it would be four -- four times total.

     Q    Okay. And what is the -- or what was the general nature of -- of the three previous times you were deposed?

10:04:21
10:04:23
10:04:26
10:04:29
10:04:31
10:04:32
10:04:34
10:04:35
10:04:37
10:04:41
10:04:44
10:04:46
10:04:47
10:04:51
10:04:57
10:04:59
10:05:02
10:05:04
10:05:05
10:05:06
10:05:14
10:05:17
10:05:19
10:05:31
10:05:34

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

10

A    So one was -- you know, it was a similar matter with the Save Arkansas.  One was a just intellectual property matter that was not, you know, really similar at all to -- to this one.  And then one was kind of more of a personal matter.

Q    Okay.  And just so that we are playing by the same ground rules, sitting to your right and to my left is the stenographer.  And because we have a stenographer here, if we were to meet at a Starbucks or someplace else, we would have a normal conversation, which means we would talk over each other.  We would finish each other's sentences.  We would interrupt each other.  But she can only take down one voice at a time.  And so we both need to, you know, make sure that the other is finished before we interrupt.  Is that fair?

A    Totally.  I understand.

Q    Okay.  And sitting to your left is your counsel.  If you can just pause after I finish a question just a couple seconds and let her have a chance because she can object to questions.  Now, there's no judge here.  But she will make her objection, and then unless it's an objection based on privilege, you'll probably go ahead and answer the question.  Is that fair?  Or do you understand?

10:05:37
10:05:41
10:05:48
10:05:51
10:05:55
10:06:01
10:06:04
10:06:08
10:06:13
10:06:18
10:06:19
10:06:22
10:06:26
10:06:29
10:06:32
10:06:37
10:06:39
10:06:41
10:06:44
10:06:47
10:06:52
10:06:54
10:06:57
10:07:00
10:07:02

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    11

A    Understood.  Yeah.

Q    Okay.  All right.  This is not the Bataan Death March.  So if it any point in time you need to take a break, if you'll just ask to take a break -- as long as there's not a question pending, we'll take a break.  Is that fair?

A    Fair.  Thank you.

Q    Okay.  Have you taken any medications today -- today that would impair your ability to testify truthfully?

A    No.

Q    In what city do you live?

A    I live in West Hollywood, California.

Q    Okay.  And in what city do you work?

A    Santa Monica, California.

Q    Okay.  Do you have currently any intention to be in -- in the Florida area between February and May of 2025?

A    February and May, yeah.  I -- I think it's very possible we will be there sometime in the next couple months for -- for vacation but not for business.

Q    Okay.  All right.  The reason why I was asking that is we have a couple of hearings, and -- and to use deposition sometimes -- where in Florida

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    12

would -- would you be?  Just general city --

A    Yeah.

Q    I'm not asking a -- a loc- --

A    I -- I think most -- most likely, it would be Miami.

Q    Okay.  That's helpful.

I'm going to ask you a couple questions now, and when I use the word counsel, I don't just mean the lawyers that are sitting to your left.  I also mean Snap's internal counsel.  Other than speak with your counsel, did you do anything to prepare for this deposition?

A    I -- I did reread the -- the statement that I wrote to make sure that I could recall the -- you know, the statement.  But other -- other than that, just reviewed, you know, with -- with counsel.

Q    Again, I'm not asking what you did with counsel.

A    Yep.

Q    All right.  Did you speak to anyone other than counsel about this deposition?

A    Not in any substantive way, but things such as, you know, telling my assistant and people that work for me on my team I will be out of the office today and -- and just more organizational

10:08:07
10:08:09
10:08:09
10:08:12
10:08:13
10:08:14
10:08:17
10:08:19
10:08:21
10:08:25
10:08:28
10:08:31
10:08:34
10:08:39
10:08:41
10:08:46
10:08:51
10:08:53
10:08:54
10:08:54
10:08:56
10:09:01
10:09:04
10:09:07
10:09:10

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    13

things like that but not in preparation for -- for                10:09:14

the substance of the deposition.                                  10:09:17

        Q    Okay.  Where are you employed?                       10:09:19

        A    Snapchat.                                            10:09:22

        Q    And how long have -- are you employed                10:09:24

actually by Snapchat, or are you employed by                      10:09:27

Snap Inc.?                                                        10:09:28

        A    So I'm employed by Snap Inc., and I work             10:09:30

for the Snapchat part of Snap Inc.  You know, as you              10:09:34

may or may not know, there's also, say, like a                    10:09:40

hardware division that works on our Spectacles                    10:09:43

product as an example.  I don't work on that in any               10:09:46

form or fashion but work on Snapchat as part of                   10:09:48

Snap Inc.                                                         10:09:52

        Q    Okay.  And how long have you been                    10:09:53

employed by Snap Inc.?                                             10:09:55

        A    About six and a half years.                          10:10:00

        Q    So since 2018?                                       10:10:04

        A    That's right.                                        10:10:06

        Q    Okay.  And what is your job title with               10:10:07

Snap Inc.?                                                        10:10:11

        A    I'm a senior director of product                     10:10:12

management.                                                       10:10:14

        Q    And did you begin your career at Snapchat            10:10:17

as a senior director of product?                                  10:10:20

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

14

A    That was not my initial title coming in, but I think I've had, you know, that title of director or senior director for the past few years.

Q    What was your title before it was either director or senior director if you can recall?

A    I think it would have been group product manager.

Q    And when your title changed from group product manager to director or senior director, did your job duties change?

A    I don't think that those were concurrent. At different points, my job duties have changed slightly.  There, you know, are internal reorganizations at times.  Or there are certain things that came within my purview or certain things that exited my team's purview, but it wasn't so much aligned with a change in -- in my job title if that makes sense.

Q    That makes sense.

What are your current duties as senior director of product at Snap Inc.?

A    So currently in -- in my role, my -- you know, I -- my team work on a number of Snap's core, you know, features, including but not limited to messaging, so the core kind of chatting, sending you

10:10:23
10:10:26
10:10:28
10:10:35
10:10:37
10:10:40
10:10:42
10:10:46
10:10:49
10:10:52
10:11:00
10:11:02
10:11:08
10:11:12
10:11:14
10:11:17
10:11:21
10:11:24
10:11:25
10:11:26
10:11:28
10:11:31
10:11:35
10:11:40
10:11:46

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    15

a Snap or calling you, the camera experience and -- | 10:11:48

and some of the visual and creative effects with the | 10:11:56

camera, you know, our memories feature, helping | 10:12:01

users find friends, as well as trust and safety. | 10:12:10

Q    And who do you report to as the senior | 10:12:20

director of product of Snap Inc.? | 10:12:23

A    I report to Ceci Mourkogiannis [sic]. | 10:12:26

Q    And what is -- I'm going to butcher his | 10:12:32

name, and I apologize. | 10:12:34

A    It's okay. | 10:12:35

Q    Mark -- | 10:12:37

A    Ceci. | 10:12:38

Q    Ceci Mark -- | 10:12:40

A    Mourkogiannis. | 10:12:41

Q    Ceci Mourkogiannis' title? | 10:12:41

A    She is a vice president of product design | 10:12:44

and -- and data science. | 10:12:46

Q    Prior to being -- being, I guess, group | 10:12:55

manager at Snap, where were you employed? | 10:12:58

A    I was employed at YouTube. | 10:13:00

Q    And how long were you employed at | 10:13:05

YouTube? | 10:13:07

A    For about eight years. | 10:13:09

Q    And what was your title at YouTube? | 10:13:15

A    Product manager. | 10:13:18

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                16

Q    And what were your duties as a product manager for YouTube?

A    Well, so I was there for, you know, a period of eight years.  So over that period, I worked -- worked on just a number of different things from YouTube's content ID and -- and copyright and -- and rights management systems, YouTube's mobile applications as well as user -- user growth.

Q    All right.  So you would have started there in roughly 2010?

A    2010, exactly.

Q    Okay.  Prior to YouTube, where were you employed?

A    I was a student at the University of Michigan, so --

Q    Okay. All right.  And so you went to college at the University of Michigan, right?

A    Correct.

Q    Okay.  And did you obtain any degrees?

A    Yes.

Q    What degree did you obtain?

A    Bachelor of arts.

Q    Was there any focus or course of study?

A    Yeah, history and other general topics

too, but liberal arts.

Q   All right.  Turning kind of to Snap now, what business is Snap in?

MS. TELLER:  Objection.  Vague.

Q   What business is Snap Inc. in?

MS. TELLER:  Objection.  Vague.

Q   You may answer.

A   Yeah.  It's -- it's a hard -- yeah.  It's a hard, you know, question to answer.  But I think as a product, at least, you know, what we work on at Snapchat and what we hear from our users and what we see is that, you know, first and foremost, the reason why people use Snapchat is as a direct messaging platform for their close friends and family.  So that's kind of the primary purpose of the application is communication with close friends and family.

Q   All right.  So Snap has one product, Snapchat, correct --

A   Correct.

Q   And then it has Bitmoji as a product?

A   Bitmoji as well is owned by Snap -- Snap Inc.  There's a separate Bitmoji application, but most usage of Bitmoji currently is people create Bitmoji avatars and use it inside of the Snapchat

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    18

application.

Q    Okay.  And I think we talked about
Spectacles --

A    Right.

Q    -- as well is a Snap Inc. product, right?

A    Yeah.

Q    Okay.  Other than those three products,
does Snap Inc. have other products?

A    Another one that -- that might be worth
representing that is smaller is we also have a
product called Lens Studio, which allows augmented
reality developers to make, you know, lenses, face
filters, essentially, that work within the Snapchat
application.  That's more of an -- an enterprise or
developer-facing application if you will.

Q    To the extent you know, how many
employees approximately does Snap have?

MS. TELLER:  Objection.  Foundation.

A    I think that's probably something that's
publicly available maybe in some of our earning
or -- or financial statements.  So I -- I don't know
if I want to misquote the number.  Like, I could
take a guess and the -- you know --

Q    Again, I'm not asking you --

A    Yeah.

10:16:18
10:16:19
10:16:22
10:16:23
10:16:23
10:16:26
10:16:26
10:16:29
10:16:34
10:16:36
10:16:41
10:16:46
10:16:50
10:16:54
10:16:59
10:17:02
10:17:05
10:17:09
10:17:12
10:17:14
10:17:17
10:17:20
10:17:22
10:17:24
10:17:26

Q    -- to take -- take a guess.  It -- it is okay --

A    Yeah.

Q    -- if you do not know to say I don't know.

A    Yeah.

Q    And that's -- because I don't know --

A    Yeah.

Q    -- what you know.

A    Yeah.  I don't -- I don't know the number off the top of my head.  And I think it's a, you know, public number we -- we could likely provide.

Q    All right.  And I think you just said Snap Inc. is -- is publicly traded, right?

A    That's correct, yes.

Q    All right.  Does Snap do business outside the United States?

MS. TELLER:  Objection.  Foundation.

Q    To -- to your knowledge?

A    Yes.  So we -- we have offices outside of the United States.  We have users outside of the United States and, you know, content partners, for example, as well outside of the United States.

Q    Okay.  If you know, how many countries does Snap have users in?

MS. TELLER: Objection. Foundation.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q    Okay.  Does Snap have users in -- in the European Union?

A    Yes.

Q    All right.  Does Snap have users in the

Transcript of David Boyle
Conducted on December 12, 2024                    21

United Kingdom?

        A    Yes.

        Q    Does Snap have users in France?

        A    Yes.

        Q    Does Snap have user in Australia?

        A    Yes.

        Q    Now, is Snapchat a product, the same basic product, in each of those countries?

               MS. TELLER:  Objection.  Vague.

        A    So I -- I think I -- I understand the question you're asking, and -- and essentially, yes.

        Q    There's not a different version of Snapchat as -- depending on what country you're in?

               MS. TELLER:  So I just want to pause here because I don't think David was finished answering the last question.

               So, David, I want to make sure you -- you finished your answer.

Q   So if you're in the United States and happened to have a friend in France, you can use Snapchat to communicate with them, right?

A   Absolutely, yes.

Q   Okay.  And if you know, how many users does Snapchat have approximately?

MS. TELLER:  Objection.  Foundation.

But answer if you can.

A   Worldwide or in the United States?

Q   Let's start with worldwide.

Q   And I'm actually asking for --

A   Yes.

Q   -- approximately.  I'm not asking for, like, down to the --

A   Yeah.  Yeah.  I'm -- so I'm -- I'm just

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                23

████████████████████████████████     10:22:15

█████████     10:22:21

        Q    Okay.  And if you know, how many users     10:22:22
does Snapchat have in the United States     10:22:26
approximately?     10:22:29

        A     ████████████████████████     10:22:34

        Q    Again, if you know, how many users does     10:22:47
Snapchat have that are under the age of 18     10:22:50
approximately?     10:22:52

             MS. TELLER:  Objection.  Foundation.     10:22:56

             But you can answer if you know.     10:22:57

      █   ███   ███████████████     10:22:59

████████████████████████████████████     10:23:04

███████████████████████████████████     10:23:11

███████████████████████████████████     10:23:14

████████████████████████████████████     10:23:17

███████████████████████████████████     10:23:22

███████████████████   █████████████     10:23:28

██████████████████████████     10:23:32

      █   ███   ███████████████████     10:23:36

██████████████   ████████████████████     10:23:42

███████████████████████████████████     10:23:47

      █   ████████████████████████████     10:23:51

██████████████████     10:23:56

        Q    Okay.  I would assume that you would not     10:24:02

Q   You're in charge of segments of the product.  I get that.

But is there a unit or a person who that request would be best sent to, if you know?

A   I mean, I think if that's something that we -- we needed to provide for the purposes of this litigation, we -- we could.  It's -- it's, you know, available in a lot of our common data sets.  Like if -- yeah, a number people would be able to have access to that data and -- and query it.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                                    25

Q    Okay.  Well, we'll take care of that
later.  I just -- if you could point me in the right
direction, I was going to try to get that now.

All right.  As part of your duties as a
senior director of product at Snap, do you have any
familiarity with the laws and regulations that
affect Snapchat?

MS. TELLER:  Objection.  Vague.

And, David, I'll just counsel you that if
the question requires you to reveal anything about
the substance of your conversations with counsel for
Snapchat, you shouldn't answer.  I don't think
John's intending to go there.

MR. GUARD:  No.  I was going to have that
preface on the next question.  I was just asking if
he had any familiarity as the precursor before I got
to the next question.

MS. TELLER:  Objection.  Vague.

You can go ahead and answer.

10:25:35
10:25:36
10:25:39
10:25:42
10:25:44
10:25:48
10:25:49
10:25:53
10:25:55
10:25:59
10:26:01
10:26:03
10:26:05
10:26:07
10:26:08
10:26:11
10:26:13
10:26:15
10:26:15
10:26:18
10:26:20
10:26:23
10:26:26
10:26:32
10:26:35

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    26

████████████████████████████████████████     10:26:39

███████████████████████████████████████       10:26:44

███████████████████████████████████████       10:26:49

███████                                        10:26:52

Q    Okay.  And, again, without -- I'm going    10:26:54
to go ahead and put the preface on it.  Without  10:26:57
revealing anything that has been told to you or   10:26:59
shared with you by counsel, are you generally     10:27:02
familiar with the United States Child -- Children 10:27:04
Online Privacy Protection Act of 1998?            10:27:08

███  █████  ██████████████████              10:27:13

████████████████████████████████████████     10:27:18

████████████████████████████████████████     10:27:23

████████████████████████████████████████     10:27:28

████████████████████████████████████████     10:27:32

██████                                        10:27:35

Q    Again, without revealing anything that    10:27:39
has been shared with you by counsel, what is your  10:27:40
general understanding of COPPA?                     10:27:45

MS. TELLER:  And I'll just object here.    10:27:48

To the extent your understanding is based   10:27:49
on conversations with counsel, you should not reveal  10:27:51
that.  If you have independent understanding of it,    10:27:53
you should feel free to share that.                     10:27:56

A    I -- I wouldn't say that I have a      10:28:03

specific understanding of that particular law because I think the thing is there's so many different laws and regulations that a company like ours is subject to.  And COPPA has been in existence

████████████████████████████  ██████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

        ███████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████

████████████████████████████████████

██████████████████████  ████████████████

████████████████████████

        Q    Okay.  Does COPPA set -- to your knowledge, and without revealing anything from counsel, does that -- COPPA set an age where it has increased responsibilities on a product like Snapchat?

                MS. TELLER:  Objection.  Vague.

                And, David, to the extent you have a lay

understanding of this, you should feel free to share this.  But if it's from conversations with counsel, I would instruct you not to answer.

A    Yeah.  As it -- as it relates to COPPA in particular, I -- I don't have any, you know, personal knowledge of that.

Q    Okay.  As I think we are going to discuss at length, Snapchat has a minimum age to utilize its product, correct?

A    That's correct.

Q    And what is that minimum age?

A    That minimum age is 13.

Q    Okay.  Since Snap operates worldwide, would you agree with me that it's subject to laws in other countries as well?

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024          29

A    Yes.

MS. TELLER:  Objection.  Calls for a legal conclusion.

But answer if you can.

Q    And again, I know we're getting a little bit of rhythm, but if you give her --

A    Yeah.

Q    -- just a heartbeat, it would be --

A    Yeah.

Q    -- helpful and make the record a little bit cleaner.

And would you agree with me that the last several years has seen an increase in the number of proposed statutory and regulatory laws that apply to Snapchat?

MS. TELLER:  Objection.  Foundation; speculation; calls for a legal conclusion.

But answer if you can.

