**HOUSE OF REPRESENTATIVES STAFF FINAL BILL ANALYSIS**

**BILL #:**       CS/CS/HB 3       Online Protections for Minors
**SPONSOR(S):** Judiciary Committee and Regulatory Reform & Economic Development Subcommittee, Tramont and others
**TIED BILLS:** CS/CS/HB 1491       **IDEN./SIM. BILLS:**   CS/SB 1792

---

**FINAL HOUSE FLOOR ACTION:**   109 **Y's**       4 **N's**       **GOVERNOR'S ACTION:**   Approved

---

### SUMMARY ANALYSIS

CS/CS/HB 3 passed the House on January 24, 2024. The bill was amended in the Senate on March 4, 2024, and was returned to the House. The House concurred in the Senate amendment and passed the bill as amended on March 6, 2024.

In 2023, an estimated 4.9 billion people worldwide used social media. Many experts have tied the increased use of social media in our society to the increase in rates of depression, anxiety, and stress in adolescents. Additionally, many minors are regularly exposed to pornography online.

Related to social media platforms that use certain addictive features that have a certain number of daily active users younger than 16 years of age who spend 2 hours or more on the platform a day, the bill requires such platforms to:
- For minors under 14 years of age:
  - Prohibit such a minor from entering into a contract with the platform to become an account holder.
  - Terminate any existing account that the platform knows or has reason to believe is held by an account holder younger than 14 years of age.
- For minors 14 or 15 years of age:
  - Prohibit such a minor from entering into a contract with a platform to become an account holder, unless there is parental consent.
  - Terminate any existing account that the platform knows or has reason to believe is held by an account holder 14 or 15 years of age, unless there is parental consent.
  - However, if a court enjoins the provisions requiring parental consent for accounts for minors 14 or 15 years of age, the bill severs such provisions and instead requires a prohibition on such accounts and termination of any such existing account, regardless of parental consent.
- Allow an account holder younger than 16 years of age or a confirmed parent or guardian of such an account holder to request to terminate the account.
- Permanently delete all personal information held by the social media platform relating to a terminated account, unless there are legal requirements to maintain such information.

Related to harmful material, the bill requires a commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on a website or application, if the website or application contains a substantial portion of material harmful to minors, to verify that the age of a person attempting to access the material is 18 years of age or older and prevent access to the material by a person younger than 18 years of age. Commercial entities must use either an anonymous method performed by a third party, or a standard method chosen by the entity to verify age.

The bill provides that, if a social media platform or a commercial entity violates the applicable requirements for certain minor users, it is actionable under the Florida Deceptive and Unfair Trade Practice Act, solely by the Department of Legal Affairs. The bill also provides a private cause of action against a social media platform and a commercial entity.

The bill has an indeterminate fiscal impact on state government and private entities. *See* Fiscal Comments.

The bill was approved by the Governor on March 25, 2024, ch. 2024-42, L.O.F., and will become effective on January 1, 2025.

**I. SUBSTANTIVE INFORMATION**

A.   EFFECT OF CHANGES:

<u>**Social Media – Current Situation**</u>

**Social Media Platforms**

The term "social media" includes "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, videos, personal messages, and other content."[1]

In 2005, the year Facebook started, just 5% of American adults used social media platforms. By 2011, that share had risen to half of all Americans, and by 2021, 72% of the public used some type of social media.[2]

Approximately 38% of children between the ages 8 to 12 and 84% of teenagers between the ages of 13 and 18 are using social media.[3] More than one in three teens ages 13 to 17 report that they use social media "almost constantly".[4] Some social media companies already prohibit kids under 13 from signing up to their platforms to comply with federal requirements, but children may easily get around the bans, regardless of their parents' consent.[5]

In less than a generation, social media has evolved from a direct electronic information exchange to a virtual gathering place, retail platform, and marketing tool. What began as a desktop or laptop experience shifted to mobile phones and tablets. With the advent of social media apps that could run on smartphones, end users could take their communities with them wherever they went and use social media at any time.[6]

**Social Media and Addictive Designs and Deceptive Patterns**

In general, "addictive designs" or "deceptive patterns," also called "dark patterns," are deceptive user experiences that take advantage of how people habitually use websites to incentivize people to do something they may not normally do, such as impulse purchasing, giving away personal information, or spending excessive time on a website.[7] Examples include "autoplay," when a video website

---

[1] Meriam-Webster, *Dictionary, Definition, Social Media*, https://www.merriam-webster.com/dictionary/social%20media (last visited Jan. 8, 2024).

[2] Pew Research Center, *Social Media Fact Sheet*, (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/social-media/ (last visited Jan. 8, 2024).

[3] Shiv Sudhakar, *Age 13 and younger is 'too early' for kids to be on social media, surgeon general admits*, Fox News, Feb. 10, 2023, https://www.foxnews.com/lifestyle/age-13-too-early-kids-social-media-surgeon-general (last visited Jan. 9, 2024).

[4] The Annie E. Casey Foundation, *Social Media's Concerning Effect on Teen Mental Health*, (Aug. 10, 2023), https://www.aecf.org/blog/social-medias-concerning-effect-on-teen-mental-health#:~:text=Numerous%20studies%20show%20that%20higher,poor%20body%20image%2C%20eating%20disorder (last visited January 8, 2024).

[5] Barbara Ortutay, *Car seats and baby formula are regulated. Is social media next?*, The Associated Press, May, 23, 2023, https://apnews.com/article/surgeon-general-kids-social-media-teens-tiktok-instagram-443530d9baa3f91386bf9fbfb313bbaf (last visited Jan. 9, 2024).

[6] Maryville University, *The Evolution of Social Media: How Did It Begin, and Where Could It Go Next?,* (May 28, 2020), https://online.maryville.edu/blog/evolution-social-media/ (last visited Jan. 8, 2024).

[7] Brad Bartlett, *Dark Design Patterns: Teach Kids to Recognise Them*, Kidslox, Feb. 7, 2023, https://kidslox.com/guide-to-dark-design-patterns (last visited Jan. 6, 2024).

automatically plays new videos in succession as a default setting;[8] and "infinite scroll," when a website allows users to scroll endlessly through content, rather than clicking through pages.[9]

In 2022, the Federal Trade Commission (FTC) issued a report outlining the ways that companies are increasingly using dark patterns to manipulate consumers into buying products or forfeiting their privacy.[10] Common dark pattern tactics include:

- Disguising ads by designing advertisements to look like independent, editorial content; claiming to be neutral but really ranking companies based on compensation; and utilizing countdown timers designed to make consumers believe they only have a limited time to purchase a product or service when the offer is not actually time-limited.
- Making it difficult to cancel subscriptions or charges, which involves tricking someone into paying for goods or services without consent.
- Burying key terms and junk fees, which involves hiding or obscuring material information from consumers that consumers do not see before making a purchase.
- Tricking consumers into sharing data, which involves falsely giving consumers choices about privacy settings or sharing data, and instead steering consumers toward the option that gives away the most personal information.[11]

Recently, FTC has filed complaints against several companies for using dark patterns as a deceptive trade practice.[12] For example, FTC has taken action against Twitter (now X), alleging it deceptively used account security information to sell targeted advertisements.[13] Additionally, FTC filed a complaint against Amazon, alleging use of dark patterns to deceive users into subscribing to a premium service.[14] Both cases are still pending.

**Effects of Social Media on Children**

Social media has become an important aspect of the digital interactions of minors, who use social media for entertainment and communication purposes.[15] Adolescents are constantly in touch with their peers via social media accounts. However, social media has the potential to have both positive and negative effects on their health.[16]

---

[8] Rene Otto, *Autoplay and infinite scroll*, Medium, https://rene-otto.medium.com/autoplay-and-infinite-scroll-8607abe52bb7#:~:text=nobody%20asked%20for%20autoplay%20video,%3A%20stealing%20your%20attention%20back.%E2%80%9D (last visited Jan. 6, 2024).

[9] Erin Rupp, *The Infinite Scroll: Why It's So Addictive and How to Break Free*, Freedom.to, Feb. 28, 2022, The Infinite Scroll: Why It's So Addictive and How to Break Free - Freedom Matters (last visited Jan. 6, 2024).

[10] Federal Trade Commission, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers*, Sep. 15, 2022, https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers (last visited Jan. 9, 2024).

[11] *Id*.

[12] Frank Gorman, Benjamin Chapin, Reade Jacob, and Julia May, *FTC Targets "Dark Patterns" in Actions Against Amazon and Publishers Clearing House*, WilmerHale, https://www.wilmerhale.com/insights/client-alerts/20230814-ftc-targets-dark-patterns-in-actions-against-amazon-and-publishers-clearing-house (last visited Jan. 6, 2024).

[13] Federal Trade Commission, *FTC Charges Twitter with Deceptively Using Account Security Data to Sell Targeted Ads*, May 25, 2022, https://www.ftc.gov/news-events/news/press-releases/2022/05/ftc-charges-twitter-deceptively-using-account-security-data-sell-targeted-ads (last visited Jan. 9, 2024).

[14] Federal Trade Commission, *FTC Takes Action Against Amazon for Enrolling Consumers in Amazon Prime Without Consent and Sabotaging Their Attempts to Cancel*, Jun. 21, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-takes-action-against-amazon-enrolling-consumers-amazon-prime-without-consent-sabotaging-their (last visited Jan. 6, 2024).

