# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

    *Plaintiffs*,

    v.

ASHLEY BROOKE MOODY, in her
official capacity as Attorney General of
the State of Florida,

    *Defendant*.

Case No. 4:24-cv-438-MW-MAF

## <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................... 1

BACKGROUND .................................................................................. 3

    A.    Factual Background ..................................................................... 3

    B.    Procedural History ..................................................................... 5

ARGUMENT ....................................................................................... 5

I.    Plaintiffs' Complaint Is Not A "Shotgun Pleading." ...................... 5

II.    Florida's Standing Arguments Lack Merit ..................................... 6

    A.    Plaintiffs Have Associational Standing to Bring Their Claims ...................................................................................... 6

    B.    Plaintiffs Have Prudential Standing to Assert the First Amendment Rights of Their Members' Users .................................... 15

III.    The Complaint States A Claim ..................................................... 20

    A.    Plaintiffs Have a Cause of Action to Seek Declaratory and Injunctive Relief for Violations of Their Members' Rights .............. 20

    B.    Plaintiffs Plausibly Allege That HB3 Violates the First Amendment ...................................................................... 22

    C.    Plaintiffs Plausibly Allege Their Vagueness Claim............................. 31

    D.    Plaintiffs Have a Cause of Action to Assert Their COPPA Preemption Claim ................................................................. 32

IV.    Florida's Argument About The Scope Of Injunctive Relief Is Premature ................................................................................. 33

CONCLUSION .................................................................................. 33

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Am. Airlines v. Wolens*,
513 U.S. 219 (1995)..............................................................................33

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986)..............................................................................28

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. 320 (2015)..............................................................................21

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)........................................................................ 24, 29

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002)..............................................................................17

*Borrero v. United Healthcare*,
610 F.3d 1296 (11th Cir. 2010) .............................................................9

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ...................................................................... *passim*

*Buehrle v. Key West*,
813 F.3d 973 (11th Cir. 2015) .............................................................23

*Carafano v. Metrosplash.com*,
339 F.3d 1119 (9th Cir. 2003) .............................................................23

*Carey v. Population Servs.*,
431 U.S. 678 (1977)..............................................................................17

*CCIA v. Paxton*,
2024 WL 4051786 (W.D. Tex. Aug. 30, 2024)................................. 1, 8, 15, 20

*Charles v. Front Royal Volunteer Fire & Rescue Dep't*,
21 F.Supp.3d 620 (W.D. Va. 2014) ......................................................33

*Club Madonna v. City of Miami Beach*,
42 F.4th 1231 (11th Cir. 2022)............................................................28

*Collins v. Yellen,*
  594 U.S. 220 (2021)..................................................................................7

*Craig v. Boren,*
  429 U.S. 190 (1976)...................................................................... 16, 17, 18

*FW/PBS v. City of Dallas,*
  493 U.S. 215 (1990)................................................................................28

*Ga. Latino All. for Hum. Rts. v. Governor,*
  691 F.3d 1250 (11th Cir. 2012)..............................................................21

*Gary v. Warner Robins,*
  311 F.3d 1334 (11th Cir. 2002) .............................................................26

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977)........................................................................... 7, 18

*Indigo Room v. Fort Myers,*
  710 F.3d 1294 (11th Cir. 2013)........................................................ 26, 27

*Jacksonville Branch, NAACP v. Duval Cnty. Sch. Bd.,*
  883 F.2d 945 (11th Cir. 1989) ...............................................................16

*Moody v. NetChoice,*
  603 U.S. 707 (2024)....................................................................... 10, 13, 14

*Moore v. Urquhart,*
  899 F.3d 1094 (9th Cir. 2018)................................................................21

*Morales v. Trans World Airlines,*
  504 U.S. 374 (1992).................................................................................33

*Murthy v. Missouri,*
  603 U.S. 43 (2024)........................................................................... 26, 30

*NetChoice v. Bonta,*
  2024 WL 5264045 (N.D. Cal. Dec. 31, 2024)......................................14

*NetChoice v. Fitch,*
  738 F.Supp.3d 753 (S.D. Miss. 2024)....................................... *passim*

*NetChoice v. Griffin*,
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)............................................ *passim*

*NetChoice v. Reyes*,
2024 WL 4135626 (D. Utah Sept. 10, 2024)...................................... 1, 9, 22, 29

*NetChoice v. Yost*,
716 F.Supp.3d 539 (S.D. Ohio 2024) ........................................................ *passim*

*Otto v. Boca Raton*,
981 F.3d 854 (11th Cir. 2020).....................................................................23

*Pa. Psychiatric Soc'y v. Green Spring Health*,
280 F.3d 278 (3d Cir. 2002) ..........................................................................9

*Packingham v. N.C.*,
582 U.S. 98 (2017)...................................................................... *passim*

*Reno v. ACLU*,
521 U.S. 844 (1997)........................................................................... 24, 29

*SEAT v. Paxton*,
2025 WL 455463 (W.D. Tex. Feb. 7, 2025) ................................... 1, 13, 22, 30

*Solomon v. Gainesville*,
763 F.2d 1212 (11th Cir. 1985) .....................................................................31

*Sorrell v. IMS Health*,
564 U.S. 552 (2011)........................................................................... 15, 23

*Speech First v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ..................................................................7, 8

*SRSNE Site v. Advance Coatings*,
2014 WL 671317 (D. Conn. Feb. 21, 2014) .................................................33

*State v. Packingham*,
368 N.C. 380 (2015) ..................................................................................24

*TikTok v. Garland*,
145 S.Ct. 57 (2025) ........................................................................... 26, 28

*TransUnion v. Ramirez*,
 594 U.S. 413 (2021)..................................................................7

*U.S. v. O'Brien*,
 391 U.S. 367 (1968)................................................................27

*U.S. v. Playboy Ent. Grp.*,
 529 U.S. 803 (2000)................................................................17

*United Food & Com. Workers Union v. Brown Grp.*,
 517 U.S. 544 (1996)..................................................................9

*Virginia v. Am. Booksellers Ass'n*,
 484 U.S. 383 (1988)................................................ 8, 15, 19, 22

*Vote.org v. Callanen*,
 89 F.4th 459 (5th Cir. 2023)...................................................21

*Warth v. Seldin*,
 422 U.S. 490 (1975)................................................................22

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
 792 F.3d 1313 (11th Cir. 2015)................................................6

*Wilder v. Va. Hosp. Ass'n*,
 496 U.S. 498 (1990)................................................................22

