UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

----------------------------

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

Plaintiffs,

vs. No. 4:24-cv-00438-MW-MAF

ASHLEY BROOKE MOODY, in
Her official capacity as
Attorney General of the State
Of Florida,

Defendant.

-----------------------------

VIDEOTAPED DEPOSITION OF ADAM ALTER, Ph.D.

New York, New York

Thursday, January 23, 2025

Reported by:

Yaffa Kaplan

JOB NO. 12224247

January 23, 2025

10:04 a.m.

Videotaped Deposition of ADAM ALTER, Ph.D., held at the offices of Esquire Deposition Solutions, 228 East 45th Street, New York, New York, pursuant to Notice, before Yaffa Kaplan, a Notary Public of the State of New York.

A P P E A R A N C E S:

STEARNS WEAVER MILLER WEISSLER ALHADEFF &
SITTERSON PA
Attorneys for Plaintiffs
106 East College Street, Suite 700
Tallahassee, Florida 32301
BY: GRACE MEAD, ESQ.
HANNAH MURPHY, ESQ.
DOUGLAS KILBY, ESQ.,
(Via videoconference)

CLEMENT & MURPHY PLLC
Attorneys for Plaintiffs
706 Duke Street
Alexandria, Virginia 22314
BY: KEVIN WYNOSKY, ESQ.,
(Via videoconference)

A P P E A R A N C E S (Cont'd):

OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
Attorneys for Defendant
PL-01 The Capitol
400 S. Monroe Street
Tallahassee, Florida 32399
BY: CHRISTINE LAMIA, ESQ.
ANITA PATEL, ESQ.
NATALIE BIELBY, ESQ.
SARA SPEARS, ESQ.,
(Via videoconference)

ALSO PRESENT:
LESLIE CANALES - Paralegal (via videoconference)
DMITRY ZVONKOV - Videographer
STEPHANIE JOYCE, ESQ. - Inhouse counsel for CCIA, (via videoconference)

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

THE VIDEOGRAPHER: We are on the record. Today's date is January 23, 2025. The time on the video is 10:05 a.m. This is Video 1 in the deposition of Adam Alter in the matter of Computer & Communications Industry Association, et al., versus Ashley Brooke Moody, in the US District Court, Northern District of Florida, Tallahassee Division. This deposition is being taken at 228 East 45th Street, New York, New York. The videographer is Dmitry Zvonkov. The court reporter is Yaffi Kaplan, both with Esquire.

Will counsel please identify themselves for the record.

MS. MEAD: Grace Mead, Douglas Kilby, Hannah E. Murphy from Stearns Weaver Miller on behalf of plaintiffs Computer & Communications Industry Association and NetChoice. Also with us from Clement & Murphy is Kevin Wynosky, also on behalf of plaintiffs.

MS. LAMIA: Good morning, Christine Lamia, Anita Patel, Sara Spears, Natalie Bielby for the Attorney General's Office from the State of Florida.

A. Alter, Ph.D.

THE VIDEOGRAPHER: Will the reporter please swear in the witness.

A D A M A L T E R, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MS. MEAD:

Q. What is your name and address?

A. Adam Alter, 171 Lincoln Avenue, Old Greenwich, Connecticut 06870.

Q. Good morning, Professor Alter.

A. Good morning.

Q. Can you state and spell your name?

A. Yes. It's Adam Alter, A-D-A-M, A-L-T-E-R.

Q. Have you been deposed before?

A. Yes, I have.

Q. How many times?

A. Between deposition and testimony, probably eight times or ten times, something like that.

Q. Lawyers sometimes discuss instructions differently so I will go over the instructions with you. Does that work with you?

A. Alter, Ph.D.

A. Yes.

Q. Are you suffering from any illness that would interfere with your ability to testify accurately today?

A. No.

Q. Are you suffering from any illness that would interfere with your ability to testify truthfully today?

A. No.

Q. Are you on any substances that would affect your ability to testify accurately today?

A. No.

Q. Are you on any substances that would affect your ability to testify truthfully today?

A. No.

Q. I will ask questions and I will try to be clear. If I am unclear, will you tell me?

A. I will do my best, yes.

Q. Your lawyer may assert two types of objections. The first is an objection to form. If your lawyer objects to form, you should go ahead and answer the question. Do you understand?

A. I do.

Q. Your lawyer may also object and instruct

you not to answer. If your lawyer objects and instructs you not to answer, you should not answer. Do you understand?

A. I do.

Q. What are some of the topics on which you have previously given testimony?

A. Broadly speaking, I have testified on consumer behavior and human decision-making, particularly as they apply to business and marketing contexts. And more broadly, I have testified on defamation matters, a number of consumer expectations matters, consumer perception matters, and some others.

Q. Do you know whether any of those cases have involved any of the members of Computer & Communications Industry Association?

A. I don't believe they have.

Q. Do you know whether any of those cases have involved any of the members of NetChoice?

A. I don't believe they have.

Q. Who do you understand the members of -- strike that.

If I refer to Computer & Communications Industry Association as CCIA, will you understand

me?

A. Yes.

Q. Who do you understand the members of CCIA to be?

A. I don't have the full list at the top of my head. I listed some of the members in my declaration. I don't have them at the top of my head. But as relevant to this matter I understand it's a range of technology companies.

Q. Do you know any of those companies off the top of your head?

MS. LAMIA: Objection to the form.

A. I understand there is overlap between NetChoice and CCIA, and I may get confused between them to some extent given the overlap. But I understand that there are, among other companies, Google, Meta. I understand I believe that X is a company under one or both. Snap may be a company under one but not the other, and I can't recall which. But that's the best of my recollection as I sit here.

Q. Do you have any recollection of any members of NetChoice that are unique to NetChoice and not members of the CCIA?

A. Alter, Ph.D.

A. Not off the top of my head.

MS. LAMIA: Objection to the form.

A. Sorry.

Q. What is HB3, if you know?

A. It's -- House Bill 3 was introduced by the Florida legislature and passed by the Florida legislature, and it's the subject of today's matter as I understand it.

Q. How would you summarize what HB3 does?

A. I prefer the summary that I delivered in my report will probably more succinct than I can be as I am sitting here today. But broadly speaking, it discusses a number of features associated with certain technology platforms, social media platforms in particular, stipulates certain age restrictions on the users who are allowed to use those platforms or should be allowed to use those platforms, and then lists a number of features that are attached to such platforms that are as the Florida legislature sees it problematic.

Q. How does HB3 regulate the use -- strike that.

How does HB3 regulate individuals under the age of 14?

A. Alter, Ph.D.

MS. LAMIA: Objection to the form.

A. As I understand it, the legislation stipulates that users under the age of 14 should not be able to use social media platforms that fall under the definition associated with HB3.

Q. How does HB3 regulate users aged 14 to 15?

MS. LAMIA: Objection to the form.

A. I am not a legal expert here, and I am not here to analyze the legislation. That's not my -- my role in this case or my assignment. I can explain to the best of my ability how I understand the legislation to work, but again, I am not a lawyer. I didn't introduce the legislation. My understanding is that parents need to give consent for users aged 14 and 15 who the parents deem should be able to use the platform. But beyond that I couldn't say more given that I am, again, not a lawyer and I didn't introduce the legislation. I am not a legislator.

Q. Do you have an undergraduate degree?

A. Yes.

Q. Where did you obtain that undergraduate degree?

A. Alter, Ph.D.

A. At the University of New South Wales in Sydney, Australia.

Q. And did you have a major?

A. I did. My major is psychology.

Q. Was there a specialty in psychology in which you majored?

A. Broadly speaking, as an undergraduate I majored in social and cognitive psychology.

Q. How would you broadly define social psychology?

A. Social psychology, very broadly, is the study of how people interact with one another, how they think about other people, whether those people are real or imagined or in the room with them or in some other context and how those other people influence the psychological experience that a particular individual has.

Q. How would you broadly define cognitive psychology?

A. Cognitive psychology is essentially the study of a range of cognitive processes. In other words, processes associated with thinking, memory, judgment, decision-making, and a host of other cognitive processes.

A. Alter, Ph.D.

Q. What is clinical psychology if you know?

A. Clinical psychology is not my specialty, but broadly speaking, as I understand it, it is the either treatment of individuals who present with clinical issues. It can sometimes be a study of psychopathology or psychopathologies. And I think that's to the best of my ability as good a definition as I can give you as I sit here.

Q. Can you estimate the number of classes you took on clinical psychology as an undergraduate?

A. Clinical psychology is a component of many of the courses I took. I would say it featured in perhaps -- it's difficult to estimate but five to ten courses.

Q. Did you ever take any introductory course on clinical psychology?

A. I didn't take an introductory course on clinical psychology, but the introductory course I took included clinical psychology components, and then follow-up courses also included clinical psychology components.

Q. Have you ever taken advanced undergraduate courses on clinical psychology?

A. Alter, Ph.D.

A. Again, some of the advanced courses I took, the second and third level courses involved aspects of clinical psychology, but I didn't specifically take a course titled, for example, clinical psychology.

Q. Did you take any classes on experimental design?

A. I have taught classes on experimental design. I have taken classes on experimental design at undergrad and grad levels, yes.

Q. Have you taken any undergraduate courses on statistics?

A. Yes, I have.

Q. Have you taught any undergraduate level courses on statistics?

A. I have taught undergrad and grad level courses, yes.

Q. Do you have any graduate degrees?

A. I do.

Q. From where did you obtain your graduate degrees?

A. From Princeton University.

Q. And what are those graduate degrees?

A. I have a master of arts and a Ph.D. in

A. Alter, Ph.D.

social and cognitive psychology.

Q. Both? Let me just break that down for the record. The master's degree is in both social and cognitive psychology, correct?

A. The way it's listed is psychology, but there are specialties within that, and my specialties were social and cognitive psychology.

Q. And as for your Ph.D., your specialties were also social and cognitive psychology, correct?

A. I am not sure I would describe those as my specialities. Those are the areas of psychology I studied. My specialties are perhaps more precise than that. But, yes, broadly speaking, social and cognitive psychology are the specialties.

Q. How would you describe your specialties more precisely?

A. I focus in particular on human judgment and decision-making, how people spend their resources, including time and money. And I focus a considerable portion of my time and attention on technology platforms and the interactions people have with those platforms.

Q. When did you obtain your Ph.D.?

A. In 2009.

A. Alter, Ph.D.

Q. Have you ever taken any courses, graduate or undergraduate, in computer science?

A. I believe I took two undergraduate courses in computer science but no graduate courses.

Q. Have you ever taught any courses in computer science?

A. I have not, no.

Q. Have you ever taken -- strike that.

Have you ever taught any classes in statistics?

A. Yes, I have.

Q. What are those classes?

A. I have been a teaching assistant when I was in undergrad in a statistics course. I believe it was called reserve methods, but essentially it was a statistics course for psychologists. I taught statistics for psychologists in I believe it was 2007 and then again in 2008. And that was to undergrads. And then I taught some research seminars to Ph.D. students that involved statistics and research methods.

Q. Have you ever taken a graduate level course in clinical psychology?

A. Alter, Ph.D.

A. Again, there were components of the graduate level courses that I took that involved clinical psychology concepts, but they were not called clinical psychology specifically.

Q. Which clinical psychology concepts did they involve?

A. In the course of studying, for example, cognitive psychology or neuroscience, or social psychology, a number of psychopathological issues were discussed, and so we discussed some of those issues through the lens of those broader topics. But those courses were not described specifically as clinical psychology courses or psychopathology courses.

Q. Have you ever taught any class in clinical psychology?

A. Again, some of the classes I have taught have involved some clinical psychology concepts, but they were not described as clinical psychology courses.

Q. Which concepts did they involve?

A. A number of them involved, for example, discussions of depression, anxiety, particularly as they applied to social psychological concepts, to

A. Alter, Ph.D.

some extent as they applied to screens and to digital platforms and to social media platforms. So those concepts were part of what I was teaching, but again, the courses were not described as clinical psychology courses.

Q. And you have used the word "psychopathology" several times. What does that word mean to you?

A. Psychopathology as I understand it essentially means a dysfunction psychologically speaking in terms of how a person is essentially operating or behaving. A component of clinical psychology is to understand psychopathologies, and that term very broadly describes a wide range of concepts.

Q. What do you mean by a "dysfunction" in operating or behavior? Can you provide an example?

A. A psychopathology course might examine, for example, diagnosis and treatment of depression or anxiety or other psychopathological concepts or other clinical psychology concepts. And so essentially it overlaps substantially with clinical psychology.

Q. What is subclinical depression?

A. Alter, Ph.D.

A. I don't want to give a definition, but here it -- I have a sense of it, but it's not something I studied to the extent I could give a definition.

Q. Is there an example of the clinical definition of depression and its colloquial use?

A. Again, this is not something I was asked to opine on in this case, and it's certainly not an area that I would be attempting to opine on here.

Q. Do you understand the difference between clinical anxiety and subclinical anxiety?

A. Again, I will give the same response. That's not my specialty, and I am not here to opine on that topic.

Q. What is body dysmorphia?

A. Again, I am not a clinical psychologist, but my understanding is that it involves how an individual sees his or her body and the fact that there are perhaps dysfunctions in how that person sees his or her body that lead to certain psychopathological outcomes. And, again, it's not my area of specialty. That's my understanding as I sit here today.

Q. What is the difference between clinical

A. Alter, Ph.D.

body dysmorphia and its colloquial use?

MS. LAMIA: Objection to the form.

A. Again, that's not my -- my specialty. It's not something I am here to opine on.

Q. What is ADHD?

A. Again, I have a nonclinical sense of the concept. Attention deficit hyperactivity disorder is what that stands for, that acronym stands for. But, again, the full list of clinical symptoms and causes and so on is not my -- is not my specialty, broadly speaking. I have some understanding of the concept, but, again, that's not my specialty.

Q. Do you understand the difference between subclinical hyperactivity or attention issues and clinical ADHD?

MS. LAMIA: Objection to the form.

A. Again, as I sit here I have a vague sense of the term subclinical, and I could hazard a guess. But that's not my specialty, and I am not here to opine on that topic.

Q. What is a peer reviewed publication if you know?

A. A peer reviewed publication is essentially a publication that's submitted to a

A. Alter, Ph.D.

peer reviewed journal or outlet. It is then reviewed by people in the academic community who determine whether the piece should be published. Often there is a review process that involves multiple revisions. And then ultimately the journal will accept or reject the paper, and if it's accepted, it will be published in whichever publication it is being accepted to.

Q. Do you have tenure?

A. Yes, I do.

Q. And so I take it you have published peer reviewed articles before, correct?

A. Yes.

Q. What is the importance of peer reviewed publications in an academic's career trajectory?

A. That's a very broad question. It really depends on the kind of academic, and it depends on how that academic is -- is being assessed by senior academics who are doing the assessing. There are a lot of different academic paths, so it's a very difficult question to answer very broadly.

Q. What is the importance of peer reviewed publications in obtaining tenure as a psychology professor at NYU?

A. Alter, Ph.D.

A. So I am not in the psychology department. That's not where I was granted tenure. My tenure extends to the psychology department. So I couldn't say specifically what sorts of criteria operate in the psychology department. I am an affiliated professor in the psychology department. I can certainly tell you more about what happens in the business school where I am based primarily, but I can't say much about the psychology department specifically.

Q. What is the title of your tenured professorship?

A. I am a professor of marketing and psychology as an affiliated professor in the psychology department at NYU. But as you asked me about the tenure process with respect to the psychology department, that's not where my tenure occurred, and so I don't want to guess about how they use peer reviewed publications in that department.

Q. Have you taught classes in marketing?

A. Yes.

Q. What is marketing, broadly defined?

A. Marketing is a range of concepts that

A. Alter, Ph.D.

involve essentially presenting products that fulfill needs to people who then consume those products. And from my perspective it's the academic study of how that happens, what sorts of products consumers are attracted to, what sorts of products they purchase, what sorts of products they decide to spend their time consuming, and then also as an extension of that, whether those products offer them well-being or whether those products detract from their well-being. That's a particular interest of mine.

Q. Do you believe that marketing adds social value?

A. It's a very, very broad question, but giving you an equally broad response, yes, I do.

Q. Why?

A. There are parts --

MS. LAMIA: Just I am objecting to the form.

Go ahead.

A. There are parts of marketing known as, for example, transformative consumer research that is specifically focused on exactly that question. That's a branch of marketing and psychology that I

A. Alter, Ph.D.

spent a lot of time thinking about. And so, for example, marketing might examine how certain products affect people, whether those products could be changed to generate greater well-being, how to encourage, for example, charities to encourage generosity in their potential donors. There are a number of different topics that marketing addresses that are involved in or lead to greater social welfare as I understand it.

Q. So marketing could facilitate communication between the provider of the service and the consumer in a way that improves the service, correct?

A. No, that's not at all --

MS. LAMIA: Objection to the form.

Dr. Alter, if you can just pause a minute to give me the opportunity to object. Thank you.

A. Yes, I apologize. It's tricky on Zoom. It's different from having everyone in the room I will say.

MS. LAMIA: I know.

A. So that's not at all what I was trying to say, and what this suggests to me is that

A. Alter, Ph.D.

perhaps our definition of marketing is different. I was answering a very broad question about whether academic marketing, the discipline itself, can engender welfare, and I think you were asking a very different question.

Q. Can the commercial process of marketing create social welfare?

A. I am not sure.

MS. LAMIA: Objection to the form.

I'm sorry. I was a little slow there. My bad.

A. That's okay.

I would need to understand more about what you think of as the commercial process of marketing to be able to answer that question.

Q. So does the commercial process of broadcasting TV ads ever create social value?

MS. LAMIA: Objection to the form.

A. I am not sure. That's a very broad hypothetical question. I would need to look at a specific instance of such ads, where they are broadcast, how they are broadcasted, and then I might be able to give you a better response.

Q. Can you think of a single example of a

A. Alter, Ph.D.

television ad that has created social value?

A. Probably. I could probably think of some PSAs, public service announcements that have broad some value. That's not an area that I am really prepared to opine on at length in this concept, but you could imagine some doing some value or bringing some value.

Q. How many of the students to whom you teach marketing go on to exclusively create public service announcements?

A. It's very difficult for me to say. I don't always have access to their career trajectories, and I have been teaching for 16 years now as a professor. So some of them are quite deep into their careers, and I just couldn't tell you what sorts of career paths they have followed.

Q. In 2017, you published a book titled Irresistible, correct?

A. Yes.

Q. What's your elevator pitch for Irresistible?

A. Irresistible is a book that examines the concept of behavioral addiction. Describes a number of behavioral hooks or features of, in

A. Alter, Ph.D.

particular, digital platforms that make them very difficult to resist. And I use the term "addictive" in that context, and then I try to offer some potential solutions in the final part of that book.

Q. What is your definition of addiction?

A. Broadly speaking, and I set this out in my report -- sorry, my declaration, addiction is the pursuit of an activity or behavior -- or if it's a substance addiction, a substance -- in the short-term that a person wants to consume or pursue or experience despite recognizing that in the long run there are significant costs to physical, social, and other forms of welfare.

Q. What is your definition of behavioral addiction?

A. The definition I just gave you is essentially my definition of behavioral addiction meaning the components that address substances. So behavioral addiction is the pursuit of an experience in the short-term that is something that a person wants to do that a person feels compelled to do despite the fact that in the long run that behavior has a number of costs and leads to

long-term diminishment of welfare.

