**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION, et al.,

    Plaintiffs,

v.                                                     Case No. 4:24-cv-00438-MW-MAF

JAMES UTHMEIER, in his official
capacity as Attorney General
of the State of Florida,

    Defendant.

_____/

## **REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

The complaint must be dismissed. Plaintiffs do not identify even a single member that HB3 regulates. They ignore Eleventh Circuit precedent on standing. And they have no answer for *TikTok v. Garland*, 145 S. Ct. 57 (2025); *Arcara v. Cloud Books*, 478 U.S. 697 (1986); *Indigo Room v. Fort Myers*, 710 F.3d 1294 (11th Cir. 2013); or *Gary v. Warner Robins*, 311 F.3d 1334 (11th Cir. 2002), under which HB3 at most incidentally affects speech. The law regulates only platforms that choose to infuse their product with addictive features and then contract with children. By regulating that practice, and reducing children's exposure to the

features, HB3 does not implicate their First Amendment rights. Plaintiffs do not even contend that children have an expressive interest in addictive features.[1]

## I. THE COMPLAINT IS A SHOTGUN PLEADING.

Plaintiffs do not deny that their complaint violates two of the Eleventh Circuit's shotgun-pleading rules by incorporating into each count the allegations of all preceding counts and failing to separate each claim into different counts. Yet Plaintiffs say it would be "borderline frivolous" to make them comply with those pleading standards because, in their minds, their shotgun-pleading violations are "common" and their complaint is "informative enough" for Defendant to move for dismissal. DE62 at 5-6. But Plaintiffs do not cite any cases permitting "a quintessential shotgun pleading" like theirs, *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 n.11 (11th Cir. 2015), just because a defendant managed to slog through it.

## II. PLAINTIFFS LACK STANDING.

Plaintiffs do not dispute that they independently lack standing and instead rely exclusively on associational standing. DE62 at 6-20. But they lack associational standing for three reasons: They fail to adequately allege that any of their members

---

[1] Plaintiffs also have no cause of action under Section 1983 and have not stated a vagueness claim, a preemption claim, or a claim for injunctive relief. As to those issues, Defendant rests on the arguments in his motion to dismiss. DE50 at 24-25, 34-37.

2

would have standing; their claims require member participation; and associational standing cannot be used to assert the rights of social-media users Plaintiffs have no relationship with.

### A. Plaintiffs failed to adequately allege that any of their members would have standing.

**1.** An association must "make specific allegations establishing that at least one identified member" has an injury-in-fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). In a pre-enforcement challenge, that requires specific allegations that at least one identified member is both subject to the challenged law and faces a "credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

Yet nowhere does the complaint "allege that a specific member" satisfies all the criteria in Section 501.1736(1)(e), much less plead facts supporting such an allegation. *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018). The complaint does not identify any member that operates a platform on which "[t]en percent or more of the daily active users who are younger than 16 years of age spen[t] on average 2 hours per day or longer . . . during the previous 12 months." Fla. Stat. § 501.1736(1)(e)2. Nor does the complaint identify any members that "[e]mploy[] algorithms that analyze user data or information to select content for users." *Id.*

3

§ 501.1736(1)(e)3. Because a platform is not regulated by the law unless it meets those criteria, Plaintiffs have not adequately alleged member standing.

Plaintiffs state that they must allege only that HB3 "arguably covers one of [their] members" and that paragraphs "7-9, 50, 63-68" do that. DE62 at 7-8. But none of those paragraphs even mentions the law's criteria. So Plaintiffs pivot and assert that their allegations are sufficient because a Florida official in a press conference and Defendant in his preliminary-injunction opposition mentioned platforms that Plaintiffs' members operate. *See* DE62 at 8. But standing must be "evaluate[d] . . . based on the facts alleged in the complaint." *Duty Free Ams. v. Estee Lauder*, 797 F.3d 1248, 1271 (11th Cir. 2015). And in any event, nothing in the press conference or Defendant's opposition shows how any platform meets Section 501.1736(1)(e)'s criteria.[2]

