IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

    *Plaintiffs,*

v.                                Case No.:  4:24cv438-MW/MAF

JAMES UTHMEIER,

    *Defendant.*
_____/

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs bring a First Amendment challenge to provisions of a Florida law that prohibit some social media platforms from allowing youth in the state who are under the age of 14 to create or hold an account on their platforms, and similarly prohibit allowing youth who are 14 or 15 to create or hold an account unless a parent or guardian provides affirmative consent for them to do so. Before this Court is Plaintiffs' motion for a preliminary injunction. ECF No. 4. This Court has considered all the briefing and evidence submitted by the parties and held a hearing on the motion on February 28, 2025. For the reasons stated below, Plaintiffs' motion is **DENIED** for failure to show a substantial likelihood of demonstrating standing.

Standing is not a technicality, but a constitutional requirement that must be satisfied for any federal court to exercise jurisdiction over an action. The source of

this requirement is Article III, Section 2 of the Constitution, which grants federal courts power only over "cases" and "controversies." This Court recognizes that, to a lay observer, it may seem counterintuitive or even absurd to conclude that there is no case or controversy between the Plaintiffs here—two trade associations representing, among others, several major social media companies—and the Attorney General of Florida, who is charged with enforcing a law that regulates some social media companies. But the Supreme Court and the Eleventh Circuit have developed a rigorous, fact-intensive test for standing that this Court must faithfully apply.[1] And it should come as no surprise to the parties that this Court does so in this case, as this Court has applied that now familiar test in every case before it and has been required to dismiss no small number of cases for lack of standing. Plaintiffs bear the burden to establish standing, and at the preliminary-injunction stage, they must do so by coming forward with evidence demonstrating a substantial likelihood of establishing standing. Here, Plaintiffs have failed to carry that burden. Because Plaintiffs have not demonstrated a substantial likelihood of establishing standing, this Court does not reach the merits of the question in this case; namely, whether the challenged law abridges the First Amendment.

---

[1] *See, e.g.*, *NFC Freedom, Inc. v. Diaz*, 700 F. Supp. 3d 1057, 1074 (N.D. Fla. 2023) (explaining how the Eleventh Circuit's application of the Supreme Court's three-part test for Article III standing has evolved in recent years).

I

A district court may grant a preliminary injunction only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). A preliminary injunction is an "extraordinary and drastic remedy" that may only be granted if "the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal quotation marks omitted). This Court begins its analysis here with the first prong because typically, if a plaintiff cannot establish a substantial likelihood of success on the merits, this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). The "affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that a plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting) (internal alterations omitted). In other

words, if Plaintiffs fail to carry their burden on standing, this Court cannot issue a preliminary injunction.

Over time, the Supreme Court has developed a three-part test for determining whether a party has standing. Under that test, a plaintiff must show (1) that they have suffered an injury in fact that is (2) fairly traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The first prong, an injury in fact, requires that the plaintiff face an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. This is the "irreducible constitutional minimum" required for standing under Article III of the Constitution. *Id.* And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, a plaintiff cannot "rest on such mere allegations as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Cacchillo*, 638 F.3d at 404 (quoting *Lujan*, 504 U.S. at 561) (internal

alterations omitted); *see also Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 608 (11th Cir. 1985).

II

Plaintiffs are "Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat." ECF No. 1 at ¶ 15. Plaintiffs assert associational standing, which allows a membership organization to bring claims on behalf of its members so long as (1) at least one of its members would have standing to sue in its own right, (2) the interests the suit seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). To satisfy the first requirement, Plaintiffs must provide evidence that at least one of their members can satisfy the traditional three-part test for Article III standing. Here, Plaintiffs have not provided evidence showing that at least one of their members meets the injury-in-fact requirement of Article III standing.

