# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

    *Plaintiffs*,

    v.

JAMES UTHMEIER, in his official
capacity as Attorney General of the
State of Florida,

    *Defendant*.

Case No. 4:24-cv-00438-MW-MAF

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## **INTRODUCTION**

1.      Florida House Bill 3 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors.  Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors.  Today, similar debates rage about "social media" websites.  These debates are important, and the government may certainly take part in them.  But the First Amendment does not take kindly to government efforts to resolve them.  The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs:  with their parents.

2.      Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services.  Courts across the country have unanimously rejected those efforts as inconsistent with the First Amendment.  And rightly so.  While states certainly have a legitimate interest in protecting minors who use such services, restricting the ability of minors (and adults) to access them altogether is not a narrowly tailored means of advancing any such interest.  In a Nation that values the First Amendment, the preferred response is to let parents decide what speech and mediums their minor children may access—including by utilizing the many available tools to monitor their activities on the Internet.

3.     Like the laws that have preceded it, HB3 violates the First Amendment. The Act bans anyone under 14 from creating or holding an account on certain "social media platforms" altogether, and it requires 14- and 15-year-olds to obtain a parent's consent before doing so.  By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Florida has "with one broad stroke" restricted—and, for those under 14, prohibited—access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

4.     Again, while Florida certainly has a legitimate interest in protecting minors, it is not obvious what HB3 is designed to "protect" minors from.  The law does not focus on any particular content that may pose special risk to minors.  Nor does it focus on identifying specific means of or forums for communication that those seeking to take advantage of minors have proven more likely to use.  HB3's definition of "social media platform" instead appears designed to restrict access to websites that minors especially enjoy using—specifically, websites that facilitate significant amounts of First Amendment activity.  Indeed, whether a service is covered turns in part on how long minors spend on it and whether it employs tools designed to bring to their attention content they might like.  But by that metric, the state could restrict access to the most popular segments of nearly any medium for

constitutionally protected speech, be it enticing video games, page-turning novels, or binge-worthy TV shows. Burdening protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

5.    In all events, the state cannot begin to show that its draconian access restrictions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they can do on those services, and how often they can use them. Florida may wish that more Floridians shared its own views about whether minors should use "social media platforms." But while the state may take many steps to protect minors from harm, including by persuading parents to take advantage of tools to limit their minor children's access to "social media platforms," it may not take matters into its own hands and restrict access itself. After all, "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

6.    For these reasons and others, the Court should declare Section 1 of HB3 unconstitutional and enjoin the Attorney General of Florida from enforcing it.

## **THE PARTIES**

7.    Plaintiff Computer & Communications Industry Association (CCIA) is a nonprofit membership association that represents a broad cross-section of

companies in the computer, Internet, information technology, and telecommunications industries. CCIA's members include (among others) Google, LLC, and Meta Platforms, Inc. A full list of CCIA's members is located here: https://tinyurl.com/mvh4tv2n. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA serves the interests of its members, which share a commitment to the vital First Amendment protections that HB3 undermines. CCIA brings this action on its members' behalf to vindicate its members' First Amendment rights and the First Amendment rights of their users and to prevent the economic and other injuries that HB3 will cause them absent judicial relief.

8.    Plaintiff NetChoice is a nonprofit trade association for Internet companies. NetChoice's members include (among others) Google, LLC, Meta Platforms, Inc., and Snap Inc. A full list of NetChoice's members is located here: https://tinyurl.com/3vdmvstv. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful. NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that HB3 undermines. NetChoice brings this action on its members' behalf to vindicate its members' First Amendment rights and the First Amendment rights of their members' users and to prevent the economic and

other injuries that HB3 will cause members absent judicial relief.

9.     CCIA and NetChoice have standing to bring their challenges.

10.     CCIA and NetChoice have associational standing to challenge the Act because: (1) some of their members have standing to sue in their own right; (2) challenging the Act is germane to CCIA's and NetChoice's associational purposes; and (3) their members' individual participation is unnecessary in this challenge.  *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *7 (D. Utah Sept. 10, 2024); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *7-9 (W.D. Tex. Aug. 30, 2024); *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at *5-6 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 548-50 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9 (W.D. Ark. Aug. 31, 2023).

11.     At least one of CCIA's and NetChoice's members has standing to sue in its own right.  "Nothing in [the Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014).  A plaintiff need allege only facts sufficient to establish that his conduct is "arguably proscribed by the statute they wish to challenge."  *Id.* (alterations and quotation marks omitted); *see also id.* at 158 (explaining that "we do not require a plaintiff to

expose himself to liability before bringing suit" (citation omitted)); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (finding that plaintiffs had standing to bring a pre-enforcement challenge because they "alleged an actual and well-founded fear that the law will be enforced against them"); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119-20 (11th Cir. 2022) (explaining that plaintiff need only allege that its conduct is "arguably proscribed" by the law and that the plaintiff is subject to "a credible threat of enforcement"). Both CCIA and NetChoice have members who satisfy that standard, as each has members who operate services that are at a minimum "likely covered by the law." Dkt. 73 at 5.

12.    Snap Inc., which is a member of NetChoice, operates Snapchat, which appears to satisfy each of the criteria set forth in HB3's definition of "social media platform."

13.    Snapchat "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as it allows users to create, upload, and share pictures and videos with other users. *See* Snapchat Support, How to Use Snapchat (last visited Mar. 28, 2025), https://tinyurl.com/3n4eh9vm.

14.    During the past 12 months, 10% or more of the daily active users on Snapchat who used Snapchat at least 80 percent of the days during the previous 12 months and who are younger than 16 years of age spent on average 2 hours per day or longer on Snapchat on the days when using Snapchat.

15.    Snapchat "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), as it uses algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past. *See* Snapchat Support, Personalization on Snapchat (last visited Mar. 28, 2025), https://tinyurl.com/ytavfaum.

16.    Snapchat includes at least one feature listed under Section 501.1736(1)(e)(4).  Snapchat users may enable notifications to alert them of Snaps or messages from other users.  §501.1736(1)(e)(4)(b) ("Push notifications"); *see* Snapchat Support, Notifications (last visited Mar. 28, 2025), https://tinyurl.com/4hs56nsm.

17.    While direct messaging is one of Snapchat's primary uses, "e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not Snapchat's "exclusive function."  §501.1736(1)(e).

18.    Snapchat's users include "resident[s]" in Florida (as HB3 defines that term) who are between 13 and 16 years old.  §501.1736(1)(a), (d)

19.    Snapchat does not currently prohibit minors under 14 from creating accounts when Snapchat knows or has reason to believe that the minor is located in Florida.  §501.1736(2).  Snapchat does not currently prohibit 14- and 15-year-olds

from creating accounts when Snapchat knows or has reason to believe that the minor is located in Florida. §501.1736(4). And Snapchat does not currently require 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when Snapchat knows or has reason to believe that the minor is located in Florida. §501.1736(3).

20.    There is an "actual and well-founded fear that the law will be enforced against" Snap. *Am. Booksellers*, 484 U.S. at 393. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.* To the contrary, statements made by officials at HB3's signing ceremony expressly identified Snapchat as one of Florida's intended targets. Press Conference at 22:24-23:03, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. And while Florida has had ample opportunity throughout this litigation to provide assurances that Snap is not covered if that is its view, the state has conspicuously declined to do so. To the contrary, Florida has repeatedly explained in its briefs that it enacted HB3 in response to alleged concerns about various features on websites such as "Snapchat." Dkt. 51 at 2.

