**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

     *Plaintiffs*,

     v.

JAMES UTHMEIER, in his official
capacity as Attorney General of the State
of Florida,

     *Defendant*.

Case No. 4:24-cv-00438-MW-MAF

**DECLARATION OF MATTHEW SCHRUERS
IN SUPPORT OF PLAINTIFFS' RENEWED
MOTION FOR PRELIMINARY INJUNCTION**

1

I, Matthew Schruers, declare as follows:

1.      I am the President & CEO of the Computer & Communications Industry Association (CCIA).  I have worked at the organization for nearly twenty years.  Upon joining the Association, I focused on legal, legislative, and policy matters, later taking on the roles of Chief Operating Officer and President and CEO.  In each of these capacities, I have worked closely and communicated often with CCIA members regarding how public policy proposals affect their businesses, operations, and relationships with their users.  Through my experience, I have also gained familiarity with how such proposals affect all manner of websites, applications, and other digital services.[1]

2.      I previously submitted a declaration, dated October 28, 2024, in this case. I submit this declaration in support of Plaintiffs' Renewed Motion for Preliminary Injunction.  I am over the age of 18 and am competent to make the statements herein.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.   About CCIA and CCIA's Affected Members.

3.      CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet,

---

[1] This Declaration will refer to all digital services—including social media websites and applications—as "websites" unless necessary to distinguish among different kinds of digital services.

information technology, and telecommunications industries.  For more than fifty years, CCIA has promoted open markets, open systems, and open networks, and has advocated for the interests of the world's leading providers of technology products and services before governments and the courts.[2]

4.    CCIA's membership includes computer and communications companies, equipment manufacturers, software developers, service providers, and integrators, among others.[3]  I understand that a number of CCIA's members would be considered "social media platforms" under Florida House Bill 3 (HB3) including, at a minimum: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram.

5.    More specifically, based on my experience in the industry, my review of the declaration submitted by Alexandra Veitch on behalf of YouTube, and based on information publicly available about how YouTube's services operate, it is my understanding that one or more of YouTube's services likely meet each of the criteria to constitute a "social media platform" under HB3.    Fla. Stat. §501.1736(1)(e).

    a.    It is my understanding that because YouTube allows users to create, upload, and share videos with others, *see* YouTube Help, Upload

---

[2] CCIA, Home, https://tinyurl.com/4vd6akap (last visited Mar. 27, 2025).

[3] Currently, CCIA's members include: Amazon, Apple, Cloudflare, Coupang, Deliveroo, eBay, EchoStar, Google, Intel, Intuit, Meta, Nord Security, Opera, Pinterest, Rakuten, Shopify, Texas.net, Uber, Viagogo, Waymo, X, and Zebra.    *See* CCIA, Members, https://tinyurl.com/mvh4tv2n (last visited Mar. 27, 2025).

YouTube Videos (last visited Mar. 27, 2025), https://tinyurl.com/2fety3cv, and because YouTube Kids allows users to view content created by other users, *see* YouTube Help, YouTube Kids (last visited Mar. 27, 2025), https://tinyurl.com/yhn4aycy, YouTube constitutes a service that "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1).

b.     It is my understanding that YouTube also "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), because YouTube and YouTube Kids provide users with recommendations of videos to view that are informed by users' past interaction with content on those services.  *See* YouTube Help, Manage Your Recommendations & Search Results (last visited Mar 27, 2025), https://tinyurl.com/536r2wwu; *see also* YouTube For Families Help, Recommended Videos on YouTube Kids (last visited Mar. 27, 2025), https://tinyurl.com/mryarz36.

c.     I further understand that YouTube has what the state refers to as "addictive" features, as YouTube gives users the option to receive "[p]ush notifications," §501.1736(1)(e)(4)(b); *see* YouTube Help, Manage YouTube Notifications (last visited Mar. 27, 2025), https://tinyurl.com/3zsdfjwr, and because YouTube also displays "likes," which HB3 characterizes as

4

"personal interactive metrics," §501.1736(1)(e)(4)(c); *see* YouTube Help, Like or Dislike a Video (last visited Mar. 27, 2025), https://tinyurl.com/wrvf33vr.

d.     I also understand that YouTube and YouTube Kids are services, whose "exclusive function" is neither "email [n]or direct messaging." §501.1736(1)(e).

