# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION, et al.,

     Plaintiffs,

v.                             Case No. 4:24-cv-438-MW-MAF

JAMES UTHMEIER, in his official
capacity as Attorney General of the
State of Florida,

     Defendant.

_____/

## OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

James Uthmeier
  *Attorney General of Florida*

John Guard
  *Chief Deputy Attorney General*
Jeffrey P. DeSousa
  *Acting Solicitor General*
David M. Costello
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski
  *Senior Deputy Solicitor General*
Darrick W. Monson
  *Assistant Solicitor General*

Anita J. Patel
  *Special Counsel*
Christine E. Lamia
  *Special Counsel*
James Waczewski
  *Senior Assistant Attorney General*
Sara E. Spears
  *Assistant Attorney General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

April 21, 2025

*Counsel for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................4

    A.  Children and Social Media.......................................................................4

    B.  HB3 ........................................................................................................7

    C.  Procedural History..................................................................................8

ARGUMENT.....................................................................................................13

I.   PLAINTIFFS' "RENEWED" MOTION IS A MOTION FOR RECONSIDERATION, WHICH MUST BE DENIED BECAUSE RECONSIDERATION IS NOT JUSTIFIED .........13

II.  PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN ON THE EQUITIES...................16

    A.  Plaintiffs have shown neither reasonable diligence nor irreparable harm .....................................................................................................17

    B.  In any event, the equities do not support disturbing the status quo and allowing platforms to ignore HB3 ..................................................22

III. PLAINTIFFS CANNOT OBTAIN A PRELIMINARY INJUNCTION BECAUSE THIS COURT LACKS POWER TO PASS ON THEIR FIRST AMENDMENT CLAIMS............24

    A.  *Younger* bars Plaintiffs' claims ...........................................................25

    B.  Plaintiffs do not have associational standing .......................................28

IV. PLAINTIFFS' CLAIMS FAIL ON THE MERITS BECAUSE HB3 DOES NOT VIOLATE THE FIRST AMENDMENT.................................................................39

    A.  HB3 is not subject to heightened scrutiny ...........................................39

    B.  Even if HB3 regulated speech, it would be a time, place, or manner restriction that survives scrutiny.........................................................48

    C.  At minimum, Plaintiffs have not established that HB3 is facially unconstitutional ...................................................................................58

V.  PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE ENTITLED TO THE SWEEPING INJUNCTION THEY SEEK...............................................................59

CONCLUSION...................................................................................................60

CERTIFICATES OF COMPLIANCE AND SERVICE .....................................62

**INTRODUCTION**

Over a year ago, the Florida Legislature passed HB3 to protect children from the "dangers" that "today's social media pose" to "adolescents' mental health." *Moody v. NetChoice*, 603 U.S. 707, 733 (2024); *M.H. ex rel. C.H. v. Omegle.com*, 122 F.4th 1266, 1268 (11th Cir. 2024) ("[T]he internet in general and social media in particular pose grave risks to children."). The law, which was passed with broad bipartisan support, regulates social-media companies' use of design features that addict children by exploiting their deficits in impulse control and delayed gratification. If a platform chooses to use the features, it cannot contract with children for its services.

That restriction does not violate the First Amendment. Since the Founding, the Nation has regulated children's contracts, *NRA v. Bondi*, ___ F.4th ___, 2025 WL 815734, at *6-7 (11th Cir. Mar. 14, 2025) (en banc), and HB3 does not threaten to "drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992). Infinite scroll, autoplay, push notifications, personalized metrics, and live streaming are not intertwined with any ideas, messages, or viewpoints.

Plaintiffs' request for a preliminary injunction must therefore be denied. But merits aside, Plaintiffs still face four insuperable hurdles. First, their "renewed" motion is a motion for reconsideration. In effect, they want a "mulligan" after failing

to adequately support their motion for preliminary injunction. DE72 at 10 n.9. Yet they have not established that reconsideration is justified.

Second, the equities do not support a preliminary injunction. Plaintiffs waited seven months to file this action and then acted with no urgency in pursuing a preliminary injunction. Back in October, Plaintiffs proclaimed that an injunction was necessary because once in effect, HB3 would "restrict[] a breathtaking amount of core First Amendment activity" and "impose significant costs" on their members. DE5 at 16, 33. Even so, Plaintiffs were unwilling to present evidence at a hearing and could not be bothered to gather basic evidence for associational standing. *See* DE72 at 9. Plaintiffs' lack of "reasonable diligence" defeats their request for a preliminary injunction. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). At minimum, it undercuts the request, and the equities weigh against putting children at risk by allowing Plaintiffs' members to ignore HB3 "for the life of this lawsuit." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay, joined by Thomas and Alito, JJ.).

Third, *Younger* bars Plaintiffs' First Amendment claims. Florida has filed a state enforcement action against Snap under HB3 and the Florida Deceptive and Unfair Trade Practices Act, and "the relief requested" by Plaintiffs would interfere with that prosecution. *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003). Plaintiffs request an injunction that stops "the Attorney General" from

enforcing HB3 "against" Snap and their other "members." DE76 at 34; DE74 ¶ 8 (Snap is a member). That relief would have "the effect of restraining" Defendant's "prosecution" of Snap, which *Younger* forbids. *31 Foster Child.*, 329 F.3d at 1276-77.

Finally, Plaintiffs lack associational standing because their First Amendment claims require member participation. Plaintiffs do not even address associational standing in their renewed motion, much less show that member participation is unnecessary. Plaintiffs now assert the First Amendment rights of individual platforms, DE76 at 22, which exacerbates the need for platform participation. Whether a platform is even engaged in First Amendment activity when it curates and disseminates speech is a fact-intensive inquiry. *See Moody*, 603 U.S. at 725-26. It depends on the nuances of the "algorithms" that the platform uses, *id.* at 734; *id.* at 745-46 (Barrett, J., concurring); whether the platform's feeds "exclude[]" certain types of content, *id.* at 731 (majority op.); whether the platform relies on "artificial intelligence" to operate its feeds, *id.* at 770, 795 (Alito, J., concurring in the judgment, joined by Thomas and Gorsuch, J.J.); and the "corporate structure and ownership" of the platform. *Id.* at 746 (Barrett, J., concurring).

"At this juncture, the status quo" is that covered platforms "are subject to" HB3. *Free Speech Coal. v. Uthmeier*, No. 24-cv-514, slip op. at 3 n.1 (N.D. Fla. Jan.

16, 2025) (Walker, C.J.). The Court should deny Plaintiffs' request to disturb that status quo pending final judgment.

## BACKGROUND

### A. Children and Social Media

Mounting evidence shows that social-media companies deploy features designed to addict users, resulting in significant harm to their mental health—particularly in children. As the U.S. Surgeon General explained in a recent advisory, platforms use features like "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations" that lead to "excessive use and behavioral dysregulation." DE51-9 at 9. Those features "overstimulate the reward center in the brain" and "trigger pathways comparable to addiction," causing "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." *Id.*; *accord* DE51-2 ¶¶ 29-45.

Although the design features can addict anyone, children "are particularly at risk, as their developing brains are more susceptible to the reward-driven mechanisms underlying the[] features." DE51-2 ¶ 46; *see also* DE63-3 at 127:14-22; DE51-9 at 5. Children have an undeveloped "prefrontal cortex," which "is responsible for, among other things, planning, decisionmaking, and problem solving." *NRA v. Bondi*, ___ F.4th ___, 2025 WL 815734, at *34 (11th Cir. Mar. 14,

2025) (en banc) (Rosenbaum, J., concurring, joined in part by Jordan and Abudu, JJ.). As a result, children struggle with "impulse control," "delayed gratification," and "moderating the influences of societal pressures, such as those on social media." *Id.* That makes them particularly vulnerable to platforms' addictive features. Adolescents average 5 hours per day on social media with nearly half reporting "almost constant[]" online use. DE51-1 ¶¶ 9, 13; DE51-2 ¶ 18. More than a third feel "addicted" to social media and almost 75% report feeling "manipulate[d]" to spend more time on it than they intend. DE51-9 at 9-10.

That manipulation has severe consequences. "[C]ompulsive or uncontrollable use" of social media can cause "sleep problems, attention problems, and feelings of exclusion," all of which put children at risk of "depression, anxiety, and neuroticism." DE51-9 at 10; DE51-1 ¶ 20; DE51-2 ¶ 16. As child social-media use proliferated over the last 15 years, adolescent depression rates more than doubled, and associated behaviors like self-harm and suicide "skyrocketed." DE51-1 ¶¶ 15-18, 23; *see also* DE63-1 at 201:19-21.

Studies reveal that the correlation is no coincidence: Addictive social-media use is a causal factor. DE51-1 ¶¶ 34, 47. There is "a causal path from social media use to depression and low well-being." DE51-1 ¶ 59. Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression. DE51-1 ¶¶ 39, 47; DE51-9 at 6.

Because addiction to social media has fueled the Nation's "youth mental health crisis," DE51-9 at 13; DE51-1 ¶ 26, the U.S. Surgeon General has called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children." DE51-9 at 15. The Surgeon General has specifically recommended policies that "strengthen[] and enforce[e] age minimums" and "limit[] the use of features that attempt to maximize time, attention, and engagement." *Id.*

Policy intervention is necessary because platforms' own interventions have proven inadequate. Platforms have long had parental controls, but they have made no dent in child addiction. *See* DE63-3 at 183:16-23. That is both because parents do not use them and because they are ineffective. ████████████████████████ ████████████████████. DE51-6 at 149:10-150:25. In February 2024, in response to questions from the Chair of the U.S. Senate Judiciary Committee, the CEO of Snap admitted that only 200,000 parents use Snapchat's controls, though the platform has 60 million users under age 18. *See* Evan Spiegel, Snap CEO, Resp. to Sen. Judiciary Comm. Questions for the Record, at 1-2 (Feb. 28, 2024), https://tinyurl.com/55amwdfc. Moreover, parental controls are difficult for parents to use and manage, DE51-3 ¶¶ 51-61; they do not address the features that make platforms addictive, DE51-2 ¶¶ 48-50; and platforms do not implement them with fidelity. *See, e.g.*, Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL

4272104, at *9 (Sep. 1, 2024) (discussing the Commission's finding that Facebook has "misled parents about their ability to control" their child's accounts).

