# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

     *Plaintiffs*,

     v.

JAMES UTHMEIER, in his official
capacity as Attorney General of the
State of Florida,

     *Defendant*.

Case No. 4:24-cv-438-MW-MAF

## PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ...................................................................................... 1

I.   Florida's Threshold Arguments Lack Merit .................................... 5

     A.   Plaintiffs' Motion Is Not a Motion for Reconsideration ...................... 5

     B.   *Younger* Abstention Is Not Appropriate ............................................. 11

     C.   Plaintiffs Have Associational Standing to Bring Their
          Claims ................................................................................................ 18

     D.   Plaintiffs Have Prudential Standing to Assert the First
          Amendment Rights of Their Members' Users ................................... 24

II.  Plaintiffs Are Likely To Succeed On Their First Amendment Claim .......... 28

     A.   HB3 Triggers Strict Scrutiny ............................................................. 28

     B.   HB3 Cannot Survive Any Level of Heightened Scrutiny ................. 36

III. The Other Preliminary Injunction Factors Support Relief ............................ 43

IV.  Florida's Scope Of Relief Argument Lacks Merit ........................................ 49

CONCLUSION ...................................................................................... 50

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abreu v. Pfizer, Inc.*,
   2022 WL 2352443 (S.D. Fla. June 22, 2022) ..........................................................8

*Adams v. City of Chicago*,
   135 F.3d 1150 (7th Cir. 1998) ...............................................................................6

*Alachua Cnty. Educ. Ass'n v. Rubottom*,
   2023 WL 7132968 (N.D. Fla. Sept. 22, 2023) ....................................................7, 8

*Allen v. Sch. Bd. for Santa Rosa Cnty.*,
   782 F.Supp.2d 1304 (N.D. Fla. 2011) .....................................................................7

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) .............................................................................50

*Arcara v. Cloud Books*,
   478 U.S. 697 (1986) ..............................................................................................32

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ....................................................................................... 25, 33

*Awad v. Ziriax*,
   670 F.3d 1111 (10th Cir. 2012) .............................................................................37

*Borrero v. United Healthcare*,
   610 F.3d 1296 (11th Cir. 2010) ............................................................................19

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ....................................................................................... passim

*Buehrle v. Key West*,
   813 F.3d 973 (11th Cir. 2015) ..............................................................................29

*Canal Auth. of State of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ................................................................................48

*Carafano v. Metrosplash.com*,
   339 F.3d 1119 (9th Cir. 2003) ..............................................................................29

*Carey v. Population Servs. Int'l,*
431 U.S. 678 (1977) ............................................................25

*CCIA v. Paxton,*
747 F.Supp.3d 1011 (W.D. Tex. 2024)................................ 18, 24, 28, 46

*Chegg, Inc. v. Doe,*
2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) ...........................................7

*Courthouse News Serv. v. Forman,*
606 F.Supp.3d 1200 (N.D. Fla. 2022) .....................................49

*Craig v. Boren,*
429 U.S. 190 (1976)................................................ 25, 26, 28

*Cranford v. Palos,*
2014 WL 1689658 (E.D. Cal. Apr. 29, 2014) .........................................7

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008)................................................33

*Cumulus Media v. Clear Channel Commc'ns,*
304 F.3d 1167 (11th Cir. 2002) .........................................8, 11

*D'Amico v. Jones,*
2019 WL 3976315 (N.D. Fla. Aug. 22, 2019) .........................................7

*Davila v. Gladden,*
777 F.3d 1198 (11th Cir. 2015) .........................................37

*Delgado v. Swearingen,*
375 F.Supp.3d 1251 (N.D. Fla. 2018)..................................31

*Democratic Exec. Comm. of Florida v. Detzner,*
347 F. Supp. 3d 1017 (N.D. Fla. 2018)..................................50

*Elrod v. Burns,*
427 U.S. 347 (1976)................................................ 43, 45

*Eufaula Heritage Ass'n v. Ala. Dep't of Transp.,*
2015 WL 404534 (M.D. Ala. Jan. 29, 2015) .........................................7

*Fac. Senate of Fla. Int'l Univ. v. Winn*,
  477 F.Supp.2d 1198 (S.D. Fla. 2007)......................................................45

*FEC v. Cruz*,
  596 U.S. 289 (2022).................................................................................42

*For Your Eyes Alone, Inc. v. City of Columbus*,
  281 F.3d 1209 (11th Cir. 2002) ....................................................... 14, 15

*Forty One News, Inc. v. County of Lake*,
  491 F.3d 662 (7th Cir. 2007) ..................................................................16

*Free Speech Coal. v. Paxton*,
  No. 23-1122 (U.S. argued Jan. 15, 2025) ...............................................47

*Gary v. City of Warner Robins*,
  311 F.3d 1334 (11th Cir. 2002) ..............................................................31

*Giulini v. Blessing*,
  654 F.2d 189 (2d Cir. 1981) ...................................................................16

*Hicks v. Miranda*,
  422 U.S. 332 (1975).................................................................................16

*Honeyfund.com Inc. v. Governor*,
  94 F.4th 1272 (11th Cir. 2024) ........................................................ 43, 45

*Hornady v. Outokumpu Stainless USA, LLC*,
  118 F.4th 1367 (11th Cir. 2024) ...............................................................5

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).................................................................................27

*Indigo Room v. Fort Myers*,
  710 F.3d 1294 (11th Cir. 2013) ..............................................................31

*J-B Weld Co. v. Gorilla Glue Co.*,
  2018 WL 1989308 (N.D. Ga. Feb. 12, 2018) ............................................8

*JMM Corp. v. District of Columbia*,
  378 F.3d 1117 (D.C. Cir. 2004)...............................................................16

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004)................................................................26

*Leonard v. Ala. State Bd. of Pharmacy*,
  61 F.4th 902 (11th Cir. 2023) ................................................12

*Louisville & Nashville R.R. Co. v. Finn*,
  235 U.S. 601 (1915)..................................................................7

*Machesky v. Bizzell*,
  414 F.2d 283 (5th Cir. 1969) .................................................18

*Mannings v. Sch. Bd. of Hillsborough Cnty.*,
  149 F.R.D. 235 (M.D. Fla. 1993).............................................8

*Mata Chorwadi, Inc. v. City of Boynton Beach*,
  66 F.4th 1259 (11th Cir. 2023) ....................................... 27, 28

*Mitchum v. Foster*,
  407 U.S. 225 (1972)................................................................18

*Molina v. Aurora Loan Servs., LLC*,
  635 F.App'x 618 (11th Cir. 2015)...........................................18

*Moody v. NetChoice*,
  603 U.S. 707 (2024)........................................................ *passim*

*Morbark, LLC v. Beckowitz*,
  2023 WL 4358749 (N.D. Fla. May 3, 2023)..............................6

*Nationwide Biweekly Admin., Inc. v. Owen*,
  873 F.3d 716 (9th Cir. 2017) .................................................15

*NetChoice v. Bonta*,
  2024 WL 5264045 (N.D. Cal. Dec. 31, 2024) .................... 22, 23

*NetChoice v. Fitch*,
  2025 WL 1135279 (5th Cir. Apr. 17, 2025) ....................... *passim*

*NetChoice v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)................... *passim*

*NetChoice v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ................................................... *passim*

*NetChoice v. Reyes*,
    748 F.Supp.3d 1105 (D. Utah 2024) ............................................................. *passim*

*NetChoice v. Yost*,
    2025 WL 1137485 (S.D. Ohio Apr. 16, 2025) ................................................ *passim*

*NetChoice v. Yost*,
    716 F.Supp.3d 539 (S.D. Ohio 2024)............................................ 24, 28, 35, 50

*NetChoice, LLC v. Griffin*,
    2024 WL 1262476 (W.D. Ark. Mar. 24. 2024) .......................................................14

*New Ga. Project, Inc. v. Att'y Gen.*,
    106 F.4th 1237 (11th Cir. 2024) ................................................. 16, 17, 18

*Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*,
    2021 WL 5029427 (N.D. Ga. June 29, 2021) .......................................................48

*O Centro Espírita Beneficente União Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ...................................................................48

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
    920 F.2d 187 (3d Cir. 1990) .....................................................................48

*Otto v. Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ...................................................................29

*Oviedo Med. Ctr., LLC v. Adventis Health Sys./Sunbelt, Inc.*,
    2020 WL 4218276 (M.D. Fla. Apr. 28, 2020) .......................................................8, 9

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ......................................................................... *passim*

*Patsy v. Bd. of Regents*,
    457 U.S. 496 (1982).........................................................................2

*Pensacola Firefighters' Relief & Pension Fund Bd. of Dirs. v. Merrill Lynch*,
    2010 WL 11519376 (N.D. Fla. June 28, 2010).......................................................8

*Reno v. ACLU*,
    521 U.S. 844 (1997) ..........................................................................33

*Revival Health Pharmacy, LLC v. Americas Pharmacy Source, LLC*,
    2024 WL 3221727 (C.D. Cal. June 21, 2024) ........................................7

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ..........................................................................44

*SEAT v. Paxton*,
    2025 WL 455463 (W.D. Tex. Feb. 7, 2025)..............................21, 39, 41

*Sekhar v. United States*,
    570 U.S. 729 (2013) ..........................................................................2

*Sorrell v. IMS Health*,
    564 U.S. 552 (2011) ...............................................4, 24, 29, 39

*Speech First, Inc. v. Cartwright*,
    2021 WL 3399829 (M.D. Fla. 2021) ....................................................50

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ...............................................10, 50

*State v. Packingham*,
    368 N.C. 380 (2015) ..........................................................................30

*Steffel v. Thompson*,
    415 U.S. 452 (1974)...............................................................2, 13, 18

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..........................................................................10, 11

*Text Ads & Mktg., LLC v. Rafferty*,
    2024 WL 5107239 (W.D. Pa. Dec. 13, 2024) ........................................8

*TikTok v. Garland*,
    145 S.Ct. 57 (2025)..........................................................................32

*Tokyo Gwinnett, LLC v. Gwinnett Cnty.*,
    940 F.3d 1254 (11th Cir. 2019) ........................................... *passim*

*U.S. v. O'Brien*,
391 U.S. 367 (1968) ............................................................. 31, 38

*U.S. v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) ............................................................. 25, 41

*United Food & Com. Workers Union v. Brown Grp.*,
517 U.S. 544 (1996) .................................................................19