A    There's certainly been an increase in legislative and regulatory activity.  My understanding is some of these laws do directly, you know, call out Snapchat as being subject to -- to those laws.  Others, it's less clear.  You know, I'm not -- I'm not the lawyer, you know, when the criteria come along about which companies are

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    30

subject to which laws.  But, for -- for example, one

that I -- I think was very clear is in Europe,

there's the -- the Digital Services Act that very

clearly designated which platforms were -- were

subject to the Digital Service -- Services Act.  And

we were named as one of them, so that -- that one is

abundantly clear.

         There are others that I hear about all

the time over the last few years, as you've said,

where it's not always as clear whether we are

subject to them or who is subject to them or --

or -- or not.  But it definitely seems like there

has been an increase in regulatory and legislative

activity over the last few years.

    Q    And you mentioned Arkansas earlier.  In

addition to there being international action,

there -- would you agree with me there have been

multiple states that have passed laws that

potentially at least could affect Snapchat's

business?

         MS. TELLER:  Objection.  Foundation;

speculation; calls for a legal conclusion.

         But answer to the extent that you can.

    A    Yes.  That -- that definitely seems to be

the case.  You -- you noted Arkansas, and -- you

10:31:45
10:31:51
10:31:54
10:31:59
10:32:02
10:32:05
10:32:08
10:32:10
10:32:13
10:32:16
10:32:19
10:32:22
10:32:26
10:32:29
10:32:31
10:32:34
10:32:35
10:32:38
10:32:46
10:32:49
10:32:50
10:32:50
10:32:53
10:33:00
10:33:01

know, I don't -- I don't have the full inventory in my head.  But there have been several other state laws, that may -- you know, may have to do with -- with our platform and -- and certainly on the topic of teens and how they're spending their time online.

Q    And would you agree with me that both the international movement and the state movement, the laws -- the laws and regulations seem to be concerned about the effect of social media in teens?  And when I mean teens, I mean 13 to 18-year-olds.

MS. TELLER:  Objection.  Foundation; speculation; calls for a legal conclusion.

And I'll instruct you on the basis of privilege to answer only to the extent you have a lay understanding of this independent of your conversations with counsel.

A    So there -- there seems to be also activity on under-13 experiences as well, for example, which -- which Snapchat does not offer.  And some of these other services do offer under-13-year-old services.  So I wouldn't necessarily say my observation has been it's been limited to 13 to 17.  I think we've seen as well a lot of interest in activity around the services that provide online services to under 13-year-olds.

Transcript of David Boyle
Conducted on December 12, 2024                              32

But that being said, there has also been, you know, heightened interest in the impact on teenagers, so 13 to -- to 17-year-olds, and their use of online services.

Q   As the senior director of product at Snap, are you aware of Australia's new social media law?

MR. GUARD:  And, again, all these questions -- I don't know if you want me to say it every time or we could just have a general understanding -- I am not asking for anything that he has learned from counsel.  But, you know, these are all things that are published in newspapers and are generally around other than advice of counsel.

Q   So what I'm asking you for is not something you've heard from counsel.

A   Yes.  So as, you know, these things, through the news, I -- I generally become aware of them through various means, you know, whether reading the -- the news or internal means.  So I have a general understanding that there's a new legislation that -- that was passed there recently.

Q   And from that general understanding and nothing that you learned from counsel --

A   Yeah.

10:34:33
10:34:38
10:34:41
10:34:45
10:34:49
10:34:52
10:34:56
10:34:57
10:34:59
10:35:02
10:35:04
10:35:07
10:35:11
10:35:14
10:35:17
10:35:18
10:35:23
10:35:25
10:35:29
10:35:35
10:35:39
10:35:41
10:35:45
10:35:47
10:35:49

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    33

Q    -- does that Australian law impose requirements on social media companies?

MS. TELLER:  Objection.  Vague; foundation.

Answer if you can.

A    So -- and -- and not to be -- yeah. Not -- not -- not to be like difficult here with the response, I -- I don't know if they impose responsibilities on -- on, like, social media companies or -- or exactly how that's phrased or constructed or which, you know, companies or -- or how that's phrased.  But I -- I have a general understanding that companies in that sector are -- are expecting to be impacted.  And I don't know the exact language they use or if they directly name specific platforms in the law.  But that's my general understanding.

Q    And, again, without revealing anything from counsel, are you aware that the new social media Australian law imposes requirements on age verification?

MS. TELLER:  Objection.  Vague.

A    Yes, I am aware of that.

Q    Okay.  And it requires, whether it's Internet or social media companies, because I

10:35:49
10:35:54
10:35:57
10:35:58
10:35:59
10:36:04
10:36:08
10:36:12
10:36:17
10:36:20
10:36:24
10:36:28
10:36:32
10:36:35
10:36:39
10:36:42
10:36:44
10:36:46
10:36:48
10:36:53
10:36:59
10:37:00
10:37:03
10:37:06
10:37:10

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    34

understand that that can have different definitions,

it requires them to engage in age verification; is

that correct?

          MS. TELLER:  Objection.  Vague; calls for

a legal conclusion.

          Answer if you can.

     A    So, yeah.  First of all, I'm not entirely

sure if we -- we're subject to the law.  I think

that's still up for interpretation.  But my

understanding is -- is the thrust of the law is

that -- there will be age verification requirements

for -- for certain online applications.

     Q    All right.  You mentioned it earlier, but

I'm going to go ahead and ask it again.  And, again,

I'm not asking anything that you've learned from

counsel.  And I'm using the broad definition of

counsel even though I just pointed to the lawyer

that happens to be sitting with you.

          As a senior director of product at Snap,

are you generally familiar with the European Union's

Digital Services Act?

     A    Yes, I'm generally familiar with the

European Union Digital Services Act.

     Q    Okay.  And, again, without revealing

anything that you've learned from counsel, as the

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                                35

senior director of product at Snap, are you                     10:38:26

generally familiar with European Union's General                10:38:29

Data Protection Regulation?                                      10:38:32

      A    I'm generally familiar with the GDPR in              10:38:36

Europe.                                                          10:38:39

      Q    Okay.  I -- I can't jump right to                     10:38:39

acronyms.  I have to say the full name.                          10:38:44

      A    Sorry.                                                10:38:46

      Q    That's okay.                                          10:38:47

      A    Yeah.                                                 10:38:47

      Q    That's okay.                                          10:38:47

           And as -- again, without revealing                   10:38:47

anything from counsel, as senior director of product            10:38:50

at Snap, are you generally familiar with the                    10:38:53

European Union's Audiovisual Media Services                      10:38:56

Directive?                                                       10:38:59

      A    So that one in particular, I'm not                    10:39:05

actually familiar with that one.  I -- I would say,             10:39:08

though, that often our, you know, counsel will --               10:39:11

      Q    Again --                                              10:39:16

      A    Yeah.                                                 10:39:17

      Q    -- I don't want to know anything from                 10:39:17

counsel.                                                         10:39:18

      A    I don't -- yeah.  I'm -- I'm not actually            10:39:19

generally familiar with -- with that one.                       10:39:21

Q    Okay.  As -- again, without revealing anything from counsel, as senior director of product at Snap, are you aware that the European Union has a committee currently discussing age verification right now?

MS. TELLER:  Objection.  Foundation.

And the usual instruction not -- not to reveal anything from counsel, Mr. Boyle.

Q    Would it be fair to say across the European Union, there are different minimum ages depending on which country you happen to be in based on your general awareness and not anything you've heard from counsel?

MS. TELLER:  Objection.  Foundation.

Answer if you can.

A    I think anything with respect to -- to minimum age in -- in different countries would be something that I -- I would've learned from counsel.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                37

Q    Okay.  Fair enough.

Again, without revealing anything that you've learned from counsel, as senior director of product at Snap, are you generally familiar with the United Kingdom's Online Safety Act?

A    Yes, I am generally familiar with the Online Safety Act.

Q    Are you familiar, and, again, not from anything you learned from counsel, about that act's requirement regarding requiring an age-appropriate experience for users in the United Kingdom?

A    Yes, I'm familiar with the age-appropriate design codes.

Q    With respect to the United Kingdom's Online Safety Act, based, again, not on anything you've been told by counsel, just your general understanding from reading the newspaper, are you aware that the United Kingdom is going to require age verification?

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                    38

████████████████████████████████████    10:42:29

██████████████████████████████████████    10:42:33

███████████████████████████    10:42:36

        Q    Okay.  And I'm going to save you from    10:42:40
enduring me butchering the French language and just    10:42:42
ask you again without revealing anything you've    10:42:46
learned from counsel, are you familiar with the    10:42:49
French law from 2023 which requires age verification    10:42:52
and parental consent for those under 15 to utilize    10:42:56
social media?    10:43:01

        A    So that -- that one, I believe anything    10:43:05
that I would have heard would've been from -- from    10:43:08
counsel.    10:43:09

        Q    Fair enough.    10:43:11

        Is Snap contemplating performing age    10:43:12
verification as a result of these changes in law?    10:43:18

        MS. TELLER:  And I'll just object here.    10:43:24

        To the extent answering that question    10:43:25
would require you to reveal conversations with    10:43:26
counsel, I'll instruct you not to answer based on    10:43:29
the basis of privilege.    10:43:32

██  ████  ████████████████    10:43:35

████████████████████████████████    10:43:40

██████████████████████████████    10:43:45

██████████████████████████████████    10:43:49

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

39

10:43:54
10:43:59
10:44:05
10:44:07
10:44:10
10:44:14
10:44:16
10:44:22
10:44:25
10:44:31
10:44:40
10:44:43
10:44:46
10:44:50
10:44:55
10:44:58
10:45:02
10:45:05
10:45:08
10:45:10
10:45:13
10:45:16
10:45:18
10:45:26
10:45:31

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024

40

So our -- our preference would be to have
something that -- that does work across multiple
geographies.  It's just -- it's simpler.  It's more

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    41

secure.  But, you know, as you know, you mentioned a number of laws that, you know, either passed or kind of in the stage of definition.  It's -- it's still unclear whether there will be a -- a solution that actually can work in all these countries that all these different regulators can agree upon.

Q    Okay.  I was asking -- you keep on doing this, and that's fine.

A    Yeah.

Q    But I was going to ask you Meta has come out publicly --

A    Yeah.

Q    -- in documents --

A    Yeah.

Q    -- advocating for -- for the -- the Google and Apple solution.  And if that were to occur, that would be something that Snapchat would support?  Without --

MS. TELLER:  Mr. Boyle?

THE WITNESS:  Yeah.

MS. TELLER:  I was actually going to say that when you are responding to John's questions, wait until he finishes the question --

THE WITNESS:  Yeah.

MS. TELLER:  -- just so that we have a

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

42

clear record.  That's all I was going to say.

MR. GUARD:  Okay.

Q    And, again, I'm not trying to get anything that you've talked about with counsel.

But from a policy position, utilizing the app stores to provide, I guess, it's called an API -- and I'm not going to go further than that because I'm a lawyer.  You're a products guy. That's beyond my reach.  From the stores telling you what someone's age is, is that something that Snapchat is interested in and supports?

MS. TELLER:  Objection.  Vague.

And with Mr. Guard's instruction that don't reveal anything that is relying on conversations with counsel, you can answer the question.

A    Yes.  So I think when -- you know, as we've been looking at the different options out there -- and, obviously, it depends on the -- the implementation details and if they were to offer an API like that, the form it would take and -- and, you know, such details like that.  But the way I would personally see it is that those two platforms are already the primary way that people install and distribute apps.  They, you know, already collect a

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    43

lot of very private and sensitive user data that -- you know, like credit cards for App Store transactions.  In many cases, they actually already do collect state-issued IDs.

I think particularly if it's known that there are these requirements to collect everybody's ID, for example, to -- to access all these large online platforms, that would increase the incentive for -- for hackers and other bad actors to -- to target that user data.  And so then having it be

more centralized as a user, I don't need to give it out to ten different apps.  And who knows behind the scenes how that data is being, you know, stored, retained, and secured versus Apple or Google, depending on my operating system.  And those are companies that have a multi-decade-long track record of doing a really good job of securing private user data.

If those are kind of the two options on -- on the table, I -- I personally think that I would be more trusting if -- if Google and Apple's ability to secure that data and provide it back to developers in a way that makes all this more practically feasible.

Q    Would you agree with me that it is not technologically infeasible to conduct age verification now?

MS. TELLER:  Objection.  Vague.

THE REPORTER:  And what?

Q    Would you agree the privacy part of your concern is a public policy question?

MS. TELLER:  Objection.  Vague.

Q    And not a -- not a technical feasible question?

MS. TELLER:  Objection.  Compound and vague.

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    46

A    Could we maybe -- could you just repeat the question?

Q    Sure.  Would you agree -- and, again, I'm not asking for anything that you may have learned from counsel.  So --

A    Yeah.

Q    -- with that preface, would you agree that the concern that you raised about privacy and keeping information private is not a technical or technological concern but a public policy concern?

MS. TELLER:  Objection.  Vague; compound.

Q    Are you familiar with a company named Ondato?

A    I'm not familiar with that company in particular.

Q    Okay.  Are you familiar with the platform called OnlyFans?

A    Yes, I'm generally familiar with OnlyFans.

Q    Okay.  Do you know if -- oh, you said you were not -- do you know if OnlyFans does age

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    47

verification?

    A    I -- I don't know.

    Q    Okay.

         MS. TELLER:  And, John, just when you get
to a breaking point, if we could take a break.

         MR. GUARD:  Sure.  Go ahead.

         THE VIDEOGRAPHER:  We are going off the
record at 10:55.

         (Whereupon, there was a recess in the
proceedings.)

         THE VIDEOGRAPHER:  We are back on the
record at 11:03.

BY MR. GUARD:

    Q    I think before we left, I had mentioned
OnlyFans.  Is OnlyFans, as far as user size, what
you would consider a large application or Internet
company?

         MS. TELLER:  Objection.  Foundation.

    A    I -- I don't know how many users OnlyFans
has.  I somewhat doubt that they have as many users
in the United States as Snapchat does, but I
don't -- I don't entirely know.

    Q    I don't know how many they -- they have
in the United States, but at least according to
public reports, they have 225 million users.  If

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    48

that is true, would you consider that to be a large
kind of Internet service provider kind of -- or
Internet company?

　　　　MS. TELLER:  Objection.  Vague;
foundation.

　　A　　I don't know if those numbers are apples
to apples with -- with our own numbers.  I don't
know if that's a daily number, an all-time
registered users number, a monthly, it's a bit hard
to say.  I -- I don't know.

　　Q　　Fair enough.

　　A　　Yeah.

　　Q　　Are you familiar with Meta and its
products?

　　A　　Yes.

　　Q　　All right.  And Meta has a product known
as Instagram, correct?

　　A　　Yes.

　　Q　　And Instagram is a product that competes
with Snapchat, right?

　　　　MS. TELLER:  Objection.  Vague;
foundation.

　　　　But answer to your understanding.

　　A　　You -- you could say that, yeah.

　　Q　　Okay.  Are you aware that Instagram has

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    49

been testing age estimation and verification

products since 2022?

        MS. TELLER:  Objection.  Foundation;

speculation.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                      50

Q    And have you ever heard of a company named Yoti?

A    Yes, I have.

Q    And are you aware that Meta has partnered -- partnered with Yoti relating to age verification?

MS. TELLER:  Objection.  Foundation.

A    Yes.  And my understanding is that Yoti is one of the options they are using in the aforementioned circumstance.

Q    Okay.  And whether you want to call it X or Twitter, are you aware that they are also testing age verification?

MS. TELLER:  Objection.  Foundation.

A    I'm -- I'm not specifically aware of -- of what Twitter is doing -- or X is doing in this space, but it wouldn't surprise me.

Q    Okay.  And are you aware that your former employer Google/YouTube is, at least in a limited circumstance, is doing age verification?

MS. TELLER:  Objection.  Foundation.

A    I -- you know, I -- I -- they -- that might be the case.  But what I'm aware of that they are doing, for example, is YouTube Kids registration and a parental link.  And from what I can tell, that

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                51

doesn't require an identity to -- you know, an ID card or anything to verify the age of the parent. So I think -- I've, you know, heard of activity that other platforms are doing with age verification, but they're not at the front door of these products. They're typically to guard a more sensitive feature that a limited number of users of the products are utilizing.

Q    All right.  I'm going to show you what I've marked for identification as Exhibit 1 to your deposition.

(Whereupon, Exhibit 1 was marked for identification and is attached to the transcript.)

MR. GUARD:  And I'm not trying to throw this at you -- I'm --

MS. TELLER:  Wide table.

MR. GUARD:  It's a very wide table.

MS. TELLER:  Thank you.

Q    Have you ever seen Exhibit 1 before?

A    Yes, I have.

Q    Okay.  And if you'll turn to -- I think it's the seventh page, but it's numbered 6.  I think it's one more page.

So at the top there -- there are file markings that say it's page 7 of 7, and then at the

11:07:55
11:07:59
11:08:03
11:08:07
11:08:10
11:08:13
11:08:17
11:08:21
11:08:24
11:08:26
11:08:29
11:08:30
11:08:30
11:08:35
11:08:35
11:08:36
11:08:36
11:08:38
11:08:53
11:08:57
11:08:58
11:09:03
11:09:16
11:09:20
11:09:20

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    52

bottom, it says page 6; is that right?    11:09:24

A    Yes.    11:09:26

Q    Okay.  I just want to make sure that we    11:09:27
are on the right page together.  Is that your    11:09:29
electronic signature that you have affixed on this    11:09:33
document?    11:09:36

A    Yes.    11:09:37

Q    All right.  And -- and did you affix that    11:09:38
signature on or about October 24th, 2024?    11:09:41

A    Yes.    11:09:45

Q    Okay.  And, again, without providing    11:09:51
anything that you've learned from counsel, what is    11:09:56
your understanding of the lawsuit where Exhibit 1    11:10:01
was filed?    11:10:05

A    So my -- my understanding is that there    11:10:13
is a new law in Florida, HB 3, that would require    11:10:17
certain online platforms to do three different    11:10:26
things.  So one is remove 13-year-olds from those    11:10:31
platforms.  Two would be for 14 and 15-year-olds to    11:10:37
obtain verifiable parental consent or, if not,    11:10:43
remove those users from, you know, these online    11:10:48
platforms.  And then lastly would be to probably    11:10:52
verify the ages of all users on the online platforms    11:10:58
to ensure that those, you know, first two things    11:11:03
can -- can be done with confidence.    11:11:06

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                53

Q    Okay.  And what does the lawsuit seek to do?