[15] Andrea Irmer & Florian Schmiedek, *Associations between youth's daily social media use and well-being are mediated by upward comparisons*, Communications Psychology, (Aug. 22, 2023), https://www.nature.com/articles/s44271-023-00013-0#citeas (last visited Jan. 8, 2024).

[16] Maya Dollarhide, *Social Media: Definition, Effects, and List of Top Apps*, Investopedia.com, https://www.investopedia.com/terms/s/social-media.asp (last visited Jan. 6, 2024).

Children may experience many benefits from using social media, including:[17]

- Enhancing their communication skills;
- Enhancing their social connections;
- Making new friends and meaningful connections;
- Exchanging ideas and digital photos;
- Developing a new interest, and experimenting with new forms of self-expression;
- Learning basic social and technical skills;
- Feeling more included;
- Interacting across geographic barriers; and
- Enjoying humor.

On the other hand, common risks associated with using social media include:[18]

- Depression;
- Increased stress;
- Social withdrawal;
- Anxiety;
- Poor body image;
- Loneliness;
- Low self-esteem;
- Exposure to harmful or inappropriate content;
- Exposure to dangerous people;
- Cyberbullying;[19]
- Sexting;
- Oversharing personal or private information;
- Exposure to excessive advertisements;
- Being the victim of hacking or identity theft;
- Interference with sleep, exercise, homework, or family activities;
- Drama;
- Social pressure;
- Suicide or suicidal thoughts;
- Negative influence on cognitive ability; and
- Negative school performance.

Children use social media to find community,[20] but their mental health may be negatively affected. Deterioration in mental health is one of the side effects stemming from social media overuse. The link between social-media use, depression, and loneliness has been causally linked or proven by psychologists showing that an increase in use causes a decrease in well-being.[21]

---

[17] American Academy of Child and Adolescent Psychiatry, *Social Media and Teens*, March 2018, https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Social-Media-and-Teens-100.aspx (last visited Jan. 12, 2024).

[18] Loyola Medicine, *Social Media Safety for Kids and Teens*, https://www.loyolamedicine.org/about-us/blog/social-media-safety-kids-teens, (last visited Jan. 6, 2024); *Is social media bad for mental health and wellbeing? Exploring the perspectives of adolescents*. O'Reilly M, Dogra N, Whiteman N, Hughes J, Eruyar S, Reilly P. Clin Child Psychol Psychiatry. 2018; 23:601–613.

[19] Research shows that victims of cyberbullying are more likely to use alcohol and drugs and skip school than other students. They also are more likely to receive poor grades and experience low self esteem and health problems. In extreme situations, cyberbullying has led to suicide. Fisher BW, Gardella JH, Teurbe-Tolon AR, *Peer cybervictimization among adolescents and the associated internalizing and externalizing problems: a meta-analysis.*. J Youth Adolesc., Jul. 22, 2016, https://pubmed.ncbi.nlm.nih.gov/27447707/ (last visited Jan. 8, 2024).

[20] Pew Research Center, *Teens' Social Media Habits and Experiences,* https://www.pewresearch.org/internet/2018/11/28/teens-social-media-habits-and-experiences/, (last visited Jan. 6, 2024).

[21] Michele W. Berger, *Social media use increases depression and loneliness*, Penn Today, Nov. 9, 2018, https://penntoday.upenn.edu/news/social-media-use-increases-depression-and-loneliness (last visited March 12, 2024).

In May 2023, U.S. Surgeon General Dr. Vivek Murthy released an advisory to call attention to the effects of social media on youth mental health. The advisory noted that at crucial periods of adolescent brain development, social media use is predictive of decreases in life satisfaction, as well as additional concerns around body image, sleep issues, and much more.[22] He also concluded that 13 years old is "too early" for children to use social media, despite most social media companies allowing 13-year-olds to use their platforms, because in early adolescence, kids are still "developing their identity, their sense of self."[23]

Other experts, such as David Greenfield, a psychologist, agree and assert the platforms lure users with powerful tactics. One such tactic is "intermittent reinforcement," which refers to a reward scheme in which the user receives rewards inconsistently and unpredictably. While adults are susceptible, young people are particularly at risk because the brain regions that are involved in resisting temptation and reward are not nearly as developed in children and teenagers as in adults.[24]

Examples of studies and reports that have shown the dangers of social media use by children include the following.

- One study conducted by social media and psychology scholars found a link between social media use and poor mental health, especially among girls. The study demonstrated that girls experience a consistent and substantial association between mental health and social media, and such associations were stronger than links between mental health and binge drinking, sexual assault, obesity, and hard drug use. [25]
    - Dr. Jean Twenge, a generational trends scholar, saw the beginning of a mental health crisis starting in 2012 when reviewing mental health metrics that showed rates of depression, anxiety, and loneliness were rising, which she points out coincides with the fast rise in use of smartphones in 2012 and all the social media that comes along with them.[26]
- Another study found that social media use causes children to be more sensitive to anticipating social risks: While children generally become more attuned to social interactions as they enter adolescence, those who are frequent, early social media users become particularly sensitive to anticipating social risks and rewards from their peers.[27]
    - The researchers found that "habitual" social media users, or those who checked their social feeds 15 times a day or more, responded more quickly and more intensely to perceived good or bad emotions from peers, compared to students who checked once a day or less.[28]
- A recent report by the Wall Street Journal outlined internal Meta[29] research showing that Instagram conducted online surveys, diary studies, focus groups, and large-scale questionnaires, which showed that 32 percent of teenage girls reported that Instagram made them have a worse body image. Of research participants who experienced suicidal thoughts, 13

---

[22] "Social Media and Youth Mental Health," The US Surgeon General's Advisory, May 2023.

[23] Lauraine Langreo, EducationWeek, *Surgeon General: Kids Under 14 Should Not Use Social Media,* Feb. 2, 2023, https://www.edweek.org/leadership/surgeon-general-kids-under-14-should-not-use-social-media/2023/02 (last visited Jan. 6, 2024).

[24] Matt Richtel, New York Times, *Is Social Media Addictive? Here's What the Science Says.* (Oct. 25, 2023), https://www.nytimes.com/2023/10/25/health/social-media-addiction.html (last visited Jan. 8, 2024).

[25] Haidt, J., Rausch, Z., & Twenge, J., *Social Media and Mental Health: A Collaborative Review*, New York University, https://jonathanhaidt.com/reviews/ (last visited Jan. 8, 2024).

[26] Michaeleen Doucleff, *The truth about teens, social media and the mental health crisis*, NPR Health Shots, Apr. 25, 2023, https://www.npr.org/sections/health-shots/2023/04/25/1171773181/social-media-teens-mental-health (last visited Jan. 8, 2024).

[27] Sarah D. Sparks, *Preteens'' Social Media Habits Could Be Changing Their Brains*, Education Week, Jan. 6, 2023, https://www.edweek.org/leadership/preteens-social-media-habits-could-be-changing-their-brains/2023/01 (last visited Jan. 6, 2024); Maria T. Maza, BS; Kara A. Fox, MA; Seh-Joo Kwon, BS; et al, *Association of Habitual Checking Behaviors on Social Media With Longitudinal Functional Brain Development*, JAMA Pediatrics, (Jan. 3, 2023), https://jamanetwork.com/journals/jamapediatrics/article-abstract/2799812 (last visited Jan. 6, 2024).

[28] Maria T. Maza, *supra* note 27.

[29] Meta is the parent company of Facebook, Instagram, WhatsApp, and Messenger.

percent of British teens and 6 percent of American teens directly linked their interest in suicide to Instagram.[30]

- Several studies have also tied the advent of the smartphone, where the majority of children are accessing social media, to increased rates of depression, especially among girls.[31] Since 2019, rates of depression, especially among young girls, has skyrocketed. In 2021, more than 40 percent of high school students reported depressive symptoms, with girls reporting even higher rates of poor mental health and suicidal thoughts, according to data from the U.S. Centers for Disease Control and Prevention (CDC).[32]
  - According to the CDC, nearly one in three high school girls considered suicide in 2021, a 60 percent increase since 2011; teen depression doubled between 2010 and 2019; and emergency room admissions for self-harm among 10 to 14-year-old girls tripled between 2009 and 2015.[33]
- A study on the effects of social media use on mental health during adolescent development indicates that there are two windows of time when children are most sensitive to detrimental effects of social media, and when higher estimated social media use predicts a decrease in life satisfaction ratings a year later. For girls, the windows occur at ages 11 through 13; and for boys, the windows occur at ages 14 through 15.[34]

Based on these studies and other scientific research, many experts have called for the regulation of social media, and specifically, regulation of the use of social media by children. Dr. Mary Alvord, a member of the American Psychological Association social media advisory panel, states that just because social media is here to stay, doesn't "mean we have to accept its dangers. Just as we decide when kids are old enough to drive, and we teach them to be good drivers, we can establish guidelines and teach children to use social media safely."[35]

**Safety Measures and Parental Controls**

Providing children with information on ways to more safely use social media may decrease the harm they experience. Having conversations about social media, its benefits, and its risks, may help promote positive social media usage.[36] Parental controls may also help protect children from inappropriate content, cyberbullying, and other online safety issues.[37] Examples of parental controls include blocking websites, filtering content, imposing limits on screen time, allowing parents to monitor online activity, using location tracking, and disabling Wi-Fi.[38]

However, two studies at the University of Central Florida found that parental control apps may actually be counterproductive, harming the trust between a parent and child and reducing the child's ability to respond to online threats. In one of the studies, children believed that the apps were overly restrictive and prevented them from doing everyday tasks, such as homework assignments. Additionally, a

---

[30] Taylor Hatmaker, *Facebook knows Instagram harms teens. Now, its plan to open the app to kids looks worse than ever*, TechCrunch.com, https://techcrunch.com/2021/09/16/facebook-instagram-for-kids-mosseri-wsj-teen-girls/ (last visited Jan. 6, 2024).