*Wollschlaeger v. Governor*,
 848 F.3d 1293 (11th Cir. 2017)..............................................31

**Statutes**

42 U.S.C. §1983 ......................................................................21

Fla. Stat. §501.1736(1)(e) ...................................... 3, 4, 10, 15

Fla. Stat. §501.1736(2)(a) ...................................................1, 4

Fla. Stat. §501.1736(2)(b)(1) ..............................................1, 4

Fla. Stat. §501.1736(3)(a) ......................................................4

Fla. Stat. §501.1736(3)(b)(1) .................................................4

Fla. Stat. §501.1736(4)(a) .................................................................5

Fla. Stat. §501.1736(4)(b)(1) ............................................................5

**Regulation**

Fla. Admin. Code §2-43.002(3) .........................................................29

**Rule**

Fed. R. Civ. P. 54(c) .......................................................................33

**Other Authorities**

*NetChoice v. Bonta*, Dkt.11.1, No. 25-146 (9th Cir. Jan. 28, 2025) ......................14

Press Conference, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024),
    https://tinyurl.com/5fhv2e2t .................................................................8

## INTRODUCTION

Florida's attempt to dismiss this lawsuit is flawed from top to bottom. HB3 restricts minors from creating accounts on the most popular "social media" websites. And it does so on the basis of content and speaker to boot. Courts across the country have enjoined similar efforts to restrict minors from accessing protected speech on "social media" websites based on concerns about their potential effect on minors. *E.g., SEAT v. Paxton*, 2025 WL 455463 (W.D. Tex. Feb. 7, 2025); *NetChoice v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *CCIA v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024); *NetChoice v. Fitch*, 738 F.Supp.3d 753 (S.D. Miss. 2024); *NetChoice v. Yost*, 716 F.Supp.3d 539 (S.D. Ohio 2024); *NetChoice v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023). Nothing about Florida's law warrants a different result.

Rather than focus on the merits of Plaintiffs' claims, Florida offers a slew of threshold objections, attacking everything from how Plaintiffs organized their complaint to whether Plaintiffs have a cause of action to enjoin the enforcement of an unconstitutional statute. Florida's arguments are meritless. There is no basis to dismiss Plaintiffs' complaint because some counts incorporate all the allegations in the complaint instead of just some of them, or because Plaintiffs organized their claims by legal challenge (e.g., First Amendment, Due Process) instead of by statutory provision (e.g., Fla. Stat. §§501.1736(2)(a), (2)(b)(1)). And the assertion

that trade organizations that represent the intended targets of HB3 lack a cause of action to enjoin the law's blatant First Amendment violations is foreclosed by precedent and common sense. Florida's argument that Plaintiffs lack associational standing is equally unavailing. None of Plaintiffs' claims requires the participation of individual members, and a long line of precedent confirms that Plaintiffs can assert the First Amendment rights of both their members and their members' users.

When Florida finally turns to the merits, it has little to say. It argues that HB3 regulates the conduct of "account creation" rather than speech. But courts have repeatedly rejected that same exact argument, for good reason. Just as with library cards, newspaper subscriptions, or any other "conduct" necessary to access speech, people create accounts on "social media" websites to gain access to websites "where they can speak and listen." *Packingham v. N.C.*, 582 U.S. 98, 104 (2017). Florida does not dispute that prohibiting minors from creating accounts on "social media" websites makes it impossible for them to engage in the full range of social and interactive First Amendment activity that users enjoy on those websites—be it publishing speech on their Instagram profiles, sharing photos with friends on Snapchat, or debating politics with classmates on Facebook.

The Court should deny Florida's motion in its entirety.

# BACKGROUND

## A.    Factual Background

CCIA and NetChoice are Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat. Compl.¶¶7-11. Those services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104. YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. On Snapchat, users can deepen connections with friends and family by communicating with each other in fun and casual ways. Compl.¶15.

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree websites like Facebook, YouTube, and Snapchat are appropriate for minors. In March 2024, Florida enacted HB3 to impose its own views about whether "social media platforms" are appropriate for minors. HB3 defines a "social media platform" as an online service that "[a]llows users to upload content or view the content or activit[ies] of other users." Fla. Stat. §501.1736(1)(e). But rather than regulating all websites that allow users to share

3

and view content, the Act limits the definition to popular websites that minors especially enjoy using—i.e., services that facilitate the most First Amendment activity.  A website qualifies as a "social media platform" if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the service "on the days when using" the service, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has one or more "addictive features." *Id.*  HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play" functions, and "[l]ive-streaming" functions. *Id.*

Section 1 of HB3 imposes several restrictions on access to "social media platforms" that are relevant here:

- **_Restrictions on minors under 14._**  HB3 prohibits minors under the age of 14 from creating accounts on "social media platforms" and requires "social media platforms" to terminate existing accounts held by minors under 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §§501.1736(2)(a), (2)(b)(1).

- **_Restrictions on 14- and 15-year-olds._**  HB3 prohibits 14- and 15-year-olds from creating accounts on "social media platforms" "unless the minor's parent or guardian provides consent for the minor to become an account holder."  It also requires "social media platforms" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." *Id.* §§501.1736(3)(a), (3)(b)(1).  HB3 specifies that if the parental consent requirements are enjoined, they "shall be severed" and replaced with a provision banning 14-

and 15-year-olds from creating accounts altogether. *Id.* §§501.1736(4)(a), (4)(b)(1).

### B.   Procedural History

Soon after Florida passed HB3, Plaintiffs filed this lawsuit.  Count I alleges that HB3's provision prohibiting minors under 14 from creating accounts on "social media platforms," and its provision requiring 14- and 15-year-olds to obtain parental consent before doing so, violate the First Amendment.  Compl.¶¶52-82.  Count II alleges that Section 1 of HB3 is unconstitutional because its coverage definition is unconstitutionally vague.  Compl.¶¶83-92.  And Count III alleges that the Children's Online Privacy Protection Act preempts the provisions of HB3 that require covered websites to delete information related to terminated accounts.  Compl.¶¶93-99.  Plaintiffs seek a declaration that Section 1 of HB3 violates the Constitution on its face and as applied to Plaintiffs' members that operate "social media platforms," as well as a preliminary and permanent injunction prohibiting Florida from enforcing the challenged provisions.