Q. Under your theory of behavioral addiction, can one be addicted to eating?

A. I have interviewed -- sorry, we have some lighting issues here.

MS. MEAD: Take a break here to fix the lighting.

THE VIDEOGRAPHER: This ends Unit 1. We are off the record at 10:35.

(Discussion off the record.)

THE VIDEOGRAPHER: This begins Unit 2. We are on the record at 10:36.

Q. Professor Alter, under your theory of behavioral addiction, can one be addicted to eating?

A. I am not an expert on that particular concept, but I understand from my research and from some interviews that there are researchers who describe eating under certain circumstances as a form of behavioral addiction.

Q. Do you agree with their conclusions?

A. I am not an expert on eating and eating-related behaviors.

Q. Under your theory of behavioral

A. Alter, Ph.D.

addiction, can one be addicted to e-mail?

A. To the extent that e-mail fulfills that definition for a particular person, to the extent that a person feels compelled to e-mail over and over in the short-term despite long-term costs, then yes, that could fulfill the definition of behavioral addiction under certain circumstances.

Q. Under your theory of behavioral addiction, can one be addicted to exercise?

A. The same response to the question about eating, that I have spoken to some experts who study exercise-related disorders, and they believe that exercise can under some circumstances be a behavioral addiction. But, again, that's not a concept that I myself directly opine on or have expertise on.

Q. So you have never opined on whether exercise can be addictive?

MS. LAMIA: Objection to the form.

A. I have spoken about it, but essentially as a mouthpiece for others who have told me in interviews that it is. But I don't treat exercise addicts such as they are described. For example, in Irresistible I do talk about exercise-based

A. Alter, Ph.D.

addictions, so I am essentially relating on the work of other people, and I have not treated such individuals, for example.

Q. Under your theory of behavioral addiction, can one be addicted to gambling?

MS. LAMIA: Objection to the form.

A. Again, we can take any behavior and apply it to the definition as I described it, and if someone feels compelled to gamble in the short run but ultimately suffers costs in the long run, that can be considered a behavioral addiction. And indeed, there are manuals that describe it that way, the DSM and the ICD, for example.

Q. Do you agree with the positions of DSM and ICD on those issues?

MS. LAMIA: Objection to form.

A. I would need to understand what you mean by "those issues."

Q. On -- strike that.

Do you agree with the position of the DSM and the ICD on whether one can have a gambling use disorder?

A. I haven't been asked to evaluate the ICD or the DSM. I am not in the position to do that

A. Alter, Ph.D.

here with regards to the inclusion or exclusion of certain kinds of behavioral addictions.

Q. Can one be addicted under your theory of behavioral addiction to gaming?

MS. LAMIA: Objection to the form.

A. Again, by the same logic, if someone is gaming compulsively in the short run but ultimately suffers long-term consequences, it's possible to describe that person as being behaviorally addicted according to my definition and that definition.

Q. Do you believe anyone is addicted to gaming under your definition of behavioral addiction?

A. I believe you asked a similar question. Could you ask that question again?

Q. Do you believe anyone in the world is addicted to gaming under your definition of behavioral addiction?

MS. LAMIA: Objection to the form.

A. I haven't been asked to ascertain the number of people who are addicted to gaming. That's not part of my work in this report. I did some research on that question many years ago as part of the background for Irresistible. Certainly

A. Alter, Ph.D.

you are asking if anyone in the world is addicted. According to that definition, I would say there are a number of people who are -- who satisfy that definition, yes.

Q. Under your definition of behavioral addiction, can one be addicted to using the Internet?

A. That's a broad set of different behaviors, but to the extent that someone feels compelled to use the Internet broadly and fits the definition, it's possible for that person to fall under the banner of that concept.

Q. Under your definition of behavioral addiction, can one be addicted to reading?

A. So I will give the same basic response would apply to all of these, that according to the definition I gave you it would be possible for a person to be behaviorally addicted to a whole range of different experiences. Whether there is actually someone who is behaviorally addicted to reading or the incident rate of that, that's a different question.

But yes, to the extent that a person fulfills a definition, you can ask me about any

A. Alter, Ph.D.

behavior and I would be able to answer you, does that person fulfill the definition, and if so, that person would be described as essentially a behavioral addict. Are there many of them? Have I come across them? No.

Q. Under your definition of behavioral addiction, can one be addicted to smartphone use?

A. Again, that is a broad concept. Smartphones include many applications. To the extent that, for example, a smartphone includes social media platforms and a person uses the smartphone to access those platforms, I would say that person could be behaviorally addicted to using a smartphone as a device to access those experiences.

Q. But under your theory of behavioral addiction not everyone who uses social media is addicted, correct?

MS. LAMIA: Objection to the form.

A. That's not something I was asked to opine on. I wasn't asked to quantify the number of people who are or who are not behaviorally addicted to smartphones as a proportion. I would have to do additional research to opine on that topic.

A. Alter, Ph.D.

Q. Under your theory of behavioral addiction, can one be addicted to shopping?

MS. LAMIA: Objection to the form.

A. I will give the same response. It really depends on whether those persons satisfy the definition.

Q. Under your definition of behavioral addiction, can one be addicted to viewing sports?

A. The same response will apply that if there is a behavior that a person feels compelled to engage in in the short-term that does harm in the long-term, that can be considered a behavioral addiction. But these are obviously theoretical questions, and I would need to understand the nature of an individual's behavior to comment.

Q. Under your theory of behavioral addiction, can one be addicted to participating in sports?

MS. LAMIA: Objection to the form.

A. Much like exercise-based addictions, if the person satisfies a particular definition, that person would be considered behaviorally addicted to whatever the experience might be. So I will give the same response to essentially all of these

A. Alter, Ph.D.

questions.

Q. Under your definition of behavioral addiction, can one be addicted to streaming?

A. I need to understand better what you mean by "streaming". But even so, I will give the same response and that there is a definition, and if people satisfy that definition, that experience would be considered a form of behavioral addiction according to that definition.

Q. Under your definition of behavioral addiction, can one be addicted to studying?

A. I will give the same response.

Q. You have given slightly different responses to each one, so can you answer each independently? I would appreciate it.

I will reask the question. Under your definition of behavioral addiction, can one be addicted to studying?

MS. LAMIA: Objection to form.

A. The blanket response, if there is a definition of behavioral addiction that involves short-term compulsive behavior and long-term harm and a person engages in a behavior or experience that leads to that harm, then that would be

A. Alter, Ph.D.

considered behavioral addiction given that definition.

Q. Under your definition of behavioral addiction, can one be addicted to texting?

A. Again, if the person satisfies the definition, that can be considered a behavioral addiction.

Q. Under your definition of behavioral addiction, can one be addicted to watching television?

A. Again, if a person satisfies that particular definition, that can be considered a behavioral addiction.

Q. Under your definition of behavioral addiction, can one be addicted to watching movies?

A. Again, same response. A person could be considered behaviorally addicted to the extent that he or she satisfies the definition.

Q. Under your definition of behavioral addiction, can one be addicted to working?

A. Again, the same response. To the extent that a person satisfies the definition, he or she could be considered behaviorally addicted.

Q. Under your definition of behavioral

A. Alter, Ph.D.

addiction, can you identify any behavior that could not qualify as addictive?

A. Again, that's not my role here. I haven't been asked to enumerate the different behaviors that do not fall under the banner of behavioral addiction. I have been asked to opine on what behavioral addiction is as it applies in this context and to try to explain the different features that drive behavioral addiction in this context. To the extent that a behavior leads to positive outcomes or neutral outcomes, it would not be considered behavioral addiction, and to the extent that a person doesn't feel compelled to engage in it in a short-term, it wouldn't be considered behavioral addiction. So there are two elements.

Q. Well, some behaviors we just discussed like exercise can lead to positive outcomes, correct?

A. But that's a different question from what you asked me before. You didn't ask me if exercise can lead to positive outcomes. You asked me if you can be behaviorally addicted to exercise or whether it fits the definition.

A. Alter, Ph.D.
Q. So you first published a book on your theory of behavioral addiction in 2017, correct?
A. Yes.
Q. And you in promoting that book discussed your theory of behavioral addiction extensively, correct?
A. I am not sure how you would describe or categorize extensively, but I discussed it to the extent people were inviting me to discuss it, yes.
Q. You gave over 20 interviews, correct?
A. I can't recall, but I would say it was certainly a number of interviews.
Q. And you have taught classes on your theory of behavioral addiction, correct?
MS. LAMIA: Objection to the form.
A. I have introduced the concept in some of my classes. I wouldn't say I taught classes on behavioral addiction, but I have introduced the concept into some of my classes.
Q. Can you name for me any behavior under your theory of behavioral addiction which could not be addictive?
MS. LAMIA: Objection to the form.
A. I will give you one example that I have

A. Alter, Ph.D.

discussed with some researchers. Breathing. Breathing is a behavior that people engage in. They feel compelled to do it in the short-term. But it's good for them, and so breathing is not, as I understand it, a behavioral addiction or capable of becoming a behavioral addiction. So that's -- that's one example I can give you as I sit here.

Q. Can you name any other examples sitting here?

A. I think what I am struggling with with your question is that essentially behavior that satisfies that definition could be a behavior that under certain circumstances, depending on the behavior, for some people might not satisfy the definition, and so the question then becomes severity and incidence. And so you might have some behaviors, including some that you listed, that fall along a spectrum where you could imagine a person becoming behaviorally addicted to that behavior. But in general is that behavior the kind of behavior that you would expect to lead many people to a behavioral addiction, the answer would be perhaps not; and then for other behaviors the answer would be absolutely. Many people seem to

exhibit signs that they are behaviorally addicted to that behavior. And, for example, what we are discussing here today, social media, engagement seems to lean more in that higher incidence side of the spectrum.

Q. Backing up a bit, can you name any negative effect of breathing?

MS. LAMIA: Objection to the form.

A. That's really not -- I am not a respiration or breathing expert. I have spoken to some physiologists and psychologists and psychiatrists. They have discussed it as an example of a behavior that would not be considered a behavioral addiction despite the fact that people are compelled to do it. But I am not an expert in breathing specifically.

Q. Can you name any behavior other than breathing that under your theory of behavioral addiction could not be addictive?

MS. LAMIA: Objection to the form.

A. I think it's very clear from the definition that you could imagine for many behaviors at the margins or the edges people who overpursue those to the point where they become

A. Alter, Ph.D.

harmful, perhaps they edge out other aspects of life, perhaps there are other negative consequences that arrive.

Where I use the term "behavioral addiction" as I understand it and as I apply it in practical settings is to behaviors that are much more likely to lead to those outcomes. These are behaviors where the incidence rate is higher or high enough to be concerning. And so for some behaviors that might not be true.

You asked me, for example, about sports playing. In general as I understand it, there is a bigger problem with people not exercising than exercising, and so in most people it's probably helpful that they engage in more sports activity. Are there some people at the margins who have a behavioral addiction to sports? Probably. But I wouldn't say that's an area of particular concern or low-hanging fruit that we should be paying attention to.

Q. What apps do you believe HB3 applies to?

MS. LAMIA: Objection to the form.

A. That's a question for the Florida legislature. I would not claim to be an expert in

A. Alter, Ph.D.

which apps the legislation applies to specifically.

Q. For purposes of your opinion here, did you make any assumptions about the apps to which HB3 applies?

A. I don't believe I did. What I did was I focused on the features that are enumerated in HB3. And so to the extent those features were present in certain apps, I perhaps discussed those as examples to illuminate the concepts, but I was not attempting to make any legal conclusions about which apps would fall under the banner of HB3.

Q. Did you make any assumptions about the apps that HB3 would be applied to?

A. Again, that wasn't the focus of my report. I, again, was focused on behavioral addiction as a concept and those various features that are described in the legislation. Again, drawing in some of those various social media platforms to illustrate some of the concepts, I was able to illuminate those features in my report, but I wasn't attempting to draw legal conclusions about which apps were being addressed by HB3 specifically.

Q. We will mark as Alter Exhibit 1 a

A. Alter, Ph.D.

document titled Expert Declaration of Professor Adam L. Alter, dated January 13, 2025.

(Exhibit 1, Expert Declaration of Professor Adam L. Alter, marked for identification, as of this date.)

Q. And we will e-mail a complete copy around, but I will share my screen. And I hope I am sharing it now.

Can you see the document?

A. I can. Quite small, so I hope we can zoom in a little. But yes, I can see it.

Q. We can.

I will point you to Page 4 which is your summary of opinions, and this is paragraph 10C. And you write: "The five features identified by HB3 are correctly described as addictive. Each feature employs at least one psychological hook to capture attention and drive engagement, inevitably contributing to overuse of social media and increasing the risk of behavioral addiction."

Do you see that?

A. Yes, I do.

Q. And a mere risk of behavioral addiction does not mean that every app with those features

A. Alter, Ph.D.

causes addiction in every user, correct?

MS. LAMIA: Objection to the form.

A. Again, that wasn't the focus of the report. I wasn't trying to draw conclusions about the rate at which these features led to behavioral addiction but rather their nature as particular kinds of hooks that might drive or increase the propensity of a particular platform to have that effect.

Q. And little A, you have a reference to "social media."

What apps do you find as included in social media?

A. I am not attempting to be exhaustive about a list of social media platforms. As I structure the report, the report focuses on, as you see in B below, the psychological hooks that increase usage. You find a lot of social media platforms have some or most or even in some cases all of those hooks. So those are the social media platforms I was referring to, but I wasn't attempting to create a list of social media platforms that was complete or exhaustive.

Q. Can you name any social media platforms

A. Alter, Ph.D.

that fall within the definition of that phrase as you use it in Alter Exhibit 1, your report?

A. I wouldn't want to create a list off the top of my head. But I do specifically in the report attach certain of those hooks and features to specific platforms by way of illustration. So, again, my role here is not to say HB3 applies directly and specifically to a specific list of platforms, but rather to say here are some hooks that are problematic, and they are at large present in social media platforms.

Q. Let's break that down a little bit. Can you name a single app that qualifies as a social media platform?

MS. LAMIA: Objection to the form.

A. I don't have a copy of the report in front of me, but I can certainly walk through the report and you will see that there are a number of references to social media platforms. Obviously I have identified those as relevant to the extent that they draw on these specific hooks, but I, again, wouldn't want to make conclusions about which platforms the legislation applies to specifically.

A. Alter, Ph.D.

Q. Professor Alter, you are being offered as a proposed expert on a theory of social media platform addiction, correct?

A. I am not sure how it would be described by counsel, but I am certainly an expert in, again, all the features that you see described in the report.

Q. Despite that expertise, sitting here today you cannot name a single app that falls within your definition of social media platform; is that correct?

A. I haven't --

MS. LAMIA: Objection to form.

A. Sorry, Christine.

I haven't said that I cannot name them. No, I am saying I prefer not to enumerate a list. But I don't have an exhaustive list in mind. I am not trying to say that the legislation is designed to apply to a specific set of platforms. And, in fact, if you read the declaration, you will see a long list of such social media platforms that are listed because they have certain features. So off the top of my head I can certainly list some and refer back to my report. I am just saying I

A. Alter, Ph.D.

wouldn't want to offer a complete and full list that's designed to be exhaustive.

Q. What are some of those examples?

A. Well, for example, Meta's platforms, Facebook and Instagram, fall under that banner. But, again, I wouldn't want to go further than that at this stage. You can see the list of platforms in the report, and it applies to a broader list of social media platforms.

Q. And you would not want to go further because you cannot remember them sitting here today?

A. I am reluctant to create a list that's incomplete. I wasn't asked to create a comprehensive list here. That wasn't my role. Again, I am not here to analyze the scope of the legislation and which platforms it applies to. But, again, the declaration is very clear that a number of social media platforms have a number of features that are discussed in the legislation and then further they involve a number of the hooks that I enumerate in my report. I just wouldn't want to offer you an incomplete list here.

Q. I am going to mark as Alter Exhibit 2 a

A. Alter, Ph.D.

press release dated May 31, 2023, titled App Store Developers Generated 1.1 Trillion in Total Billing and Sales in the App Store Ecosystem in 2022. I will share my screen. It should be e-mailed around. And, in particular, I would point to the page with the heading the App Store Turns 15.

Bottom paragraph, last sentence, it says: "And today, the App Store has more than 123 times as many apps -- nearly 1.8 million -- to choose from compared to the thousands available on the App Store at the end of 2008."

(Exhibit 2, Article entitled "App Store Developers Generated 1.1 Trillion in Total Billing and Sales in the App Store Ecosystem in 2022", marked for identification, as of this date.)

Q. My question is: Did you ever take any steps to ascertain how many apps were on the App Store?

A. First, I don't know that I recognize this document. I would like to know more about it before I comment on a question that's inspired by it. So I am not sure, to begin, where these numbers come from. But obviously you are not

A. Alter, Ph.D.

asking me to examine that particular number. You are asking me if I examined the number of apps on the App Store, and for the purposes of this report, no, that was beyond the scope of my report.

Q. Do you know how many apps on the App Store would fall within your definition of social media platform?

MS. LAMIA: Objection to the form.

A. Again, that wasn't my assignment. That's not something I am attempting to do here is to apply legislation to specific platforms.

Q. Did you ever take a sample of any of the apps on the App Store?

MS. LAMIA: Objection to the form.

A. Again, that's a role that I believe the legislature would play rather than a role that I would play. I am not here to tell you whether a particular platform falls under the banner of HB3.

Q. And you never took a sample of the apps on the App Store to determine how many in that population fell within your definition of social media platform, correct?

A. Again, that was not my assignment. That would be a task for the legislature I believe.

A. Alter, Ph.D.

Q. But in terms of your opinions here and your theory of behavioral addiction, you never took a sample of the apps on the App Store to determine which qualified as social media platforms, correct?

MS. LAMIA: Objection to the form.

A. The same response. Again, that wasn't my assignment. My assignment was to explain the concept of behavioral addiction and to examine various hooks that are embedded in certain platforms and not specifically to attach those hooks to specific platforms or to rule on whether HB3 did or did not include certain platforms.

Q. Is there any way for the developer of any given app to know whether or not you believe their app would fall under your definition of social media platforms that are potentially addictive under your definition?

MS. LAMIA: Objection to the form.

A. I don't think the question is one that is appropriately directed to me. I am not the one making legislation and enumerating the features. That's something that the Florida legislature has done, and so the question is not a question that I can answer on their behalf.

A. Alter, Ph.D.

Q. But you do be -- strike that.

But you have written about a theory of behavioral addiction, correct?

A. Broadly speaking, yes, I agree.

Q. And you are offering opinions here about your theory of behavioral addiction, correct?

MS. LAMIA: Objection to the form.

A. Broadly speaking, I would agree, yes.

Q. Is there any way for an app developer to know whether your theory of behavioral addiction applies to its app?

MS. LAMIA: Objection to the form.

A. It's not my intention to legislate or adjudicate whether a particular app is or is not under any particular definition of behavioral addiction. That's not my assignment. I have been asked to consider which apps do and do not fall under that definition. So sitting here today I wouldn't be able to tell you specifically whether any particular app does or does not fall under any particular definition, legislative or otherwise. All I could do is present the features, and then the developers themselves could examine those features and the role of those features in their

platforms.

Q. What is a content creator on a social media platform?

A. Broadly speaking, as I understand it, it is a person who creates content and then uploads it to the platform for consumption by others.

Q. In the process of creating content, what kinds of content do they create?

MS. LAMIA: Objection to the form.

A. This is also beyond the scope of my report, but it varies dramatically across different platforms.

Q. So content creators sometimes upload written texts, correct?

MS. LAMIA: Objection to the form.