Read charitably, Plaintiffs make a probabilistic argument. That is, their members operate many large social-media platforms, so it is likely that at least one is regulated. *See* DE62 at 7 ("If HB3 goes into effect, *some* . . . members will unquestionably suffer an injury-in-fact." (emphasis added)). Yet "the Supreme Court has rejected probabilistic analysis as a basis for conferring standing." *Ga.*

---

[2] If Plaintiffs think Defendant's preliminary-injunction opposition is relevant to standing at the pleadings stage, they must acknowledge their own executive officers' confessions that they have no idea which members are regulated by HB3. *See* DE51 at 13-14.

*Republican Party*, 888 F.3d at 1204. Associations must provide "specific allegations" of an injury suffered by "at least one identified member" and cannot rely on a "statistical probability" of injury. *Summers*, 555 U.S. at 497-98. "[G]eneralized assertions" that require courts to "fill in the blanks" do not suffice under Article III. *Upside Foods v. Simpson*, 2024 WL 5274483, at *2 (N.D. Fla. Oct. 11, 2024) (Walker, C.J.).

**2.** Because Plaintiffs claim that HB3 violates social-media users' First Amendment rights, they also had to adequately allege that at least one member would have prudential standing to assert those rights. DE50 at 15. Plaintiffs do not dispute that. Instead, they ignore Eleventh Circuit precedent that forecloses prudential standing here.

First, though, Plaintiffs say they are not in fact asserting only the rights of users; they are also alleging a violation of "their *members*'" rights.[3] DE62 at 15. But Plaintiffs pleaded no such claims. Count I—Plaintiffs' umbrella count for all First Amendment claims—has no allegations that HB3 violates the First Amendment rights of members other than a single sentence stating a legal conclusion that HB3 "interfere[s]" with members' rights. DE1 ¶ 63. Nor do Plaintiffs allege facts about

---

[3] This is a reversal from Plaintiffs' previous positions. When asking this Court to limit discovery, Plaintiffs claimed that this case does not implicate platforms' speech but only whether "HB3 restricts access to speech." DE48 at 4. The shotgun-pleading rules exist precisely to avoid forcing defendants to play whack-a-mole with vague, shifting claims.

5

members' rights elsewhere in the complaint. Their passing legal conclusion does not state a claim.[4] DE50 at 7 & n.2.

As for users, Plaintiffs argue that their members would have prudential standing to assert users' rights under *Virginia v. American Booksellers Ass'n*, which held that the plaintiff could assert third-party rights under the overbreadth doctrine. *See* 484 U.S. 383, 392-93 (1988) (citing *Sec'y of State v. J.H. Munson, Co.*, 467 U.S. 947, 956-57 (1973)). But Plaintiffs cannot rely on the overbreadth doctrine to assert users' rights because HB3 regulates platforms, not users. DE50 at 16-17 (discussing the holding in *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259 (11th Cir. 2023), that the overbreadth doctrine may be used only to assert the rights of those regulated by the statute). Plaintiffs have no answer for *Mata Chorwadi*. They do not even mention it.

Next, Plaintiffs say that a member would have third-party standing under *Craig v. Boren*, 429 U.S. 190 (1976). Yet they do not dispute that they have failed to allege a close relationship between a platform and its users or a hindrance preventing users from asserting their own rights. Rather, Plaintiffs claim that their members need not meet those requirements because HB3 "require[s] them to

---

[4] Even if Plaintiffs had asserted claims based on platforms' First Amendment rights, that would only underscore the need for member participation. *See infra* pp. 7-9. As *Moody v. NetChoice* makes clear, whether a platform is engaged in speech turns on highly specific facts about the platform's operations. *See* 603 U.S. 707, 725-26 (2024).

6

restrict" users from accessing their platforms. DE62 at 17-18 & n.4. According to Plaintiffs, *Craig* excepts such circumstances from the traditional third-party standing requirements. But that flouts Eleventh Circuit precedent requiring directly regulated businesses invoking *Craig* to satisfy the requirements. *See Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041-42 (11th Cir. 2008).