Plaintiffs assert two theories of an injury in fact to at least one of their members. First, Plaintiffs argue that at least one of their members has an injury in fact because it operates a platform that is likely to be covered by Florida's law, and the member company will have to expend money and resources to come into compliance with the law. ECF No. 62 at 14. Second, Plaintiffs argue that the law

injures the First Amendment rights of at least one of its members because it restricts the member's ability to disseminate both their own and third-party speech to their users. *Id.* Either type of injury would satisfy the injury-in-fact requirement of the standing test. But Plaintiffs have failed to produce the evidence needed to show that either of these purported injuries is "actual or imminent, not conjectural or hypothetical" and "fairly traceable" to the Attorney General. *Lujan*, 504 U.S. at 560. That is because, for either injury to be "actual or imminent" and "fairly traceable" to the Attorney General, Plaintiffs must show that at least one specific member of theirs is likely regulated by the law. They have not done so.

Florida's law does not regulate all social media platforms. Instead, it regulates only those platforms that meet each of four specific criteria under the challenged statute. The first criterion is that the platform "[a]llows users to upload content or view the content or activity of other users." § 501.1736(1)(e)(1), Fla. Stat. The second criterion is that ten percent or more of the platform's users who are under 16 spend, on average, two hours or more on the platform on the days when using it. § 501.1736(1)(e)(2), Fla. Stat.[2] The third criterion is that the platform employs "algorithms that analyze user data or information on users to select content for users." § 501.1736(1)(e)(3), Fla. Stat. The last criterion is that the platform has at

---

[2] For simplicity, this Court will hereinafter refer to this requirement as the "time requirement."

6

least one "addictive feature."[3] § 501.1736(1)(e)(4), Fla. Stat. But Plaintiffs have not provided evidence showing that any one specific member operates a platform that is likely covered by the law.[4] The only pieces of evidence that Plaintiffs have produced on this point are vague, conclusory assertions in each of the four declarations attached to their motion for a preliminary injunction that the declarant "understand[s]" or "believes" that one of their members "may be" or "appears to be" covered by the law. *See* ECF No. 5-1 at ¶ 5 (declaration of Alexandra Veitch) ("I understand that YouTube may be subject to the Act, as one or more of its services may meet the definition of 'social media platform.'"); ECF No. 5-2 at ¶ 20 (declaration of Bartlett Cleland) ("Although aspects of the Act's definition are vague and do not make clear the full extent of the entities governed by its provisions, I understand that some NetChoice members appear to be regulated by the Act. These include, at least the following members: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram."); ECF No. 5-3 at ¶ 9 (declaration of Bartlett Cleland) ("I am familiar with Florida's HB3

---

[3] The "addictive features" covered by the law are infinite scrolling, push notifications, the display of "personal interactive metrics" (such as the number of "likes" on a post), auto-play video, and live-streaming functionality.

[4] Plaintiffs chose not to provide this evidence even after Defendant raised this issue in both the motion to dismiss, ECF No. 50 at 14–15, and the opposition to the motion for a preliminary injunction, ECF No. 51 at 12–14. Moreover, this Court expressly provided Plaintiffs with the opportunity to file supplemental declarations in support of their reply brief and did not prohibit the parties from presenting live testimony at the hearing. *See* ECF No. 35.

(the 'Act') and believe that Snap may be covered by the scope of the law."); ECF No. 5-4 at ¶ 4 (declaration of Matthew Schruers) ("I understand that a number of CCIA's members would be considered 'social media platforms under Florida House Bill 3 (HB3) including, at a minimum: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram."). The declarants do not offer any explanation for these assertions. What's more, Plaintiffs objected to interrogatories from Defendant about their reasons for believing that some of their members would be covered by the law. *See* ECF No. 51-8 at 3 ("CCIA further objects to this interrogatory . . . including that portion of the request calling for CCIA to explain how it determined that one or more members falls within the definition set out in the statute."); *id.* at 24 (same objection with respect to NetChoice).