21.    Because Snapchat is "likely covered by" HB3, Dkt. 73 at 5, Snap will be forced "to take significant and costly compliance measures or risk" potential enforcement against it, if HB3 is not enjoined. *Am. Booksellers*, 484 U.S. at 392. To avoid the substantial risk of an enforcement action, Snap will need to implement

systems to conduct age verification. It will also need to implement systems to conduct parental verification. Making such changes to Snapchat will be costly and will require a significant amount of budget, resources, and staff investment over many months and possibly longer. A "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

22.    Because Snapchat is "likely covered by" HB3, Dkt. 73 at 5, HB3 will also hinder Snap's ability to communicate with its users, burdening Snap's own exercise of First Amendment rights. Snapchat curates and disseminates content to users that Snapchat thinks will be particularly relevant to them. Snapchat selects the content it disseminates to a particular user based in part on the content that the user has interacted with in the past (via the user's account) and Snapchat's own rules about what content is appropriate. By restricting users from creating accounts on Snapchat, HB3 burdens Snap's exercise of First Amendment rights. *Moody v. NetChoice, LLC*, 603 U.S. 707, 727-40 (2024). "[A] deprivation of the[] First Amendment right to free speech" is a quintessential injury in fact. *Speech First*, 32 F.4th at 1119.

23.    Likewise, HB3's regulation of so-called "addictive features" burdens Snap's exercise of First Amendment rights. Snapchat engages in First Amendment activity when it communicates with its users via, e.g., "[p]ush notifications." By imposing burdens on Snap for engaging in that First Amendment activity, HB3

interferes with Snap's First Amendment rights. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

24.    Google, LLC, which is a member of both CCIA and NetChoice, operates YouTube. YouTube "is likely covered" by HB3, as it appears to satisfy each of the criteria set forth in HB3's definition of "social media platform."

25.    YouTube "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as it allows users to create, upload, and share videos with others around the world. *See* YouTube Help, Upload YouTube Videos (last visited Mar. 28, 2025), https://tinyurl.com/2fety3cv. YouTube Kids likewise allows users to view content created by other users. *See* YouTube Help, YouTube Kids (last visited Mar. 28, 2025), https://tinyurl.com/yhn4aycy.

26.    YouTube "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), as it relies on automated efforts to suggest videos to users based on, among other things, content the user has interacted with in the past. *See* YouTube Help, Manage Your Recommendations & Search Results (last visited Mar. 28, 2025), https://tinyurl.com/536r2wwu; *see also* YouTube For Families Help, Recommended Videos on YouTube Kids (last visited Mar. 28, 2025), https://tinyurl.com/mryarz36.

27.    YouTube utilizes at least one of the features listed in Section

501.1736(1)(e)(4).  YouTube users may enable "[p]ush notifications" to alert them of user activity on the videos they upload.  §501.1736(1)(e)(4)(b); *see* YouTube Help, Manage YouTube Notifications (last visited Mar. 28, 2025), https://tinyurl.com/3zsdfjwr.  And YouTube displays "personal interactive metrics" to show users how many times other users have "liked" their videos. §501.1736(1)(e)(4)(c); *see* YouTube Help, Like or Dislike a Video (last visited Mar. 28, 2025), https://tinyurl.com/wrvf33vr.

28.    Because YouTube's usage patterns and demographics change frequently, it is difficult for YouTube to conclusively determine whether "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" YouTube "on the days when using" YouTube "during the previous 12 months."  §501.1736(1)(e)(2).  One significant ambiguity of HB3 is that it is unclear whether a company is covered if it meets the 10% metric over certain periods but not others, which is entirely possible given that YouTube does not have control over which users spend how much time using YouTube in a given time.  The problem is compounded by the fact that HB3 defines "daily active users" in a way that is different from how YouTube defines and measures that term.[1]  Nevertheless, even though YouTube does not in the ordinary

---

[1] HB3 defines "[d]aily active users" to mean "the number of unique users in the United States who used the online forum, website, or application at least 80 percent

course of its business attempt to measure the specific metric made relevant by HB3 (the percentage of "daily active users" who are under 16 who spend on average 2 or more hours per day using the service), there is reason to believe that, based on historical data about usage, YouTube may be covered by the Act. At a minimum, YouTube would face a serious risk of an enforcement action by Florida if it did not comply. That is partly because there are multiple ways of calculating the threshold, and it is unclear which method Florida would use. Because there is a potential way to calculate the threshold that might result in a percentage above 10%, the costs, risks, and reputational harms associated with an enforcement action (including potentially broad investigatory demands) are sufficiently substantial that, absent an express assurance by the state that YouTube is not covered, YouTube will face substantial and costly compliance measures.

29.    In addition, Florida's own expert cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)," Dkt. 51-1 at ¶13, which includes survey results regarding teenagers' self-reported time using YouTube. *See* J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c. Given

---

of the days during the previous 12 months," regardless of whether users have an account or access the service using their own account.

Florida's expert's reliance on that survey, YouTube has an "actual and well-founded fear" that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" YouTube "on the days when using" YouTube "during the previous 12 months," §501.1736(1)(e)(2). *Am. Booksellers*, 484 U.S. at 393.

30.    "[E]-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not the "exclusive function" of YouTube or YouTube Kids. §501.1736(1)(e).

31.    YouTube's users include "resident[s]" in Florida (as HB3 defines that term) who are under 14, as well as "resident[s]" in Florida who are 14 and 15 years old. §501.1736(1)(a), (d).

32.    YouTube does not currently prohibit minors under 14 from creating accounts when YouTube knows or has reason to believe that the minor is located in Florida. §501.1736(2). YouTube does not currently prohibit 14- and 15-year-olds from creating accounts when YouTube knows or has reason to believe that the minor is located in Florida. §501.1736(4). And YouTube does not currently require 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when YouTube knows or has reason to believe that the minor is located in Florida.

§501.1736(3).

33.    There is an "actual and well-founded fear that the law will be enforced against" YouTube. *Am. Booksellers*, 484 U.S. at 393. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.* And while Florida has had ample opportunity throughout this litigation to provide assurances that YouTube is not covered if that is its view, the state has conspicuously declined to do so.

34.    Because there is an "actual and well-founded fear that the law will be enforced against" YouTube, YouTube will be forced "to take significant and costly compliance measures or risk" potential enforcement against it should the law take effect. *Am. Booksellers*, 484 U.S. at 392-93. To avoid the risk of an enforcement action, YouTube will need to implement systems to conduct age verification. It will also need to implement systems to conduct parental verification. Making such changes to YouTube will be costly.

35.    Because there is an "actual and well-founded fear that the law will be enforced against" YouTube, *Am. Booksellers*, 484 U.S. at 393, HB3 will also hinder YouTube's ability to communicate with its users, burdening YouTube's exercise of First Amendment rights. YouTube curates and disseminates content to users that YouTube thinks will be particularly relevant to them. YouTube selects the content it disseminates to a particular user based in part on the content that the user has

interacted with in the past (via the user's account) and YouTube's own rules about what content is appropriate. By restricting users from creating accounts on YouTube, HB3 burdens that exercise of First Amendment rights. *Moody*, 603 U.S. at 727-40.

36.    Likewise, HB3's regulation of so-called "addictive features" burdens YouTube's exercise of First Amendment rights. YouTube engages in First Amendment activity when it communicates with its users via, e.g., "[p]ush notifications," and "personal interactive metrics." By imposing special burdens on YouTube for engaging in that First Amendment activity, HB3 burdens YouTube's First Amendment rights.

37.    Meta Platforms, Inc., which is a member of CCIA and NetChoice, operates Facebook and Instagram, which appear to satisfy each of the criteria set forth in HB3's definition of "social media platform."

38.    On information and belief, both Facebook and Instagram "[a]llow[] users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as they allow users to create, upload, and share pictures and videos with other users. *See* Facebook Help Center, Share Photos on Facebook (last visited Mar. 28, 2025), https://tinyurl.com/5jxy2hcb; Instagram Help Center, Share a Post (last visited Mar. 28, 2025), https://tinyurl.com/eaz6nwub.