e.     And it is my understanding from my review of Ms. Veitch's declaration that while YouTube does not track data in the exact manner necessary to state precisely whether its services meet the hourly threshold that HB3 sets (i.e., whether 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on its services on the days when using those services, §501.1736(1)(e)(2)), there is reason to believe that, based on historical data about usage, YouTube may be covered by the Act.  At the very least, there is reason to believe that Florida thinks YouTube meets HB3's hourly threshold.  After all, Florida's own expert cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)," Dkt. 51-1 at ¶13, which includes survey results regarding teenagers' self-reported time using YouTube.  *See* J. Rothwell, Teens Spend Average of 4.8 Hours on

Social Media Per Day (Oct. 13, 2023) (last visited Mar. 27, 2025), https://tinyurl.com/2j55rs7c. Given Florida's expert's reliance on that survey, there is reason to believe that Florida thinks YouTube meets the 10 percent threshold.

f.    I further understand that YouTube has users under the age of 16 who are located in Florida. I also understand that YouTube does not prevent minors under 14 (including those who have access to YouTube's age-appropriate experiences via YouTube Kids or Supervised Experience) from accessing its services through parent-supervised accounts when YouTube has reason to believe those users are located in Florida and that YouTube does not prohibit 14- or 15-year-olds who do not have consent from a parent or guardian from creating accounts when it has reason to believe those users are located in Florida.

6.    In addition, based on my experience in the industry and my review of publicly available information, I believe that Meta-owned and -operated services, Facebook and Instagram, likely satisfy each of the component parts of the definition of "social media platform." Fla. Stat. §501.1736(1)(e).

a.    It is my understanding that both Facebook and Instagram "[a]llow[] users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as both services allow users to create,

upload, and share pictures and videos with other users. *See* Facebook Help Center, Share Photos on Facebook (last visited Mar. 27, 2025), https://tinyurl.com/5jxy2hcb; Instagram Help Center, Share a Post (last visited Mar. 27, 2025), https://tinyurl.com/eaz6nwub.

b.     It is my understanding that Facebook and Instagram also both "[e]mploy[] algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), because both services use algorithms to show users content that may be particularly relevant to them based in part on their past interaction with content on the services. *See* Facebook Help Center, Learn About and Manage Suggested Content In Your Facebook Feed (last visited Mar. 27, 2025), https://tinyurl.com/yumkra7m; Instagram Help Center, How Instagram Determines Which Posts Appear As Suggested Posts (last visited Mar. 27, 2025), https://tinyurl.com/2w97sbcn.

c.     I further understand that Facebook and Instagram both have features that the state refers to as "addictive." When using these services, users can enable "[p]ush notifications," §501.1736(1)(e)(4)(b). *See* Facebook Help Center, Push, Email and Text Notifications (last visited Mar. 27, 2025), https://tinyurl.com/4965bkx8; Instagram Help Center, Notification Settings (last visited Mar. 27, 2025), https://tinyurl.com/47k8p3ce. In addition, both Facebook and Instagram

display how many other users have "liked" a given post, which meets HB3's definition of "personal interactive metrics," §501.1736(1)(e)(4)(c). *See* Facebook Help Center, Like and React to Reels and Videos on Facebook (last visited Mar. 27, 2025), https://tinyurl.com/438vek43; Instagram Help Center, Like or Unlike a Post on Instagram (last visited Mar. 27, 2025), https://tinyurl.com/mrx4w563.

d.    It is my understanding that "email [and] direct messaging" are not the "exclusive function[s]" of either Facebook or Instagram. §501.1736(1)(e).

e.    Florida's own statements regarding HB3 and its reliance on a publicly available survey data about minors' reported use of CCIA members' services leads me to conclude that there is an "actual and well-founded" basis for believing that Florida thinks that both Meta-operated services, Facebook and Instagram, meet HB3's requirement that 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on the services on the days when using those services, §501.1736(1)(e)(2), and that Florida will accordingly enforce HB3 against Meta.

f.    Indeed, officials at HB3's signing ceremony expressly identified Instagram as one of Florida's intended online services to regulate.