**B. HB3**

HB3 protects children from platforms with addictive features by regulating the platforms' contracts with children. When a platform transacts with a child to create a personal account, it can target the child with addictive features like "personal interactive metrics," "[p]ush notifications," "[i]nfinite scrolling," and "[a]uto-play video." Fla. Stat. § 501.1736(1)(e); DE51-9 at 9. If a platform chooses to engage in those practices, HB3 limits its ability to "enter[] into a contract" with a child "to become an account holder." Fla. Stat. § 501.1736(2)(a), (3)(a); *see also* Pls. Resp. to Supp. Auth. at 3, *NetChoice v. Skrmetti*, No. 24-cv-1191 (M.D. Tenn. Mar. 18, 2025), DE64 ("Florida's law applies only to accounts owned by minors[.]").

Codified at Florida Statutes § 501.1736, HB3 defines the "social media platform[s]" subject to its provisions as those that: (1) allow "users to upload content or view the content or activity of other users"; (2) employ "algorithms that analyze user data or information on users to select content for users"; (3) use an "addictive feature[]," defined as "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]uto-play," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content"; and (4) have at least 10 percent of their "daily active

users who are younger than 16 years of age spend on average 2 hours per day or longer" on the platform. Fla. Stat. § 501.1736(1)(e).

If a platform satisfies all those criteria, Section 501.1736(2) prohibits it from "entering into a contract with" a child under 14 "to become an account holder." And Section 501.1736(3) requires the platform to obtain parental consent before "entering into a contract" with "a minor who is 14 or 15" "to become an account holder." An "account holder" is anyone with an "account," "profile," or other "unique identifier while using or accessing" the platform. *Id.* § 501.1736(1)(a).

**C. Procedural History**

HB3 was enacted on March 25, 2024, with an effective date of January 1, 2025. 2024 Fla. Sess. Law Serv. Ch. 2024-42 (H.B. 3). Seven months later, on October 28 and 29, 2024, Plaintiffs filed this action and requested a preliminary injunction. DE1; DE4; DE5.

Plaintiffs attached four declarations to their motion for preliminary injunction, and they asked for oral argument but not an evidentiary hearing. DE4 at 1. Defendant requested to depose Plaintiffs' declarants, DE25 at 4, but Plaintiffs opposed any discovery, asserting that no "factual disputes" existed. DE25 at 2. Plaintiffs, however, said they would make the declarants available for deposition if Defendant "stay[ed] enforcement of" HB3 from its "January 1 effective date until the Preliminary Injunction Motion [wa]s resolved." DE25 at 3. Defendant was willing

to stay enforcement for that limited time given the importance of "factual development" in this case. DE25 at 4-5; *see also Moody v. NetChoice*, 603 U.S. 707, 725-26 (2024) (emphasizing that the record required more factual development to resolve NetChoice's request for a preliminary injunction).[1]

This Court held a telephonic hearing to address Defendant's request for depositions. *See* DE36. The Court explored the possibility of an evidentiary hearing in lieu of depositions, but Plaintiffs opposed a hearing and stated that "if [the Court] were to hold a live hearing," they would not want "to present witnesses" and "would just rest on the[ir] declarations." DE51-10 at 9-10. Ultimately, the Court permitted both parties to conduct limited discovery and adopted the briefing schedule that the parties proposed. DE35 at 2. The Court stayed merits discovery, ordering the parties to conduct only "limited discovery . . . for purposes of preparing for the [preliminary-injunction] motion." DE49 at 1.

On January 13, 2025, Defendant filed a motion to dismiss, as well as his opposition to Plaintiffs' preliminary-injunction motion. In both filings, Defendant argued that Plaintiffs lacked associational standing because they failed to identify any "members who will be injured by" HB3. DE50 at 2; DE51 at 12. Plaintiffs had offered no evidence that one of their members operates a platform on which "[t]en

---

[1] Although the Office of the Attorney General stayed enforcement, families were still able to bring private actions enforcing HB3. *See* Fla. Stat. § 501.1736(6).

percent or more the daily active users" under age 16 "spend on average at least 2 hours per day." DE51 at 13 (quoting HB3's time requirement).

Plaintiffs had a month to submit their reply in support of their preliminary-injunction motion, and this Court allowed them to attach to it "supplemental declarations," which they could have used to offer evidence about HB3's time requirement. DE35 at 2. But Plaintiffs chose not to do so even though "the Supreme Court and the Eleventh Circuit have developed a rigorous, fact-intensive test for standing." DE72 at 2, 7 n.4.

On February 28, 2025, the Court held oral argument on Plaintiffs' motion. The Court asked Plaintiffs to identify "record evidence" showing that "one member" satisfies HB3's time requirement. DE71 at 51. Plaintiffs identified no such evidence. *See id.* Instead, they asked the Court to give them more time to produce evidence. DE71 at 54, 68. The Court denied that request, concluding that it was "too late" for Plaintiffs to supplement the record. DE72 at 10 n.9. They "had multiple opportunities to provide supplemental evidence in response to Defendant's standing arguments," but "[t]hey declined to avail themselves of those opportunities." *Id.* Because Plaintiffs failed to establish standing, the Court denied their motion and dismissed their complaint. DE72 at 13; DE73. On March 14, 2025, immediately after the Court denied Plaintiffs' motion, Defendant notified Plaintiffs that he was no longer voluntarily staying enforcement.

Two weeks later—and over a year after HB3 was passed—Plaintiffs filed a new complaint and a "renewed" motion for preliminary injunction. DE74; DE75. The motion presses Plaintiffs' "First Amendment Claim" facially challenging HB3 and requests an injunction barring Defendant from enforcing HB3 against any of Plaintiffs' members. DE76 at 16, 34. The motion "is substantively identical to [Plaintiff's] initial Motion for Preliminary Injunction." DE79 at 1. Plaintiffs have merely used the motion to submit "supplemental evidence" on standing. DE72 at 10 n.9; *see* DE76 at 4 n.2. Unlike Plaintiff's initial motion, which they filed before HB3 went into effect, the renewed motion seeks to alter the status quo because covered platforms "are [now] subject to the" law. *Free Speech Coal. v. Uthmeier*, No. 24-cv-514, slip op. at 3 n.1 (N.D. Fla. Jan. 16, 2025) (Walker, C.J.).

On April 3, 2025, this Court held a scheduling conference for the renewed motion. DE79. Though the conference was held solely to establish a briefing schedule, Defendant—in the interest of transparency and candor to the Court—informed the Court and Plaintiffs that "[t]he State [had] for some time" been "investigating the harms caused by social media companies"; that it "sued Meta" for unfair and deceptive trade practices before HB3 was "even considered"; and that the State was considering other enforcement actions against social-media companies, which might include claims under HB3. DE82 at 8-9, 12-13. In response, Plaintiffs said that briefing on the renewed motion should "move forward as quickly as

possible" in case the State proceeds with enforcement against one of their members. DE82 at 11. The Court agreed to expedite the briefing schedule. DE82 at 14-15. It ordered Plaintiffs to produce their declarants for one-hour depositions by April 11, 2025, Defendant to file his opposition by April 18, 2025, and Plaintiffs to reply by April 23, 2025. DE80 at 1.

Despite urging the Court to adopt a "quick[]" schedule, DE82 at 11, Plaintiffs later jointly moved with Defendant to extend the parties' deadlines because Plaintiffs were "unable" to produce one of their declarants for deposition until April 17, 2025—six days after the Court's deadline. DE83 at 1-2. The Court granted the motion. DE84.

In the meantime, Florida continued its efforts to address "the harms [to children] caused by social media companies." DE82 at 8-9. It filed a state enforcement action against Snap alleging that Snap is violating HB3 and the Florida Deceptive and Unfair Trade Practices Act. *See* DE86-1 at 33-35 (Florida's state complaint, which was filed on April 21, 2025). In the coming days, Florida intends to move for a preliminary injunction requiring Snap to immediately comply with HB3. *See id.* at 35. Separately, Florida subpoenaed Roblox, a platform that is not a member of Plaintiffs' associations. *AG James Uthmeier Fights to Protect Children Online; Subpoenas Roblox for Child Protection Policies and Procedures*, Office of

the Attorney General (Apr. 16, 2025), https://perma.cc/5XW6-W376. Defendant expects that additional investigations and enforcement actions will commence soon.

## ARGUMENT

### I. PLAINTIFFS' "RENEWED" MOTION IS A MOTION FOR RECONSIDERATION, WHICH MUST BE DENIED BECAUSE RECONSIDERATION IS NOT JUSTIFIED.

Although labeled a "renewed motion for preliminary injunction," DE75, Plaintiffs' "motion should be construed . . . as a motion for reconsideration." *Alachua Cnty. Educ. Ass'n v. Rubottom*, 2023 WL 7132968, at *1 n.2 (N.D. Fla. Sept. 22, 2023) (Walker, C.J.) (citing *Oviedo Med. Ctr. v. Adventis Health Sys./Sunbelt*, 2020 WL 4218276, at *1 n.2 (M.D. Fla. Apr. 28, 2020)); *see also* DE79 at 7-8. Plaintiffs admit that their renewed motion is "substantively identical" to the motion this Court denied. DE79 at 1. They merely seek to fill the "evidentiary gap" that led the Court to deny the motion. DE79 at 3. But when plaintiffs "come forward with new evidence in an attempt to alter th[e] Court's prior determination" of a "motion seeking identical relief," that is a "quintessential request for reconsideration." *Oviedo Med. Ctr.*, 2020 WL 4218276, at *1 n.2; *see also Abreu v. Pfizer, Inc.*, 2022 WL 2352443, at *6 (S.D. Fla. June 22, 2022) (treating a "renewed motion" as a reconsideration motion and collecting cases doing the same), *R&R adopted by* 2022 WL 3372104 (S.D. Fla. Aug. 16, 2022). Plaintiffs cannot evade the stringent standard for reconsideration simply by calling their motion a "renewed" motion. *See Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997) (whether a

motion is for reconsideration "depend[s] on the type of relief sought," "regardless of how the motion is styled").