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ............................................................. 24, 27

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .................................................................41

*Wood v. Fla. Dep't of Educ.*,
729 F.Supp.3d 1255 (N.D. Fla. 2024) ................................... 46, 47

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ....................................................42

*Younger v. Harris*,
401 U.S. 37 (1971) ...........................................................2, 11, 18

**Statutes**

Anti-Injunction Act, 28 U.S.C. §2283 ..........................................18

Fla. Stat. §501.1736(1)(e) ............................................. 20, 23, 43

Fla. Stat. §501.1736(1)(e)(1) ...................................................34

Fla. Stat. §501.1736(2)(b)(3) ...................................................42

**Regulation and Other Authorities**

Fla. Admin. Code §2-43.002(3)(a) ...............................................46

Fox Business, *Snapchat Is Violating Florida State Law in Multiple Ways, AG
Claims* (Apr. 23, 2025), https://tinyurl.com/mr33cs89 ...........11

*NetChoice v. Bonta*, Dkt.11.1,
No. 25-146 (9th Cir. Jan. 28, 2025) .......................................22

Order Denying Motion for Preliminary Injunction,
*Morbark LLC v. Beckowitz*, No: 4:23-cv-116 (N.D. Fla. Mar. 27, 2024).................6

Order Granting Motion to Stay, *Free Speech Coalition v. Moody*,
No. 4:24-cv-514 (N.D. Fla. Jan. 16, 2025) .............................................................48

Order, *Angelilli v. Activision Blizzard, Inc.*,
No. 23-cv-16566 (N.D. Ill. Apr. 23, 2025) .............................................................39

Press Release, Off. of the Att'y Gen., *Attorney General James Uthmeier
Takes Legal Action Against Snapchat* (April 22, 2025),
https://tinyurl.com/m4zww2jz ...............................................................................11

U.S. Surgeon General, *Social Media and Youth Mental Health*
(May 23, 2023)................................................................................ 36, 38

Wright, Miller, & Kane, Fed. Prac. & Proc. (2d ed. 1995)..........................................48

# INTRODUCTION

CCIA and NetChoice filed this lawsuit six months ago to enjoin HB3 as a violation of the First Amendment. Since then, Florida has done everything in its power to try to keep the Court from reaching the merits of Plaintiffs' First Amendment claim. Florida first insisted that it needed far-reaching discovery just to respond to the First Amendment arguments in Plaintiffs' preliminary injunction motion, and that it was willing to stay enforcement of HB3 to obtain that discovery. Yet when it finally got around to filing its opposition brief, the state barely cited any of that discovery when addressing the merits of Plaintiffs' claim. Instead, Florida raised a slew of threshold objections, insisting (among other things) that the direct and intended targets of HB3 must not only allege, but prove, that they are likely covered (and therefore violating) the law just to demonstrate Article III standing to challenge it. After the Court agreed with the state, Plaintiffs promptly complied with the Court's guidance by supplying evidence that Snap (among others) is indeed "likely covered" by HB3. Instead of agreeing to continue the stay of enforcement to give the Court time to decide the merits, the state then brazenly used that same evidence to sue Snap in state court mere hours before responding to Plaintiffs' motion—after procuring yet more delay by insisting on another round of unnecessary depositions that yielded virtually no relevant evidence.

The state's new lawsuit lays to rest any doubt that Plaintiffs have standing,

and indeed have had standing all along. Reading that writing on the wall, the state takes a new obstructionist tack. Though the ink on its new lawsuit is barely dry, Florida takes the remarkable position that this Court must now abstain from resolving this months-old lawsuit under *Younger v. Harris*, 401 U.S. 37 (1971), because doing so would interfere with a state-court proceeding initiated just a few days ago for the obvious purpose of trying to frustrate the resolution of this one.

That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). By the state's telling, plaintiffs cannot bring a pre-enforcement action unless they admit that they are likely violating a law, yet once they admit as much, the state can turn around and preempt their pre-enforcement action with an enforcement action of its own. Neither standing nor abstention doctrine creates— let alone tolerates—that kind of Catch-22. As the Supreme Court recognized long ago, federal law does not "place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity." *Steffel v. Thompson*, 415 U.S. 452, 462, 472-73 (1974). To the contrary, Section 1983 and *Ex parte Young* guard against that untenable result by giving plaintiffs "who [a]re threatened with … the deprivation of [federal] constitutional rights" a way into federal court. *Patsy v. Bd. of Regents*, 457 U.S. 496, 504 (1982). And plaintiffs remain entitled to that path notwithstanding a state's efforts to foreclose it by proceeding with the very deprivation of rights

plaintiffs sued to prevent. To accept Florida's contrary view would reward states for being coy about who they think their own laws cover, then using the plaintiff's forced admissions to turn around and enforce them in exactly the way the plaintiff feared.

The Court should not countenance such blatant gamesmanship to deprive Plaintiffs of their chosen forum. It is time to resolve Plaintiffs' First Amendment claims, and the need for relief is all the more urgent in light of the state's conduct. The state's remaining arguments for forestalling resolution lack merit. Its novel effort to characterize this renewed preliminary injunction motion as a reconsideration motion is unavailing, and its argument that Plaintiffs lack associational standing is foreclosed by a long line of precedent.

On the merits, the state continues to insist that HB3 regulates the conduct of "account creation" rather than speech. But courts have repeatedly rejected that argument, for good reason. Just as with library cards, newspaper subscriptions, or any other "conduct" necessary to access speech, people create accounts on "social media" websites to gain access to websites "where they can speak and listen." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). And Florida does not dispute that prohibiting minors from creating accounts on "social media" websites makes it impossible for them to engage in the full range of social and interactive First Amendment activity that users enjoy on those websites—be it posting short videos for their Instagram followers, sharing pictures with friends on Snapchat, or

debating politics with classmates on Facebook.

Florida's efforts to satisfy heightened scrutiny likewise fall short. It insists that HB3 protects children from "addiction" and likens it to laws protecting minors from "drugs and gambling." Fla.PI.Opp.53. But HB3 does not seek to protect minors from "addiction" to non-speech products; HB3 seeks to protect minors from purported "addiction" to popular websites for *speech*. Burdening protected speech that citizens find especially compelling is especially inconsistent with the First Amendment. The "fear that speech might persuade provides no lawful basis for quieting it." *Sorrell v. IMS Health*, 564 U.S. 552, 576 (2011). If it were otherwise, then Florida could limit how much time minors spend reading page-turning novels like Harry Potter or watching gripping TV shows like X-Men '97.

In the end, Florida has no answer to scores of precedents prohibiting states from decreeing what minors can say, see, and hear. Courts have repeatedly enjoined similar efforts to protect minors from the purportedly harmful effects of "social media." Indeed, since the last round of briefing, two courts have *permanently* enjoined states from enforcing such laws. *See NetChoice v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025). Florida identifies no reason to depart from that consensus.

4

## I. Florida's Threshold Arguments Lack Merit.[1]

### A. Plaintiffs' Motion Is Not a Motion for Reconsideration.

Florida begins by insisting that Plaintiffs' renewed preliminary injunction motion should be treated as a "motion for reconsideration." Fla.PI.Opp.13. That argument lacks merit. A motion for reconsideration is a request "'to reconsider, revise, alter or amend' a non-final order before the entry of final judgment." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1380 (11th Cir. 2024). That is not what Plaintiffs are trying to do. While Plaintiffs respectfully disagree with the Court's decision denying their initial preliminary injunction motion, Plaintiffs are not asking the Court to reconsider anything. Plaintiffs have instead filed an amended complaint with new factual allegations and a new preliminary injunction motion with new evidentiary support. The renewed motion simply asks the Court to apply the legal standard it announced, i.e., that Plaintiffs must "provide[] evidence showing that any one specific member operates a platform that is likely covered by the law," Dkt.72 at 7, to new facts mustered in support of that motion, Pls'.PI.Br.4 n.2.

Because Plaintiffs are not asking the Court to reconsider any prior holdings, it makes no sense to treat their renewed preliminary injunction motion as a motion

---

[1] To the extent the Court would find it useful to hear argument on the new developments in this case, Plaintiffs are ready and willing to work with the Court to schedule a hearing immediately.

for reconsideration. Courts routinely consider new preliminary injunction motions on the merits without recharacterizing them as reconsideration motions, and they routinely "allow[]" parties who file a "new motion for preliminary injunction" to "present new evidence" in support of it. *Adams v. City of Chicago*, 135 F.3d 1150, 1153 (7th Cir. 1998). That is so even when the new evidence was available when the party filed its initial motion.

*Morbark, LLC v. Beckowitz*, 2023 WL 4358749 (N.D. Fla. May 3, 2023) (Walker, C.J.), illustrates the point. There, this Court dismissed the plaintiff's complaint for lack of subject matter jurisdiction and denied its motion for preliminary injunction as moot. *Id.* at *2. In doing so, the Court expressly contemplated that the plaintiff may "file an amended complaint … remedy[ing] the deficient allegations," as well as a new "motion for preliminary injunction." *Id.* It noted that "if Plaintiff files an amended complaint" that corrects the deficiencies identified by the court, it could file a new motion for preliminary injunction "mak[ing] the same arguments" and citing "any evidence in support." *Id.* at *2 n.1. And when the plaintiff filed a new preliminary injunction motion, the Court did not treat it as a motion for reconsideration; it simply addressed the motion on the merits. *See* Order Denying Motion for Preliminary Injunction at 5-6, 22, *Morbark LLC v. Beckowitz*, No: 4:23-cv-116 (N.D. Fla. Mar. 27, 2024).