MS. TELLER:  Objection.  Just to caution you not to reveal your -- your -- any understanding gained from counsel, but if you have a lay understanding, you should provide that.

A    Yeah.  I'm -- I'm not a lawyer, and so I'm probably not the best person to speak to that. But I -- I do know that we're seeking an injunction.

Q    When you say, we are seeking, what do you mean by that?

A    I'm -- I'm not a lawyer, so I would say that it would be better to ask the counsel.

Q    Is it your understanding that Snapchat is a plaintiff in the lawsuit?

MS. TELLER:  Objection.  Foundation.

And, David, just answer to the best of your ability --

THE WITNESS:  Yeah.

MS. TELLER:  -- your lay understanding of the lawsuit.

A    Yeah.  Again, I'm -- I'm not the -- the lawyer here.  I think that there's -- there's also industry groups that are plaintiffs in the lawsuit. So I'm -- I'm probably not the best person to

████████████████████████████    ████    11:12:21

███████████████████████████████████    11:12:24

██████████████████████████████████    11:12:28

████████████████████    11:12:33

Q    Okay.  And have you ever reviewed either    11:12:34
a draft or the final complaint in that lawsuit?    11:12:37

A    Which -- which complaint?  Sorry.    11:12:44

Q    The complaint against -- that Exhibit 1    11:12:46
was filed in.    11:12:48

A    The -- the declaration I wrote?    11:12:50

Q    Yes.    11:12:52

A    Yes.    11:12:53

MS. TELLER:  Just to be clear, I'm a    11:12:55
little confused by the question.    11:12:56

A    Yeah.    11:12:57

Q    All right.  There -- I'll take a step    11:12:57
back --    11:13:02

A    Yeah.    11:13:03

Q    -- to try to clarify it.    11:13:03

A    Yeah.    11:13:04

Q    So when a lawsuit begins, the parties to    11:13:04
the lawsuit file a complaint.  All right?    11:13:07

Have you ever reviewed the complaint that    11:13:10
started that lawsuit?    11:13:13

MS. TELLER:  And so, Mr. Boyle, just to    11:13:14

help you here, he's referring -- if you go to the first page --

THE WITNESS:  Yeah.

MS. TELLER:  -- of the caption here, right, of the overall case.  And what we have here is your declaration.  You know --

THE WITNESS:  Yeah.

MR. GUARD:  -- I don't think Mr. Guard is trying to confuse you, but just make sure you understand.

A    So you're asking if I read the overall complaint or the declaration that I wrote?

Q    I'm not asking about the declaration. I'm going to ask about the declaration in a minute. I'm asking about the complaint that initiated --

A    Yeah.

Q    -- the lawsuit, the lawsuit that's in the caption that's on the top of the first page of your declaration.  Did you review it?

A    I -- I have not personally reviewed that, no.

Q    Okay.  Do you know who Ashley Moody is?

A    I mean, from reading this document, it would appear she's acting as an attorney general of the State of Florida.

Q    Okay.  But other -- and separate and apart from you reviewing Exhibit 1, you have no knowledge about who Ashley Moody is; is that fair?

A    That -- that's accurate.

Q    Okay.  All right.  The face of Exhibit 1 -- and I'm going to try to do it this way so that it's -- I'm not confusing you -- says, this declaration is being filed in support of plaintiff's motion for preliminary injunction.  Do you see that on page 1 of Exhibit 1?

A    Yes.

Q    Have you ever reviewed a copy of the motion for preliminary injunction that Exhibit 1 supports?

MS. TELLER:  Objection.  Vague.

If you understand the question, David, you should feel free to answer it.

A    I -- I don't recall.  When these, you know, types of new laws and lawsuits and things like that come to our attention, it's usually discussed with counsel who explain and summarize what's going on versus me directly reading legal documents like that.

Q    Okay.  So, again.  I'm not asking you and I don't think my question asks you for anything that

11:14:14
11:14:16
11:14:19
11:14:25
11:14:27
11:14:29
11:14:31
11:14:35
11:14:38
11:14:41
11:14:44
11:14:46
11:14:48
11:14:52
11:14:58
11:15:00
11:15:01
11:15:05
11:15:07
11:15:11
11:15:15
11:15:19
11:15:23
11:15:24
11:15:26

you talked about with counsel.  But as far as                 11:15:28

reviewing the actual motion, did you ever review the          11:15:29

actual motion for preliminary injunction?                     11:15:35

    A    I -- I personally wouldn't do something              11:15:38

like that because I'm not a lawyer.                            11:15:39

    Q    Okay.  Now, looking at Exhibit 1, which              11:15:41

is in front of you, Exhibit 1 indicates that there            11:15:46

are two plaintiffs in this case, right?                       11:15:51

         MS. TELLER:  Objection.  Foundation.                 11:15:55

    A    Well, the document says Computer and                 11:16:04

Communications Industry Association and NetChoice.            11:16:06

    Q    And that's -- and that's above the                   11:16:11

plaintiffs line, right?                                        11:16:12

    A    Right.                                                11:16:14

    Q    Okay.  All right.  But sitting here right            11:16:15

now, you don't know if there are other plaintiffs?            11:16:17

    A    I -- I'm not the -- the --                           11:16:25

    Q    I'm only asking your knowledge.                      11:16:27

    A    Yeah.                                                 11:16:28

    Q    I'm only asking your knowledge.  And if             11:16:28

it's, again -- I'm --                                          11:16:30

    A    Yeah.                                                 11:16:32

    Q    -- I'm okay with you saying, I don't                 11:16:32

know.                                                         11:16:34

    A    I -- yeah.                                            11:16:34

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    58

Q    And I'm not asking anything that you may have learned from your counsel.

A    Yeah.  I -- I don't know about the overall mechanics of this lawsuit or -- or the legal process that surrounds it, so no.

Q    Okay.  To your knowledge -- and, again, I'm not asking you anything you learned from counsel -- does Snap Inc. have a relationship with the Computer and Communications Industry Association?

MS. TELLER:  Objection.  Foundation.

A    I --

MS. TELLER:  And vague.  Sorry.

Go ahead.

A    Yeah.  I just -- I just don't have specific knowledge about this.

Q    So you -- you don't know if Snap has a relationship?

MS. TELLER:  Objection.  Vague; foundation.

A    I -- look, I -- I work more on the product development of the products.  It's possible in some meetings with counsel when they are explaining --

MS. TELLER:  And, David, I'll just --

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024          59

Q    I'm not -- I'm not -- we're not --                    11:17:33

A    Yeah.  I -- I just -- I don't -- I don't              11:17:35
have personal knowledge of -- of the mechanics of          11:17:36
the legal process here.  Outside of my declaration         11:17:39
and things that were explained to me by counsel,           11:17:43
this is not, you know, my -- my area of expertise.         11:17:45

        MS. TELLER:  And, David, I'll just --              11:17:50
just for the record, put one objection here --             11:17:51

        THE WITNESS:  Yeah.                                11:17:53

        MS. TELLER:  -- just so you -- you can             11:17:53
hear it as well.  When Mr. Guard asks you questions        11:17:54
that you only know given your conversations with           11:17:58
counsel, I'll instruct you not to answer those.  And       11:18:00
you need not --                                            11:18:03

        THE WITNESS:  Yeah.                                11:18:03

        MS. TELLER:  -- reveal those, and I don't          11:18:03
think Mr. Guard's asking you for those.                    11:18:05

Q    And I think in every one of these                     11:18:08
questions --                                               11:18:09

A    Yeah.                                                 11:18:09

Q    -- I'm putting that explicitly in there.             11:18:09

A    Yeah.                                                 11:18:12

Q    And to your knowledge and, again, without            11:18:14
revealing anything from counsel, does Snap Inc. have       11:18:16
a relationship with NetChoice?                             11:18:21

A   I -- I don't entirely know.  I mean, I would assume that to be the case.  But I -- I don't have personal knowledge of that outside of anything I've discussed with counsel.

Q   And again, I was explicitly excluding --

A   Yeah.

Q   -- and I know that this is kind of weird because in normal life, you don't --

A   Yeah.

Q   -- sit there and compartmentalize.  But I'm trying very hard to -- to keep that wall up here.

Do you know if Snap Inc. is a member of NetChoice?

MS. TELLER:  And I'll just object here. I think the witness has made pretty clear he doesn't really understand the details of this independent of his conversations with counsel.  So you should feel free to ask the questions, Mr. Guard.  But I think the witness is not going to be able to answer that. He's made it pretty clear.

MR. GUARD:  I'm -- I -- again, I -- I've said this repeatedly.  I'm okay with him saying, I don't know.  He signed the declaration.  I'm taking a deposition.  I'm entitled to what -- what he

11:18:28
11:18:29
11:18:33
11:18:36
11:18:37
11:18:41
11:18:41
11:18:43
11:18:45
11:18:45
11:18:49
11:18:52
11:18:55
11:18:57
11:18:59
11:19:01
11:19:03
11:19:06
11:19:08
11:19:10
11:19:12
11:19:14
11:19:16
11:19:18
11:19:24

knows, and he doesn't know.

MS. TELLER:  And he may -- his answer may be, I can't answer that without relying on my conversations with counsel.  So I just want to make clear that that seems to be the answer he's giving.  If you want to make the record of the questions, of course, that's fine.

Q    I'm not sure if there's actually a question pending at this point.  So I'm going to ask my last question again, and I apologize if you already have answered it.

To your knowledge, and again, without revealing any conversation you've had with counsel, is Snap Inc. a member of NetChoice?

MS. TELLER:  Same objections.

A    I -- I -- I don't know the answer to that question.  Anything that I would have learned about the mechanics of this lawsuit, I would have learned in a conversation with -- with counsel.  But I don't -- I don't know the mechanics of -- of, you know, that part of the lawsuit.

Q    Okay.  Have you, yourself, had any interactions with NetChoice?

A    I personally don't recall any direct interactions with NetChoice or any reason why I

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                    62

would have, no.

Q    Okay.  Have you ever had any interactions with Computer and Communications Industry Association?

A    Not to my recollection, no.

Q    Do you have any understanding of what the Computer and Communication -- Communications Industry Association is?

A    I -- I don't know.

Q    All right.  Do you have -- same question with respect to NetChoice.  Do you have any understanding, and, again, excluding anything you've been told by counsel, of what NetChoice is?

A    I mean, I -- I think from reading, you know, public stories and news, I have -- I have an -- general understanding that they're an industry trade group that, you know, may -- may represent various online companies and platforms.  That's -- that's probably the greatest extent of my understanding.

Q    Okay.  And with the exception of maybe that first page, did you draft Exhibit 1?

MS. TELLER:  Objection.  Vague.

And just -- just a caution -- I don't think the question's asking for this -- but don't --

don't reveal anything about your conversations with counsel to the extent it raises that issue.

A    Yes.  So in -- in partnership with counsel, I -- I drafted the declaration.

Q    Okay.  And prior to you electronically affixing your signature, did you review Exhibit 1?

A    Yes.

Q    Okay.  And excluding all conversations that you may have had with your counsel, have you had a conversation with anyone else about the declaration, Exhibit 1?

MS. TELLER:  Objection.  Vague.

A    I -- I don't believe so.  The only, you know, maybe in -- in some minor logistical things around just being able to get it printed out and -- and signed but not in a substantive way.

Q    Okay. All right.  In preparing Exhibit 1, did you review any documents?

A    I -- I don't recall reviewing any specific documents to prepare this because this is really just a reflection of my knowledge in the course of my job.

Q    Okay.  In preparing Exhibit 1, did you review what is referred to in your declaration as HB 3?

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

64

During the course of that -- I mean, that's mostly led by counsel. I think I likely did open and -- and read the -- you know, the document of the law at some point. But as a nonlawyer, my reliance and understanding of the law would primarily be on counsel, not my own, you know, interpretation of -- or reading a few sentences of it, right? So I'd say most of, you know, my primary

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                 65

understanding of the law and similar laws and                    11:26:00

regulations comes from my conversations with counsel             11:26:04

if -- if that's helpful.                                         11:26:08

        Q    So in paragraph 9 on page 4 in the first            11:26:13

sentence where you said, I am familiar with                      11:26:22

Florida's HB 3 ("The Act") and believe that Snap may             11:26:28

be covered by the scope of the law, that was -- was              11:26:38

that from your perusal of the law or some other                  11:26:42

source?                                                          11:26:47

        MS. TELLER:  And I'll just object here,                   11:26:48

David --                                                         11:26:49

        THE WITNESS:  Yeah.                                       11:26:50

        MS. TELLER:  -- on the basis of                          11:26:50

privilege.  I would -- I would instruct you not to               11:26:50

go into the details of exactly how you came to be                11:26:54

able to make this statement.  I think, obviously,                11:26:57

you have made this statement, and you have that                  11:26:59

familiarity.                                                     11:27:02

        And I -- I would caution counsel as well                 11:27:03

to -- that I -- we have the statements that are in               11:27:06

the declaration.  I think, obviously, asking                     11:27:09

questions about his understanding based on that is               11:27:11

fine.  But I -- I don't want to go into questions                11:27:15

about exactly how he came to learn them.  As I think             11:27:18

he's explained, counsel's intimately involved in                 11:27:22

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    66

this.

MR. GUARD:  We may have a waiver problem, but we'll take that up later with the judge.

MS. TELLER:  I'll just object.  I don't -- I don't think there's been any waiver here. Perfectly able to ask questions about what he said about what his understanding is in the declaration.

Q    How does the act implicate fundamental aspects of Snap services?

A    So my -- my understanding with, you know, conversations with counsel --

MS. TELLER:  And, David, I'll just --

THE WITNESS:  Yeah.

MS. TELLER:  -- instruct you here, don't -- don't reveal the basis of those -- let me be just -- can we just have a minute?

MR. GUARD:  Yeah.

MS. TELLER:  And I'll help him answer these questions.

Let's take a two-minute break here.

THE VIDEOGRAPHER:  We're off the record at 11:28.

(Whereupon, there was a recess in the proceedings.)

THE VIDEOGRAPHER:  We are back on the

record at 11:32.

BY MR. GUARD:

Q    The second sentence of paragraph 9, what is numbered at the bottom of page 4 on the top of it says page 5, reads -- in part because I'm going to stop -- this act implicates fundamental aspects of Snap services.

What aspects of Snap services does the act implicate?

████ ██████████████████████████████████

█████████████████████████████████████  ████

██████████████████████████████████████

██████  ███████████████████████████████████

████████████████████████████████

████████████████████████████████████

███████████████  ██████████████████████████

██████████████████████████████████████

██████████████████████████████████████

Q    How many 13-year-old users are there in the State of Florida?

MS. TELLER:  Objection.  Foundation.

████ ████████████████████████████████████

████████████████████████████████████

Q    Okay.  When you were executing this declaration, did you have the number of 13-year-old

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    68

users in the State of Florida handy?

                MS. TELLER:  David, I'll just stop you.

                THE WITNESS:  Yeah.

                MS. TELLER:  Make sure you just answer
the question that Mr. Guard has asked, which is I
think whether, when you drafted the declaration --

                THE WITNESS:  Yeah.

                MS. TELLER:  -- you were aware of the
number of 13-year-old users.  And you need not get
into how you knew that.

        A    Yeah.  I mean, I think the -- the
specific number --

                MS. TELLER:  And if you don't remember,
that's okay too.

                THE WITNESS:  Yeah.

11:34:37
11:34:44
11:34:46
11:34:49
11:34:53
11:34:57
11:34:57
11:34:57
11:34:59
11:35:01
11:35:04
11:35:04
11:35:05
11:35:08
11:35:10
11:35:12
11:35:15
11:35:16
11:35:17
11:35:17
11:35:20
11:35:28
11:35:32
11:35:36
11:35:40

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                          69

Q    Well, the law, HB 3, applies only in the State of Florida, correct?

A    Correct.

Q    And so only 13-year-old users that are in the State of Florida would be impacted, right?

MS. TELLER:  Objection.  Calls for legal conclusion.

Answer to your knowledge.

▮ ██████████████████████

████████████████████████████

███████████████████████  ██

████████████████████

████████████████████████

████████████████████████████

██████████████  ████████████

█████████████████████

███████

Q    Well, I think my question was aimed at the --

A    Yeah.

Q    You made three points here.

A    Yeah.

Q    And I'm trying to go slowly.

A    Yeah.

Q    And I'm trying to be -- tread carefully

here because, again, I'm not trying to get into what counsel has told you.

A    Yeah.

Q    Okay?  Your first point was -- was that 13-year-old users would have to be kicked off the platform, correct?

A    That's right.

Q    Okay.  And the question I was trying to ask before was at the time you executed this declaration, were you aware -- and I'm not asking how you are aware --

A    Yeah.

Q    -- of the number of 13-year-old users in the State of Florida?

Q    All right.  For your second point, which was it would require -- so for the 13-year-old users, at least initially, there's no parental consent requirement because there's no parental consent option, right?

A    That is my understanding, yes.

Q    Okay.  Your second point was for 14 and 15-year-old users, there would have to be age verification followed by parental consent verification.  Did I say that correctly?

A    That's my understanding is that you would need age verification and verifiable parental consent.

████████████████████   ███████████████    11:39:32

████████████████   █████████████    11:39:34

            MS. TELLER:  Objection.  Foundation.