[31] Nesi J, Prinstein MJ., *Using social media for social comparison and feedback-seeking: gender and popularity moderate associations with depressive symptoms*. J Abnorm Child Psychol., Nov. 2015, https://pubmed.ncbi.nlm.nih.gov/25899879/ (last visited Jan. 8, 2024).

[32] Fardouly J, Vartanian LR, *Social media and body image concerns: current research and future directions*, Curr. Opin. Psychol., 2016, https://www.sciencedirect.com/science/article/abs/pii/S2352250X15002249 (last visited Jan. 8, 2024).

[33] Centers for Disease Control and Prevention, *U.S. Teen Girls Experiencing Increased Sadness and Violence* (Feb. 13, 2023), https://www.cdc.gov/media/releases/2023/p0213-yrbs.html (last visited Jan. 8, 2024)

[34] Kirsten Weir, *Social media brings benefits and risks to teens. Here's how psychology can help identify a path forward*, American Psychological Association (Sep. 1, 2023), https://www.apa.org/monitor/2023/09/protecting-teens-on-social-media#:~:text=During%20those%20windows%E2%80%94around%2011,1649%2C%202022) (last visited Jan. 8, 2023).

[35] *Id*.

[36] WebMD Editorial Contributors, *How to Talk to Your Kids About Social Media*, WebMD.com, https://www.webmd.com/parenting/how-to-talk-to-kids-about-social-media (last visited Jan. 6, 2024).

[37] Internetmatters.org, *Parental Controls*, https://www.internetmatters.org/parental-controls/ (last visited Jan. 6, 2024).

[38] Caroline Knorr, Commonsensemedia.org, *Parents' Ultimate Guide to Parental Controls*, https://www.commonsensemedia.org/articles/parents-ultimate-guide-to-parental-controls (last visited Jan. 6, 2024).

researcher stated that "parental involvement and direct supervision were both associated with fewer peer problems and less online victimization for teens, but neither of these factors correlated with the use of parental control apps." [39]

**Lawsuits Against Social Media Platforms**

Evidence exists that social media platforms have intentionally created algorithms and other functions deliberately designed to hold users' attention as long as possible, tapping into psychological biases and vulnerabilities relating to the human desire for validation and fear of rejection. The platforms continue to do so even though they are aware that too much passive use of social media can be unhealthy. [40]

On October 24, 2023, a group of 41 states, including Florida, and the District of Columbia, filed suit against Meta, [41] contending that the company knowingly used features on its platforms to cause children to use them compulsively, even as the company said that its social media sites were safe for young people. [42] The complaint alleges that Meta took actions which qualify as a deceptive or unfair trade practice and which violate the federal Children's Online Privacy Protection Act. [43]

The complaint alleges that "Meta has harnessed powerful and unprecedented technologies to entice, engage and ultimately ensnare youth and teens. Its motive is profit, and in seeking to maximize its financial gains, Meta has repeatedly misled the public about the substantial dangers of its Social Media Platforms" and "has concealed the ways in which these Platforms exploit and manipulate its most vulnerable consumers: teenagers and children." [44]

Regarding the motivation for the suit, Florida Attorney General Ashley Moody stated that "Meta has gone unchecked for too long, and our children are suffering the consequences of these unlawful practices…I took action to stop Meta from targeting minors with addictive features to keep them online for hours, collecting their data and other unlawful actions that harm teens' mental health," [45] and "It's no surprise to parents that children cannot stay off their phones. This has been shown to be very addictive to children across the United States. It's caused mental health problems and sleep problems." [46]

Additionally, New York Attorney General Letitia James stated "Meta has profited from children's pain by intentionally designing its platforms with manipulative features that make children addicted to their platforms while lowering their self-esteem….Social media companies, including Meta, have contributed to a national youth mental health crisis and they must be held accountable." [47]

---

[39] Barbara Abney and Zenaida Kotala, *Apps to Keep Children Safe Online May be Counterproductive*, UCF Today, Apr. 2, 2018, https://www.ucf.edu/news/apps-keep-children-safe-online-may-counterproductive/ (last visited Jan. 9, 2024).

[40] Kraut R, Patterson M, Lundmark V, Kiesler S, Mukophadhyay T, Scherlis W., *Internet paradox: a social technology that reduces social involvement and psychological well-being?,* Am Psychol., Sept. 1998, https://pubmed.ncbi.nlm.nih.gov/9841579/ (last visited Jan. 8, 2024)

[41] *State of Florida v. Meta Platforms, Inc., Instagram, LLC*, Case No. 8:23-cv-02412 (M.D. Fla.); *State of Arizona, et al. v Meta Platforms, Inc., Instagram LLC, Meta Payments, Inc., et al*, Case No. 4:23-cv-05448 (N.D. Cal.). The cases have merged, and are still pending.

[42] *State of Arizona, et al. v Meta, Id*; Matt Richtel, *Is Social Media Addictive? Here's What the Science Say,.* New York Times, Oct. 25, 2023, https://www.nytimes.com/2023/10/25/health/social-media-addiction.html (last visited Jan. 8, 2024) (sic).

[43] *Id*.

[44] Compl., *State of Arizona, et al. v. Meta Platforms, Inc., et al.*, https://www.washingtonpost.com/documents/b68f2951-2a4b-4822-b0fb-04238703c039.pdf?itid=lk_inline_manual_5 (N.D. Cal. Oct. 24, 2023) (No. 4:23-cv-05448).

[45] Office of Attorney General Ashley, ATTORNEY GENERAL MOODY TAKES LEGAL ACTION AGAINST META TO PROTECT CHILDREN, Oct. 24, 2023, https://www.myfloridalegal.com/newsrelease/attorney-general-moody-takes-legal-action-against-meta-protect-children (last visited Jan. 9, 2024).

[46] CBS, *Florida Attorney General Ashley Moody targets Meta over negative impacts on kids*, (Oct. 25, 2023) https://www.cbsnews.com/miami/news/florida-attorney-general-ashley-moody-targets-meta-negative-impacts-kids/ (last visited Jan. 13, 2024).

[47] New York State Attorney General, *Attorney General James and Multistate Coalition Sue Meta for Harming Youth*, (Oct. 24, 2023) https://ag.ny.gov/press-release/2023/attorney-general-james-and-multistate-coalition-sue-meta-harming-youth (last visited Jan. 13, 2024).

**Florida's Social Media Laws for Children**

*Requirements for Social Media and Phones in Schools*

Section 1003.42(2)(n), F.S., requires students in grades 6 through 12 to receive instruction on the social, emotional, and physical effects of social media. The instructional materials must be available online, and district school boards must notify parents of the material's availability.

Sections 1006.07(2)(f) and 1003.32(1)(a), F.S., prohibit students from using wireless communications devices at school during instructional time, except when expressly directed by a teacher solely for educational purposes and requires a teacher to designate an area for wireless communications devices during instructional time.

*Protection of Children in Online Spaces Act*

Section 501.1735, F.S., provides that any online service, product, game, or feature likely to be predominantly accessed by children under 18 years of age may not, except under certain situations:
- Process the personal information of any child if the platform has actual knowledge or willfully disregards that the processing may result in substantial harm or privacy risk to children.
- Profile a child.
- Collect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged.
- Use a child's personal information for any unstated reason.
- Collect, sell, or share any precise geolocation data of children.
- Use dark patterns to lead or encourage children to provide personal information beyond what personal information would otherwise be reasonably expected to be provided for that online service, product, game or feature; to forego privacy protections; or to take any action that the online platform has actual knowledge of or willfully disregards that may result in substantial harm or privacy risk to children.
- Use collected information to estimate age or age range for any other purpose or retain that personal information longer than necessary to estimate age.

**Social Media Use by Children - Laws in Other States**

In March 2023, Utah became the first state to adopt laws regulating kids' access to social media.[48] This legislative action was rapidly followed by several other states, including Arkansas, Louisiana, Ohio, and Texas, with numerous others contemplating similar measures.[49]

According to the Utah law, effective March 1, 2024, a social media company must:[50]
- Verify the age of a Utah resident seeking to maintain or open an account,
- Obtain parental consent before minors under 18 can open or maintain their current account, and
- Deny access to existing users who do not verify their age within 14 days of attempting to access their account.
- Give a minor's parents or guardians access to all posts, messages, and responses.
- Not display advertising to minors.
- Not allow minors to engage in direct messaging to individuals outside their platform friend group.
- Prohibit minors from accessing their accounts between 10:30pm and 6:30am.

---

[48] Ch. 498, Laws of Utah 2023.