### ARGUMENT

## I.   Plaintiffs' Complaint Is Not A "Shotgun Pleading."

Florida begins by arguing that the complaint is a "shotgun pleading." MTD.10-11.  That argument is borderline frivolous.  A "shotgun pleading" is a pleading that violates "the spirit, if not the letter" of Rules 8(a)(2) and 10(b) by failing "to give the defendants adequate notice of the claims against them and the

grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320-23 (11th Cir. 2015).  Plaintiffs' complaint is anything but that.  Although Florida nitpicks aspects of the complaint, it does not (and cannot) assert that it lacks notice of the claims against it or the grounds on which they rest.  Indeed, Florida's motion confirms that the complaint is more than "informative enough" for it to respond.  *Id.* at 1326.

Florida's quibbles do not undermine that conclusion.  Florida complains that Counts II and III incorporate all prior allegations instead of just some of them, and criticizes Plaintiffs for grouping their challenges to HB3's provisions by legal challenge (i.e., First Amendment, Due Process, etc.) instead of statutory provision (i.e., provisions related to minors under 14, provisions related to 14- and 15-year olds, etc.).  MTD.11.  But Florida does not suggest that those common organizational choices prevented it from understanding the claims, nor does it explain how its preferred approach would make things clearer.  Florida knows what challenges Plaintiffs are bringing to which provisions.  MTD.8-9.  The pleading rules require nothing more.  *See Weiland*, 792 F.3d at 1326.

## II.    Florida's Standing Arguments Lack Merit.

### A.    Plaintiffs Have Associational Standing to Bring Their Claims.

To invoke associational standing, an organization must allege that (1) at least one of its members has standing to sue, (2) the interests it seeks to protect are

germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Florida does not dispute that the interests Plaintiffs seek to protect are germane to their purposes. *See* Compl.¶¶7-8. It instead argues that none of Plaintiffs' members have Article III standing to sue in their own right, and that resolving Plaintiffs' claims requires participation by individual members. Both arguments are flawed.

1. Plaintiffs plausibly allege that at least one member has Article III standing. Standing requires: an injury in fact that (1) is concrete, particularized, and actual or imminent; (2) is traceable to the challenged action of the defendant; and (3) would likely be redressed by judicial relief. *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021). If HB3 goes into effect, some CCIA and NetChoice members will unquestionably suffer an injury-in-fact. For one, HB3 directly regulates and imposes compliance costs on them. Compl.¶¶7-9, 50, 63-68. And a "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021). Further, HB3's access restrictions interfere with the First Amendment rights of Plaintiffs' members to disseminate both their own and third-party speech to their users. Compl.¶63. "[A] deprivation of the[] First Amendment right to free speech" is an injury in fact too. *Speech First v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022). Those injuries are "imminent," as Florida "has not suggested that the … law

will not be enforced." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). They are directly traceable to HB3. And an injunction prohibiting the state from enforcing the law will redress them. At least one member therefore has standing.

Florida does not seriously dispute that HB3 regulates some of Plaintiffs' members. Florida just faults Plaintiffs for failing to include detailed allegations about which members operate websites with "all the features necessary to be 'regulated under' Section 501.1736." MTD.14. But Plaintiffs must allege only that HB3 "arguably" covers one of its members, *Speech First*, 32 F.4th at 1119-20, and Florida does not and cannot dispute that HB3 does. After all, officials at HB3's signing ceremony expressly identified Instagram and Snapchat as two of its intended targets. Press Conference at 12:30-13:00, 22:24-23:03, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. And Florida's briefs explain (repeatedly) that Florida enacted HB3 in response to alleged concerns about various features on websites like "Facebook," "Instagram," and "Snapchat." Fla.PI.Opp.1-8.

2. Florida is also wrong to argue that Plaintiffs lack associational standing because resolving Plaintiffs' First Amendment claims requires participation by individual members. MTD.17-20. Courts across the country have resolved First Amendment challenges to similar laws without dragging members in as parties. *See Paxton*, 2024 WL 4051786, at *8-*9; *Fitch*, 738 F.Supp.3d at 767-68; *Yost*, 716

F.Supp.3d at 549-50; *Griffin*, 2023 WL 5660155, at *10; *Reyes*, 2024 WL 4135626, at *7. Florida offers no good reason why this Court cannot do the same.

As the Supreme Court has explained, the third prong of the associational standing test is "prudential," not constitutional, and is "best seen as focusing on … matters of administrative convenience and efficiency." *United Food & Com. Workers Union v. Brown Grp.*, 517 U.S. 544, 556-57 (1996). As the Eleventh Circuit has explained, the question is whether resolving the organization's claims "require[s] *excessive* participation by individual members." *Borrero v. United Healthcare*, 610 F.3d 1296, 1306 (11th Cir. 2010). So long as the claims "can be proved with the[ir] limited participation," the "organization has standing to assert them." *Id.*[1]

Plaintiffs' First Amendment claims do not require "excessive participation by individual members." *Id.* Plaintiffs argue that HB3 violates the First Amendment because it restricts minors (and adults) from engaging in core First Amendment activity on "social media" websites, and because it prevents websites from disseminating speech to their users. Compl.¶¶52-82. To resolve those claims, the

---

[1] The Eleventh Circuit has made clear, moreover, that it is typically "premature" to dismiss claims "at the pleadings stage" based on arguments about member-specific proof. *Borrero*, 610 F.3d at 1306 n.3. After all, "should the actual litigation … involve excessive individual participation, the district court retains discretion to consider the associations' standing at that later time." *Id.* So with rare exceptions, an organization's "suit should not be dismissed before it is given the opportunity to establish the alleged violations without significant individual participation." *Pa. Psychiatric Soc'y v. Green Spring Health*, 280 F.3d 278, 286 (3d Cir. 2002).

Court must determine (1) whether the law triggers First Amendment scrutiny, (2) whether strict or intermediate scrutiny applies, and (3) whether the challenged provisions survive the applicable level of scrutiny. *See* Fla.PI.Opp.17-34. The Court does not need "excessive" member participation to answer any of those questions.

Start with whether HB3 triggers First Amendment scrutiny. To answer that question, the Court need only read HB3's text. HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to *upload content or view the content or activity of other users*" and "*select[s] content for users*." Fla. Stat. §501.1736(1)(e). In other words, HB3 applies only to websites that allow users to engage in speech, *see Packingham*, 582 U.S. at 104, and that engage in their own First Amendment activity by selecting and disseminating content to their users, *see Moody v. NetChoice*, 603 U.S. 707 (2024). By restricting minors from creating accounts on those websites, HB3 both "prevent[s] user[s] from engaging in the legitimate exercise of First Amendment rights," *Packingham*, 582 U.S. at 108, and burdens the First Amendment rights of those websites to disseminate speech to their users, *Moody*, 603 U.S. at 731-32. The state resists that conclusion by likening HB3 to age restrictions on bars, but not even Florida suggests that those arguments turn on member-specific information, which is why the state raises them in a motion to dismiss. MTD.25-34. Indeed, courts across the country have rejected the same arguments without needing to delve into *any* member-specific facts. *E.g.*, *Yost*, 716

F.Supp.3d at 552-53; *Fitch*, 738 F.Supp.3d at 771-72; *Griffin*, 2023 WL 5660155, at *16.