A. I am not sure. This is, again, not something that I was asked to examine, the nature of content.

Q. Do you know whether or not content creators sometimes upload images?

A. As I said, content has a wide variety of application across a lot of different platforms. I am sure it comes in different forms, yes.

Q. Do you know whether content creators

A. Alter, Ph.D.

sometimes upload videos?

A. Again, I assume that many different formats of content can be uploaded by content creators.

Q. Do you know whether content creators in Florida are ever under the age of 14?

A. That's certainly not a question I was asked to examine, and that's not something I am here to opine on today.

Q. Do you know whether content consumers on social media platforms in Florida are ever under the age 14?

A. Again, that's not a question that I was asked to opine on today.

MS. MEAD: I think now is a good time for a break. Ten minutes. Does that work for everyone?

THE VIDEOGRAPHER: This ends Unit 2. We are off the record at 11:08.

(Recess taken.)

THE VIDEOGRAPHER: This begins Unit 3. We are on the record at 11:35.

Q. Good morning, Professor Alter.

A. Good morning.

A. Alter, Ph.D.

Q. Now, we made reference a few times today to the DSM-5.

Do you know what that stands for?

A. Yes, the Diagnostic and Statistical Manual of the American Psychiatric Association, the Fifth Edition.

Q. And are psychiatrists medical doctors?

A. Yes, they are.

Q. And can psychiatrists write prescriptions?

A. I believe they can, yes.

Q. And can psychiatrists perform therapy?

A. I believe they can. I pause a little because the rules in Australia and the United States may differ a little bit, but as I understand it, yes, they can.

Q. And I did not ask you this earlier, but have you ever had -- strike that.

Have you ever taken or taught any courses on psychopharmacology?

A. No.

Q. And do you have any degrees in psychopharmacology?

A. No.

A. Alter, Ph.D.

Q. Have you ever published any peer reviewed articles on psychopharmacology?

A. No, I don't believe I have.

Q. Have you ever published any peer reviewed articles on your theory of behavioral addiction?

A. I don't believe I have. I have discussed it in a review that was in a peer reviewed journal of another person's book, and so it was described here. And I believe that review was peer reviewed, but I wouldn't say that was a peer reviewed publication that was designed essentially to discuss or disseminate that theory.

Q. Have you ever conducted any studies designed for peer reviewed publication about your theory of behavioral addiction?

A. So essentially there are I would say two ways to arrive at a theory like that. One way is to do original research, and another way is to essentially review the literature. And that's literature that much of it would come from peer reviewed publications and then it would be synthesized to produce a theory. Further to that you can also discuss a theory like that with

A. Alter, Ph.D.

experts, which I did in approximately 60 interviews. And so that was an indirect route to publishing that through peer reviewed literature. But had I published it as a theory to be discussed in the context of peer review in a journal? That was never my intention, and it's not something I did.

Q. And you had never done any original research on your theory of behavioral addiction, correct?

A. I wouldn't quite agree with that classification. A lot of my research on judgment and decision-making involves allied concepts. For example, I studied the concept of fluency which overlaps substantially with, for example, stopping cues, which are a big part of my thinking on the topic. I have done some research on scarcity which is also a big part of what goes into my understanding of, for example, fear of missing out and the role of ephemeral experiences in these contexts driving certain behavioral addictive patterns. So I wouldn't say I have done no research on the concept, but I think you are asking if I published something specifically on behavioral

A. Alter, Ph.D.

addiction as a theory, and I haven't done that, but a lot of the building blocks of that theory are the fruits of research.

Q. Have you ever published any peer reviewed articles on social media platforms?

A. I don't believe I have published peer reviewed articles on social media platforms specifically. I have published some work that discusses social media platforms. I am trying to work through in my head the research that I have published to figure out whether some of it might have involved social media platforms. There is, once again, review articles that involve social media platforms to an extent. But specifically publishing articles that are for peer reviewed consumption on social media platforms, that's not something I have done.

Q. Have you ever conducted a study on social media platforms?

A. I have.

MS. LAMIA: Objection. I'm sorry, took me a minute. Objection to the form.

Q. Let me rephrase it. There was a little ambiguity there.

A. Alter, Ph.D.

Have you ever discussed studies about social media platforms?

A. I have, and some of that research is ongoing. Some of it, again, involves building blocks that make up some of the hooks or features associated with those platforms. So it's sort of depends a little bit I think on your definition of publishing research on or about social media platforms. I would say yes, on allied concepts I have.

Q. But do you include citations to all of those studies in your declaration that you submitted in this case, Alter Exhibit 1?

A. I believe that included published work. I have some ongoing work that perhaps wasn't included there. I am not sure. I would have to look again to make sure. I don't always include ongoing work. But I am doing some ongoing work on the topic, and then the other work I published that's on related concepts will -- if it has been published, as some of it has -- will be there in the appendix.

Q. Have you ever done any original research on social media platforms?

A. Alter, Ph.D.

A. Again, the same response on the building blocks of social media platforms and on some of the hooks, I have done some. I would also argue that synthesis and reviews are original research as well to an extent. If you are asking if I have run data collection and run experiments directly, the answer is, again, on some of those building blocks. But have I done that with respect to platforms at large and published that work at this stage? The answer is no. That's -- again, some of that work is ongoing.

Q. What, if anything, do you know about the census and review process that undergirds the DSM-5?

A. I have some understanding of the basic process, but I am not intimately familiar with it.

Q. I will mark as Exhibit 3, Alter Exhibit 3, a document titled Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5, copyright 2013. And I will represent to you that this was produced by the defendants here to us.

(Exhibit 3, Document titled "Diagnostic and Statistical Manual of Mental Disorders,

A. Alter, Ph.D.

Fifth Edition, DSM-5," copyright 2013, marked for identification, as of this date.)

Q. Do you know why -- strike that.

Did you provide this document to the State attorneys to provide to us?

A. I can't be sure. I work with an expert witness support agency, and they do much of the legwork on that side. And so I can't be sure of exactly what they produced.

Q. How, if at all, did Alter Exhibit 3 relate to your expert opinions in this case?

A. As I recall, I refer to the DSM because the DSM introduced behavioral addiction concepts in its fifth edition in 2013, and so I introduced the DSM in illustrating that point.

Q. Do you know if this is the latest edition of the DSM published in 2013?

A. It is the latest current edition. I know there is a discussion of a sixth edition, and in general, they are published every ten to 15 years. So I think we are at the point now where people are anticipating perhaps the release of another one, but it has not happened yet.

Q. I will mark as Alter Exhibit 4 a

A. Alter, Ph.D.

document titled DSM-5-TR, and I will point you to the copyright which is in 2022 by the American Psychiatric Association. Have you ever reviewed a copy of the DSM-5-TR?

(Exhibit, Document titled "DSM-5-TR", marked for identification, as of this date.)

A. I am aware that the DSM has these interim updates from time to time that are designated TR, and I am aware that there is a DSM-5-TR, yes.

Q. Have you ever reviewed DSM-5-TR?

A. Very broadly speaking, yes, I believe I have a copy of the DSM-5-TR. I haven't reviewed it recently, but I have reviewed it before.

Q. And in the process of drafting the DSM-5 there are review groups, correct?

A. As I said earlier, I am not intimately familiar with the process of review that drives the production of the DSM.

Q. Okay. So I will ask you some questions using some of the words here.

Are you an expert on neurodevelopmental disorders?

A. I wouldn't say so, no.

A. Alter, Ph.D.
Q. Are you an expert on bipolar and related disorders?
A. I wouldn't say so.
Q. Are you an expert on depressive disorders?
A. I wouldn't say so, no.
Q. Are you an expert on anxiety disorders?
A. I wouldn't say so.
Q. Are you an expert on somatic symptom and related disorders?
A. I don't believe so, no.
Q. Are you an expert on feeding and eating disorders?
A. I wouldn't hold myself out to be, no.
Q. Are you an expert on sleep-wake disorders?
A. No.
Q. Are you an expert on gender dysphoria?
A. No.
Q. Are you an expert on substance-related and addictive disorders?
A. As with all of these concepts, to the extent they are discussed in academic literature, I could interpret what is being said about them in

A. Alter, Ph.D.

the context of that literature, but I don't study those concepts directly. Obviously I study the concept of behavioral addiction much more closely and much more thoroughly, so I would say I am an expert on addiction to the extent it overlaps with behavioral addiction. But in general across all the subtopics you listed here, I would say I am an expert in this one in some respects but less so in some of the others you listed.

Q. Are you an expert in neurocognitive disorders?

A. In general, I would say no.

Q. Are you an expert in personality disorders?

A. Again, in general, I would say no.

Q. Are you an expert in medication-induced movement disorders and other adverse effects of medication?

A. I would not say so.

Q. Are you an expert on ADHD or disruptive behavior disorders?

A. Again, to the extent that this covers some of the literature that I have read and interviewed other researchers about, I can

A. Alter, Ph.D.

interpret some of the results. But am I an expert or have I directly studied these concepts myself as a primary researcher? The answer is no.

Q. Are you an expert in anxiety, obsessive compulsive spectrum, posttraumatic, and associate disorders?

A. Again, I would say no.

Q. Are you an expert in childhood and adolescent disorders?

A. Again, to the extent those concepts come up in some of the work that I have reviewed or discussed with other researchers, I can certainly see overlap between those areas and the social and cognitive psychology that I am an expert in. But, broadly speaking, I would not describe myself as an expert in that field.

Q. Are you an expert in eating disorders?

A. Again, the same response. There may be some overlap with some of the concepts in social psychology and cognitive psychology, for example, but I would not hold myself out as an expert who primarily studies eating disorder behavior.

Q. Are you an expert in substance-related disorders?

A. Alter, Ph.D.

A. Again, to the extent there is overlap with behavioral addiction, I am an expert to an extent there, but I would not hold myself out as a substance-related disorder expert in general.

Q. Could you lawfully prescribe medication for any psychiatric disorder?

A. No.

Q. Can you lawfully perform therapy for any psychiatric disorder?

A. No.

Q. Do you know whether insurance would reimburse therapy for any psychiatric issue not addressed in the DSM?

MS. LAMIA: Objection to the form.

A. That's, again, not something I was asked to opine on, and I am not sure of the answer to that question. It's certainly not something I would claim to be an expert in.

Q. Do you know whether or not the DSM has abandoned the terminology of addiction?

A. As you just showed me, the term "addiction" or "addictive" is still in the manual itself. I can't comment beyond that. But I know I have discussed the concept of addiction with a

A. Alter, Ph.D.

number of neuroscientists and a number of psychiatrists, so they certainly still use the term. I can't tell you specifically about what the DSM does or does not do.

Q. I will point you to Page XXIV. There is a bullet: "Restructuring of substance use disorders for consistency and clarity."

A. Sorry, it's not on the screen.

Q. Oh, thank you.

Can you see it now?

A. Yes. I can see a section that's zoomed in. Yes.

Q. Okay. And the bolding refers to "restructuring of substance use disorders for consistency and clarity."

Do you see that?

A. Yes.

Q. And it says in the second sentence: "Dependency has been easily confused with the term addiction when, in fact, the tolerance and withdrawal that previously defined dependency are actually very normal responses to prescribed medications that affect the central nervous system and do not necessarily indicate the presence of an

A. Alter, Ph.D.

addiction."

Did you agree with that sentence?

A. So as I say multiple times in my declaration, I don't use the term addiction in a medical sense. I don't describe social media-based addictions as medical. So I raise the DSM-5 as an example of the use of the term "behavioral addiction" and the rise of the consideration of these issues by researchers. I don't profess to be an expert on the difference and the specifics that distinguish, say, dependency and addiction, and I can't claim to be able to comment on the differences as the DSM considers them here.

Q. So when you use the term "addiction" in your expert declaration here, Alter Exhibit 1, you are not using it in the medical sense of the term, correct?

A. I am --

MS. LAMIA: Objection to the form.

A. I am using it in the sense that I define it -- or in the sense in which I define it. So I am very clear about the definition of it, that it is a behavior that people repeat over time that they strongly want to repeat in the short-term that

A. Alter, Ph.D.

leads to harm in the long-term. And so that's the definition I use. That may overlap to some extent with medical concepts of an addiction. And indeed, many people I have spoken to and other researchers believe that there is considerable overlap between medical substance addiction and behavioral addiction. But as I am very clear about in my declaration, I don't use the term as a medical term.

Q. But do you know whether your definition of addiction is consistent or inconsistent with that of the American Psychiatric Association?

A. Again, I have interviewed and spoken to a number of practitioners, and the definition as far as they are concerned is consistent with the way they use the term. Broadly speaking, whether the definition overlaps with the DSM's definition is not something I can -- I can claim. All I can claim is that the definition I use is how I think about behavioral addiction and how some other people that I interact with about the concept think about it. But what I am essentially most concerned about is this relationship between a short-term behavior that is repeated and long-term harm, and

A. Alter, Ph.D.

so that is how I use the term addiction.

Q. Do you know whether your definition of addiction used in your declaration here is consistent or inconsistent with that of the American Psychological Association?

A. I believe it overlaps substantially with a number of other definitions. It may not be an identical definition. But I understand, again, having spoken to psychologists, psychiatrists, and other practitioners that the elements here of short-term compulsion paired with long-term harm are critical elements in addiction, both behavioral and substance-based.

Q. Do you know whether your definition of addiction used in your declaration here is consistent or inconsistent with any definition promulgated with the American Academy of Pediatrics?

MS. LAMIA: Objection to the form.

A. Yes, I wasn't asked specifically to opine on the relationship between this definition and others. But the definition that I use that involves short-term compulsive use paired with long-term harm overlaps substantially with the many

A. Alter, Ph.D.

definitions that I read, but I cannot comment on the specific overlap between this definition and others.

Q. I will point you to the introduction of Alter Exhibit 4 which is the DSM-5-TR. This is Page 5, and it --

A. Sorry, I don't see it.

Q. And I will share my screen.

Now do you see it?

A. Yes, now I do.

Q. It says: "The creation of the fifth edition of Diagnostic and Statistical Manual of Mental Disorders, DSM-5, was a massive undertaking that involved hundreds of people working toward a common goal over a 12-year period."

How does that compare to the research you have done into your theory of behavioral addiction?

MS. LAMIA: Objection to the form.

A. I am not sure exactly what you are asking me to comment on. Can you be clearer about what you are asking?

Q. Sure. So the creation of the DSM-5 took 12 years, correct?

A. Alter, Ph.D.

A. That's what this sentence says, yes.

Q. How long have you been reading and writing on your theory of behavioral addiction?

A. At this stage, about 12 years actually.

Q. And how many -- strike that.

You are one person, correct?

A. Obviously, any individual is one person, and in the course of doing research a person consults lots of other texts. But yes, I am one person doing the research.

Q. How many people were directly involved in drafting your declaration?

A. Directly involved as in actually drafting the declaration? I drafted the declaration, but obviously the ideas of many other people were infused in the declaration.

Q. How many people actively participated in the drafting of the declaration?

MS. LAMIA: Objection to the form.

A. I had a team of supporters at GBX Voluble, so they helped.

Q. How many?

A. I would say or guess perhaps four or five in total. But essentially this is my work,

A. Alter, Ph.D.

and this is a reflection of the 12-plus years of research that I have been doing on this topic and, more broadly, on the 20-plus years I have done on related concepts that predate the research that I did to create this definition.

Q. All right. I will point you to Page 543, substance-related and addictive disorders. It says: "The substance-related disorders encompass ten separate classes of drugs: Alcohol, caffeine, cannabis, hallucinogens."

It goes on to say: "Inhalants, opioids, sedatives, hypnotics or anxiolytics, stimulants, tobacco, and other or unknown substances."

These ten drugs are all psychoactive substances, correct?

MS. LAMIA: Objection to form.

A. I believe they are. Having a quick look at the list here, I believe they are based on my understanding. Again, I am not a psychiatrist, and I don't prescribe medication. But looking at these drugs, I believe that's true.

Q. And if you go further down this page, it says: "Other excessive behavioral patterns such as Internet gaming (see conditions for further study)

A. Alter, Ph.D.

have also been prescribed, but the research on these and other behavioral syndromes is less clear. Thus, groups of repetitive behaviors sometimes termed behavioral addictions with subcategories such as sex addiction, exercise addiction, and shopping addiction are not included because there is insufficient peer reviewed evidence to establish the diagnostic criteria and course descriptions needed to identify these behaviors as mental disorders."

Do you agree or disagree that for what is sometimes termed behavioral addiction there is insufficient peer reviewed evidence to establish the diagnostic criteria and course descriptions needed to identify these behaviors are mental disorders?

A. So I am very clear in my declaration that I don't use the term to describe mental disorders. In fact, that's exactly the opposite of what I am doing in my declaration. I am describing a pattern that applies to literally millions of people, and I wouldn't call all of those people disordered. I would say that they are experiencing behavioral addictions in a different sense, in a

A. Alter, Ph.D.

nonmedical sense.

So this is essentially an orthogonal issue to the one I am discussing in my declaration. I don't profess to have a medical definition to share, and that's not my intention. I am just describing again two things: Short-term compulsive use paired with long-term harm, whether or not that overlaps or doesn't with the medical definitions.

Q. But for individuals under the age of 14, HB3 is insensitive to whether they are satisfying your definition of behavioral addiction, correct?

A. You would have to ask.

MS. LAMIA: Objection to form.

A. Sorry. You would have to ask the legislature about how they think of the overlap between my definition and their application of the law. As I did, and as I was asked to do, I described the concept of behavioral addiction as, again, the product of much research and applied the various hooks and features associated with behavioral addiction to the listed features in HB3. That's what I was asked to do, and that's what I did.

Q. Do you know whether or not HB3 sweeps

A. Alter, Ph.D.

more broadly than -- strike that.

Do you know whether or not HB3 includes conducts and behaviors that would not qualify as behavioral addictions?

MS. LAMIA: Objection to the form.

A. Again, that wasn't something I was asked to examine, and that's something you would have to ask the legislature.

Q. I will point you to Page 553 of the DSM-5-TR which is Exhibit 4, alcohol-related disorders, and there is a listing of: "Alcohol use disorder, alcohol intoxication, alcohol withdrawal, alcohol-induced mental disorders, and unspecified alcohol related disorder."

MS. LAMIA: Excuse me, Counsel. I'm sorry to interrupt. Is this exhibit in the chat?

MS. MEAD: It's Exhibit 4. Yes.

MS. LAMIA: Can you just give me one second, please?

MS. MEAD: Sure. Page 553.

MS. LAMIA: Thank you.

Q. Are you an expert in substance intoxication?

A. Alter, Ph.D.

A. Specifically I wouldn't say so, no.

Q. Are you an expert in substance withdrawal?

A. I broadly have written about and understand the concept of withdrawal as it applies to addiction broadly and as it applies to the cessation of use of particular substances, but I wouldn't say that I consider that a central area of expertise.

Q. Are you an expert in substance-induced mental disorders?

A. I wouldn't say so, no.

Q. So, for example, you are not an expert in amphetamine-induced psychosis, correct?

A. Specifically as an area of expertise, no.

Q. And are you an expert in unspecified substance-related disorder?

A. So what's giving me pause is there is some overlap between a lot of these concepts and behavioral addiction broadly as I understand it. So there may be some overlap between these concepts and concepts that I do say that I am an expert in and I understand as an expert. But specifically as

A. Alter, Ph.D.

you list these concepts before me, I wouldn't hold myself out as someone who is an expert in, for example, unspecified alcohol-related disorder or other related disorders.