In any event, nothing in HB3 "requires" members to restrict access to their platforms. If a platform chooses not to deploy addictive features, it can give children accounts. *See* Fla. Stat. § 501.1736(1)(e). That highlights another reason that platforms and users do not have "aligned" interests: Plaintiffs have never explained what interest children have in platforms using infinite scroll, autoplay, push notifications, and other features that manipulate them into compulsively consuming social media. *See id.*

### B. Plaintiffs' claims require the participation of individual members.

Plaintiffs assert that associational standing's member-participation requirement is "prudential" and that the Eleventh Circuit has held that it is "premature to dismiss claims 'at the pleading stage'" for failing to meet it. DE62 at 9 & n.1 (quoting *Borrero v. United Healthcare of N.Y.*, 610 F.3d 1296, 1306 n.3 (2010)). The Eleventh Circuit said no such thing. *Borrero* held that dismissal at the pleadings stage was premature *in that case* because it did not appear from a "review of the [plaintiffs'] complaints" that member participation was necessary. 610 F.3d

7

at 1306 & n.3. The court did not announce a "typical[]" rule, DE62 at 9 n.1, against dismissal on the pleadings when, as here, it is apparent on the face of the complaint that member participation *is* necessary.[5]

Plaintiffs contend that member participation is not required because "the Court need only read HB3's text" to resolve their claims. DE62 at 10. In that case, it is unclear why Plaintiffs submitted evidence, including from YouTube and SnapChat, to support their preliminary-injunction motion. But more fundamentally, Plaintiffs ignore that whether HB3 applies to a platform at all turns on information about the platform's users, their ages, and how much time they spend on the platform, Fla. Stat. § 501.1736(1)(b), (e)2.; what algorithms the platform employs, *id.* § 501.1736(1)(e)3.; and what features the platform uses, *id.* § 501.1736(1)(e)4. Because HB3's application "depend[s] upon" individualized findings about the members' "circumstances," member participation is necessary. *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). Plaintiffs' own complaint confirms this—they were not even able to *allege* which of their members are subject to HB3, despite purporting to pursue "as applied" challenges on their behalf.

Plaintiffs are also wrong that the First Amendment analysis would not require member-specific findings. First, Florida's interest in applying HB3 to a platform will

---

[5] Moreover, just because "a standing requirement is prudential does not mean that its application is discretionary." *Leaf Tobacco Exps. Ass'n v. Block*, 749 F.2d 1106, 1112 (4th Cir. 1984*).*

be greater, and the First Amendment interests of the users lower, the younger the platform's user base. *See, e.g.*, *Bellotti v. Baird*, 443 U.S. 622, 635-36 (1979) (plurality op.). Second, as to Plaintiffs' claim that age-verification unconstitutionally burdens adult speech, platforms' existing age-verification practices are relevant to the scope, if any, of the burden imposed by HB3. *See Ga. Cemetery Ass'n*, 353 F.3d at 1322. Third, Plaintiffs assert that platforms' use of parental controls is relevant to tailoring. *See* DE1 at 11-19. If that is so, each member's parental-control practices must be examined. Merely reviewing their policies would not suffice since platforms have "misled parents about their ability to control" their child's account. *A Look Behind the Screens*, Federal Trade Commission, 2024 WL 4272104, at *9 (Sep. 2024).

And on the remedy, the Court would have to evaluate platforms' existing practices because platforms that do not contract with users under 14 or 16, or that do not require users to hold accounts, lack the threat of irreparable harm necessary for an injunction.

### C. In any event, Plaintiffs cannot use associational standing to assert the rights of users.

Though associational standing is a standing exception that allows organizations "to enforce the rights of [their] members," *NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008), Plaintiffs claim they may use it to enforce the rights of nonmember social-media users because their members would have third-

9

party standing to do so. *But see supra* pp. 5-7. Neither case Plaintiffs rely on supports their attempt to use a chain of standing exceptions to assert the rights of people they concededly have no relationship with. As explained above, *American Booksellers* considered the rights of nonmembers under the overbreadth doctrine, which does not apply here because HB3 regulates platforms, not users. *See supra* p. 6. And *Brown*, which Plaintiffs concede did not address standing, DE62 at 19, *was* based on the speech rights of the association's members. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011).