When questioned at the hearing about the factual basis for their assertion that at least one of their members is likely covered by the law, Plaintiffs made essentially two arguments. First, Plaintiffs argued that evidence introduced by Defendant shows that at least one of Plaintiffs' members is likely covered by the law. Plaintiffs pointed to the depositions of their declarants,[5] in which employees of YouTube and Snap confirmed that their respective companies' platforms met three of the law's four

---

[5] Depositions which this Court allowed Defendant to conduct over Plaintiffs' objection that no discovery should be permitted at this stage in the case.

coverage criteria: the ability of users to upload content, the use of algorithms to select content for users, and the use of one or more "addictive features" as identified by the law. ECF No. 71 at 59:17–60:6. But nowhere in these depositions—or in any of the evidence submitted by either party—is there a single fact tending to show that any one specific member likely meets the time requirement for coverage under the law.[6]

Plaintiffs do not claim that this information is unavailable to their members or that it would be burdensome for their members to provide it.[7] Nor do they argue that the time requirement is so vague that their members can only guess at whether it applies to them. They argue only that standing does not require them to provide the Attorney General with precisely the information he would need to successfully

---

[6] Plaintiffs at the hearing also gestured at factual assertions in Defendant's briefing and evidence from Defendant's expert declarations. But although one of Defendant's expert declarations cites statistics about how much time youth spend using "social media" generally, neither that declaration nor any of Defendant's evidence includes facts about how much time youth spend using any particular platform. *See, e.g.*, ECF No. 51-1 at ¶¶ 10–11, 13 (declaration of Jean Twenge); *see also* ECF No. 51-9 at 7, 9 (Surgeon General's Advisory). Generalized statistics about "social media" do not give this Court enough information to determine whether it is likely that any particular platform—such as Facebook, Instagram, YouTube, or Snapchat—meets the time requirement to fall within the statute's reach. These generalized statistics could mean either that many youth spend more than two hours on, say, Facebook, or it could equally mean that youth spend an hour or so on each of many different social media platforms each day. The evidence before this Court does not allow it to assess which of these explanations is more likely, let alone identify which of Plaintiffs' members' platforms likely meet the time requirement in addition to the law's other three criteria. It should be no surprise to Plaintiffs that facts matter here, and this Court cannot simply ignore this gap in the record that Plaintiffs failed to fill.

[7] Nor could they reasonably do so, as at least one of Plaintiffs' declarants noted in his deposition that Snapchat already tracks the total amount of time users spend in the app and has the capability of breaking that data down by age. ECF No. 52-2 at 119:14–120:13 (transcript of Boyle deposition).

9

enforce the law against one of their members. *See* ECF No. 71 at 117:1–4. But that argument relies on a misunderstanding of the level of specificity the standing inquiry requires. This Court has never suggested that Plaintiffs must hand over data showing with certainty that one of their members meets the time requirement. What is required is for Plaintiffs to adduce some evidence from which this Court could reasonably conclude that it is likely that at least one specific member meets this requirement. For example, if Plaintiffs provided evidence that their member "Z" operates a platform on which more than ten percent of *all* users average two hours of daily use, that this platform allows youth under 16 to use its platform, and that its user data does not give any indication that users under 16 use the platform less per day than adult users, this would likely be sufficient at this stage to demonstrate that member "Z" arguably falls under coverage of the challenged statute.[8] But here, Plaintiffs failed to provide any evidence that permits a reasonable inference that any of their members are covered by the challenged statute.[9]

---

[8] Some may read this example and find it frustrating that this Court reaches the conclusion it does on standing, because it seems that this evidentiary deficiency could be easily fixed. It likely could have been, and Plaintiffs were afforded ample opportunity to do so before the hearing. Nevertheless, it was not fixed, and "close enough" is not good enough for standing.