39.    On information and belief, both Facebook and Instagram "[e]mploy[] algorithms that analyze user data or information on users to select content for users,"

§501.1736(1)(e)(3), as they use algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past. *See* Facebook Help Center, Learn About and Manage Suggested Content in Your Facebook Feed (last visited Mar. 28, 2025), https://tinyurl.com/yumkra7m; Instagram Help Center, How Instagram Determines Which Posts Appear As Suggested Posts (last visited Mar. 28, 2025), https://tinyurl.com/2w97sbcn.

40.    On information and belief, both Facebook and Instagram include at least one feature listed under Section 501.1736(1)(e)(4).   Both Facebook and Instagram users may enable notifications to alert them of activity related to their accounts. §501.1736(1)(e)(4)(b) ("Push notifications"); *see* Facebook Help Center, Push, Email and Text Notifications (last visited Mar. 28, 2025), https://tinyurl.com/4965bkx8; Instagram Help Center, Notification Settings (last visited Mar. 28, 2025), https://tinyurl.com/47k8p3ce.   And both Facebook and Instagram display "personal interactive metrics" to show users how many times other users have "liked" their content.   §501.1736(1)(e)(4)(c); *see* Facebook Help Center, Like and React to Reels and Videos on Facebook (last visited Mar. 28, 2025), https://tinyurl.com/438vek43; Instagram Help Center, Like or Unlike a Post on Instagram (last visited Mar. 28, 2025), https://tinyurl.com/mrx4w563.

41.    There is an "actual and well-founded fear" that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend

on average 2 hours per day or longer on" Meta's online service, Facebook, "on the days when using" Facebook "during the previous 12 months," §501.1736(1)(e)(2). *Am. Booksellers*, 484 U.S. at 393. There is likewise an "actual and well-founded fear" that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" Instagram, another Meta-operated service, "on the days when using" Instagram "during the previous 12 months," §501.1736(1)(e)(2). *Am. Booksellers*, 484 U.S. at 393.

42. Statements made by officials at HB3's signing ceremony expressly identified Instagram as one of Florida's intended online services to regulate. Press Conference at 12:30-13:00, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. Florida has repeatedly explained in its briefs that it enacted HB3 in response to alleged concerns about various features on websites such as "Facebook and Instagram." Dkt. 51 at 6. And the legislative history of HB3 is replete with references to both Facebook and Instagram. *See* Florida House of Representatives Staff Final Bill Analysis HB3 at 5, 7, 11 (Mar. 28, 2024); Florida Senate Bill Analysis and Fiscal Impact Statement HB3 at 6 (Feb. 13, 2024); Florida House of Representatives Staff Analysis at 5 (Jan. 17, 2024).

43. Florida's own expert, moreover, cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time

spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)." Dkt. 51-1 at ¶13. While Florida's expert did not include specific information "about how much time youth spend using any particular platform" in her report, Dkt. 72 at 9 n.6, the study that she cites identifies Instagram and Facebook as two of the four most popular "social media platforms" among teenagers. *See* J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c. It also includes survey results regarding teenagers' self-reported time using Facebook and Instagram. *Id.* Given Florida's expert's reliance on that survey, there is an actual and well-founded fear that Florida thinks that 10% or more of daily active users on Facebook and Instagram who are younger than 16 spend on average 2 hours per day or longer on Facebook and Instagram.

44. On information and belief, "e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not the "exclusive function" of either Facebook or Instagram. §501.1736(1)(e).

45. On information and belief, both Facebook and Instagram users include "resident[s]" in Florida (as HB3 defines that term) who are between 13 and 16 years old. §501.1736(1)(a), (d).

46.    On information and belief, neither Facebook nor Instagram currently prohibits minors under 14 from creating accounts when they know or have reason to believe that the minor is located in Florida, §501.1736(2), neither Facebook nor Instagram currently prohibits 14- and 15-year-olds from creating accounts when they know or have reason to believe that the minor is located in Florida, §501.1736(4), and neither Facebook nor Instagram currently requires 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when they know or have reason to believe that the minor is located in Florida. §501.1736(3).

47.    Because there is an "actual and well-founded fear that the law will be enforced against" Meta, Plaintiffs expect that Meta will be forced "to take significant and costly compliance measures or risk" potential enforcement against it should HB3 take effect. *Am. Booksellers*, 484 U.S. at 392-93.  To avoid the substantial risk of an enforcement action, Plaintiffs expect that Meta will need to implement both age verification and parental verification systems.  Making such changes to Facebook and Instagram will be costly and will require a significant amount of budget, resources, and staff investment.

48.    Because there is an "actual and well-founded fear that the law will be enforced against" Meta, *Am. Booksellers*, 484 U.S. at 393, Plaintiffs expect that HB3 will also hinder Meta's ability to communicate with its users, burdening Meta's own exercise of First Amendment rights.  Both Facebook and Instagram curate and

disseminate content to users that they think will be particularly relevant to them. Facebook and Instagram select the content they disseminate to a particular user based in part on the content that the user has interacted with in the past (via the user's account) and Facebook's and Instagram's own rules about what content is appropriate. By restricting users from creating accounts on Facebook and Instagram, HB3 burdens their exercise of First Amendment rights. *Moody*, 603 U.S. at 727-40.

49.     Likewise, HB3's regulation of so-called "addictive features" burdens Facebook's and Instagram's exercise of First Amendment rights. Facebook and Instagram engage in First Amendment activity when they communicate with their users via, e.g., "[p]ush notifications." By imposing burdens on Facebook and Instagram for engaging in that First Amendment activity, HB3 interferes with their First Amendment rights.

50.     CCIA and NetChoice have standing to assert both their members' First Amendment rights and the First Amendment rights of their members' current and prospective users. *See Am.* Booksellers, 484 U.S. at 393; *Paxton*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 716 F.Supp.3d at 550-51; *Griffin*, 2023 WL 5660155, at *11-12.

51.     Defendant James Uthmeier is the Attorney General of Florida. HB3 charges the Florida Department of Legal Affairs—of which the Attorney General is the head—with its enforcement. *See* HB3, §1(5) (codified at Fla. Stat.

§501.1736(5)).[2]  Attorney General Uthmeier is a resident of Florida.  CCIA and

NetChoice sue Attorney General Uthmeier for declaratory and injunctive relief in

his official capacity as the Attorney General of Florida.

## JURISDICTION AND VENUE

52.    CCIA's and NetChoice's causes of action arise under 42 U.S.C. §1983

and the United States Constitution.   The Court therefore has subject matter

jurisdiction under 28 U.S.C. §1331.  This Court has authority to grant legal and

equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908),

injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C.

§§2201(a) and 2202.

53.    Venue is proper in this district under 28 U.S.C. §1391 because the

defendant performs his official duties in the Northern District of Florida and is

therefore considered to reside in this district as a matter of law.

## BACKGROUND

54.    CCIA and NetChoice are Internet trade associations whose members

operate many online services, including Facebook, Instagram, YouTube, and

Snapchat.   These services "allow[] users to gain access to information and

communicate with one another about it on any subject that might come to mind."

---

[2] For ease of reference, this complaint cites provisions of HB3 §1 based on the
locations in Title XXXIII, Chapter 501 of Fla. Stat. at which they are codified.

*Packingham*, 582 U.S. at 107. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104. YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. And on Snapchat, users can deepen connections with friends and family by communicating with each other in fun and casual ways.

55.    Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics. Minors use online services to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges. Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression. Others use them to raise awareness about social causes and to participate in public discussions on salient topics of the day. Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized at home, or are seeking support from others who understand their experiences. *See* Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), https://tinyurl.com/t2rejxyx.