8

Press Conference at 12:30-13:00, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.  And that Florida believes Meta's services are covered by HB3 is further substantiated by its assertions in its briefing in this case that it has concerns about the features available on websites, such as "Facebook and Instagram."  Dkt. 51 at 6.  In addition, Florida's own expert in this case relied on a study claiming that minors in the United States spend "an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)."  Dkt. 51-1 at ¶13.  That study identifies Instagram and Facebook as two of the four most popular "social media platforms" among teenagers.  *See* J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c.  And it includes survey results in which teenagers self-reported spending an average of 0.9 hours per day on Instagram and 0.3 hours per day on Facebook.  Given that those self-reported numbers are for the average teenage user, it is likely that at least 10% or more of Facebook's daily active users under the age of 16 spend 2 hours or more per day on that service and that at least 10% or more of Instagram's daily active users under the age of 16 spend 2 hours or more per day on Instagram.

g.      At the very least, it is likely that Florida thinks both Facebook and Instagram satisfy HB3's coverage requirements, especially considering the legislative history of HB3 is replete with references to both Facebook and Instagram.  *See* Florida House of Representatives Staff Final Bill Analysis HB3 at 5, 7, 11 (Mar. 28, 2024); Florida Senate Bill Analysis and Fiscal Impact Statement HB3 at 6 (Feb. 13, 2024); Florida House of Representatives Staff Analysis at 5 (Jan. 17, 2024).  Because Florida likely thinks Facebook and Instagram are covered, Meta will likely have to take costly steps to comply with the law.

h.      Finally, it is my understanding that Facebook and Instagram both have users under 16 who are "residents" of Florida (as HB3 defines that term).  It is my understanding that neither service prohibits minors under 14 that they have reason to believe are located in Florida from creating or holding accounts and that neither service requires 14- and 15-year-olds that the services have reason to believe are located in Florida to obtain consent from a parent or guardian before creating an account.

7.      These HB3-covered members enable billions of users around the world to create and share content using their services, whether to facilitate work, study, prayer, socialization, commerce, or communications.  These companies also moderate and curate what is displayed on their services as a vital part of their

10

operations. They disseminate a massive and constantly expanding amount of content in order to provide valuable products and tools for their users.

8. Because content moderation is central to the operations of these CCIA members, issues surrounding trust and safety constitute a significant part of CCIA's policy and advocacy work. To that end—among our other endeavors and projects in this area—CCIA is incubating a non-profit organization called the Digital Trust & Safety Partnership (DTSP). DTSP partners include CCIA members and other businesses dedicated to improving practices and procedures for identifying and preventing the dissemination of objectionable and harmful content online. DTSP aims to develop and iterate upon industry best practices for, among other things, the moderation of third-party content and behavior, with the goal of ensuring a safer and more trustworthy Internet. DTSP's objectives include the facilitation of internal assessments—and, subsequently, independent third-party assessments—of participants' implementation of identified best practices for promoting the safety of their users and the online communities that they maintain. DTSP balances these collective goals with the recognition that each participating company has its own values, service aims, digital tools, and human-led processes for moderating the extremely broad range of human expression they facilitate.

11

## II. Valuable and Protected Speech on CCIA Members' Websites.

9.    The content on CCIA members' websites comes from all over the world and is incredibly diverse.  The services enable and provide a forum for the height of human thought and creativity: material that runs the gamut from being culturally significant, informative, educational, or politically engaging to funny and entertaining.    These services offer central avenues for protected speech and expression, and millions of individuals use these services daily to engage in speech.

10.    CCIA members' websites offer access to a wide array of highly valuable speech and viewpoints, and adults and minors alike benefit from access to these websites.  Many Americans use at least one of CCIA members' websites. Accordingly, CCIA's members offer their users the opportunity to (1) maintain connections with friends and family and create new connections, (2) express themselves and their creative works, (3) stay informed about current events and engage in their own political and social speech on the day's issues, (4) learn from others, whether through expressly educational content or through the ability for cross-cultural exchange, and (5) find high-quality and engaging expression.

**III. Parents Already Have Many Ways to Monitor Their Teens' Internet Use.**

11.    CCIA holds a firm conviction that children are entitled to a higher level of security and privacy in their online experiences.  But not only do parents already have widely available tools to monitor and control their children's online behavior, CCIA's members are already actively engaged in various initiatives to integrate new, robust protective design features into their websites and services.

12.    **Device-level restrictions.**  Parents can decide whether and when to let their children use computers, tablets, and smartphones.  And those who choose to let their children use such devices have many ways to control what their children see and do.  Device manufacturers, such as Apple, Google, Microsoft, and Samsung, provide parents with tools to limit how long their children can spend on their devices.  *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://tinyurl.com/uxfnna4y (last visited Mar. 27, 2025); Google, Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited Mar. 27, 2025); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited Mar. 27, 2025); Samsung, Manage Family Groups and Parental Controls with Your Samsung Account, https://rb.gy/u4y1sz (last visited Mar. 27, 2025).  And many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services.  *See, e.g.,* Alyson Behr, *The Best*

13

*Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://tinyurl.com/s6bje2jd (last visited Mar. 27, 2025).