And Plaintiffs have not met the standard for reconsideration. *See, e.g.*, *Mannings v. Sch. Bd. of Hillsborough Cnty.*, 149 F.R.D. 235, 235 (M.D. Fla. 1993) ("The burden is upon the movant to establish the extraordinary circumstances supporting reconsideration."). Federal Rule of Civil Procedure 54(b) governs motions to reconsider interlocutory orders, and though it provides no standard for deciding such motions, "the interests of finality and conservation of scarce resources favor deeming reconsideration . . . an extraordinary remedy which is to be employed sparingly." *Pensacola Firefighters' Relief & Pension Fund Bd. of Dirs. v. Merrill Lynch*, 2010 WL 11519376, at *2 (N.D. Fla. June 28, 2010). For that reason, "where a party attempts to introduce previously unsubmitted evidence on a motion to reconsider" a preliminary-injunction order, "the court should not grant the motion absent some showing that the evidence was not available during the pendency of the [preliminary-injunction] motion." *Cumulus Media v. Clear Channel Commc'ns*, 304 F.3d 1167, 1178 (11th Cir. 2002); *accord Oviedo Med. Ct.*, 2023 WL 7132968, at *2; *J-B Weld Co. v. Gorilla Glue Co.*, 2018 WL 1989308, at *4 (N.D. Ga. Feb. 12, 2018).

Here, the additional evidence that Plaintiffs offer (information about users) was "available to [them] at the time of" their initial motion. *Text Ads & Mktg. v.*

*Rafferty*, 2024 WL 5107239, at *3 (W.D. Pa. Dec. 13, 2024). The Snap and YouTube declarants providing Plaintiffs' "new" evidence are the *same declarants* Plaintiffs used previously, and they admitted during their depositions that "th[e] data [submitted] is not new." DE86-2 at 14:3-8 (Snap declarant); DE86-3 at 22:13-23:5 (YouTube declarant testifying that the additional information in her declaration was "not . . . previously unknown to Google"). "Plaintiff[s] cannot resort to repeated, successive attempts to obtain preliminary injunctive relief by submitting piecemeal evidence that was already available to [them] when [they] filed [their] Motion for Preliminary Injunction." *Rafferty*, 2024 WL 5107239, at *3. They have "no right" to "two bites at the apple" when they "fail[ed] to present [their] strongest case in the first instance." *Oviedo Med. Ctr.*, 2020 WL 4218276, at *2.

Indeed, this Court has already rejected Plaintiffs' attempt "to seek a mulligan." DE72 at 10 n.9. At the preliminary-injunction hearing, Plaintiffs asked the Court to allow them to supplement the record with the evidence they now submit. *Id.* But "that ship had sailed," the Court concluded, because "Plaintiffs had multiple opportunities to provide supplemental evidence in response to Defendant's standing arguments." *Id.* If Plaintiffs were not permitted to supplement the record while their motion was still pending, they cannot do so now by refiling the motion and slapping a new label on it.

Plaintiffs protest that it would "make[] no sense" for them to be able to amend their complaint but not present previously available evidence to obtain a preliminary injunction. DE79 at 7 n.2. That does not follow. "Leave to amend" a complaint "should be freely granted." *Bloodworth v. United States*, 623 F. App'x 976, 978 (11th Cir. 2015). Relitigating a preliminary injunction, on the other hand, is "an extraordinary measure and should be [done] sparingly." *Oviedo Med. Ctr.*, 2020 WL 4218276, at *2. Just because the Court did not end Plaintiffs' lawsuit entirely over their lack of diligence does not mean that the Court is "compelled to give [them] another" chance to obtain the "extraordinary and drastic remedy" of a preliminary injunction. *Cumulus Media*, 304 F.3d at 1178 (first quotation); DE72 at 3 (second).

## II. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN ON THE EQUITIES.

Even if Plaintiffs are permitted a second bite at the apple, their request for a preliminary injunction must be denied because the equities do not support it. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018). Plaintiffs have not acted with "reasonable diligence" in seeking an injunction, and their lack of urgency and vague evidence belie their assertion of irreparable harm. *Id.* at 159. Each of those failures "standing alone" forecloses injunctive relief. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

At the very least, they severely undercut Plaintiffs' request, and the "balance of equities and the public interest tilt[] against the[] request." *Benisek*, 585 U.S. at

158. A preliminary injunction is not in the public interest both because it would put children at risk and because in two months, the Supreme Court will decide *Free Speech Coalition v. Paxton*, No. 23-1122, which bears on Plaintiffs' First Amendment claims. *Benisek*, 585 U.S. at 160-61 (observing that "charging ahead" and granting a "preliminary injunction" in a "fluctuating legal environment" is not in the "public interest").

### A. Plaintiffs have shown neither reasonable diligence nor irreparable harm.

**1.** "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Id.* Plaintiffs, however, delayed filing this action, then they failed to "act with . . . urgency" in litigating their motion for preliminary injunction. *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Over a year ago, while the Florida Legislature was still considering HB3, Plaintiffs proclaimed it "unconstitutional" and urged the Governor to veto it. *Gov. DeSantis Indicates That He Will Sign Unconstitutional HB3*, NetChoice (Mar. 8, 2024), https://perma.cc/S7BS-VZ86. Still, Plaintiffs did not challenge HB3 after the Governor signed it into law on March 25, 2024. Even though Plaintiffs are "sophisticated litigants" with vast resources and a large legal team, they waited seven months.[2] *Cf. PDVSA US Litig. Tr. v. Lukoil Pan Americas*, 991 F.3d 1187,

---

[2] Plaintiffs are represented by nine attorneys and two law firms. *See* Docket, *CCIA v. Uthmeier*, No. 24-cv-438 (N.D. Fla.). In another case before this Court, they

1193 (11th Cir. 2021); DE1. They have no "justification" for that delay. *Wreal*, 840 F.3d at 1248. Defendant previously raised the delay, DE51 at 35-36, and Plaintiffs acknowledged it but offered no reason for it. *See* DE63 at 14.

Plaintiffs also failed to act with "reasonable diligence" in litigating their motion for preliminary injunction. *Benisek*, 585 U.S. at 159. As explained above, in Defendant's motion to dismiss and his opposition to Plaintiffs' motion, he asserted that Plaintiffs had failed to offer evidence of injury in fact. Yet "even after Defendant raised th[at] issue," "Plaintiffs chose not to provide [any] evidence" of injury. DE72 at 7 n.4. That failure doomed their request for a preliminary injunction. *Id.* at 13. And it reflected a lack of urgency, not "circumstances" outside of Plaintiffs' "control." *Benisek*, 585 U.S. at 159. Plaintiffs did "not claim that th[e] [missing] information [wa]s unavailable to their members or that it would be burdensome for their members to provide it." DE72 at 9. Plaintiffs simply chose not to gather the information.

Plaintiffs have not even acted with urgency in pursuing their renewed motion. After HB3 went into effect and Defendant informed Plaintiffs that Florida was considering a state enforcement action, DE82 at 8-9, 12-13, Plaintiffs chose to

---

are represented by nineteen attorneys and five law firms. *See* Docket, *NetChoice v. Uthmeier*, No. 21-cv-220 (N.D. Fla.).

extend the motion's briefing schedule rather than produce a declarant—for a one-hour deposition—by the deadline this Court set for them. DE83 at 1.

**2.** Plaintiffs' failure to diligently seek a preliminary injunction underscores that the harm they assert is "speculative," not "actual and imminent." *Siegel*, 234 F.3d at 1176. Plaintiffs assert that absent a preliminary injunction, their members' ability to disseminate speech to children will be burdened, and members will incur compliance costs because they will have to verify users' ages and obtain parental consent for 14- and 15-year-olds. *See* DE76 at 32-33. But if those purported harms were "actual and imminent," Plaintiffs would have done the basic legwork necessary to satisfy Article III months ago. *Siegel*, 234 F.3d at 1176.[3]

Plaintiffs did not do that legwork because the harm they assert is a mirage. Their declarants previously testified that as soon as HB3 went into effect, it would disrupt platforms' operations and force them to incur new compliance costs. Since then, HB3 has gone into effect, and the declarants now say that harm is just over the horizon. Back in October 2024, Plaintiffs' YouTube declarant (Alexandra Veitch)

---

[3] Plaintiffs also say that an injunction is necessary because HB3 harms users' First Amendment rights, *see* DE76 at 32, but "injuries to third parties are not a basis to find irreparable harm." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018); *accord Oviedo Med. Ctr.*, 2020 WL 4218276, at *2 ("[P]otential harm to third parties can[not] support a finding of irreparable harm."); *Island Wifi Ltd. v. AT&T Mobility Nat'l Accts.*, 2020 WL 6270862, at *2 n.2 (S.D. Fla. Sept. 14, 2020) (same); *Nutrition Distrib. v. Enhanced Athlete, Inc.*, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017) (same); *Wooten v. BNSF Ry. Co.*, 2017 WL 1089546, at *1 (D. Mont. Mar. 21, 2017) (same).

testified: "[I]f the Act takes effect on January 1, 2025, Google and YouTube will suffer irreparable harm in the form of unrecoverable compliance costs" and "diminished ability to provide valuable user-generated content." DE5-1 ¶ 42. But months later—after HB3 has for weeks been enforceable by both Defendant and private parties—Google and YouTube have still suffered no harm: Veitch now says those harms "will" occur "if Defendant is allowed to enforce the Act." DE76-4 ¶ 51. The same is true for Snap. In October, the Snap declarant (David Boyle) stated that Snap "will" have to make "changes" to its platform to comply with HB3, which will be "costly." DE5-3 ¶ 9. Six months later, Boyle is still asserting that Snap "will" at some point have to "change" its platform and incur "cost[s]." DE76-1 ¶ 16.

The declarants can muster only vague assertions of "some day" harms because HB3 has not saddled platforms with any new costs. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). Platforms were already conducting age-verification and obtaining parental consent before HB3 went into effect. *See* DE76 at 8-9 (Plaintiffs asserting that their members engage in "age-gating," which involves identifying a user's age then filtering content for that user); DE51-3 at 22 ("Meta" and "YouTube" are "already using age-assurance technology"); DE63-2 at 156-57 (certain platforms must already age-verify and seek parental consent to comply with the Children's Online Privacy Protection Act); DE86-2 at 24:5-24 (testifying that Snap has

"test[ed]" "third-party age verification vendors" because "there are many jurisdictions" contemplating age-verification).

Plaintiffs have not shown irreparable First Amendment injury either. They say that "the loss of First Amendment freedoms . . . constitutes irreparable injury." DE76 at 32. But Plaintiffs ignore that irreparable injury is "presumed" for only "*certain* First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether." *Siegel*, 234 F.3d at 1178 (emphasis added). "[I]t is the direct penalization . . . of First Amendment rights which constitute irreparable injury." *Id.* Yet even assuming that HB3 implicates the First Amendment because it disproportionately burdens speech, *but see infra* at 41-48, it does not directly penalize any speech. It penalizes platforms only for contracting with children to make them account holders. Any burden on speech arises only indirectly—from platforms choosing to both use addictive features and condition access on users contracting for accounts. Fla. Stat. § 501.1736(2)(a), (3)(a). HB3 therefore "does not [itself] prevent expressive activity." *Fac. Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208-09 (S.D. Fla. 2007) (Jordan, J.) (finding no irreparable harm because the statute did not directly penalize speech).