*Morbark* hardly stands alone. Numerous courts (including the U.S. Supreme Court) take the same approach. *See, e.g.*, *Louisville & Nashville R.R. Co. v. Finn*, 235 U.S. 601, 604-05 (1915); *Allen v. Sch. Bd. for Santa Rosa Cnty.*, 782 F.Supp.2d 1304, 1309-10 (N.D. Fla. 2011); *Revival Health Pharmacy, LLC v. Americas Pharmacy Source, LLC*, 2024 WL 3221727, at *2 (C.D. Cal. June 21, 2024); *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *2-10 (N.D. Cal. Nov. 7, 2023); *Cranford v. Palos*, 2014 WL 1689658, at *1 (E.D. Cal. Apr. 29, 2014); *see also Eufaula Heritage Ass'n v. Ala. Dep't of Transp.*, 2015 WL 404534, at *1-9 (M.D. Ala. Jan. 29, 2015) (resolving on the merits renewed motion for preliminary injunction that sought "the same relief as the [prior] motion"); *cf. D'Amico v. Jones*, 2019 WL 3976315, at *1 (N.D. Fla. Aug. 22, 2019) (denying preliminary injunction but allowing plaintiff to renew it). To be sure, those cases do not squarely address whether such motions should be treated as reconsideration motions. But the fact that courts and litigants alike rarely suggest that they should is a strong indication that they should not.[2]

Florida's cases are inapposite. *Alachua County Education Ass'n v. Rubottom*, 2023 WL 7132968, at *1 n.2 (N.D. Fla. Sept. 22, 2023) (Walker, C.J.), did not decide

---

[2] In the context of motions to dismiss, courts have explained that "when an original complaint is dismissed without prejudice, the filing of an amended complaint does not ask the court to reconsider its analysis of the initial complaint. The amended complaint is a new complaint, entitling the plaintiff to judgment on the complaint's own merits." *Askins v. DHS*, 899 F.3d 1035, 1043 (9th Cir. 2018). There is no logical reason why a different rule would apply to a renewed preliminary injunction motion based on an amended complaint.

whether the plaintiff's second preliminary injunction motion was "procedurally proper." *Id. Abreu v. Pfizer, Inc.* did not involve a second preliminary injunction motion; it involved a second motion to intervene that effectively asked for the court to re-evaluate the denial of intervention. 2022 WL 2352443, at *1, *7-9 (S.D. Fla. June 22, 2022). And *Mannings v. School Board of Hillsborough County*, 149 F.R.D. 235 (M.D. Fla. 1993), *Pensacola Firefighters' Relief & Pension Fund Board of Directors v. Merrill Lynch*, 2010 WL 11519376 (N.D. Fla. June 28, 2010), *Cumulus Media v. Clear Channel Communications*, 304 F.3d 1167 (11th Cir. 2002), *J-B Weld Co. v. Gorilla Glue Co.*, 2018 WL 1989308 (N.D. Ga. Feb. 12, 2018), and *Text Ads & Marketing, LLC v. Rafferty*, 2024 WL 5107239 (W.D. Pa. Dec. 13, 2024), involved actual motions for reconsideration. They say nothing about when a renewed preliminary injunction motion should be characterized as a reconsideration motion in the circumstances here.

In fact, the state cites just a single case that treats a second preliminary injunction motion as a motion for reconsideration. *See Oviedo Med. Ctr., LLC v. Adventis Health Sys./Sunbelt, Inc.*, 2020 WL 4218276 (M.D. Fla. Apr. 28, 2020). But even a cursory review of that decision shows that it has no bearing on this one. There, after the court denied a preliminary injunction motion "because it unreasonably delayed in seeking such relief," the plaintiff filed a second preliminary injunction motion presenting "new evidence" on a merits question on which the

court had "found in *Plaintiff's favor.*" *Id.* at *2 (emphasis added). Since the new evidence did not address the ground on which relief was denied (unreasonable delay), the court understood the plaintiff to be asking it to reconsider its holding on that ground. *Id.* Here, by contrast, this Court denied Plaintiffs' initial motion for lack of standing, Dkt.72, while explaining that Plaintiffs were free to file an amended complaint meeting the legal standard announced, Dkt.73 at 6. Plaintiffs are not asking this Court to reconsider that conclusion. The renewed motion simply asks the Court to apply that legal standard to new facts mustered in support of Plaintiffs' renewed motion and to rule on the merits. Pls'.PI.Br.4 n.2. The state has not identified a single case that treats a similar motion as a motion for reconsideration.

Shifting gears, the state asserts that Plaintiffs had "multiple opportunities to provide supplemental evidence in response to Defendant's standing arguments" when litigating the initial motions, and it characterizes Plaintiffs' failure to do so as a "lack of diligence." Fla.PI.Opp.15-16. At the outset, that argument proves far too much, as it would suggest that Plaintiffs could not even amend their complaint. It also ignores that courts around the country have found declarations with virtually the same information more than sufficient to demonstrate that Plaintiffs' members have standing to challenge the numerous laws that (like HB3) have been passed for the express purpose of regulating their members. And it ignores that Plaintiffs produced four deponents, including a representative from Snap who addressed all

but one of the state's inquiries about why Snap believes itself to be covered by HB3. Plaintiffs certainly did not display any lack of "diligence" by failing to produce evidence on just one aspect of HB3's definition of "social media platform," particularly where Plaintiffs have now submitted evidence on that one aspect the Court found lacking.

Florida's "diligence" argument is especially galling when the state has never denied that Plaintiffs' members—including Meta, Snap, and Google—operate websites that are covered by HB3. Indeed, the state has repeatedly acknowledged (and has continued to acknowledge) throughout this litigation that Plaintiffs' members are the targets of HB3. And the Supreme Court has repeatedly held that "a plaintiff who wishes to challenge the constitutionality of a law [need not] confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119-20 (11th Cir. 2022) (plaintiff need allege only that its conduct is "arguably proscribed" by the law and that it faces "a credible threat of enforcement"). While this Court concluded that Article III requires more—namely, that plaintiffs demonstrate that they are "*likely* covered by the law," Dkt. 72 at 6 (emphasis added)—Plaintiffs decision not to supplement the record with evidence that they thought was not only unnecessary, but also potentially harmful to members, cannot seriously be characterized as a "lack of diligence." Plaintiffs can hardly be blamed for not

wanting to submit what they in good faith believed to be unnecessary evidence that might "expose [their members] to liability before bringing suit," *Driehaus*, 573 U.S. at 158-59, especially now that the state has done exactly what Plaintiffs feared that evidence might prompt it to do—i.e., use that evidence to sue one of their members.[3]

In all events, even if the Court were to recharacterize Plaintiffs' motion as a motion for reconsideration, it would make no difference. As Florida acknowledges, reconsideration is appropriate to consider evidence that "was not available" in the earlier proceeding. Fla.PI.Opp.14 (quoting *Cumulus*, 304 F.3d at 1178). Here, newly available evidence—namely, the state's decision to sue one of Plaintiffs' members, *see* Dkt.86-1, and its express representation to the Court that it is contemplating enforcement against another, *see* Dkt.82 at 9-13—confirms beyond cavil that at least one of Plaintiffs' members has Article III standing to sue.

### B. *Younger* Abstention Is Not Appropriate.

Florida's abstention argument fares no better. Invoking *Younger v. Harris*, 401 U.S. 37 (1971), the state asserts that the lawsuit it just filed against Snap last week (and that it waited four days to serve) somehow precludes the Court from

---

[3] The Attorney General openly declared that the state court complaint is based on Snap's declarations in this case, stating in a recent press release that "Snap, Inc. has acknowledged in other litigation that it is subject to HB 3." Press Release, Off. of the Att'y Gen., *Attorney General James Uthmeier Takes Legal Action Against Snapchat* (April 22, 2025), https://tinyurl.com/m4zww2jz; *see also* Fox Business, *Snapchat Is Violating Florida State Law in Multiple Ways, AG Claims* (Apr. 23, 2025), https://tinyurl.com/mr33cs89.

reaching the merits of this lawsuit, which has been pending *for six months*. Fla.PI.Opp.2-3. That naked ploy to deprive Plaintiffs of their chosen forum defies decades of settled precedent.

*Younger* abstention, like all other abstention doctrines, "is the exception, not the rule" because "federal courts have a virtually unflagging obligation to exercise their jurisdiction." *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1266-67 (11th Cir. 2019). Accordingly, "[o]nly the clearest of justifications merits abstention." *Id.* at 1267 (brackets omitted). Under *Younger*, a federal court may abstain only if there is an "ongoing" or "pending" state-court criminal prosecution, civil enforcement proceeding, or civil proceeding involving orders that uniquely further state courts' judicial functions. *Leonard v. Ala. State Bd. of Pharmacy*, 61 F.4th 902, 907-08 (11th Cir. 2023). The state's eleventh-hour lawsuit against Snap is not an "ongoing" or "pending" state court proceeding, and even if it were, *Younger* does not apply to actions initiated in a bad-faith effort to deprive plaintiffs of their chosen forum.

Start with the ongoing-proceeding requirement. *Younger* abstention is generally appropriate only when the state-court lawsuit is filed first, *Tokyo Gwinnett,* 940 F.3d at 1268, which is plainly not the case here. The narrow exception Florida invokes (at 26-28) is limited to instances in which the first-in-time federal action has not "moved beyond the 'embryonic stage.'" *Id.* at 1271. When there has been

significant federal-court action before the state action was filed, *Younger* does not "requir[e] the federal courts totally to step aside." *Steffel*, 415 U.S. at 472. After all, to let late-breaking state-court lawsuits preempt long-running federal-court litigation would "turn federalism on its head." *Id.*

To assess whether a federal action has progressed so little as to justify a federal court abandoning its "virtually unflagging obligation to exercise … jurisdiction," "courts look to 'the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences [or hearings] held, and any change in the parties' position as a result of the federal litigation,'" as well as "the filing of motions, even if the district court did not rule on the motions." *Tokyo Gwinnett,* 940 F.3d at 1267, 1272. A district court's assessment of whether those factors warrant abstention is left to its sound discretion. *Id.* at 1266.

Under those factors, *Younger* abstention is plainly inappropriate here. Plaintiffs filed this lawsuit six months ago. The parties fully briefed, and this Court resolved, two motions (a preliminary injunction motion and a motion to dismiss), both of which involve significant discussion of Plaintiffs' claims. *See* Dkts.4-5, 51, 63; Dkts.50, 62, 66. Plaintiffs have since filed an amended complaint, Dkt.74, and the parties have now completed briefing on a third motion (Plaintiffs' renewed preliminary injunction motion), which again involves substantial argument on the merits of Plaintiffs' First Amendment claim. *See* Dkts.75-76, 87. And that is to say

nothing of the substantial discovery in which the parties have engaged—at the *state's* insistence, no less.[4] This Court imposed no limits on the topics the state could explore in deposing Plaintiffs' four declarants, Dkt.35 at 3, and the state took full advantage of that in deposing each of them for hours, Dkts.51-4 to 51-7. Plaintiffs deposed three experts that the state chose to produce. Dkts.63-1 to 63-3. And the parties have exchanged initial disclosures, a first round of interrogatories, requests for admission, and requests for production, and responses to the same. Dkts.47, 61 at 1-2. On top of all that, this Court has held multiple conferences and a hearing on Plaintiffs' First Amendment claims, which included consideration of both the law and the parties' evidence. Dkt.70.