      Q    If you can -- if you can --

    █    ██████    ██████    ████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████

      Q    Okay.  To your knowledge, and, again, I'm not talking about anything that you learned from counsel, does COPPA require verifiable consent?

            MS. TELLER:  And I'll caution you, although Mr. Guard already has, not to reveal any conversations with counsel, but just if you have a lay understanding, you can answer, yes, or no.

      A    My understanding of COPPA is that they do require a verifiable parental consent for under-13 users, but -- but not for the set of, you know, users that are -- are over 13.

      Q    Okay.  All right.  And the third point you mentioned was it was going to require age verification for all users in Florida.  Again, without revealing anything that counsel told you, at the time you signed this declaration, were you aware

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                73

of the number of users in Florida that would be subject to age verification?

MS. TELLER:  And, David, just -- just to be helpful here --

THE WITNESS:  Yeah.

MS. TELLER:  -- you can just answer yes or no.  Either you were aware or you weren't aware. That might simplify things a bit.

A    Well, there's -- there's a couple -- you know, there's a point that inside of the question that I'm -- I'm not entirely sure about, though, which is how many would be subject to age verification because I think that's still perhaps up to a legal -- legal interpretation I'm not certain of.

Q    Okay.  All right.  You can for now put -- close up the declaration and put it to the side. Though, I would probably keep this somewhat handy because you can imagine we'll come back to it a

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    74

couple times probably.                                    11:42:34

A    Understood.                                          11:42:35

Q    Okay.  Now changing topics, Snap doesn't            11:42:36
charge for users downloading its application or           11:42:42
utilizing its site, correct?                              11:42:44

A    That's correct.                                      11:42:48

Q    All right.  And Snap does not charge an             11:42:49
annual fee, right?                                        11:42:53

A    No.                                                  11:42:55

Q    It doesn't charge some kind of monthly              11:42:56
fee, right?                                               11:42:57

A    No.                                                  11:42:59

Q    All right.  Snap's business model is                11:43:02
about selling ads, right?                                 11:43:04

A    ████████████████████████████████████                11:43:11
████████████████████████                                 11:43:13
████  ██████  ████████████████████                       11:43:15
██████████████████████████████                           11:43:21
████████████████████                                     11:43:22
████  ████████████████████████                           11:43:26
████████████████████████████████                         11:43:31
██████████████████████████████████                       11:43:36
████████████████████████████████                         11:43:38
██████████████████████████                               11:43:43
██████████████████████████                               11:43:47

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

75

MS. TELLER:  Objection.  Vague.

Q    Okay.  That's fair enough.  And some of

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                    76

this is I'm not necessarily as familiar with the        11:45:16

product as you are, so I appreciate that                11:45:18

explanation.                                            11:45:20

      I'm going to show you what I've marked    11:45:21

for identification as Exhibit 2 to your deposition.     11:45:22

      (Whereupon, Exhibit 2 was marked for       11:45:27

identification and is attached to the transcript.)      11:45:27

Q    What is Exhibit 2?                                11:45:41

A    Exhibit 2 is our terms of service for             11:45:45

using Snapchat.                                         11:45:49

Q    All right.  Have you ever reviewed the            11:45:51

terms of service?                                       11:45:54

                                                       11:45:58

                                                       11:46:01

                                                       11:46:05

                                                       11:46:08

                                                       11:46:12

                                                       11:46:17

                                                       11:46:20

                                                       11:46:23

Q    Okay.  And are -- from -- are the terms           11:46:26

of service that were effective on                       11:46:29

February 26th, 2024 the current for terms of service    11:46:31

as far as your knowledge?                               11:46:36

      MS. TELLER:  Objective -- objection.      11:46:38

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024          77

Foundation.                                    11:46:38

█    ███████████████████████           11:46:43

████████████████████████████████████  11:46:46

█████████████    ████████████████      11:46:50

███████████████████████████████        11:46:55

████████████████████████████████       11:46:57

███████████████████                     11:46:59

     Q    Okay.                          11:47:01

     A    But --                         11:47:02

     Q    And I'm asking this as a general   11:47:06
question.  And again --                11:47:07

     A    Yeah.                          11:47:08

     Q    -- I'm not asking anything that you   11:47:08
learned from counsel.                   11:47:09

     A    Yeah.                          11:47:11

     Q    What is -- what is the purpose of the   11:47:11
terms of service?                       11:47:13

     A    I -- I think there are a few purposes.   11:47:17

███████████████████████████████        11:47:19

███████████████████████████            11:47:24

████████████████████████████████       11:47:27

████████████████████████████████       11:47:31

████████████████████████████████       11:47:33

█████████████████████████████████      11:47:37

████████████████████████████████       11:47:41

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

78

████████████████████████████████████████    11:47:44

████████████████████████████    11:47:46

Q    Okay.  And if you look at that middle of    11:47:48
the second page, I think it's, 1, who can use the    11:47:51
services.  In this section, Snap is indicating who    11:47:56
can use its services, right?    11:48:11

MS. TELLER:  Objection.  Foundation.    11:48:13

A    It -- yeah.  It -- it seems to say who    11:48:20
can use the -- the services, so, yes.    11:48:22

Q    Okay.  And it indicates that Snapchat is    11:48:24
not directed at someone under 13 years of age,    11:48:29
right?    11:48:32

A    That's right.    11:48:33

Q    All right.  And we've talked about the    11:48:34
minimum age to use the Snap product is -- is 13,    11:48:35
correct?    11:48:39

A    Correct.    11:48:40

█  ███████████  ███████████████████████    11:48:41

█████████████████████████████████    11:48:43

█████████████████████████████    11:48:49

MS. TELLER:  Objection.  Foundation.    11:48:53

But answer to the extent you can.    11:48:54

█  ████████  ████████████████████████████    11:48:56

██████████████████  █████████████████    11:48:57

█████████████████████████████████████    11:49:01

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    79

                                                                11:49:05

                                                                11:49:09

                                                                11:49:14

                                                                11:49:20

                                                                11:49:24

                                                                11:49:27

                                                                11:49:31

                                                                11:49:34

                                                                11:49:40

                                                                11:49:46

                                                                11:49:51

                                                                11:49:56

                                                                11:50:00

                                                                11:50:04

                                                                11:50:07

                                                                11:50:11

                                                                11:50:14

                                                                11:50:17

                                                                11:50:20

                                                                11:50:24

                                                                11:50:27

                                                                11:50:30

                                                                11:50:34

          MS. TELLER:  Objection.  Foundation.          11:50:37

          Answer to the extent you know.                11:50:39

11:50:41

11:50:43

11:50:48

11:50:50

11:50:54

11:50:58

11:50:59

11:51:02

11:51:07

11:51:10

11:51:14

11:51:17

11:51:21

11:51:23

11:51:27

11:51:30

11:51:34

11:51:37

11:51:40

11:51:43

11:51:47

11:51:48

11:51:53

11:51:57

11:51:59

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                    81

MS. TELLER:  Objection.  Foundation;
misstates the prior testimony.

Q    If I misstated something, please clarify.

MS. TELLER:  Objection.  Foundation.

Q    Okay.  Is that unit underneath you as
a -- as the senior director product manager, or is

it under someone else?

███ ████████████████████████████

███████████████████████ ███████████

████████████████████████████████

████████████████████████████

██████████████ ███████████████

██████████████████████████████████

██████████████

     Q    Okay. And who is the individual at Snap that is at kind of your level over that organization?

███ ██████████████████████

████████████████████████████████

█████████████████ ██████████████

██████████████████████████

██████████████████████████

███████████████████████████████████

████████████████████████ ███████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████████████████

█████████

           ██████████████████████████

█████████████████████████████



Q    Sure.

A    Yeah.

Q    So they would have had a public profile?

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

84

A    Yeah.  Yeah.

Q    There's multiple steps?

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                          85

    MS. TELLER:  David, I don't want to interrupt you --

    THE WITNESS:  Yeah.

    MS. TELLER:  -- but we're just getting into a little back-and-forth --

    THE WITNESS:  Yeah.

    MS. TELLER:  -- where it's not clear what the question --

    THE WITNESS:  Yeah.

    MS. TELLER:  -- on the record is.

    THE WITNESS:  Yeah.

    MS. TELLER:  So just make sure you let --

    THE WITNESS:  Yeah.

    MS. TELLER:  -- Mr. Guard finish a question --

    THE WITNESS:  Yeah.  Apologies.

    MS. TELLER:  -- and we all know what it is, and I can object and just make sure we -- we get that.

    THE WITNESS:  Yeah.

BY MR. GUARD:

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    86

Q    If we were -- if we were having a
conversation at Starbucks --

A    I -- yeah.

Q    -- it would be -- it would perfect.

A    Yeah, so.

███ ████████ ████████████████

████████████████████████████████████████

███████ ████████████████████████████████

████████████████████████████████████████

██████████ ████

█ ████████████████████████████████

████████████

Q    Okay.

A    -- and year.

MS. TELLER:  And I'm told lunch is here.
So not -- need to break right this moment, but
whenever you have a break, let's go ahead and take
it, Mr. Guard.

MR. GUARD:  Okay.  Let me try to finish
this document, and then we'll break.

MS. TELLER:  That's fine.

Q    Is Snap Inc. aware of adults pretending
to be under 18 years old on its products?

MS. TELLER:  Objection.  Foundation.

█ ████████████████████████████████ █

Q   Okay.  All right.  And if you look down at the third bullet point on page 2 of Exhibit 2, it says -- and -- and so the record is clear, that there's a statement before it that says, by using the services, you represent, warrant, and agree that:  And then it has a series of bullet points. The third one is, you are not a convicted sex offender.  Do you see that?

A   I do see that, yes.

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                              88

████ █████ ███████████

█████████████████████████

█████████████████████████

█████████████████████████

████████

        MS. TELLER:  Objection.  Foundation.

        Answer to the extent you can.

████ ███████████████████

██████████████████  ████████

██████████████████████████

█████████████████████████

█████████████████████████

█████████████████████  ███

██████████████████████████

████████████████████

    Q   Okay.  Are you aware that the United States and most states in the United States require sex offenders to register?

        MS. TELLER:  Objection.  Foundation.

    A   You know, I have some lay understanding that that's something that, you know, exists, but it's not something I've personally looked into seeing if we can do that at scale.

    Q   Okay.

    A   Yeah.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                              89

Q    Something like if you move into a new neighborhood, you might go to a website and check to see if there are any sex offenders in your neighborhood is what you're talking as far as a lay understanding, right?

A    Yeah.

Q    Okay.  All right.

MR. GUARD:  We can take a break.

THE VIDEOGRAPHER:  We are going off the record at 12:02.

(Whereupon, there was a recess in the proceedings.)

THE VIDEOGRAPHER:  We are back on the record at 12:32.

BY MR. GUARD:

MS. TELLER:  Objection.  Foundation.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    90

MS. TELLER:  Objection.  Foundation;
vague.

　■　████████████████████████████

Q    What information is required to create an
account with Snapchat?

MS. TELLER:  Objection.  Foundation.

Answer to your personal knowledge.

A    So, yeah, there are a few things.  So,
you know, your first and last name, date of birth,
including year of birth, and then some kind of, you
know, account identifiers.  So it could be either a
phone number and an e-mail address.  And then people
can optionally do things like add a -- you know, a
profile photo, Bitmoji, as an example.

Q    Okay.  And so kind of going back to the
question I asked before that where the person, in
order to -- and I just want to make sure the record
is clear.  In order to set up a -- I've been
terminated, and I'm trying to set up a new account.
Would I have to lie to Snapchat to be able to do
that, or could I simply enter the same information
that I entered with the old account?

MS. TELLER:  Objection.  Vague.

　■　████████████████████████████
████████████████████████

12:32:56
12:32:58
12:33:01
12:33:08
12:33:12
12:33:18
12:33:19
12:33:21
12:33:23
12:33:30
12:33:35
12:33:40
12:33:48
12:33:50
12:33:55
12:33:57
12:34:01
12:34:03
12:34:06
12:34:09
12:34:14
12:34:17
12:34:20
12:34:24
12:34:25

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

91

Q    Okay.  In this hypothetical --

A    Yeah.

Q    -- assume that I entered originally a
date of birth that has me being over 13.

A    Yeah.

Q    So I was allowed to create an account.
That account got terminated, and then I went back to
Snapchat and tried to create a new account.  But I
used the same identifiers, the same first and last
name, the same date of birth, and the same phone
number or e-mail address, could I create a new
account on Snapchat?

MS. TELLER:  Objection.  Vague.

████████████████████████████████████  12:36:03

████████████████████████████████████  12:36:08

████████████████████████████████████  12:36:12

████████████████████████████████████  12:36:14

████████████████████████████  ████████  12:36:21

████████████████████████████████████  12:36:26

████████████████████████████████████  12:36:30

████████████████████████████  12:36:35

Q   Okay.  All right.  I'm going to show  12:36:38
marked for identification as Exhibit 3 to your  12:36:41
deposition.  12:36:43
(Whereupon, Exhibit 3 was marked for  12:36:44
identification and is attached to the transcript.)  12:36:44
MS. TELLER:  And I'm just going to put  12:36:46
them in a pile --  12:36:47
THE WITNESS:  Yeah.  12:36:48
MS. TELLER:  It might be handy if you  12:36:48
find it.  12:36:50
MR. GUARD:  It may be good to put them  12:36:50
upside, like, down, one on the bottom?  That way --  12:36:52
MS. TELLER:  Sure.  I can do that there.  12:36:55
I'm not sure what you're saying, but I can find  12:36:55
whatever you need if you need it.  12:36:59
THE WITNESS:  Yeah.  Okay.  12:37:00
MR. GUARD:  Sorry.  I'm not trying to  12:37:02

throw this.  Is just too -- like, too far.

MS. TELLER:  Yeah.  I got it.  Thank you.

Q    Have you ever seen Exhibit 3 before?

A    So I -- I don't recall if I've seen this in -- in this exact form.  But I, you know, have seen similar documents or contributed to -- to similar documents, but perhaps not this one in, like, this exact final form, if you understand.

Q    All right.  I understand.  And what is Exhibit 3?

MS. TELLER:  Objection.  Foundation.

Q    Okay.  Is the safety hub -- or safety and policy hub, that function underneath your chain of command?

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                94

Q    Okay.  From your own knowledge, what is sextortion?

A    So sextortion that, you know, we have learned about, and I -- you know, I recall the -- the FBI also had some, you know, good information that they shared publicly that was helpful -- is typically what, you know, I -- I have observed is there's often a -- a fake female account. Typically, the person operating the account is located overseas outside of the United States.  With those accounts, they will pose as, you know, an attractive person to befriend the potential victim.

Often, what we've learned from, you know, outside industry groups and others is that often that starts in some of the public social media products with, you know, a public profile of an attractive-looking person.  Then they move the conversation onto more private communication platforms, build a rapport with the prospective victim, start to exchange intimate imagery, and then once the victim has reciprocated with the exchange of intimate imagery, then they use that material for -- for blackmailing the -- the victim.  So that's the general kind of pattern that I've observed and -- and learned about.  And it's

12:38:49
12:38:55
12:38:59
12:39:03
12:39:07
12:39:10
12:39:12
12:39:21
12:39:25
12:39:29
12:39:34
12:39:37
12:39:43
12:39:48
12:39:51
12:39:55
12:39:57
12:40:00
12:40:04
12:40:08
12:40:14
12:40:17
12:40:21
12:40:26
12:40:27

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024          95

something that we take extremely seriously.

Q    Okay.  Has Snapchat been utilized by people conducting sextortion?

MS. TELLER:  Objection.  Foundation.

But answer as you know.

A    You know, Snapchat is one of a handful of online applications that we, you know, have seen is used as part of this process.  There's online -- there's an online industry group called Thorn that has publicly available information, reports of patterns of sextortion, and they -- you know, they list us as one of a handful of platforms that, you know, bad actors do use them as part of these scams.

Q    Okay.  Based on your knowledge, is there a particular age group that is targeted by people that are committing sextortion?

MS. TELLER:  Objection.  Foundation.

A    I think, actually, the -- the one more kind of common distinguishing demographic factor that I -- I have seen from my knowledge and analysis is more like male versus age necessarily.  It tends to be more male users get targeted by, you know, fake female users.  You know, I think in -- my recollection is that in the analysis, we haven't necessarily seen that younger users get

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    96

disproportionately targeted.

Q    Okay.  Does Snap collect data on how many times its services have been utilized in sextortion scams?

MS. TELLER:  Objection.  Foundation.

Q    Would that be something that someone in your area would have knowledge of or be able to obtain, or would it be somebody that -- like public policy or -- or support group were to have that information?

Q    Have you ever heard of the phrase catfishing?