[49] Act No. 441, 2023 La. Acts; Tex. H.B. 18 (2023); 2023 Ark. Acts 689; Ohio House Bill 33 - 135th General Assembly.

[50] Lisa M. Thomas, Snehal Desai, and Kathryn Smith, *The Beehive State Joins the Buzz Around Minors and Social Media,* The National Law Review, Dec. 26, 2023, https://www.natlawreview.com/article/beehive-state-joins-buzz-around-minors-and-social-media (last visited Jan. 7, 2024).

The law has recently been challenged on First Amendment grounds.[51] NetChoice, LLC, an Internet trade association whose members include Facebook, Instagram, Twitter, TikTok, Snapchat, Pinterest, and Nextdoor, claims the provisions amount to a "unconditional attempt to regulate both minors' and adults' access to-and ability to engage in-protected expression." The case is still pending.[52]

A case challenging a similar law in Arkansas resulted in the law being preliminarily enjoined, meaning it is not in effect, pending an appeal.[53] The court found that the law placed too high a burden on adults and children attempting to access protected content, and was impermissibly vague as to whom the bill applies.[54]

**Child-Focused Online Privacy Laws**

*Federal Children's Online Privacy Protection Act (COPPA)*

COPPA,[55] and its related rules,[56] federally regulate websites' collection and use of children's information. COPPA provides that the operator of a covered entity, a website or online service that is directed at children, or that has actual knowledge that it collects children's personal information, must comply with requirements regarding data collection and use, privacy policy notifications, and data security.

A covered entity may not collect personal information from a child under the age of 13 without the prior, verifiable consent of his or her parent.[57]

COPPA requires covered entities to:[58]
- Give parents direct notice of their privacy policies, including a description of their data collection and sharing practices;
- Post a clear link to their privacy policies on their home page and at each area of their website where they collect personal information from children;
- Institute procedures to protect the personal information that they hold;
- Ensure that any third-party with which they share collected personal information implements the same protection procedures; and
- Delete children's personal information after the purpose for its retention has been fulfilled.

Violations of COPPA are deemed an unfair or deceptive act or practice and may therefore be federally prosecuted by FTC. While there is no criminal prosecution or private right of action under COPPA, it does authorize state attorneys general to enforce violations that affect residents of their states.[59]

In 2019, Google and its subsidiary YouTube agreed to pay a $170 million settlement for lawsuits from FTC and New York for violations of COPPA for collecting personal information from children without

---

[51] *NetChoice, LLC v. Reyes*, (D. Utah December 18, 2023) (No. 2:23-cv-00911).

[52] Mack Degeurin, *Tech trade group sues over 'unconstitutional' Utah teen social media curfew law*, Popular Science, https://www.popsci.com/technology/lawsuit-utah-teen-social-media-curfew/#:~:text=NetChoice%2C%20in%20a%20suit%20filed,age%20verification%20requirement%2C%20which%20NetChoice (last visited Jan. 8, 2024).

[53] *NetChoice v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).

[54] Id.

[55] 15 U.S.C. §6502.

[56] 16 C.F.R. pt. 312.

[57] 15 U.S.C. §§ 6502(a)-(b).

[58] *See*, Federal Trade Commission, *General Questions About the COPPA Rule: What is the Children's Online Privacy Protection Rule?*, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-asked-questions-0 (last visited Jan. 6, 2024).

[59] *Id*.

consent. Specifically, it was alleged that YouTube tracked cookies[60] from viewers of child-directed channels, without first notifying parents and obtaining their consent. YouTube earned millions of dollars by using the identifiers to deliver targeted ads to viewers of these channels.[61]

*California Age-Appropriate Design Code Act*

In 2022, California passed a combination social media and data privacy law that prohibits social media platforms from showing children advertising. California adopted the California Age-Appropriate Design Code Act (CAADCA)[62] legislation modeled on the United Kingdom's Age Appropriate Design Code,[63] which requires online platforms to adhere to strict default privacy and safety settings that protect the best interest of children.[64] CAADCA covers children under 18 years of age and will be effective July 1, 2024.[65]

More specifically, CAADCA requires certain businesses that provide an online service, product, or feature that is likely to be accessed by children to comply with several new requirements and restrictions, including a:[66]
- Prohibition on using personal information of any child in a way that it knows or has reason to know is materially detrimental to a child's physical or mental health and/or wellbeing; and
- Prohibition on using dark patterns to manipulate children into providing unnecessary personal information.

The law has recently been challenged on several grounds, including on First Amendment and Supremacy Clause grounds, and has been preliminarily enjoined.[67] A similar law has since been adopted in Utah.[68]

*European Union - Social Media and Data Privacy Laws for Children*

In 2015, the European Union (E.U.) passed a law to require member states to require parental consent for a child to access social media. The E.U. mandates that at a minimum, such parental consent requirements must apply to children 13 years of age or younger, and may apply to children 16 years of age or younger.[69]

Additionally, in 2023, the E.U. passed the Digital Services Act (DCA), which currently applies to 19 of the largest Internet companies, including Meta, Apple, TikTok, and Google. The DCA, in part, requires

---

[60] Cookies are bits of data that are sent to and from a user's browser to identify the user. When the user opens a website, the user's browser sends a piece of data to the web server hosting that website. This data usually appears as strings of numbers and letters in a text file. Every time the user accesses a website, a cookie is created and placed in a temporary folder on the user's device. From here, cookies try to match the user's preferences for what the user wants to read, see, or purchase. Microsoft, *Everything you need to know about Internet cookies*, (April 25, 2023), https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2 (last visited Jan. 12, 2024).

[61] Federal Trade Commission, *Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, Sep. 4, 2019, https://www.ftc.gov/news-events/news/press-releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations-childrens-privacy-law (last visited Jan. 9, 2024).

[62] Cal. Civil Code § 1798.99.28-.35.

[63] 5Rights Foundation, *California follows UK lead as child data protection law is passed*, https://5rightsfoundation.com/in-action/california-follows-uk-lead-as-child-data-protection-law-is-passed.html (last visited Jan. 7, 2024).

[64] Office of Governor Gavin Newsome, *Governor Newsom Signs First-in-Nation Bill Protecting Children's Online Data and Privacy*, https://www.gov.ca.gov/2022/09/15/governor-newsom-signs-first-in-nation-bill-protecting-childrens-online-data-and-privacy/ (last visited Jan. 7, 2024).

[65] Cal. Civil Code § 1798.99.28-.35

[66] Briana Kelly, Nelson Mullins Riley & Scarborough LLP, *State of California Passes Bill to Protect Children Online*, Jan. 26, 2023, https://www.lexology.com/library/detail.aspx?g=e4c49600-b850-4d8f-a68a-117acf89972f (last visited Jan. 7, 2024).

[67] *NetChoice, LLC v. Bonta*, 2023 WL 6135551 (N.D. Cal 2023).

[68] Ch. 477, Laws of Utah 2023.

[69] Diana Graber, *Europeans Teach Us a Lesson About Banning Teens From Social Media*, HuffPost, Dec. 21, 2015, https://www.huffpost.com/entry/europeans-teach-us-a-less_b_8854802 (last visited Jan. 6, 2024).

such companies to prevent harmful content from spreading on their platforms and to share certain internal data with regulators and associated researchers.[70]

The DCA, which became effective January 1, 2024, compels such tech companies to set up new policies and procedures to remove flagged hate speech, terrorist propaganda, and other material defined as illegal by countries within the E.U.[71]

## Age Verification

### Age Verification Mechanisms

Many industries are currently required to use online age-verification methods, including:
- Alcohol and tobacco,[72]
- Gambling, and
- Firearms.[73]

Adult websites in the United States generally use a checkbox for a user to confirm they are at least 18 years of age. Recently, however, several states and the United Kingdom have passed laws to require adult websites to use age-verification measures to block adult content from being accessed by minors.[74]

Additionally, some social media platforms ask for age identifying information to create an account, but such information is not always verified. For example, Facebook requires new users to self-report a birthdate to confirm that their age is of at least 13 years old. Meta is currently testing new ways to age verify, including through the use of biometrics and online interviews.[75]

There are several ways that Internet companies verify, or attempt to verify, age. Options include using:[76]
- Government identity documents, which generally require the user to submit a government document to a third party for the company to review.
- Phone records, which generally check the user's phone for parental controls.
- Credit score databases, which generally require the user to enter identifying information, which is then confirmed through a credit check agency.
- Biometric age estimation, which generally requires a facial analysis to estimate age.
- Credit cards, which generally require the user to supply credit card information for validation.
- Open banking, which generally requires the user to log into their own online banking system, and give approval for date of birth data to be supplied to a bank-approved third-party age verification provider.

---

[70] Martin Coulter, *Big Tech braces for EU Digital Services Act regulations*, Reuters (Aug. 24, 2023), https://www.reuters.com/technology/big-tech-braces-roll-out-eus-digital-services-act-2023-08-24/ (last visited Jan. 6, 2024).

[71] Adam Satariano, *E.U. Takes Aim at Social Media's Harms With Landmark New Law*, The New York Times, Apr. 22, 2022, https://www.nytimes.com/2022/04/22/technology/european-union-social-media-law.html (last visited Jan. 6, 2024).