Nor does the Court need "excessive" member participation to determine whether the challenged provisions survive First Amendment scrutiny. Whether strict or intermediate scrutiny applies turns on whether HB3 is content or speaker based, not on details about Plaintiffs' members. And as cases like *Griffin*, *Yost*, *Reyes*, and *Fitch* make clear, the Court needs no member-specific facts to determine that restricting minors from creating accounts on "social media" websites is not a narrowly tailored means of achieving the state's interest in protecting minors from harm. *See* Fla.PI.Opp.29. HB3 is overinclusive because it restricts minors (and adults) from accessing all manner of First Amendment activity on "social media" websites regardless of whether the activity has any capacity to lead to "depression" or "self-harm." Compl.¶¶74-75. And it is underinclusive because it leaves services with the same allegedly "addictive" features uncovered, while allowing some minors to access supposedly harmful websites "so long as one parent" approves. Compl.¶76; *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). Just as the Supreme Court did not need member-specific facts to resolve the Entertainment Merchants Association's arguments that California's ban on selling violent video games to minors was both over- and underinclusive, *id.* at 802-04, this Court does

not need member-specific facts to determine whether HB3 is an over- and underinclusive means of achieving the state's objectives.

Florida insists that the Court must examine "the specifics of each platform's operations" to determine "how applying each challenged provision to each platform affects different users' First Amendment rights." MTD.17. But nothing about Plaintiffs' First Amendment challenges turns on the "specifics of each platform's operations." All the Court needs to know is that HB3 restricts access to websites where minors and adults alike "can speak and listen." *Packingham*, 582 U.S. at 104. There is no need to look at member-specific facts to know that HB3 does just that.

Florida suggests that the burden on First Amendment rights might differ depending on whether a particular website "might already age-verify or require parental consent." MTD.17. But why that is relevant to Plaintiffs' First Amendment arguments, Florida does not explain. After all, even if some websites *voluntarily* impose age restrictions, that does not mean that the government can *mandate* that they do so. Nor would it take "excessive" member participation to acquire information about such efforts even if it mattered. Florida notes that some websites may allow users to access *some* features without accounts. But Florida does not dispute that accounts are necessary to access the full range of interactive and social features on "social media" websites. *See* Fla.PI.Opp.18-21. That is all the Court needs to know to determine that HB3 triggers First Amendment scrutiny.

Florida insists that "the First Amendment analysis will differ for 15-year-old and 5-year-old users." MTD.18. But even if that were true, Florida does not explain why that would require a member-specific analysis. And while Florida claims that narrow tailoring may turn on what "tools and technologies" websites employ to protect minors, the tools members provide are only some of the many tools that parents have at their disposal to manage their minors' access and use of the Internet. Compl.¶¶24-40. Other courts have had no trouble concluding that a campaign promoting those same tools is a less restrictive way to achieve the state's objectives without delving into member-specific facts. *See SEAT*, 2025 WL 455463, at *12; *Griffin*, 2023 WL 5660155, at *20-*21; *Brown*, 564 U.S. at 803. Florida does not explain why this Court could not do the same.

Rather than grappling with those cases, Florida attempts to seek refuge in the Supreme Court's *Moody* decision. But the Court's opinion does not address associational standing. Contrary to Florida's assertion, the problem in *Moody* was not the "lack of … direct involvement" of CCIA and NetChoice members. MTD.19. The Court remanded because the Eleventh Circuit did not "properly consider[] the facial nature of [Plaintiffs'] challenge." 603 U.S. at 717. *Moody* did not address whether that would require excessive member participation there, let alone whether it would require excessive participation here.

13

Florida's reliance on *NetChoice v. Bonta* is also misplaced.  The district court there found that NetChoice's challenge required "factual inquiries into how" individual members' "feed[s] work" to determine whether members' activities are "expressive."  2024 WL 5264045, at *18 (N.D. Cal. Dec. 31, 2024).  That decision is wrong—in fact, the Ninth Circuit recently granted an injunction pending appeal, *see NetChoice v. Bonta*, Dkt.11.1, No. 25-146 (9th Cir. Jan. 28, 2025).  But that aside, *Bonta* has no relevance to Plaintiffs' argument that HB3 unconstitutionally restricts minors (and adults) from accessing websites where *they* engage in First Amendment activity.   And while Plaintiffs also argue that HB3 restricts the First Amendment right of websites to *disseminate* third-party speech to their users, Compl.¶63, this Court need not resolve that issue because members plainly have Article III standing either way, *see supra* at pp.7-8, and Plaintiffs plainly can assert the First Amendment rights of their members' users, *see infra* Section II.B.

In all events, there is no need to delve into how individual "members' feeds work" to conclude that HB3 regulates First Amendment activity.  Florida has not suggested that HB3 might apply to "a payment service like Venmo" or "a ride-sharing service like Uber."  *Moody*, 603 U.S. at 725.  By its terms, HB3 applies only to a "social media platform" that "select[s] content" to disseminate to its "users."

Fla. Stat. §501.1736(1)(e).[2]  And the Supreme Court has repeatedly held that the "dissemination of information" is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health*, 564 U.S. 552, 570 (2011).

### B.  Plaintiffs Have Prudential Standing to Assert the First Amendment Rights of Their Members' Users.

Florida insists that Plaintiffs lack standing to assert the First Amendment rights of their members' users.  That is not a sufficient basis to dismiss the complaint, as Plaintiffs have associational standing to assert the First Amendment rights of their *members*.  *See supra* Section II.A.[3]  That aside, every court that has considered Florida's argument has rejected it.  *Griffin*, 2023 WL 5660155, at *10; *Yost*, 716 F.Supp.3d at 551; *Paxton*, 2024 WL 4051786, at *9; *Fitch*, 738 F.Supp.3d at 768. Decades of precedent confirm that CCIA and NetChoice may assert the First Amendment rights of both their members and their members' users.  *E.g.*, *Am. Booksellers*, 484 U.S. at 392-93 (holding that several booksellers' associations had prudential standing to assert the First Amendment rights of bookbuyers); *Brown*, 564 U.S. at 795 n.3 (repeatedly emphasizing the First Amendment rights of minor

---

[2] Accordingly, even if *Moody* had addressed whether excessive member participation was necessary to address Plaintiffs' facial claim in that case, it would have no relevance here.