Q. And are you an expert in any of the ten substances identified in the DSM-5-TR?

A. In the substances themselves, and the neuropharmacology associated with them, I would say no. But to the extent, again, that there is an interaction between those substances and behavioral addiction as I have studied it, I understand that there is overlap, and I could speak to that overlap to an extent. But I would not say I am an expert, for example, in anxiolytic or amphetamines or alcohol or nicotine or any of those specific substances.

Q. Now I will point you to Page 661. And after identifying ten substance-related disorders, the DSM-5-TR identifies one non-substance-related disorder, namely gambling disorder.

Do you see that?

A. Yes, I do.

Q. And it has diagnostic criteria, correct?

A. It does.

A. Alter, Ph.D.

Q. And you have no expertise in diagnosing gambling disorder, correct?

A. I would never diagnose a patient as having gambling disorder, but I could certainly look at the symptoms associated with gambling disorder and recognize it in a person. But, again, I don't profess to be a clinician. I wouldn't diagnose an individual, but I understand that there are specific criteria based on the medical definition of gambling disorder.

Q. So, for example, under subsection B it says: "The gambling behavior is not better explained by a manic episode."

You lack the expertise to make that evaluation, correct?

A. Again, I understand the concept that it might be confused for or might overlap with manic episodes, but I do not profess to being able to make that diagnosis in an individual.

Q. Would it be lawful for you to diagnose someone with a gambling disorder?

A. It would not, and it's not something I would seek to do as a professional.

Q. In sub A it refers to "persistent and

A. Alter, Ph.D.

recurrent problematic gambling behavior leading to clinically significant impairment or distress as indicated by the individual exhibiting four or more of the following in a 12-month period."

Do you know whether or not for gambling disorder the DSM-5-TR requires exhibiting a larger number of traits than it does for other substance-related disorders?

MS. LAMIA: Objection to the form.

A. That's not something I could opine on. I couldn't say it requires more or fewer. I will say you removed it from the screen, but a lot of the issues there that were listed overlap with both compulsive use in the short-term and harm in the long-term. So as a sort of distillation of this set of criteria, the definition that I prefer is certainly more succinct, but it overlaps substantially. Again, it's not designed to be a medical definition, a behavioral addiction, but there is certainly some overlap as you would expect between the two terms.

Q. Well, this is for more specific than mere negative consequence, for example, gamble with increasing amounts of money, correct?

A. Alter, Ph.D.

MS. LAMIA: Objection to the form.

A. Well, one of the four kinds of long-term harm that I discussed, we haven't discussed it here in the context of this deposition, is financial harm. That's one of the four, along with the psychological harm, physiological harm, and social harm. So the financial harm component would overlap substantially, for example, with increasing commitment to spending more and more money. But I don't profess to be a person who goes out and diagnoses people with having gambling addictions, again, because I am not a psychiatrist and that's not my role. And, again my definition of behavioral addiction is not designed to be medical.

Q. Do you know that sports gambling is lawful by app in the state of Florida?

A. I do not.

Q. Do you know how much money the State of Florida makes on online gambling each year?

MS. LAMIA: Objection to the form.

A. I do not. It's not something I was asked to examine.

Q. Now, you also in the report reference the ICD-11. What's the ICD-11?

A. Alter, Ph.D.

A. It's the World Health Organization's International Classification of Diseases, the 11th edition, which was published I believe in 2018, but I could be wrong about the exact date. Maybe 2022 it was disseminated but first published in 2017 or 2018.

Q. Could you lawfully diagnose someone under the ICD-11 system?

A. I could not and would not seek to.

Q. But could you lawfully treat anyone suffering a disorder classified under the ICD-11?

A. I could not and would not seek to.

Q. And the ICD-11 is -- strike that.

Do you know how the DSM publication is coordinated with the ICD-11?

A. I am not sure about the extent to which they are independent or the extent they overlap or rely on one another. I am not privy to those processes. But, again, I introduced DSM and the ICD just to illustrate that the issue of behavioral addiction has become a topic of interest and focus for a lot of researchers in the last, I would say, roughly ten to 15 years and perhaps even before that.

A. Alter, Ph.D.

Q. Do you know whether the DSM or the ICD provides the prevailing model for coding clinical disorders in the United States?

A. I stand to be corrected, but I believe the DSM is the dominant manual. But, again, I am not sure. I understand the WHO's manual is applied more broadly and internationally, but I believe it's the DSM for psychiatrists in the United States.

Q. Like the DSM-5, the ICD identifies a large range of substances for which there can be disorders, correct?

MS. LAMIA: Objection to the form.

A. Again, that's not something I was asked to opine on. That's not something that I use the ICD to support my declaration. I would be happy to consider a list and to examine the two side by side, or I am happy to take your word for it, but I can't say one way or the other.

Q. Have you ever read the DSM cover to cover?

A. I will be honest, I am not sure many people read the DSM cover to cover unless they are psychiatrists. I certainly read large portions of

A. Alter, Ph.D.

it as it has been relevant to some of my work, but I have not read it cover to cover, no.

Q. Have you ever read the ICD cover to cover?

A. Again, these reference manuals are not the kind of manuals that you would read cover to cover in the same way you would use a dictionary. You would go to find a particular thing that you are trying to understand better and read about that particular thing and perhaps if you are more broadly interested in a concept, you would read it more broadly the way you would an encyclopedia. But it's rare, I would say, for people in general, especially in my position who are not practitioners, to read them cover to cover.

Q. When is the last time you read the DSM before today?

A. I last read components of the DSM when preparing my report but have not read it since then I don't believe.

Q. When did you last read any part of the ICD?

A. Again, at the same time.

Q. What, if any, non-substance use

A. Alter, Ph.D.

disorders does the ICD recognize?

A. I would have to check my report again. I can't recall exactly which behavioral addictions or related non-substance disorders are listed. I know gambling is mentioned in the DSM. I can't recall the specific nature of the discussions in the ICD. But, again, that's not something I am professing to be an expert on. All I am raising here is the idea that these two dominant manuals have been considering the issue and including more behavioral addictions over time. But, again, I am not trying to make medical claims here, and I am not using the term about behavioral addiction as a medical term.

Q. We can take a break now if folks want to or we can keep going. I will defer to the witness above all.

A. I am happy to continue, but it would be good to probably order some food.

MS. MEAD: We can go off the record and take a ten-minute break? Does that work for folks?

MS. LAMIA: Yes.

THE VIDEOGRAPHER: This ends Unit 3. We

A. Alter, Ph.D.

are off the record at 1:16.

(Recess taken.)

THE VIDEOGRAPHER: This begins Unit 4. We are on the record at 12:25.

Q. Good morning, Professor Alter.

A. Good morning.

Q. If you know, what is the National Academies of Sciences?

A. National Academies of Sciences is one of the bodies that I know publishes some of the key journals in the scientific field. And I can't claim to know exactly what the organization does from a policy-making perspective or in an advisory capacity, but I understand that it does some of that for the government and otherwise.

Q. What, if you know, is the National Academies of Engineering?

A. I am not sure.

Q. What, if you know, is the National Academies of Medicine?

A. Again, I could probably guess, but I am not sure, and I certainly wouldn't be guessing today.

Q. I will mark as Alter Exhibit 5, and I

A. Alter, Ph.D.

believe it has already been loaded into the chat, a document titled Social Media and Adolescent Health 2024, and in the details it says it's 274 pages. And I will ask have you ever read a National Academies report titled Social Media and Adolescent Health from 2024?

(Exhibit 5, Document titled "Social Media and Adolescent Health 2024", marked for identification, as of this date.)

A. I can't recall off the top of my head. I believe I have seen parts of it perhaps, but I can't recall having read it in its entirety.

Q. Can you recall reading any part of it?

A. The title is familiar and the fact that it was produced by the National Academies of Sciences is familiar to me, but I just can't recall specifically having read the entire thing.

Q. Do you -- I will point you to the preface Page XVI, the first whole paragraph. And there is a sentence that says: "However, there are also several ways in which social media improves the lives of youth, including the creation of opportunities for community among more marginalized youth and the opportunity for fun and joy for the

A. Alter, Ph.D.

vast majority of users."

Do you agree or disagree with that statement?

A. I would need to read all of this in context. And also I will say that my role here was not to opine on the relative harms and benefits of social media platforms. I believe that it's certainly possible that there might be some benefits to some people. But my understanding is that particularly for young people, the consequences are dwarfed by -- sorry -- the pluses are dwarfed by the minuses.

Q. So are you offering an opinion in this case about the minuses?

A. I am offering an opinion about, for example, when I talk about the specific hooks and the fact that they might lead to compulsive overuse and to behavioral addiction, then there are essentially some minuses attached to that. But this question about whether there are pluses is not something that I was asked to opine on directly. But I will say that a lot of the content-based features could be shared under different circumstances with a platform that did not fall

A. Alter, Ph.D.

afoul of HB3. So I understand that there are ways for a platform to preserve the pluses while doing away with a lot of the minuses.

Q. For your work here, did you do any examination of the potential pluses of social media?

A. Again, that was not my assignment. My assignment was to describe behavioral addiction, the various hooks and how they applied to the five features described in HB3.

Q. In the course of your career, have you ever focused on the potential pluses of social media?

A. I have certainly in the course of doing research read about certain pluses, and that's something I have come across in discussions with people. But I will say that in my many years now studying the topic, when I discuss the topic with people organically, the negatives dwarf discussion of the pluses. So my sense is that the negatives are far more prominent in people's minds, whether those people are parents, teachers, policymakers, or otherwise.

Q. So these are organic discussions with

A. Alter, Ph.D.

parents, teachers, policymakers, and who else?

A. I list those audiences because they are the ones that describe their experience with the platform as distinct from researchers. So certainly researchers have their own perspectives on the topic, but I have spoken about this issue to many, many audiences, and the predominant response is this is deeply problematic and I am very concerned about my children. The question of pluses comes up very occasionally, and the topic comes up very rarely, and my sense is that the negatives concerns dwarf any discussion of the pluses. I am not saying that none exist. I am just saying that as a matter of balancing the two, my experience is that the negatives far outweigh concerns -- the negative concerns far outweigh the pluses.

Q. How can you determine the net effect of social media use if you have not investigated the pluses?

MS. LAMIA: Objection to the form.

A. I wasn't asked to conduct a balancing exercise and to say one is greater than the other. What I am reporting to you is that I have

A. Alter, Ph.D.

organically for the last more than a decade discussed the concept with many people. Often they don't know my role as someone who has researched the negative side of the concept. And I very rarely hear people say social media is wonderful and it's given my children all sorts of opportunities, but I very often hear major concerns from all sorts of stakeholders saying this is a concern for me. And that seems to be echoed in my understanding of the state of the research.

So are there some pluses for some audiences? It's certainly possible. I don't want to rule that out. But the discussions I have seen, both organically and in research contexts, describe the negative as far more concerning and overwhelming. And when you do conduct a balancing exercise looking at all the published research, it does seem to come out saying that the negatives are greater. But, again, that's not my role in the assignment. I am just answering your questions.

Q. Did you investigate the published research on pluses of social media?

A. In the context of reading research for the last 12 years I have come across some -- some

A. Alter, Ph.D.

research that is -- that all the research that's published on this topic, I have come across a large portion of it, I believe, and I try to conduct literature reviews from time to time. But that's not my intention here. I am not here to say that a certain percentage are positive versus negative. I am just here to describe the concept of behavioral addiction and to report that my sense is that the negatives outweigh the positives.

Q. You are reporting your sense. But are you offering an opinion here about the net effect of social media use?

A. That's not something I was asked to do in the context of my declaration.

Q. Is it something you are doing?

A. I don't believe so. I believe I am presenting a definition of behavioral addiction as I see it, supported by many interviews and discussions and research and literature. And then I am discussing a number of hooks and tethering those hooks to psychological research and explaining how those hooks map on to the features described in HB3.

Q. Do you agree that social media

A. Alter, Ph.D.

facilitates the creation of sharing of information, ideas, interests, and other forms of expression through virtual communities and networks?

MS. LAMIA: Objection to the form.

A. I would need to understand more of that definition before weighing in, and it's also, again, not something I was asked to consider in forming my opinions in this report.

Q. Do you believe that social media allows for the creation and sharing of information?

A. I am not sure that I am in a position to offer testimony on that. But what I will say is a hypothetical version of a social media platform that did not fall afoul of the rules of HB3 could achieve all that and more without the negatives.

Q. Do you know whether or not social media facilitates the creation and sharing of information?

A. It's a really broad abstract question. Again, it's not something I was asked to opine on. Obviously to the extent that information is proliferating on social media platforms, people come into contact with that information and perhaps process it and use it in ways that are beneficial

A. Alter, Ph.D.

to them. But, again, my sense is that the negatives are considerable and there are ways of delivering all those benefits without those negatives, which is certainly possible if the platforms themselves were designed so as not to fall afoul of HB3.

Q. I will point you to Page 4 and share my screen. The potential benefits of social media, the first sentence says: "Meta-analyses linking social media to various measures of health and well-being generally report small effects and weak associations drawn from mainly cross-sectional studies."

Do you agree or disagree with that statement?

MS. LAMIA: Objection to the form.

A. Again, this is not something I was asked to review. I would need to do a much more thorough review to be able to make claims about the outcome of certain meta-analyses. But, again, looking at the balance of publications, the vast majority have shown harms as I understand them. And that's across a range of different methodologies and con- -- and context.

A. Alter, Ph.D.

Q. So sitting here today, you do not know whether meta-analyses linking social media to various measures of health and well-being generally support small effects and weak associations drawn mainly from cross-sectional studies?

A. I was not asked to examine that question. That's obviously a question that would require processing large amounts of data, looking at the meta-analyses, and focusing on them, which I may have done in other contexts, but certainly I am not in a position here given my role in this particular matter to deliver a verdict on whether this is true or not. My understanding is that there is considerable evidence of negative consequences, but this act of balancing here and whether I agree with this particular statement, I am not in a position to give you that assessment here today. And, again it was not what I was asked to do in this case.

Q. Do you know whether or not there is ample room for both positive and negative experiences to be obscured in such analyses?

A. Again, this is a sort of general claim that could be made about meta-analyses, but I --

A. Alter, Ph.D.

this is not a source that I am conversant with, that I understand fully as we sit here today, and I don't want to make strong claims based on a couple of sentences or paragraphs drawn from this source.

Q. Is your answer fundamentally you do not know?

MS. LAMIA: Objection to the form.

A. This -- this is a claim about meta-analyses in general that when you do a meta-analysis and you come up with a particular number, the number represents kind of collapsing of all the data into a single number or a couple of numbers. That's the sort of claim made about meta-analyses generally.

Q. Do all meta-analyses involve small effects?

MS. LAMIA: I'm sorry. I don't think he was finished answering.

MS. MEAD: Oh, you may finish.

A. I was just going to say that claim that there is ample room for positive and negative experiences to be obscured in such analyses, that is a claim that you can make about any meta-analysis regardless of the size of the effect.

A. Alter, Ph.D.

It obscures, by nature, some of the specifics. So, again, I am not familiar with this particular meta-analysis. I am not here to comment on it. It wasn't something I was asked to do in the context of this matter, and so I wouldn't be comfortable making an assessment of this specific meta-analysis or series of analyses.

Q. Do all meta-analyses involve small effect sizes?

A. The size of effects in meta-analyses varies greatly, and a lot of that variance is dependent on the methodological choice you use and the choices you make in deciding what to include or not include in the analysis. Again, I can't claim on -- I can't make claims about these specific analyses.

Q. Do all meta-analyses produce weak associations?

A. Again, the same response. The size of an association in a meta-analysis will vary, and it will vary in part on some of the methodological decisions in driving that meta-analysis. Until I see all the papers included and until I can make claims about that and until I review it myself,

A. Alter, Ph.D.

which I was not asked to do in this matter, I can't give you strong responses about this particular paragraph. Underlying this paragraph is just a huge amount of data, I assume, and I can't just look at this paragraph and give you informed responses as a scientist.

Q. Do all meta-analyses involve mainly cross-sectional studies?

MS. LAMIA: Objection to form.

A. Meta-analyses -- sorry -- meta-analysis is a tool that can be used for all sorts of different kinds of analyses for all different kinds of data. For example, here there are lots of different kinds of studies that have been done to look at the effects of social media on various outcomes. Not all of those are cross-sectional studies. So if a meta-analysis looks only at cross-sectional studies, I am not sure what's omitted. Another reason why I would need to see the data.

Q. A meta-analysis could theoretically be done of randomized controlled trials, correct?

A. It can be done on any process that leads to a statistical outcome. Again, I am not sure

A. Alter, Ph.D.

what the inputs are here so I can't comment on what was done or what was done here.

Q. In forming your opinions here did you consider the value of connectiveness for LGBTQ+ individuals through social media?

A. When you ask me about benefits, I understand that for that particular community there is certainly the possibility of certain benefits for connection. But, again, those benefits don't require that you have the hooks that are described in HB3 or the requirement that you sign up for an account. These are benefits that are available to people even when those features are absent from a platform.

Q. What is a network externality, if you know?

A. I am not an expert in network theory and network design, but I -- I wouldn't even want to hazard a definition of it. But as I understand it, it's an external consequence of some experience on a particular network or within a network, and often they are negative.

Q. Is the telephone system a network?

MS. LAMIA: Objection to the form.

A. Alter, Ph.D.

A. It depends on your definition of a network.

MS. MEAD: Lunch has arrived. Should we break for lunch or not?

MS. LAMIA: I think we should.

MS. MEAD: Okay. Good. Only needed one vote. We will break for lunch. Go off the record.

THE VIDEOGRAPHER: This ends Unit 4. We are off the record at 12:42.

(Recess taken.)

THE VIDEOGRAPHER: This begins Unit 5. We are on the record at 1:13.

Q. Good afternoon, Professor Alter.

A. Good afternoon.

Q. Do you believe that the literature supports the conclusion that social media causes changes in adolescent health at the population level?

A. That, again, was not something I was asked to opine on in my report and in my declaration. So it's not something I am really prepared to discuss today. Again, I was just asked to talk about the specific hooks and the nature of

A. Alter, Ph.D.

behavioral addiction as they apply to HB3.

Q. Do you agree with the statement "Studies looking at the association between social media use and feelings of sadness over time have largely found small to no effects, but people with clinically meaningful depression may engage with social media differently"?

MS. LAMIA: Objection to the form.

A. There is so much going on with the question, I'm sorry, it's hard for me to track it all. I assume this is a quote from somewhere, and it's hard for me to follow the whole thread of it.

Q. I will share my screen. And I am pointing you to Exhibit 5, the National Academies of Sciences report on Page 6, the second paragraph from bottom, and it says: "Studies looking at the association between social media use and feelings of sadness over time have largely found small to no effects but people with clinically meaningful depression may engage with social media differently."

Do you agree with that statement?

A. That's not something I was asked to opine on in the context of this matter, and if

A. Alter, Ph.D.

counsel asks me to, I could certainly form opinions and do some further investigation. But that's not a statement that I am willing to examine in this context now.

Q. Sitting here today, are you willing to express a view on that statement?

A. That's what I am saying. My -- that was not my brief. My brief was not to examine that specific statement. And as I have said in early parts of this deposition, I have seen plenty of evidence using many different methodologies across literally dozens of studies of harms. But as to this specific statement, I couldn't offer you a summary opinion that would be useful given that I haven't looked at all the underlying data that formed or drove this particular statement.