### III. HB3 DOES NOT TRIGGER FIRST AMENDMENT SCRUTINY.

A law triggers heightened First Amendment scrutiny in two ways: (1) it is a "*direct* regulation of expressive activity or semi-expressive conduct," or (2) it regulates commercial activity or conduct but "impose[s] a disproportionate burden" on expression. *TikTok*, 145 S. Ct. at 65-66 (quoting *Arcara*, 478 U.S. at 704). A law imposes a disproportionate burden on expression if its statutory context reveals that despite regulating non-expressive activity, it is "aimed" at expression. *See Arcara*, 478 U.S. at 707. Otherwise, the law only incidentally burdens expression, and heightened scrutiny does not apply. *See id.*; *Sorrell v. IMS Health*, 564 U.S. 552, 566-67 (2011) (scrutiny applies to laws regulating commercial activity if their "purpose" is to "suppress" speech). Plaintiffs do not dispute that contracting with children is commercial activity. Their "arguments more closely approximate a claim

10

that" HB3 disproportionately burdens expression because it "designat[es]" certain platforms (those that meet the statutory criteria) and "prohibit[s]" them from providing children accounts. *TikTok*, 145 S. Ct. at 66. The "point" of the law, Plaintiffs say, "is to prevent minors from spending too much time on websites that disseminate speech in ways that minors find especially engaging." DE62 at 27.

Although the Supreme Court recognized in *TikTok* that it "has not articulated a clear framework for" assessing such a claim, the Court deemed it relevant whether the challenged law "focus[es]" on an interest unrelated to expression, whether a legislative determination corroborates that focus, and whether there are "causal steps between the [law] and the alleged burden on protected speech." 145 S. Ct. at 66. All those considerations show that HB3 is not aimed at expression. First, HB3 focuses on behavioral addiction, not expression. The "point" of the law is not to prevent children from spending "time" on "websites that disseminate . . . engaging" speech. DE62 at 27. The law on its face prohibits platforms from using addictive features and contracting with children. If a platform does not use the features, it can contract with children, and they can use the platform as much as they want. Second, the Florida Legislature determined that the features that the law targets are "addictive." Fla. Stat. 501.1736(1)(e)4; *accord* Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 2-7 (March 28, 2024). Last, there are causal steps between HB3 and the alleged burden

on user speech: The burden arises only if platforms choose to use addictive features and require users to have accounts.

Plaintiffs claim that HB3 disproportionately burdens speech because, in their view, "creating an account . . . is itself speech." DE62 at 23. But HB3 does not regulate the speech on any account—it regulates the contractual exchange necessary to create an account, and "the State is free to impose any rational regulation on the commercial transaction itself." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part). Plaintiffs counter with a parade of irrelevant analogies: laws banning book publishers from purchasing ink, banning people from making accounts on miamiherald.com, and banning newspaper subscriptions. DE62 at 23-24. Those hypothetical laws serve no conceivable function other than the suppression of expression and thus plainly would "disproportionate[ly] burden" expression. *TikTok*, 145 S. Ct. at 65; *see also Moody*, 603 U.S. at 733 ("[T]oday's social media pose dangers not seen earlier: No one ever feared the effects of newspaper opinion pages on adolescents' mental health."). HB3 on the other hand serves to prevent children from being exposed to addictive features. Plaintiffs surely would not claim that preventing a child from entering an employment contract to work as a journalist for a newspaper violates the First Amendment just because it prevents the child from engaging in speech. The function of that law—preventing child labor—does not target expression. Same here. Nowhere in their response do

12

Plaintiffs claim that HB3's function of preventing exposure to addictive features is related to expression.[6]

But whatever the strength of those hypotheticals, *Indigo Room* and *Gary* are dispositive. Plaintiffs say that the laws in those cases "regulated non-speech conduct (accessing establishments that served alcohol), and the impact on speech (nude dancing [or attending political rallies]) was merely incidental." DE62 at 26-27. That is precisely the case here. HB3 regulates non-speech conduct (contracting with children while using addictive features) and the impact on speech (speaking on the internet) is merely incidental. Just like the plaintiffs in *Indigo Room* and *Gary* were free to attend any event or socialize in any establishment where alcohol was not present, children may contract with any platform where addictive features are not present.