[9] At the hearing, in response to this Court's questioning, Plaintiffs requested that this Court give them "a little time to see if we can provide information" to correct the evidentiary deficiencies. ECF No. 71 at 68:9–18. But by then, that ship had sailed. As this Court noted above, Plaintiffs had multiple opportunities to provide supplemental evidence in response to Defendant's standing arguments. They declined to avail themselves of those opportunities. Only when pressed by this Court at the hearing did Plaintiffs decide to seek a mulligan. For the purposes of this motion, that was too late.

Second and primarily, Plaintiffs argued that it is not their burden to provide evidence that one of their members in fact meets all four of the coverage criteria, so long as "it's a reasonable view of ours that the State thinks that we satisfy the criteria."[10] ECF No. 71 at 56:8–58:1, 61:1–25. For this argument, Plaintiffs lean heavily on the standard for establishing a First Amendment "chill" injury—namely, an intention to engage in a course of conduct that is arguably affected with a constitutional interest and proscribed by statute under which they face a credible threat of enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). But whenever a plaintiff invokes federal jurisdiction, that plaintiff bears the burden of establishing standing. *Lujan*, 504 U.S. at 561. And Plaintiffs cannot show that their members' intended conduct is "arguably proscribed" by statute absent facts showing that they likely meet the statute's coverage criteria.[11] *See CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006). The evidence Plaintiffs cited in their briefing and at the hearing—mentions of some of Plaintiffs' members in the Attorney General's briefing in this case and in the press

---

[10] This was the only argument Plaintiffs made on this point in their briefing, *see* ECF No. 62 at 15, ECF No. 63 at 8 n. 1, and their primary argument at the hearing.

[11] *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988), does not help Plaintiffs on this point. *American Booksellers* reached its conclusion that plaintiff booksellers had standing to challenge a ban on display of books "harmful to juveniles" after a consolidated preliminary injunction hearing and trial on the merits in which plaintiffs introduced 16 books that they believed were examples of books that would subject them to the statute. *Id.* at 390–91. In other words, the American Booksellers Association introduced actual evidence to support their claim that the challenged statute applied to them.

conference following the Governor's signing of HB 3—does not compensate for this omission. Even assuming, for the sake of argument, that the Florida Legislature designed the law with some of Plaintiffs' members in mind and that the Attorney General believes some of Plaintiffs' members are likely covered by it, the law can only be enforced against one of Plaintiffs' members if its platform meets each of the four specific coverage criteria. Plaintiffs have failed to demonstrate that any of its members meet these coverage requirements, and there is no reason to believe that the Legislature or the Attorney General has any more information about whether or which of Plaintiffs' members meet those coverage criteria than Plaintiffs or their members do. Moreover, Plaintiffs have pointed to no evidence suggesting the Attorney General plans to act in bad faith and enforce the statute against members whose platforms *do not* meet the statutory coverage requirements. So this Court cannot conclude that any potential compliance costs or chilled speech is fairly traceable to Defendant in the absence of evidence that the member so harmed operates a platform that likely meets the law's coverage criteria. *C.f. Clapper v. Amnesty Int'l*, 568 U.S. 398, 415 (2013) ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

A final note: at times, Plaintiffs' arguments seem to suggest that this Court should simply conclude that Plaintiffs have standing because it is likely, given that

their members include most of the major social media companies, that the law will apply to at least one of those members. But this sort of probabilistic analysis has been squarely rejected by the Supreme Court. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009). Accordingly, this Court can only find standing if there are sufficient facts to show that at least one *specific* member is likely covered by the law. The record does not provide sufficient facts to make that finding here.

III

Because Plaintiffs have not met their burden to show that at least one of their members has an injury in fact sufficient to confer Article III standing, they have not demonstrated a substantial likelihood of establishing standing for purposes of their preliminary injunction motion. Accordingly, Plaintiffs' motion, ECF No. 4, is **DENIED**.

**SO ORDERED on March 13, 2025.**

s/Mark E. Walker
**Chief United States District Judge**