56.    These websites also engage in their own First Amendment activity when they curate and disseminate third-party speech to their users. Both Facebook and Instagram curate and disseminate third-party content to their users based on their

judgment about what is appropriate for users to see, taking into consideration information about each user through the user's account.  YouTube likewise curates and disseminates videos to users based on YouTube's judgment about what the user may find especially interesting, which is informed in part by the activity associated with the user's account.  Snapchat also curates and disseminates content to users based on what Snapchat thinks is relevant to the user, which is also based in part on activity associated with the user's account.

57.    Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, YouTube, and Snapchat are appropriate for minors.  Concerns that new means of communication may be harmful to minors, however, are hardly new.  The same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

58.    In the 1800s, for example, "penny dreadful" publications were condemned for glorifying criminals and were blamed for youthful delinquency by the media and parents alike.  *See* James B. Twitchell, *Preposterous Violence: Fables of Aggression in Modern Culture* 169 (1989).  Decades later, comic books were derided as "particularly injurious to the ethical development of children."  *Juvenile*

*Delinquency (Comic Books), Hearings Before the Subcommittee to Investigate Juvenile Delinquency*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham).   Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952).   Television too.   *See, e.g.*, Surgeon General's Scientific Advisory Committee on Television and Social Behavior, *Television and Growing Up: The Impact of Televised Violence, Report to the Surgeon General*, U.S. Pub. Health Serv. (1971), https://tinyurl.com/39xcysnk; *Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary*, 83d Cong., 2d Sess. (1954).   In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem.   *See* I. Molotsky, *Hearing on Rock Lyrics*, N.Y. Times (Sept. 10, 1985), https://tinyurl.com/yrknwwf8.   A decade later, families and lawmakers alike raised concerns about the harmful effects of the Internet.   *See* H.R. Rep. No. 105-775, p.7 (1998).   Concerns about violent video games followed soon after.   *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789-90 (2011).

59.   As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors.   Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it

contains racial epithets; others think it is a uniquely valuable piece of literature.  *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb. Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons.  *See Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr.  Some think that video games are unduly violent.  *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh.  Others say that smartphones are too addictive.  *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum.  Opinions likewise differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like Facebook, YouTube, and Snapchat.

60.    There are certainly legitimate concerns underlying both sides of these debates, and the government may have a role in empowering parents with tools and information to make their own judgments about what speech is appropriate for their own minor children.  But when the government has crossed the line into deciding for itself which constitutionally protected speech minors may access, courts have invalidated such efforts as inconsistent with the First Amendment.  *See, e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games

to minors without parental consent); *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975) (invalidating law prohibiting display of movies containing nudity at drive-in theaters). After all, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may the government bar public dissemination of protected materials to them." 422 U.S. at 212-13 (citation omitted).

61. Indeed, even restrictions on access to speech that is *not* constitutionally protected as to some or all minors have rarely survived scrutiny, as they often impede the First Amendment rights of adults. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Reno v. ACLU*, 521 U.S. 844 (1997) (invalidating law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet). As courts have explained in striking down such laws, tools that enable parents to decide for themselves what speech their minor children may access are virtually always "less restrictive" than imposing "universal restrictions at the source." *Ashcroft*, 542 U.S. at 667.

62. In short, in a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children, including by using tools that make it easier for them to restrict

access should they choose to do so. And while the government may have some role to play in facilitating access to such tools, it has rarely needed to do so since market forces typically drive industries to be responsive to parents' concerns. The movie, music, and video game industries, for example, have all developed sophisticated ratings systems to assist parents.

63. The same is true of the Internet. Plaintiffs' members and others have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it. Parents who wish to limit minors' access to online services like Instagram and YouTube, or to filter or monitor the content to which they are exposed, have many options at their disposal.

64. ***Device-level restrictions.*** Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place. And those who choose to let them use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long minors can spend on their iPhones, iPads, and MacBooks. *See, e.g.*, Apple, *Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch*, https://tinyurl.com/uxfnna4y (last visited Mar. 26, 2025). It also provides them with tools to control what applications (*e.g.*, Facebook, YouTube, and Snapchat) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. *Id.* Google,

27

Microsoft, and Samsung similarly offer parental controls for their devices. *See* Google, Family Link, *Help Keep Your Family Safer Online*, https://tinyurl.com/mr4bnwpy (last visited Mar. 26, 2025); Microsoft, *Getting Started with Microsoft Family Safety*, https://tinyurl.com/yc6kyruh (last visited Mar. 26, 2025); Samsung, *Manage Family Groups and Parental Controls with Your Samsung Account*, https://rb.gy/u4y1sz (last visited Mar. 28, 2025). And many third-party applications allow parents to control and monitor minors' use of Internet-connected devices and online services. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://tinyurl.com/s6bje2jd.

65.    ***Network-level restrictions***.  Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. *See, e.g.*, Verizon, *Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family*, https://tinyurl.com/ycyxy6x6 (last visited Mar. 26, 2025); AT&T, *AT&T Secure Family App*, https://tinyurl.com/d995ya2u (last visited Mar. 26, 2025); T-Mobile, *Family Controls and Privacy*, https://tinyurl.com/57run7ac (last visited Mar. 26, 2025); Comcast Xfinity, *Parental Controls for Xfinity Internet and TV*, https://tinyurl.com/2rwyt7mv (last visited Mar. 26, 2025). Most wireless routers (the

devices that provide wireless Internet throughout a home) contain parental control settings as well. *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 28, 2025), https://tinyurl.com/mtvdwypu. Parents can use those settings to block specific websites and applications (Facebook, YouTube, etc.) if they do not want their minor children to access them. *See, e.g.*, Netgear, *NETGEAR Smart Parental Controls*, https://tinyurl.com/me3ksfvu (last visited Mar. 26, 2025). They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long their minor children can spend on a particular website or service. *Id.* And they can set individualized content filters for their minor children and monitor the websites they visit and services they use. *Id*.

66. ***Browser-level restrictions.*** Parental controls on Internet browsers offer another layer of protection. Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites minors can access. *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox*, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022). Microsoft offers "Kids Mode," which allows access to only a pre-approved list of websites. *See* Microsoft, *Learn More About Kids Mode in Microsoft Edge*, https://tinyurl.com/59wsev2k (last visited Mar. 26, 2025). Google has a similar feature. It also provides parents with "activity reports," allowing them to see what apps and websites their minor children

are accessing the most.  Google, *Google's Parental Controls – Google Safety Center*, https://tinyurl.com/kwkeej9z (last visited Mar. 26, 2025).

67.    ***Application-level restrictions.***  On top of all that, CCIA and NetChoice members provide parents with many tools to decide what their minor children can see and do on their services.  And they have devoted extensive resources to developing policies and practices to protect minors who use them.

68.    For starters, services operated by CCIA and NetChoice members, including Facebook, Instagram, and Snapchat, prohibit minors under 13 from accessing their main services.  Some members offer separate experiences for users under 13 geared for that age group.  For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13.  *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Mar. 26, 2025); YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Mar. 26, 2025).  These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

69.    CCIA and NetChoice members also expend significant resources curating the content users post on their services to ensure that it is appropriate for adults and teens alike.  Members restrict the publication of (among other things) violent and sexual content, bullying, and harassment.  Some prohibit content that

encourages body shaming and promote content that encourages a positive self-image. Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens. CCIA and NetChoice members implement their policies through algorithms, automated editing tools, and human review. If a member determines that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it. And members can (and do) suspend or ban accounts that violate their policies.

70.     CCIA and NetChoice members also provide users with tools to curate the content they wish to see. Users can generally choose whom to follow. Users can generally block or mute other users and control who may see and interact with their own content. Some members provide users with tools to exclude specific categories of content they wish to avoid. Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group (or blocking them altogether). Instagram users can select a "not interested" button to filter out content they do not wish to see. They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

71.     CCIA and NetChoice members empower parents to monitor teens' online activities on their services.

72.     Snapchat's "family center" allows parents to see their teen's friends list and who they have been messaging, review their privacy settings, and manage parental controls.