13.   **Network-level restrictions.**   Cell carriers and broadband providers similarly give parents tools to block apps and sites from children's devices, ensure that they are texting and chatting with trusted contacts, and restrict screen time during certain hours of the day.  *See, e.g.*, Verizon, Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family, https://tinyurl.com/ycyxy6x6 (last visited   Mar.   27,   2025);   AT&T,   AT&T   Secure   Family   App, https://tinyurl.com/d995ya2u (last visited Mar. 27, 2025); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac (last visited Mar. 27, 2025); Comcast   Xfinity,   Parental   Controls   for   Xfinity   Internet   and   TV, https://tinyurl.com/2rwyt7mv (last visited Mar. 27, 2025).  Many wireless routers (devices that provide wireless Internet throughout a home) offer parental control settings as well, which allow parents to block specific websites or applications, monitor what services their children visit and for how long they visit them, and limit hours that children can use the internet.  *See, e.g.*, Molly Price & Ry Crist, How to Set Up and Use Your Wi-Fi Router's Parental Controls, CNET (Feb. 28, 2025),   https://tinyurl.com/mtvdwypu;   Netgear,   NETGEAR   Smart   Parental Controls, https://tinyurl.com/me3ksfvu (last visited Mar. 27, 2025).

14. **Browser-level restrictions.**  Internet browsers give parents another layer of protection by offering parents tools to control which websites their children can access.  *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022) (last visited Mar. 27, 2025).  Others also permit parents to set up a "Kids Mode," which allows children to access only a pre-approved list of websites.  *See* Microsoft, Learn More About Kids Mode in Microsoft Edge, https://tinyurl.com/59wsev2k (last visited Mar. 27, 2025); Google, Google's Parental Controls–Google Safety Center, https://tinyurl.com/kwkeej9z (last visited Mar. 27, 2025).

15. **Application-level restrictions.**  On top of all the measures discussed above, CCIA's members have been leading the effort to implement settings and parental tools to individually tailor younger users' online use to the content and services that are suited to their unique lived experience and developmental needs. Jordan Rodell, *Why Implementing Education is a Logical Starting Point for Children's Safety Online*, Disruptive Competition Project (Feb. 7, 2023), https://tinyurl.com/bdct9res.

   a. Several CCIA members prohibit minors younger than 13 from accessing their main services.  Other members offer separate experiences for users under 13 geared for that specific age group.  *See* YouTube for Families

15

Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Mar. 27, 2025); YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Mar. 27, 2025).

b.    Several use "age gating" to help ensure that users view only age-appropriate content. *See* Instagram, Updates to the Sensitive Content Control (June 6, 2022), https://tinyurl.com/y8y8ds7p; YouTube Help, Age-Restricted Content, https://tinyurl.com/52hmx4ze (last visited Mar. 27, 2025).

c.    Others automatically impose default privacy settings for minors' accounts. *See* Pinterest, Resources for Parents and Caregivers of Teens, https://tinyurl.com/yvzsd82p (last visited Mar. 27, 2025); Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, https://tinyurl.com/22fwuzz9 (last visited Mar. 27, 2025).

d.    Several CCIA member products permit a self-identified parent to supervise teens' online activities on their services, once confirmed by both users. *See, e.g.*, Meta, Supervision on Facebook, https://tinyurl.com/595h985k (last visited Mar. 27, 2025); Instagram, Help

16

Center, About Supervision on Instagram, https://tinyurl.com/zxxmmbhb (last visited Mar. 27, 2025).