Even if HB3 directly penalized speech, the presumption of irreparable injury is rebuttable—otherwise, it would not be a presumption but a "categorical rule." *eBay v. MercExchange*, 547 U.S. 388, 393 (2006) ("[T]raditional equitable

principles do not permit . . . categorical rule[s]" about "injunctive relief."). "[S]everal" circuits have held that "there is no per se rule that a violation of freedom of expression automatically constitutes irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006). Courts still must "exercise[] [their] discretion in light of the facts of the case" and "not simply apply a categorical rule." *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 985 (11th Cir. 2016). And the facts here rebut any presumption of irreparable harm. Though Plaintiffs claim that HB3 imperils platforms' and users' First Amendment rights, no platforms or users have themselves challenged the law. Only Plaintiffs have, and they have altogether failed to act with "speed or urgency." *Wreal*, 840 F.3d at 1248; *see also Winn*, 477 F. Supp. 2d at 1209 (equities did not support an injunction in part because the party that the challenged law affected did not join the suit, which "suggest[ed]" that the party was "not too concerned about" the law).

Because Plaintiffs have shown neither reasonable diligence nor irreparable harm, they are not entitled to a preliminary injunction.

### B. In any event, the equities do not support disturbing the status quo and allowing platforms to ignore HB3.

Even if Plaintiffs' lack of diligence did not foreclose a preliminary injunction, it undercuts their assertion of harm, which is outweighed by the harm to the public

that an injunction would cause and by the legal uncertainty surrounding Plaintiffs' First Amendment claims.

The harm to the public from a preliminary injunction would be substantial. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted [statutes] clearly inflicts irreparable harm on the State."). On top of that, a preliminary injunction would put children at risk by allowing Plaintiffs' members to ignore HB3 "for the life of this lawsuit," which could last "years." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay, joined by Thomas and Alito, JJ.). Even under Plaintiffs' view that the evidence is inconclusive as to whether platforms are harming children by deploying addictive features, *see* DE63 at 9-10, a preliminary injunction is against the public interest because it would force Florida to stand by while children serve as "participants in a" troubling "experiment." DE51-9 at 11.

A preliminary injunction would also be "against the public interest" because the "legal environment" for claims like Plaintiffs' is "fluctuating." *Benisek*, 585 U.S. at 160-61. In two months, the Supreme Court is set to decide *Free Speech Coalition v. Paxton*, No. 23-1122, which involves a First Amendment challenge to a Texas law

that requires "age-verification" on certain platforms. *Uthmeier*, No. 24-cv-514, slip op. at 2. That case implicates issues that bear on Plaintiffs' First Amendment claims, including whether age-verification "burdens the . . . rights of *adults*," DE76 at 20-21; Pet. Br. 25-26, *Paxton*, No. 23-1122 (arguing that Texas's law violates the First Amendment because its "age-verification requirement imposes a burden" on adults); and whether parental controls are an effective, less-restrictive alternative for protecting children on the internet. *See* DE76 at 31-32 (claiming they are); Pet. Br. 3, *Paxton*, No. 23-1122 (same).[4] Because "firmer guidance from th[e] [Supreme] Court might" be "forthcoming" in just a couple months, it would be a "mistake" for this Court to "charg[e] ahead" and grant a "preliminary injunction." *Benisek*, 585 U.S. at 160-61.

## III. PLAINTIFFS CANNOT OBTAIN A PRELIMINARY INJUNCTION BECAUSE THIS COURT LACKS POWER TO PASS ON THEIR FIRST AMENDMENT CLAIMS.

Plaintiffs cannot obtain a preliminary injunction because *Younger* requires abstention, and they lack associational standing.

---

[4] Even Plaintiffs have recognized that the *Free Speech Coalition* cases are relevant to their challenges to social-media laws. *See* Pls. Not. of Supp. Auth., *NetChoice v. Skrmetti*, No. 24-cv-1191 (M.D. Tenn. Dec. 31, 2024), DE40 (submitting as supplemental authority *Free Speech Coal. v. Skrmetti*, No. 24-cv-2933 (W.D. Tenn. Dec. 30, 2024), *preliminary injunction stayed pending appeal by* No. 24-6158 (6th Cir. Jan 13, 2025)).

## A. *Younger* bars Plaintiffs' claims.

*Younger* bars a federal claim if "the relief requested" would have "the effect of" interfering with certain "state proceedings," *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003), such as "state-filed civil enforcement proceedings." *New Ga. Project, Inc. v. Att'y Gen.*, 106 F.4th 1237, 1242 (11th Cir. 2024) (vacating a preliminary injunction in a First Amendment case based on *Younger*). When a plaintiff requests relief that would interfere with a state-filed civil enforcement proceeding, the district court must abstain if the proceeding "implicates important state interests," affords an "adequate opportunity . . . to raise constitutional challenges," and is "ongoing." *Id.* A state proceeding is considered "ongoing" if it was "pending on the day the federal suit [wa]s filed" or it was pending "before any proceedings of substance on the merits [took] place in federal court." *Id.* at 1243.

*Younger* bars Plaintiffs' First Amendment claims because the relief they request would interfere with Florida's pending state enforcement action against Snap. Plaintiffs request an injunction that stops "the Attorney General" from enforcing HB3 "against" Snap and their other "members." DE76 at 34. That relief would have "the effect of restraining" Florida's "prosecution" of Snap by forcing Florida to halt its enforcement efforts. *31 Foster Child.*, 329 F.3d at 1276.

Florida's enforcement action also "implicates important state interests," affords an "adequate opportunity . . . to raise constitutional challenges," and is

"ongoing." *New Ga. Project*, 106 F.4th at 1242. First, it implicates Florida's important interest in prosecuting violations of its laws, as well as its interest in protecting children. *See Juidice v. Vail*, 430 U.S. 327, 335 (1977); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989). Second, the action is proceeding in Florida state court, and "state courts" are "able to address federal constitutional challenges adequately." *Butler v. Ala. Jud. Inquiry Comm'n*, 261 F.3d 1154, 1159 (11th Cir. 2001). Last, the action is "ongoing" because it is already pending and no "proceedings of substance on the merits have taken place" in this Court. *New Ga. Project*, 106 F.4th at 1243.

Whether proceedings of substance on the merits have taken place depends "not on the raw time that a federal case has spent on a district court's docket but, rather, on whether the court has meaningfully engaged the merits of the claims before it." *Id.* at 1244. Thus, courts have held that no proceedings of substance on the merits took place where the parties litigated a request for preliminary relief, but the request was disposed of on procedural grounds and the case had not progressed beyond the pleadings stage. *See Hicks v. Miranda*, 422 U.S. 332, 348 (1975) (no proceedings of substance on merits where the plaintiffs requested a TRO, the parties submitted a dozen affidavits as well as other documents, and the district court denied the TRO); *id.* at 353 n.1 (Stewart, J. dissenting) (summarizing the procedural history); *JMM Corp. v. Dist. of Columbia*, 378 F.3d 1117, 1126 (D.C. Cir. 2004)

26

(Garland, J.) (no proceedings of substance on the merits where the district court "deni[ed]" the plaintiff's "motion for preliminary injunction" based on *Younger* and lack of "injury"); *Forty One News, Inc. v. County of Lake*, 491 F.3d 662, 666-67 (7th Cir. 2007) (same where the district court's motion-to-dismiss rulings addressed only procedural matters); *Giulini v. Blessing*, 654 F.2d 189, 193 (2d Cir. 1981) (same where the district court ruled only on standing).

By contrast, courts have held that proceedings of substance on the merits occurred where preliminary relief was granted or the case proceeded well past the pleadings stage. *See Tokyo Gwinnett, LLC v. Gwinnett County*, 940 F.3d 1254, 1272 (11th Cir. 2019) (proceedings of substance on the merits took place where the district court "entered a consent [TRO]," the defendant "answered" the complaint, and the plaintiff "filed a notice of appeal and its opening brief for [an initial] appeal"); *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1218 (11th Cir. 2002) (same where the defendant "filed its answer," the defendant filed both a "motion to dismiss" and a "motion for summary judgment," and the district court held a "thorough evidentiary hearing" on a "TRO motion").

This case is the former. "[N]othing important relating to the merits has happened yet." *Forty One News*, 491 F.3d at 666. This Court has issued no rulings related to the merits—it has passed only on standing. The parties have conducted no merits discovery. *See* DE49 at 1-2. And the case is still at the pleadings stage, as

Defendant has not answered Plaintiffs' complaint. *See* DE80 at 1 (staying the answer deadline).

Under these circumstances, "the vital consideration of comity between the state and national governments" requires abstention. *31 Foster Child.*, 329 F.3d at 1274.

**B.    Plaintiffs do not have associational standing.**

Plaintiffs contend that they have "associational standing to challenge" HB3 on behalf of their members, DE74 ¶ 10, and they say that they can assert the First Amendment rights of children and adults by piggybacking third-party standing and the overbreadth doctrine on top of associational standing. *See* DE74 ¶ 50. But Plaintiffs have not established associational standing, so they lack standing for all their First Amendment claims. And even if they had associational standing, they could not assert the rights of children and adults with whom they have no relationship.

**1.    Plaintiffs lack associational standing because their claims require member participation.**

A claim requires the participation of members if it "depend[s] upon [their individual] circumstances." *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003); *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("[C]onferring associational standing is improper for claims requiring a fact-intensive-individual inquiry."). For example, Free Exercise claims under the First

Amendment "ordinarily require[] individual participation," even where plaintiffs seek to enjoin enforcement of a statute, because courts must examine how the challenged law "operates against [particular individuals] in the practice of [their] religion." *Harris v. McRae*, 448 U.S. 297, 321 (1980). Courts, in other words, must make factual determinations about individuals' religious practices, which makes their participation necessary to resolve the case. *Id.*; *see also UAW v. Brock*, 477 U.S. 274, 287-88 (1986) (finding associational standing only because the "suit raise[d] a pure question of law"); *Nat'l Franchisee Ass'n v. Burger King*, 715 F. Supp. 2d 1232, 1239 (S.D. Fla. 2010) ("A court's inquiry into the extent individual participation is required does not end . . . simply because a claim seeks declaratory relief.").