To put it mildly, both parties have done more than just "beg[i]n actively litigating [their] position[s] in federal court." *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1219 (11th Cir. 2002). This action thus fits comfortably within the long line of cases that have rejected requests to abstain under *Younger* from resolving a first-in-time federal suit. *See Tokyo Gwinnett*, 940 F.3d at 1272 (reversing decision to abstain when plaintiff had filed a complaint and an amended complaint, and parties had briefed a motion to dismiss and filed initial disclosures);

---

[4] In fact, the parties have already engaged in far more discovery than other courts have found necessary to *permanently* enjoin similar laws. *See Griffin*, 2025 WL 978607, at *17; *NetChoice, LLC v. Griffin*, 2024 WL 1262476, at *4 (W.D. Ark. Mar. 24. 2024) (permanently enjoining Arkansas law after only "minimal discovery"); *Yost*, 2025 WL 1137485, at *5 (permanently enjoining Ohio law after no discovery).

*For Your Eyes Alone*, 281 F.3d at 1213-14, 1220 (reversing decision to abstain when parties were in the midst of briefing two motions on the merits and court had resolved a motion for a temporary restraining order after an evidentiary hearing); *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 729-30 (9th Cir. 2017) (holding that abstention under *Younger* was an abuse of discretion when federal actions had been pending for approximately six months and district court had considered briefing on a motion to dismiss and preliminary injunction involving the merits).

Florida has no answer to any of that. Instead, it insists that "no proceedings of substance on the merits" have occurred because this Court resolved the parties' first two motions on standing grounds. Fla.PI.Opp.26-28. But that was also the case in *Tokyo Gwinnett*. The district court had twice granted motions to dismiss on jurisdictional grounds, first finding the matter moot, and then finding that the plaintiff lacked standing to assert certain claims—yet the Eleventh Circuit nonetheless held that the district court abused its discretion by abstaining. 940 F.3d at 1259-61, 1272. As the Court explained, the evidence the parties presented in connection with a request for a temporary restraining order, the briefing on a motion to dismiss, and the filing of initial disclosures all demonstrated that the first-in-time federal action had proceeded far beyond the nascent stage that might justify deferring to a second-in-time state action. *Id.* at 1272. This case follows *a fortiori*, as the

litigation the parties have engaged in here well outpaces what had occurred in *Tokyo Gwinnett*.

The cases Florida cites do not aid its cause. Some do not even involve a first-in-time federal suit. *See, e.g.*, *Giulini v. Blessing*, 654 F.2d 189, 193 (2d Cir. 1981); *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1126 (D.C. Cir. 2004) (federal action filed after D.C. administrative proceeding). And the rest involve federal suits that had barely progressed beyond their filing. *See, e.g.*, *Hicks v. Miranda*, 422 U.S. 332, 348-49 (1975) (finding abstention warranted when state action was filed one day after federal complaint was served); *New Ga. Project, Inc. v. Att'y Gen.*, 106 F.4th 1237, 1240, 1244 (11th Cir. 2024) (finding abstention proper where state campaign-finance commission had recommended that the attorney general initiate a prosecution four weeks before the federal lawsuit was filed, and no briefing had been completed on any motion in federal court); *Forty One News, Inc. v. County of Lake*, 491 F.3d 662, 666-67 (7th Cir. 2007) (holding that district court did not abuse its discretion in abstaining when no discovery had occurred and two motions to dismiss that had been briefed did not address the merits). Here, by contrast, the only thing nascent is the state's late-breaking state court enforcement action (which it waited four days serve). Put simply, to abandon this Court's "virtually unflagging obligation to exercise … jurisdiction," *Tokyo Gwinnett*, 940 F.3d at 1266-67, on these facts would be an abuse of discretion in the extreme.

That is particularly true given that the state-court proceeding appears to have been initiated in a bad faith effort to frustrate Plaintiffs' ability to litigate their federal claims in federal court. As the Eleventh Circuit has explained, *Younger* abstention is patently inappropriate when "the state was strategically seeking to evade federal-court jurisdiction." *New Ga. Project*, 106 F.4th at 1246. The state's behavior here smacks of that kind of gamesmanship. After having persuaded the Court to dismiss Plaintiffs' initial complaint on standing grounds, the state has now turned around and used a declaration it forced Plaintiffs to file in support of their renewed motion as its grounds for bringing an enforcement action against Snap under HB3. Dkt.86-1 ¶¶47, 139-41. Nothing in its complaint remotely suggests that Florida had long been investigating Snap for purported violations of HB3, and the state notably did not suggest as much in the most recent conference before this Court—even as it *did* inform the court of a purportedly long-running investigation into Meta for supposed violations of the unrelated Florida Deceptive and Unfair Trade Practices Act. And Florida filed the state court action mere hours before filing its response to Plaintiffs' renewed preliminary injunction motion. In short, the state insisted on even more discovery to drag out the briefing on Plaintiffs' renewed motion, only to then turn around and use that discovery not to *litigate* this case, but to try to *preempt* this case by doing exactly what Plaintiffs filed this motion to prevent—namely, the filing of (unconstitutional) enforcement actions against their members. Because that cannot

be understood as anything other than a "strategic[] [attempt] to evade federal-court jurisdiction," *New Ga. Project*, 106 F.4th at 1246, to reward the state's tactics with abstention would "turn federalism on its head," *Steffel*, 415 U.S. at 472.[5]

**C.  Plaintiffs Have Associational Standing to Bring Their Claims.**

While Florida can no longer dispute that at least one of Plaintiffs' members has standing to challenge HB3, it renews its argument that Plaintiffs lack associational standing because resolving their First Amendment claims purportedly requires participation by individual members. Fla.PI.Opp.28-34.  The state is wrong. Courts across the country have resolved First Amendment challenges to similar laws without dragging members in as parties. *See Yost*, 2025 WL 1137485, at *9; *Griffin*, 2025 WL 978607, at *6; *NetChoice v. Reyes*, 748 F.Supp.3d 1105, 1118-19 (D. Utah 2024); *CCIA v. Paxton*, 747 F.Supp.3d 1011, 1029-31 (W.D. Tex. 2024); *see also NetChoice v. Fitch*, 2025 WL 1135279, at *3, *7 (5th Cir. Apr. 17, 2025) (holding

---

[5] For all the same reasons, the Anti-Injunction Act, 28 U.S.C. §2283, does not preclude this Court from enjoining the state from pursuing its enforcement action against Snap.  As an initial matter, the state does not even mention the Act in its brief, so it forfeited any such argument.  *See Molina v. Aurora Loan Servs., LLC*, 635 F.App'x 618, 623 (11th Cir. 2015) (Anti-Injunction Act "is not a jurisdictional statute."); *Machesky v. Bizzell*, 414 F.2d 283, 287 (5th Cir. 1969) (same).  In any event, §1983 and *Ex parte Young* have long supplied vehicles for federal courts to grant "federal injunctive relief against a state court proceeding" when doing so is "essential to prevent great, immediate, and irreparable loss of a [litigant's] constitutional rights."  *Mitchum v. Foster*, 407 U.S. 225, 242 (1972); *accord Younger*, 401 U.S. at 43 (holding that *Ex parte Young* permits enjoining a state court proceeding that will cause the litigant to "suffer irreparable damages").

that NetChoice had associational standing, but remanding on other grounds). Florida offers no good reason why this Court cannot do the same.

The third prong of the associational standing test is "prudential," not constitutional, and is "best seen as focusing on … matters of administrative convenience and efficiency." *United Food & Com. Workers Union v. Brown Grp.*, 517 U.S. 544, 556-57 (1996). The question is not whether resolving the organization's claims requires *any* member participation, but whether it would "require *excessive* participation." *Borrero v. United Healthcare*, 610 F.3d 1296, 1306 (11th Cir. 2010). So long as the claims "can be proved with the[ir] limited participation," the "organization has standing to assert them." *Id.*

Plaintiffs' First Amendment claims do not require "excessive participation by individual members." *Id.* Plaintiffs principally argue that HB3 violates the First Amendment because it restricts minors (and adults) from engaging in core First Amendment activity on "social media" websites, and because it prevents websites from disseminating speech to their users. Pls'.PI.Br.16-22. To resolve that claim, the Court must determine (1) whether the law triggers First Amendment scrutiny, (2) whether strict or intermediate scrutiny applies, and (3) whether the challenged provisions survive the applicable level of scrutiny. *See* Fla.PI.Opp.39-58. The Court does not need "excessive" member participation to answer any of those questions.

Start with whether HB3 triggers First Amendment scrutiny. To answer that question, the Court need only read HB3's text. HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to *upload content or view the content or activity of other users*" and "*select[s] content for users*." Fla. Stat. §501.1736(1)(e). In other words, HB3 applies *only* to websites that allow users to engage in speech, *see Packingham*, 582 U.S. at 104, and that engage in their own First Amendment activity by selecting and disseminating content, *see Moody v. NetChoice*, 603 U.S. 707 (2024). By restricting minors from creating accounts on those websites, HB3 both "prevent[s] user[s] from engaging in the legitimate exercise of First Amendment rights," *Packingham*, 582 U.S. at 108, and burdens the First Amendment rights of those websites to disseminate speech to their users, *Moody*, 603 U.S. at 731-32. The state resists that conclusion by likening HB3 to age restrictions on bars, but not even Florida suggests that those arguments turn on member-specific information. Indeed, courts across the country have rejected the same arguments without needing to delve into *any* member-specific facts. *E.g.*, *Yost*, 2025 WL 1137485, at *15-16; *Griffin*, 2025 WL 978607, at *7.

Nor does the Court need "excessive" member participation to determine whether the challenged provisions survive First Amendment scrutiny. Whether strict or intermediate scrutiny applies turns on whether HB3 is content or speaker based, not on details about Plaintiffs' members. Pls'.PI.Br.23-26. And as cases like *Griffin*,

*Yost*, and *Reyes* make clear, the Court needs no member-specific facts to determine that restricting minors from creating accounts on "social media" websites is not a narrowly tailored means of achieving the state's interest in protecting minors from harm. Just as the Supreme Court did not need member-specific facts to resolve the Entertainment Merchants Association's arguments that California's ban on selling violent video games to minors was both over- and underinclusive, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802-04 (2011), this Court does not need member-specific facts to determine whether HB3 suffers from the same flaw.