A    Unfortunately, yes, I have heard that phrase, and it is part of this scam, yes.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

97

Q    What is catfishing?                                                  12:43:42

A    So my -- my understanding of catfishing         12:43:48

is that, you know, you create a fake online persona.         12:43:51

Usually, it's, you know, an attractive person of the         12:43:56

opposite gender targeting someone of the opposite         12:43:58

gender to convince them that they have romantic         12:44:04

interest in them and then using that to their         12:44:06

advantage.         12:44:10

Q    Okay.  If Snapchat conducted age         12:44:11

verification as required from HB 3, would catfishing         12:44:15

scams be more difficult or less difficult to occur?         12:44:21

MS. TELLER:  Objection.  Speculation;         12:44:24

calls for a legal conclusion; foundation.         12:44:28

Answer to the extent you can.         12:44:31

█  ████████████████████         12:44:39

████████████████████████         12:44:48

█████████████████████████         12:44:54

██████████████████████         12:44:58

████████████████████         12:45:01

████████████████  ████████         12:45:04

████████████████████         12:45:08

████████████████████         12:45:11

██████████  ████████████████         12:45:14

████████████████████         12:45:19

██████████████████         12:45:24

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                98

████████████████████████████████████████        12:45:27

████████████████████████████████████████        12:45:32

██████████████████████████    ███████████        12:45:34

█████████████████████████████████████            12:45:38

Q    I'm going to show you now what I've           12:45:46
marked for identification as Exhibit 4 to your      12:45:47
deposition.                                         12:45:51
        (Whereupon, Exhibit 4 was marked for        12:45:52
identification and is attached to the transcript.)  12:45:52
        MS. TELLER:  Thank you.                     12:45:58
Q    What is Exhibit 4?                             12:46:09
        MS. TELLER:  Objection.  Foundation.        12:46:15
A    This -- my understanding is this is the        12:46:20
Snapchat 101 that is on our support site.           12:46:23
Q    Okay.  And since it's on the support          12:46:26
site, is it something that you have input in?       12:46:29

█  █████████████████████████████                   12:46:36
████████████████████████████████████               12:46:38
██████████████████████████████████                 12:46:42
█████████████████████████  ███████████             12:46:45
███████████████████████████████                    12:46:46
████████████████████████████████████████           12:46:51
███████████████████                                12:46:54

Q    Okay.  And what is the purpose of             12:46:57
Exhibit 4?                                          12:47:01

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    99

MS. TELLER:  Objection.  Foundation.

You can answer if you know.

THE WITNESS:  Yeah.  I'm just quickly scanning the document to make sure I answer his question as well as I can.

Yeah.  I think the purpose of this is to explain, especially to, say, you know, a parent or someone who's not familiar with using Snapchat how the product works overall and having, you know, links to other support resources about safety.

Q    Okay.  You can put that document aside, and if you can get Exhibit 1 again.

MS. TELLER:  It's his declaration, right?

MR. GUARD:  Yes.

Q    And if you look back at your declaration, Exhibit 1, in paragraph 4, you mentioned several features of Snapchat, correct?

A    Yes.

Q    Okay.  In paragraph 4, I noticed you did not mention a feature called Streaks.  Are you familiar with the feature called Streaks?

A    Yes, I'm familiar with Streaks.

Q    Can you explain what Streaks is?

A    So Streaks, if you and I send each other a Snap each day for at least three consecutive days,

12:47:02
12:47:03
12:47:16
12:47:18
12:47:20
12:47:56
12:47:59
12:48:03
12:48:07
12:48:10
12:48:13
12:48:15
12:48:23
12:48:25
12:48:27
12:48:30
12:48:34
12:48:46
12:48:47
12:48:52
12:48:54
12:48:58
12:49:01
12:49:05
12:49:11

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

100

it will start to increment a streak.

Q    Okay.  Is it -- given what you just said to me, is it just if you and I exchange a Snap or if I continue to Snap, including with other people?

A    Streaks are only -- they only occur at the level between two individuals.  They have to be bidirectional in nature.  So if you Snap me every day for 100 days and then I don't Snap you back, the streak won't be, you know, maintained or won't exist.  It also doesn't -- there's no way to get a streak with a group, for example.  So they're entirely private.  They're entirely between the two participants, and it requires that, you know, bidirectional Snapping for it -- for it to exist.

Q    Okay.  Do you know when Snap introduced Streaks as a feature?

A    It would've been before the time that -- that I joined.  So it's -- it's been, you know, around for, you know, at least since 2018.  So it predates when I joined at the company.

Q    Do you know why Snap first introduced the Streaks feature?

MS. TELLER:  Objection.  Foundation.

A    I -- I don't know exactly.  But, you know, to give you another idea, there's other kind

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

101

of -- we call them Friendmojis, too, that can appear on your profile with another friend that just represent aspects of your friendship with the person that are meant to be kind of fun and playful.

Q   Is Streaks still incorporated in Snapchat?

A   Yes.

Q   Does Streaks increase the usage of Snapchat?

MS. TELLER:  Objection.  Foundation.

A   It -- it's not something we have necessarily definitively studied that -- that it does.  As a team, whenever we talk about Streaks, it's not for that purpose of trying to increase usage of -- of the product.  It's something that, you know, our users tell us is fun and helps them maintain a connection with a friend and celebrate milestones of their friendship.  And, you know, it's not the kind of thing we've, yeah, necessarily produced analysis showing that this is something that increases usage or -- or -- at least to my knowledge, that's not how we really talk about it or think about it.

Q   Okay.  And, again, I'm going to put the disclaimer on that I put on a bunch of questions

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    102

here.  I'm not talking about anything that you've          12:52:23

learned from counsel.                                       12:52:26

        A     Yeah.                                         12:52:28

        Q     And I'm using the broad definition of        12:52:28

counsel, not just the lawyers that are sitting next        12:52:29

to you?                                                     12:52:32

        A     Yeah.                                         12:52:32

        Q     Are you aware of research showing that        12:52:33

Streaks can be harmful, encouraging usage or               12:52:35

compulsion to where -- the point where people are          12:52:40

drawn to perpetuate a streak at the expense of their       12:52:42

well-being?                                                 12:52:46

        MS. TELLER:  Objection.  Foundation;               12:52:47

calls for speculation.                                      12:52:47

        Answer to the best of your ability.                 12:52:49

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

103

████████████████████████████████          12:53:36

███████████      ████████████████████      12:53:37

████████████████████████                   12:53:41

          ████████████████████             12:53:43

████████████████████████████████          12:53:47

████████████████████████████               12:53:52

Q    Are you aware of any external research relating to Streaks?          12:53:55 / 12:53:58

A    There's -- there's nothing like that that's been brought to my attention personally, no.          12:54:02 / 12:54:05

Q    Okay.  In your declaration, Exhibit 1, one feature that you did mention is a feature called Stories?          12:54:08 / 12:54:12 / 12:54:15

A    Yes.          12:54:16

Q    What is the Stories feature?          12:54:18

A    So Stories kind of -- to describe it, it is a way most commonly to broadcast to your friends what's happening with a Snap, and then that lives for 24 hours and then disappears.  We also have a feature called Private Stories that is a further subset of your friends.  So we've just found that, you know, most Snapchat users are already private in that -- like that's the default is that if you post something, it only goes to your current friends list.  But then over time, we found as, you know,          12:54:23 / 12:54:30 / 12:54:39 / 12:54:42 / 12:54:50 / 12:54:53 / 12:54:59 / 12:55:06 / 12:55:09 / 12:55:12

104

people kind of grow and accumulate a friends list from high school, college, adulthood, they want to have more control over who can see it.  So we have regular Stories and then also Private Stories where people can choose a subset of their friends to be able to see that piece of content.  And it lives for typically 24 hours.

Q   Okay.  Does Snapchat send push notifications or other notifications to a user's friend that a new story is available?

A   So -- so we -- we can.  It doesn't send a notification deterministically for every single post for every single user.  We have users that will tap a bell and say that I want to get notified about every, you know, single post for a particular user, but that's not the most common behavior.

Q   Okay.  If that's not the most common behavior, how would your friends learn that there is a story posted?

A   I think the most common is that they're opening the app first to kind of use the messaging service.  And then once that they're there, then they'll see that there are Stories, and then they'll watch them.  So that's, you know, a common pattern is I get a message.  I open the app.  I respond to

12:55:16
12:55:19
12:55:22
12:55:26
12:55:28
12:55:30
12:55:34
12:55:36
12:55:45
12:55:48
12:55:53
12:55:58
12:56:01
12:56:05
12:56:10
12:56:15
12:56:20
12:56:23
12:56:26
12:56:31
12:56:36
12:56:40
12:56:42
12:56:46
12:56:49

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

105

the message, and then I'd look at whatever content is there.  And then maybe I'd respond to more messages, and maybe I'd leave after that.

Q    Okay.  Is part of the purpose of the Stories feature to drive users to use Snapchat more?

MS. TELLER:  Objection.  Vague; foundation.

A    I -- I don't know if that's the -- the purpose.  I think the -- the original purpose was Snapchat started for us as a just way to send direct Snaps back and forth, and then -- so this is before my time.  But the, you know, the folks who were working on it at that time, as they explained it to me what they saw is that there were a lot of people that would go through, and they'd take a Snap.  They would manually select every single friend and send it to all of their friends and then realize that this is repetitive and a waste of time and not helpful.  And there are sometimes -- sometimes you take a Snap, you want to choose, I send it to these three people.  There are other times you take a Snap, and you want all of your friends to be able to see it.

So that's kind of where Stories came from was really just solving that problem for -- for

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

106

users of not having to go through and, like, manually select every single friend you want to send. It's just a simple button that would appear. So that was the genesis from my understanding.

Q   Okay. Have you ever heard of something called the fear of missing out?

MS. TELLER: Objection. Foundation.

A   I've -- I've -- I've heard of that and the associated acronym, which is FOMO --

Q   Okay.

A   -- as well.

Q   And, again, I'm -- I'm not talking about if you've heard about that from counsel. What is your understanding of fear of missing out or FOMO?

MS. TELLER: Lay understanding of FOMO.

MR. GUARD: Yes.

A   Okay. I -- I think it's this idea that -- that there's other things that are kind of going around in my friend group or community that I'm not a part of and that -- that fear that you're missing out. And that's, you know, also something I remember -- you know, we talked about it at Google, YouTube as well, with certain products and services, too.

Q   Okay. Would this be -- when you were

12:58:12
12:58:13
12:58:16
12:58:19
12:58:22
12:58:23
12:58:27
12:58:28
12:58:31
12:58:35
12:58:35
12:58:39
12:58:42
12:58:45
12:58:50
12:58:51
12:58:54
12:58:56
12:59:03
12:59:05
12:59:09
12:59:14
12:59:18
12:59:22
12:59:25

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

107

talking about this at Snapchat -- and, again, I'm
not talking about anything you've talked about with
counsel.  I'm clearly trying to exclude all of that.
I've done so all day.  When you were all talking
about FOMO or fear of missing out, are you trying to
generate features that -- that deal with people's
fear of missing out?

        MS. TELLER:  Objection.  Vague; compound.

        Answer if you understand.

12:59:36
12:59:40
12:59:42
12:59:44
12:59:49
12:59:55
13:00:09
13:00:11
13:00:14
13:00:18
13:00:20
13:00:24
13:00:26
13:00:31
13:00:34
13:00:37
13:00:41
13:00:45
13:00:48
13:00:52
13:00:55
13:00:59
13:01:04
13:01:10
13:01:14

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

108

13:01:17

13:01:20

13:01:23

13:01:24

13:01:27

13:01:29

13:01:33

13:01:38

13:01:39

13:01:42

13:01:46

13:01:50

13:01:52

13:01:55

13:01:58

13:02:01

13:02:07

13:02:08

13:02:13

13:02:13

13:02:16

13:02:20

13:02:22

13:02:26

13:02:29

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

109

Q    In your declaration in paragraph 4 of Exhibit 1, you also discuss the Spotlight feature. What is the Spotlight feature?

A    So the Spotlight feature was added a few years ago because what we found with our -- our kind of public content on Snapchat is we had this group of well-known content creators that had a large following, and they had a way to reach their fans. But then if you're a smaller kind of aspiring content creator, there's no way to really see what are the best kind of Snaps or content from just that kind of tier of -- of creators.

So Spotlight is a public content feed that, you know, that is -- is moderated but includes a little bit more of this, you know, public content that is -- is timely but not as much from the same kind of stars that have a big subscriber or follower base as, say, Discover, which tends to be more publishers and those established stars.

Q    How does Snapchat determine what Snap or what posts should be featured in a Spotlight?

MS. TELLER:  Objection.  Foundation.

A    Well, so there's -- there's a few steps in the process.  So one is a -- so first, you know, as a user, you need to indicate that you actually

13:02:33
13:02:34
13:02:38
13:02:43
13:02:50
13:02:56
13:02:59
13:03:03
13:03:08
13:03:13
13:03:15
13:03:18
13:03:22
13:03:23
13:03:30
13:03:36
13:03:40
13:03:41
13:03:46
13:03:49
13:03:53
13:03:57
13:04:00
13:04:03
13:04:07

110

want it to be posted to Spotlight, which most users don't.  Most users are operating on the platform privately.  They're not posting publicly.  So it's -- it's, you know, a smaller number of users and a smaller number of posts per day where you have to literally tap, I want to post this to Spotlight.

Spotlight currently is only videos, too.  So, you know, Snaps or both -- you know, can include both images and videos.  So Spotlight is only video.  Then if I've decided I want my content to be posted or available on Spotlight, it runs through a whole bunch of moderation protocols, including both automated and human moderation.  And then it goes through what we call kind of an exploration process where a piece of content will get shown to a smaller number of users.  And if they actually like it, then it will gradually get shown to more users.

So there's a couple of steps of, like, the user needs to affirmatively decide, okay, this is a public piece of content.  I want it to go to Spotlight.  And then it goes through the tiers of moderation, exploration, and then it can gradually get more exposure.

Q    Have the tiers of moderation changed in the last couple years?

13:04:14
13:04:17
13:04:20
13:04:23
13:04:26
13:04:28
13:04:32
13:04:36
13:04:40
13:04:43
13:04:47
13:04:52
13:04:55
13:05:02
13:05:06
13:05:10
13:05:14
13:05:16
13:05:18
13:05:22
13:05:25
13:05:27
13:05:29
13:05:31
13:05:35

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                    111

MS. TELLER:  Objection.  Foundation.    13:05:37

A    With -- with any of these kind of    13:05:42
iterative processes like that, to some degree,    13:05:46
they'll change constantly, like almost on a daily    13:05:50
basis.  As we acquire new data, we learn new    13:05:53
information.  We run tests.  We, you know, might    13:05:56
identify a new signal about XYZ parameters of the    13:05:59
account indicate that it's more or less likely to be    13:06:04
good content.  So it's a pretty iterative,    13:06:08
ever-changing process, really.  So -- and, you know,    13:06:10
I think it probably has changed probably quite a bit    13:06:13
in the last couple of years.    13:06:17

Q    Prior to the last couple of years, did    13:06:20
Snapchat have a -- the middle process of -- of    13:06:26
content moderation over Spotlight posts?    13:06:32

MS. TELLER:  Objection.  Vague.    13:06:36

A    From day one of Spotlight, it was always    13:06:40
moderated, but the -- you know, moderation    13:06:44
strategies and -- and tactics kind of change over    13:06:47
time.  And, you know, to give an example, it's like    13:06:50
a whole LLM AI kind of craze that's going on with    13:06:54
ChatGPT is an example.  That's been a really    13:06:58
positive breakthrough in the last year where those    13:07:01
same types of AI models can be very good at looking    13:07:04
at a piece of content and generating labels that    13:07:09

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024

112

tell you if there's potentially bad content in the video.  So that's an example of something that's newer, which is really promising and helpful, but since -- since day one, there has been moderation.

Q    Was -- did at some point in time the moderation that was applied to Spotlight change from just computer-driven to also including people reviewing content?

MS. TELLER:  Objection.  Foundation.

A    To -- to the best of my knowledge, for Spotlight, there's always been a combination of -- of both, you know, some human moderation and -- and some machine moderation.

Q    Okay.  In your declaration, you also discuss another feature of Snapchat, the Here For You feature.  Where is that feature found on Snapchat?

A    So the most common place where Here For You is invoked and seen by people is in our search feature because we decided that, you know, we -- we see that people are searching for certain sensitive topics that if -- if -- you know, one, we want to remove any potentially harmful content from those results, and, two, replace it with something that's actually helpful.  So the most common place that

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

113

people access it is through our search results

where, you know, if you -- you search for topics

related to, say, suicide, we have resources that can

help people that are -- are searching for that sort

of topic.

    Q   Okay.  So there's not a specific spot.

It's only if you were to search for one of those

sensitive topics or words that you'd get the -- the

Here For You feature would pop up?

        MS. TELLER:  Objection.  Misstates prior

testimony.

    A   Well, there's -- there's profiles that,

you know, are hosted by Snap that also have that

content.  But the predominant way that it -- it is

accessed is when people are kind of searching for

related topics, and then we present that information

to -- to users.

    Q   Why was the Here For You feature

introduced?

        MS. TELLER:  Objection.  Foundation.

        But answer to the extent of your personal

knowledge.

    A   Well, my -- my recollection is, like,

we -- we just were -- like, in various products,

every product that my team works on, people think

13:08:49
13:08:51
13:08:55
13:08:59
13:09:01
13:09:03
13:09:06
13:09:09
13:09:10
13:09:17
13:09:18
13:09:19
13:09:22
13:09:24
13:09:27
13:09:31
13:09:34
13:09:37
13:09:39
13:09:41
13:09:42
13:09:45
13:09:49
13:09:49
13:09:53

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

114

about what are the safety implications and
opportunities for member safety.  And my
recollection is that it just came about as we were
talking about we do see people searching for topics
that are not healthy topics to be returning content
for.

         And so, A, is we built a system to block
certain search terms that are -- are not likely to
return any positive or helpful or healthy content;
but, B, also to, then, not just show people no
results, show people helpful and safe results on
these topics that can actually help them.  So, you
know, we could be a positive influence on someone's
life if we replace unhelpful resources with helpful
resources instead of just saying, we have no results
at all about suicide.  So I -- I think that's kind
of where it came from and just thinking about how
can we make these products work better for people.

    Q    Why would Snapchat need a mental health
feature like Here For You feature -- like the Here
For You feature if it wasn't concerned about the
mental health applications of using Snapchat?

         MS. TELLER:  Objection.  Assumes facts
not in evidence.