[72] The U.S. Food and Drug Administration (FDA) recommends using independent, third-party age- and identity-verification services that compare customer information against third-party data sources for online sellers of tobacco. FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)*, p. 7, (April 2020), https://www.fda.gov/media/133880/download (last visited Jan. 9, 2024).

[73] Jan Stepnov, *What Is an Age Verification System and Why Incorporate It Into Your Business*, Regula (Apr. 21, 2023), https://regulaforensics.com/blog/age-verification-system/ (last visited Jan. 12, 2024).

[74] Masha Borak, UK introduces Online Safety Bill mandating age verification, Oct. 27, 2023, https://www.biometricupdate.com/202310/uk-introduces-online-safety-bill-mandating-age-verification#:~:text=The%20United%20Kingdom%20has%20finally,checking%20measures%2C%20including%20biometric%20technology. (last visited Jan. 9, 2024); Dmytro Sashchuk, *Age verification regulations in the United States of America*, Veriff, (Nov. 15, 2023), https://www.veriff.com/fraud/learn/age-verification-legalization-in-the-united-states-of-america (last visted Jan. 7, 2024).

[75] Meta, *Introducing New Ways to Verify Age on Instagram*, Jun. 23, 2022, https://about.fb.com/news/2022/06/new-ways-to-verify-age-on-instagram/ (last visited Jan. 9, 2024).

[76] The Age Verification Providers Association, *How do you check age online?*, https://avpassociation.com/avmethods/ (last visited Jan. 7, 2024).

- Algorithmic profiling, which generally assesses the likely age of a user based on their online behavior.
- Self-declaration, which generally requires the user to tick a box or self-enter a birthdate.
- Zero knowledge proofs, which generally enable users to upload identity documents to private servers and securely share encrypted, anonymous "proofs" of age to a company, through a process called hashing, without actually transmitting the identity documents to the company.[77]

When verifying age online, users usually share personal information, including:
- Full name and location.
- Email or phone number (when using two-factor authorization).
- Home address.

Identity theft is a potential risk when users reveal this information, and websites can collect the information revealed through age verification processes and combine it with other data for targeted advertisements or sharing that data with third parties.[78]

However, there are numerous minimally invasive verification techniques that do not require sharing any age verification information at all with social media platforms.[79] Age verification systems have progressed considerably from a generation ago, when the Supreme Court held that age-verification methods often failed at that task and were too burdensome for law abiding adults.[80]

Age fabrication is also a widespread issue. For example, underage customers in the United States consumed 11.73% of all alcoholic drinks sold in the U.S. market in 2016, and 49.8% of tobacco and vape shops in California failed to check the ID of underage decoys in 2018.[81]

*Age Verification Laws*

Several states, including Louisiana, Utah, Arkansas, Mississippi, Montana, North Carolina, Texas, and Virginia, have recently passed legislation to require websites that host obscene material or other material harmful to minors to verify the age of a visitor and block access to minors.[82]

For example, Utah requires a commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the Internet through a website that contains a substantial portion of such material to perform reasonable age-verification methods to verify the age of an individual attempting to access the material. A commercial entity who violates this provision is liable to an individual for damages resulting from a minor's accessing the material, including court costs and reasonable attorney fees.[83]

---

[77] Bessie Liu, *Aleo blockchain adds zPass, a ZK protocol for verifying identities*, Blockworks, https://blockworks.co/news/zk-decentralized-identity-verification (last visited Jan. 6, 2024).

[78] John Reynolds, *Don't risk identity fraud just to play that video game — do this instead*, Aleo, https://aleo.org/post/dont-risk-identity-fraud-to-play-that-video-game/#:~:text=The%20risks%20of%20today's%20age,public%20records%2C%20or%20ID%20scans) (last visited Jan. 7, 2024).

[79] The Federalist Society, *Age Verification for Social Media: A Constitutional and Reasonable Regulation* (Aug. 7, 2023), https://fedsoc.org/commentary/fedsoc-blog/age-verification-for-social-media-a-constitutional-and-reasonable-regulation (last visited Jan. 8, 2024).

[80] *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004).

[81] Persona, *Age verification system: How to add it into your business,* https://withpersona.com/blog/incorporate-age-verification-into-business (last visited Jan. 9, 2024).

[82] Dmytro Sashchuk, *Age verification regulations in the United States of America*, Veriff, (Nov. 15, 2023), https://www.veriff.com/fraud/learn/age-verification-legalization-in-the-united-states-of-america (last visted Jan. 7, 2024); Los Angeles Blade, *Pornhub blocks access as new age verification laws take effect*, Jan. 7, 2024, https://www.losangelesblade.com/2024/01/07/pornhub-blocks-access-as-new-age-verification-laws-take-effect/ (last visited Jan. 7, 2024).

[83] Utah Code Annotated § 78B-3-1002.

Some of these state laws have recently been challenged on First Amendment grounds.[84] The law in Texas has been preliminarily enjoined, although the litigation is ongoing; but the suits challenging the laws in Utah and Louisiana have been dismissed for lack of jurisdiction, as the laws rely on private enforcement, not state enforcement.

Unlike past legislative efforts to curb online pornography by declaring the websites a danger to public health, the recent laws have had a demonstrated effect against such websites. Pornhub, a large pornography website, gets more global users than Amazon or Netflix. In 2019, the last year Pornhub released its data, the site was visited 42 billion times, or 115 million times each day.[85] In response to these bills, Pornhub has prohibited access to all users, including both minors and adults, in Montana, North Carolina, Utah, Arkansas, Mississippi, and Virginia, via geoblocking.[86]

*Constitutionality of Age Verification*

The 1996 the Communications Decency Act (CDA) was designed "to protect minors from 'indecent' and 'patently offensive' communications on the Internet" by prohibiting "the knowing transmission of obscene or indecent messages," and allowed websites to defend themselves by either making good faith efforts to restrict such communications to adults, or implementing age-verification measures.[87]

In 1997, in *Reno v. American Civil Liberties Union*,[88] the U.S. Supreme Court held that the provision of the CDA prohibiting the transmission of indecent messages[89] was an unconstitutional, content-based restriction of First Amendment free speech rights. The U.S. Supreme Court also held that requiring adults to prove their age to access certain content was an unconstitutional limit on free speech, when there were less restrictive means to curb access to minors, such as filters and parental controls.[90]

In Justice O'Connor's partial dissent, she found that since technology was insufficient for ensuring that minors could be excluded while still providing adults full access to protected content, the CDA was unconstitutional. However, she contemplated the possibility that future technological advances may allow for a constitutionally sound age-verification law.[91]

## Florida Deceptive and Unfair Trade Practices Act (FDUTPA)

FDUTPA is a consumer and business protection measure that prohibits unfair methods of competition, and unconscionable, deceptive, or unfair acts or practices in the conduct of trade or commerce.[92] FDUTPA was modeled after the FTC Act.[93]

---

[84] *See Free Speech Coalition Inc. v. LeBlanc*, No. 2:23-cv-2123 (E.D. La.); [84] *Free Speech Coalition, Inc. v. Anderson*, 2023 WL 4899509 (D. Utah 2023); *Free Speech Coalition, Inc. v. Colmenero*, 2023 WL 5655712 (W.D. Texas 2023); Christopher Brown, *Porn Industry Group Loses Challenge to Louisiana Age-Check Law*, Bloomberg Law, https://news.bloomberglaw.com/privacy-and-data-security/porn-industry-group-loses-challenge-to-louisiana-age-check-law (last visited Jan. 7, 2024).

[85] Marc Novicoff, *A Simple Law Is Doing the Impossible. It's Making the Online Porn Industry Retreat.*, Politico Magazine, Aug. 8, 2024, https://www.politico.com/news/magazine/2023/08/08/age-law-online-porn-00110148 (last visited Jan. 8, 2024).

[86] Wes Davis, *Pornhub blocks North Carolina and Montana as porn regulation spreads*, The Verge, https://www.theverge.com/2024/1/2/24022539/pornhub-blocked-montana-north-carolina-age-verification-law-protest (last visited Jan. 8, 2024).

[87] Ronald Kahn, *Reno v. American Civil Liberties Union (1997)*, Free Speech Center at Middle Tennessee State University (Dec. 15, 2023), Reno v. American Civil Liberties Union (1997) - The Free Speech Center (mtsu.edu) (last visited Jan. 7, 2024).

[88] *Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997).

[89] It is still illegal to transmit obscene messages to minors. United States Department of Justice, *Obscenity,* https://www.justice.gov/criminal/criminal-ceos/obscenity#:~:text=Federal%20law%20strictly%20prohibits%20the,is%20punishable%20under%20federal%20law (last visited Jan. 9, 2024).

[90] *Reno*, 521 U.S. 844; Ronald Kahn, *supra* note 87.

[91] *Id*.

[92] S. 501.202, F.S.

[93] D. Matthew Allen, et. al., *The Federal Character of Florida's Deceptive and Unfair Trade Practices Act*, 65 U. MIAMI L. REV. 1083 (Summer 2011).

The Department of Legal Affairs (DLA) or state attorney's office (SAO) in the judicial circuit affected or where the violation occurs may bring actions on behalf of consumers or governmental entities when it serves the public interest.[94] The SAO may enforce violations of FDUTPA if the violations take place within its jurisdiction. The DLA has enforcement authority when the violation is multi-jurisdictional, the state attorney defers to the DLA in writing, or the state attorney fails to act within 90 days after a written complaint is filed.[95] In certain circumstances, consumers may also file suit through private actions.[96]

The DLA and the SAO have powers to investigate FDUTPA claims, which include:[97]
- Administering oaths and affirmations;
- Subpoenaing witnesses or matter; and
- Collecting evidence.