[3] Florida occasionally suggests that Plaintiffs are not asserting their members' rights.  That contention is puzzling.  Both the complaint and the preliminary injunction motion make clear that Plaintiffs are asserting the First Amendment rights of their members *and* their members' users.  Compl.¶63; Pls'.PI.Br.22.

purchasers even though plaintiffs were organizations that represented video game sellers); *Jacksonville Branch, NAACP v. Duval Cnty. Sch. Bd.*, 883 F.2d 945, 946 (11th Cir. 1989) (noting that the NAACP raised the rights of "all black schoolchildren in Duval County").

Florida resists that conclusion for two reasons, but neither has merit. First, Florida insists that Plaintiffs may not assert the First Amendment rights of their members' users because their members lack standing to assert their users' rights in the first place. MTD.15-17. That is wrong. Even outside the First Amendment context, the Supreme Court has repeatedly held that service providers may assert the constitutional rights of prospective users and customers when those rights are burdened by the government regulation of providers. In *Craig v. Boren*, 429 U.S. 190 (1976), for example, the Court held that a beer vendor had standing to assert the equal-protection rights of her underage male customers in a challenge to the constitutionality of an Oklahoma statute that prohibited the sale of 3.2% beer to men under 21 and women under 18. The Court explained that the vendor was "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195. "Otherwise, the threatened imposition of governmental sanctions might deter" the vendor "from selling 3.2% beer to young males, thereby ensuring that 'enforcement of the challenged restriction against the [vendor] would result

indirectly in the violation of third parties' rights." *Id.* "Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.*; *see Carey v. Population Servs.*, 431 U.S. 678 (1977) (holding that distributors of contraceptives may raise their prospective customers' right of privacy); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252-53 (2002) (emphasizing "the rights of adults" to receive speech even though plaintiffs were publishers of adult-oriented materials, not consumers); *U.S. v. Playboy Ent. Grp.*, 529 U.S. 803, 811 (2000) (similar).

The same reasoning applies here. HB3 directly regulates CCIA and NetChoice members, and the "threatened imposition of governmental sanctions" on them will require them to restrict prospective users from accessing their services. *Craig*, 429 U.S. at 195. So if HB3 is unconstitutional, then "enforcement of [it] against" Plaintiffs' members "would result indirectly in the violation of third parties' rights." *Id.* Plaintiffs' members may therefore "act[] as advocates of the rights of third parties who seek access to their market or function." *Id.*

Florida has nothing to say about *Craig* or any of the many decisions holding that Plaintiffs' members may assert the rights of their users. *See supra* at pp.15-17. It just insists that Plaintiffs' members lack a sufficiently "close relationship" with their users to assert their rights. MTD.16. But that is impossible to square with cases

17

like *Craig* and *Casey*, which required nothing of the sort. Florida points out that "[m]any adults who use platforms" "might well applaud Section 501.1736" and "object to Plaintiffs' unilateral decision to invoke their rights to invalidate the law." MTD.16. But the same could be said whenever a vendor invokes its customer's rights; some of the vendor's customers in *Craig* may well have approved of Oklahoma's differing age restrictions on the sale of alcohol, but that did not prevent the vendor from asserting the interests of customers who wanted to purchase beer but were barred from doing so. Here, too, Plaintiffs' members are "well positioned to raise" the First Amendment rights of their users who wish to access their services, as the members are the parties regulated by HB3. *Griffin*, 2023 WL 5660155, at *12.[4]

Second, Florida argues that even if Plaintiffs' *members* may assert the First Amendment rights of their users, CCIA and NetChoice may not do so. Florida is wrong again. An organization with associational standing "assert[s] the claims of its members" and stands in their stead. *Hunt*, 432 U.S. at 342. To the extent the organization's members may assert their users' rights, the organization may too. *American Booksellers Association* is illustrative. There, several organizations of booksellers and two bookstores brought a pre-enforcement facial challenge under

---

[4] Florida also argues that users can sue. MTD.15. The same was true in *Craig*, *see* 429 U.S. at 192-93, yet the Court nevertheless held that the vendor could sue on behalf of her customers.

the First Amendment to a Virginia statute that made it unlawful to knowingly display sexually explicit material to minors.  484 U.S. at 388 & n.3.  Virginia argued that the plaintiffs lacked standing to bring a First Amendment challenge because they asserted only "the First Amendment rights of bookbuyers."  *Id.* at 392-93.  The Supreme Court rejected that argument.  While the "usual rule is that a party may assert only a violation of its own rights," "in the First Amendment context 'litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"  *Id.*  The Court therefore had no problem with either the booksellers' associations or bookstores "alleg[ing] an infringement of the First Amendment rights of bookbuyers," even though no bookbuyers were before the Court.  *Id.* at 388 n.3, 393 & n.6.

*American Booksellers Association* hardly stands alone.  The plaintiffs in *Brown* were organizations that represented the video game and software industries, not minors asserting a First Amendment right to purchase violent video games without their parents' consent.  564 U.S. at 789.  Although the Court did not specifically address standing, it saw no problem with allowing the industry plaintiffs to assert the First Amendment rights of minors, and indeed repeatedly emphasized their rights in striking down the California law even though no minor plaintiffs were

before it.  *Id.* at 795 n.3, 805.  It is thus unsurprising that courts have repeatedly rejected the notion that Plaintiffs cannot assert the First Amendment rights of their members' users.  *See Griffin*, 2023 WL 5660155, at *12; *Yost*, 716 F.Supp.3d at 551; *Paxton*, 2024 WL 4051786, at *9; *Fitch*, 738 F.Supp.3d at 768.

Florida insists that prudential considerations cut against allowing Plaintiffs to assert the rights of their members' users because the "adverseness" necessary for a "sharp" "presentation of the issues" is supposedly absent "when an organization sues to enforce the rights of nonmembers with whom it has no relationship."  MTD.20-21.  But Florida does not explain why allowing Plaintiffs to assert the rights of their members' users would hinder a sharp presentation of the issues in this case.  After all, Plaintiffs have a relationship with their own members, and those members have an interest in vindicating their own First Amendment rights and the First Amendment rights of their users.  And it is not as if Florida needs users to participate in the lawsuit to robustly defend HB3.