Q. I will point you to Page 11, a research agenda heading at the bottom of the page. And the first sentence addresses "quantifying the risks and benefits social media pose to young people is difficult for many reasons."

The following paragraph then says: "The standard of evidence needed to establish a causal relation between an outcome and exposure is high."

A. Alter, Ph.D.

Do you agree with that sentence?

A. I mean I think it's --

MS. LAMIA: Objection to form.

A. It's a broad, a very, very broad statement. Sometimes the standard of evidence will vary depending on context. Again, you are offering me a statement that's drawn out of context. I don't have the full context for this. I haven't read this particular book. I assume it's a book that it's drawn from. Certainly not for the purposes of being able to respond to specific statements within the book.

Q. You have taught experimental design, correct?

A. Yes, that's a topic I taught. Absolutely.

Q. You have taught statistics, correct?

A. Yes.

Q. And there is an entire literature on the need to establish a causal relation between an outcome and exposure, correct?

A. I mean, there is a huge number of different literatures that look at behavioral design and experimental design and statistics, and

A. Alter, Ph.D.

there are nuances in that literature that are important. So this as a general statement as it applies here I can't comment because I don't understand the full background. But certainly the degree of evidence that's required or the standard of evidence that's required to establish a causal relation depends very much on the context and on the specifics, so --

Q. Do you have any view of that standard in the context of social media?

MS. LAMIA: Objection to the form.

A. Again, this is not something I was asked to opine on for the purposes of my declaration. I wasn't asked to balance the literature and to come up with a firm conclusion about this particular issue. But I have seen and read literally hundreds of studies now across different methodologies. Some of them are association-based, but some do involve experimental designs, interventions, quasi experiments that go a long way to establish a causal relationship. So I am convinced of that relationship as I sit here.

Q. Can you name any non-associational studies that you just mentioned?

A. Alter, Ph.D.

A. As I sit here I can't give you citations, but there are certainly many. And I was, in fact, reading a couple of them this morning, and so there are plenty of studies that involve, for example, interventions or studies that look at the extent to which social media was available to certain populations but not others. That's a quasi experiment. And the preponderance of evidence when you put together all of these studies indicate that there is absolutely harm, and the harm takes many different forms.

Q. Did you provide the materials you were reading this morning to the counsel for the State in this case?

A. No, I don't believe I have specifically provided those materials. That's something that was just shared with me out of the context of this particular matter.

Q. Okay. And can you name any of the study authors for the non-associational studies you just referenced?

A. I know exactly where I can find out them, but as I sit here I am not sure I can list them for you.

A. Alter, Ph.D.

Q. Do you know if they were all listed in your declaration here, Exhibit 1?

A. They were not because that's not what I was asked to opine on. You are asking me a question, as I said, that's beyond the scope of the declaration, narrowly speaking.

Q. Correct.

A. So I cited the literature that was relevant to the declaration, and you have all of those citations in the declaration itself.

Q. So you are not offering an opinion here that social media causes any harms, correct?

A. I describe behavioral addiction which involves long-term harms, so I need to be able to argue to indicate behavioral addiction that there is a harm that emerges as a result of these behaviors. And so I do give references, for example, to illustrate the basic concept that there are multiple different kinds of harm that emerge from the hooks that I describe that drive behavioral addiction, so that is absolutely in my declaration.

But you have asked a much broader question and a couple of broad questions about

A. Alter, Ph.D.

experimental design and the kinds of evidence that are required. Those are different questions from the questions I was asked to opine on.

Q. In your declaration, you put forth your argument, correct?

MS. LAMIA: Objection to the form.

A. It's not an argument. It's not an argument as -- as you would describe it here. What I am saying is that to -- to be able to demonstrate or to indicate that I have found evidence for behavioral addiction, I need to be able to show harm. If there had been no harm, there would be no behavioral addiction because, as I said, the second component of behavioral addiction is long-term harm in addition to that first component which is compulsive use. So yes, there is evidence of harms that come from these kinds of overengagement patterns that we see in behavioral addiction.

Q. What are affordances, if you know?

A. I know the term has different meanings in different contexts, but I am not sure that I can offer you a single definition that captures them all here.

Q. Does the term "affordance" have any

A. Alter, Ph.D.

meaning in the context of the opinion you offer here?

A. I am not sure. That's a very vague and broad question. I can say in the world of human factors or the literature of human factors affordances often describe certain patterns people engage in based on the structure of the environment around them. But whether that's directly applied to some of the opinions I give here, I am not sure.

Q. Okay. So I will point you to Chapter 2, how social media work, Page 32. The heading is Social Media Affordances. And it says, bottom of the page: "Most adolescents who use social make use of affordances" -- carry over page -- "for creation and consumption of content."

Do you agree or disagree with that statement?

A. I don't understand --

MS. LAMIA: Objection to form.

A. I don't understand what they are referring to here. I haven't read this particular sentence. I haven't read this paragraph, this chapter in depth. I would like to form a more solid understanding of what they are referring to

A. Alter, Ph.D.

before I can give you an informed response to this question.

Q. Do you agree or disagree with the statement that the human brain undergoes profound development from adolescence into early adulthood?

A. Broadly speaking, in general across all of the modalities associated with neural development, yes, there are major changes that happen.

Q. Have you ever examined the literature about social media for publication bias?

A. I have read some discussions of the topic, but I haven't, certainly not in the context of this declaration, reviewed that literature.

Q. What is publication bias generally?

A. As I understand it, it's a broad catch-all term that describes the tendency for certain kinds of articles to be published over others in certain contexts.

Q. Do you agree that social media can also provide a space for self-expression?

MS. LAMIA: Objection to the form.

A. It's a very, very broad and fairly vague question, so I am not sure I am in a position to

A. Alter, Ph.D.

answer that without further definition of what you mean by that.

Q. Do you agree that social media can be valuable to adolescents who otherwise might feel excluded or lack offline support?

MS. LAMIA: Objection to form.

A. I would need to understand more about the context to be able to opine there and to understand the full constellation of consequences of those specific people you are mentioning when they use the platform. And so as I sit here, I am not in a position to make comments about that.

Q. Have you considered the possibility of social media for social support of neurodiverse teens?

MS. LAMIA: I'm sorry, I didn't catch that.

MS. MEAD: Neurodiverse.

MS. LAMIA: Objection to the form.

A. So I will give the same response which I have given elsewhere, which is: A, that's not part of my assignment here; B, it's a fairly broad question; and C, I could imagine many ways for those teens to get access to support without the

A. Alter, Ph.D.

many costs associated with accessing those forms of support on platforms that involves some of the behavioral addictive hooks that I described.

Q. Have you considered the possibility of social media for providing social support for individuals in rural communities?

A. Again, exactly the same response as last time.

Q. Which is?

A. Which is, as I said earlier, this is not something I was asked to examine in my declaration. These are very broad questions that don't have specifics attached to them. They are hypothetical, and I need to know more about the context. And the third facet is that you could deliver many of these benefits without the costs, and the costs are many.

Q. Do you know if these online communities would be as large without the features that your expert declaration focuses on?

A. I wasn't asked to examine that question, and so I don't have a response for you as I sit here today.

Q. Do you know if these -- what you call social media platforms would have as many users

A. Alter, Ph.D.

without the features you focused on in your expert declaration?

A. I am not sure I can imagine this counterfactual world. I would need to understand what the nature of the platform is before I could give you a solid response about how that would change user rates. It might change how long they spend on the platform. It might change their health as they use the platform. But specifically the number of users, I can't comment on that as I sit here now.

Q. Did you consider the potential value of social media toward learning?

A. Again --

MS. LAMIA: Objection to form.

A. That's not something I was asked to do in the context of my report. It's a very, very broad and vague question, and there are many vehicles that would drive learning that don't involve the hooks that we are discussing here today. And I could imagine those driving benefits without many of the costs associated with social media.

Q. Did you consider the benefits of social

A. Alter, Ph.D.

media potentially for development of writing skills?

A. Again, I will give the same response that I could imagine a world in which there are other ways that platforms could deliver those values and benefits without also delivering many of the harms that are associated with those platforms.

Q. Did you consider any benefits social media might provide for political and social engagement?

A. Again, that was not my assignment in that declaration or in this matter. And, again, I could imagine a platform that did not fall afoul of HB3 delivering many of those benefits.

Q. Do you know if any of those organizing Blacks Lives Matter protests used social media?

MS. LAMIA: Objection to the form.

A. Again, that's not an issue that I was asked to consider in the course of forming my opinions in this declaration. And, again, those individuals could have had access to a social media platform to the extent they did use one that did not involve these hooks and these features that are outlined in HB3.

A. Alter, Ph.D.

Q. Do you know if any school shooting survivors have used social media to organize political activity around gun safety?

A. Same response. That was not part of the assignment for this declaration and for my role in this matter. And, also, I could imagine those same individuals having access to many of the benefits that derive such as they did, if they did, without the negative consequences that came from the hooks and the features identified in HB3.

Q. If parents use their phone in front of their children, do you believe that is detrimental to the children?

A. It's a very broad hypothetical question. It depends on the nature of that use. It depends on the relationship with the children, where the children are, and so on. It's a broad question, and it needs more specifics. And, again, it's not something I was asked to opine on.

Q. What, if anything, do you understand -- strike that.

What is social media literacy, if you know?

A. I believe the term could be used in

A. Alter, Ph.D.

different contexts, so I am not sure exactly of the context that you are asking me to define the term in. One context that it's been used in is to describe familiarity with or an understanding of different social media platforms by either users or other individuals who are trying to understand or examine them.

Q. Let's go to Page 157 of the National Academies of Sciences report, and it says -- I will share my screen: "Failure to invest in young people's ability to navigate the complex world of online news and media has consequences for the people themselves and for society at large. Shortfalls in media literacy contribute to social problems and the circulation of misinformation. It can also give young people skewed perceptions of online risks. Some evidence indicates that education can counter this effect."

Do you agree that online misinformation is a problem?

MS. LAMIA: Objection to form.

A. It's not a topic that I am here to opine on nor have sufficient background on right now as I sit here to be able to deliver an opinion on. It's

A. Alter, Ph.D.

certainly possible, but it's not a topic that I was asked to research or opine on for my report.

Q. Do you believe body dissatisfaction in adolescents is a problem?

A. As an expert I wasn't asked to investigate that topic and as a scientist I would want to do a more comprehensive review before giving you my opinion on that subject.

Q. Do you believe that misinformation can affect political outcomes?

A. Again, that's a broad question, a fairly vague question, a hypothetical question. It's difficult for me to answer it, again, since it was outside the scope of my role in this matter.

Q. Turn to Page 195 of the National Academies of Sciences report. It says: "Consider, for example, the Utah legislation putting age and time limits on children and teens' social media use."

A. Sorry. I don't see it.

Q. Oh, thank you. Share my screen.

It says: "The legislature's intent to protect time for sleep and schoolwork and to prevent at least some compulsive use could just as

A. Alter, Ph.D.

easily have unintended consequences, perhaps isolating young people from their support systems when they need it."

Now, your opinion here did not consider the possibility of isolating young people from their support systems when they need it, did it?

MS. LAMIA: Objection to form.

A. I wasn't asked to consider that issue directly, but it's very clear to me you could give children access to the support system without needing to embed hooks into the platforms that deliver those benefits. So if social media platforms are trying to deliver benefits to children, they could do that without seeing many harms that we see in HB3. So I don't see this legislation as trying to prevent children from getting access to benefits. You can still have access to those benefits without the many costs associated with those platforms.

Q. What's the largest online platform you can identify that is not regulated by HB3?

MS. LAMIA: Objection to form.

A. You would have to ask the legislature to tell you which platforms are and are not captured

A. Alter, Ph.D.

to HB3. I am not in a position to deliver that verdict here.

Q. What is the largest online platform you can identify without the hooks you focused on in your expert declaration Exhibit 1?

A. Again, that's not a question I was asked to opine on. I haven't reviewed all of them for size or for whether they have or do not have the hooks. And so I am not in a position to make that claim here.

Q. Can you name any online platform that does not have the hooks you identify in your expert declaration here Alter Exhibit 1?

A. I am not in a position here to enumerate all the different platforms, whether they do have these hooks, whether they don't have these hooks. I wasn't asked to examine that question in the context of my role in this matter.

Q. What is The Trevor Project; do you know?

A. It's familiar. I can't recall off the top of my head, but it's a familiar term.

Q. Is The Trevor Project a group that seeks to reduce suicidality among LGBTQ+ teens?

A. I can't be sure. That may be the

A. Alter, Ph.D.

context in which I heard the term, but I can't be sure.

Q. I will mark as an Exhibit 6 a document titled American Psychological Association Health Advisory on Social Media Use and Adolescence, May 2023.

(Exhibit 6, Document titled "American Psychological Association Health Advisory on Social Media Use and Adolescence, May 2023", marked for identification, as of this date.)

Q. What is the American Psychological Association?

MS. LAMIA: I'm sorry. Excuse me for interrupting. Has that been posted? I am not able to see that.

MS. MEAD: It has. I will wait until you tell me you have seen it.

Counsel, do you have it?

MS. LAMIA: Give me one minute, please.

Okay. Thank you.

Q. What is the American Psychological Association?

A. It's one of the professional bodies that is associated with academic and practical

A. Alter, Ph.D.

applications of psychological science and clinical science.

Q. Are you a member -- strike that.

If I refer to the American Psychological Association as the APA, will you understand me?

A. Yes, as long as you are not referring to the American Psychiatric Association. If you do, just let me know. But yes, I will assume for now that you mean the Psychological Association.

Q. Excellent point.

Are you a member of the American Psychological Association?

A. Yes.

Q. Is your membership specific to your specialty?

A. It can be. There are certain divisions or subdivisions. So I am a member I believe of the Social and Personality Psychology Division, and perhaps one or two others. It's been a while since I checked. I know there are subdivisions, but I don't think you are specifically a member of just those subdivisions. You can also broadly be a member of the APA.

Q. How long have you been a member of the

A. Alter, Ph.D.

American Psychological Association?

A. Probably since I began graduate school, which would be 21 years.

Q. Aside from being a member, have you been active in the American Psychological Association?

A. I have not been particularly active, to be honest, in the APA. I do more work with the APS, the Association for Psychological Science. But I have appeared and delivered talks at one -- I believe I think it's just one conference organized by the APA some years ago.

Q. How many years ago; do you know?

A. I would guess seven or eight years ago.

Q. Have you had any other activities with the American Psychological Association you have not already described to me today?

A. I can't think of any off the top of my head. I would be happy to be corrected, but I don't have any off the top of my head.

Q. I will point you to Page 3 -- well, actually, strike that.

On Page 3, little A, it says: "Using social media is not inherently beneficial or harmful to young people."

A. Alter, Ph.D.

Do you agree with that statement?

A. I am not sure what that specifically refers to. I could imagine a theoretical platform that did not have certain negative hooks embedded in it, that did not inherently produce benefits or harms, that were just a vehicle for conveying information. So I am just not sure exactly what this is referring to.

Q. Do you know any social media that satisfies the criteria you have just described?

A. I am thinking of a social media platform that I assume is envisaged by HB3, so a platform that doesn't involve the negative hooks that leads to behavioral addiction, so I am not sure about that particular platform. But off the top of my head right now I would not say that social media platforms are largely beneficial. I would say for young people they are largely harmful in practice.

Q. Off the top of your head sitting here today can you name a single existing social media platform that does not have the hooks you just described?

MS. LAMIA: Objection to the form.

A. I haven't done a full survey of all

A. Alter, Ph.D.

social media platforms. There may be some, but I was really just responding to the word "inherently" here. So this question and whether social media is inherently beneficial or harmful, I could imagine ways that the harms and benefits, such as they are, could be adjusted by the features that are built into these platforms, which means that they are, by definition, not inherently beneficial or harmful. So it's not social media per se, but perhaps in practice the way these platforms have emerged today and the way they have been designed today have made them more harmful. That doesn't mean they are inherently harmful, but the way that they exist in practice today are such that they are harmful.

Q. So it says, look at the third sentence: "In most cases the effects of social media are dependent on an adolescent's own personal and psychological characteristics and social circumstances intersecting with the specific content, features, or functions that are afforded within many social media platforms."

Do you agree with that statement?

A. I would need to know more about that, what this refers to. I would also need to know

A. Alter, Ph.D.

what footnote we are referring to when they have three there. It would be useful to know the source of this so that I could understand the underlying data that drove these conclusions. But I am not in a position as I sit here to evaluate a standalone statement that doesn't have any context.

Q. On Page 5 it says: "In early adolescence, i.e. typically 10 to 14 years, adult monitoring, i.e. ongoing review, discussion, and coaching around social media is advised for most youths' social media use. Autonomy may increase gradually as kids age and if they gain digital literacy skills. However, monitoring should be balanced with youths' appropriate needs for privacy."

Do you see that?

A. I do.

Q. Would HB3 allow a parent to allow their child to access social media at 11 with parental monitoring?

MS. LAMIA: Objection to the form.

A. You would have to ask the Florida legislature, but as I understand it 11-year-olds are not allowed to use social media platforms in

A. Alter, Ph.D.

general. So 11 --

Q. Oh, I'm sorry, do you have more?

A. No.

Q. For purposes of your expert opinions offered in your declaration here, what did you assume about whether or not HB3 would allow a parent to allow an 11-year-old child to use social media with monitoring?

MS. LAMIA: Objection to the form.

A. I'm sorry, I am struggling a little with the question. Can you break that down for me a little?

Q. I don't think I need to.

All right. Does social media include harmful content?

A. Does it include harmful content?

Q. That's the question.

A. It's a very broad and fairly vague question. I am not sure I understand. Are you asking if there can be harmful content posted on social media platforms?

Q. Yes. Is there harmful content on social media platforms?

A. I am sure some harmful content is posted

A. Alter, Ph.D.

on social media platforms in general. That's certainly possible.

Q. Are you aware of any harmful content?

MS. LAMIA: Objection to the form.

A. Nothing specific comes to mind as I sit here today. Again, I wasn't asked to examine that, but I can imagine harmful content slipping through filters and nets and becoming part of what is posted on social media platforms.

Q. I will point you to Page 8. This is under Recommendations again. "Adolescents' social media use should be preceded by training in social media literacy to ensure that users have developed psychologically informed competencies and skills that will maximize the chances for balanced, safe, and meaningful social media use."

You did not evaluate the potential for social media literacy in formulating your opinions here, correct?

A. As I have studied the concept over the last many years, it is clear to me that these hooks exist and operate at a level that is far deeper than simple literacy, that they drive use and compulsive use and engender certain harms at a

A. Alter, Ph.D.

level that is deeper than just saying make sure you are careful when you use this. And so I generally find that literacy is insufficient to overcome the strength of those hooks as they operate in social media platforms and other contexts.

Q. Is literacy insufficient also for adults?

A. I am not sure.

MS. LAMIA: Objection to form.

A. I am not sure. That's a different question. And, again, it's not something I was asked to examine in this context but --

Q. Under your theory of behavioral addictions, these hooks can also lure in adults, correct?

A. They can do, and they certainly do. They are more effective among adolescents and young users who don't have some of the resources, neurological and otherwise, and behavioral. But yes, certainly they apply to, for example, adult gamblers and others, yes.

Q. Would your theory of behavioral addiction justify extending HB3 to adults?

A. That's certainly not something I have

A. Alter, Ph.D.

considered or been asked to consider. If I am asked to consider it, I would be happy to do so, but that's not something I examined looking at, for example, age threshold cutoffs and things like that. That's beyond the scope of my report, my declaration.