---

[6] In their reply in support of their preliminary-injunction motion, Plaintiffs devote one paragraph to this point. DE63 at 5-6. They tacitly concede that barring addictive features has no effect on the First Amendment rights of users—the only rights on which they base their First Amendment claims. *See supra* pp. 5-6. But they say it raises "another First Amendment problem" that they assert for the first time. DE63 at 5. Namely, it restricts "a website's choice about how to 'organiz[e] and present[]' collections of 'third-party speech.'" *Id.* (quoting *Moody*, 603 U.S. at 731-32) (alterations in original). But *Moody* explained that platforms engage in expression when they "use their Standards and Guidelines to decide which third-party" speech to display in curated "feeds" and how the speech "will be ordered." 603 U.S. at 740. Nothing in *Moody* suggests that functions like infinite scroll and autoplay express anything.

Nor are *Indigo Room* and *Gary* distinguishable if the "primary purpose" of some platforms is "to engage in speech." DE62 at 27. The laws in *Indigo Room* and *Gary* singled out "alcoholic beverage establishments" (i.e., bars and clubs), *Indigo Room*, 710 F.3d at 1298, whose primary purpose since time immemorial has been facilitating social interaction. *See Carralero v. Bonta*, 125 F.4th 1246, 1257 (9th Cir. 2025) (VanDyke, J., dissenting from denial of reh'g en banc) ("[T]averns served as the most common drinking and gathering place for colonists.").

That leaves Plaintiffs with *Packingham*. But *TikTok* drives home that *Packingham* is inapposite: The law there was a "*direct* regulation" of speech. *TikTok*, 145 S. Ct. at 65-66. Under the law, if a sexual offender posted on social media, he committed a felony. *See Packingham v. North Carolina*, 582 U.S. 98, 102-03 (2017). By contrast, users "may say anything to anyone over the internet or otherwise without violating" HB3. *Delgado v. Swearingen*, 375 F. Supp. 3d 1251, 1258 (N.D. Fla. 2018) (distinguishing *Packingham*).

## CONCLUSION

The complaint must be dismissed.

| | |
|---|---|
| Dated: February 21, 2025 | Respectfully submitted,<br><br>JAMES UTHMEIER<br>  *Attorney General of Florida*<br><br>*/s/ Darrick W. Monson*<br>JOHN GUARD (FBN 374600)<br>  *Chief Deputy Attorney General* |
| ANITA J. PATEL (FBN 0070214)<br>CHRISTINE E. LAMIA (FBN 745103)<br>JAMES WACZEWSKI (FBN 0154989)<br>  *Special Counsel*<br>SARA E. SPEARS (FBN 1054270)<br>  *Assistant Attorney General* | JEFFREY PAUL DESOUSA (FBN 110951)<br>  *Acting Solicitor General*<br>DAVID M. COSTELLO (FBN 1004952)<br>  *Chief Deputy Solicitor General*<br>KEVIN A. GOLEMBIEWSKI (FBN 1002339)<br>  *Senior Deputy Solicitor General*<br>DARRICK W. MONSON (FBN 1041273)<br>  *Assistant Solicitor General*<br><br>Office of the Attorney General<br>PL-01, The Capitol<br>Tallahassee, Florida 32399<br>(850) 414-3300<br>darrick.monson@myfloridalegal.com<br><br>*Counsel for Defendant* |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

This reply memorandum complies with Local Rule 7.1(I) because it has 3,199 words.

*/s/ Darrick W. Monson*
Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that on this 21st day of February, 2025, the foregoing reply memorandum was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ Darrick W. Monson*
Counsel for Defendant