73.     Facebook offers supervision tools that parents and guardians can use. Parents can see how much time their teens have spent on the Facebook app.  They can set scheduled breaks for them and see their Facebook friends.  Parents can also review some of their teens' privacy settings and content preferences and see the people and pages they have blocked.  *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited Mar. 28, 2025).

74.     Instagram enables parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and monitor accounts followed by their teens and the accounts that follow them.  Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive content settings.  *See, e.g.*, Instagram, Help Center, *About Supervision on Instagram*, https://tinyurl.com/zxxmmbhb (last visited Mar. 26, 2025).  Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts," which default to the strictest privacy settings and have limitations on who can contact teens, which content they can see, and what time of day they receive notifications.  Minors under 16 will need a parent's permission to relax any of these Instagram Teen Account settings.  Instagram will

also provide additional supervision features, including features that allow parents to monitor with whom their teens are chatting and what they are seeing. *See, e.g.*, Instagram, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents* (Sept. 17, 2024), https://tinyurl.com/22fwuzz9.

75.    YouTube offers a "supervised experience" for teens (separate from the supervised experience for minors younger than 13), allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teens' channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. YouTube, *More Choices for Kids, Tweens, and Teens from YouTube*, https://tinyurl.com/2dpetf76 (last visited Mar. 28, 2025). YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and reminding teens to take a break or go to bed. *Id.*

76.    CCIA and NetChoice members also restrict communications between adults and teens on their services, if they allow such communications at all.

77.    Facebook, Instagram, and Snapchat, for example, all take steps to limit adults from messaging teens to whom they are not connected. *See, e.g.*, Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan.

25, 2024), https://tinyurl.com/2ucma8sv; Snap Inc., *Snapchat Safeguards for Teens*, https://tinyurl.com/mvas8784 (last visited Mar. 26, 2025).  Snapchat's default settings permit direct messages only between people who are already friends on the platform or established contacts in both users' phones, and Snapchat does not recommend minors as friend connections unless one has the other as an existing phone contact or they share mutual friends.

78.    Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected.  And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

79.    Some CCIA and NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them.  If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult.

80.    YouTube and other members do not offer private messaging between users at all.

## FLORIDA HOUSE BILL 3

81.    Notwithstanding  the  long  line  of  cases  striking  down  government

efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Florida has taken it upon itself to decide what is appropriate for minors on the Internet.  Last year, Florida enacted HB3, which dramatically restricts minors' access to "social media platforms," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services.

82.    HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activit[ies] of other users."  Fla. Stat. §501.1736(1)(e).  But instead of regulating all online services that allow users to share and view content, the Act limits the definition to the online services that minors enjoy using the most—i.e., the services that facilitate the most First Amendment activity.  An online service qualifies as a "social media platform" only if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the service "on the days when using" the service, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has "one or more addictive features."  *Id.*  HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play functions," and "[l]ive-streaming functions."  *Id.*  The Act excludes any service on

which "the exclusive function is e-mail or direct messaging." *Id.*

83.     Section 1 of HB3 imposes several restrictions on access to "social media platforms" that are relevant here[3]:

84.     ***Restrictions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platforms" altogether. *Id.* §501.1736(2)(a). It also requires "social media platforms" to terminate any existing accounts held by minors under age 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b). Account holders have 90 days to dispute the termination. *Id.*

85.     An "account holder" is "a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state." *Id.* §501.1736(1)(a). "If a social media platform allows an account holder to use the social media platform, the parties have entered into a contract." *Id.* §501.1736(8).

86.     ***Restrictions on 14- and 15-year-olds.*** HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's

---

[3] CCIA and NetChoice challenge only Section 1 of HB3. For ease of reference, future references to "HB3" or "the Act" refer only to Section 1 unless otherwise stated.

parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a).  It also requires "social media platforms" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." *Id.* §501.1736(3)(b).  The account holder has 90 days to dispute the termination. *Id.* HB3 specifies that if its parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §501.1736(4).

87.    HB3 does not explain how a "social media platform" is supposed to identify who is a "parent or guardian."  But the regulations enacted by the Florida Attorney General require "social media platform[s]" to "conduct reasonable parental verification" in "determining whether someone is a parent."  Fla. Admin. Code §2-43.002(2).  "Reasonable parental verification" means "any method that is reasonably calculated at determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means," which "may include" "requesting from a child the child's parent's name, address, phone number, and e-mail address," "contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship," and "utilizing any commercially reasonable method

regularly used by the government or business to verify that parent's identity and age." *Id.* §2-43.001(12).

88.    HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or reckless[ly]" violate its provisions. Fla. Stat. §501.1736(5). HB3 authorizes the Florida Attorney General to enforce the law, and it imposes a civil penalty of up to $50,000 per violation. Fla. Stat. §501.1736(5). The regulations implementing HB3 specify that a "social media platform" commits a "knowing or reckless violation" if "it, based on the facts or circumstances readily available to" it, "should reasonably have been aroused to question whether the person was a child and thereafter failed to perform reasonable age verification." Fla. Admin. Code §2-43.002(3)(a).

89.    And the implementing regulations all but mandate that a "social media platform" implement whatever the state deems to be "reasonable age verification" for all users, as the regulations state that the Attorney General "will not find [a knowing or reckless violation] … has occurred if a social media platform establishes it has utilized a reasonable age verification method with respect to all who access the social media platform." *Id.* §2-43.002(3)(b). "Age verification" methods that satisfy this standard are "any commercially reasonable method of age verification approved by the commercial entity," Fla. Stat. §501.1737(1)(i); "commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party"

organized, owned, and operated in the United States, *id.* §501.1738(1); or "method of verifying age that is regularly used by the government or businesses for the purpose of age and identity verification."  Fla. Admin. Code §2-43.002(1).

90.    HB3 also includes a private right of action authorizing minors (or their representatives) to sue a "social media platform" for letting them create an account. Fla. Stat. §501.1736(6)(a).  A minor account holder may recover up to $10,000 in damages for each violation of the Act.  *Id.*

91.    HB3 took effect on January 1, 2025.  HB3 §5.

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)

92.    CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

93.    "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."  *Packingham*, 582 U.S. at 104.  Today, those places include the "vast democratic forums of the Internet."  *Id.* The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors.

94.     In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment.  The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors.  *See id.* at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied.  *Id.* at 107-08.  By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens."  *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge."  *Id.* at 107.  For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."  *Id.* at 108.

95.     That rule applies with full force to efforts to restrict minors' access to such services.  The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).  Courts have therefore routinely invalidated government efforts to

protect minors from the purportedly harmful effects of new forms of media by restricting their access to constitutionally protected speech.

96.     In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent violated the First Amendment.  564 U.S. at 804-05.  And in *Erznoznik*, the Court held the First Amendment prohibited a City of Jacksonville ordinance barring the display of movies containing nudity at drive-in theaters.  422 U.S. at 217-18; *accord Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689-91 (1968) (invalidating ordinance restricting dissemination of films deemed "not suitable for young persons"); *Joseph Burstyn*, 343 U.S. at 501-02 (invalidating law authorizing denial of license to show films deemed "sacrilegious").

97.     Unsurprisingly given that body of precedent, courts around the country have universally enjoined state efforts to restrict minors' access to "social media platforms," including laws that require teens to obtain parental consent to access them.  *See, e.g.*, *Reyes*, 2024 WL 4135626; *Paxton*, 2024 WL 4051786; *NetChoice, LLC v. Bonta*, 2024 WL 3838423 (9th Cir. Aug. 16, 2024); *Fitch*, 2024 WL 3276409; *Yost*, 716 F.Supp.3d 539; *Griffin*, 2023 WL 5660155; *NetChoice v. Bonta*, 2025 WL 807961 at *21-22 (N.D. Cal. Mar. 13, 2025).