16.    As an added layer of protection beyond these controls that limit minors' access to objectionable content on the Internet, many CCIA members moderate content.  Content moderation, which includes the practices and systems used by digital services to manage and mitigate content- and behavior-related risks to users and others, serves a vital function in allowing websites to express themselves and effectuates a website's community standards, thereby delivering on commitments that they have made to their communities.  It enables CCIA's members to remove patently illegal content like child sexual abuse material (CSAM) as defined under U.S. federal law—which members remove and report to the National Center for Missing and Exploited Children (NCMEC)—and graphic violence and material from dangerous organizations.  In Q4 of 2024 alone, Meta "actioned" tens of millions of pieces of content classified as adult nudity and sexual activity, bullying and harassment, child endangerment, dangerous organizations and individuals, hate speech, or suicide and self-injury across Facebook and Instagram.  Meta, Community Standards Enforcement Report: Q4 2024 Report, https://tinyurl.com/kewzmkbs (last visited Mar. 27, 2025).  By removing such content and, in some cases, implementing age-gate features that prevent minors' access to certain swaths of material, CCIA's members have also

17

curated the material on their websites to ensure that minors are protected from objectionable content.

17.    These various services thus enable parents to set time limits, provide enhanced privacy protections as a default for their minor children, as well as offer other tools to allow parents to block particularly objectionable sites entirely. Competitive Enterprise Institute, *Children Online Safety Tools*, https://tinyurl.com/2f36fe7x (last visited Mar. 27, 2025).    CCIA supports supplementing this array of tools with the implementation of digital citizenship curricula in educational environments.  *See* Rodell, *supra*.  Such curricula will not only educate children on proper social media use but also help inform parents on what mechanisms presently exist that can be used to protect their children as they see fit, based on their family's experiences.  *Id*.  These tools therefore empower parents and guardians to oversee and control their minor children's use of the Internet.

**IV.  Relevant Provisions of Florida House Bill 3.**

18.    I understand that HB3 prohibits minors under the age of 14 from creating accounts on "social media platform[s]" altogether.    Fla. Stat. §501.1736(2)(a).  I understand that HB3 also requires "social media platform[s]" to terminate any existing accounts held by minors under the age of 14, "including accounts that the social media platform treats or categorizes as belonging to an

account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b). I understand that account holders have 90 days to dispute the termination. *Id.*

19. I understand that HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). I understand that HB3 also requires "social media platform[s]" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." *Id.* §501.1736(3)(b). I understand that the account holder has 90 days to dispute the termination. *Id.* I also understand that HB3 specifies that if the parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §501.1736(4).

20. I understand that the regulations enacted by the Florida Attorney General to implement HB3 say that, in "determining whether someone is a parent … for a known child, a social media platform shall conduct reasonable parental verification." Fla. Admin. Code §2-43.002(2). I understand that "[r]easonable parental verification" means "any method that is reasonably calculated at

determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means," which "may include, but is not limited to" "requesting from a child the child's parent's name, address, phone number, and e-mail address," "contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship," and "utilizing any commercially reasonable method regularly used by the government or business to verify that parent's identity and age." *Id.* §2-43.001(12).

21.    I understand that HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or reckless[ly]" violate its provisions.    Fla. Stat. §501.1736(5).    I understand that HB3 authorizes the Florida Attorney General to enforce the law and that it imposes a civil penalty of up to $50,000 per violation. *Id.*

## V.    The Impact of House Bill 3 on CCIA Members.

22.    CCIA's members provide vibrant communities for users to engage in vitally important forms of free expression, and the Act will burden or eliminate their ability to engage in these various types of speech.

23.    By prohibiting minors under 14 from accessing "social media platform[s]" at all, and by blocking 14- and 15-year-olds from accessing "social media platform[s]" unless they obtain the consent of a parent or guardian, HB3

restricts them from accessing websites where they can engage in First Amendment activity.

24.    In addition to restricting the speech of minors, the Act would also burden the speech of adults.  The practical effect of the law is to require covered members to verify the age of users before deciding whether to let them create an account.  Indeed, the regulations implementing HB3 require CCIA's covered members to conduct "reasonable age verification" if the "facts or circumstance readily available to" them "should reasonably have [] aroused [a] question whether the person was a child." Fla. Admin. Code §2-43.002(3)(a).  Covered members will have no choice but to endeavor to verify users' age, including by requiring both adults and minors to provide documentation proving their age.  That would significantly burden adults' access to constitutionally protected speech. Identification requirements discourage users from accessing websites operated by covered members, and they completely bar adults who do not possess documentation from accessing such services.