That requirement is not discretionary. *See* DE62 at 9 & n.1 (contending that the member-participation requirement is flexible, affording courts discretion to ignore it because it is "prudential"). Just because "a standing requirement is prudential does not mean that its application is discretionary." *Leaf Tobacco Exps. Ass'n v. Block*, 749 F.2d 1106, 1112 (4th Cir. 1984) (Wilkinson, J.). The member-participation requirement is "prudential and malleable by Congress"—not courts. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996). Congress can "abrogate" the requirement by "authoriz[ing]" an association "to sue for its members[]," *id.* at 558, but "lower federal courts lack

similar authority." *Leaf Tobacco*, 749 F.2d at 1112. If a claim requires a district court to resolve factual questions about members, the court must deny associational standing.

Plaintiffs' First Amendment claims require the participation of platforms. If this Court were to conclude that HB3 triggers heightened scrutiny, *but see infra* at 39-48, it would have to make factual determinations about individual platforms under "the proper facial analysis," which requires "address[ing] the full range of [platforms] the law[] cover[s]" and assessing the constitutionality of each of the law's applications. *Moody*, 603 U.S. at 724.

For starters, Plaintiffs assert that HB3 violates the First Amendment because it interferes with platforms' "curat[ion] and disseminat[ion]" of speech. DE74 ¶ 56; *see also* DE74 ¶ 104. But whether a platform is even engaged in protected activity when it curates and disseminates speech is a fact-intensive inquiry. *See Moody*, 603 U.S. at 725-26. It depends on the nuances of the "algorithms" that the platform uses, *id.* at 734; *id.* at 745-46 (Barrett, J., concurring); whether the platform's feeds "exclude[]" certain types of content, *id.* at 731 (majority op.); whether the platform relies on "artificial intelligence" to operate its feeds, *id.* at 770, 795 (Alito, J., concurring in the judgment, joined by Thomas and Gorsuch, JJ.); and the "corporate structure and ownership" of the platform. *Id.* at 746 (Barrett, J., concurring). It matters if an algorithm "respond[s] solely to how users act online" (in which case

the platform is not engaged in expression), or if the algorithm instead incorporates "a wealth of user-agnostic judgments" about the kinds of speech the platform wants to promote. *Id.* at 736 n.5 (majority op.); *see also id.* at 745-46 (Barrett, J., concurring); *NetChoice v. Paxton*, 121 F.4th 494, 499 (5th Cir. 2024). It also matters whether a platform uses artificial intelligence to disseminate speech because "even the researchers and programmers creating" artificial-intelligence algorithms do not "understand" the "decisions they make." *Moody*, 603 U.S. at 795 (Alito, J., concurring in the judgment). It is thus "hard[] to say that the algorithm[s]" reflect "human expressive choice[]." *NetChoice v. Bonta*, 2024 WL 5264045, at *12, *18 (N.D. Cal. Dec. 31, 2024) (concluding that NetChoice lacked associational standing because platforms needed to participate to determine whether their feeds were expressive), *appeal pending*, No. 24-7879 (9th Cir.).

If a covered platform has feeds that are expressive, this Court would also have to examine how HB3 "intru[des] on" each feed. *Moody*, 603 U.S. at 725. HB3 might not intrude on a platform's feeds at all. If users can access a feed without an account, HB3 would not impede a platform from disseminating the feed to children and adults regardless of whether the platform uses addictive features.

After the Court performed all that analysis, it would have to determine and then apply the appropriate level of scrutiny to each application of HB3. "Given the diversity of circumstances presented by" platforms, that too is an "individualized

inquiry." *Free Speech Coal.*, 974 F.3d at 422. The provisions might be sufficiently tailored "for one association member" but not another. *Id.* Consider tailoring. Plaintiffs assert that a "campaign promoting" parental controls is an effective, less-restrictive alternative, DE63 at 13, but if one of Plaintiffs' members lacks parental controls or fails to implement them with fidelity, then promoting controls would be ineffective "for [that] member." *Free Speech Coal.*, 974 F.3d at 422. Each platform's user base is also relevant. If a platform has many users who are young children, then Florida would have a greater interest in regulating the platform since young children are more vulnerable to "emotional excitement and psychological or physical injury." *Prince v. Massachusetts*, 321 U.S. 158, 169-70 (1944); *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975) (explaining that "the age of the minor is a significant factor" in determining the scope of the First Amendment interests at stake).

Because all those questions require fact-finding about platforms' operations, member participation is required. The questions cannot be resolved "with limited individual participation" through "sample testimony." *Borrero v. United Healthcare*, 610 F.3d 1296, 1306 (11th Cir. 2010). Testimony from YouTube about its algorithms, users, and accounts cannot substitute for testimony from Facebook, Snap, X, TikTok, and other platforms about those matters.

Nor are Plaintiffs able to provide evidence about platforms' operations. The depositions of Plaintiffs' declarants confirmed that Plaintiffs are in no position to litigate fact-intensive questions on behalf of their members. NetChoice's general counsel testified that he did not even know whether Meta and Google do business outside the United States, much less how their algorithms work. DE51-4 at 31:17-32:11, 113:18-115:14, 122:13-126:1, 211:1-214:7; *see also* DE86-4 at 23:13-17 (testifying that the only information he has "about YouTube's algorithms" is publicly available information). He also did not know which, if any, platforms have the features that would subject them to HB3. DE51-4 at 141:14-142:4. CCIA's president similarly had little knowledge of member platforms. He did not know whether Meta's products use autoplay or live streaming. DE51-5 at 116:7-13. He could only "make some generalizations" about Facebook's users. DE51-5 at 114:6-115:2. He admitted that his limited "observations" about members' platforms were based exclusively on publicly available information. DE51-5 at 27:24-28:17; *see also* DE86-5 at 23:6-25:23. And he did not even know whether he could "call[] Meta" and obtain information for this case. DE86-5 at 14:6-11.

*NetChoice v. Uthmeier*, No. 21-cv-220 (N.D. Fla.) confirms that Plaintiffs cannot litigate claims that require fact-finding about platforms. As in this case, Plaintiffs are asserting platforms' First Amendment rights in *NetChoice*. On remand from the Supreme Court—after five Justices emphasized that those claims require

fact-intensive analysis[5]—Florida sought discovery from Plaintiffs about their members' operations. But Plaintiffs produced only publicly available information, which has forced Florida to engage in extensive third-party discovery of platforms. *See* Mot. to Modify Sched. at 4, *NetChoice v. Uthmeier*, No. 21-cv-220 (N.D. Fla. Apr. 14, 2025), DE196.

### 2. Even if Plaintiffs have associational standing, they lack prudential standing to assert the rights of users.

Even if Plaintiffs have associational standing to assert the rights of their members, they cannot assert the rights of users. That would require Plaintiffs to use associational standing to satisfy Article III and then use third-party standing or the overbreadth doctrine to establish prudential standing to assert the rights of users. But Plaintiffs cannot use a chain of standing exceptions to assert the rights of people they have no relationship with. Even if they could, they have not met the requirements for third-party standing or the overbreadth doctrine.

**a.** Plaintiffs cannot use associational standing to assert the rights of users because associational standing is a vehicle only for "enforc[ing] the rights of . . . members"—not nonmember third parties. *NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). Associational standing is a "strand" of "representational

---

5 *Moody*, 603 U.S. at 745-47 (Barrett, J., concurring); *id.* at 748-49 (Jackson, J., concurring in part and in the judgment); *id.* at 786-93 (Alito, J., concurring in the judgment, joined by Thomas and Gorsuch, JJ.).

standing" that allows an organization to enforce the rights of members—even though they are "absent third parties"—because the organization has a "particular," "recognized" "relationship[]" with them. *Brown Grp.*, 517 U.S. at 557. Given the close relationship between an organization and its members, the "concrete adverseness" that federal courts require is presumed when an organization brings a claim "on behalf of its directly affected members." *Brock*, 477 U.S. at 289. That "adverseness," however, does not exist when an organization sues to enforce the rights of nonmembers with whom it has no relationship. *See id.* The organization's interest in the nonmembers' claims is too attenuated to "assure" a "sharp[] . . . presentation of [the] issues." *Id.*

Courts that held otherwise in Plaintiffs' other cases erred. *See* DE1 ¶ 10 (citing *NetChoice v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023); *CCIA v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024), *appeal pending*, No. 24-50721 (5th Cir.)). Those courts concluded that Plaintiffs could use associational standing to bring nonmember claims because their members would have had third-party standing to bring them. *See Griffin*, 2023 WL 5660155, at *10-12; *Paxton*, 747 F. Supp. 3d at 1031. Yet that both stretches the associational-standing doctrine well "outside the bounds of [its] traditional" limits, *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring), and ignores the basis for the doctrine. Again, the presumption driving the narrow

exception of associational standing is that the organization has a "direct stake" in its members' legal controversies. *See Hollingsworth v. Perry*, 570 U.S. 693, 705-06 (2013). That assumption stretches to its breaking point when an organization seeks to represent members who would, in turn, be representing the interests of someone else if they filed suit.

**b.** Even if Plaintiffs could stack third-party standing or the overbreadth doctrine on top of associational standing to assert the rights of users, neither exception to the bar on third-party claims applies here.

A party invoking third-party standing must show that it "has a 'close' relationship with" the third parties and that "there is a 'hindrance' to" them "protect[ing] [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Yet Plaintiffs offer no facts suggesting that there is a "hindrance" to children and adults "protect[ing] [their] own" First Amendment "interests." *Id.* Nor could they: Plaintiffs themselves rely on cases in which "minors" and "adults" challenged social-media laws in other States. *Students Engaged in Advancing Texas v. Paxton*, 2025 WL 455463, at *1 (W.D. Tex. Feb. 7, 2025); *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1112 (D. Utah 2024); DE76 at 1.

Plaintiffs have also failed to show that any member has a "close relationship" with children and adults who use its services. *Kowalski*, 543 U.S. at 130. They have made no showing that internet conglomerates and their users have "aligned" interests

on HB3. *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994). Users may have chosen not to "challenge the [law] themselves" because "they like it." *Id.* Many adults who use platforms, for example, are parents who might well applaud HB3—which was enacted with broad bipartisan support—and object to Plaintiffs' unilateral decision to invoke their rights to invalidate the law. "[T]he standing doctrine serves to protect the 'autonomy'" of those adults from litigants like Plaintiffs who "roam the country in search of" internet regulations that they dislike. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379-80 (2024).