Florida insists that narrow tailoring may turn on what tools and technologies websites employ to protect minors. Fla.PI.Opp.31-32. But the tools members provide are only some of the many tools that parents have at their disposal to manage their minors' access and use of the Internet. Pls'.PI.Br.30-31. Other courts have had no trouble concluding that a campaign promoting those same tools is a less restrictive way to achieve any legitimate objectives without delving into member-specific facts. *E.g.*, *SEAT v. Paxton*, 2025 WL 455463, at *12 (W.D. Tex. Feb. 7, 2025); *Griffin*, 2025 WL 978607, at *13; *Brown*, 564 U.S. at 803. Florida does not explain why this Court could not do the same. Florida also contends that a website's "user base is also relevant" to narrow tailoring because it has a "greater interest in regulating" websites with more "young children." Fla.PI.Opp.32. But the same could be said in other cases challenging similar laws, yet that has not required

excessive member proof.  *Yost*, 2025 WL 1137485, at \*15-16; *Griffin*, 2025 WL 978607, at \*7.

Rather than grappling with those cases, Florida tries to seek refuge in the Supreme Court's decision in *Moody*.  But *Moody* had nothing to do with associational standing.  The concern in *Moody* was not the lack of involvement of CCIA and NetChoice members.  It was that the lower courts had not "determine[d] [the] law's full set of applications," which the Court deemed necessary to "properly consider[] the facial nature of [Plaintiffs'] challenge."  603 U.S. at 717-18.  *Moody* nowhere suggested that answering that question (which is really just a matter of statutory interpretation) would require excessive member participation; indeed, the majority did not mention associational (or any other) standing at all.

Florida's reliance on *NetChoice v. Bonta* is also misplaced.  The district court there found that NetChoice's challenge to a California law—that differs from this one in several respects—required "factual inquiries into how" members' "feed[s] work" to determine whether their activities are "expressive."  2024 WL 5264045, at \*18 (N.D. Cal. Dec. 31, 2024).  That decision is wrong—in fact, the Ninth Circuit granted an injunction pending appeal, *see NetChoice v. Bonta*, Dkt.11.1, No. 25-146 (9th Cir. Jan. 28, 2025).  But that aside, *Bonta* has no relevance to Plaintiffs' argument that HB3 unconstitutionally restricts minors (and adults) from accessing websites where *they* engage in First Amendment activity.  Nothing about that

argument turns on the specifics of each website's "feeds." All the Court needs to know is that HB3 restricts access to websites where minors and adults alike "can speak and listen," *Packingham*, 582 U.S. at 104, which Florida does not seriously dispute that it does.[6]

While Plaintiffs also argue that HB3 restricts the First Amendment right of websites to *disseminate* third-party speech to their users, Pls'.PI.Br.21-22, this Court need not resolve that issue because members have Article III standing either way (as evidenced by the fact that Florida has sued one of them under HB3), *see supra* Section I.B, and Plaintiffs can assert the First Amendment rights of their members' users, *see infra* Section I.D. In all events, there is no need to delve into how individual members' "feed[s] work" to conclude that HB3 regulates the First Amendment activity of Plaintiffs' members. Florida has not suggested that HB3 might apply to "a payment service like Venmo" or "a ride-sharing service like Uber." *Moody*, 603 U.S. at 725. By its terms, HB3 applies *only* to a "social media platform" that "select[s] content" to disseminate to its "users." Fla. Stat. §501.1736(1)(e).[7] And the Supreme Court has repeatedly held that the "dissemination of information"

---

[6] Florida also omits that the court enjoined California from enforcing several aspects of the law. *See Bonta*, 2024 WL 5264045, at *13-16.

[7] Accordingly, even if *Moody* had addressed whether excessive member participation was necessary to address Plaintiffs' facial challenge to the Florida law at issue there, it would have no relevance here.

is "speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570.

### D. Plaintiffs Have Prudential Standing to Assert the First Amendment Rights of Their Members' Users.

Florida insists that even if Plaintiffs have associational standing to bring their claims, they lack prudential standing to assert the First Amendment rights of their members' users. Every court that has considered that argument has rejected it, including the Fifth Circuit in a decision this month. *See Fitch*, 2025 WL 1135279, at *3-4; *NetChoice v. Griffin*, 2023 WL 5660155, *10-12 (W.D. Ark. Aug. 31, 2023); *NetChoice v. Yost*, 716 F.Supp.3d 539, 550-51 (S.D. Ohio 2024); *Paxton*, 747 F.Supp.3d at 1030. Decades of precedent confirm that CCIA and NetChoice may assert the First Amendment rights of both their members and their members' users. *E.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (holding that several booksellers' associations had prudential standing to assert the First Amendment rights of bookbuyers); *Brown*, 564 U.S. at 795 n.3 (repeatedly emphasizing the First Amendment rights of minor purchasers even though plaintiffs were organizations that represented video game sellers).

Florida insists that Plaintiffs may not assert the First Amendment rights of their members' users because their members lack prudential standing to assert their users' rights. Fla.PI.Opp.36-38. But even outside the First Amendment context, the Supreme Court has repeatedly held that service providers may assert the constitutional rights of prospective users and customers when those rights are

24

burdened by government regulation of providers. In *Craig v. Boren*, 429 U.S. 190 (1976), for example, the Court held that a beer vendor had standing to assert the equal-protection rights of her underage male customers in a challenge to the constitutionality of an Oklahoma statute that prohibited the sale of 3.2% beer to men under 21 and women under 18. The Court explained that the vendor was "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195; *see also Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (holding that distributors of contraceptives may raise their prospective customers' right of privacy); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252-53 (2002) (emphasizing "the rights of adults" to receive speech even though plaintiffs were publishers of adult-oriented materials, not consumers); *U.S. v. Playboy Ent. Grp.*, 529 U.S. 803, 811 (2000) (similar).

The same reasoning applies here. HB3 directly regulates CCIA and NetChoice members, and the "threatened imposition of governmental sanctions" on them will require them to restrict prospective users from accessing their services. *Craig*, 429 U.S. at 195. So if HB3 is unconstitutional, then "enforcement of [it] against" Plaintiffs' members "would result indirectly in the violation of third parties' rights." *Id.* Plaintiffs' members may therefore "act[] as advocates of the rights of third parties who seek access to their market or function." *Id.*

Florida has little to say about *Craig* or any of the many decisions holding that Plaintiffs' members may assert the rights of their users. It just insists that Plaintiffs' members lack a sufficiently "close relationship" with their users to assert their rights. Fla.PI.Opp.36-37. But that is impossible to square with cases like *Craig* and *Carey*. Florida points out that "[m]any adults who use platforms" "might well applaud HB3" and "object to Plaintiffs' unilateral decision to invoke their rights to invalidate the law." Fla.PI.Opp.37. But the same could be said whenever a vendor invokes its customer's rights; some of the vendor's customers in *Craig* may well have approved of Oklahoma's differing age restrictions on the sale of alcohol, but that did not prevent the vendor from asserting the interests of customers who wanted to purchase beer but were barred from doing so. Here, too, Plaintiffs' members are "well positioned to raise" the First Amendment rights of their users who wish to access their services, as the members are the parties regulated by HB3. *Griffin*, 2023 WL 5660155, at *12.[8]

Florida also argues that even if Plaintiffs' *members* may assert the First Amendment rights of their users, CCIA and NetChoice may not do so. Florida is

---

[8] Florida also argues that users can sue. Fla.PI.Opp.36. The same was true in *Craig*, *see* 429 U.S. at 192-93, yet the Court nevertheless held that the vendor could sue on behalf of her customers. Florida relies on *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). But as other courts have explained, *Kowalski* is "clearly distinguishable" because "the contested issue there was Article III standing—not prudential standing." *Griffin*, 2023 WL 5660155, at *12.

wrong again. *See Fitch*, 2025 WL 1135279, at \*3-4. An organization with associational standing "assert[s] the claims of its members" and stands in their stead. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). To the extent the organization's members may assert their users' rights, the organization may too.

*American Booksellers Association* is illustrative. There, several organizations of booksellers and two bookstores brought a pre-enforcement facial challenge under the First Amendment to a Virginia statute that made it unlawful to knowingly display sexually explicit material to minors. 484 U.S. at 388 & n.3. Virginia argued that the plaintiffs lacked standing to bring a First Amendment challenge because they asserted only "the First Amendment rights of bookbuyers." *Id.* at 392-93. The Supreme Court disagreed. While the "usual rule is that a party may assert only a violation of its own rights," "in the First Amendment context 'litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* (alterations omitted). So the Court had no problem with either the booksellers' associations or bookstores "alleg[ing] an infringement of the First Amendment rights of bookbuyers." *Id.* at 388 n.3, 393 & n.6.[9]

_____

[9] Florida also relies on *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259 (11th Cir. 2023). But as that case makes clear, "a litigant is permitted to

*American Booksellers Association* hardly stands alone. The plaintiffs in *Brown* were organizations that represented the video game and software industries, not minors asserting a First Amendment right to purchase violent video games without their parents' consent. 564 U.S. at 789. Although the Court did not specifically address standing, it allowed the industry plaintiffs to assert the First Amendment rights of minors, and indeed repeatedly emphasized their rights in striking down the California law even though no minor plaintiffs were before it. *Id.* at 795 n.3, 805. It is thus unsurprising that courts have repeatedly and resoundingly rejected the notion that Plaintiffs cannot assert the First Amendment rights of their members' users. *See Fitch*, 2025 WL 1135279, at \*3-4; *Griffin*, 2023 WL 5660155, at \*12; *Yost*, 716 F.Supp.3d at 551; *Paxton*, 747 F.Supp.3d at 1030-31.

## II.    Plaintiffs Are Likely To Succeed On Their First Amendment Claim.

### A.    HB3 Triggers Strict Scrutiny.

1. Florida does not deny that adults and minors use websites like YouTube and Snapchat to engage in protected First Amendment activity. It nevertheless tries to evade First Amendment scrutiny by insisting that HB3 regulates the "commercial activity" of "entering into a contract" to "become an account holder," not speech. Fla.PI.Opp.39-41. Courts have repeatedly rejected that argument. *E.g.*, *Griffin*,

---

challenge the enforcement of a statute against himself and also assert that the legal duties imposed on the litigant operate to violate third parties' rights." *Id.* at 1265 (citing *Craig*, 429 U.S. at 191-97). That is precisely the case here.