    A    I think the reason why is that on -- you

13:09:58
13:10:00
13:10:04
13:10:07
13:10:10
13:10:14
13:10:14
13:10:20
13:10:25
13:10:28
13:10:33
13:10:36
13:10:39
13:10:42
13:10:46
13:10:49
13:10:51
13:10:52
13:10:57
13:11:01
13:11:03
13:11:07
13:11:11
13:11:12
13:11:17

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

115

know, when -- when I worked at YouTube, we built
similar futures just because we know that people use
these platforms to seek out information, and they
are searching for this information already in, you
know, Google, YouTube, others.  Like, if you search
Google or YouTube for suicide or eating disorders,
right, they have approved, safe kind of content that
they've worked with third-party organizations on.

You know, we work with different NGOs and
government agencies to make sure that the content
kind of met their standards, and we continue to do
that.  So I think it's less about the fact that we
believe that we are having a negative impact on
mental health.  It's more about the fact that we
just know a lot of people use these platforms to
seek out information.  And we want to make sure that
when they do, they can actually find the most
helpful information.

Q   But, Mr. Boyle, how do you know those
concerns aren't arising on Snapchat or from
experiences on Snapchat?

A   I don't know if that's anything that I
have the basis to evaluate, but, you know, Google
search has the same types of features.  And -- and
so I -- I don't then presuppose that they are the

13:11:19
13:11:23
13:11:26
13:11:29
13:11:32
13:11:35
13:11:37
13:11:41
13:11:43
13:11:47
13:11:49
13:11:52
13:11:55
13:11:59
13:12:01
13:12:03
13:12:06
13:12:08
13:12:11
13:12:13
13:12:18
13:12:23
13:12:26
13:12:31
13:12:34

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    116

cause of mental health problems either, right?               13:12:37

That's all.  Just we know that we are one of the             13:12:40

handful of platforms that people use to find this            13:12:41

information.                                                  13:12:44

Q                                                            13:12:46

                                                             13:12:49

MS. TELLER:  Objection.  Foundation;                         13:12:53

vague.                                                        13:12:53

                                                             13:12:56

Q    I'm going to show you what I've marked as               13:13:12

Exhibit 5 to your deposition.                                13:13:14

(Whereupon, Exhibit 5 was marked for                         13:13:15

identification and is attached to the transcript.)           13:13:15

Q    Have you ever seen Exhibit 5 before?                    13:13:39

A    So I -- I can't recall if I've seen the                 13:14:03

document in this exact form or if I have talked              13:14:12

about, you know, a summary of kind of the points of          13:14:16

the document with -- with counsel.  But that's --            13:14:19

yeah. I --                                                   13:14:23

Q    Okay.                                                   13:14:25

MS. TELLER:  Let's identify the document                     13:14:26

first and then --                                            13:14:28

THE WITNESS:  Yeah.                                          13:14:28

MS. TELLER:  I don't know if Mr. Boyle                       13:14:28

can do that, but maybe we could put that on the              13:14:30

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                                117

record.  And he can answer questions.                    13:14:31

Q    Well, I'll represent to you this is            13:14:33
section 1 of HB 3 after it was passed and signed by      13:14:35
the governor.  It was placed in -- in Florida            13:14:40
statutes as every bill that gets signed into law         13:14:44
does.                                                    13:14:47

        And so you earlier stated that you'd        13:14:48
seen -- at least I think you said that you'd seen HB     13:14:53
3.  So I was -- that -- that was the basis for me        13:14:55
asking the question I asked.                             13:15:01

A    Yeah.  And I was just saying, like, you        13:15:02
know, again, I don't think this was clearly              13:15:05
identified as Florida HB 3 at the top of the             13:15:11
document.  So I think my   my response is                13:15:14
consistent, which is just this exact -- the contents     13:15:17
I'm looking at, I just can't remember this.  So --       13:15:20

Q    So if you look at section 1, sub E,            13:15:24
you'll find a definition for social media platform.      13:15:26
Do you see that?                                         13:15:34

A    Yes.                                            13:15:35

Q    Okay.  Is Snapchat an online forum,            13:15:39
website, or application?                                 13:15:42

        MS. TELLER:  Objection.  Calls for a        13:15:45
legal conclusion.                                        13:15:46

        If you feel like you can offer your lay     13:15:47

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                        118

understanding of that, Mr. Boyle, you should go                    13:15:48

ahead and do that.  But I would caution you not to                 13:15:52

answer the question if it relies on conversations                  13:15:54

with counsel.                                                      13:15:58

     A    To -- to me, this seems like a legal -- a                13:16:00

question of legal interpretation that I'm probably                 13:16:02

just not the best person to respond to it.                         13:16:06

     Q    Is Snapchat -- is Snapchat an                            13:16:09

application?                                                        13:16:12

     A    Well, the -- the E says, satisfies each                  13:16:16

of the following criteria.  So --                                  13:16:24

          MS. TELLER:  So, David -- and I just want                13:16:26

to be clear.                                                       13:16:27

          THE WITNESS:  Yeah.                                      13:16:28

          MS. TELLER:  I think what Mr. Guard is                   13:16:28

just asking is -- he didn't ask-- he wasn't quoting                13:16:30

that.                                                              13:16:32

          THE WITNESS:  Yeah.                                      13:16:32

          MS. TELLER:  He just is asking you, in                   13:16:32

your lay understanding, is Snapchat an application.                13:16:33

You should answer that.  Don't -- don't worry about                13:16:35

the language.  If he asks you about the language,                  13:16:38

I'll probably lodge an objection.  But I want to                   13:16:38

make sure he can get the answer as to what you can                 13:16:42

answer as a layperson, not relying on legal                        13:16:44

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                              119

interpretation.                                                    13:16:47

Q    Snapchat is available on app stores,                    13:16:49
correct?                                                          13:16:52

A    Yes, correct.                                            13:16:53

Q    And it is an application that a user can                 13:16:54
download from an app store, right?                                13:16:57

A    That's correct.                                          13:17:01

Q    All right.  Does Snapchat allow a user to                13:17:01
upload content?                                                   13:17:05

A    Yes.                                                     13:17:10

Q    Does Snapchat allow a user to view the                   13:17:12
content of another?                                               13:17:19

A    Yes.                                                     13:17:26

Q    All right.  Does Snapchat have or keep                   13:17:28
track of how long users stay on its application?                  13:17:41

MS. TELLER:  Objection.  Foundation;                 13:17:48
vague.                                                            13:17:48

You should answer with just your lay                  13:17:49
understanding.  And if you don't understand, you                 13:17:51
should feel free to say that, Mr. Boyle.                         13:17:54

██   ███████████████████   █████████            13:17:57
███████████████████████████████████████              13:17:59
█████████████████                                     13:18:03
██   ███████████████████████████████                 13:18:04
████████████████████████                             13:18:07

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

120

MS. TELLER:  Objection.  Foundation.

You can answer to the extent you know.

MS. TELLER:  Objection.  Vague.

MS. TELLER:  Objection.  Vague.

MS. TELLER:  Objection.  Vague.

Q    Does Snapchat have infinite scrolling?

MS. TELLER:  Objection.  Vague.

Q    Okay.

Q    It would be bounded by how many Snaps you exchange with how many different people, right?

A

Q    All right.  So only the public part of Snapchat could potentially meet the infinite scrolling definition that is contained here?

        MS. TELLER:  Objection.  Calls for a legal conclusion.

Q    You can answer.

[REDACTED]

Q    Okay.  Does Snapchat send push notifications or alerts to its users?

A    So we -- we do, but, you know, the overwhelming majority are just due to kind of private messaging interactions between people.  So I mean, that -- that's also true of iMessage and WhatsApp and messaging applications.  So most of the notifications we -- we send are due to these direct interactions between users.

Q    Okay.  Does Snapchat auto play videos?

MS. TELLER:  Objection.  Vague.

A    So I -- yeah.  So I'm -- I'm not the lawyer, and there's maybe legal interpretation here that goes into the bullet points.  But, you know, for things like video that begins to play without the user first clicking on the video or play -- play button for that video -- you know, I think we're a little bit different than some other products where, like, on Snapchat, you open to the camera, there isn't any video that's just playing, right?

You know, some other products you open, there's immediately a video that is literally auto

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                                    123

playing without you expressing any kind of interest   13:23:31
or intent in content whatsoever.  We -- we don't       13:23:33
have that when you open the application.               13:23:38
        But we do have features like once you are      13:23:40
-- once you've decided to get into a content           13:23:43
consumption experience, we do have, like, an           13:23:48
auto-advance feature, for example.  So once I've       13:23:51
started to -- I've chosen to watch content, then it    13:23:55
will continue to serve me more content.  But we        13:23:58
don't quite have a feature I just open Snapchat, and   13:24:01
there's content playing, if that makes sense.          13:24:04

        Q    Okay.  So if I were to click on the       13:24:07
Spotlight feature, and that's videos, and I were to    13:24:11
watch a video, and it came to the end of the video,    13:24:15
would a -- maybe another video start playing           13:24:20
automatically?                                         13:24:25

        A    Yes.                                      13:24:27

        Q    Okay.  All right.  I think I understand   13:24:28
now.  And then does Snapchat have a live streaming     13:24:33
capability?                                            13:24:38

        A    We -- we do not, no.                      13:24:41

        Q    Okay.  All right.  Could -- for -- for    13:24:43
the -- for the -- could Snapchat decide to turn off    13:24:58
features like infinite scrolling or the                13:25:10
notifications it sends or any of the other things      13:25:17

Transcript of David Boyle
Conducted on December 12, 2024                    124

that we -- we talked about just now to -- to either
all of its users or to segments of its users?

MS. TELLER:  Objection.  Foundation;
compound; vague.

A    Well, I think in a case like
notifications when most of the notifications we send
relate to direct messaging interactions, that would
essentially break the service, right?  And there --
then it would just be an ineffective messaging
service, which is the primary reason why people use
the product.  So I think if we turned off
notifications, that would just -- it would give
no -- people -- it would give people no reason to
use our messaging service versus others.

So as one example, I think that would
just -- that would undermine the entire service.

Q    Okay.  But as to infinite scrolling,
could Snapchat turn that off, that feature off?

MS. TELLER:  Objection.  Vague;
foundation; incomplete hypothetical.

A    I mean, I think that, in many ways, would
degrade that particular part of the experience.  But
from a just, you know, purely commercial, like,
operational perspective of, like, would it be
possible to, you know, to keep certain feature like

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

125

that and augment it, that -- that is possible, yes.

Q    Okay.  And to the extent that we're talking about -- I guess I'm going to call it advancing to the next video.  I'm not going to call it auto play because I think that'll probably cause an objection here.  But the -- we talked about how after you watch the video and if you didn't do anything, it would just advance to the next video.  Could you turn that feature off?

MS. TELLER:  Objection.  Vague; misstates prior testimony; compound.

Q    Okay.  Are you aware that YouTube has turned off its auto play feature for certain -- certain demographic segments?

MS. TELLER:  Objection.  Foundation.

A    I'm not aware of that.  But also YouTube kind of is -- as I was mentioning earlier, they have some different features than we do.  They have, you know, an auto play that starts when you immediately open the app.  And then they also have more of an

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

126

auto-advance-type feature as well.

MS. TELLER:  John, whenever you get to a stopping point.

MR. GUARD:  We can take a break.

THE VIDEOGRAPHER:  We are going off the record at 1:28.

(Whereupon, there was a recess in the proceedings.)

THE VIDEOGRAPHER:  We are back on the record at 1:41.

BY MR. GUARD:

Q    Are you aware that Snap publishes transparency reports every six months?

A    Yes, I am aware.

Q    Are you involved in the production of those transparency reports?

A    It's -- it's similar to some of the other, you know, documents we were talking about earlier where folks on our public policy team are responsible for the overall kind of production output.  But people on my team who work on trust and safety are involved in, you know, ensuring that the information is accurate and up-to-date and -- and things like that.  So --

Q    Okay.  I'm going to show you what I've

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

127

marked for identification as Exhibit 6 to your

deposition.

(Whereupon, Exhibit 6 was marked for

identification and is attached to the transcript.)

MS. TELLER:  Thank you.

Q     What is Exhibit 6?

MS. TELLER:  Objection.  Foundation.

A     Exhibit 6 looks like our transparency

report that was released in November 2021.

Q     Okay.  What is the purpose of

transparency reports like Exhibit 6?

MS. TELLER:  Objection.  Foundation.

A     I think there's probably a couple of

purposes.  One, is to just let, you know, members of

our community and users know about these trends and

how we are serving our community.  And it's also

something that, as an industry, I -- you know, we'll

periodically read some of the other companies'

transparency -- so it's also kind of industry

information-sharing mechanism so we can learn more

about trends that are going on both, you know, good

and bad new problems since they're emerging.  And

it's helpful from that perspective as well.

13:42:11
13:42:13
13:42:15
13:42:15
13:42:18
13:42:40
13:42:44
13:42:51
13:42:55
13:43:00
13:43:04
13:43:09
13:43:15
13:43:16
13:43:21
13:43:26
13:43:29
13:43:34
13:43:38
13:43:39
13:43:44
13:43:47
13:43:51
13:43:55
13:43:56

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

128

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MS. TELLER:  Objection.  Foundation.

▮ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

Q    For either content or posts that violated some portion of the terms of service or the community guidelines, correct?

MS. TELLER:  Objection.  Vague; foundation.

▮ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

Q    Okay.  You can put Exhibit 6 to the side. I'm going to show you what I've marked for identification as Exhibit 7.

(Whereupon, Exhibit 7 was marked for identification and is attached to the transcript.)

Q    What is Exhibit 7?

MS. TELLER:  Objection.  Foundation.

A    This looks like our transparency report that was released in April of 2022.

Q    And Exhibit 8, I think it's the one we're on, right?

MS. TELLER:  7.

A    7.

Q    I'm sorry.  I did not write the exhibit number on the front.

Exhibit 7 contains the same kind of information that Exhibit 6 contained, correct?

MS. TELLER:  Objection.  Foundation.

THE REPORTER:  New data points what?

130

Q    Okay.  You can put that aside.

I'm going to show you what I've marked for identification as Exhibit 8 to your deposition.

(Whereupon, Exhibit 8 was marked for identification and is attached to the transcript.)

Q    What is Exhibit 8?

MS. TELLER:  Objection.  Foundation.

A    Exhibit 8 is our transparency report released in April 2024.

Q    Okay.  And if you look at the bottom of the page 1 of page 8, it lists out three changes to the transparency report.  Do you see that there's three paragraphs.  One says, first.  The second one says, second, and then there's a third paragraph that says, finally?

A    Yes.

MS. TELLER:  Objection.  Foundation.

Q    All right.  You could put Exhibit 8 aside.

███████████████████████████

████████████████████████████████

██████████████████████████████

MS. TELLER:  Objection.  Foundation.

█    ████████████████████

████████████  ████████████████

██████████████████████████████████

███████████

Q    Okay.  I'm going to show you what I've marked as Exhibit 9 to your deposition.

(Whereupon, Exhibit 9 was marked for identification and is attached to the transcript.)

MS. TELLER:  I'm just going to lodge an objection, Mr. Guard, because I'm not -- I'm not sure where this document came from.

MR. GUARD:  It came from Snapchat's website.

MS. TELLER:  Okay.  It's listed on the website?

MR. GUARD:  Yeah.

MS. TELLER:  That's correct?  Okay. That's what I'm trying to understand.

MR. GUARD:  Yeah.  The next one I'm going

132

to do, which is 2023, some of it is marked -- it says it's confidential, but it's on the website, so I mean --

MS. TELLER:  Okay.  But you'll make a representation that you pulled it from the website?

MR. GUARD:  Pulled it from the website.

MS. TELLER:  Okay.

MR. GUARD:  Last deposition, I had one for Microsoft, but it was listed as confidential. I'm like, I pulled it from Microsoft's website.

MS. TELLER:  Okay.

A    Yeah.  This one, I'm not as personally familiar with.

Q    Based on your experience, do you have any idea which business unit or which portion of Snapchat would have been responsible for something like this?

MS. TELLER:  Objection.  Foundation.

███  ████████████████████████████████

████████████████████████████████████

█████████████████

Q    Okay.  And who's in charge of the user research team?

███  █████████████████████████████████

████████████████████████████████████  13:52:07

██████████████████████  █████████████████  13:52:11

█████████████████████████████████████  13:52:15

████████████████████████  █████████████████  13:52:20

█████████████████████████████  13:52:23

█████████████████████████████  13:52:26

████████████████████████████████  13:52:30

███████  13:52:32

Q    Okay.  And who's in charge of that group?  13:52:32

A    Her name is Morgan Hammerstrom.  13:52:36

Q    Okay.  All right.  I'm going to show you what I've marked for identification as Exhibit 10 to your deposition.

(Whereupon, Exhibit 10 was marked for identification and is attached to the transcript.)

MS. TELLER:  Thank you.

Q    You're free to read all of it.

A    Yeah.

█  ██████████████████████████  13:54:22

█████████████████████████  13:54:24

█  █████████████████████  13:54:26

███████████████  13:54:28

█  ██████████  ███████████████████  13:54:30

█████████████████████████████████  13:54:35

MS. TELLER:  Objection.  Misstates prior

testimony.

A    I -- don't -- I don't remember these, no.

Q    Okay.  I'm going to show you what I've marked for identification as Exhibit 11.

(Whereupon, Exhibit 11 was marked for identification and is attached to the transcript.)

MS. TELLER:  Thank you.

A    Sorry.  What's the question?

Q    Have you ever seen Exhibit 11 before?

A    So this one in -- this document, in particular, I don't know if I've seen this.  But I do, you know -- when -- when this kind of data gets released, there's, you know, usually some kind of internal information sharing about -- about this. And our team also works a lot with -- I'll not use acronyms here until I've gotten to the terms.  Our team does work a lot with the National Center for Missing and Exploited Children, a.k.a., NCMEC.  And, you know, they are in touch with us pretty regularly and send reports on, you know, how many of our cyber tips are being actioned and -- and data of this nature.