The DLA and SAO may seek the following remedies:
- Declaratory judgments;
- Injunctive relief;
- Actual damages on behalf of consumers and businesses;
- Cease and desist orders; and
- Civil penalties of up to $10,000 per willful violation.[98]

FDUTPA may not be applied to certain entities in certain circumstances, including:[99]
- Any person or activity regulated under laws administered by the Office of Insurance Regulation or the Department of Financial Services; or
- Banks, credit unions, and savings and loan associations regulated by the Office of Financial Regulation or federal agencies.

### **Effect of the Bill – Social Media**

The bill provides the following definitions:
- "Account holder" means a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state.
- "Daily active users" means the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous 12 months, or if the online forum, website, or application did not exist during the previous 12 months, the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous month.
- "Resident" means a person who lives in this state for more than 6 months of the year.
- "Social media platform" means an online forum, website, or application that satisfies each of the following criteria:
  - Allows users to upload content or view the content or activity of other users;

---

[94] Ss. 501.203(2) and 501.207(1)(c) and (2), F.S.; *see also* David J. Federbush, *FDUTPA for Civil Antitrust: Additional Conduct, Party, and Geographic Coverage; State Actions for Consumer Restitution*, 76 FLORIDA BAR JOURNAL 52, Dec. 2002 (analyzing the merits of FDUPTA and the potential for deterrence of anticompetitive conduct in Florida), *available at* http://www.floridabar.org/divcom/jn/jnjournal01.nsf/c0d731e03de9828d852574580042ae7a/99aa165b7d8ac8a485256c8300791ec1!OpenDocument&Highlight=0,business,Division* (last visited on Jan. 6, 2024).

[95] S. 501.203(2), F.S.

[96] S. 501.211, F.S.

[97] S. 501.206(1), F.S.

[98] Ss. 501.207(1), 501.208, and 501.2075, F.S. Civil Penalties are deposited into general revenue. Enforcing authorities may also request attorney fees and costs of investigation or litigation. S. 501.2105, F.S.

[99] S. 501.212(4), F.S.

- o Ten percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the online forum, website, or application on the days when using the online forum, website, or application during the previous 12 months or, if the online forum, website, or application did not exist during the previous 12 months, during the previous month;
- o Employs algorithms that analyze user data or information on users to select content for users; and
- o Has any of the following **addictive features**:
  - ▪ Infinite scrolling, which means either:
    - • Continuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page; or
    - • Seamless content, or the use of pages with no visible or apparent end or pagebreaks.
  - ▪ Push notifications or alerts sent by the online forum, website, or application to inform a user about specific activities or events related to the user's account.
  - ▪ Displays personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content.
  - ▪ Auto-play video or video that begins to play without the user first clicking on the video or on a play button for that video.
  - ▪ Live-streaming or a function that allows a user or advertiser to broadcast live video content in real-time.
- o The term does not include an online service, website, or application where the exclusive function is e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender.

**For minors under 14 years of age**, the bill requires a social media platform to:
- • Prohibit a minor who is younger than 14 years of age from entering into a contract with a social media platform to become an account holder.
- • Terminate any account held by an account holder younger than 14 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising
  - o The social media platform must provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.
- • Allow an account holder younger than 14 years of age to request to terminate the account. Termination must be effective within **5 business days** after such request.
- • Allow the confirmed parent or guardian of an account holder younger than 14 years of age to request the minor's account be terminated. Termination must be effective within **10 business days** after such request.
- • Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

**For minors 14 or 15 years of age**, the bill:
- • Requires a social media platform to prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent for the minor to become an account holder.
- • Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account.

- o The social media platform must provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.
- Allow an account holder who is 14 or 15 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.
- Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.
- Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

The bill provides that **if a court enjoins** the enforcement of the provisions for minors 14 or 15 years of age, or such provision caused a court to otherwise enjoin enforcement of any other provision of the bill, then the provision is severed, and the following comes into effect:

- A social media platform must prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder.
- A social media platform must:
  - o Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising.
    - ▪ The social media platform must provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of 90 days if the account holder fails to effectively dispute the termination.
  - o Allow an account holder who is 14 or 15 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.
  - o Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.
  - o Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

The bill provides that if a social media platform allows an account holder to use the social media platform, the parties have entered into a contract.

The bill provides that any knowing or reckless violation of the requirements for minor users under 14 years of age or the requirements for minor users under 16 years of age by a social media platform is an unfair and deceptive trade practice actionable under FDUTPA solely by DLA.[100] In addition to other FDUTPA remedies, DLA may collect a civil penalty of up to $50,000 per violation and reasonable attorney fees and court costs. When the social media platform's failure to comply with such requirements is a consistent pattern of knowing or reckless conduct, punitive damages may be assessed against the social media platform.

The bill provides that a social media platform that knowingly or recklessly violates the requirements for minor users under 14 years of age or the requirements for minor users under 16 years of age is liable to such minor account holder, including court costs and reasonable attorney fees as ordered by the court. Claimants may be awarded up to $10,000 in damages. Such an action must be brought within 1 year from the date the complainant knew, or reasonably should have known, of the alleged violation.

---

[100] DLA is not prohibited from bringing an action against:
- Any person or activity regulated under laws administered by OIR or DFS; and
- Banks, credit unions, and savings and loan associations regulated by OFR or federal agencies.

The bill requires that any action brought pursuant to the bill may only be brought on behalf of a resident minor, and does not preclude any other available remedy at law or equity against such social media platform.

For purposes of bringing an action under the bill, the bill provides that a social media platform that allows a minor account holder younger than 14 years of age or a minor account holder who is 14 or 15 years of age to create an account on such platform is considered to be both engaged in substantial and not isolated activities within Florida and operating, conducting, engaging in, or carrying on a business and doing business in Florida, and is therefore subject to the jurisdiction of the courts of Florida.

The bill provides the following related to DLA subpoena power:
- If, by its own inquiry or as a result of complaints, DLA has reason to believe that an entity or person has engaged in, or is engaging in, an act or practice that violates the bill, DLA may administer oaths and affirmations, subpoena witnesses or matter, and collect evidence. Within 5 days, excluding weekends and legal holidays, after the service of a subpoena or at any time before the return date specified therein, whichever is longer, the party served may file in the circuit court in the county in which it resides or in which it transacts business and serve upon the enforcing authority a petition for an order modifying or setting aside the subpoena. The petitioner may raise any objection or privilege which would be available upon service of such subpoena in a civil action. The subpoena must inform the party served of its rights.
- If the matter that DLA seeks to obtain by subpoena is located outside Florida, the entity or person subpoenaed may make it available to DLA or its representative to examine the matter at the place where it is located. DLA may designate representatives, including Florida officials which the matter is located, to inspect the matter on its behalf, and may respond to similar requests from officials of other states.
- Upon failure of an entity or person without lawful excuse to obey a subpoena and upon reasonable notice to all persons affected, DLA may apply to the circuit court for an order compelling compliance.
- DLA may request that an entity or person that refuses to comply with a subpoena on the ground that testimony or matter may incriminate the entity or person be ordered by the court to provide the testimony or matter. Except in a prosecution for perjury, an entity or individual that complies with a court order to provide testimony or matter after asserting a valid privilege against self-incrimination shall not have the testimony or matter so provided, or evidence derived therefrom, received against the entity or person in any criminal investigation or proceeding.
- Any entity or person upon whom a subpoena is served pursuant to the bill must comply with the terms thereof unless otherwise provided by order of the court. Any entity or person that fails to appear with the intent to avoid, evade, or prevent compliance in whole or in part with any investigation under this part or who removes from any place, conceals, withholds, mutilates, alters, or destroys, or by any other means falsifies any documentary material in the possession, custody, or control of any entity or person subject to any such subpoena, or knowingly conceals any relevant information with the intent to avoid, evade, or prevent compliance is liable for a civil penalty of not more than $5,000 per week in violation, reasonable attorney's fees, and costs.

## Current Situation – Harmful Content

### Effects of Harmful Content on Children

Internet usage and mobile technology has become mainstream, especially among teens and young adults.[101]

---

[101] Eric W. Owens et al., *The Impact of Internet Pornography on Adolescents: A Review of the Research*, 19(1-2) SEXUAL ADDICTION & COMPULSIVITY 99, 99-100 (2012); *See also* PEW RESEARCH CENTER, *Teens, Social Media & Technology Overview 2015: Smartphones Facilitate Shifts in Communication Landscape for Teens,* http://www.pewinternet.org/2015/04/09/teens-social-media-technology-2015/ (last visited Jan. 7, 2024).