## III.   The Complaint States A Claim.

### A.   Plaintiffs Have a Cause of Action to Seek Declaratory and Injunctive Relief for Violations of Their Members' Rights.

Florida contends the complaint must be dismissed because "Plaintiffs lack a cause of action under Section 1983."  MTD.24.  To start, Florida ignores that Plaintiffs "do not need a statutory cause of action" to obtain "declaratory and injunctive relief" against the Attorney General in her official capacity.  *Moore v.*

*Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (citing *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015)); *Ga. Latino All. for Hum. Rts. v. Governor*, 691 F.3d 1250, 1262 & n.8 (11th Cir. 2012) (similar). As Florida appears to acknowledge elsewhere, MTD.36, "the judge-made cause of action recognized in *Ex parte Young* … permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws." *Moore*, 899 F.3d at 1103.

In all events, Plaintiffs have a cause of action under §1983. Section 1983 provides that state actors who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983. Florida insists that §1983 is available only to the parties whose rights are violated—i.e., Plaintiffs' members or their users. MTD.24-25. But §1983's text says no such thing; it provides only that liability or relief must flow from state actors to the "party injured." Nothing in §1983 forecloses organizations from seeking relief for violations of the constitutional and statutory rights of their members and their users. As the Fifth Circuit put it in rejecting the same argument: "Section 1983 is an appropriate vehicle for third-party claims." *Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023). Examples abound. *Id.* (collecting cases); *Warth v. Seldin*, 422 U.S.

490, 511 (1975); *Brown*, 564 U.S. at 789-90; *Am. Booksellers*, 484 U.S. at 393; *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 503, 524 (1990).

### B. Plaintiffs Plausibly Allege That HB3 Violates the First Amendment.

Florida's First Amendment arguments are equally meritless. As Plaintiffs explain in the complaint and preliminary injunction motion, *see* Compl.¶¶52-82; Pls'.PI.Br.16-32, HB3 restricts a massive amount of core First Amendment activity. It restricts (and sometimes even prohibits) minors from creating accounts on websites like Facebook and YouTube even if all they want to do is attend church services, participate in the launch of a presidential campaign, or communicate with friends or family. Compl.¶¶58-61. It burdens the First Amendment right of adults who wish to access those websites by effectively requiring all users to verify their age before creating an account. Compl.¶62. Moreover, HB3's access restrictions interfere with the First Amendment rights of Plaintiffs' members to disseminate both their own and third-party speech to users. Compl.¶63. HB3 triggers strict scrutiny because it discriminates based on content and speaker. Compl.¶¶65-69. And it flunks any level of heightened scrutiny because it is not a narrowly tailored means of achieving any legitimate interest that Florida might assert. Compl.¶¶70-82. Courts across the country have rejected similar efforts to restrict minors' access to "social media platforms." *E.g.*, *SEAT*, 2025 WL 455463; *Reyes*, 2024 WL 4135626;

*Fitch*, 738 F.Supp.3d 753; *Yost*, 716 F.Supp.3d 539; *Griffin*, 2023 WL 5660155.  HB3 should meet the same fate.

Florida insists that HB3 does not trigger First Amendment scrutiny because it "does not infringe the rights of children or adults" at all.  MTD.23.  Even if true (it is not), that is not a sufficient basis to dismiss Plaintiffs' First Amendment claims, since HB3 restricts the First Amendment rights of their *members* too.  Compl.¶63. In all events, Florida is wrong.  According to Florida, HB3 does "not implicate the First Amendment rights of children" because HB3 regulates "conduct"—"[e]ntering a contract to become an account holder on platforms"—not speech.  MTD.25-26. But that argument ignores that creating an account—a personalized profile containing information the user chooses to show others—is itself speech.  *E.g.*, *Carafano v. Metrosplash.com*, 339 F.3d 1119, 1124 (9th Cir. 2003).  And that aside, courts have repeatedly held that the First Amendment may not be evaded by isolating some purportedly "non-speech" component of protected activity.  *See Otto v. Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020); *Buehrle v. Key West*, 813 F.3d 973, 977 (11th Cir. 2015).  A law that precludes publishing books does not become any more tolerable if it accomplishes that end by banning "purchasing or using ink."  *Sorrell*, 564 U.S. at 571.  So too with a law that prohibits people from reading the Miami Herald by banning them from creating an account on miamiherald.com.  Just as with library cards, newspaper subscriptions, or any other "conduct" necessary to access

speech, people create the accounts HB3 targets to gain access to websites "where they can speak and listen." *Packingham*, 582 U.S. at 104. Divorcing the act of creating an account from the intended objective of using the website is like trying to divorce the act of buying a book from the intended objective of reading it. *See Brown*, 564 U.S. at 792 n.1.

That is precisely why the Supreme Court has held that when the government restricts access to "social media," it "prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. The Court did so, moreover, while reversing a decision holding that a state statute prohibiting sex offenders from "access[ing] certain carefully-defined Web sites" was "a regulation of conduct," not speech. *State v. Packingham*, 368 N.C. 380, 386 (2015). Florida tries to distinguish *Packingham* on the theory that the challenged law "foreclose[d] access to social media altogether," whereas HB3 merely restricts minors from creating accounts on "social media." MTD.30-31. But that again ignores that creating an account involves speech, and is impossible to square with cases like *Ashcroft v. ACLU*, 542 U.S. 656 (2004), and *Reno v. ACLU*, 521 U.S. 844 (1997). Neither the Child Online Protection Act nor the Communications Decency Act "foreclosed" adults from accessing speech on the Internet; they just made it more difficult to do so. Yet those laws nevertheless triggered (and failed) heightened First

Amendment scrutiny because whether a law implicates the First Amendment is not a question of degree.

Courts across the country have rejected similar efforts to characterize laws that restrict minors from creating accounts on "social media" websites as regulations of "conduct" rather than "speech." *E.g.*, *Yost*, 716 F.Supp.3d at 552; *Fitch*, 738 F.Supp.3d at 771-72; *Griffin*, 2023 WL 5660155, at *16. There is no reason for a different approach here. After all, Florida does not seriously dispute that restricting minors from creating accounts makes it impossible for them to engage in wide swaths of First Amendment activity. Compl.¶¶58-61. Nor does it dispute that restricting users from creating accounts will make it difficult for CCIA and NetChoice members to disseminate speech to them. Compl.¶63.