Q. Do you know sitting here today?

MS. LAMIA: Objection to the form.

A. As I said, I haven't formed a solid opinion of that question. It's not something that I was asked to opine on.

Q. I will mark as Exhibit 7 a document titled Surgeon General Social Media and Youth Mental Health, dated 2023, and it should be going around.

(Exhibit 7, Document titled "American Psychological Association Health Advisory on Social Media Use and Adolescence," May 2023, marked for identification, as of this date.)

Q. I will share it on my screen.

Have you seen this document before today?

A. Yes.

Q. What role, if any, did this document

play in forming your expert opinions here?

A. I am not totally certain, but I believe I may have read this after writing the declaration. But I am not 100 percent sure. I would need to check. There are a lot of documents floating around, but I have certainly read large parts of this document.

Q. Have you ever read this document in its entirety?

A. I believe I have, yes.

Q. And is this document authoritative in your field?

A. It's a difficult question to answer. I am not sure that I can tell you what individuals in my field think about specific documents. People have various opinions. I am not sure that I can make claims about how authoritative it is in general, but if it's been released by the US Surgeon General, I am sure there is some research behind it. But about the individual and specific claims made, I couldn't comment as a general matter.

Q. Do you have any documents that you rely upon in your declaration that you would describe as

A. Alter, Ph.D.

authoritative in your field?

A. It's a strange concept. We don't normally use that term. If a document has been peer reviewed, obviously that lends it some authority. If it's been produced by a body that itself has done much research, for example, if a book has hundreds of footnotes and involves much interviewing and discussion with many stakeholders, then that would have more authority than a book that did not. So it really depends. That's a broad question, and it's hard to give you a single answer that captures where authority comes from in the field.

Q. But relevant factors to authority include the history of the promulgating organization, correct?

A. I think in general the source probably plays a role in driving authority, but there are many old agencies that perhaps don't have the same reputation as some younger ones. I can't think off the top of my head of specific examples. But obviously the source matters to some extent, and the extent to which it matters will vary depending on the source and what the source is claiming.

A. Alter, Ph.D.

Q. The amount of evidence reviewed also matters, correct?

A. I wouldn't just say it's about the amount of evidence reviewed. I would say it's the quality of that review, the nature of that review, how carefully the review is done, the quality of the conclusions that are drawn based on that review. It's not simply a matter of counting. It goes beyond that. But that's certainly one factor. All things being equal, reviewing more information rather than less means that you have been exposed to a greater range of possible opinions and expressions and pieces of knowledge, so I would imagine that would matter as a general factor.

Q. And the caliber of the membership matters too, correct?

A. Again, in theory, that might be a factor that matters. It depends on the specific context.

Q. According to those metrics how much weight do you give the DSM?

MS. LAMIA: Objection to the form.

A. I am not sure. I haven't thought about weighing up all of those factors.

Q. According to those metrics how much

A. Alter, Ph.D.

weight do you give to the ICD?

A. Again, I haven't thought about weighing up all those metrics. You know, if you look back at the declaration, I use those two publications in a very specific and narrow context. I don't talk about weighing up every piece of content in the hundreds of pages of the ICD and DSM. What I do is just say, here is some evidence that these manuals that are widely used and widely cited are considering the issue of behavioral addiction. That's how I refer to it in there.

Q. That's correct. You cite to only a few pages of the DSM in your declaration here, correct?

A. That's all I intended to cite in this particular context just to indicate that the term and concept of behavioral addiction had been considered. It is front and center on the radar of organizations like the American Psychiatric Association.

Q. And you cite to only a few pages of the ICD in your declaration here, correct?

A. Again, as evidence that the WHO is paying attention to the issue of behavioral addiction and that it's an issue that's been fairly

A. Alter, Ph.D.

heavily considered.

Q. Well, the WHO is paying attention to it. But do you know if the WHO has recognized any behavioral addiction to any online activity as any sort of diagnosis?

A. I wasn't intending to make claims about what the medical community is doing with respect to behavioral addictions. I was very clear about that, as I said earlier in my deposition. I gave you a very succinct definition of behavioral addiction as I see it. I believe it applies to a very large part of the population, particularly youth. And that's not intended to be a medical definition, so I am not here to weigh up the definitions and the strengths and weaknesses of the claims made by the ICD or the DSM.

Q. I point you to Page 5 of the Surgeon General's report which is Exhibit 7. And it says, bottom of the first paragraph: "There is broad agreement among the scientific community that social media has the potential to both benefit and harm children and adolescents."

Do you agree or disagree with that statement?

A. Alter, Ph.D.

A. I believe you could in theory construct a social media platform that involved fewer harms and more benefits, but that is not how social media platforms today have been constructed such as they are captured by HB3.

Q. We will mark as Exhibit 8 a document titled Media Use in School Age Children and Adolescents from the American Academy of Pediatrics.

(Exhibit 8, Document titled "Media Use in School Age Children and Adolescents", marked for identification, as of this date.)

Q. And my first question is: What is the American Academy of Pediatrics?

A. As I understand it, it is an organization that delivers advice about and works on policies related to pediatric care and pediatric medicine. But it's not a body that I am a member of, and so beyond that I wouldn't want to make specific claims about what the academy does and does not do.

Q. Did this policy statement play any role in the formulation of your expert opinions here?

A. I have read various policy statements

A. Alter, Ph.D.

delivered by the AAP over the years. I don't know that I have read this specific one, but I have read a number beginning in perhaps 2016. I can't see the date on this one. This looks like it might be from 2016.

Q. If you look at the box on the first page, it says: "This policy statement was reaffirmed in July 2022 with reference and data updates."

Does that refresh your recollection about whether or not you have looked at this policy statement which at the bottom bears a publication date of November 2016?

A. Yes, I think, right, I think this is possibly a later version of the version I have seen many times. But I am not sure that I have seen this latest version.

Q. What role did any policy statement from the American Academy of Pediatrics play in forming your opinion here?

A. I wouldn't say it played a direct role. Perhaps indirectly as I gathered information over that many years. But, again, I wasn't asked to make claims that would or could be driven by any

A. Alter, Ph.D.

statements made specifically by the AAP. Again, I was asked just to describe what behavioral addiction was, the various hooks, and how they mapped on to HB3 and the five features described therein.

Q. And it says: "Again, like many other authorities, research suggests both benefits and risks of media use for the health of children and teenagers."

Do you agree or disagree with that statement?

MS. LAMIA: Objection to the form.

A. Again, I would give the same response that I gave earlier, which is that it is certainly possible that there might be some benefits. I believe they are given the current nature of social media platforms dwarfed by the costs. But, in theory, there could be a benefit that is delivered by social media unaccompanied by harm if social media platforms are designed that way, and, in particular, a platform that were designed to fall within the scope of what HB3 imagines will do that. It will minimize the costs but retain the benefits. And so that's as I understand it.

A. Alter, Ph.D.

Q. The only behavior under your theory of behavioral addiction you could identify to me previously that had no harms was breathing, correct?

MS. LAMIA: Objection to form.

A. I wouldn't say it was the only behavior I could identify to you. I said to you that I was not asked to survey the landscape to find behaviors that absolutely could not lead to harm. There are certainly many behaviors that predominantly don't produce harm. I gave you an example of taking part in physical activities and sports. I think for most people that is likely to engender benefits much more so than costs.

Are there people who have exercise addictions? Are there people who play sports to the point where it might be harmful? Absolutely. Does that mean we should say that that's a behavior that does not at all ever involve behavioral addiction? I wouldn't say so. But I would say that's a behavior that in general is much more positive than negative, so I would encourage people in general to engage in physical activity.

So I wouldn't say that's the only --

A. Alter, Ph.D.

breathing is the only example. I was very clear with you about the nature of these different behaviors and where they would fall.

Q. Under your theory of behavioral addiction, does social media addict every user?

A. I would say that social media addicts users, according to my definition, when those users satisfy the definition. And the definition is quite specific.

Q. Do you know what frequency -- strike that.

Do you know what percentage of individuals under 14 satisfy your definition of behavioral addiction?

A. I was not asked to come up with a definitive number, although I did refer to some numbers in the report that others had come up with as illustrative. And those numbers are somewhere around I believe it's 27 percent, but I would need to check. To me, if the number is anywhere near a quarter or more, that's a significant number, and that's a major harm. But I am not here to deliver a specific canonical number to you.

Q. But HB3 extends beyond that 27 percent

A. Alter, Ph.D.

of users, correct?
A. You would have to speak to the legislatures to ask them what they envisage and how they plan to apply the legislation.
Q. I would be delighted. But now I will mark as Exhibit 9 a document entitled Professional Services Contract, State of Florida, Department of Legal Affairs, Office of the Attorney General and GBX Holdings.
(Exhibit 9, Document entitled "Professional Services Contract, State of Florida, Department of Legal Affairs, Office of the Attorney General and GBX Holdings", marked for identification, as of this date.)
Q. Do you now see that on the screen?
A. Yes.
Q. What is GBX Holdings, LLC?
A. GBX Holdings stands for Global Business Experts, and they are an expert witness support agency that I work with when I offer expert testimony in legal matters.
Q. And I will turn your attention to the last page which is the signature page, page 12, and there is a signature, Mark Pelofsky of GBX

A. Alter, Ph.D.

Holdings, LLC. Who is that; do you know?

A. He is one of the individual principals, one of the two principals at GBX Holdings.

Q. And the date of this contract is April 4, 2024, correct?

A. Yes.

Q. And it's countersigned by John M. Guard, Chief Deputy Attorney General, correct?

A. Yes.

Q. And I will point you to Article 1, General Description. It says: "This contract is for the provision of expert witness services provided by the contract through Adam Alter, Ph.D., and consulting team for services including reviewing case files, providing reports, and testifying in litigation related to Florida House Bill 3 (2024)."

Do you see that?

A. Yes.

Q. So as of April 4, 2024, you had agreed to give expert testimony in support of HB3, correct?

A. Broadly speaking, yes. The specifics of what I was actually asked to do in my report were

A. Alter, Ph.D.

perhaps not yet described in this contract. But yes, I had agreed to provide my expert opinions.

Q. As of April 4, 2024, you had agreed to provide an expert report in support of HB3, correct?

MS. LAMIA: Objection to the form.

A. I am not familiar with the specific document that was delivered by Mr. Pelofsky through, again, GBX. So I am not sure if this is a broader agreement to engage on the topic or if this is a specific agreement to write a particular report on particular matters; I believe that came later. But I certainly reviewed some of the basic information and agreed that I could explain the nature of behavioral addiction and related concepts.

Q. What did you review relevant to this case before April 4, 2024?

A. I can't recall off the top of my head as I sit here.

Q. Do you know whether or not you had reviewed HB3 itself?

A. I can't recall, but I believe I understood the nature of those hooks, those five

A. Alter, Ph.D.

features, and was prepared to explain them and the relationship between them and the behavioral addiction such as they were. But I can't be sure of exactly what I had and hadn't read on a particular date that occurred eight months ago.

Q. Do you know whether you had read any of the House or Senate bill analyses of HB3 before April 4, 2024?

A. I don't believe I had. If I had been asked to comment on them, I certainly would have been willing to do that. But I don't believe I read any of those analyses at that point.

Q. Do you know if you read any drafts of HB3 before April 4 of 2024?

A. I may have read -- if HB1 is one of those drafts, I may have read it, but I just can't recall off the top of my head. This is a long time ago. I am not sure exactly what material I had and had not read.

Q. Did you have any input into the drafting of HB3?

A. No.

Q. Were you first contacted by the State of Florida after HB3 had been signed by the governor?

A. Alter, Ph.D.

A. I believe so, yes.

Q. Who first contacted you from the State of Florida about HB3?

A. I believe it was Ms. Lamia.

Q. When did she contact you?

A. I can't recall the date, but it was close to that April date that you showed me earlier. I am not sure if it was a month before or exactly how long before, but it was around that time and that part of the spring of 2024 I believe.

Q. How did she contact you? By phone? By e-mail?

A. I can't recall to be honest. She may have called; she may have e-mailed. I am not sure.

Q. Did you search your e-mail for any documents to provide to the State before today's deposition?

A. I am not sure.

MS. LAMIA: Objection to form.

A. I'm sorry. I am not sure I understand the question. But no, not to my knowledge.

Q. Did you provide any e-mails to the State before today's deposition for purposes of production in this case?

A. Alter, Ph.D.
MS. LAMIA: Objection to the form.
A. I am not sure I understand the question, but I don't believe so.
Q. Do you know whether anyone else at GBX searched your e-mail for this deposition?
A. I am not sure. I'm sorry. I can't answer for people at GBX.
Q. Do you know if anyone at GBX provided any documents to the State before this deposition?
A. That's a broad question. I am sure they provided some sorts of documents like the contract, but beyond that I am not sure.
Q. Did you, in fact, provide any documents to the State immediately before your deposition?
A. I don't believe so.
Q. You did not provide a copy of Exhibit 9 in this contract, for example?
A. I am not sure what Exhibit 9 is off the top of my head.
Q. Exhibit 9 is the document we were just looking at, the contract between the State and -- Professional Services Contract, State of Florida, Department of Legal Affairs, and I have it on the screen. Did you provide that document to the

State?

A. I am not sure I had seen this document before today. So no, I did not provide a copy of that document.

Q. What communications, if any, did you have with anyone from the State from April 4, 2024, to November 1, 2024?

MS. LAMIA: Are you asking him also communications with the lawyers?

MS. MEAD: I think I can do this better, so strike it and I will keep going.

Q. What involvement, if any, did you have with the preparation of invoices to the State of Florida for this matter?

A. I don't prepare invoices. I send hours, and then the invoices are prepared by GBX.

Q. I will mark as Exhibit 10 an invoice with "GBX" at the top, and it says invoice number 2591 invoice, dated November 30, 2024.

(Exhibit 10, GBX Invoice Number 2591, marked for identification, as of this date.)

Q. Have you seen a copy -- and I will share my screen -- of this document before today?

A. I don't believe I have. No, I don't

A. Alter, Ph.D.

believe I have. Sorry, there was a -- there was an inset above it. No.

Q. When you reviewed -- strike that.

When you provide your time to the staff at GBX, do you record all of your time?

A. Yes.

Q. And when you provide your time to the staff at GBX, do you try to be as accurate as possible?

A. I always endeavor to do my best, yes.

Q. And how long have you been working with GBX?

A. I believe we started working together in either 2021 or 2022.

Q. Have you had any issues in the past with GBX issuing invoices in terms of inaccuracy?

A. I don't believe so.

Q. Now, the first time entry here is November 1, 2024: "Adam Alter call with GBX."

And then the second is November 3, 2024: "Adam Alter reviewing materials."

Do you see that?

A. I do.

Q. Is this the first work you had done in

A. Alter, Ph.D.

this case?

A. I am not sure off the top of my head that I can answer that.

Q. Why not?

A. Because you have just shown me this particular invoice with a couple of dates on it. I just am not sure. I would need to go back and look at my accounting of hours and so on.

Q. Do you -- strike that.

Sitting here today, do you remember doing any work in this case before November 1, 2024?

A. I will be totally honest, I don't think of my work that way. I don't automatically capture and store in long-term memory every minute of work that I do. That's why I write down or record the hours of work that I have done.

Q. I will give you a different reference then. Do you recall doing any work in this case before the end of summer?

A. I can't recall off the top of my head. I have done a lot of work on a lot of different cases in the last six to 12 months, and so it's hard for me to pin that to a particular time

A. Alter, Ph.D.

period.

Q. Are you engaged by other states to defend any other state statutes?

MS. LAMIA: Objection to the form.

A. I am not sure that I am engaged to defend statutes, but I am engaged very broadly speaking on similar matters with some other parties.

Q. What are those matters?

A. I am honestly not sure how much of this I can and can't discuss. I am not sure which matters are under protective orders and which ones are not. But there are related matters.

Q. I will try to ask the question around it then.

A. Okay.

Q. Have you served an expert report in any similar matters?

A. I don't recall off the top of my head an expert report on a matter very similar to this one, no.

Q. Have you given any testimony, whether as a declaration, affidavit or deposition, in any similar matters?

A. Alter, Ph.D.

A. The only testimony I have given declaration, deposition, or trial is listed in the appendix in my declaration, and there are no matters like this listed there.

Q. Are you charging the same hourly rate of $1300 per hour in those other matters?

A. In some of them I am. There are matters where there are different rates, some of which go back quite a long way in time to when I first started doing expert work, and so some of those clients have been grandfathered in at lower rates. But this is my standard rate. So I have worked on a few matters recently, in fact, this month involving rates that were very similar to this or are identical to this.

Q. Have you charged a rate higher than $1300 an hour?

A. No, that's my standard rate.

Q. I will look at entry 8.

Now, you describe Mark Pelofsky as a principal at GBX, correct?

A. Yes.

Q. What is his educational background?

A. I am not sure I can answer that for you.

A. Alter, Ph.D.

I know something of his alma mater but not what degree he did or anything else like that.

Q. What is his alma mater?

A. I know he is an undergraduate at Harvard, but I don't know what he studied.

Q. Did Mr. Pelofsky do any substantive work in this case?

A. I am not sure I understand what you mean by "substantive." Maybe you can define that for me.

Q. Well, so, for example, there is a time entry: "Review declaration research."

Do you know what that means?

A. It's possible that it refers to the fact that I had sent a particular request to the team at GBX. I said to them: Here is some background information. I believe this is a relevant concept. Will you do a quick literature search to make sure that I haven't missed anything? And then I believe Mark would have reviewed the research that would have been done on that question. But in all cases, essentially I direct GBX, and they go and do the things that I ask them to do. And I imagine Mark oversees the process of ensuring that before that

research has been delivered to me, it's been done in a way that's appropriate.

Q. And does Mr. Pelofsky have any graduate degrees?

A. I actually don't know the answer to that question.

Q. Does Mr. Pelofsky have any experience in psychology?

A. I am not sure what his undergrad is in.

Q. Do you know if he has any work experience in the field of psychology?

A. I am not sure.

Q. Do you know if Mr. Pelofsky has any work experience in medicine?

A. No, I am not sure.

Q. Who is Evan Taylor?

A. Evan is one of the employees at GBX who does a number of different kinds of work supporting me in a lot of my expert testimony matters.

Q. How, if at all, does his work differ from that of Mr. Pelofsky?

A. I described earlier sometimes I will ask people to review a particular area of literature. They will come back sharing what they have found.

A. Alter, Ph.D.

Evan will often be engaged in the business of combing the academic landscape for literature, and then I imagine Mark oversees that process. But Evan will often deliver the summary that I have asked to be generated, and so he works perhaps more directly at the process of gathering the information and then will deliver it to me.

Q. What is Mr. Taylor's educational background?

A. I am not in a position to tell you everything about his background. I believe he has a doctorate in philosophy, but I am not 100 percent sure.

Q. Are you aware of any other graduate -- strike that.

Are you aware of any other degrees that Mr. Taylor has?

A. I assume he has others if he has a Ph.D., but I am just not sure as I sit here what those are.

Q. Are you aware of any work experience that Mr. Taylor has in psychology?

A. I cannot be sure, though I know he is very familiar with a number of concepts that I

A. Alter, Ph.D.

sometimes describe which indicates a level of background. But as always, he essentially gathers the information and delivers it to me to form a judgment about whether that information is relevant. So ultimately everything in the declaration rests on me, and I apply my expertise in understanding and processing that information.