98.     HB3 should be enjoined for the same reasons.  The provisions prohibiting some minors from creating accounts on "social media platforms"

altogether, *see* Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (4)(a), (4)(b)(1), and the provisions requiring other minors to obtain parental consent to create accounts on "social media platforms," *id.* §§501.1736(3)(a), (3)(b)(1), are unconstitutional, as they violate the First Amendment both on their face and as applied to CCIA and NetChoice members who operate "social media platform[s]" as defined by the Act.[4]

99.    Those provisions plainly restrict core First Amendment activity.  They completely prohibit minors under age 14 from creating accounts on the websites it covers.  Fla. Stat. §§501.1736(2)(a), (2)(b)(1).  That makes HB3 even more restrictive than the laws enjoined in *Paxton*, *Fitch*, *Yost*, *Griffin*, and *Bonta*—none of which completely *bans* access to covered services.  By prohibiting minors under age 14 from creating accounts at all, Florida has "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Packingham*, 582 U.S. at 107.

100.    Requiring 14- and 15-year-olds to obtain parental consent before creating accounts likewise restricts core First Amendment activity.  Fla. Stat.

---

[4] While all of Section 1 is unconstitutional because HB3's definition of "social media platform" is unconstitutionally vague, *see* Count II *infra*, Plaintiffs' First Amendment challenge is only to the provisions prohibiting minors under 14 from creating accounts on "social media platforms," the provisions requiring 14- and 15-year-olds to obtain parental consent before doing so, and the backup provisions prohibiting 14- and 15-year-olds from creating accounts (which kick in only if the parental-consent provisions are enjoined).  *See* Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), (4)(b)(1).

§§501.1736(3)(a), (3)(b)(1).  As numerous courts have concluded, requiring minors to obtain parental consent before accessing "social media" abridges First Amendment rights.  *See, e.g.*, *Reyes*, 2024 WL 4135626 at *20; *Fitch*, 2024 WL 3276409 at *14; *Yost*, 716 F.Supp.3d at 551; *Griffin*, 2023 WL 5660155 at *17.  And the Supreme Court has already held that the government lacks "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3.  Otherwise, then "it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent— even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.*  It could even "be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.*  The state plainly has no such authority: demanding parental consent requires parents to intervene to undo the state's exercise of governmental authority to restrict speech. *Id.*; *Yost*, 716 F.Supp.3d at 558.

101.  Potentially anticipating these challenges, HB3 specifies that if the court enjoins the parental consent requirement, then it shall be severed and replaced with a provision banning access by 14- and 15-year-olds.  Fla. Stat. §501.1736(4)(a), (4)(b)(1).  That would make the First Amendment problem even more glaring, as that would just prevent even more minors "from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108.  And it confirms that the

state's real goal is not to aid parental authority, but to override it.

102.   HB3 also burdens the First Amendment rights of *adults* to access covered services, as it effectively requires adults to prove their age to do so.  HB3's implementing regulations specify that it is a "knowing or reckless" violation of the law for a "social media platform" not to conduct a "reasonable age verification" when it suspects (or reasonably should suspect) that the account holder is "a child." Fla. Admin. Code §2-43.002(3).  And the implementing regulations effectively compel covered services to implement whatever the state deems to be "reasonable age verification procedures" for all users, as doing so operates as an affirmative defense.  *Id.* §2-43.002(3)(b).  As courts have repeatedly reaffirmed, requiring adults to verify their age before accessing speech significantly burdens First Amendment rights.  *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 849; *Griffin*, 2023 WL 5660155 at *17; *Yost*, 716 F.Supp.3d at 552; *Fitch*, 2024 WL 3276409, at *12.  By forcing adults to either surrender sensitive personal information to access protected speech or forgo that First Amendment activity entirely, such requirements "discourage users from accessing" online services and "completely bar" some adults from doing so.  *Reno*, 521 U.S. at 856.

103.   The unique aspects of online services like Facebook and YouTube only heighten the First Amendment values at stake.  While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech,

44

HB3 also restricts users' ability to engage in their own speech and associate with like-minded individuals. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982).

104. On top of that, HB3's access restrictions interfere with the First Amendment rights of CCIA and NetChoice members to disseminate both their own and third-party speech to their users—restricting their own First Amendment rights as well. *See Moody*, 144 S.Ct. 2383; *Reyes*, 2024 WL 4135626, at *8; *Yost*, 716 F.Supp.3d at 551-52. For example, the Act restricts covered websites from curating and disseminating content to their users, who are willing listeners. It also imposes compliance obligations on covered websites for communicating with their users via "[p]ush notifications," "[a]uto-play," "[i]nfinite scrolling," and "personal interactive metrics."

105. In fact, HB3 is even more problematic than the laws invalidated in *Brown*, *Erznoznik*, *Ashcroft*, and *Playboy*. Some of those laws at least involved an attempt (albeit an unsuccessful one) to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. But Section 1 of HB3 does not endeavor to confine its restrictions to anything that even arguably approaches unprotected speech. It instead restricts—and sometimes even prohibits—access to "social media platforms" even if all a teenager wants to do is attend church services on Facebook or view educational materials on YouTube.

106.  Because HB3 restricts access to large swaths of constitutionally protected speech, it is subject to heightened scrutiny.  *See Packingham*, 582 U.S. at 103.  Indeed, the sweeping nature of its restrictions demands strict scrutiny.  If California had restricted access to *all* video games out of concern that video games might be addictive, that would have made the First Amendment violation even more glaring.  *See Brown*, 564 U.S. at 794.  So too if Jacksonville had prohibited the public display of all movies based on a concern "that motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression," *Joseph Burstyn*, 343 U.S. at 502; *see Erznoznik*, 422 U.S. at 217-18.

107.  Florida's decision to restrict minors' access to a particular medium of protected expression, based on features that are not meaningfully different from features found on all manner of mediums for speech, reinforces the need for strict scrutiny, as it renders HB3 content based.  The law singles out certain "social media platforms" because the state is concerned about the *content* minors may encounter on those services.  As the House Speaker explained at the bill's signing ceremony (which the Governor livestreamed on Facebook), HB3 seeks to address services that are "curating *content* for your children which is encouraging them to stay on just a few more hours longer every day *and is leading them and nudging them in a particular direction*."  Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024),

46

https://tinyurl.com/5fhv2e2t (emphases added).

108.    HB3's speaker distinctions reinforce that conclusion.  Courts are deeply skeptical of laws that "distinguish[] among different speakers," as a speaker and her speech are so often "interrelated" that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  That principle has particular force when a law singles out for disfavored treatment some but not all in the business of disseminating speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983).

109.  HB3 facially "distinguish[es] among different speakers." *Citizens United*, 558 U.S. at 340.  The definition of "social media platform" singles out a subset of online services for disfavored treatment, while exempting others.  And those speaker distinctions are an obvious proxy for content discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).  While the law purports to address "addictive features," it does not restrict access to all mediums that employ similar features to engage their audience.  The law leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they employ the same so-called "addictive features," like personalized algorithms, push notifications, and autoplay. *See Reyes*, 2024 WL 4135626 at *15 & n.157.  The state's only evident justification for restricting access

to Facebook, Instagram, YouTube, and Snapchat while leaving many other mediums for speech untouched is the state's apparent belief that the covered websites deliver *content* the state thinks is particularly harmful. *See* Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.

110. Regulation based on these so-called "addictive features"—i.e., how long users remain engaged—is particularly suspect, as the judgment that minors are spending too much time on certain media, whether it be comic books, video games, television, or websites, is inherently content based. And singling out forms of speech that have proven particularly popular imposes a particularly significant First Amendment burden, as it distinctly burdens the content that people find most valuable. Letting the government make such decisions would be devastating to First Amendment values—which is precisely why whether and what limits to put on screen time or video games or the like is a matter that has traditionally been reserved to parents, not to the government, "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

111. But whether strict or intermediate scrutiny applies, Florida at the very least must demonstrate that HB3 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 103. Florida cannot do so.