25.    HB3 also burdens the First Amendment rights of CCIA members who wish to communicate with users.  As detailed above, CCIA members curate and disseminate content to their users that they think will be particularly relevant to them.  These members decide what content to share with users based on the content that users have previously interacted with as well as the members' rules

about what content is appropriate for their services.  As the Supreme Court has explained, "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 730-32 (2024).  But by imposing restrictions on who may access covered members' services, including by restricting who may create accounts, HB3 directly abridges members' ability to disseminate information to their users in violation of their speech rights.  *Moody*, 603 U.S. at 727-40.  Furthermore, HB3 further burdens CCIA's covered members' First Amendment rights by regulating so-called "addictive features."  Such features, like "[p]ush notifications," enable CCIA members to speak directly to users, which means that HB3's restrictions on the use of those features directly interferes with members' ability to communicate with their users.  As a result, HB3 denies covered members the right to disseminate their speech and the speech of others to the audience that wishes to interact with their services.

26.    The burden on speech imposed by HB3 is particularly notable because it singles out websites that (according to the state) are "addictive."  As I understand it, whether a service is covered turns in part on how long minors spend on the service and whether the service employs tools designed to bring to their attention content they might like.  *See* Fla. Stat. §501.1736(1)(e); Press Conference, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social*

*Media*, 6:00-6:23 (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.   In other words, the law burdens speech that users find especially interesting, rationing the Internet and doling it out only in those contexts that the state believes are appropriate for its citizenry.

**VI. Complying with HB3 Would Be Extremely Burdensome.**

27.    Compliance with HB3 will be unduly burdensome and extremely costly for CCIA's covered members, which will cause them and their users irreparable harm.   Based on my experiences working with CCIA's members, I believe that HB3's restrictions will require websites, in practice, to implement complex age verification, parental consent, and parental verification procedures. And I can attest that the processes of confirming the age and identity of users, confirming the age and identity of parents, and confirming the relationship between the user and the parent are inherently difficult and require capabilities that many websites lack.

28.    To comply with HB3's ban on minors under 14 from creating accounts and accessing their websites altogether, CCIA's covered members will need to assess the age of existing account holders and implement procedures to determine the age of future account holders before they access their services.   Fla. Stat. §501.1736(2)(a).   But the statute also requires websites to investigate and to terminate "an account holder who is likely younger than 14 years of age."   *Id.*

§501.1736(2)(b).    And HB3's implementing regulations impose liability on websites that "fail[] to perform reasonable age verification" after learning that an account holder may in fact be a minor.  Fla. Admin. Code §2-43.002(3)(a).  The combination of these requirements means that in practice CCIA's covered members will be forced to implement age-verification procedures to avoid potential liability for failing to properly investigate whether an account needs to be terminated under HB3's ban related to minors under 14.  To do so, members will spend large, unrecoverable sums up front to develop the proper capabilities.  And to ensure the process continues to work effectively, members will need to engage in additional ongoing expenditures that maintain those capabilities.   These costs cannot be recouped and are extremely burdensome on members.

29.    Complying with HB3's parental consent requirement for 14- and 15-year-olds will also be extremely difficult and costly.  Fla. Stat. §501.1736(3)(a).

a.    Because the parental consent provision covers both account holders who actually are 14- or 15-year-olds and those who are "likely" that age, *id.* §§501.1736(3)(a), (b), and because the implementing regulations similarly require age verifications for such account holders as well, Fla. Admin. Code §2-43.002(3)(a), CCIA's members will need to institute procedures that enable them to assess the age of account holders (both current and prospective) to correctly determine whether they are in fact

24

minors.  As was the case with HB3's provision banning 14-year-olds, the parental consent provision will require, in practice, that CCIA's members implement age verification procedures, which will be extremely difficult and costly.

b.    In addition, HB3's parental consent requirement and the implementing regulations will also compel CCIA's members to implement parental-verification procedures.  Fla. Admin. Code §2-43.002(2).  Remotely verifying the existence of a relationship between two accounts as Florida requires is exceptionally difficult to implement.  This is particularly so in instances where parents or legal guardians do not have the same last name as the children in question, where a child is in foster care, or where a parent is not located in Florida.  As a result, these requirements demand additional, significant upfront and ongoing investments to implement.  And these costs compound the irreparable burden HB3 will place on CCIA's members, just for the members to attempt to comply with its restrictions.

30.    In short, if HB3 is not enjoined and is enforced against CCIA's members, as Florida is likely to do, CCIA's mission to promote open markets, open systems, and open networks would be directly, substantially, and irreparably harmed.  Likewise, CCIA's covered members, as well as their users (both minor and adult account holders alike), will suffer irreparable harm.

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of March, 2025, in Washington, DC.

Matthew Schruers