Plaintiffs contend that under *Craig v. Boren*, 429 U.S. 190 (1976), their members need not meet the hindrance and close-relationship requirements because HB3 "require[s] them to restrict" users from accessing their platforms. DE62 at 17-18 & n.4. According to Plaintiffs, *Craig* excepts directly regulated businesses from the traditional third-party standing requirements. *See id.* But in *Kowalski*, which was decided after *Craig*, the Supreme Court clarified that plaintiffs must always satisfy the requirements. 543 U.S. at 130. The Court even mentioned *Craig* when identifying cases where it has found that the "criteria" were met. *Id.* And since *Kowalski*, the Eleventh Circuit has required directly regulated businesses invoking *Craig* to meet the requirements. *See Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041-42 (11th Cir. 2008).

The overbreadth doctrine is likewise unavailable to Plaintiffs. To assert the rights of third parties using overbreadth, a plaintiff must show, among other things, that the challenged law can be enforced against the third parties. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023); *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40-41 (1999) (plaintiff could not use overbreadth to assert the rights of "potential customers" because they faced "[n]o threat of prosecution"). But HB3 does not "impose[] penalties" on users—it imposes penalties only on platforms. *Mata Chorwadi*, 66 F.4th at 1265; Fla. Stat. § 501.1736(5)-(6).

*Mata Chorwadi* is on point. There, "hotel owners" asserted the rights of their "guests," but the Eleventh Circuit held that the owners could not "rely on the overbreadth doctrine" because the challenged law did not "apply to guests." 66 F.4th at 1265. "[O]n its face," the law "impose[d] penalties only on the owners." *Id.* So too here. HB3 does not apply to children and adults who want an account on a covered platform.

Plaintiffs have argued that *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) allows them to assert users' rights using the overbreadth doctrine. *See* DE62 at 18-19. But the hotel in *Mata Chorwadi* made the same argument, and the Eleventh Circuit rejected it. Init. Br. 38-39, *Mata Chorwadi*, 2021 WL 1761923 (relying on "*American Booksellers*").

## IV. PLAINTIFFS' CLAIMS FAIL ON THE MERITS BECAUSE HB3 DOES NOT VIOLATE THE FIRST AMENDMENT.

*Younger* and standing aside, Plaintiffs' claims fail because HB3 does not trigger heightened scrutiny, and even if it did, it would survive as a reasonable, content-neutral time, place, or manner restriction.

### A. HB3 is not subject to heightened scrutiny.

A law can trigger heightened scrutiny in two ways: (1) it "direct[ly] regulat[es] . . . expressive activity," or (2) it regulates conduct or commercial activity but "impose[s] a disproportionate burden" on expression. *TikTok v. Garland*, 145 S. Ct. 57, 65-66 (2025) (quoting *Arcara v. Cloud Books*, 478 U.S. 697, 704 (1986)). HB3 does neither.

### 1. HB3 does not directly regulate speech.

HB3 directly regulates commercial activity with children, not speech. *See Norwegian Cruise Line Holdings v. Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) ("Restrictions on protected expression are distinct from restrictions on economic activity[.]"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and concurring in the judgment) ("[T]he State is free to impose any rational regulation on [a] commercial transaction itself."). It

39

prevents platforms with addictive features from contracting with children who lack the capacity to adequately weigh the transaction's risks and benefits.

HB3 limits "entering into a contract" with a child "to become an account holder" on a covered platform. Fla. Stat. § 501.1736(2)(a), (3)(a). That activity involves an exchange of value, no different than contracts with other businesses. By creating a personal "profile" or otherwise using a platform under a "unique identifier," *id.* § 501.1736(1)(a), the child permits the platform to collect his valuable personal data, advertise to him, and license the content that he generates. *See How Websites and Apps Collect and Use Your Information*, Fed. Trade Comm'n (Sept. 2023), https://tinyurl.com/ykcdtwm4. In exchange, the platform gives the child access to its services.

On social-media platforms, that commercial transaction is accomplished through an express contract. Platforms require users to create personal accounts and agree to terms of service that entitle the platforms to collect user data in exchange for full access. *See, e.g.*, *Terms of Service*, Facebook (Jan. 1, 2025), https://tinyurl.com/zf86f89r. Such "clickwrap agreements" are enforceable contracts under Florida law. *Vitacost.com v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA

2017). HB3 simply regulates the extent to which platforms that design their products with addictive features may engage in that commercial activity with children.

### 2. HB3 does not disproportionately burden expression.

Plaintiffs do not dispute that contracting with children is commercial activity. Their "arguments more closely approximate a claim that" HB3 disproportionately burdens expression because it "designat[es]" for regulation certain platforms that host speech. *TikTok*, 145 S. Ct. at 66. HB3, Plaintiffs say, "appears designed to restrict access to websites that minors especially enjoy using." DE76 at 2. They are wrong. HB3 is not a stealth speech regulation.

The Supreme Court's disproportionate-burden decisions examine whether regulations of commercial activity are "directed at, or present[] the danger of suppressing, particular ideas." *Leathers v. Medlock*, 499 U.S. 439, 453 (1991). A law disproportionately burdens expression if its statutory context reveals that despite regulating commercial activity, it "single[s] out," or is "aimed" at, expression. *Arcara*, 478 U.S. at 705, 707; *see also Leathers*, 499 U.S. at 451-53. Otherwise, the law only incidentally burdens expression, and heightened scrutiny does not apply. *See Arcara*, 478 U.S. at 707; *Sorrell v. IMS Health*, 564 U.S. 552, 566-67 (2011)

(scrutiny applies to laws regulating commercial activity if their "purpose" is to "suppress speech").

Although the Supreme Court has not "articulated a clear framework for" assessing a disproportionate-burden claim, *TikTok* provides guidance. 145 S. Ct. at 66. TikTok and some of its users challenged a federal law that required TikTok's parent company—which China controlled—to divest its ownership of TikTok. *See id.* at 64. They argued that the law "burden[ed] various First Amendment activities" by "effectively ban[ning] TikTok." *Id.* at 66. The D.C. Circuit "conclude[d] that the [law] was subject to heightened scrutiny," but the Supreme Court rebuffed that ruling and declined to hold that the law implicated the First Amendment. *Id.* at 65-66. The law, the Court explained, directly regulated "corporate control," not speech. *Id.* And it did not appear to disproportionately burden expression because it "focus[ed]" on an interest unrelated to expression (foreign control of a platform); Congress made a "determin[ation]" that corroborated that focus (that China was a foreign adversary); and there were "causal steps between the [law] and the alleged burden on protected speech" (TikTok would have to shut down only if its parent company refused to divest). *Id.* at 66. But because the law satisfied scrutiny in any

event, the Court "assume[d] without deciding that" the law implicated the First Amendment.[6] *Id.*

The Eleventh Circuit has offered similar guidance. In *Gary v. City of Warner Robins*, 311 F.3d 1334 (11th Cir. 2002) and *Indigo Room v. City of Fort Myers*, 710 F.3d 1294 (11th Cir. 2013), the plaintiffs challenged ordinances that banned minors from entering certain alcohol-serving establishments. The ordinances had the effect of preventing the plaintiffs from participating in expressive activities that covered establishments hosted. *See Gary*, 311 F.3d at 1340; *Indigo Room*, 710 F.3d at 1299-1300. Yet the Eleventh Circuit held that the First Amendment was not implicated because the ordinances regulated only "admittance" into establishments and did not target expression. *See Indigo Room*, 710 F.3d at 1300. The ordinances were focused on underage drinking—not expression—because they applied only "while alcohol [wa]s being served," *id.*, and there was a causal step between the ordinances and any burden on expressive activities: A minor would be unable to participate in an activity only if an establishment chose to pair the activity with alcohol.

HB3 is in the mold of those ordinances and the law in *TikTok*. It is "focus[ed]" on children's exposure to addictive features, not any expressive activity. *TikTok*, 145 S. Ct. at 66. The law on its face prohibits platforms only from using addictive

---

[6] Only one Justice concluded that the law "implicate[d] the First Amendment." 145 S. Ct. at 73 (Sotomayor, J., concurring).

features and contracting with children. If a platform does not use the features, it can contract with children and they can use the platform as much as they want. Like the ordinances in *Gary* and *Indigo Room*, then, HB3 at most affects only children's "admittance" into online businesses that have chosen to pair speech-hosting with harmful commercial practices. *Indigo Room*, 710 F.3d at 1300. Children "remain[] free" to express themselves on the internet; they just "cannot" use an account to enter platforms that "serve" up addictive features. *Gary*, 311 F.3d at 1338.

Next, the Florida Legislature determined that the features that HB3 targets are "addictive." Fla. Stat. § 501.1736(1)(e)4; *accord* Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 2-7 (March 28, 2024). That determination corroborates that the law is not a stealth speech regulation but instead is aimed at a problem unrelated to expression. *See TikTok*, 145 S. Ct. at 66.

Plaintiffs have suggested that HB3 targets speech because the addictive features are speech themselves. Barring addictive features, they say, restricts "a website's choice about how to 'organiz[e] and present[]' collections of 'third-party speech.'" DE63 at 5-6 (quoting *Moody*, 603 U.S. at 731-32). *Moody*, however, explained that platforms engage in expression when they "use their Standards and Guidelines to decide which third-party" speech to display in curated "feeds" and how the speech "will be ordered." 603 U.S. at 740. Nothing in *Moody* suggests that functions like infinite scroll and autoplay express anything, and courts across the

44

country have rejected platforms' attempts to drape the First Amendment over their addictive features. *See Commonwealth v. Meta Platforms*, 2024 WL 4648435, at *5, *9 (Mass. Super. Ct. Oct. 17, 2024) (Meta's "notifications," "infinite scroll," and "auto play" are "conduct and product design," not speech.); *Vermont v. Meta Platforms*, 2024 WL 3741424, at *1, *6 (Vt. Super. Ct. July 29, 2024) ("The First Amendment does not apply to" Meta's use of addictive "design[s]" and "features."); *Dist. of Columbia v. Meta Platforms*, 2023 WL 11921682, at *13 (D.C. Super. Ct. Jan. 1, 2023) (holding that Meta does not convey "even a broad or vague message . . . through the implementation of its design features"); *Arkansas v. Meta Platforms*, 2024 WL 4037209, at *3 (Ark. Cir. Ct. June 13, 2024) (same).