2025 WL 978607, at *7-10; *Yost*, 2025 WL 1137485, at *15-16. This Court should too.

At the outset, the state ignores that creating an account—a personalized profile containing information the user chooses to present to others—is itself speech. *E.g.*, *Carafano v. Metrosplash.com*, 339 F.3d 1119, 1124 (9th Cir. 2003). But that aside, courts have repeatedly held that the First Amendment may not be evaded by isolating some purportedly "non-speech" component of protected activity. *See Otto v. Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020); *Buehrle v. Key West*, 813 F.3d 973, 977 (11th Cir. 2015) (explaining that the government cannot restrict "protected activity" by "proceed[ing] upstream" to "dam the source"). A law that precludes publishing books does not become any more tolerable if it accomplishes that end by banning entering a contract to "purchas[e] or us[e] ink." *Sorrell*, 564 U.S. at 571. So too with a law that precludes people from reading the Miami Herald by banning them from entering a contract to create an account on miamiherald.com. Just as with library cards, newspaper subscriptions, or any other "conduct" necessary to access speech, people create the accounts HB3 targets to gain access to websites "where they can speak and listen." *Packingham*, 582 U.S. at 104.

That is precisely why the Supreme Court has held that when the government restricts access to "social media," it "prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108. The Court did so,

moreover, while reversing a decision holding that a statute prohibiting sex offenders from "access[ing] certain carefully-defined Web sites" was "a regulation of conduct," not speech. *State v. Packingham*, 368 N.C. 380, 386 (2015). Florida tries to distinguish *Packingham* on the theory that North Carolina's law was a "*direct* regulation" of speech because it forbade sex offenders from "post[ing] on social media," whereas users "'may say anything to anyone over the internet or otherwise without violating' HB3." Fla.PI.Opp.48. But it defies common sense to think that *Packingham* would have turned out differently had North Carolina prohibited sex offenders from "entering a contract" to "create an account" to access the same websites.

Moreover, Florida does not dispute that many forms of social interaction on "social media" websites can happen only with an account. To be sure, users may still engage in *some* activity on *some* websites without an account, such as anonymously viewing content posted by others. But Florida does not seriously dispute that restricting minors from creating accounts will preclude them from engaging in the full range of First Amendment activity on those services. After all, people do not just use "social media" to anonymously browse content posted by others. They use those websites to engage in the sort of social interaction with other users that is only possible with an account, such as publishing their thoughts on their Facebook profiles, sharing photos with friends on Instagram, or sending videos to

their friends on Snapchat.[10]

The state tries to analogize HB3 to laws that prohibit minors from entering establishments that serve alcohol. Fla.PI.Opp.43-45. But as other courts have explained in rejecting that analogy, *see Griffin*, 2023 WL 5660155, at \*16, such laws principally regulate the non-speech activity of drinking alcohol. *See Indigo Room v. Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013); *Gary v. City of Warner Robins*, 311 F.3d 1334 (11th Cir. 2002). The government obviously has reasons "unrelated to the suppression of free expression" to limit access to establishments that serve alcohol, *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968), so any impact on speech inside those premises is incidental. Here, "[b]y contrast, the primary purpose of a social media platform is to engage in speech," and the restrictions HB3 imposes on speech are anything but incidental. *Griffin*, 2023 WL 5660155, at \*16. While Florida insists that HB3 is "'focused' on children's exposure to addictive features, not any expressive activity," Fla.PI.Opp.43 (brackets omitted), it does not dispute (and in fact acknowledges elsewhere) that the point of HB3 is to protect minors from

_____

[10] The state's citation to *Delgado v. Swearingen*, 375 F.Supp.3d 1251 (N.D. Fla. 2018), does not help its cause. That case involved a First Amendment challenge to Florida's sex-offender registration law. It did not restrict access to any website; it just required sex offenders to register their email and internet identifiers. *Id.* at 1258. And even then, the court concluded that the law "burdens speech" and is "subject[] … to scrutiny under the First Amendment." *Id.* (emphasis omitted). How *Delgado* supports Florida's argument that the First Amendment does not apply, the state does not explain.

"addiction" to websites where they engage in and interact with constitutionally protected *speech*. Dkt.51 at 4-10.[11]

Florida's reliance on *Arcara v. Cloud Books*, 478 U.S. 697 (1986), fails for similar reasons. There, New York applied its law banning prostitution to shut down an adult bookstore where prostitution was commonplace. Doing so did not violate the First Amendment because the law regulated non-expressive conduct (prostitution), and impacted speech only incidentally. *Id.* at 707. Nor does *TikTok v. Garland*, 145 S.Ct. 57 (2025), help the state. The Court did not hold that the First Amendment did not apply in that case—it assumed that it did. *Id.* at 65-66. And the "unique" law at issue in *TikTok* is not remotely comparable to HB3, as it regulated TikTok's foreign ownership, not access to expressive activity. *Id.* at 64-66. While that law may ultimately require TikTok to shutter in the U.S. if it cannot find a buyer, that is an incidental effect of the Act's prohibition on foreign ownership. Here, by contrast, there is no plausible argument that HB3's speech restrictions are an incidental effect of conduct regulation—the entire point of the law is to restrict minors from accessing *speech*.

---

[11] Florida argues that "historical tradition" supports its position because "[a]t the Founding, children lacked the formal capacity to participate in public life" and were "viewed as lacking reason and decisionmaking ability." Fla.PI.Opp.46-47 (quoting *Brown*, 564 U.S. at 826 (Thomas, J., dissenting)). While that was certainly "Justice Thomas's view in *Brown*," those views are "not" the "law of the land." *Fitch*, 2025 WL 1135279, at *7 (Ho, J., concurring in judgment).

HB3 also burdens the First Amendment rights of *adults* to access covered websites. Pls'.PI.Br.20-21. Florida insists that HB3 "does not burden adult access" because "age-verification" is now "technologically feasible." Fla.PI.Opp.57. That misses the point. Even if age-verification is "technologically feasible" for *websites* to implement, *but see* Dkt.63-2 at 95:11-25 (conceding that it may be difficult for websites to verify the age of some populations, including "younger … people" who "haven't built up that … digital footprint"), it still imposes a burden on *users* who wish to access constitutionally protected speech on those websites. Florida's own expert concedes that age-verification requires users to surrender *some* personal information—be it a "government-issued ID," or "physical attributes" captured via "webcam" or "smartphone camera." Dkt.51-3 ¶¶21-24. The Supreme Court has squarely held that requiring adults to surrender sensitive personal information to access protected speech burdens First Amendment rights. *Ashcroft*, 542 U.S. at 667; *see also Reno v. ACLU*, 521 U.S. 844, 856 (1997); *cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198-99 (2008). There is no reason to reach a different conclusion here. Even the state's expert concedes that "it's possible that people will decide that they don't want to use the service" if they are forced to verify their age. Dkt.63-2 at 77:18-78:11; 96:1-11.

On top of that, HB3 triggers First Amendment scrutiny because it interferes with the First Amendment rights of Plaintiffs' members to curate and disseminate

speech to their users based on their own decisions about what speech they think the user will enjoy. Pls'.PI.Br.21-22. The state insists that the "addictive features" that it regulates are not "speech." But that argument cannot be squared with *Moody*, which held that a website's choice about how to "organiz[e] and present[]" collections of "third-party speech" is "expressive activity" protected by the First Amendment. 603 U.S. at 731-32. Just as Florida may not prohibit the Miami Herald from using push notifications to alert users of news or override its decision to display articles with seamless pagination, Florida cannot prohibit Plaintiffs' members from using push notifications to alert users that someone has, e.g., sent them a message or tagged them in a photo, or displaying third-party content in a seamless feed. When it comes to disseminating speech, decisions about how to "organiz[e] and present[]" collections of speech are for private parties—not the government—to make. *Id.* at 731-32. By the state's logic, it could ban these features *entirely* (not just restrict minors' access to them) without even implicating the First Amendment.

2. HB3 not only restricts an unprecedented amount of First Amendment activity; it does so based on content and speaker. Florida insists that HB3 is content neutral because the text focuses on "addictive features." Fla.PI.Opp.48-49. But the text also singles out websites that permit users to "upload content or view the content or activity of other users." Fla. Stat. §501.1736(1)(e)(1). In other words, HB3 singles out websites "based on the 'social' subject matter 'of the material they

disseminate.'" *See Reyes*, 748 F.Supp.3d at 1122-23 (brackets omitted). As other courts have held, that is a content-based distinction. *Id.*

HB3's speaker-based distinctions reinforce that conclusion. Pls'.PI.Br.24-25. Florida does not dispute that services like Disney+ and Hulu employ many of the same features to keep users engaged. Email and direct messaging services (which are excluded from HB3) often include such features as well. The only apparent difference between those services and the services HB3 covers is that the former do not permit users to "upload content or view the content or activity of other users"— in other words, they do not have the type of social content that websites regulated by HB3 include. Florida tries to justify the differential treatment on the theory that "social media" is more "addictive[]" and imposes "harm … on children." Fla.PI.Opp.52. But that just underscores that HB3 is content based twice over. As the state explained both at the signing ceremony and in its briefs to this Court, Florida thinks that "social media" is particularly "addictive" and "associated with higher rates of depression" because "social media" delivers *content* that supposedly leads to addiction and depression. Dkt.51 at 2, 4-6, 29; Dkt.50 at 3; *see also Yost*, 716 F.Supp.3d at 557 (explaining that "functionalities allowing users to post, comment, and privately chat" are "inextricable from the *content* produced by those features" (emphasis added)).

Florida's emphasis on the Surgeon General advisory confirms the point. That document repeatedly highlights supposedly harmful *content* that minors may encounter. *See, e.g.*, U.S. Surgeon General, *Social Media and Youth Mental Health* 8-9, 16-19 (May 23, 2023) (pointing to content that encourages "[s]ocial comparison," which is allegedly "associated with body dissatisfaction, disordered eating, and depressive symptoms," "cyberbullying," "online abuse," and "exploitation"). And Florida's own expert repeatedly speculated that "social media" harms minors because of its *content*. Dkt.51-1 at 54-55 (identifying "cyberbullying," "inappropriate content around drugs and alcohol," and "negative comments on posts"). If Florida really thinks that features like push notifications and infinite scroll lead to "addiction" and "depression" independent of the content on "social media," then it would have swept in all services with those features. *See Reyes*, 748 F.Supp.3d at 1128-29.