So this particular document, I -- I don't know if I've seen, but our team is in pretty frequent contact with -- with NCMEC and constantly

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

135

doing what we can to help.

Q    Okay.  Have you seen reports like Exhibit 11 before?

███ ███████████████████████████████

██████████████████  █████████████████████████

██████  ████████████████████████████████████

███████████████

Q    Okay.  All right.  You can put Exhibit 11 aside.

I'm going to show you what I've marked for identification to your deposition as Exhibit 12.

(Whereupon, Exhibit 12 was marked for identification and is attached to the transcript.)

Q    Exhibit 12 purports to be an amended complaint filed against Snap Inc.; is that right?

MS. TELLER:  Objection.  Foundation.

A    That -- that's what it looks like, yes.

Q    Were you aware that the Attorney General of New Mexico had sued Snap?  And, again, I'm not asking you for anything --

A    Yeah.

Q    -- that has been told you by counsel.

A    I -- I think, you know, with things like this and similar, you know, new laws or litigation,

136

I -- I typically become aware of them through counsel and working with our, you know, legal counterparts to summarize them and -- and make me aware of them.  That is the most common scenario. And it's kind of what I recall for -- for this as well.

Q   Okay.  All right.  So you didn't see any news stories or anything else about Snap being sued by the State of New Mexico?

A   I -- you know, I -- I think I recall headlines about it, but the bulk of the information that I -- I receive about a topic like this is -- is from our counsel.

Q   Okay.  You can put it aside if that's the case.

Have you ever heard the name Alyssa Zinger?

A   That name is -- I -- I don't remember.  I don't recall.

Q   Okay.  I'm going to show you what I've marked for identification as Exhibit 13 to your deposition.

(Whereupon, Exhibit 13 was marked for identification and is attached to the transcript.)

Q   If you want to take a minute, you can

CONFIDENTIAL

Transcript of David Boyle
Conducted on December 12, 2024                137

read Exhibit 13.                                          13:59:08

        A    I'm not previously aware of this.  But --    14:00:15

        Q    So this is a news story from a news          14:00:23

station in Tampa, Florida, correct?                       14:00:27

             MS. TELLER:  Objection.  Foundation.         14:00:32

        A    It -- it looks like it's a news story        14:00:35

from ABC Tampa.                                           14:00:37

        Q    Okay.  And if you look at the second         14:00:41

page, it indicates that the news story was posted on      14:00:43

or about April 8th of 2024 and then updated on April      14:00:47

9th, 2024?                                                14:00:52

        A    That's correct.                              14:00:55

        Q    All right.  And the news story purports      14:00:55

to indicate that Ms. Zinger was a 22-year-old woman       14:00:59

who pretended to be a 14-year-old girl on Snapchat        14:01:04

and TikTok to meet and molest young boys, right?          14:01:09

             MS. TELLER:  Objection.  The document        14:01:13

speaks for itself.                                        14:01:14

        A    Yeah.  I have no prior knowledge of -- of    14:01:16

this case kind of beyond what's written, so I think       14:01:20

it -- it kind of speaks for itself.                       14:01:23

        Q    Okay.  And TikTok, that's another social     14:01:26

media company that we haven't spoken about today,         14:01:31

right?                                                    14:01:33

        A    Yes, that's correct.                         14:01:34

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024                    138

Q    That's a competitor of Snapchat?

A    People could say that, but I think, you know, TikTok is probably a more, you know, default primarily public content platform, whereas we're more primarily, you know, the starting point and main reason for -- for -- our product is more direct messaging.  So they're a bit different, but there are some overlapping functionality, for sure.

Q    And the overlapping functionality is you both have and allow users to post videos, right?

A    Yes.  But I think, you know, in our case, that kind of public posting is a very narrow use case, whereas in their case, it's kind of a primary use case.

Q    The five young -- according to the story, the five young boys that were molested were between 13 and 14 years old, correct?

        MS. TELLER:  Objection.  Foundation; document speaks for itself.

A    It seems to be what the document states, yes.

Q    If HB 3 had been in effect, those five boys would not have been able to be molested by that predator, correct?

        MS. TELLER:  Objection.  Foundation;

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                139

speculation; requires a legal conclusion.

          You can answer to the best of your ability.

     A    It's just hard to say because it's very speculative because they -- you know, if it had been in effect, there's other -- there's other, like, modes of communication they could use.  There's other online platforms that might not be in scope of the law that they could continue to use.  So it's pretty hard to say that.

     Q    Does TikTok -- is TikTok within -- we looked earlier at the definition of social media platform?

     A    Yeah.

     Q    All right.  And are you familiar with TikTok?

     A    Generally familiar, yes.

     Q    Based on your general familiarity, would TikTok be a social media company under that definition?

          MS. TELLER:  Objection.  Misstates prior testimony; calls for legal conclusion.

     A    I -- I -- I don't know because they're not -- they're not clearly named in -- in the law.  So it's hard to say.  It's a bit of a legal

14:03:07
14:03:09
14:03:11
14:03:12
14:03:14
14:03:18
14:03:21
14:03:24
14:03:28
14:03:30
14:03:34
14:03:37
14:03:40
14:03:41
14:03:41
14:03:44
14:03:44
14:03:51
14:03:52
14:03:56
14:03:59
14:04:00
14:04:03
14:04:04
14:04:05

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

140

interpretation.  And, you know -- as well I might add, there's other -- you know, again, we're kind of getting into hypotheticals, which might not be that helpful to hear from me.  But there's other messaging platforms out there as well, like Telegram and Signal that are, you know, even a lot less safe than some of the existing ones.

So I think it's very hard to speculate about if these platforms were regulated, they wouldn't then -- you know, teens of this age would not then continue to use other modes of communication.

Q    If, assume just for moment, that TikTok and Snapchat are within the definition of HB 3.  Just assume that fact for a moment.  Ms. Zinger would not have been able to pose as a 13-year-old girl on either platform, right?

MS. TELLER:  Objection.  Foundation; calls for speculation and a legal conclusion.

Answer to the best of your ability, Mr. Boyle.

A    I mean, it's pretty speculative, but -- I -- I don't quite know how to answer that.  I mean, people pose as all kinds of things in online and communication platforms.  I get -- you know, I get

14:04:08
14:04:10
14:04:14
14:04:17
14:04:22
14:04:25
14:04:30
14:04:31
14:04:35
14:04:40
14:04:43
14:04:46
14:04:47
14:04:53
14:04:57
14:05:03
14:05:07
14:05:10
14:05:11
14:05:14
14:05:16
14:05:22
14:05:23
14:05:23
14:05:34

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

141

text messages all the time from scammers where people are posing to be various people. And -- and on Twitter, people are posing -- you know, purporting to be people that they're not and misrepresenting each other. So it's just hard to conclude that on the basis of this, you know, particular law, it would solve all these problems with online identity and misrepresentation.

Q    In order to create an account -- well, A, a 13-year-old would not be able to create an account under HB 3, right?

MS. TELLER: Objection. Vague.

A    That would be my understanding, yes.

Q    So she would at least would not have been able to appear as a 13-year-old girl, right?

MS. TELLER: Objection. Vague.

A    Well, on Snapchat, there's no public way that you can represent your age anyway. I mean we're not like Facebook, for example, where your age is public. So if she was representing her age in a certain way, it would have been done in private communication, presumably, which is something she could have done equally well on iMessage or WhatsApp. Like, we don't have, like, here's my age on my profile or something like that.

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                                    142

Q    But when she registered for Snapchat and said she was a 13-year-old, you would not have allowed her to create an account, right?                     14:06:55 14:06:58 14:07:01

MS. TELLER:  Objection.  Assumes facts not in evidence; argumentative.                                14:07:06 14:07:07

A    Right.  I don't know, though, if when she signed up, she actually represented her age to be 13 or 14.  She may have just told them in a private conversation that that was her age because on our platform and several others, your age is kept private and not displayed to other users.            14:07:10 14:07:12 14:07:15 14:07:20 14:07:22 14:07:26

Q    Does it bother you, sitting here right now, that five boys were molested using a product that you manage?                                            14:07:29 14:07:31 14:07:34

MS. TELLER:  Objection.  Argumentative.      14:07:36

A    I -- I will tell you that, you know, as we talked about earlier, I'm responsible for a bunch of different areas of our product, including safety.  And the one that I personally spend the most time on and I care about the most is safety.  And, you know, the first thing I do every morning when I wake up is I work on those problems.  And all the other parts of my team that work on the rest of the product, like messaging, it's really at the center of everything that -- that we do.  So that's why     14:07:38 14:07:40 14:07:43 14:07:47 14:07:50 14:07:53 14:07:55 14:07:59 14:08:01 14:08:05

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

143

when -- you know, you put this in front of me, I
read it from start to finish because I want to
understand when these problems occur and how to work
with law enforcement, work with government to, you
know, improve on these problems.

So we -- you know, I personally
absolutely care a lot about these problems
arriving -- arising and for us to do everything we
possibly can to help.

Q   I'm going to show you what I've marked
for identification.  It's Exhibit 14 to your
deposition.

(Whereupon, Exhibit 14 was marked for
identification and is attached to the transcript.)

MS. TELLER:  I got it.

MR. GUARD:  Make sure I give you the
right one.

Q   Exhibit 14 purports to be an article or a
blog post from a website called Hackread.com.  It is
reporting data from a United Kingdom charity known
as the National Society for the Prevention of
Cruelty to Children.  You were familiar with NCMEC
earlier.  Are you familiar with the United Kingdom's
National Society for the Prevention of Cruelty to
Children?

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                                    144

MS. TELLER:  Objection.  Foundation, and I think it assumes some facts not in evidence in the course of that question.

But you can answer.

A    This organization, I'm not personally familiar with.

Q    Okay.  This blog post or article purports that, Half of the Online Child Grooming Cases Now Happen on Snapchat Reports UK Charity.  At least that's the title of it.  Did I read that correctly?

MS. TELLER:  Objection.  Compound; foundation; document speaks for itself.

A    Yeah.  I have no prior familiarity with this document.  I think it -- you know, the title is what -- what it is.  I'm not familiar with this data.

Q    Okay.  So you're not familiar one way or the other if in the -- I'm trying to give a date range here -- sometime in the '23, '24 time period, that Snapchat was responsible for half of the online child grooming cases in the United Kingdom?

MS. TELLER:  Objection.  Assumes facts not in evidence; foundation.

A    Yeah.  I'm not familiar with this data or this article.  But our -- you know, our company and

14:09:52
14:09:53
14:09:57
14:09:58
14:09:59
14:10:00
14:10:01
14:10:06
14:10:10
14:10:14
14:10:16
14:10:19
14:10:26
14:10:28
14:10:31
14:10:35
14:10:35
14:10:39
14:10:44
14:10:51
14:10:58
14:11:02
14:11:04
14:11:10
14:11:12

145

our team works with the UK government, Ofcom, on, you know, the Online Safety Act.  And so we're very much involved with the governmental organizations here, but I'm not familiar with this article or this data.

Q    All right.  If you'll turn back to Exhibit 1, paragraph number 9 on page either 5 or 4 -- if you're looking at the top of the page, it's 5.  If you're looking at the bottom of the page, it's 4.

MS. TELLER:  You said paragraph 9, did I hear that correct?

MR. GUARD:  Yes.

Q    If you look at the end of the paragraph, the last sentence reads, these changes are also costly from a monetary and privacy perspective and will require a significant amount of budget, resources, and staff investment over many months and possibly longer.

You put that in your declaration, sir?

A    That -- that appears to be the case, yes.

Q    Is it your testimony that protecting those five boys that were molested by Ms. Zinger or all those cases of grooming in the United Kingdom isn't worth the time and budget it would take to

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024                        146

stop?

MS. TELLER:  Objection.  Argumentative.

A       That's --

MS. TELLER:  Just a second, David.

Objection.  Argumentative; misstates prior testimony.

You may answer.

you've enumerated all the other laws that are kind of pending or passing in Europe, in the United Kingdom, in Australia, and all these other places. There's a reason why there is not yet mandatory age assurance across all these applications because we

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

147

haven't really gotten to a place as an industry

where there are good solutions that are commercially

viable and secure.

And I -- you know, I think that we will

be able to get there, particularly with more support

from the operating system -- you know, the operating

██████████████████████████████    ████████████████

████████████████████████████████████████    ██

████████████████████    ██████████████████████

███████████████████████████████████████

Q    Sir, isn't it true that age verification

has existed for tobacco and alcohol products for

more than a decade online?

MS. TELLER:  Objection.  Foundation;

vague.

Q    You're aware right now if you want to go

buy tobacco product online, you have to verify your

identity and your age, correct?

MS. TELLER:  Objection.  Foundation;

vague.

A    I've never purchased tobacco online, so

I'm not aware of that.  But there are other ways you

-- you can also, you know, purchase tobacco in

person.  So I'm not aware of the online purchasing

process.

CONFIDENTIAL

Transcript of David Boyle

Conducted on December 12, 2024

148

Q    Okay.  If you went into a store to purchase tobacco, you would have to show an identity, correct?  And prove your age?    14:15:18 / 14:15:21 / 14:15:23

A    Yes.    14:15:26

Q    All right.  If you went into a store to buy alcohol, you would have to produce an ID and prove your age, right?    14:15:27 / 14:15:30 / 14:15:32

A    You would, yes.    14:15:35

Q    All right.  Have you ever purchased alcohol online?    14:15:36 / 14:15:38

A    I -- I think so, yes.    14:15:46

Q    Okay.  And did you have to prove your age when you purchased alcohol?    14:15:48 / 14:15:50

A    I -- I don't recall.    14:15:53

Q    Okay.  In Exhibit 1, you also discussed parental controls, correct?    14:15:55 / 14:16:12

A    Correct.    14:16:19

Q    Okay.  And Snapchat didn't even have parental controls until 2022, correct?    14:16:19 / 14:16:23

MS. TELLER:  Objection.  Foundation.    14:16:27

14:16:32

14:16:34

14:16:37

14:16:41

14:16:46

Q    Okay.  I'm going to show you what I'm going to mark for identification as Exhibit 15 to your deposition.

(Whereupon, Exhibit 15 was marked for identification and is attached to the transcript.)

MS. TELLER:  Objection.  Foundation.

Q    So at the time or shortly thereafter your CEO was in front of Congress, usage of the Family Center and Snapchat's parental controls was about 1 percent of users, right?

MS. TELLER:  Objection.  Foundation.

A    I think at that -- that time, that would have been, you know, data that was pulled and double and triple checked.  And so at that time, that would have been accurate.  But since then, we've released

MR. GUARD:  I have nothing further.                14:19:51

MS. TELLER:  No questions for us.                  14:20:03

MR. GUARD:  You want to explain read              14:20:06
versus waive?  I would assume you're --            14:20:06

MS. TELLER:  Yeah.  We're going to                14:20:06
reserve signature.  Yeah.                          14:20:06

MR. GUARD:  Okay.                                  14:20:10

THE VIDEOGRAPHER:  This marks the end of          14:20:11
the deposition of David Boyle.  We are going off the   14:20:12
record at 2:20.                                    14:20:13

(Off the record at 2:20 p.m.)                     14:20:14

ACKNOWLEDGMENT OF DEPONENT

     I, David Boyle, do hereby acknowledge that
I have read and examined the foregoing testimony,
and the same is a true, correct, and complete
transcription of the testimony given by me and any
corrections appear on the attached Errata sheet
signed by me.


_____   _____
   (DATE)                  (SIGNATURE)

14:21:10
19:41:52
19:41:54
19:42:03
19:42:07
19:42:12
19:42:15
19:42:21
19:42:22
19:42:22
19:42:22
19:42:22
19:42:22
19:42:22
19:42:22

CONFIDENTIAL
Transcript of David Boyle
Conducted on December 12, 2024

153

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Cynthia Lichtman, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of December, 2024.

My Commission Expires:  April 7, 2026

*Cynthia Lichtman*

Notary Public in and for
the State of California

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

|  |  |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, <br><br> *Plaintiffs,* <br><br> v. <br><br> ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida, <br><br> *Defendant.* | Case No. 4:24-cv-00438-MW-MAF <br><br><br> **DECLARATION OF DAVID BOYLE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |



I, David Boyle, declare as follows

1.      I am over 18 years of age and am competent in all respects to make this Declaration.

2.      I am currently employed as Senior Director, Product at Snap Inc. ("Snap"). I have held this role since 2018. I make this declaration based on personal knowledge including information and belief obtained from performing my job duties in the ordinary course of business.

3.      Snap's flagship application is Snapchat, a camera and communications service that allows users to communicate with friends and family using text, audio and video calls, photos, and short videos. Snapchat is typically used for direct, private communications between small groups of people who already know each other in real life. By default, friendship and the ability to communicate on Snapchat must be "bidirectional," meaning that two users cannot communicate with one another unless both parties have requested and/or agreed to accept the other as a friend or both users have each other in their contact books.

4.      Snapchat opens to the user's camera and allows the user to send texts (called "chats") and images (called "Snaps") that delete by default after being opened. This default ephemerality feature is designed to mirror real-life interactions. It affords users a digital way to show a more authentic, unpolished, and spontaneous side of themselves. Snapchat also offers users a variety of tools to add effects to

their photos, such as adding puppy dog ears to a face or augmented reality effects on a landmark (like rainbows coming out of the Eiffel tower). Since October 2013, users have been able to compile photos and videos into "Stories" generally available for 24-hours which, by default, are viewable only by a user's friends. Through Snapchat's "Discover" feature, users also have access to vetted content from trusted partners (e.g., NBC News). In November 2020, Snap introduced "Spotlight," a feature that allows users to make videos that anyone can view. Over 430 million people globally use Snapchat every day to communicate with friends and stay in touch.

5.     When creating an account on Snapchat, users are required to provide their date of birth, as well as to provide either an email address or phone number. Individuals under age 13 are not allowed to create an account. If Snap learns that a registered user is under 13, it takes action to terminate the account.