One study found that:

> Because the Internet is not subject to regulations, it has emerged as a vehicle for circulation of pornography. Pornographic images are available for consumption in the privacy of one's home via the Internet rather than in public adult bookstores or movie theaters. Therefore, the accessibility, affordability, and anonymity have attracted a wider audience. Research in the United States has shown that 66% of men and 41% of women consume pornography on a monthly basis. An estimated 50% of all Internet traffic is related to sex. These percentages illustrate that pornography is no longer an issue of minority populations but a mass phenomenon that influences our society.[102]

Many users come across pornography on the internet who are not seeking it, and others seek it out.[103] Adult websites such as Xvideos and Pornhub are among the most visited in the United States, receiving an average of 693.5 million and 639.6 million monthly visitors, respectively. Of the top 20 most visited websites, four are classified as pornographic.[104]

Twenty-seven percent of young adults first view pornography before the onset of puberty and 70 percent of teens accidentally stumble upon pornography online[105] with trends showing teens are generally experiencing an increase in unwanted exposure to pornographic content online.[106] A sample of American high school students in 2021 found that 56 percent viewed pornography in 2020.[107]

Research suggests that adolescents who view pornography tend to have more sexually permissive attitudes, have more sexual partners in their lifetime, and are more likely to have engaged in certain sexual acts.[108] Similarly, adolescents who viewed pornography tended to display more aggression, have more traditional gender role attitudes, and view women as sex objects.[109] Due to the correlational nature of these findings, researchers were unable to determine if these characteristics were precursors to pornography use or a consequence of it;[110] however, they were able to identify pornography use as a strong exacerbating factor in individuals who have preexisting markers for sexual aggression.[111]

---

[102] Simone Kuhn, PhD, and Jurgen Gallinat, PhD, *Brain Structure and Functional Connectivity Associated With Pornography Consumption, The Brain on Porn,* JAMA Psychiatry, JAMA Network, (July 2014), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874574

[103] Josh McDowell Ministry, THE PORN PHENOMENON: THE IMPACT OF PORNOGRAPHY IN THE DIGITAL AGE (2016), research summary available at https://www.barna.com/research/porn-in-the-digital-age-new-research-reveals-10-trends/ (last visited Jan. 7, 2024).

[104] Joel Khalil, *These are the most popular websites right now - and they might just surprise you* (October 2023 edition), TechRadar, https://www.techradar.com/news/porn-sites-attract-more-visitors-than-netflix-and-amazon-youll-never-guess-how-many (last visited Jan. 8, 2024).

[105] KAISER FAMILY FOUNDATION, *Generation Rx.com: How Young People Use the Internet for Health Information*, December 2001, at 12, available at https://kaiserfamilyfoundation.files.wordpress.com/2001/11/3202-genrx-report.pdf.

[106] Kimberly J. Mitchell et al., *Trends in Youth Reports of Sexual Solicitations, Harassment and Unwanted Exposure to Pornography on the Internet*, 40 JOURNAL OF ADOLESCENT HEALTH 116, 124 (2007), available at: http://unh.edu/ccrc/pdf/CV135.pdf (last visited Jan. 7, 2023).

[107] Amanda Giordano, *What to Know About Adolescent Pornography Exposure*, Psychology Today (Feb. 27, 2022), https://www.psychologytoday.com/us/blog/understanding-addiction/202202/what-know-about-adolescent-pornography-exposure (last visited Jan. 7, 2024).

[108] Debra K. Braun-Corville & Mary Rojas, *Exposure to Sexually Explicit Web Sites and Adolescent Sexual Attitudes and Behaviors,* 45(2) J ADOLESCENT HEALTH 153, 156-162 (2009). *See also* Jane D. Brown & Kelly L. L'Engles, *X-Rated: Sexual Attitudes and Behaviors Associated with U.S. Early Adolescents' Exposure to Sexually Explicit Media,* 36 COMM. RSCH. 129-151 (2009). *Contra.* Marie-Therese Luder et al., *Associations between Online Pornography and Sexual Behavior among Adolescents: Myth or Reality?,* 40(5) ARCHIVES OF SEXUAL BEHAVIOR 1027-1035 (2011) (finding that pornography use had no association with early sexual imitation or risky sexual behaviors).

[109] Eileen M. Alexy et al., *Pornography as a Risk Marker for an Aggressive Pattern of Behavior among Sexually Reactive Children and Adolescents*, 14(6) J AM. PSYCHIATRIC NURSES ASS'N 442, 450 (2009). *See also* Elisabet Haggstrom-Nordin et al., *Experiences of and Attitudes towards Pornography among a Group of Swedish High School Students*, 14 EURO. J CONTRACEPTION AND REPRODUCTIVE HEALTH CARE 277, 277-284 (2009).

[110] Owens, *supra* note 1, at 101.

[111] Michelle L. Ybarra & Kimberly J. Mitchell, *X-Rated Material and Perpetration of Sexually Aggressive Behavior Among Children and Adolescents: Is There a Link?,* 8 CyberPsychology and Behavior 473, 473-486 (2011). *See generally,* Paul J. Wright, *A Meta-*

Adolescents who view pornography report feeling insecure about their ability to perform sexually and how they look, and tend to decrease their pornography use as their self-confidence increases or they develop positive relationships with friends and family.[112]

Additionally, studies have shown that problematic or excessive pornography use actually changes the reward circuitry in people's brains leading to a loss of self-control, which can lead to addiction.[113]

Eight states have recently passed laws to require websites with pornography to verify the age of a visitor and block access to minors.[114] Those states include Louisiana,[115] Utah, Arkansas, Mississippi, Montana, North Carolina, Texas, and Virginia.

**Obscenity**

"Sexual expression which is indecent but not obscene is protected by the First Amendment."[116] However, material that is obscene does not enjoy the same constitutional protections.[117] In determining whether sexual expression is obscene and thus outside the protection of the First Amendment, a court may apply the *Miller*[118] test, which considers whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interests and that the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by . . . applicable state law; and whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.[119,120]

The Florida Supreme Court has determined that the applicable community standard to be used in determining obscenity is the local county standard, explaining that such a standard "permits maximum protection of materials acceptable in cosmopolitan areas while not forcing more conservative areas to accept public depiction of conduct they find obscene."[121]

**Florida Definition of Material Harmful to Minors**

---

*Analysis of Pornography Consumption and Actual Acts of Sexual Aggression in General Population Studies,* 66(1) J COMM 183-205 (2016).

[112] Lotta Lofgren-Martenson & Sven-Axel Mason, *Lust, Love, and Life: A Qualitative Study of Swedish Adolescents' Perceptions and Experiences with Pornography* 47 J SEX RSCH. 568, 575 (2010).

[113] Simone Kuhn & Jurgen Gallinat, *Brain Structure and Functional Connectivity Associated with Pornography Consumption*, 71(7) JAMA PSYCHIATRY 827, 827-834, *available at* https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874574?utm_source=Silverchair%20Information%20Systems&utm_medium=email&utm_campaign=JAMAPsychiatry:OnlineFirst05/28/2014#Discussion (last visited Jan. 7, 2024).

[114] Sashchuk, *supra* note 82; Los Angeles Blade, *supra* note 82.

[115] The personal story of pop-singer Billie Eilish inspired the law in Louisiana which blocks access to pornography for minors. Eilish reported that she watched a lot of porn when she was about 11 years old. Eilish believes that the pornography had a drastic effect on her brain and feels "incredibly devastated that I was exposed to so much porn." The author of the bill, a sex addiction therapist, said "I just thought how courageous it was. … It just sort of re-emphasized to me what a problem this is, especially for our children." The Guardian, *Billie Eilish says watching porn as a child 'destroyed my brain',* (Dec. 14, 2021) https://www.theguardian.com/music/2021/dec/15/billie-eilish-says-watching-porn-gave-her-nightmares-and-destroyed-my-brain#:~:text=%E2%80%9CI%20think%20it%20really%20destroyed,was%20so%20violent%20and%20abusive (last visited Jan. 13, 2024); Marc Novicoff, *A Simple Law Is Doing the Impossible. It's Making the Online Porn Industry Retreat.*, Politico Magazine (Aug. 8, 2024), https://www.politico.com/news/magazine/2023/08/08/age-law-online-porn-00110148 (last visited Jan. 8, 2024).

[116] *Simmons v. State*, 944 So. 2d 317, 323 (Fla. 2006).

[117] *Id*.

[118] *Miller v. California*, 413 U.S. 15, 23 (1973).

[119] *2025 Emery Hwy, L.L.C. v. Bibb County, Georgia*, 377 F. Supp. 2d 1310 (M.D. Georgia 2005).

[120] S. 847.001(12), F.S. (A mother's breastfeeding of her baby is not under any circumstance "obscene").

[121] *Johnson v. State,* 351 So. 2d 10, 11 (Fla. 1977).

Section 847.001(7), F.S., defines as "harmful to minors" any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:

- Predominantly appeals to a prurient, shameful, or morbid interest;
- Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and
- Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.

Section 847.001(19), F.S., defines "sexual conduct" as any actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed.[122]

Section 847.001(20), F.S., defines "sexual excitement" as the condition of the human male or female genitals when in a state of sexual stimulation or arousal.