To be sure, users may still be able to engage in *some* activity on *some* covered websites without an account, such as anonymously viewing content posted by others. But Florida does not seriously dispute that barring minors from creating accounts makes it more difficult for them to engage in the full range of First Amendment activity on those services. After all, people do not use "social media" websites just to anonymously browse others' content; they use them to engage in all manner of social and interactive activities that are possible only with an account that links the user to her activity on the website—be it publishing speech on the user's Instagram

profile, sharing photos with friends and family on Snapchat, or debating classmates on Facebook.  Compl.¶¶15-16.[5]

Instead of grappling with that reality, the state relies on cases upholding laws that prohibit minors from accessing establishments that serve alcohol.  MTD.27-30 (citing *Indigo Room v. Fort Myers*, 710 F.3d 1294 (11th Cir. 2013); *Gary v. Warner Robins*, 311 F.3d 1334 (11th Cir. 2002)).  But as other courts have explained in rejecting the same argument based on the same cases, that analogy is "weak" and "not persuasive."  *Griffin*, 2023 WL 5660155, at *16; *see Fitch*, 738 F.Supp.3d at 771-72 (similar).  In *Gary*, the Eleventh Circuit upheld an ordinance prohibiting persons under 21 from entering establishments that sell alcohol, even though the plaintiff argued that it interfered with her First Amendment right to engage in nude dancing in such establishments.  311 F.3d at 1340.  The ordinance, the Eleventh Circuit explained, regulated non-speech conduct (accessing establishments that serve alcohol), and the impact on speech (nude dancing) was merely incidental.  *Id.*

_____

[5] Florida suggests that minors do not have a "First Amendment right to speak and listen on the internet."  MTD.26-27, 33.  Florida makes no effort to square that claim with *Packingham*.  582 U.S. at 107.  Florida invokes *Murthy v. Missouri*, but that case just held that individual users do not have Article III standing to challenge government efforts to coerce "social media" websites to take down other users' content.  603 U.S. 43, 74-75 (2024).  Nothing in *Murthy* casts doubt on *Packingham*'s holding that laws that restrict access to "social media" websites trigger First Amendment scrutiny. *See TikTok v. Garland*, 145 S.Ct. 57 (2025) (users held a First Amendment interest in accessing and interacting with expressive activity on TikTok).

In *Indigo Room*, the Eleventh Circuit upheld a similar ordinance prohibiting persons under 21 from entering establishments that serve alcohol, even though the plaintiffs argued that it infringed the First Amendment rights of individuals who wished to enter such establishments to engage in political activity.  710 F.3d at 1299-300. Again, the ordinance regulated non-speech conduct, and the impact on speech was merely incidental.  *Id.*

As those cases reflect, the government has obvious reasons "unrelated to the suppression of free expression," *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968), to restrict minors from accessing establishments that serve alcohol: to prevent minors from engaging in *non-speech* activities like drinking alcohol.  *See Indigo Room*, 710 F.3d at 1300.  But the same cannot be said of laws that restrict minors from accessing the kinds of websites HB3 covers, as "the primary purpose of a social media platform is to *engage in speech*."  *Griffin*, 2023 WL 5660155, at *16 (emphasis added).  And the burdens imposed on speech by HB3 are anything but incidental.  By the state's own telling, the entire point of restricting account creation is to prevent minors from spending too much time on websites that disseminate speech in ways that minors find especially engaging.  *See* Fla.PI.Opp.4-10; Compl.¶¶58-61, 69.  If Florida restricted access to Disney+ because it offered too many engrossing cartoons, or Marvel.com because it offered too many page-turning comics, or PlayStation Plus

because it offered too many captivating games, those efforts would unquestionably trigger First Amendment scrutiny. Just so here.[6]

Florida's reliance on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), is also misplaced. There, the state applied its law banning prostitution to shut down an adult bookstore where prostitution was commonplace. The Court concluded that doing so did not violate the First Amendment because the law regulated non-expressive conduct (prostitution), and the impact on speech was incidental. *Id.* at 707. Here, by contrast, the burdens HB3 imposes on speech are anything but incidental. Had the law in *Arcara* prohibited access to adult bookstores because they sold certain books, then First Amendment scrutiny would obviously have applied. *See FW/PBS v. City of Dallas*, 493 U.S. 215, 224 (1990) (plurality opinion). For the same reasons, Florida cannot rely on *TikTok v. Garland*. Dkt.56. The law there regulated TikTok's foreign ownership based on national security concerns, and the impact on speech (shutting down TikTok) was incidental to that effort. 145 S.Ct. at 64-66. Even so, the Court did not hold that the First Amendment did not apply; instead, it assumed that it did before holding that the law satisfied First Amendment scrutiny.

---

[6] And if the ordinances in *Gary* and *Indigo Room* had prohibited access to establishments *because they hosted nude dancing or political activity*, then First Amendment scrutiny obviously would have applied. *See Club Madonna v. City of Miami Beach*, 42 F.4th 1231, 1243-44 (11th Cir. 2022).

HB3 not only burdens the First Amendment rights of minors, it burdens the First Amendment rights of adults as well.  By making it a "knowing or reckless" violation for a "social media platform" not to conduct "reasonable age verification" when it suspects (or reasonably should suspect) that the account holder is a "child," Fla. Admin. Code §2-43.002(3), Florida effectively requires adults to prove their age to create an account to engage in First Amendment activity on "social media" websites.  Compl.¶62.  As courts have repeatedly reaffirmed, requiring adults to verify their age before accessing protected speech significantly burdens First Amendment rights.  *See Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 849; *Griffin*, 2023 WL 5660155, at *17; *Fitch*, 738 F.Supp.3d at 774; *Reyes*, 2024 WL 4135626, at *16 n.169.

Florida does not dispute that HB3 so requires; it just insists that "it is wholly speculative that [HB3] will result in platforms imposing new 'burdens' on adults" because some websites may already require adults to verify their age before creating accounts.  MTD.33.  But again, even if some websites *voluntarily* require users to verify their age, that does not mean that the government can *mandate* that they do so.  Florida tries to distinguish *Ashcroft* and *Reno* (but not the others) because they involved content-based laws.  That ignores that HB3 is content based too.  Compl.¶¶65-68; Pls'.PI.Br.23-26.  But that aside, whether a law is content based has nothing to do with whether requiring adults to verify their age before accessing

speech burdens First Amendment rights.  In *Griffin*, for example, the court declined to decide whether the Arkansas law was content based.  2023 WL 5660155, at *16. Yet it had no trouble concluding that requiring users to verify their age before creating an account on "social media" websites was a significant burden on the First Amendment rights of adults.[7]  *Id.* at *16-*17; *see SEAT*, 2025 WL 455463, at *14.