Q. Who is Justin Pelofsky?
A. Justin is another employee at GBX.
Q. What is his educational background?
A. I don't know.
Q. Does he have a graduate degree?
A. I -- I am not sure. I'm sorry I can't tell you.
Q. Does he have any work experience in psychology?
A. I can't say. I am not sure.
Q. Does he have any work experience in medicine?
A. I don't know.
Q. How, if at all, did the work that Justin Pelofsky do -- strike that.
How, if it did, did Justin Pelofsky's work here differ from that of Mark Pelofsky and

A. Alter, Ph.D.

Evan Taylor?

A. I am not sure exactly what their relative roles were. Part of the reason for working with a company like GBX is I will ask for a particular task to be done, and then it's done, and I am given the product of that work. I always review it myself. I make sure that it is a response to exactly what I asked the team to do. And so I am not always sure of exactly what roles each of the individuals plays. But I receive the product of that work, and then I evaluate it and make sure that it's relevant and that it's sound.

Q. Who created the first draft of your declaration Exhibit 1?

A. I believe I did.

Q. I will mark as Exhibit 11 a document entitled invoice GBX Holdings, LLC, Invoice Number 2645, invoice date 12/31/24. And I take it you likewise have not seen this invoice before today.

(Exhibit 11, GBX Invoice Number 2645, marked for identification, as of this date.)

A. I have not.

Q. Who is Alex Wesson?

A. Alter, Ph.D.

A. Alex is another employee of GBX.

Q. What is his educational background, if you know?

A. Alex is a woman. I am not sure exactly what her background is.

Q. Apologies.

A. No, that's okay.

Q. To her I suppose.

But do you know if she has any work experience in psychology?

A. I am not sure.

Q. Do you know if she has any work experience in medicine?

A. I don't know.

Q. Who is Peter Calkins?

A. Another employee of GBX.

Q. What is Mr. Calkins' educational background, if you know?

A. I don't.

Q. Does Mr. Calkins have any background in psychology?

A. I am not sure.

Q. Does Mr. Calkins have any background in medicine?

A. Alter, Ph.D.

A. I don't know.

Q. Do you know how many hours total you have billed in this matter?

A. I don't.

Q. Have you billed any time for which you have not yet invoiced?

A. Yes, this month. So the bills come once a month I believe. I am asked to deliver my hours at the end of the month. So there will certainly be some hours for this month including this deposition.

Q. Can you estimate how many hours you have incurred in this month?

A. I haven't looked or calculated. I just list them down as I do them, and I don't sum them until the end of the month. So I'm sorry, I am not in a position to deliver that information.

Q. How many hours do you believe you have billed in this matter --

A. I am not sure.

Q. -- before -- let me finish my question. I suspect it's the same answer, but let me get the full question out.

How many hours have you billed in this

A. Alter, Ph.D.

matter before January 1, 2025?

A. I am not sure. It would be a guess, and I just don't know.

Q. Would it surprise you to learn that you had billed fewer than 36 hours in this matter by January 1, 2025?

A. Not particularly, no. That sounds like it's an appropriate number.

Q. So you believe that fewer than 36 hours in this case is an appropriate number to render the declaration including the opinions you provided here?

MS. LAMIA: Objection to the form.

A. The declaration I believe was submitted in January; is that correct? I believe that's right. And so there is some work that would have happened between January 1 and the submission of the declaration. Possibly quite substantial that would have been added to the number. But I do my best to be efficient and to do the work as well but also as efficiently as possible, and it's possible that it's 30-something hours. I couldn't comment. As I said, I don't -- I don't tend to tally hours. That's just not the way I approach this sort of

A. Alter, Ph.D.

work.

Q. What -- strike that.

What, if any, role did the declaration of Jean M. Twenge play in your opinion here?

A. It played no role. I was not aware of Dr. Twenge's declaration until after I submitted my report.

Q. So you have only reviewed the final version of Dr. Twenge's declaration?

A. Yes, the submitted version.

Q. You had no input into Dr. Twenge's declaration?

A. Certainly no direct input. I haven't spoken to Dr. Twenge at all.

Q. My next question: Have you had any communications with Dr. Twenge about your expert opinions in this case?

A. No.

MS. MEAD: Now would be good for a break. I think we have been going a while. Does that sound good to everyone?

THE VIDEOGRAPHER: This ends Unit 5. We are off the record at 2:28.

(Recess taken.)

A. Alter, Ph.D.

THE VIDEOGRAPHER: This begins Unit 6.
We are on the record at 2:38.

Q. Good afternoon again, Professor Alter.

A. Good afternoon.

Q. Have you had any communications about the substance of your opinions today during breaks with the State attorneys?

A. I have had no communication at all with the State attorneys.

Q. I will mark as Exhibit 12 a document titled Global Prevalence of Digital Addiction in General Population: A Systematic Review and Meta Analysis. The lead author is Shi-Qiu Meng, if I pronounced it correctly. It is accepted for publication January 2022. And I will represent to you this was provided to us by the state's attorneys, and in the introduction it begins with the number of active digital users was 4.66 billion for Internet, 4.32 billion for mobile Internet, and 4.2 billion for social media by January 2021.

(Exhibit 12, Document titled "Global Prevalence of Digital Addiction in General Population: A Systematic Review and Meta Analysis", marked for identification, as of

A. Alter, Ph.D.

this date.)

MS. LAMIA: Excuse me, Counsel. Can you just give me ten seconds, please?

MS. MEAD: Sure.

MS. LAMIA: Sorry about that.

Q. Have you read this article before today; do you know?

A. Yes, it was cited in my declaration I believe.

Q. And it says: "However, persistent or recurrent use of digital media referring to digital devices, e.g., computers, smartphone, and related activities, games, social media, could lead to digital addiction."

It goes on to say: "Digital addiction is an umbrella term incorporating subtypes of the longstanding problem of Internet addiction, the highly discussed issue of game addiction, and the emerging topic on social media addiction or other digital media addiction."

Do you see that?

A. Yes.

Q. Now, under your theory of behavioral addiction individuals can't be addicted to the

A. Alter, Ph.D.

Internet, correct?

MS. LAMIA: Objection to form.

A. I think that's a very broad term. Usually people do things on the Internet that can be defined more narrowly so you are not addicted per se to the Internet. It's something you are doing on the Internet. But yes, certainly that's the vehicle through which you might access certain experiences that you developed an addiction to.

Q. And under your theory of addiction, one can be addicted to use of the mobile Internet, correct?

A. Again, the mobile Internet is a way of delivering a lot of experiences. So to the extent those experiences live on, for example, smartphones, that could be the vehicle that drives those experiences and therefore the vehicle that drives that particular behavioral addiction.

Q. And under your theory of behavioral addiction, one can become addicted to social media, correct?

A. Yes.

Q. Under your theory of behavioral addiction it could sweep in billions of people

A. Alter, Ph.D.

worldwide, correct?

A. Theoretically, absolutely, yes. The definition is not trying to be contained to a particular part of the population or to speak to certain parts of the population. It's a definition that will capture who it will capture. It's agnostic about the size of population that it captures.

Q. And your definition of behavioral addiction could sweep in an enormous amount of digital activity, correct?

MS. LAMIA: Objection to the form.

A. It could theoretically do that, absolutely. In the same way that if everyone on the planet started smoking and developed a nicotine addiction, there would be more people captured by that particular addiction. And so it's really just a matter of what the data tells us about the number of users.

Q. But, in fact, many billions of people are using the Internet, mobile Internet, and social media, correct?

A. That's what I see here based on Statista's accounting, yes.

A. Alter, Ph.D.

Q. And, in fact, China has erected what's called the "great firewall of China" to regulate speech on the Internet, correct?

MS. LAMIA: Objection to the form.

A. Sorry. I am not sure. I am not an expert on China's approach to these issues.

Q. Have you ever heard of the "great firewall of China"?

A. I haven't heard of that specific term.

Q. I point you to the second page of this document. It says: "Epidemiological studies showed the prevalence of different subtypes of digital addiction ranging from .5 percent to 84 percent with great variations in subtypes of digital media diagnostic tools and methodological quality and bias from small sample size, single population, nonrandom sampling, and invalidated screening methods."

Do you see that?

A. Yes.

Q. How would you describe the range from .5 percent to 84 percent?

A. I am not sure what you are asking exactly.

A. Alter, Ph.D.

Q. Is it a large range?

MS. LAMIA: Objection to form.

A. I need to know more about the context of what the range refers to, but generally speaking, just in simple numerical terms, .5 to 84 is large. But the way you interpret the size of that range will depend on the context and what feeds into those differences.

Q. If you have a population of a billion, how large is the size of range between .5 percent and 84 percent?

A. Well, this says they are --

MS. LAMIA: Objection to form.

A. Sorry.

They are talking about different subtypes of digital addiction, and so some of them may be more prevalent than others. We are talking about apples and oranges. So yes, this range could vary dramatically depending on what we are discussing. Some of this might be about measuring techniques, but some of it might be different subtypes of digital addiction.

Q. What do you estimate the prevalence of digital addiction as you have defined it is for the

A. Alter, Ph.D.

technologies regulated by HB3?

A. I refer to two numbers that are described in this article. I don't intend for them to be definitive or canonical, but they illustrate a particular number that these authors arrived at. And what I intended to do by referring to them was just to give a point estimate which is such that it captures a large part of the population. We are talking about many billions of people or certainly hundreds of millions of people. And so that illustrates that the size of the effect or the population that's captured here is large.

Q. So it's many billions or hundreds of millions of people that use the Internet to send and receive texts, for example?

A. I said billions or maybe hundreds of millions. But yes, I mean we are talking about a large part of the population that uses these modalities. But as I have had discussion with other people about this issue, I come to realize that we are essentially just describing what's going on here. This is a form of technology or technology that has reached many billions of people. It could be problematic for many of them,

A. Alter, Ph.D.

and that would just be a fact. And indeed other addictions, say nicotine addiction at various points in history has affected many millions of people. So yes, as I see the data, I just basically read it as it sits there and it turns out it captures a large part of the population.

Q. Does tobacco use inherently involve speech?

MS. LAMIA: Objection to the form.

A. I am not sure I understand the question.

Q. Does smoking a cigarette involve speech?

MS. LAMIA: Objection to the form.

A. I don't think so. I am not sure how you are using the word "speech." But no, I wouldn't say so.

Q. Does creating content involve speech?

A. I am not sure. That's not --

MS. LAMIA: Objection to form.

A. That's not a question I have been asked to examine. And also the concept of speech varies depending on the context, and I am not in a position here to offer a response on that.

Q. Does creating video content where someone is speaking involve speech?

A. Alter, Ph.D.

MS. LAMIA: Objection to the form.

A. Again, there are lay definitions of speech. There are probably legal definitions of speech. I am not sure. I wasn't asked to opine on that question.

Q. Do you know what "fan fiction" is?

A. In general I do understand what fan fiction is, yes.

Q. Does writing and posting fan fiction involve speech?

MS. LAMIA: Objection to form.

A. Again, sounds like you are asking me to make legal conclusions. There is a lay definition of speech and then there are legal definitions, and I was not asked to opine on whether different forms of communication represented speech.

Q. What is World of Warcraft?

A. It is a video game.

Q. Under your definition of behavioral addiction, is it addictive?

A. Certainly to some of its users, yes.

Q. Have you ever seen a Netflix documentary titled The Remarkable Life of Ibelin?

A. I don't believe so.

A. Alter, Ph.D.

Q. About a Norwegian gamer named Mats Steen.

Does that refresh your recollection?

A. No.

Q. Do you believe 41 percent of the population has suffered from at least one behavioral addiction over the past 12 months?

A. That's probably a line from Irresistible. I remember the number 41 percent. Certainly something that I have heard described. Something that Mark Griffiths has claimed and others I believe have pointed to as a viable number. That number was grounded in the world such as it was in 2016, '17. I don't know about the extent to which that might have shifted, but that sounds like a plausible figure.

Q. Do you believe the number has shifted upward or downwards since 2016 or '17?

A. Across all behavioral addictions I couldn't say, but my understanding is that people are spending more time on screens than they were previously and more time on social media platforms in aggregate, and at the individual level. So my guess is that it has gone up, but I can't be sure.

A. Alter, Ph.D.

Q. Do you agree the highest risk period for addiction is early adulthood?

A. I think that's a very broad question, and it really depends on how you define addiction in that context. So it would be difficult for me to say what you mean by that or how to answer that question given the woolliness of the definition of addiction there. If it's about a particular form of addiction that affects older people or younger people, that number -- that age bracket might shift.

Q. I will mark as Exhibit 13 a document entitled Irresistible: The Rise of Addictive Technology and the Business of Keeping Us Hooked. This is exported from the Kindle version of the book using a plug-in called Bookcision, and I have also added page numbers to the hard copy. I believe you have a hard copy. And we have a couple of other ways we can do this, but I will represent to you that this has been exported from the book. And I will point you to an excerpt. Copies of these excerpts are going around.

(Exhibit 13, Excerpt from "Irresistible: The Rise of Addictive Technology and the

A. Alter, Ph.D.

Business of Keeping Us Hooked", marked for identification, as of this date.)

Q. What is under the heading The Biology of Behavioral Addiction, and the last paragraph, says: "The highest risk period for addiction is early adulthood. Very few people develop addictions later in life if they haven't been addicted in adolescence. One of the major reasons is that young adults are bombarded by a galaxy of responsibilities that they are not equipped to handle. They learn to medicate by taking up substances or behaviors that dull the insistent sting of those persistent hardships. By their mid-20s, many people acquire the coping skills and social networks that they lack in adolescence."

Did you write those words?

A. I don't have a copy of the book with me. I really wish I did because then I can see which part of the book that lies in and I can give you the context for it immediately.

But yes, that looks like something I would have written in the book, but it would have followed some other discussions, and I just don't have that in front of me. It's a little tricky for

A. Alter, Ph.D.

me to tell you where that sits in the context of everything else there. But yes, that sounds like something I wrote in the book, for sure.

Q. I will point you to what's contained on Page 291 of the book. It's got a Kindle location too, but I think I am the only one who reads it on screen. It says: "But not all addictive experiences are bad. In theory, the same hooks that drive addiction can also be harnessed to drive healthier eating, regular exercise, retirement saving, charitable giving and committed studying. Sometimes the problem isn't that we are addicted to the wrong kinds of behaviors but rather that we abandon the right kinds. Behavioral architecture is just a tool for doing less of the wrong things. It's also a tool for doing more of the right things."

Did you write those words?

A. Yes, I was writing in that section about the fact that the hooks that we talk about are themselves agnostic and can be used to drive people to do things that are ultimately good for them. So the term addictive experiences here is a kind of catch-all for these hooks as they are used, but

A. Alter, Ph.D.

they can certainly drive -- here you can see healthy eating, regular exercise, retirement savings, charitable giving, and so on. So that's what I was writing about here.

Q. Did you do any analysis in your expert work here about whether HB3 would eliminate any hooks that had been harnessed to drive healthy activities?

A. That wasn't what I was asked to do in the context of this report. I was asked to investigate the hook such as they mapped on to behavioral addiction, which as I have defined it in the declaration as a negative experience. So I was focused on that question, not on the question of what effect it would have on positive outcomes. That wasn't part of the declaration.

Q. I will point you to the epilogue. It says: "Half of the developed world is addicted to something, and for most people that something is behavior. We are hooked on our phones and e-mail and video games and TV and work and shopping and exercise and a long list of other experiences that exist on the back of rapid technological growth and sophisticated product design. Few of those

A. Alter, Ph.D.

experiences existed in the year 2000, and by the year 2030 we will be grappling with a new list that barely overlaps with the current roster."

Did you write those words?

A. Absolutely, yes. I wrote those nine years ago, and they still hold true.

Q. Under your theory of behavioral addiction, would a government be justified in regulating half of its population?

MS. LAMIA: Objection to form.

A. I am not here as a policymaking expert. I am not here to opine on the applications of legislation, and that wasn't what I was asked to do in the context of my engagement here.

Q. Under your theory of behavioral addiction, people can be addicted to telephones, correct?

A. Well, as I said, the experiences that they derive through their phones or for which their phones provide access.

Q. Under your theory of behavioral addiction, people can be addicted to e-mail, correct?

A. If they feel like they compulsively need

A. Alter, Ph.D.

to check their e-mails or send e-mails or read e-mails and that leads to harm, then absolutely, that would fall under the banner of the definition that I supplied in my declaration.

Q. Under your theory of addiction, people can be addicted to video games, correct?

A. Same response. As long as they satisfy the definition.

Q. Under your theory of addiction people can be addicted to television, correct?

A. Certainly possible if they fall under the banner of the definition.

Q. Under your theory of behavioral addiction, people can be addicted to work, correct?

A. Again, it's possible if they fall under the banner of the definition.

Q. Under your theory of addiction, people can be addicted to shopping, correct?

A. Again, if they satisfy the definition.

Q. And under your theory of behavioral addiction, people can be addicted to exercise, correct?

A. In theory, people can be addicted to all of these, including exercise. The question is the

A. Alter, Ph.D.

prevalence of each of these and the kind of harms that are done.

Q. And if your theory of behavioral addiction can justify government intervention, it could justify regulation of all of these activities, correct?

MS. LAMIA: Objection to the form.

A. As I just answered when you asked me about a similar question earlier, I am not a policymaking expert. I am not here to opine on what the government can and can't do. Its role as a legislative body and my role really is confined to describing behavioral addiction and indicating the extent to which certain features described in HB3 overlap with or are related to various hooks that are embedded in certain platforms. And that's what I did in the declaration.

Q. Now, in your book Irresistible, do you -- you recommend solutions, correct?

A. I very humbly try to suggest some. This, again, was couched in the world such as it was about a decade ago. And so I did my best to offer some solutions, yes.

Q. And you also did press interviews and

A. Alter, Ph.D.

events surrounding Irresistible, correct?

A. Yes.

Q. In either the book or any of those press interviews, before 2023, did you ever recommend a legislative ban on the use of any app?

A. I have very long discussed two forms of intervention: Bottom up interventions which are at the level of the user and top down interventions. And for many years I have said that the interventions really need to stem from the top down, and that includes legislative intervention. So it's an idea that I have certainly discussed.

Q. Sir, that wasn't the question.

Before 2020, in either your book or any of the press surrounding it, did you ever recommend as a solution any legislative ban on apps?

MS. LAMIA: Objection to the form.

A. I'm sorry, I think you changed the number from 2023 to 2020; is that right, or am I misremembering?

Q. Yes.

A. Okay. I'm sorry. Are you asking about 2020 or 2023?

Q. 2023.

A. Alter, Ph.D.

A. I can't recall exactly what I have suggested, but I also have done literally hundreds of events, many of them to smaller audiences, many of them not recorded or disseminated. I have spoken to governments around the world, and I certainly discussed the possibility of interventions of a legislative nature.

Q. Sitting here today, can you recall before 2023 ever recommending as a solution to what you posit is behavioral addiction a governmental ban on any app?

A. A complete ban on the app are you asking?

Q. Yes, let's start there.

A. I honestly can't recall. I don't recall. I have spoken about certainly legislative interventions so many times. I can't recall if I have actually described full legislative bans of these particular platforms. It's possible, but I can't recall off the top of my head.

Q. Sitting here today can you recall before 2023 ever advocating for a legislative ban against some users using any apps?