112. To the extent Florida seeks to justify HB3's restrictions on the theory

that they "give[] parents a greater ability to protect their children," Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a, that argument fails at least twice over. For one thing, the law is radically over-restrictive judged by that interest, as it prohibits some minors from creating accounts on "social media platform[s]" *even if their parents approve*. Fla. Stat. §§501.1736(2)(a)-(b), 501.1736(4). That Florida has taken that extreme step raises a serious concern that its true goal is to impose "what the State thinks parents *ought* to want," which is not a permissible ground for government interference with First Amendment rights. *Brown*, 564 U.S. at 804.

113. But that aside, Florida's conception of how it may help parents "protect their children" reflects a fundamental misunderstanding of the proper role of government in family decision-making. The Supreme Court has consistently held that parents—not the state—have the primary right and responsibility to guide their minor children's upbringing. And the Supreme Court has expressed serious "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802.

114. To the extent Florida seeks to justify HB3 on the ground that it helps protect minors from "predators," Press Release, *Governor DeSantis Signs*

*Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a, that does not work either, as the law is radically over-restrictive judged by that interest.  *See Fitch*, 2024 WL 3276409, at *14.  In *Packingham*, North Carolina argued that barring convicted sex offenders from accessing "social media" was necessary to protect minors from predators.  582 U.S. at 106.  The Court acknowledged the importance of that interest, but it nevertheless concluded that the law could not withstand intermediate scrutiny because the state had a narrower way to achieve its goals:  It could "prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor."  *Id.* at 107.  If the First Amendment prohibits barring convicted sex offenders from using websites, laws restricting or even prohibiting innocent users' access to those same websites cannot possibly be narrowly tailored.

115.  Nor can Florida justify HB3 on the theory that it has an important interest in protecting minors from alleged "dangers" of "social media," such as "addiction," "higher rates of depression" and "self-harm."  Press Conference at 6:54-6:58, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t; Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a.  Even assuming the state

could produce evidence that its concerns are real rather than conjectural, HB3 is both wildly overinclusive and underinclusive judged by that interest. The law does not single out any particular speech (let alone any *unprotected* speech) that might pose special risks to minors. It instead restricts (and sometimes forecloses) minors' ability to access any speech on these services at all, regardless of whether the content has *any* capacity to lead to "depression" or "self-harm."

116.    HB3 thus hinders access not just to potentially harmful content, but to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Indeed, it would even preclude minors from accessing content and resources on these services that could help them cope with mental health struggles. On top of that, the Act has the practical effect of hindering adults from accessing the same online services, even though the state has no legitimate reason to do so. *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57. That is breathtakingly overbroad measured against *any* interest the state could assert. *See Fitch*, 2024 WL 3276409, at *12.

117.    Conversely, HB3 is "wildly underinclusive when judged against" any of the justifications the state has proffered. *Brown*, 564 U.S. at 802. The Act leaves many online services with materially indistinguishable—indeed, sometimes literally identical—content and functionality uncovered just because they are preferred by a

smaller percentage of minors and/or typically used for fewer hours a day. The law exempts services like Disney+, Hulu, and Roblox, even though they employ many of the same features HB3 denigrates as "addictive." The legislative record contains no evidence that "requiring social media companies to compel minors to push 'play,' hit 'next,' and log in for updates will meaningfully reduce the amount of time they spend on social media platforms." *Reyes*, 2024 WL 4135626, at *15. And Florida is "perfectly willing" to let minors access supposedly harmful services to their hearts' content "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802.

118. At bottom, the law really seems to be animated by Florida's concern that minors are spending what the state views as "too much" time on "social media platforms." In a word, HB3 is an internet-rationing statute that restricts minors in Florida from accessing speech that their peers elsewhere may access. It is highly doubtful that the state has a legitimate interest in restricting minors' ability to access and interact with mediums for protected speech just because it thinks they are spending too much time doing so. Some minors undoubtedly spend two hours a day reading graphic novels, playing video games, listening to podcasts or music, watching movies, or binging television series. That hardly empowers Florida to insert itself into homes throughout the state and second-guess the parenting choices of its residents about what content and in what quantity is appropriate for their minor children.

119.   But even assuming that is an important state interest, Florida cannot begin to demonstrate that it lacks less restrictive alternatives than restricting minors' (and adults') access to "social media platforms."  When it comes to concerns about the Internet, the Supreme Court has repeatedly emphasized that enabling people to voluntarily restrict content at the *receiving* end is less restrictive than restricting access at the source.  *See, e.g.*, *Ashcroft*, 542 U.S. at 666-67; *Playboy*, 529 U.S. at 815.  After all, "targeted blocking enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners."  529 U.S. at 815.

120.   Here, too, parents already have ample tools at their disposal to restrict minors' access to "social media platforms"—which unlike the services in those cases, involve speech that is constitutionally *protected* as to minors—should they want to do so.  *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 2024 WL 4135626, at *13; *Fitch*, 2024 WL 3276409, at *11; *Yost*, 716 F.Supp.3d at 560.  To be sure, parents may not always choose to utilize those tools in the ways Florida wishes they would.  But to the extent Florida is concerned that parents do not understand how to utilize them, it "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access … but cannot do so."  *Brown*, 564 U.S. at 803.  After all, it is manifestly less restrictive to educate parents about what tools are available and how to use them, and "a court should not presume parents, given

full information, will fail to act." *Playboy*, 529 U.S. at 824.

121.   The state also has plenty of other far less restrictive alternatives to address any concerns it may have about specific content, like expanding its recently enacted digital literacy curriculum for public-school students or developing an easily accessible curriculum for parents. *See* Fla. Stat. §1003.42(2)(*o*)(5) (as added by Fla. H.B. 379 (2023)). Instead, Florida chose the bluntest possible instrument: a near-total ban on access for teens and onerous restrictions for adults. That is the antithesis of narrow tailoring.

122.   Indeed, HB3 is so poorly tailored when judged against any *legitimate* interest the state may have that it seems Florida's real concern is that not all parents share its views about the propriety of "social media platforms" for minors. But to the extent that is the concern that HB3 is designed to address, the law's "effect is only in support of what the State thinks parents *ought* to want," which, again, is not a permissible ground for government interference with First Amendment rights. *Brown*, 564 U.S. at 804.

123.   Unless declared invalid and enjoined, the Act's access ban and parental consent requirements will unlawfully deprive Plaintiffs' members and their users of their fundamental First Amendment rights and will irreparably harm Plaintiffs, their members, and their members' users.

## COUNT TWO
### Unconstitutional Vagueness
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)

124.   CCIA and NetChoice re-allege and incorporate by reference the allegations in paragraphs 1-91 as though fully set out herein.

125.   "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  So when a law "reaches a substantial amount of constitutionally protected conduct," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982), it must speak "only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963).

126.   HB3 fails to speak with the requisite specificity.  The Act's primary provision governing the scope of its coverage defines "[s]ocial media platform" as

"an online forum, website, or application" (1) that allows users to "upload content" or view content from other users; (2) where ten percent or more of the daily active users who are younger than 16 years of age spend on average two hours per day or longer "on the online forum, website, or application"; (3) that "[e]mploys algorithms" that analyze user data or information on users to select content for users; and (4) that has one or more "addictive features," including "push notifications" to "inform a user about specific activities or events related to the user's account."  Fla. Stat. §501.1736(1)(e).  These criteria are riddled with ambiguities, rendering both the definition and the operative provisions that employ it unconstitutionally vague.