Third, there are causal steps between HB3 and the alleged burden on speech: Any burden on expression arises only if a platform chooses to use addictive features and require users to become account holders. Only then would children be prevented from engaging in expressive activity on a platform. That makes HB3 similar to the ordinances in *Indigo Room* and *Gary* and the law in *TikTok*: The ordinances affected expression only if covered businesses chose to serve alcohol, and the law affected online expression only if TikTok's parent company refused to divest.

Last, HB3 is simply "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *TikTok*, 145 S. Ct. at 66. Unlike taxes that "singl[e] out" certain newspapers, *Arcara*,

478 U.S. at 704, laws regulating children's contracts have never raised constitutional concerns. States have always had the power to protect children from their "lack[]" of "reason and judgment" by restricting their ability "to enter contracts." *NRA v. Bondi*, ___ F.4th ___, 2025 WL 815734, at *6-7 (11th Cir. Mar. 14, 2025) (en banc).

At the Founding, children "lacked the formal capacity to participate in public life." *Id.* at *6. They were deemed unable "to take care of themselves," 2 James Kent, Commentaries on American Law 101 (1827), and viewed as "lack[ing] reason and decisionmaking ability." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 826 (2011) (Thomas, J., dissenting). So "[p]arents controlled children's access to information, including books." *NRA*, 2025 WL 815734, at *6. States prohibited "[e]ntertaining . . . [c]hildren" without parental consent. Juries verdict agst Alice Thomas, Vol. 29: Records of Suffolk Cnty. Ct. 1671-1680 Part 1, pp. 82-83, available at https://perma.cc/89UP-YJP6; *see also* Book of the Gen. Laws and Liberties of Mass. 137 (1649) (penalizing "entertain[ing]" children "to the dishonour of God and grief of their parents"). And children did not have "the capacity to contract." *NRA*, 2025 WL 815734, at *6. The common law limited children's ability to contract to protect them from "hurting themselves by their own improvident acts." *Id.* Children who

lived with their parents could not even "bind" themselves for "apparel, education, and lodging." *Id.*

Because HB3 regulates contracting with children, it fits within that historical tradition and does not implicate the First Amendment. *See Vidal v. Elster*, 602 U.S. 286, 301 (2024) ("[W]hen considering the scope of the First Amendment," the Supreme Court looks to "history and tradition."); *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("When faced with a dispute about the Constitution's meaning or application, long settled and established practice is a consideration of great weight."). Platforms may prefer requiring children to become account holders as a condition of access so they can collect their data and maximize revenue, but that preferred business model is not constitutionally protected.

Plaintiffs counter with a parade of irrelevant analogies, asserting that HB3's regulation of children's contracts is similar to laws banning book publishers from purchasing ink, banning accounts on miamiherald.com, and banning newspaper subscriptions. DE62 at 23-24. Those hypothetical laws serve no conceivable function other than the suppression of expression and thus plainly would "disproportionate[ly] burden" expression. *TikTok*, 145 S. Ct. at 65; *see also Moody*, 603 U.S. at 733 ("[T]oday's social media pose dangers not seen earlier: No one ever feared the effects of newspaper opinion pages on adolescents' mental health."). HB3

on the other hand serves to prevent children from being exposed to non-expressive addictive features.

That leaves Plaintiffs with *Packingham* and *Brown*. But *TikTok* drives home that *Packingham* is irrelevant: The law there was a "*direct* regulation" of speech. *TikTok*, 145 S. Ct. at 65-66. Under the law, if a sexual offender posted on social media, he committed a felony. *See Packingham v. North Carolina*, 582 U.S. 98, 102-03 (2017). By contrast, users "may say anything to anyone over the internet or otherwise without violating" HB3. *Delgado v. Swearingen*, 375 F. Supp. 3d 1251, 1258 (N.D. Fla. 2018) (distinguishing *Packingham*). And the law in *Brown* clearly implicated the First Amendment because it singled out "violent" speech. 564 U.S. at 789, 792.

## B. Even if HB3 regulated speech, it would be a time, place, or manner restriction that survives scrutiny.

The First Amendment does not prevent States from "regulat[ing] only the time, place, or manner of speech." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980). Because States have "latitude" to "design regulatory solutions t[hat] address content-neutral interests," *TikTok*, 145 S. Ct. at 71, regulations of the time, place, or manner of speech are permissible as long as they "are narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

HB3 is at most a content-neutral regulation of the *manner* of speech, which easily survives scrutiny. Again, HB3 does not prohibit anyone from accessing social media. It requires only that platforms provide access without addictive features or without requiring children to be account holders. If platforms provide access in either *manner*, HB3 imposes no restrictions.

### 1. HB3 is content-neutral.

A law is content-based if it "target[s] speech based on its communicative content," i.e., "the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 69 (2022). "[C]ontent discrimination" triggers strict scrutiny because it threatens to "drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992). But HB3 does not on its face discriminate against any topics, ideas, or messages. Plaintiffs have conceded as much. DE5 at 2, 28 ("The law does not focus on any particular content . . . ."). Nor does HB3 reflect Florida's "disagreement with the message" conveyed by any speech. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). It protects children from the health risks posed by platforms that use features designed to addict them, regardless of the content on those platforms. Whether a platform consists entirely of Bill Nye the Science Guy videos or depictions of graphic violence, HB3's application turns on whether the platform uses addictive features.

Plaintiffs have declared that HB3's focus on platforms' addictive features is "inextricable from the *content*" on those platforms. DE5 at 24. But "personal interactive metrics," "[p]ush notifications," "[i]nfinite scrolling," "[a]uto-play video," and "[l]ive streaming" do not depend on content. Fla. Stat. § 501.1736(1)(e)4; *see also* DE71 at 35:17-36:5. They can be applied to any content and removed without regard to content. Even Plaintiffs' witness from Snap ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. *See* DE51-6 at 124:17-125:16.

Plaintiffs have never refuted that. Instead, they say that one legislator's comments at a press conference show that the Florida Legislature, in focusing on the features, "aimed" to limit certain content (though Plaintiffs never say what topics, ideas, or messages the Legislature was "concern[ed]" about). DE76 at 24. But even putting aside that a legislator's comments cannot render an "otherwise constitutional statute" presumptively unconstitutional under the First Amendment, *see In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015), Plaintiffs selectively quote the legislator here. They ignore, for instance, his statement that "[w]e didn't focus on content." Press Conf. at 5:30-6:40, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.

Equally unpersuasive is Plaintiffs' attempt to characterize HB3 as content-based because its "definition of 'social media platform' singles out a subset of online services" and thus "distinguish[es] among different speakers." DE76 at 24-25. Speaker distinctions are not content distinctions unless the "speaker preference reflects a content preference" or the objective of the distinction is "the suppression of certain ideas." *Turner*, 512 U.S. at 658-60; *accord NetChoice v. Att'y Gen.*, 34 F.4th 1196, 1225-26 (11th Cir. 2022) (rejecting NetChoice's argument that heightened scrutiny applied if the law regulated only the largest platforms), *vacated on other grounds sub nom. Moody*, 603 U.S. 707. Yet Plaintiffs offer nothing to support their suggestion that HB3's facially content-neutral definition of "social media platform" is really a content regulation.

All they say is that HB3 "leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they employ . . . 'addictive features.'" DE76 at 24-25. That differential treatment, Plaintiffs tell us, can only mean that Florida prefers the content on Disney+ and Roblox. *See id.* But Plaintiffs are wrong that HB3 categorically excludes platforms like Disney+ and Roblox: Such platforms would be covered if they gamified their services by using addictive features and allowing users to "view the content or activity of other users," and they otherwise met the statutory criteria. Fla Stat. § 501.1736(1)(e)1; *see also AG James Uthmeier Fights to Protect Children*

*Online; Subpoenas Roblox for Child Protection Policies and Procedures*, Office of the Attorney General (Apr. 16, 2025), https://perma.cc/5XW6-W376.

Regardless, a law does not trigger strict scrutiny just because it places "differential burdens" on different forms of media. *Leathers*, 499 U.S. at 452. If the "differential treatment is justified by some special characteristic of the particular speaker being regulated," then strict scrutiny is "unwarranted." *TikTok*, 145 S. Ct. at 68. And HB3's focus on social-media platforms is justified by their addictiveness and the harm they are inflicting on children. DE51-2 ¶ 19; DE51-1 ¶ 37. That special characteristic is why states and federal agencies across the country and across the political spectrum have focused on social media. *E.g.*, DE51-9. If HB3 swept in every conceivable internet service, Plaintiffs would claim that it was wildly overinclusive. That HB3 is tailored to the services posing the greatest risk of the harm it seeks to mitigate is a feature—not a bug.

Plaintiffs' final contention is that HB3 is content-based because it targets platforms that allow users to interact socially. *See* DE71 at 126-27 (relying on *Reyes*). But nothing on the face of HB3 targets social interaction, and even if HB3 did, it would not be content-based. *See* DE71 at 106-09. A law aimed at platforms that facilitate social interaction would "not single out any topic or subject matter for differential treatment" because social interaction can involve *any* topic or subject matter, from "political messages" to comments about "specific events" to

"ideological" debates. *City of Austin*, 596 U.S. at 71. Whether a communication is a "social interaction" depends at most on the time, place, and manner of the communication, not its content. For example, while a statement on a commercial billboard would not constitute social interaction, the same statement to a friend over lunch would. The "substantive message itself is irrelevant." *Id.*

### 2. HB3 serves a compelling interest.

HB3 serves the compelling interest of "protecting the physical and psychological well-being of minors." *Sable Commc'ns*, 492 U.S. at 126. Adolescents almost universally use social media and are particularly susceptible to compulsive use that resembles addiction to drugs and gambling. DE51-2 ¶ 10. That in turn has disastrous consequences for their mental health. DE51-1 ¶ 6. The Florida Legislature relied heavily on that evidence in enacting HB3. *See, e.g.*, Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 2-7 (Mar. 28, 2024). Plaintiffs do not even dispute that Florida has a compelling interest in protecting children from those harms. *See* DE76 at 26-32 (raising only tailoring arguments); DE5 at 1-2, 29; DE51-10 at 16:17-17:18.