**B.     HB3 Cannot Survive Any Level of Heightened Scrutiny.**

1. When Florida finally turns to strict scrutiny, it abandons any argument that HB3 is justified by an interest in assisting parental authority. That decision is wise. Supreme Court precedent forecloses that argument, and that interest would not justify banning minors from creating accounts *even if their parents approve them*. Pls'.PI.Br.26-27. Similarly, while the state littered its earlier briefs with concerns about predators and "sextortion," *see* Dkt.51 at 2, 6, Florida does not argue that HB3

is narrowly tailored to protect minors from predators either. Nor could it; if restricting convicted sex offenders from accessing "social media" websites is not a narrowly tailored means of protecting minors, *see Packingham*, 582 U.S. at 107-08, restricting minors from accessing them is plainly not either. Pls'.PI.Br.27-28.

Florida is thus left insisting that HB3 serves its interest in protecting children from "addiction." Fla.PI.Opp.53; Dkt.51 at 29. But while protecting minors is a laudable goal, "generalized statement of interests, unsupported by specific and reliable evidence, is not sufficient" to satisfy the state's burden to articulate a compelling interest. *Davila v. Gladden*, 777 F.3d 1198, 1206 (11th Cir. 2015); *see also Awad v. Ziriax*, 670 F.3d 1111, 1129-30 (10th Cir. 2012) (same). Strict scrutiny demands that the state "specifically identify an 'actual problem' in need of solving," and supply firm "proof"—not just "predictive judgment"—of "a direct causal link" between covered websites and "harm to minors." *Brown*, 564 U.S. at 799. Mere "correlation" will not do. *Id.* at 800.

Florida's evidence falls far short. Despite having many months and a second chance to muster evidence in support of its speculation that "social media" has "disastrous consequences for … mental health," Fla.PI.Opp.53, Florida's evidence remains thin and at best shows that the impact of "social media" on minors remains hotly debated. Its primary authority, the advisory from the Surgeon General, acknowledges that "social media" has many *benefits*; that "[m]ore research is needed

to fully understand the impact of social media"; and that "[m]ost prior research to date has been correlational." *Surgeon General Advisory*, *supra*, at 4, 6, 11. Unsurprisingly, other courts have found the same advisory insufficient. *E.g.*, *Yost*, 2025 WL 1137485, at *21 & n.10.

Florida's other source, Dr. Twenge's declaration, is similarly flawed. As another court explained in rejecting Utah's reliance on Dr. Twenge, "the majority of the reports she cites show only a correlative relationship between social media use and negative mental health impacts," *Reyes*, 748 F.Supp.3d at 1125, which is likely why she acknowledged that "we need more experimental studies, especially on children and teens." Dkt.51-1 at 202. That is hardly the conclusive proof of a causal link that the First Amendment requires. And if history is any indication, that demand for proof is wise. After all, many forms of new media (from comic books to radio) have been accused of harming minors, only to have the perceived threat prove unfounded. *See Brown*, 564 U.S. at 797-98.

Even if Florida could muster proof that the harms it purports to address are real, HB3 would still fail heightened scrutiny. It is not at all clear that the state's interest in protecting minors from "addiction" is "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. After all, HB3 does not seek to protect minors from addiction to non-speech products like "drugs and gambling." Fla.PI.Opp.53. Florida seeks to protect minors from alleged "addiction" to websites

where they engage in and interact with *speech*. But the state has no legitimate interest in restricting minors from accessing websites because Florida thinks they disseminate speech in ways that minors find too appealing. *See Sorrell*, 564 U.S. at 576; *see also* Order at 10, *Angelilli v. Activision Blizzard, Inc.*, No. 23-cv-16566 (N.D. Ill. Apr. 23, 2025) ("First Amendment protections do not disappear simply because expression is impactful. To the contrary, that is when First Amendment protection should be at its zenith."). If it were otherwise, then Florida could restrict access to Disney+ because it includes too many engaging cartoons, or Marvel.com because it includes too many page-turning comics.

Even setting that aside, the means Florida has chosen are both over- and underinclusive. Pls'.PI.Br.28-30. Florida offers no response to Plaintiffs' arguments about why HB3 is underinclusive. *See SEAT*, 2025 WL 455463, at *14. It does not dispute that the legislative record contains zero evidence that "requiring social media companies to compel minors to push 'play,' hit 'next,' and log in for updates will meaningfully reduce the amount of time they spend on social media platforms." *Reyes*, 748 F.Supp.3d at 1128. And it ignores the problem that courts have repeatedly identified with similar laws: Florida is "perfectly willing" to let minors access supposedly harmful services "so long as one parent … says it's OK," which is "not how one addresses a serious social problem." *Brown*, 564 U.S. at 802; *see also Yost*, 2025 WL 1137485 at *21 (same); *Griffin*, 2025 WL 978607, at *13 (same).

Florida also has little to say about HB3's overinclusive-ness. HB3 does not single out any particular speech (let alone any *unprotected* speech) that might pose special risks to minors. It instead restricts—and sometimes forecloses—minors' ability to access any speech on these services at all, regardless of whether the content has *any* capacity to lead to "depression" or "self-harm." HB3 thus hinders access not just to potentially harmful content, but to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Florida's only response is to claim that HB3 is not overinclusive because it targets "the services posing the greatest risk" of "addicting" minors—i.e., websites that minors use most. Fla.PI.Opp.64; Dkt.51 at 31. But singling out websites that minors especially enjoy using is a First Amendment vice, not a virtue. Pls'.PI.Br.30.

Florida points out that users can still view some content on some websites without an account. If anything, encouraging users to use websites anonymously makes it more difficult for websites to deploy the many tools they typically use to ensure that the content minors encounter is age appropriate. Dkt.51-7 at 158:6-160:21.[12] But that aside, Florida does not meaningfully dispute that HB3 restricts minors from engaging in all sorts of First Amendment activity on the most popular

---

[12] It also underscores HB3's underinclusive-ness problem, as minors who access "social media" without an account will still encounter so-called "addictive features" like infinite scroll, livestreaming, and autoplay.

websites, including the ability to post content to their accounts, or to interact with content posed by other accounts. And by requiring all users to verify their age, the law hinders adults' ability to engage in First Amendment activity too. Pls'.PI.Br.29; Dkt.63-2 at 78:8-14. HB3 is thus "a breathtakingly blunt instrument for reducing social media's harm to children," *Yost*, 2025 WL 1137485, at *21, as it "burden[s] substantially more speech than is necessary" to further the state's interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

On top of that, Florida has no answer to the fact that less restrictive alternatives are available. When it comes to constitutionally protected speech on the Internet, enabling people to voluntarily filter content at the receiving end is less restrictive than restricting content at the source. Parents already have many tools to protect their minors on the Internet, including refusing to give them smartphones in the first place. If the state is concerned that these tools are "difficult for parents to use and manage" Fla.PI.Opp.56-57, or "easy to circumvent,"[13] Dkt.51 at 32, a campaign promoting them is less restrictive. *See Playboy*, 529 U.S. at 823; *SEAT*, 2025 WL 455463, at *12.

If Florida's real concern is that parents choose not to use these tools, a law "in support of what the State thinks parents *ought* to want" does not cut it. *Brown*, 564

---

[13] It is not even clear how frequently (if at all) minors circumvent these tools. Florida's own expert admitted he had no data and was just speculating about whether minors circumvent parental tools. Dkt.63-2 at 210:1-218:10.

U.S. at 804. And even if "[p]arents alone" cannot address the state's concerns, Fla.PI.Opp.56, Florida nowhere explains why HB3's separate requirement that services terminate minors' accounts at their parents' behest (which Plaintiffs are not challenging under the First Amendment) is not enough. *E.g.*, Fla. Stat. §501.1736(2)(b)(3). Even under intermediate scrutiny, a "prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *FEC v. Cruz*, 596 U.S. 289, 306 (2022).

\*          \*          \*

With nothing else left to offer, Florida argues (at 58-59) that the record is too underdeveloped to determine that the challenged provisions are unconstitutional on their face under *Moody*. But that decision just reiterated the long-standing rule that, to prove a facial challenge, the plaintiff must show that a law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." 603 U.S. at 744. Plaintiffs have done just that, as "all aspects of [HB3], in every application to a covered social media company, raise the same First Amendment issues." *X Corp. v. Bonta*, 116 F.4th 888, 898-99 (9th Cir. 2024); *see also Griffin*, 2025 WL 978607, at \*6-7 (distinguishing *Moody*); *Yost*, 2025 WL 1137485, at \*14 (same). Indeed, the state does not identify *any* application of HB3 that *would not* raise the problems Plaintiffs have identified. Florida identifies no covered service, for instance, on which protected speech *does not* proliferate. Nor could it. HB3 applies *only* to

42

websites where users "upload content or view the content or activity of other users." Fla. Stat. §501.1736(1)(e)—in other words, where users *engage in speech*.

The best the state can muster is to suggest that HB3 might apply differently to websites when they "provide accounts to children of 'tender years.'" Fla.PI.Opp.59. Florida never defines what it means by "tender years," or explains why a six-year-old has less of a First Amendment interest in viewing content on YouTube Kids than a teen has in sharing photographs with friends on Snapchat. But that aside, if Florida really thinks there is a constitutional difference between the two, it should have tailored its law accordingly. That HB3 instead treats thirteen-year-olds the same way it treats six-year-olds just underscores that it is not remotely tailored to achieve the state's professed interests.[14]

## III. The Other Preliminary Injunction Factors Support Relief.

The other preliminary injunction factors favor relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). The harm here is not just to members, but to millions of minors who will be cut off from

---

[14] *Fitch* does not help Florida's cause. While the Fifth Circuit remanded because it concluded that the district court (which issued its opinion the same day the Supreme Court decided *Moody*) failed to conduct the requisite facial analysis, it did not suggest that the law is not facially unconstitutional. 2025 WL 1135279, at *5-6.

vital channels of communication, education, and self-expression. Pls'.PI.Br.32-33. And the First Amendment harms are not the only things at stake. Complying with HB3 would require significant changes to existing services and impose significant costs that cannot be recouped at the conclusion of this lawsuit. Schruers.Decl.¶¶27-30; Cleland.Decl.¶¶27(b)-(c), 28(b)-30, 33; Boyle.Decl.¶¶16-17; Veitch.Decl.¶¶47-48, 51. So unless the Attorney General is enjoined from enforcing HB3, covered members will have to choose between exposing themselves to massive liability for disseminating constitutionally protected speech to minors or taking costly and burdensome steps that will drastically curtail access to their services and limit their ability to disseminate speech to users.