6.     Snap takes numerous precautions to protect minors (age 13-17) who use the service. For example, minors can only view direct messages from users with whom they are already friends on the platform or already have in their phone's contacts. Even so, whenever a teen is embarking on a 1:1 chat conversation with a friend with whom they do not share multiple mutual friends, the teen will receive an in-app warning that this person is outside the teen's network and to remind the teen to only chat with people they know and trust and giving them the option to block the

user before chatting.  Snap also empowers users to report harmful images or videos, and it employs technology to identify known illegal images and videos of child sexual abuse materials, which it then reports to the relevant authority.  Snap also takes steps to safeguard the mental health of its users.  For instance, in 2020, Snap launched Here For You which surfaces resources from expert organizations to Snapchat users when they search for a range of mental-health related topics.

7.    In addition, Snap launched Family Center to empower parents with tools and resources to make what they believe are the right choices for their teen – based on their teen's age, maturity level, and their family values. Through Snapchat's Family Center, a parent or guardian can link their Snapchat account to their teen's account to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report suspicious accounts.  Family Center is designed to mirror the oversight that parents have over their teens' actions in real life.  For instance, parents typically know who their teen spends time with in-person, but they generally do not hear all the in-person conversations that their teens have with their friends.

8.    Parents and legal guardians of Snapchatters under 18 may submit privacy requests on their teen's behalf.  These requests may include options to access, download, and delete their teen's information, including the deletion of their teen's Snapchat account.  The easiest way for a parent to access their teen's

3

data would be through the Download My Data tool or, if they would like to delete their teen's account, the account deletion process. Snap's Privacy FAQ provides more information about the tools available to the Snapchat community. Snap continuously reviews its policies and procedures to ensure our community is able to submit and fulfill privacy requests.

9. I am familiar with Florida's HB3 (the "Act") and believe that Snap may be covered by the scope of the law. This Act implicates fundamental aspects of Snap's services and requires extensive modifications to Snapchat code that would fundamentally alter the nature of those services. This includes implementing an age verification process for adults and minors alike, implementing parental identification and verifiable parental consent processes on an application or feature-by-feature basis, disabling and/or removing various features of the app for certain minor users, and potentially requiring other changes depending on how the law is interpreted and enforced. These changes will impede users' – minors and adults alike – access to Snap's services and their enjoyment of the ability to communicate with friends and family, and make those services less helpful to users. These changes are also costly from a monetary and privacy perspective and will require a significant amount of budget, resources, and staff investment over many months and possibly longer.

10. Conducting parental verification poses two unique challenges. First, Snap has to confirm that the person claiming to be the parent is who they claim to

be. This may require collecting government-issued or other forms of identification that contain personal information. Snap typically does not collect, let alone store, more personal information about its users than necessary and does not collect government-issued or other forms of identification. Snap does not currently have a process in place to collect and verify identity through forms of government-issued identification, or otherwise verify a person's identity. Second, even if Snap could verify a person's identity, there are separate challenges with establishing whether that person is a parent or legal guardian of the minor user and maintaining that information. These challenges include establishing a parent or legal guardian for minor users whose parents are not their biological parents, minor users whose parents are not their legal guardians, minor users who have different last names than their parents, or those whose parents share joint custody. Although Snap has a multi-step process set up in Family Center to establish a parent/teen association between accounts, Snap does not have a system in place to verify the familial relationship between two individuals to the specifications described in the law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this __24th__ day of October 2024, in Santa Monica, California.

*David Boyle*

David Boyle

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, <br><br> *Plaintiffs,* <br><br> v. <br><br> ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida, <br><br> *Defendant.* | Case No. 4:24-cv-00438-MW-MAF <br><br><br> **DECLARATION OF DAVID BOYLE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, David Boyle, declare as follows

1.      I am over 18 years of age and am competent in all respects to make this Declaration.

2.      I am currently employed as Senior Director, Product at Snap Inc. ("Snap"). I have held this role since 2018. I make this declaration based on personal knowledge including information and belief obtained from performing my job duties in the ordinary course of business.

3.      Snap's flagship application is Snapchat, a camera and communications service that allows users to communicate with friends and family using text, audio and video calls, photos, and short videos. Snapchat is typically used for direct, private communications between small groups of people who already know each other in real life. By default, friendship and the ability to communicate on Snapchat must be "bidirectional," meaning that two users cannot communicate with one another unless both parties have requested and/or agreed to accept the other as a friend or both users have each other in their contact books.

4.      Snapchat opens to the user's camera and allows the user to send texts (called "chats") and images (called "Snaps") that delete by default after being opened. This default ephemerality feature is designed to mirror real-life interactions. It affords users a digital way to show a more authentic, unpolished, and spontaneous side of themselves. Snapchat also offers users a variety of tools to add effects to

1

their photos, such as adding puppy dog ears to a face or augmented reality effects on a landmark (like rainbows coming out of the Eiffel tower). Since October 2013, users have been able to compile photos and videos into "Stories" generally available for 24-hours which, by default, are viewable only by a user's friends. Through Snapchat's "Discover" feature, users also have access to vetted content from trusted partners (e.g., NBC News). In November 2020, Snap introduced "Spotlight," a feature that allows users to make videos that anyone can view. Over 430 million people globally use Snapchat every day to communicate with friends and stay in touch.

5.      When creating an account on Snapchat, users are required to provide their date of birth, as well as to provide either an email address or phone number. Individuals under age 13 are not allowed to create an account. If Snap learns that a registered user is under 13, it takes action to terminate the account.

6.      Snap takes numerous precautions to protect minors (age 13-17) who use the service. For example, minors can only view direct messages from users with whom they are already friends on the platform or already have in their phone's contacts. Even so, whenever a teen is embarking on a 1:1 chat conversation with a friend with whom they do not share multiple mutual friends, the teen will receive an in-app warning that this person is outside the teen's network and to remind the teen to only chat with people they know and trust and giving them the option to block the

2

user before chatting. Snap also empowers users to report harmful images or videos, and it employs technology to identify known illegal images and videos of child sexual abuse materials, which it then reports to the relevant authority. Snap also takes steps to safeguard the mental health of its users. For instance, in 2020, Snap launched Here For You which surfaces resources from expert organizations to Snapchat users when they search for a range of mental-health related topics.

7. In addition, Snap launched Family Center to empower parents with tools and resources to make what they believe are the right choices for their teen – based on their teen's age, maturity level, and their family values. Through Snapchat's Family Center, a parent or guardian can link their Snapchat account to their teen's account to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report suspicious accounts. Family Center is designed to mirror the oversight that parents have over their teens' actions in real life. For instance, parents typically know who their teen spends time with in-person, but they generally do not hear all the in-person conversations that their teens have with their friends.

8. Parents and legal guardians of Snapchatters under 18 may submit privacy requests on their teen's behalf. These requests may include options to access, download, and delete their teen's information, including the deletion of their teen's Snapchat account. The easiest way for a parent to access their teen's

data would be through the Download My Data tool or, if they would like to delete their teen's account, the account deletion process. Snap's Privacy FAQ provides more information about the tools available to the Snapchat community. Snap continuously reviews its policies and procedures to ensure our community is able to submit and fulfill privacy requests.

9. I am familiar with Florida's HB3 (the "Act") and believe that Snap may be covered by the scope of the law. This Act implicates fundamental aspects of Snap's services and requires extensive modifications to Snapchat code that would fundamentally alter the nature of those services. This includes implementing an age verification process for adults and minors alike, implementing parental identification and verifiable parental consent processes on an application or feature-by-feature basis, disabling and/or removing various features of the app for certain minor users, and potentially requiring other changes depending on how the law is interpreted and enforced. These changes will impede users' – minors and adults alike – access to Snap's services and their enjoyment of the ability to communicate with friends and family, and make those services less helpful to users. These changes are also costly from a monetary and privacy perspective and will require a significant amount of budget, resources, and staff investment over many months and possibly longer.

10. Conducting parental verification poses two unique challenges. First, Snap has to confirm that the person claiming to be the parent is who they claim to

be. This may require collecting government-issued or other forms of identification that contain personal information. Snap typically does not collect, let alone store, more personal information about its users than necessary and does not collect government-issued or other forms of identification. Snap does not currently have a process in place to collect and verify identity through forms of government-issued identification, or otherwise verify a person's identity. Second, even if Snap could verify a person's identity, there are separate challenges with establishing whether that person is a parent or legal guardian of the minor user and maintaining that information. These challenges include establishing a parent or legal guardian for minor users whose parents are not their biological parents, minor users whose parents are not their legal guardians, minor users who have different last names than their parents, or those whose parents share joint custody. Although Snap has a multi-step process set up in Family Center to establish a parent/teen association between accounts, Snap does not have a system in place to verify the familial relationship between two individuals to the specifications described in the law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this ___24th___ day of October 2024, in Santa Monica, California.

*David Boyle*
_____

___
David Boyle

MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
STUART N. SENATOR
JONATHAN E. ALTMAN
KELLY M. KLAUS
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.
GINGER D. ANDERS P.C.
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
JEREMY A. LAWRENCE
ACHYUT J. PHADKE
ZACHARY M. BRIERS
KURUVILLA J. OLASA

JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS P.C.
JOHN L. SCHWAB
EMILY C. CURRAN
L. ASHLEY AULL
WESLEY T. L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
VINCENT LING
LAUREN BELL P.C.
VICTORIA A. DEGTYAREVA
JOHN B. MAJOR
RACHEL G. MILLER-ZIEGLER P.C.
FAYE PAUL TELLER
STEPHANIE G. HERRERA
JULIANA M. YEE
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
SARA A. MCDERMOTT
J. MAX ROSEN
ANNE K. CONLEY
DAVID W. MORESHEAD
ROWLEY J. RICE
LAUREN E. ROSS
BENJAMIN G. BAROKH
ABE DYK
MEGAN MCCREADIE
RAQUEL E. DOMINGUEZ
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU
CARRIE C. LITTEN
JAMES R. SALZMANN
SEAN P. BARRY
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
OLIVER BROWN
PAUL E. MARTIN

MATTHEW MIYAMOTO
ANDRA LIM
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK
CALEB W. PEIFFER
GREGORY T. S. BISCHOPING
JAMIE LUGURI
STEVEN B. R. LEVICK
JANELLE KRUMMEN
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES ARRIAGA
JESSICA O. LAIRD
ERICA C. TOOCH
SARAH E. WEINER
EVAN MANN
ANDREW T. NGUYEN
NATALIE G. MOYCE
RACHEL M. SCHIFF
MIRANDA E. REHAUT
STEPHANY REAVES
LAUREN E. KUHN
J. KAIN DAY
GARRETT SOLBERG
TED KANG
ADAM W. KWON
JOSEPH N. GLYNN
SIMON K. ZHEN
CARSON J. SCOTT
CHRISTOPHER B. CRUZ
MATTHEW W. LINSLEY
ADEEL MOHAMMADI
TAYLOR L. BENNINGER
LORRAINE L. ABDULAHAD
CLARE KANE
SIDNEY M. EISNER
HELEN ELIZABETH WHITE
KATHLEEN FOLEY
ALISON A. DOYLE
FELIPE DE JESÚS HERNÁNDEZ
JASON D. WEISS
HENRY D. SHREFFLER
MILES W. UNTERREINER
LYNDSEY FRANKLIN
ANDREW DELAPLANE

ARIELLA PARK
LAURA R. PERRY
NATASHA GEILING
JOSEPH MANTEGANI
GRAHAM J. WYATT
WESLEY P. DEVOLL
LAUREN A. BILOW
ROMAN LEAL
KAYSIE GONZALEZ
ALEXIS D. CAMPBELL
KYRA E. SCHOONOVER
WENDY Q. XIAO
DANIEL KANE
ADITI NARESH GHATLIA
ALBERTO J. DE DIEGO-HABEL
KYLE A. SCHNEIDER
PRISCILA E. CORONADO
CARL H. JIANG
BOBBY H. KIM
CLAIRE I. ROGERSON
EDUARDO A. GONZÁLEZ
GRACE ORDONEZ
LIAM GENNARI
CHARLES LAM
MICHAEL X. WEI
MAGGIE BUSHELL
REBECCA J. HANSEN
CONNOR HOGE
SARAH M. PFANDER
ELIZABETH ANASTASI
KEVIN HAN YANG
CHRISTOPHER A. MORILLO
CORDELL A. BROWN
QIANZHE DANNY ZHANG
JULIA KONSTANTINOVSKY
BENJAMIN R. WELTON
ABIGAIL K. BESSLER
KYLE A. GROVES

————
OF COUNSEL
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
BRADLEY R. SCHNEIDER
PETER E. GRATZINGER
ADAM R. LAWTON
SARAH J. COLE

————
SEE MTO.COM FOR
JURISDICTIONS OF ADMISSION

350 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100

————

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000

————

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100

December 30, 2024

Writer's Direct Contact
(213) 683-9583
(213) 683-9583 FAX
Faye.Teller@mto.com

Douglas L. Kilby
Hannah E. Murphy
Abby Corbett
Stearns Weaver Miller Weissler Alhadeff &
Sitterson, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com

John M. Guard
Henry C. Whitaker
Daniel W. Bell
Kevin A. Golembiewski
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
kevin.golembiewski@myfloridalegal.com

Paul D. Clement
Erin E. Murphy
James Y. Xi
Joseph J. DeMott
Mitchell K. Pallaki
Clement & Murphy, PLC
Duke Street Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
mitchell.pallaki@clementmurphy.com

MUNGER, TOLLES & OLSON LLP

December 30, 2024
Page 2

Re:  Computer & Communications Industry Association v. Moody, Case No.: 4:24-cv-438-MW-MAF

Dear Counsel:

Pursuant to the protective order entered in this matter, non-party Snap, Inc., designates the following page and line numbers of the December 12, 2024 deposition of David Boyle as confidential:

- 20:2 - 20:21
- 21:19 - 22:3
- 22:14 - 22:19
- 22:25 - 23:2
- 23:6 - 23:6
- 23:12 - 23:19
- 23:20 - 23:24
- 24:1 - 24:15
- 25:20 - 26:4
- 26:11 - 26:16
- 27:5 - 27:18
- 28:13 - 28:22
- 36:9 - 36:15
- 37:20 - 38:3
- 38:22 - 40:22
- 43:5 - 43:19
- 44:19 - 44:23
- 44:25 - 45:18
- 46:12 - 46:15
- 49:5 - 49:25
- 54:1 - 54:4
- 64:1 - 64:9
- 64:10 - 64:17
- 67:10 - 67:18
- 67:22 - 67:23
- 68:2 - 68:5
- 68:20 - 68:25
- 69:9 - 69:17
- 70:8 - 70:14

MUNGER, TOLLES & OLSON LLP

December 30, 2024
Page 3

- 70:22 - 70:23
- 70:24 - 71:4
- 71:18 - 71:24
- 71:25 - 72:2
- 72:5 - 72:9
- 73:16 - 73:21
- 74:15 - 74:16
- 74:17 - 74:25
- 75:1 - 75:5
- 75:6 - 75:8
- 75:10 - 75:24
- 76:13 - 76:20
- 77:2 - 77:7
- 77:19 - 78:2
- 78:18 - 78:20
- 78:23 - 78:25
- 79:1 - 79:19
- 79:20 - 79:23
- 80:1 - 80:21
- 80:22 - 81:2
- 81:6 - 81:16
- 81:17 - 81:18
- 81:20 - 81:23
- 82:2 - 82:8
- 82:12 - 82:23
- 82:24 - 83:10
- 83:11 - 83:17
- 83:20 - 83:24
- 84:3 - 84:22
- 84:23 - 85:4
- 86:6 - 86:10
- 86:11 - 86:12
- 86:25 - 87:16
- 88:1 - 88:5
- 88:8 - 88:15
- 89:16 - 89:19
- 89:21 - 89:22
- 89:23 - 89:25
- 90:3 - 90:3

MUNGER, TOLLES & OLSON LLP

December 30, 2024
Page 4

- 90:24 - 91:2
- 91:15 - 91:19
- 91:20 - 91:22
- 91:24 - 92:8
- 93:12 - 93:17
- 93:21 - 93:25
- 96:6 - 96:14
- 96:20 - 96:21
- 97:15 - 97:25
- 98:1 - 98:4
- 98:17 - 98:23
- 102:16 - 102:25
- 103:1 - 103:6
- 107:10 - 108:25
- 116:5 - 116:6
- 116:9 - 116:9
- 119:21 - 119:23
- 119:24 - 119:25
- 120:3 - 120:3
- 120:4 - 120:5
- 120:7 - 120:9
- 120:10 - 120:13
- 120:14 - 120:15
- 120:17 - 120:17
- 120:18 - 120:20
- 120:22 - 120:22
- 120:25 - 121:2
- 121:4 - 121:7
- 121:10 - 121:12
- 121:19 - 122:3
- 125:12 - 125:16
- 127:24 - 128:1
- 128:3 - 128:6
- 128:12 - 128:18
- 129:12 - 129:19
- 129:21 - 129:25
- 130:17 - 130:20
- 130:22 - 130:25
- 131:3 - 131:5

MUNGER, TOLLES & OLSON LLP

December 30, 2024
Page 5

- 131:7 - 131:10
- 132:20 - 132:22
- 132:25 - 133:8
- 133:19 - 133:24
- 135:4 - 135:7
- 146:8 - 146:20
- 147:7 - 147:10
- 148:21 - 148:22
- 148:23 - 148:25
- 149:1 - 149:4
- 149:10 - 149:14
- 149:16 - 149:24
- 149:25 - 150:5
- 150:15 - 150:19
- 150:20 - 150:25

Sincerely,

*/s/ Faye P. Teller*

Faye P. Teller