The Florida Supreme Court has found that images in the aid of legitimate scientific or educational purposes, such as a depiction of Michelangelo's David transmitted for an art history class, and an illustration of human genitalia intended for a sex education or biology class, are not materials harmful to minors.[123]

**Laws Related to Material Harmful to Minors**

There are several federal laws that prohibit access or distribution of harmful or obscene material to a minor:

- Schools and libraries that receive discounts for Internet access or internal connections through an E-rate program must:
  - "Certify that they block or filter Internet access" to pictures that are (a) obscene, (b) child pornography, and (c) harmful to minors on computers accessed by minors; and
  - Implement an Internet safety policy.[124]
- It is a crime to knowingly use a misleading domain name on the Internet with the intent to deceive a minor into viewing material that is harmful to minors.[125]
- It a crime to knowingly embed words or digital images into the source code of a website with the intent to deceive a minor into viewing material that is harmful to minors.[126]
- It is a crime to knowingly make any Internet communication for commercial purposes that is available to any minor and that includes any material harmful to minors.[127]

Additionally, s. 847.0138, F.S., prohibits a person from knowingly transmitting or believing that he or she was transmitting an image, information, or data that is harmful to minors via an electronic mail to a specific individual known by the defendant to be a minor.[128]

**Effect of the Bill – Harmful Content**

The bill provides the following definitions:

---

[122] A mother's breastfeeding of her baby does not under any circumstances constitute "sexual conduct."

[123] *Simmons v. State*, 944 So. 2d 317, 329 (Fla. 2006).

[124] Federal Communications Commission, *Children's Internet Protection Act (CIPA)*, https://www.fcc.gov/consumers/guides/childrens-Internet-protection-act (last visited Jan. 7, 2024).

[125] The definition of "harmful to minors" parallels the *Miller* test for obscenity, as applied to minors. 18 U.S.C. § 2252B.

[126] 18 U.S.C. § 2252C.

[127] 47 U.S.C. § 231.

[128] S. 847.0138, F.S.

- "Commercial entity" includes a corporation, limited liability company, partnership, limited partnership, sole proprietorship, and any other legally recognized entity.
- "Distribute" means to issue, sell, give, provide, deliver, transfer, transmit, circulate, or disseminate by any means.
- "Material harmful to minors" means any material that:
  - The average person applying contemporary community standards would find, taken as a whole, appeals to the prurient interest;
  - Depicts or describes, in a patently offensive way, sexual conduct;[129] and
  - When taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.
- "News-gathering organization" means any of the following:
  - A newspaper, news publication, or news source, printed or published online or on a mobile platform, engaged in reporting current news and matters of public interest, and an employee thereof who can provide documentation of such employment.
  - A radio broadcast station, television broadcast station, cable television operator, or wire service, and an employee thereof who can provide documentation of such employment.
- "Publish" means to communicate or make information available to another person or entity on a publicly available website or application.
- "Resident" means a person who lives in Florida for more than 6 months of the year.
- "Standard age verification" means any commercially reasonable method of age verification approved by the commercial entity.
- "Substantial portion" means more than 33.3 percent of total material on a website or application.

The bill requires a commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on a website or application, if the website or application contains a substantial portion of material harmful to minors, to use either anonymous age verification or standard age verification to verify that the age of a person attempting to access the material is 18 years of age or older and prevent access to the material by a person younger than 18 years of age.

The commercial entity must offer anonymous age verification and may offer standard age verification, and a person attempting to access the material may select which method will be used to verify his or her age.

The bill requires a commercial entity to ensure that the age verification procedures under s. 501.1738 are met.

The bill does not apply to:
- A bona fide news or public interest broadcast, website video, report, or event and does not affect the rights of a news-gathering organization.
- An Internet service provider or its affiliates or subsidiaries, a search engine, or a cloud service provider that provides access or connection to or from a website or other information or content on the Internet or a facility, system, or network not under the provider's control, including transmission, downloading, intermediate storage, or access software, to the extent the provider is not responsible for the creation of the material harmful to minors.

The bill provides that, if a commercial entity violates the requirements for minor users, it is an unfair and deceptive trade practice actionable under FDUTPA solely by DLA.[130] In addition to other FDUTPA remedies, DLA may collect a civil penalty of up to $50,000 per violation and reasonable attorney fees and court costs. When the commercial entity's failure to comply with requirements for minor users is a

---

[129] As defined in s. 847.001(19), F.S.

[130] DLA is not prohibited from bringing an action against:
- Any person or activity regulated under laws administered by OIR or DFS; and
- Banks, credit unions, and savings and loan associations regulated by OFR or federal agencies.

consistent pattern of conduct of the commercial entity, punitive damages may be assessed against the commercial entity.

The bill provides that a third party that performs age verification for a commercial entity in violation of s. 501.1738 is deemed to have committed an unfair and deceptive trade practice actionable solely by DLA against such third party. In addition to other FDUTPA remedies, DLA may collect a civil penalty of up to $50,000 per violation and reasonable attorney fees and court costs.

The bill also allows for a private cause of action against a commercial entity that fails to prohibit access or prohibit a minor from future access to material harmful to minors after a report of unauthorized or unlawful access has been made. The commercial entity is liable to such Florida minor for such access, including up to $10,000 in damages, court costs, and reasonable attorney fees. Such an action must be brought within one year from the date the complainant knew, or reasonably should have known, of the alleged violation.

The bill requires that any action brought pursuant to the bill may only be brought on behalf of a resident minor, and does not preclude any other available remedy at law or equity against such commercial entity.

For purposes of bringing an action under the bill, a commercial entity that publishes or distributes material harmful to minors on a website or application, if the website or application contains a substantial portion of material harmful to minors and such website or application is available to be accessed in Florida, is considered to be both engaged in substantial and not isolated activities within Florida and operating, conducting, engaging in, or carrying on a business and doing business in Florida, and is therefore subject to the jurisdiction of the courts of Florida.

The bill provides the following related to DLA subpoena power:
- If, by its own inquiry or as a result of complaints, DLA has reason to believe that an entity or person has engaged in, or is engaging in, an act or practice that violates the bill, DLA may administer oaths and affirmations, subpoena witnesses or matter, and collect evidence. Within 5 days, excluding weekends and legal holidays, after the service of a subpoena or at any time before the return date specified therein, whichever is longer, the party served may file in the circuit court in the county in which it resides or in which it transacts business and serve upon the enforcing authority a petition for an order modifying or setting aside the subpoena. The petitioner may raise any objection or privilege which would be available upon service of such subpoena in a civil action. The subpoena must inform the party served of its rights.
- If the matter that DLA seeks to obtain by subpoena is located outside Florida, the entity or person subpoenaed may make it available to DLA or its representative to examine the matter at the place where it is located. DLA may designate representatives, including Florida officials which the matter is located, to inspect the matter on its behalf, and may respond to similar requests from officials of other states.
- Upon failure of an entity or person without lawful excuse to obey a subpoena and upon reasonable notice to all persons affected, DLA may apply to the circuit court for an order compelling compliance.
- DLA may request that an entity or person that refuses to comply with a subpoena on the ground that testimony or matter may incriminate the entity or person be ordered by the court to provide the testimony or matter. Except in a prosecution for perjury, an entity or individual that complies with a court order to provide testimony or matter after asserting a valid privilege against self-incrimination shall not have the testimony or matter so provided, or evidence derived therefrom, received against the entity or person in any criminal investigation or proceeding.
- Any entity or person upon whom a subpoena is served pursuant to the bill must comply with the terms thereof unless otherwise provided by order of the court. Any entity or person that fails to appear with the intent to avoid, evade, or prevent compliance in whole or in part with any investigation under this part or who removes from any place, conceals, withholds, mutilates, alters, or destroys, or by any other means falsifies any documentary material in the possession,

custody, or control of any entity or person subject to any such subpoena, or knowingly conceals any relevant information with the intent to avoid, evade, or prevent compliance is liable for a civil penalty of not more than $5,000 per week in violation, reasonable attorney's fees, and costs.

The bill allows DLA to adopt rules to implement the bill.

The bill provides a severability clause.

*Age Verification Procedures*

The bill creates s. 501.1738, F.S., to provide age verification standards for third parties conducting age verification for social media platforms or commercial entities.

The bill provides that the the term "anonymous age verification" means a commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party organized under the laws of a state of the United States which:

- Has its principal place of business in a state of the United States; and
- Is not owned or controlled by a company formed in a foreign country, a government of a foreign country, or any other entity formed in a foreign country.

A third party conducting age verification for a commercial entity:

- May not retain personal identifying information used to verify age once the age of an account holder or a person seeking an account has been verified.
- May not use personal identifying information used to verify age for any other purpose.
- Must keep anonymous any personal identifying information used to verify age. Such information may not be shared or otherwise communicated to any person.
- Must protect personal identifying information used to verify age from unauthorized or illegal access, destruction, use, modification, or disclosure through reasonable security procedures and practices appropriate to the nature of the personal information.

The bill provides an effective date of January 1, 2025.

## II.  FISCAL ANALYSIS & ECONOMIC IMPACT STATEMENT

A.  FISCAL IMPACT ON STATE GOVERNMENT:

1.  Revenues:

The bill may result in an increase in civil penalties collected by DLA.

2.  Expenditures:

The bill may increase regulatory costs to DLA due to the resources necessary to enforce the bill.

B.  FISCAL IMPACT ON LOCAL GOVERNMENTS:

1.  Revenues:

None.

2.  Expenditures:

None.

C.  DIRECT ECONOMIC IMPACT ON PRIVATE SECTOR:

The bill may result in increased costs for companies operating websites due to the resources necessary to implement new procedures for age-verification and parental consent.

D.  FISCAL COMMENTS:

None.