Finally, Florida insists that even if HB3 violates the rights of some minors and adults, Plaintiffs' First Amendment arguments fail as a matter of law because HB3 "has a plainly legitimate sweep."  MTD.31.  According to Florida, HB3 can be "validly enforced against an addictive platform when it provides accounts to children of 'tender years'" since "[f]ive-year-olds have no First Amendment interest in internet accounts."  MTD.31.  Florida never defines what it means by "tender years," and it fails to explain why a five-year-old has less of a First Amendment interest in viewing content on YouTube Kids than a teenager has in sharing photographs with friends on Snapchat.  But that aside, if Florida really thinks that there is a

---

[7] Florida again suggests that even adults "do not have a freewheeling 'interest in reading and engaging with the content of other speakers on social media,'" and that the "'right to receive information and ideas' is implicated only when a 'listener has a concrete, specific connection to the speaker.'"  MTD.33 (quoting *Murthy*, 603 U.S. at 74-75).  Once again, that contention cannot be squared with *Packingham*, which *Murthy* did not disturb.  *See supra* note 5.  In all events, preventing adults from creating accounts on "social media" itself restricts the speech inherent in account creation.  And it restricts adults from participating in all manner of First Amendment activity by engaging with friends and family on websites like Facebook, YouTube, and Snapchat.  Compl.¶¶15-16.

constitutional difference between the two, it should have tailored its law accordingly. That HB3 treats "five-year-olds" and some teenagers the same underscores that it is not a narrowly tailored means of achieving the state's interests. Florida's effort to convert that overbreadth into a shield against constitutional scrutiny turns First Amendment doctrine on its head.

### C.    Plaintiffs Plausibly Allege Their Vagueness Claim.

Florida's attack on Plaintiffs' vagueness claim is equally meritless. MTD.34-35. Several key terms ("upload content," "algorithms," and "push notifications") are "in no way defined." *Solomon v. Gainesville*, 763 F.2d 1212, 1215 (11th Cir. 1985). HB3 does not provide even minimal guidance about how to interpret them, forcing covered providers to choose between risking unpredictable and arbitrary enforcement or restricting access to their services. "In this quintessential First Amendment area, the State may not hinge liability on a phrase so ambiguous in nature." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1323 (11th Cir. 2017) (en banc).

Florida insists that those terms are "common concepts" that "persons of ordinary intelligence" can understand. MTD.35. But it does not explain why that is so. Take "upload content." Any website that requires a user to create an account requires a user to upload at least *some* information as part of the registration process. Does filling in such information count as "uploading content"? Florida does not say. Does typing information in a search bar count as "uploading content"? HB3

31

provides no guidance.  Similarly, what counts as an "algorithm"?  The ordinary understanding of that term is "a step-by-step procedure for solving a problem or accomplishing some end."  Compl.¶87.  Under that definition, almost any computer code would seemingly qualify.  Nor does HB3 explain what notices constitute "push notifications" "related to a user's account."  Virtually all notices from websites could "relate[] to" a user's account and trigger HB3's obligations.

### D.    Plaintiffs Have a Cause of Action to Assert Their COPPA Preemption Claim.

Florida seeks dismissal of Plaintiffs' COPPA preemption claim on the ground that they cannot enforce COPPA's express preemption provision under §1983.  MTD.36.  But Plaintiffs can enforce COPPA's express preemption provision under *Ex parte Young.  See supra* at pp.20-21.

Florida insists that Congress "made clear its 'intent to foreclose' private enforcement of COPPA" because COPPA does not independently create a private right of action.  MTD.36.  That argument makes no sense.  If Congress needs to create an express cause of action for a law to be enforced under *Ex parte Young*, then there would be no need for *Ex parte Young* at all, since parties could always enforce the law under the relevant statute's express cause of action.  To the extent Florida is suggesting that Congress meant to foreclose affirmative enforcement of COPPA because COPPA's express preemption provision can be invoked defensively in a preexisting proceeding, that makes no sense either.  Virtually every preemption

provision in the U.S. Code can be invoked defensively in a preexisting proceeding, yet courts have never understood that to suffice to displace *Ex parte Young*. *E.g.*, *Am. Airlines v. Wolens*, 513 U.S. 219 (1995) (defensive use of the express-preemption provision); *Morales v. Trans World Airlines*, 504 U.S. 374 (1992) (offensive use of same provision).

## IV.    Florida's Argument About The Scope Of Injunctive Relief Is Premature.

Lastly, Florida argues that Plaintiffs cannot state a claim for injunctive relief because they "fail[ed] to identify those members" who operate "social media platforms" as defined in HB3.   MTD.36-37.   That is an argument about the appropriate scope of relief, not a basis for dismissing Plaintiffs' claims.   "At the motion to dismiss stage, plaintiffs need not prove that they are entitled to each form of relief sought, so long as they have adequately ple[d] the underlying claim." *SRSNE Site v. Advance Coatings*, 2014 WL 671317, at *2 (D. Conn. Feb. 21, 2014). "[T]he nature of the relief included in the demand for judgment is immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted." *Charles v. Front Royal Volunteer Fire & Rescue Dep't*, 21 F.Supp.3d 620, 629 (W.D. Va. 2014); *see* Fed. R. Civ. P. 54(c).   Florida's argument about the appropriate scope of relief is thus premature.

## CONCLUSION

The Court should deny Florida's motion.

33

Respectfully submitted,

/s/ *Douglas L. Kilby*

Paul D. Clement
Erin E. Murphy
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
Kevin Wynosky (admitted *pro hac vice*)
Mitchell K. Pallaki (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
kevin.wynosky@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Douglas L. Kilby
Florida Bar No. 73407
Hannah E. Murphy
Florida Bar No. 1032759
Abby Corbett
Florida Bar No. 1032759
Grace Mead
Florida Bar No. 49896
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
106 East College Ave., Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com
acorbett@stearnsweaver.com
gmead@stearnsweaver.com
boneal@stearnsweaver.com

*Counsel for Plaintiffs CCIA and NetChoice*

February 14, 2025

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

This response in opposition to Defendant's motion to dismiss Plaintiffs' complaint complies with the type-volume limitation of Local Rule 7.1(F) because it contains 7,987 words, excluding the parts of the response exempted by Local Rule 7.1(F).

February 14, 2025                           */s/ Douglas L. Kilby*
                                            Douglas L. Kilby

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 14th day of February, 2025.

                                            */s/ Douglas L. Kilby*
                                            Douglas L. Kilby