A. Again, I can't recall the specifics. I

A. Alter, Ph.D.

have certainly discussed legislative intervention. That may have involved in some of the discussions talk of particular populations being legislated out of using particular platforms. But I can't recall the specifics of what I have discussed at any particular point in time.

Q. Sitting here today, can you identify before 2023 any psychologists or medical doctor that recommended legislative bans on any users from any apps?

MS. LAMIA: Objection to the form.

A. That's just not my role in this case. I haven't been combing the opinions of every researcher, psychologist, practitioner, clinician to understand which ones believe what about the nature of specific bans. I know that a lot of the suggestions that academics experts, practitioners, and clinicians have made are consistent with the idea of limiting or even eliminating use by young people from apps. So this certainly doesn't seem like it's a big leap from what I have heard people advocate for.

Q. Can you identify any that are not couched as recommendations to parents?

A. Alter, Ph.D.

A. I have certainly discussed the possibility of those interventions coming from government, and one of the reasons for that is because it's very difficult for an individual parent to make decisions when other parents are making different decisions. And so I have certainly talked about and heard other practitioners and clinicians talk about the possibility of broader bans that then might make it easier for parents to manage what becomes a very, very difficult process that seems to drive great harm.

Q. But parents can physically take a cellphone away from a child, correct?

A. That is a very broad hypothetical question. It sort of depends on the age of the child, on the nature of the parental relationship. Parenting is very complicated. And so I think requiring parents to effectively undo the force of these hooks and the harms that are done by them, by just saying you can take the phone away is a simplistic assessment of the situation, and it's not how I believe we can make real inroads into minimizing these harms.

A. Alter, Ph.D.

Q. Given the complexities of parenting, should governments be mandating how parents parent?

MS. LAMIA: Objection to the form.

A. That's certainly not my role here. I am not here to tell you the way governments should or should not be involved in the parenting process.

Q. Now, there are households in Florida with handguns in them, correct?

A. I imagine so.

MS. LAMIA: Objection to form.

Q. Have you ever heard of a gun safe?

A. I have heard of the concept of a gun safe.

Q. Is there any reason a parent couldn't take a child's cellphone away and put it in a gun safe if they wanted them to stop using the cellphone?

A. I am not in a position here to equate and consider the differences and similarities between gun safety and cellphones and smartphones and social media platforms. That's not something I was asked to investigate, and I am not in a position to comment on those issues.

Q. Have you ever heard of a device called

A. Alter, Ph.D.

Brick?

A. Yes.

Q. What is it?

A. It's a device that you can program to essentially turn off certain applications or I believe even perhaps wifi such as it would be delivered to a phone to enable certain applications. And it can be used to do that temporarily or for even longer periods of time.

Q. And parents can use Brick to regulate their children's use of cellphones, for example, correct?

A. Hypothetically you could use Brick to do that. In practice, Brick as a standalone tool that undoes the hooks associated with social media platforms completely seems to me to be an impractical solution.

Q. Well, people do, in fact, use Brick, correct?

A. I imagine it's one of the tools that people have tried to use to deal with what is an overwhelming mismatch between their own self-control resources and other resources against companies that have done a very good job of

A. Alter, Ph.D.

embedding their platforms with these hooks that lead to compulsive overuse.

Q. Brick is an actual product, not a hypothetical one, correct?

A. Yes.

Q. What is Moment?

A. Moment is an app, as I understand it, that measures how long people use certain features on their phones. I haven't tracked the development of Moment over time, but that's what it was when I was most closely affiliated with the founder of Moment and when I recognized what -- what the app was doing. But its function may have changed over time. I am not totally sure.

Q. And is Moment a tool parents can use to monitor their children's activities on their cell phones?

A. In theory, Moment could do that. It could track usage patterns, which goes a very, very small way to actually dealing with the problem at large. But that would provide one source of information about the problem, yes.

Q. What is Opal, if you know?

A. I don't.

A. Alter, Ph.D.

Q. And parents can also physically take a tablet away from a child, correct?

A. In theory, absolutely, yes.

Q. Parents could physically take a laptop computer away from a child, correct?

A. In theory, parents can take a lot of things away from their children. If you see a problem that has existed and is only getting more problematic over time, despite the fact that the parents have those solutions, I think it's clear it's not a sufficient solution for this particular problem.

Q. Or are you questioning the judgment of the parents in not taking away the device?

A. I am not here to pass judgments on parents. I am here to read the landscape such as it exists today. As it exists today, there are major harms being done by social media platforms despite the fact that parents have whatever particular avenues I described here for dealing with those harms, which indicates to me that those particular avenues are insufficient.

Q. But you support taking away from parents the option of monitoring use of children under the

A. Alter, Ph.D.

age of 14, correct?

MS. LAMIA: Objection to the form.

A. I am not sure where you would have derived that analysis of my views. Certainly something I described in my report as far as I recall it.

Q. And a parent could physically take away a non-laptop computer, correct?

A. Again, parents have many different options at their disposal. They can take away all sorts of devices. But in this particular context it's not clear to me that those particular options have been valuable or have done the job they need to do.

Q. Do you know the percentage of kids for which the initial purchase of a cellphone is made by the parent?

A. I am not sure of that statistic. It's not something I was asked to look into.

Q. Do you know the percentage of kids for which the initial purchase of a tablet is made by a parent?

A. I couldn't say. I am not sure.

Q. Do you know which percentage of kids for

A. Alter, Ph.D.

which the initial purchase of a computer was made by a parent?

A. I don't know that number.

Q. Is there any reason a parent couldn't use more general security features like passwords, biometric identification, and dual factor identification to keep a child locked out of a device?

A. These are all options that I imagine are available today, and they have not done the job. I hear from hundreds, if not thousands, of parents constantly about these issues, and they tell me that there is just no viable way that they can manage this problem the way things stand.

But, again, my role is not here to discuss the application of legislation or the nature of parenting in 2025. It's really just to describe the behavioral addiction and the nature of the hooks that are embedded in these platforms that seem to drive those addictions.

Q. What's Waste No Time, if you know?

A. I can guess, but I am not sure I am familiar with that particular movement.

Q. I think your attorney will prefer you

A. Alter, Ph.D.

not guess.

A. Yes, I agree.

Q. I will mark as Exhibit 14 a document entitled Complaint for Declaratory and Injunctive Relief.

(Exhibit 14, Document entitled "Complaint for Declaratory and Injunctive Relief", marked for identification, as of this date.)

Q. And ask have you seen this document before today?

A. Yes, I have.

Q. When did you first see it?

A. I am not sure when I first saw it, but I it was after it was filed. So I am guessing it was probably in October or November, but I can't be sure.

Q. I will point you to paragraph 24, Device-Level Restrictions: "Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place, and those who choose to let them use such devices have many ways to control what they see and do." And it goes on to reference products from

A. Alter, Ph.D.

Apple and various other controls.

Have you evaluated all of the documents cited here in forming your expert opinion?

A. I don't believe I specifically evaluated all of these documents that are referred to. I have an understanding of the tools at parents' disposal. As I said earlier, I believe those tools are insufficient given the current landscape, but I understand that these are claims that have been made in the complaint.

Q. Did you, in fact, drill down into the cited documents in paragraph 24 to evaluate these device-level restrictions?

A. I don't believe I have, but I am not totally sure. I can't recall off the top of my head which of these links I followed.

Q. I point you to paragraph 25, Network-Level Restrictions: "Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices to ensure that they are texting and chatting with only parent-approved contacts and restrict screen time for certain hours." Then there is a bunch of sources cited here.

A. Alter, Ph.D.

Did you review any of these underlying sources?

A. I just know that these are facts that you can have access to these certain networks and the features on those networks to do this kind of thing. The fact is that despite the existence of all of these, my experience is after speaking to many people and looking at the research that these are insufficient. These have not done what's needed to give parents the kind of control they are seeking. I very rarely, if ever, had a parent come to me and said: Thank God I can enable network-level restrictions because there is no problem anymore. They all say to me: I don't know what I am going to do here. This is a terrible problem for me. And I hear that over and over again. So yes, I understand these are theoretical options, but I haven't seen them do the job that's required.

Q. How much of your expert opinion here is grounded in repeating what parents have told you?

MS. LAMIA: Objection to form.

A. My role is to essentially gather evidence and to do that dispassionately as a

A. Alter, Ph.D.

scientist. I have been doing that for 12 years. Much of that time did not involve speaking to parents. Certainly before my book was released when I formed the original opinions that form the foundation of the book, I was not speaking to parents.

But in the course of discussing the book, and describing the research I have spoken to parents and policymakers and government officials and others across time, and I have certainly heard echos of these concerns for many of these people. But if you are asking me if I am simply parroting what parents have told me, the answer is absolutely not. They echo my concerns. What they tell me dovetails with what the research shows. But I would not say I am here just to tell you what I heard from parents. It's just that they echo my concerns.

Q. What is the population of parents in the state of Florida?

A. I am not sure.

Q. What do you mean by "population"? That's a term of art in statistics?

MS. LAMIA: Objection to the form.

A. Alter, Ph.D.
A. The term "population" in a statistical sense means the full set of people or other individuals, if not people, that are described by a set of criteria. So you are asking me about parents. I can't tell you how many parents there are in total across all of Florida.
Q. Have you ever taken a sample of parents' opinions in the state of Florida about restrictions on use of devices by children?
A. No, that's not something I was asked to do. I have certainly over time spoken to many parents, and some of them in Florida. But I did not at any point intend to represent a particular proportion of parents who agree or disagree with any facet of any particular argument. That's not my role here.
Q. And there could be a selection bias in the parents who seek you out, correct?
A. It depends on the context. If a parent comes to me and says, I have a concern, I read your book, absolutely. That parent is coming to me because specifically he or she is concerned about something the book addresses.
But I speak to very large audiences,

A. Alter, Ph.D.

sometimes with a very big range of parents, some of whom come there with absolutely no background on what I am discussing. Often I am brought in as a speaker in an audience where there is no preexisting reason why anyone would come in with concerns. So the nature of the engagements varies pretty dramatically. And I also speak to audiences that are, by their nature, supposed to be dispassionate.

Q. The subtitle of your book is The Rise of Addictive Technology and the Business of Keeping Us Hooked. Would you describe that as an agnostic title?

A. I wouldn't because I have done much research to form the conclusions that I described in the book. The book is certainly not agnostic. But as a scientist I did considerable research to form the views that are described in the book, and my views have only strengthened over time as more evidence has been published as I have spoken to more people since the publication of the book in 2017.

Q. As someone with background in experimental design and statistics, you have the

A. Alter, Ph.D.

capability to conduct a survey of the representative sample of Florida parents, correct?

A. If that were my brief, I would have been able to do something like that. I was not asked to do that, and that was not my role in this case.

Q. And you have not done it, correct?

A. No.

Q. I will point you to paragraph 26, Browser-Level Restrictions, and share my screen. It says: "Parental controls on Internet browsers offer another layer of protection," and then, again, it cites to a bunch of sources.

Have you read any of those underlying sources?

A. I can't be sure, but I am aware of browser-level restrictions.

Q. Are you also aware of application-level restrictions?

A. Yes. As a concept, broadly speaking, yes.

Q. Has any judge anywhere in the country ever issued an opinion addressing -- strike that.

Has any judge in the country ever made a ruling about any of your expert opinions?

A. Alter, Ph.D.

A. I can answer a question about exclusions, but I am not able to answer the question about whether they made rulings.

Q. Have any of your opinions ever been excluded by any judge in the country?

A. No.

Q. Have any of your opinions ever been relied upon by any judge in the country?

A. I believe so, yes.

Q. What was that case?

A. There was a case in Missouri where I offered opinions, and during class certification in the merit stage of a case, and I believe the judge relied on my opinions in that matter. That's what counsel told me.

I was -- I testified in a confidential arbitration in JAMS, and I believe the arbitrator relied on that opinion.

I testified in a case involving the school that's the Western Reserve Academy case. I believe the judge, again, relied on that testimony, that deposition testimony.

I would need to look at the full list, but as I have been informed by counsel, I believe

A. Alter, Ph.D.

yes, in some cases.

Q. The Missouri class action, what was that case about?

A. It was about the manner in which people who own tractors or who otherwise purchased tractor hydraulic fluid understand the commercial landscape and how they make decisions with respect to the purchasing of tractor hydraulic fluid.

Q. Was that class action certified?

A. Yes.

Q. Did you testify for the plaintiffs or defendants?

A. For the plaintiffs.

Q. Did it go to judgment? You may not be familiar with that term.

A. So it went to the eve -- the eve of the trial and then was settled before the trial. I was due to fly over, and then it was settled right before I was due to offer testimony.

Q. Very generally, can you describe what the JAMS arbitration was about?

A. The JAMS arbitration was a case in which a company argued that its manufacturer had not done the job that it had been contracted for, so as a

A. Alter, Ph.D.

result that company failed commercially. And I was asked to opine as a consumer behavior and marketing expert on the prospects of success for that company assuming the manufacturer had done its job.

Q. So you were retained by the plaintiff in that case?

A. Yes.

Q. Did that case end in a judgment?

A. I am actually not sure of the outcome of that case. I am not sure if it's been concluded.

Q. What was the Western Reserve Academy case about?

A. That was a case in which two students at the school had made a post that the school argued was an affront to Black Lives Matter and a number of students at the school were unhappy with and a number of parents were unhappy with. The students were asked to leave the school. And the students sued for defamation, and I appeared on behalf of the school in that matter. So the defense. Or the respondents. I can't recall the term.

Q. You provided a report in that case I take it?

A. Yes.

A. Alter, Ph.D.
Q. Did you give a deposition in that case?
A. I did.
Q. Did you testify in trial in that case?
A. I did not. I am not sure of the outcome of that case though. I may still be asked to do that at some point.
Q. And it was a case involving political speech that students had posted, correct?
A. I am not sure it was political speech. I wasn't asked to categorize it or classify it. But that seems how it's been interpreted by a number of people at the school.
Q. So do you think Black Lives Matter is a political issue?
A. I certainly think Black Lives Matter is a political issue, but it was a big discussion about the nature of the facts in that case and what the nature of that post was. That was at issue in the case. So I don't want to say here one way or the other whether that was political speech. That was one of the issues in the case.
Q. Was the post there speech?
A. Again, I am not sure of the legal definition of speech in this context.

A. Alter, Ph.D.

Q. Under the colloquial definition of speech was the post there speech?

MS. LAMIA: Objection to the form.

A. Well, the speech at issue here I believe is what the school had said to the students. That's why there is a defamation case, so that's why I am pausing. I think it's a question of the speech from the school side and whether the school had engaged in defamation and also the appropriate damage if defamation was found. And that was my role. I was mostly there to comment on a report from plaintiff's expert.

Q. Do you know if the students there claimed that the school had violated their First Amendment rights?

A. I can't recall.

MS. MEAD: If we can take a longer break now, I suspect the next session will be the last session, but I want to consult with all the wonderful folks here who try and make me look good. Does that work? Like 20 minutes?

MS. LAMIA: Sure.

MS. MEAD: Okay. Thank you.

THE VIDEOGRAPHER: This ends Unit 6. We

A. Alter, Ph.D.

are off the record at 3:27.

(Recess taken.)

THE VIDEOGRAPHER: This begins Unit 7. We are on the record at 3:48.

MS. MEAD: Good afternoon again, Professor Alter.

THE WITNESS: Good afternoon.

MS. MEAD: I have no further questions at this time with two qualifications. The State counsel may have questions for you, and I may in turn have follow-up questions about any topic she raises. And two, I believe that there are some documents responsive to a subpoena that the State agreed to produce that the deposition showed were not produced. We will want to review the final transcript, but we also reserve our right to reopen for that purpose. But with those qualifications, I am done.

MS. LAMIA: We don't have any questions. I would object to reopening. I don't know what you are talking about in terms of not being produced. If you let us know, we can certainly handle that, but we are objecting to

A. Alter, Ph.D.

any reopening of the deposition. And Dr. Alter will read.

THE VIDEOGRAPHER: This concludes today's proceeding. Total number of video units used was seven -- excuse me, Counsel, before we go off the record, this is the videographer, will counsel, anybody be ordering the videos of this?

MS. MEAD: We will but not on an expedited basis.

THE VIDEOGRAPHER: Do you know if you want it synced up with the transcript?

MS. MEAD: Yes, we do.

THE VIDEOGRAPHER: This concludes today's proceeding. Total number of video units used was seven. We are off the record at 3:50.

(Time noted: 3:50 p.m.)

_____________________.

ADAM ALTER, Ph.D.

Subscribed and sworn to before me
this ___ day of __________, 2025.

_________________________________

A. Alter, Ph.D.

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF QUEENS )

I, YAFFA KAPLAN, a Notary Public within and for the State of New York, do hereby certify:

That ADAM ALTER, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of January, 2025.

Yaffa Kaplan

YAFFA KAPLAN

A. Alter, Ph.D.

------------------ I N D E X ---------------

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| Adam Alter | Ms. Mead | 7 |

----------- INFORMATION REQUESTS -----------

*NO INFORMATION REQUESTS*

----------------- EXHIBITS -----------------

| EXHIBIT | | FOR ID. |
| --- | --- | --- |
| Exhibit 1 | Expert Declaration of Professor Adam L. Alter | 44 |
| Exhibit 2 | Article entitled "App Store Developers Generated 1.1 Trillion In Total Billing and Sales in the App Store Ecosystem in 2022" | 49 |
| Exhibit 3 | Document titled "Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5," copyright 2013 | 60 |
| Exhibit 4 | Document titled "DSM-5-TR" | 62 |
| Exhibit 5 | Document titled "Social Media And Adolescent Health 2024" | 87 |
| Exhibit 6 | Document titled "American Psychological Association Health Advisory on Social Media Use and Adolescence, May 2023" | 119 |

A. Alter, Ph.D.

----------------- EXHIBITS -----------------

| EXHIBIT | | FOR ID. |
|---|---|---|
| Exhibit 7 | Document titled "American Psychological Association Health Advisory on Social Media Use and Adolescence," May 2023 | 128 |
| Exhibit 8 | Document titled "Media Use in School Age Children and Adolescents" | 134 |
| Exhibit 9 | Document entitled "Professional Services Contract, State of Florida, Department of Legal Affairs, Office Of the Attorney General and GBX Holdings" | 139 |
| Exhibit 10 | GBX Invoice Number 2591 | 145 |
| Exhibit 11 | GBX Invoice Number 2645 | 154 |
| Exhibit 12 | Document titled "Global Prevalence Of Digital Addiction in General Population: A Systematic Review And Meta Analysis" | 159 |
| Exhibit 13 | Excerpt from "Irresistible: The Rise Of Addictive Technology and the Business of Keeping Us Hooked" | 169 |
| Exhibit 14 | Document entitled "Complaint for Declaratory and Injunctive Relief" | 186 |

A. Alter, Ph.D.

DEPOSITION ERRATA SHEET

Our Assignment No. 12224247

CASE NAME: CCIA vs. Moody

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, same and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

___________________________________

ADAM ALTER, Ph.D.

Subscribed and sworn to on the ______ day of

____________, 2025 before me,

____________________________________________

Notary Public,

in and for the State of _____________________

A. Alter, Ph.D.

DEPOSITION ERRATA SHEET

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

SIGNATURE:_______________________DATE:_______

ADAM ALTER, Ph.D.

A. Alter, Ph.D.

DEPOSITION ERRATA SHEET

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

Page No.____Line No.___Change to:____________

_____________________________________________

Reason for change:___________________________

SIGNATURE:_______________________DATE:________

ADAM ALTER, Ph.D.