127.  For one thing, what does it mean to "upload content"—a term left undefined?  *Id.* §501.1736(1)(e)(1).  Any online service that requires a user to create an account will require a user to upload at least *some* information as a part of the account registration process (i.e., a username and password).  Does filling in such information, or providing one's name, cellphone number, and/or email or mailing address, qualify as "uploading content"?  What about a site with a search bar that allows users to type in a query and then responds with results that match that search?  Has the user, by typing in a search bar, "uploaded content"?  Sites and applications that facilitate purchases require a user to provide payment information.  Is that "uploading content" within the meaning of HB3?  If so, there are countless sites— ranging from Spotify to C-SPAN—that could satisfy this criterion.  And what if a

site allows a user to upload content in one area—for example, a comments section on an article, or a chatbox for technical support—but nowhere else?  HB3 does not answer any of these questions.

128.   The requirement that a website "[e]mploys algorithms" analyzing user data is equally vague.  *Id.* §501.1736(1)(e)(3).  An algorithm is "a step-by-step procedure for solving a problem or accomplishing some end."  *Algorithm*, Merriam-Webster.com, https://tinyurl.com/ywn4f6x4 (last visited Mar. 28, 2025).  Computer code gives a computer step-by-step instructions for how to perform and complete a given task.  Thus, *all* computer code can be considered an algorithm at some level.  For example, many sites require a user to log in to see certain content.  Such sites require code that contains an algorithmic "if, then" instruction:  If the user is logged in, then display the content; if not, then do not display the content.  Would such a site "employ algorithms" in such a way that fulfills HB3's criterion?  Again, HB3 does not say.

129.  Finally,   the   provision   addressing   "push   notification[s]"   is indecipherable.   HB3 states that a push notification qualifies as an "addictive feature" if it "inform[s] a user about specific activities or events related to the user's account."  Fla. Stat. §501.1736(1)(e)(4)(b).  That could mean that push notifications qualify as "addictive features" only if they provide an update about "specific activities or events" that relate to a user's account.  Or it could reach updates about

"events related to a user's account," rendering the statute far more expansive. For example, any push notification about a breaking news event would fall within this broader reading, because breaking news always involves some kind of "specific activity."

130.   Even the narrower potential reading of the definition of an "addictive" push notification remains impermissibly vague. What does it mean for a notification to be "related to a user's account"? If, for example, a user expresses a preference for a given sports team as a part of the user's account or profile, does notifying the user of breaking news about that team "relate to" that user's account? Or must the notification relate to an *online* event or activity, such as a liked photo or a new follower, that relates to the user's account? What if the notification has to do with the account, but has nothing to do with content the website disseminates—say, a notification stating that there was a suspicious login attempt on the account? Again, HB3 answers none of these questions.

131.   Given these difficulties with determining who is covered by the Act, it is bound to chill even more speech, as some websites will inevitably change the way they disseminate content to try to avoid having to comply with the law.

132.   Because the vagueness problems in the law's definition of "social media platform" infect all of Section 1, all of Section 1 is unconstitutional.

133.   Unless declared invalid and enjoined, the Act will unlawfully deprive

Plaintiffs' members and Internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiffs, their members, and their members' users.

## COUNT THREE
### Preemption
**(42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)**

134.   CCIA and NetChoice re-allege and incorporate by reference the allegations in paragraphs 1-91 as though fully set out herein.

135.   The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §6501 *et seq.*, regulates online services' collection and use of personal information from minor children.  COPPA defines a "child" as an "individual under the age of 13." 15 U.S.C. §6501(1).  The Federal Trade Commission ("FTC") has authority to enforce COPPA and has promulgated regulations implementing it.  *See* 16 C.F.R. §312.1 *et seq.*

136.   COPPA makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" by the FTC.  15 U.S.C. §6502(a)(1).  These regulations generally require a website operator "to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children."   16 C.F.R.  §312.5(a).   But the regulations also

enumerate several circumstances in which a child's or parent's personal information may be collected and used without parental consent.  *See id.* §312.5(c).

137.   COPPA expressly precludes any state from "impos[ing] any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in [COPPA] that is inconsistent with the treatment of those activities or actions under" §6502 and the FTC regulations promulgated under it.  15 U.S.C. §6502(d).

138.   HB3's imposition of liability for retaining "personal information held by the social media platform relating to the terminated account," Fla. Stat. §501.1736(2)(b)(4), (3)(b)(4), (4)(b)(4), squarely conflicts with COPPA's statutory and regulatory "treatment of those [same] activities," 15 U.S.C. §6502(d).  COPPA expressly *permits* website operators to retain "personal information from children" if they first "obtain verifiable parental consent," 16 C.F.R. §312.5(a), but HB3 imposes liability for retaining such information even if there is parental consent.

139.   COPPA also permits website operators to retain minor children's personal information for certain enumerated purposes *without* parental consent.  *See* 16 C.F.R. §312.5(c)(1)-(8).  For example, parental consent is not required if an online service collects certain information from minor children to "[p]rotect the security or integrity of its Web site or online service," "[t]ake precautions against liability," "[r]espond to judicial process," or, under certain circumstances, "provide

information to law enforcement agencies." *Id.* §312.5(c)(6).  In addition, an online service may collect a form of "individually identifiable information" known as a "persistent identifier"—e.g., "a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier," any of which "can be used to recognize a user over time and across different Web sites or online services"—without parental consent, so long as the information "is used for the sole purpose of providing support for the [online service's] internal operations." *Id.* §§312.2, 312.5(c)(7).

140.  Because HB3's prohibition on retaining "personal information held by the social media platform relating to the terminated account," Fla. Stat. §501.1736(2)(b)(4), (3)(b)(4), (4)(b)(4), squarely conflicts with COPPA's statutory and regulatory scheme, it is expressly preempted under §6502(d).

## COUNT FOUR
## EQUITABLE RELIEF

141.  CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

142.  Section 1 of the Act violates federal law and deprives Plaintiffs' members and their users of enforceable federal rights.  Federal courts have the power to enjoin unlawful actions by state officials.  *See Ex parte Young*, 209 U.S. 123 (1908); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

143.  This Court can and should exercise its equitable power to enter a

preliminary injunction enjoining Attorney General Uthmeier, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1) against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

144. This Court can and should exercise its equitable power to enter a permanent injunction enjoining Attorney General Uthmeier, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Section 1 of HB3 against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

**COUNT FIVE**
**DECLARATORY RELIEF**

145. CCIA and NetChoice re-allege and incorporate by reference the allegations in paragraphs 1-140 as though fully set out herein.

146. Section 1 of the Act violates federal law and deprives Plaintiffs' members and their users of enforceable federal rights.

147. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. §2201(a). And they have the power to grant "[f]urther and necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing,

against any adverse party whose rights have been determined by such judgment." *Id.* §2202.

148.   This Court can and should exercise its power under §§2201(a) and 2202 to enter a declaration that that Section 1 of HB3 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

## PRAYER FOR RELIEF

CCIA and NetChoice pray for the following relief from the Court:

1.   A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that Section 1 of HB3 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

2.   A preliminary injunction enjoining Attorney General Uthmeier, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1) against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

3.   A permanent injunction enjoining Attorney General Uthmeier, as well

as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Section 1 of HB3 against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

4.     Such costs and reasonable attorneys' fees to which CCIA and NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5.     Any further relief that the Court deems just and proper.

Respectfully submitted,

Paul D. Clement
Erin E. Murphy
James Y. Xi (*pro hac vice*)
Joseph J. DeMott (*pro hac vice*)
Kevin Wynosky (*pro hac vice*)
Mitchell K. Pallaki (*pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
kevin.wynosky@clementmurphy.com
mitchell.pallaki@clementmurphy.com

/s/ *Douglas L. Kilby*
Douglas L. Kilby
Florida Bar No. 73407
Hannah E. Murphy
Florida Bar No. 1032759
Abby Corbett
Florida Bar No. 31332
Grace Mead
Florida Bar No. 49896
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com

*Counsel for Plaintiffs CCIA and NetChoice*

March 28, 2025