### 3. HB3 is narrowly tailored.

The tailoring requirement for content-neutral time, place, or manner restrictions is more forgiving relative to other forms of heightened scrutiny. The regulation need not be the least restrictive means of achieving the government's interest; rather, it is sufficiently tailored if the State's interest "would be achieved

less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477-78 (1989). The regulation also must avoid burdening "a substantial portion of" speech in a manner that "does not serve to advance" the State's interest, and it must leave open "ample alternative channels for communication." *Bloedorn v. Grube*, 631 F.3d 1218, 1238, 1241 (11th Cir. 2011).

HB3 easily satisfies that standard. Indeed, it would survive any form of heightened scrutiny. First, children plainly "would be more exposed to" addictive features without HB3. *Clark*, 468 U.S. at 297. HB3 ensures that any platform that children access regularly will either not use addictive features or will not allow children to be "account holders," making it more difficult for platforms to target them with the features.

Second, "[n]one of [HB3's] provisions" are "unrelated to the ends that it was designed to serve," and it both avoids burdening a substantial amount of speech and leaves open alternative avenues of communication. *Id.* HB3 protects children from the addictive use of social media, yet it does not altogether prohibit them from using social media. It instead enumerates the specific features found by the Legislature (and the U.S. Surgeon General) to be addictive, *see* DE51-2 ¶¶ 29-45; DE51-9 at 9; and applies solely to platforms that use the features. Fla. Stat. § 501.1736(1)(e)4. Among those platforms, the Legislature further tailored HB3 by targeting only those

platforms that have proven effective at using the features to addict children—platforms where 10 percent of daily active users under age 16 use the platform more than 2 hours per day. *Id.* § 501.1736(1)(e)2. Even then, HB3 does not prohibit children from accessing the platform. Instead, it prohibits the platform from giving them accounts or otherwise tracking them with a unique identifier, so that the platform cannot easily target them with addictive features. *Id.* § 501.1736(1)(a), (2)(a), (3)(a). That restriction is further tailored to a child's age: HB3 recognizes that "a 7-year-old is not a 1[4]-year-old" and allows older children (14- and 15-year-olds) to have an account if their parents consent. *J.D.B. v. North Carolina*, 564 U.S. 261, 280 (2011).

Plaintiffs suggest that HB3 may not serve the State's interest because "[t]he legislative record contains no evidence that" eliminating HB3's addictive features will "reduce" the identified harms to children. DE76 at 30. But the question is whether the Legislature "could reasonably have determined that" limiting children's exposure to those features would reduce harm. *Ward*, 491 U.S. at 801; *TikTok*, 145 S. Ct. at 69 (courts "must accord substantial deference to [legislatures'] predictive judgments"). And the evidence shows that the features contribute to child social-media addiction. *See* DE51-9 at 9. Research shows that the features "activate[] neural circuits associated with reward processing," "inevitably contributing to overuse . . . and increasing the risk of behavioral addiction." DE51-2 ¶¶ 29, 36.

Plaintiffs' Snap declarant even ███████████████████████████████████████
███████████████████████████████████████████ DE51-6 at 108:9-19.

Plaintiffs also argue that HB3 is not sufficiently tailored because "parents have ample tools at their disposal to restrict their minor children's access to 'social media platforms.'" DE5 at 31. That, however, "ignore[s] the 'latitude' [courts] afford the Government to design regulatory solutions to address content-neutral interests." *TikTok*, 145 S. Ct. at 71. The Florida Legislature "could reasonably have determined that" Plaintiffs' proposal to simply trust platforms to provide parental tools is not as "effective[]" as HB3 in preventing addiction. *Ward*, 491 U.S. at 801. The Legislature considered and rejected the adequacy of parental controls, finding them in some cases to even be counterproductive. *See* Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 6-7 (Mar. 28, 2024). That conclusion was certainly "reasonable," *TikTok*, 145 S. Ct. at 70-71, given the evidence that parental controls are difficult for parents to use and manage, DE51-3 ¶¶ 51-61; that ███████████████ ████, DE51-6 at 149:10-150:25; DE51-3 ¶ 53; and that they do not even address the features that make platforms addictive, DE51-2 ¶¶ 48-50. *See also* DE63-3 at 185:10-15; Oral Arg. Tr. 9-10, *Free Speech Coal. v. Paxton*, No. 23-1122 (U.S. Jan. 15, 2025) (Petitioner asserting that "parents [can] protect[] their kids" online, and Justice Barrett responding that using parental controls "is difficult" and that they are not "working"). Parents alone cannot prevent exposure to addictive features—

government regulation is necessary. *See* DE51-9 at 13; DE71 at 132 (Court: "[P]arents aren't addressing" the problems related to social media, "and so that's not fixing the problems.").

Finally, Plaintiffs argue that HB3 is not sufficiently tailored because it burdens adult access by effectively requiring adults to verify their ages. DE5 at 29-30. HB3 does not require age verification, however: Any platform that does not want to verify ages can simply refrain from using addictive features or refrain from requiring users to be account holders. Even so, in today's digital world, age-verification does not burden adult access. Unlike in *Reno v. ACLU*, there is no longer an "absence of a viable verification process"—companies now have many "effective way[s] to determine the identity or the age of a user" over the internet. 521 U.S. 844, 855, 876 (1997); *see* DE51-3 ¶¶ 10-50 (describing the methods developed since *Reno*). "[T]echnological evolution" has led to many viable methods, including "digital identity systems" that release a user's "age attributes" "without disclosing other personal information." DE51-3 ¶¶ 24, 32; *accord New Identity Verification Process to Access Certain IRS Tools and Services*, IRS (Nov. 17, 2021), https://perma.cc/9L52-46KK. Plaintiffs' declarants even conceded that age-verification is technologically feasible and that Plaintiffs' members either already use age-verification technology or likely will soon. *See* DE51-6 at 33:18-51:8; DE51-7 at 134:24-148:6.

HB3 is thus a reasonable time, place, or manner restriction—it restricts only the manner by which children access social media. It is also sufficiently tailored and serves a compelling interest such that it would survive any level of scrutiny.

**C. At minimum, Plaintiffs have not established that HB3 is facially unconstitutional.**

Plaintiffs press no as-applied challenges in their renewed motion—they instead broadly attack HB3 as unconstitutional on its face. *See* DE76 at 1-4. Yet just as in *Moody*, they rely on an "underdeveloped" and "incomplete" record (a handful of self-serving declarations), 603 U.S. at 726, 734, and they have made no effort to "address the full range of" platforms that HB3 "cover[s]," examine each "application[]" of the law, and show that the law lacks a plainly legitimate sweep. *Id.* at 724. As explained above, those inquiries require facts about covered platforms' operations and users. *Supra* at 30-32. Given Plaintiffs' failure to assemble those facts and perform the analysis that *Moody* requires, they have not made a clear showing that they are entitled to a preliminary injunction. *See NetChoice v. Fitch*, 2025 WL 1135279, at *6 (5th Cir. Apr. 17, 2025) (vacating preliminary injunction of Texas's social-media law based on *Moody* because the district court did not "determine to whom the [law] applies [and] the activities it regulates, and then weigh violative applications of the [law] against non-violative applications").

In all events, Plaintiffs have not met their burden as to Section 501.1736(2), which prohibits contracting with children who are age 13 or younger, because that

provision has a broad sweep of valid applications no matter the level of scrutiny. It can be validly enforced against an addictive platform when it provides accounts to children of "tender years." *Prince*, 321 U.S. at 170. Six-year-olds have no First Amendment interest in internet accounts, and platforms have no right to provide them one. *Cf. Ginsberg v. New York*, 390 U.S. 629, 638 & n.6 (1968); *Erznoznik*, 422 U.S. at 214 n.11.

## V. PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE ENTITLED TO THE SWEEPING INJUNCTION THEY SEEK.

Finally, if the Court concludes that Plaintiffs are entitled to a preliminary injunction, the injunction should not extend beyond Snap because Snap is the only member for whom Plaintiffs have shown an injury in fact. "[S]tanding and remedies are joined at the hip[.]" *Collins v. Yellen*, 594 U.S. 220, 277 n.1 (2021) (Gorsuch, J., concurring in part). "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury"—that is, any "remedy must be limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66, 73 (2018); *see also Georgia v. Biden*, 46 F.4th 1283, 1303-04 (11th Cir. 2022). When a plaintiff relies on associational standing, its "injury in fact" is that suffered by its members, so the plaintiff can obtain injunctive relief only to the extent necessary to remedy its members' injuries. *See S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 819 (11th Cir. 2023) (Associational standing confers "standing to redress an injury suffered by [the association's] members[.]"); *Conservation L. Found. of New*

*England v. Reilly*, 950 F.2d 38, 43 (1st Cir. 1991) (reversing because the district court permitted the plaintiff-associations to seek injunctive "relief far beyond any [member] injury they ha[d] established"). Therefore, because Snap's injury is the only injury in fact that supports Plaintiffs' standing, any injunction must be limited to Snap.[7]

## CONCLUSION

Plaintiffs' motion should be denied.

---

[7] Other declarants suggested—with no supporting evidence—that "YouTube may be covered by the Act," DE76-4 ¶ 10; DE76-3 ¶ 21(e); and that "there is an actual and well-founded basis for believing that Florida thinks" Facebook and Instagram are covered. DE76-2 ¶ 6(e). But such equivocal statements—as this Court has already held—are insufficient to establish injury in fact. *See* DE72 at 7, 11-12.

Dated: April 21, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

*/s/ Kevin A. Golembiewski*
John Guard (FBN 374600)
  *Chief Deputy Attorney General*
Jeffrey P. DeSousa (FBN 110951)
  *Acting Solicitor General*
David M. Costello (FBN 1004952)
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski (FBN 1002339)
  *Senior Deputy Solicitor General*
Darrick W. Monson (FBN 1041273)
  *Assistant Solicitor General*

Anita J. Patel (FBN 0070214)
  *Special Counsel*
Christine E. Lamia (FBN 745103)
  *Special Counsel*
James Waczewski (FBN 0154989)
  *Senior Assistant Attorney General*
Sara E. Spears (FBN 1054270)
  *Assistant Attorney General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

This memorandum in opposition complies with Local Rule 7.1(F) because the Court ordered that "[t]here is no word limit." DE80 at 1.

*/s/ Kevin A. Golembiewski*
Counsel for Defendant


## CERTIFICATE OF SERVICE

I certify that on this 21st day of April, 2025, the foregoing memorandum in opposition was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ Kevin A. Golembiewski*
Counsel for Defendant