Florida asks this Court to ignore the harm to millions of minors by positing that "injuries to third parties are not a basis to find irreparable harm." Fla.PI.Opp.19 n.3. But that principle has no purchase when it comes to the loss of First Amendment rights that the plaintiffs have standing to assert. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (granting injunction pending appeal after finding irreparable harm based on churchgoers' loss of First Amendment rights, even though churchgoers were not plaintiffs).

While the state acknowledges that First Amendment injuries are typically irreparable, it nevertheless insists that the specific First Amendment injuries in this case are not. Fla.PI.Opp.21. But both the Supreme Court and the Eleventh Circuit

have repeatedly held that an "ongoing violation of the First Amendment" is an "irreparable injury." *Honeyfund.com Inc.*, 94 F.4th at 1283; *see Elrod*, 427 U.S. at 373 (same). And rightly so, as no amount of money can compensate for the loss of First Amendment rights. The state points to cases that purportedly carve out an exception for "indirect" burdens on First Amendment rights, Fla.PI.Opp.21, but the First Amendment injuries here are as direct as it gets, as HB3 imposes severe penalties on websites that disseminate speech to minors. *See supra* Part II.A.[15]

As for compliance costs, Florida does not deny that they cannot be recouped. It just claims that they must be a "mirage" because members have yet to take steps to comply with HB3. Fla.PI.Opp.19. That contention is befuddling. Some members *have* taken steps to comply with the law. *See* Dkt.86-2 at 24:5-14. To the extent they have not, that is presumably because Plaintiffs have filed this motion addressing this Court's prior concerns and asking it to enjoin the state from enforcing the law. If the Court grants an injunction, then there will be no need for covered members to comply. But without that relief, members will be forced to choose between complying and risking enforcement. Indeed, in the mere weeks that the law has been in effect, the state has already sued Snap and informed this Court it is considering

---

[15] Florida does not actually identify any case that refuses to find irreparable harm after finding a First Amendment violation. It cites *Faculty Senate of Florida International University v. Winn*, 477 F.Supp.2d 1198 (S.D. Fla. 2007), but the court found "no irreparable harm" only after concluding that the plaintiffs were unlikely to succeed on their First Amendment claim. *Id.* at 1207-09.

the same as to Meta. Florida does not suggest that Snap (or Meta) could recoup the costs associated with those lawsuits at the conclusion of this lawsuit. The state's contention that those injuries are not "irreparable" beggars belief.

Florida is thus left accusing Plaintiffs of waiting too long to file their lawsuit. Fla.PI.Opp.16-22. Nonsense. Plaintiffs filed this lawsuit over two months *before* HB3's effective date. Courts routinely grant preliminary injunctions on similar timelines. *See, e.g.*, *Paxton*, 747 F.Supp.3d at 1043 (granting preliminary injunction even though motion was filed "more than a year" after signing, and just a month before effective date). Indeed, this Court has granted a motion filed five months *after* a law took effect. *See Wood v. Fla. Dep't of Educ.*, 729 F.Supp.3d 1255, 1286 (N.D. Fla. 2024) (Walker, C.J.). As the Court explained in doing so, "[t]he law does not demand that a plaintiff move for preliminary injunction the moment a challenged statute is enacted." *Id.* at 1287. After all, plaintiffs "are allowed some time to consider their options, prepare their lawsuit, and prepare their motion." *Id.* at 1288. That is particularly so when the state did not enact its implementing regulations until October 23, 2024, *see* Fla. Admin. Code §2-43.002(3)(a)—just days before Plaintiffs sued. And while Florida makes much of the fact that Plaintiffs are represented by "nine attorneys and two law firms," Fla.PI.Opp.17 n.2, that is hardly noteworthy when ten different attorneys have appeared on the state's own behalf during the course of this litigation, which just underscores the "complexity of this case" that

justifies some additional time to prepare the suit.  *Wood*, 729 F.Supp.3d at 1288.

With no serious argument that Plaintiffs unreasonably delayed in bringing its lawsuit, Florida rehashes its argument that they unreasonably delayed in litigating it, again criticizing them for failing to support their initial motion with sufficient evidence as to standing.  But as Plaintiffs explain above, *see supra* Section I.A, that was owing to a good-faith belief that no additional evidence was necessary, not a lack of diligence.  Florida then remarkably criticizes Plaintiffs for agreeing to a three-day extension—at *the state*'s request—on the state's opposition to Plaintiffs' renewed motion.  But that common courtesy (and the corresponding three-day extension to file Plaintiffs' reply) cannot seriously be labeled "unreasonable" delay—especially when it was necessitated by the state's insistence on taking a difficult-to-schedule deposition at which it barely asked any questions.  *See* Dkt.86-3.  The notion that the state actually needed three extra days to file a brief that cites that deposition just once strains credulity, especially because the delay provided an opportunity for the state to bring its eleventh-hour lawsuit against Snap.

Florida claims that an injunction would undermine the public interest because "the 'legal environment' for claims like Plaintiffs' is 'fluctuating," Fla.PI.Opp.23-24, suggesting that the Supreme Court's resolution of *Free Speech Coalition v. Paxton*, No. 23-1122 (U.S. argued Jan. 15, 2025), which addresses access to pornographic websites, might provide "firmer guidance," Fla.PI.Opp.24.  That case

might have more bearing here had plaintiffs challenged Section 3 of HB3, which restricts access to pornographic websites. *See* Order Granting Motion to Stay, *Free Speech Coalition v. Moody*, No. 4:24-cv-514 (N.D. Fla. Jan. 16, 2025). But what kinds of restrictions states may impose on access to speech that is *not* constitutionally protected as to minors has little to do with restrictions on access to speech that *is*. And this case is all about the latter. The far more relevant "legal environment," then, is the many courts that have recognized that distinction and enjoined laws like HB3 notwithstanding the pendency of *Free Speech Coalition*.

The state argues that, now that HB3 has gone into effect, the Court should deny Plaintiffs' motion to preserve the "status quo." But as courts have long recognized, the status quo is the "last, peaceable, noncontested status of the parties," *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990), which is typically the "pre-suit status quo," *Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*, 2021 WL 5029427, at *2 (N.D. Ga. June 29, 2021); *see also O Centro Espírita Beneficiente União Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (similar); *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (similar); 11A Wright, Miller, & Kane, Fed. Prac. & Proc. §2948 (2d ed. 1995) (similar). And even setting that aside, this Court has recognized that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Courthouse News Serv.*

*v. Forman*, 606 F.Supp.3d 1200, 1221 n.8 (N.D. Fla. 2022) (Walker, C.J.). "The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.* Just so here.

## IV. Florida's Scope Of Relief Argument Lacks Merit.

Finally, Florida argues that even if the Court concludes that Plaintiffs are entitled to a preliminary injunction, it should limit injunctive relief to Snap because "Snap is the only member for whom Plaintiffs have shown an injury in fact." Fla.PI.Opp.59. Setting aside the problem that its premise is wrong,[16] that argument once again lays bare the state's gamesmanship, as Florida would not be urging this Court to let it enforce the law against other members if it did not think any other members were covered. Indeed, it takes remarkable chutzpah to continue to insist that Meta has not proven that it faces a credible threat of prosecution under HB3 when the state has already informed the Court that it is considering an enforcement action against Meta under HB3.

At any rate, the state's argument makes no sense. If this Court concludes that HB3 likely violates the First Amendment, then HB3 cannot constitutionally be enforced against *any* members, be it YouTube, Facebook, Instagram, or Snapchat.

---

[16] Plaintiffs have shown injury-in-fact as to YouTube and Meta too. Pls'.PI.Br.4 n.2. YouTube's declarant explicitly lays out the factual basis for her belief that YouTube likely meets the law's 10% threshold. Veitch.Decl.¶10. Both CCIA's and NetChoice's declarants lay out the factual basis for why Facebook and Instagram likely meet that threshold. Schruers.Decl.¶6; Cleland.Decl.¶23.

Florida's contrary argument runs headlong into precedent. In *Speech First*, for example, the Eleventh Circuit reversed the denial of a preliminary injunction and ordered that the entire policy be enjoined to the benefit of *all* the association's members, even though only three submitted declarations in the district court demonstrating injury. 32 F.4th at 1129; *Speech First, Inc. v. Cartwright*, 2021 WL 3399829, at*1 (M.D. Fla. 2021); *see also Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) (similar); *Democratic Exec. Comm. of Florida v. Detzner*, 347 F. Supp. 3d 1017, 1032 (N.D. Fla. 2018) (Walker, C.J.) (similar). And courts across the country have enjoined similar laws without limiting relief to the CCIA and NetChoice members that submitted declarations. *E.g.*, *Griffin*, 2023 WL 5660155, at *21; *Yost*, 716 F.Supp.3d at 562. The state's invitation to depart from that consensus is just another not-so-thinly-veiled attack on long-settled associational standing principles.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion.

Respectfully submitted,

/s/ *Douglas L. Kilby*

Paul D. Clement
Erin E. Murphy
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
Kevin Wynosky (admitted *pro hac vice*)
Mitchell K. Pallaki (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
kevin.wynosky@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Douglas L. Kilby
Florida Bar No. 73407
Hannah E. Murphy
Florida Bar No. 1032759
Grace Mead
Florida Bar No. 49896
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com

*Counsel for Plaintiffs CCIA and NetChoice*

April 28, 2025

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

This Court has granted Plaintiffs leave to file this reply in support of their motion for preliminary injunction. Dkt.84. This brief complies with Local Rule 7.1(F) because the Court ordered that "[t]here is no word limit." Dkt.80 at 1.

April 28, 2025                                          */s/ Douglas L. Kilby*
                                                         Douglas L. Kilby


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 28th day of April, 2025.

April 28, 2025                                          */s/ Douglas L. Kilby*
                                                         Douglas L. Kilby