In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 25-11881

———————————————

COMPUTER & COMMUNICATIONS INDUSTRY
ASSOCIATION,
NETCHOICE,

*Plaintiffs-Appellees,*

*versus*

JAMES UTHMEIER,

*Defendant,*

ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant.*

———————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:24-cv-00438-MW-MAF

———————————————

Before ROSENBAUM, BRANCH, and LAGOA, Circuit Judges.

BRANCH, Circuit Judge:

In 2024, the Florida legislature passed, and the governor signed, a targeted law restricting access of children and young teens to social media platforms with certain features the legislature determined were addictive. Plaintiffs, trade associations whose members operate several large online services, challenged the law under the First Amendment, and the district court granted their request for a broad preliminary injunction preventing the State from enforcing its law against parties and nonparties alike. Florida's Attorney General now seeks a stay of the preliminary injunction pending appeal. For the reasons below, we grant the motion for a stay.

## I.    Background

Enacted in March 2024, Florida Statute § 501.1736 ("HB3"), in relevant part, requires social media platforms that employ certain addictive features to prohibit those under 14 years old from creating accounts and to require parental consent for 14- and 15-year-old account holders. Fla. Stat. § 501.1736(2)(a) & (3)(a) (2025). The law also requires such platforms to terminate a minor's account and delete all personal information associated with it upon request of the minor or a parent. *Id.* § 501.1736(2)(b)(2)–(4), (3)(b)(2)–(4) & (4)(b)(2)–(4).

The law defines a "social media platform" as "an online forum, website, or application that satisfies" four criteria: it (1) "[a]llows users to upload content or view the content or activity of other users"; (2) has a certain number of users under a certain age; (3) "[e]mploys algorithms that analyze user data or

information on users to select content for users"; and (4) has one of several "addictive features." *Id.* § 501.1736(1)(e). A platform meets the second criterion if "[t]en percent or more of [its] daily users who are younger than 16 years of age spend on average 2 hours per day or longer" on the platform, based on data from the previous 12 months (or from the previous month, for newer platforms). *Id.* § 501.1736(1)(e)(2). A platform meets the fourth criterion if it employs any one of certain features, including "[i]nfinite scrolling," "[p]ush notifications or alerts . . . to inform a user about specific activities or events related to the user's account," "personal interactive metrics" regarding likes or shares, "auto-play video," and "live-streaming." *Id.* § 501.1736(1)(e)(4). Distinct from other state and federal attempts to legislate children's access to social media, HB3 does not restrict minors from creating social media accounts altogether, nor does it include exemptions based on a platform's content (such as news, sports, and entertainment). Instead, HB3 targets certain functions that the State has identified as particularly addictive to young minors.

Plaintiffs Computer & Communications Industry Association and NetChoice are "Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat." Shortly before HB3 took effect, plaintiffs brought this suit challenging the law's

constitutionality under the First Amendment.[1]    Specifically, plaintiffs challenged the provisions of the law that prohibited platforms from allowing minors of a certain age to create new accounts and required them to automatically terminate already existing accounts.[2]    Plaintiffs promptly moved for a preliminary injunction.

In February 2025, the district court held a hearing on the motion for preliminary injunction.  Shortly thereafter, the district court denied the motion, finding that plaintiffs had not demonstrated they were likely to establish standing.  The court also granted the Attorney General's motion to dismiss on the same ground.  Plaintiffs quickly filed an amended complaint and moved again for a preliminary injunction.   The court then held a scheduling conference and set a briefing schedule, and the parties proceeded with limited discovery, including three depositions of plaintiffs' witnesses.

After discovery had commenced and while the preliminary injunction motion was pending, Florida filed an enforcement action against Snap (one of plaintiffs' trade association members) in state court, alleging violations of HB3, and Snap removed the action to federal district court.  *See* Complaint, *Off. of the Att'y Gen., Dep't of Legal Affs. v. Snap Inc.*, No. 25-000258 (Fla. Santa Rosa

---

[1] Plaintiffs also alleged that HB3 is unconstitutionally vague and that it is preempted by federal law, but they did not move for a preliminary injunction on those grounds.

[2] Plaintiffs do not oppose HB3's termination-upon-request provisions.

County Ct. April 21, 2025); Notice of Removal, *Off. of the Att'y Gen., Dep't of Legal Affs. v. Snap Inc.*, No. 25-cv-676 (N.D. Fla. May 21, 2025).

Meanwhile, in June 2025, after concluding that the plaintiffs had standing, that abstention was not required under *Younger v. Harris*, 401 U.S. 37 (1971), and that plaintiffs were likely to succeed on their First Amendment challenge, the district court granted the preliminary injunction and prohibited the Attorney General from enforcing the challenged provisions of HB3. The Attorney General appealed the grant of the injunction and now seeks a stay of the injunction pending appeal.

## II.      Standard of Review

"In reviewing a motion to stay a preliminary injunction pending appeal, we consider the following factors: '(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies.'" *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1176 (11th Cir. 2020) (quoting *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019)). The first two factors "are the most critical." *Id.* at 1177.

"In considering whether to stay a preliminary injunction, we apply the usual standards of review governing our review of the merits of the preliminary injunction." *Lee*, 915 F.3d at 1317. Thus, "we examine the district court's grant of the preliminary injunction

6                        Order of the Court                    25-11881

for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Id.* "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1289 (11th Cir. 2025) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020)).

### III.    Discussion

The Attorney General argues that the district court erred in granting the injunction for three reasons: standing, *Younger* abstention, and the merits of the First Amendment claim. The district court held that (1) plaintiffs had standing to bring their challenge; (2) abstention was not appropriate when this litigation encompassed filings, hearings, orders, and discovery before the state action was ever filed; and (3) plaintiffs were likely to succeed on the merits of their First Amendment challenge. We agree that plaintiffs have standing to challenge HB3 and that the district court did not abuse its discretion when it refused to invoke *Younger* abstention. We conclude, however, that the Attorney General has made a strong showing of a likelihood of success on the merits and that the other factors also point to granting the stay.

### A.    *Likelihood of success on the merits*

We agree with the district court's conclusions as to the two threshold questions: (1) that plaintiffs have made a clear showing they are likely to establish standing to bring their First Amendment

challenge, and (2) that abstention under *Younger* was not required. Accordingly, we do not discuss these issues further. Because we agree that it was appropriate for the district court to reach the merits of the case, we turn to plaintiffs' First Amendment challenge.

The First Amendment, incorporated against the States through the Fourteenth Amendment, prohibits the government from making any law "abridging the freedom of speech." U.S. Const. amend. I; *see Free Speech Coal. v. Paxton*, 606 U.S. 461, 470 (2025). Our First Amendment analysis proceeds in three steps: (1) we consider whether the challenged law implicates the First Amendment; (2) if so, we analyze whether the law is content neutral or content based; and (3) we then apply the corresponding level of scrutiny. *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1241, 1244 (11th Cir. 2022).

We agree with the district court that HB3 likely implicates the First Amendment by singling out protected expressive activities. We also agree that HB3 is likely content neutral because it is not facially content based, nor does it have a content-discriminatory purpose. We conclude, however, that HB3's limited restrictions likely satisfy the intermediate scrutiny test for content-neutral regulations, so the Attorney General has made a strong showing he is likely to succeed on the merits.

First, we consider whether HB3 implicates First Amendment review. First Amendment scrutiny may be warranted in cases involving "[l]aws that directly regulate expressive conduct,"

"'governmental regulation of conduct that has an expressive element,'" and "'some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities.'" *TikTok Inc. v. Garland*, 604 U.S. 56, 67–68 (2025) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04 (1986)). We have found that a law triggers First Amendment review when it "implicates expressive conduct in a real way" and "'single[s] out' . . . those engaged in protected First Amendment activities." *Club Madonna*, 42 F.4th at 1243 (alterations adopted) (quoting *Arcara*, 478 U.S. at 703–04).

The Attorney General argues that "HB3 does not *directly* regulate expression; it simply prohibits platforms that use addictive features from contracting with certain children," and that contracting "is commercial activity that has been regulated since the Founding." He further argues that "HB3 does not 'focus' on suppressing any expression" and that any burden on protected expression "results from the platforms' decisions, not the law."

We agree with the district court that HB3 implicates the First Amendment. The government may impose "generally applicable economic regulations" that indirectly burden speech "without creating constitutional problems." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983). But when it "create[s] a special [regulation] that applies only to certain [entities] protected by the First Amendment," then First Amendment scrutiny is warranted. *Id.*; *see also Arcara*, 478 U.S. at

704 (discussing *Minneapolis Star*'s analysis). While HB3 may not "directly touch on expressive conduct," it does "prescribe and regulate who can and who cannot" engage in expressive activity on social media platforms with certain features. *Club Madonna*, 42 F.4th at 1243. And there is no question that today "social media in particular" is one of "the most important places . . . for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).[3] By regulating who may speak and access speech on certain types of social media platforms, HB3 disproportionately burdens expression and so is subject to some First Amendment scrutiny.[4]

---

[3] The Attorney General also argues that "there are causal steps between HB3 and the alleged burden on protected speech" because the burden on expression only occurs "if the platform chooses to use addictive features and condition access on users' contracting for an account." The Attorney General relies on the Supreme Court's decision in *TikTok Inc. v. Garland*, where the Court suggested that some regulations of non-expressive activity might not implicate First Amendment scrutiny. 604 U.S. at 69. But "causal steps between the regulations and the alleged burden on protected speech" was just one factor the Court offered, along with "the [regulation's] focus on a foreign government" and "the congressionally determined adversary relationship between that foreign government and the United States." *Id.* While the Court may at some point "articulate[] a clear framework for determining whether a regulation of non-expressive activity that disproportionately burdens those engaged in expressive activity triggers heighted review," it chose not to do so in *TikTok*, instead assuming without deciding that First Amendment scrutiny was appropriate. *Id.* Thus, we are left with the Court's and our own decisions, all of which indicate that the First Amendment is implicated here.

[4] Plaintiffs contend that the law additionally burdens the speech of adults by "forcing adults to surrender sensitive personal information to access protected speech." The district court's injunction order "did not turn on any argument

Second, we consider whether HB3 is content based or content neutral.

> As the Supreme Court has recently explained, a law is content-*based* either (1) if it applies on its face "to particular speech because of the topic discussed or the idea or message expressed" or (2) if, though facially neutral, it "cannot be justified without reference to the content of the regulated speech or was adopted by the government because of disagreement with the message the speech conveys."

*Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1184–85 (11th Cir. 2025) (internal quotations omitted) (quoting *TikTok*, 604 U.S. at 70–71). A content-*neutral* law, on the other hand, "is one that is 'justified without reference to the content of the regulated speech.'" *Id.* at 1185 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Whether a regulation is content based or content neutral governs the appropriate level of scrutiny. Content-based laws are subject to strict scrutiny: they "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *TikTok*, 604 U.S. at 70 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Content-neutral laws, on the other hand, "are subject to an intermediate level of scrutiny because in most cases they pose a less

---

regarding the law's impact on adult users' speech," but, in any event, we agree that the law burdens the speech of both minors and adults.

substantial risk of excising certain ideas or viewpoints from the public dialogue." *Id.* at 70 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)). "[A] court applying intermediate scrutiny 'will sustain a content-neutral law if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Wacko's Too*, 134 F.4th at 1185 (quoting *TikTok*, 604 U.S. at 70).

We agree with the district court that HB3 is likely content neutral and therefore subject to the more forgiving intermediate scrutiny. "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984)). "[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014); *see also Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

Here, HB3 is facially content neutral. It restricts social media platforms' ability to contract with children under a certain age if those platforms include certain addictive features. Neither its definition of "social media platform" nor of "addictive features" makes any reference to the type of content involved. *See* Fla. Stat.

§ 501.1736(1)(e).  And plaintiffs do not point to any language in the statute or other evidence that the Florida legislature's justification for passing the law was related to the suppression of speech or disagreement with certain topics or viewpoints.  Instead, they argue that "HB3 targets websites based on the social subject matter of the material they disseminate."  But HB3 defines social media platforms by reference to a *form* of expression, not a *subject matter*.  *See, e.g.*, *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 945 (11th Cir. 2022) (concluding that a "ban on portable signs" was a content-neutral regulation of a "form of speech," although enjoining it for failing to leave open alternative avenues of expression).

Plaintiffs argue that HB3 is not content neutral because it does not address every possible source of addiction to minors. They point to other services (such as Disney+ and Hulu)[5] that they allege "employ many of the same so-called 'addictive features,'" and they note that "HB3 does not seek to protect minors from addiction to non-speech products like 'drugs and gambling.'" These arguments, however, go to underinclusivity, not content neutrality.[6]  And plaintiffs' contention that HB3 "restrict[s] access to speech just because minors find it especially appealing" ignores

---

[5] Streaming services such as the ones plaintiffs name are not covered by HB3 if they do not "[a]llow[] users to upload content or view the content or activity of other users," under the law's definition of "[s]ocial media platform."  Fla. Stat. 501.1736(1)(e)(1).

[6] And as discussed below, underinclusivity is not fatal: "the Government 'need not address all aspects of a problem in one fell swoop.'"  *TikTok*, 604 U.S. at 76 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)).

the fact that the law does not restrict any *type* of speech, simply the *form* in which that speech is presented. As the district court opined, "[s]ocial speech . . . can touch on any conceivable topic, message, or idea."[7] The law may affect certain speakers and topics more than others, but that is not enough to make it content based. *See McCullen*, 573 U.S. at 480. The district court found that the State had relied on and could offer content-neutral justifications for HB3: "that the use of push notifications, infinite scroll, auto-play video, live-streaming, and displays of personal interactive metrics is addictive to children and causes them to spend more time on the platforms than is healthy." These grounds are unrelated to the content of the speech on the platforms, so HB3 is likely a content-neutral regulation.

Finally, finding that HB3 is likely content neutral, we apply intermediate scrutiny to consider whether the Attorney General is likely to show that HB3 is (1) "grounded in a substantial governmental interest, and (2) the incidental restriction on speech is no broader than necessary to further that interest." *Wacko's Too*, 134 F.4th at 1188 (quoting *Club Madonna*, 42 F4th at 1242).[8]

---

[7] For example, plaintiffs do not deny that if Disney+ uploads its content to one of their members' "platforms," as defined by the statute, that content will also be inaccessible to young children via their own accounts under HB3.

[8] Two parallel areas of caselaw provide instruction regarding application of the intermediate scrutiny test in First Amendment cases. The *O'Brien* Court applied intermediate scrutiny to restrictions on expressive conduct, *United States v. O'Brien*, 391 U.S. 367, 377 (1968) ("no greater than is essential to the furtherance" of an "important or substantial governmental interest"), while

We have recognized a wide range of government interests as legitimate and substantial. *See, e.g.*, *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1269 (11th Cir. 2014) (protecting sick patients from excessive noise); *Wise Enters., Inc. v. Unified Gov't*, 217 F.3d 1360, 1364 (11th Cir. 2000) (recognizing interest in "protecting the public welfare, preventing undesirable community conditions including the depression of property values, and reducing criminal behavior"); *see also Ward*, 491 U.S. at 796 (recognizing interest in "protecting its citizens from unwelcome noise" and "ensuring the sufficiency of sound amplification at bandshell events"); *Clark*, 468 U.S. at 296 (recognizing interest in "maintaining the parks in the heart of our Capital in an attractive and intact condition").

We agree with the district court that the State is likely to establish that it has a legitimate and substantial interest in regulating young minors' use of platforms employing addictive

---

the Court has elsewhere applied intermediate scrutiny to "time, place, or manner" restrictions, *Ward*, 491 U.S. at 800, 802 ("not substantially broader than necessary to achieve the government's interest" and "leav[ing] open ample alternative channels of communication"). While we have noted that "in the occasional case, there may be a difference" between these two articulations of the standard, *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1364 (11th Cir. 1999), both our Court and the Supreme Court have generally recognized the two operate parallel to each other, *see Ward*, 491 U.S. at 798 ("[W]e have held that the *O'Brien* test 'in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions.'" (quoting *Clark*, 468 U.S. at 298)); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1297 (11th Cir. 2021) ("As a practical matter, there is little difference between [the time, place, or manner] standard and the *O'Brien* test we have just discussed . . . .").

features.  The State has a compelling interest in protecting minors in general, and it has demonstrated that they are particularly susceptible to the potentially addictive features built into some social media platforms.  *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors.").

Finding that the government has asserted a substantial interest, we ask whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *Wacko's Too*, 134 F.4th at 1188 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  This analysis is "less rigorous" than the strict scrutiny content-based regulations face, "afford[ing] the Government latitude in designing a regulatory solution."  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213 (1997); *see also TikTok*, 604 U.S. at 77.  In conducting this analysis, a court may not "sift[] through all the available or imagined alternative means of regulating [the conduct at issue] to determine whether the [government's] solution was the 'least intrusive means' of achieving the desired end."  *Ward*, 491 U.S. at 797.  A content-neutral regulation is "not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'"  *Id.* (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

To be sure, the government may not "suppress speech . . . for mere convenience."  *McCullen*, 573 U.S. at 486.  "[B]y

demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). But "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest," a court may not simply "conclude[] that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800; *see also Turner*, 520 U.S. at 218 (collecting cases demonstrating this principle). "[A] regulation's validity 'does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.'" *Turner*, 520 U.S. at 218 (quoting *Albertini*, 472 U.S. at 689).

Here, it is likely that the Attorney General will show that HB3 "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quoting *Albertini*, 472 U.S. at 689). The law does not apply at all to older minors and tailors its provisions to the ages of the young minors whose access it does restrict. *See* Fla. Stat. § 501.1736(2)(a), (3)(a) (providing different restrictions for those under 13 and for those who are 14 or 15 years old). Rather than blocking children from accessing social media altogether, HB3 simply prevents them from creating accounts on platforms that employ addictive features. *See id.* § 501.1736(1)(e)(4). And even among such platforms, the law narrows its focus to those that have evidenced

significant usage by children and young teens.  *See id.*
§ 501.1736(1)(e)(2).  The district court erred in holding otherwise.

First, the court pointed to *Packingham v. North Carolina*, 582
U.S. 98, as the "closest analogy" to this case.  But *Packingham*
involved a law that prohibited sex offenders from using social
media altogether, *see* 582 U.S. at 107, a significantly more expansive
restriction than this one, where even restricted minors have full
access to any platforms that do not employ addictive features and
may, in any event, access social media without an account or
through a parent's account.  In invalidating the law in question, the
*Packingham* Court emphasized that it was "sweeping," *id.* at 108,
and "unprecedented in the scope of First Amendment speech it
burdens," *id.* at 107.  *See also id.* at 106 (raising concerns about the
"broad wording" of the statute); *id.* at 107 ("By prohibiting sex
offenders from using those websites, North Carolina with one
broad stroke bars access to what for many are the principal sources
[of information]."); *id.* ("[N]o case or holding of this Court has
approved of a statute as broad in its reach.").

Second, in emphasizing that youth, as well as adults, have
First Amendment rights, the district court erred in citing cases
centered on impermissible content-based restrictions.  *See Brown v.
Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) ("No doubt a State
possesses legitimate power to protect children from harm, but that
does not include a free-floating power to restrict the *ideas* to which
children may be exposed." (emphasis added) (citations omitted));
*Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975) ("Speech that

is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from *ideas or images that a legislative body thinks unsuitable* for them." (emphasis added)); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 510–11 (1969) (holding that a school could not prohibit children from wearing black armbands to protest the Vietnam War when it allowed students to wear other political and controversial symbols); *cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (holding that a school could not compel students to say the pledge of allegiance against their personal beliefs); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (holding that the legislature could not "interfere . . . with the opportunities of pupils to acquire knowledge" by prohibiting foreign languages from being taught to those in primary school).

Third, the court mistakenly opined that "even if a social media platform created youth accounts for which none of the purportedly 'addictive' features are available, it would still be barred from allowing youth to hold those accounts if the features were available to adult account holders."  But this reading twists the law's definition of "social media platform," which necessarily includes access to addictive features.  *See* Fla. Stat. § 501.1736(1)(e)(4).  So, if there is a version of the platform available to children and teens that does *not* employ any of the listed

"addictive features," that version of the platform would not be covered by the statutory definition of "social media platform."[9]

Fourth, the court determined that the law was not "narrowly targeted only to 'platforms that have proven effective at using [the statute's purportedly "addictive"] features to addict children.'" The statute's focus on platforms where "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the online forum," based on data collected during the previous 12 months, is not narrow enough, the court said, because that ten percent may not have been addicted but simply "wished to engage with speech for more than two hours per day," and because the 12-month benchmark creates a "moving target." This criticism misses the mark. Rather than setting in stone, at the time the law took effect, which websites and platforms the law governs, HB3 encompasses only those platforms that are presently of concern. If a platform previously frequented by young people loses much of that audience, it is no longer subject to HB3's restrictions. And the decision to set the benchmark for exposure to addictive features at

---

[9] Even if we could squint and accept the district court's reading as a possible alternative interpretation, "we apply 'the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts.'" *Pine*, 762 F.3d at 1270–71 (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)). Florida law incorporates a similar presumption: "According to Florida (and general) rules of statutory construction, 'when reasonably possible, a statute should be construed in such a manner as to avoid conflict with the Constitution.'" *Hershey v. City of Clearwater*, 834 F.2d 937, 940 n.5 (11th Cir. 1987) (quoting *Schultz v. State*, 361 So.2d 416, 418 (Fla. 1978)).

two hours of use a day, rather than one, or three, or six, is just the type of disagreement around policy choices that is left to the legislature to settle, not the judiciary.  *See Clark*, 468 U.S. at 299 ("We do not believe, however, that [the intermediate scrutiny analysis] assign[s] to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.").

Finally, the district court erred in determining that HB3 failed tailoring because "enabling individuals to voluntarily restrict problematic content at the receiving end is preferred over restricting speech at the source."  Florida should allow parents to oversee their children's social media use, the district court opined, rather than stepping in and restricting access itself.  The court's lengthy discussion of alternatives already available to parents only highlights Florida's purpose in enacting HB3: it found that parental controls were not working.  The court reasoned that, in that case, "the appropriate response from the State is a public education campaign, either to inform parents about the risks of social media or to equip them with the knowledge they need to employ the tools they have available."  But it was reasonable for the State to decide that such action "would achieve [its interest] less effectively," *Ward*, 491 U.S. at 799 (quotation omitted), and that simply offering parents a new tool (in the form of the statutorily created account termination request) would not suffice when

parents were not taking advantage of the tools already available.[10] *See TikTok*, 604 U.S. at 78 ("Nor did the Government ignore less restrictive approaches *already proven effective*." (emphasis added) (citing *McCullen*, 573 U.S. at 490–94)).

Plaintiffs' remaining arguments fare no better. Despite earlier claiming that HB3 is problematic because its restrictions are content based, they now seem to contend that HB3 is not content based enough: it "does not single out any speech (let alone unprotected speech) that might pose special risks to minors" (emphasis omitted). But, as our analysis above has shown, the State need not impose content-based regulations in search of a more tailored approach, nor, on the other hand, need it limit its reach to only unprotected speech, as plaintiffs suggest. In any event, the statute singles out addictive features employed by the covered social media platforms, regardless of a platform's content.

Next, plaintiffs assert that HB3 is underinclusive because, as noted, minors will still be able to access social media without an account or through a parent's account. But a user's experience is different without an account, and the Attorney General offered evidence that "platforms leverage" personal data collected from

---

[10] The court pointed to language from *Brown* indicating that a "gap in compliance is unavoidable" and thus not enough to make a less-restrictive alternative unworkable. *Brown*, however, applied strict scrutiny to a content-based restriction, requiring a much higher level of tailoring. *See Brown*, 564 U.S. at 803 & n.9 ("Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id*. at 803.). It is thus inapplicable to an intermediate scrutiny analysis.

users "to maximize the [addictive] features' effectiveness." In any case, "'the First Amendment imposes no freestanding underinclusiveness limitation,' and the Government 'need not address all aspects of a problem in one fell swoop.'" *TikTok*, 604 U.S. at 76 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)); *see also Wacko's Too*, 134 F.4th at 1190 ("Put simply, the intermediate-scrutiny standard aims to eliminate regulations that are overinclusive, not underinclusive.").

Finally, plaintiffs assert that it is inappropriate for Florida to determine that relying on parental controls does not adequately address its interest. While the State cannot use a concern for what "parents *ought* to want," *Brown*, 564 U.S. at 804, as a justification for content-based restrictions—such as preventing children from purchasing violent video games or attending live performances that are not obscene, *see id.*; *HM Fla-ORL, LLC v. Governor*, 137 F.4th 1207, 1245 (11th Cir. 2025)—it may take steps to achieve a permissible goal in a content-neutral manner when it determines that existing solutions are inadequate.[11]

---

[11] The dissent contends the law is also overinclusive because it raises the concern of chilling the speech of adults, as well as of children. We acknowledge that the age verification requirement imposes some burden on adult speech (thus implicating First Amendment scrutiny in the first place). But the Supreme Court has recently clarified that age verification does not automatically trigger strict scrutiny because it does not constitute a "ban on speech to adults." *Free Speech Coal.*, 606 U.S. at 487. In the past, the Court has determined that age verification requirements "effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive" because "existing technology did not include any effective method . . . to prevent

The Attorney General is likely to show that the legislature chose the regulation it did, not because it is *easier* than alternatives, but because it is the most effective way of achieving its interest. Plaintiffs and the district court may disagree with its chosen approach, but "[t]he validity of the challenged provisions does not turn on whether we agree with the Government's conclusion that its chosen regulatory path is best or 'most appropriate.'" *TikTok*, 604 U.S. at 78 (quoting *Albertini*, 472 U.S. at 689). Thus, we conclude that the district court abused its discretion when it determined the law is not narrowly tailored.

B.    *The other factors favor granting the stay*

The remaining stay factors weigh in favor of granting a stay. Of the four factors, the first two—likelihood of success on the merits and irreparable injury to the applicant—"are the most critical." *Robinson*, 957 F.3d at 1177.

"[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbot v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2581

---

minors from obtaining access . . . without also denying access to adults." *Id.* (alteration and omissions in original) (emphasis omitted) (quoting *Reno v. Am. C.L. Union*, 521 U.S. 844, 874, 876 (1997)). But the *Free Speech Coalition* Court found that in the modern world, the age verification the challenged law required did not constitute a "blanket prohibition," instead imposing a "more modest burden" on adult speech. *Id.* The Court went on to conclude that methods such as "using government-issued identification or transaction data" were "plainly legitimate." *Id.* at 497. It applied intermediate scrutiny to uphold the age verification requirement, as we do here. *Id.* at 496–97.

(2025) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers))).

Plaintiffs have not shown that the injuries they face outweigh this harm to the State. The district court found plaintiffs faced the injuries of loss of First Amendment freedoms and unrecoverable compliance costs. But, as we have determined, it is unlikely that HB3 inappropriately curtails any First Amendment rights. And the compliance costs plaintiffs might incur do not outweigh the State's interest in enforcing its lawful regulation. *See NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, at *1 (2025) (mem.) (Kavanaugh, J., concurring in denial of application to vacate stay) (opining that a plaintiff "has not sufficiently demonstrated that the balance of harms and equities favors it at this time" in a case presenting parallel claims of irreparable harm).[12]

---

[12] Justice Kavanaugh, writing alone, opined that a stay preventing a Mississippi social media law from taking effect was not warranted, even though he believed the applicants were likely to succeed on the merits. *Fitch*, 145 S. Ct. at *1. He noted it was "no surprise" that district courts had enjoined enforcement of the Mississippi law and "similar state laws," citing eight district court decisions granting injunctions, including the decision below in this case. *See id.* Plaintiffs cite several of these same decisions in support of the injunction here. The other laws and accompanying district court decisions, however, are entirely distinct from HB3. In every other case cited, the district court determined that the broad restrictions in question were *content based* and so applied strict scrutiny. *See NetChoice, LLC v. Fitch*, No. 24-cv-170, 2025 WL 1709668, at *7–8 (S.D. Miss. June 18, 2025); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 557–58 (S.D. Ohio 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*,

The public also has an interest in the protection of children and the enforcement of the State's law that seeks to do just that. *See Sable Commc'ns*, 492 U.S. at 126 (recognizing a "compelling interest in protecting the physical and psychological well-being of minors"); *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421–22 (6th Cir. 2023) ("As for the public interest, [Florida's] interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture.").

We conclude that the balance of the harms and the public interest favor a stay of the preliminary injunction.

---

747 F. Supp. 3d 1011, 1033 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1122–23 (D. Utah 2024); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1186–91 (N.D. Cal. 2025); *NetChoice, LLC v. Griffin*, No. 23-cv-5105, 2025 WL 978607, at *9–10 (W.D. Ark. Mar. 31, 2025); *NetChoice v. Carr*, No. 25-cv-2422, 2025 WL 1768621, at *11–12 (N.D. Ga. June 26, 2025).

In any event, even faced with a Mississippi law that restricts *all* minors from creating social media accounts without parental consent and invokes the prevention of "exposure to *harmful material* and other *content* that promotes or facilitates" certain harms, including "self-harm" and "online bullying," *see* Miss. H.B. 1126 (2024) (emphasis added), Justice Kavanaugh opined that it was appropriate to allow the law to take effect based on the balance of the equities. *Fitch*, 145 S. Ct. at *1. Certainly here, where the law is content neutral and limited in scope, the interest balancing favors the State.

## IV.    Conclusion

Because the stay factors weigh in the Attorney General's favor, we **GRANT** his motion to stay the preliminary injunction pending resolution of this appeal.[13]

---

[13] Because we find that the injunction should be stayed, we do not reach the question of whether the injunctive relief the district court granted was appropriately tailored. The Supreme Court's recent *Trump v. CASA, Inc.* decision concluded that a "universal injunction" that grants equitable relief to parties and nonparties alike "falls outside the bounds of a federal court's equitable authority under the Judiciary Act." 145 S. Ct. at 2554. An injunction must not be "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id*. at 2562–63. Thus, the district court's injunction would require modification, at the very least, even if we denied the stay.

ROSENBAUM, J., dissenting:

I would deny Florida's motion. I disagree that Florida—and not the Computer & Communications Industry Association ("CCIA") and NetChoice LLC ("NetChoice," and collectively with CCIA, the "Social Media Groups")—is likely to prevail on the merits of its claims that Florida's challenged law, House Bill 3, codified at Fla. Stat. Ann. 501.1736 ("Act"), is constitutional under the First Amendment. In fact, it's plainly unconstitutional on its face. Because Florida has failed to make a strong showing that it's likely to prevail, and the balance of the equities favors the Social Media Groups, we should deny Florida's motion to stay the preliminary injunction pending appeal.

In brief, the Social Media Groups have standing, *Younger*[1] abstention doesn't apply, and House Bill 3 violates the First Amendment. Without a stay, Florida wouldn't suffer irreparable harm. After all, governments don't suffer harm from the inability to enforce unconstitutional laws. But with a stay of the injunction, the Social Media Groups will suffer substantial harm. And staying this preliminary injunction, which had enjoined the state's ability to enforce an unconstitutional law, doesn't serve the public interest.

I begin by reviewing the Act. Then I explain why the Act is likely unconstitutional. Because Florida's motion rises and falls on constitutional grounds, I focus my analysis on the First Amendment issue.

---

[1] *Younger v. Harris*, 401 U.S. 37, 41 (1971).

## I.    The Act

When Florida passed the Act, it ostensibly sought to protect certain minors from compulsively using and becoming addicted to certain social media platforms.  *See* Act § 1(e).  It attempted to do this through two sets of provisions.  The first set applies to social media users under age fourteen; and the second, fourteen- and fifteen-year-old users.  Below, I describe the Act's terms, and then I go over its implementing regulations.

### A.  Terms of the Act

The Act covers two cohorts of minors:  children under age fourteen and, separately, fourteen- and fifteen-year-olds.

For the younger group, the Act prohibits children under age fourteen from creating or holding social media accounts altogether.  It achieves this by (1) blocking social media platforms from entering into contracts with them to create accounts, *see id.* § 2(a); and (2) directing the social media platforms to terminate those accounts and delete the personal information associated with them, *see id.* § 2(b).[2]  I'll call this the "Under-14 Provision."

---

[2] Specifically, for minors under age fourteen, the Act directs social media platforms to "prohibit" them "from entering into a contract with a social media platform to become an account holder."  *Id.* § (2)(a).  Besides preventing minors under fourteen from setting up accounts in the first place, platforms also must terminate any accounts under fourteen hold, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination."  *Id.* § (2)(b)1.  The platforms must "[a]llow" account

25-11881          ROSENBAUM, J., Dissenting          3

As for fourteen- and fifteen-year-old users, the Act prohibits that group from creating or holding social media accounts without parental consent. It does so by (1) blocking social media platforms from entering into contracts with them to create accounts, unless their parent provides consent, *see id.* § 3(a); and (2) directing the social media platforms to terminate those accounts and delete the personal information associated with the account if the child's parent doesn't provide consent, *see id.* § 3(b).[3] I'll call this the "14–15 Provision."[4]

_____

holders under age fourteen to request to terminate their own accounts, *id.* § (2)(b)2; and "the confirmed parent or guardian" must be able to request that the platform terminate the account of their child under fourteen, *id.* § (2)(b)3. Additionally, the platform must "[p]ermanently delete all personal information" that it has "relating to the terminated account" for those minors under fourteen. *Id.* § (2)(b)4.

[3] Specifically, for fourteen- and fifteen-year-old users, the Act directs social media platforms to "prohibit" them "from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* § (3)(a). The platform must terminate those accounts if there's no parental consent, with the same ninety-day dispute provision as for the minors under fourteen; and for this older cohort, the Act also contains a similar provision including "accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising . . . ." *Id.* § (3)(b)1. Again, the fourteen- or fifteen-year-old users must be able to request to terminate their accounts, *id.* § (3)(b)2; and "the confirmed parent or guardian" of those account holders can also make such a request, *id.* § (3)(b)3. The platform must delete the minor's information if their account is terminated. *Id.* § (3)(b)4.

[4] Curiously, the Act also provides that if a court were to enjoin the 14–15 Provision, then that subsection "shall be severed," and instead the Act would

The Act targets only some social media platforms—namely, those that allow users to engage in public user-to-user speech and have certain allegedly addictive features. It defines covered "social media platforms" as any "online forum, website, or application" that meets four requirements. *See id.* § (1)(e). First, the platform must "[a]llow users to upload content or view" others' content or activity. *Id.* § (1)(e)1. Second, at least ten percent of its "daily active users" under age sixteen must have spent an average of at least two hours per day on the site, over the last twelve-month period. *Id.* § (1)(e)2. Third, the platform must "[e]mploy[] algorithms that analyze user data or information on users to select content for users." *Id.* § (1)(e)3. And fourth, the platform must have "any of the following addictive features," including "[i]nfinite scrolling," "[p]ush notifications or alerts . . . to inform a user about specific activities or events related to the user's account," "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content," "[a]uto-play video," or "[l]ive-streaming" or a similar live-broadcasting function. *Id.* § (1)(e)4.

Additionally, the Act expressly excludes websites or apps "where the exclusive function is e-mail or direct messaging consisting of [content] shared only between the sender and the recipients,

---

function identically for the older minors as it works for the younger minors. *See id.* § (4). So if we had enjoined the *less restrictive* 14–15 Provision, then those teenagers would be subject to the *more restrictive* conditions that otherwise apply to only the younger minors through the Under-14 Provision.

without displaying or posting publicly or to other users . . . ." *Id.*
§ (1)(e). In sum, the Act covers platforms that allow users to en-
gage in public, user-to-user speech and have certain allegedly ad-
dictive features as part of the design of the website or app.

Finally, the Act imposes significant penalties for noncompli-
ance. "Any knowing or reckless violation" of the Act constitutes
"an unfair and deceptive trade practice actionable . . . solely by the
[D]epartment [of Legal Affairs ('Department')] against a social me-
dia platform." *Id.* § (5). The Department can collect $50,000 per
violation, plus reasonable attorneys' fees and court costs. *Id.* And
it can seek punitive damages if a platform shows "a consistent pat-
tern of knowing or reckless conduct" in consistently failing to com-
ply. *Id.* The Act also gives minor account holders, or their
representatives, a private right of action to sue for "knowing[] or
reckless[]" violations, for up to $10,000 in damages. *Id.* § (6)(a).

### B. Implementing regulations

Florida's regulations implementing the Act tell us more
about how social media platforms must comply with the age-
verification requirement. *See id.* § (12) (providing that the Depart-
ment of Legal Affairs "may adopt rules to implement" the Act).
Under the regulations, "[a] social media platform's process for age
verification is sufficient if it consists of completing (a) standard age
verification as defined at Section 501.1737(1)(i), F. S.; (b) anony-
mous age verification as defined at Section 501.1738, F. S.; or (c)
any method of verifying age that is regularly used by the govern-

ment or businesses for the purpose of age and identity verification." Fla. Admin. Code Ann. r. 2-43.002.

The regulations define "standard age verification," in turn, as "any commercially reasonable method of age verification approved by the commercial entity." Fla. Stat. Ann. § 501.1737. And "'anonymous age verification' means a commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party organized under the laws of a state of the United States which: (a) Has its principal place of business in a state of the United States; and (b) Is not owned or controlled by . . . any . . . entity formed in a foreign country." Fla. Stat. Ann. § 501.1738.

As for "[r]easonable parental verification," that "means any method that is reasonably calculated at determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means." Fla. Admin. Code Ann. r. 2-43.001(12). This process

> may include, but is not limited to, a social media platform: (a) requesting from a child the child's parent's name, address, phone number, and e-mail address; (b) contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship; and (c) utilizing any commercially

> reasonable method regularly used by the government
> or business to verify that parent's identity and age.

*Id.*

So for the parental-verification process, the platforms will effectively need to link parents' identities to their fourteen- or fifteen-year-olds' social media accounts. And to comply generally with the age-verification law, platforms must use "commercially reasonable method[s]." Fla. Stat. Ann. § 501.1737. Though undefined at Section 501.1737, Florida's description of "commercially reasonable means" for assessing parental verification includes collecting personally identifying information on the user's parent. *See* Fla. Admin. Code Ann. r. 2-43.001(12). I can only assume the same requirement applies for the age-verification process more broadly: this Act, by its terms, effectively requires linking users' identities (not to mention their parents' identities) with users' social media accounts.

The regulations provide that a social media platform has knowingly or recklessly violated the Act if it "[w]illful[ly] disregard[s] . . . a person's age." Fla. Admin. Code Ann. r. 2-43.002(3). And a platform hits that threshold "if it, based on the facts or circumstance[s] readily available to the respondent, should reasonably have been aroused to question whether the person was a child and thereafter failed to perform reasonable age verification." *Id.* But the Department of Legal Affairs "will not find willful disregard of a person's age has occurred if a social media-platform establishes it has utilized a reasonable age verification

method with respect to *all who access the social media platform* and that reasonable age verification method determined that the person was not a child unless the social media platform later obtained actual knowledge that the person was a child and failed to act." *Id.* (emphasis added).

So importantly, social media platforms will have to use age verification "with respect to all who access the social media platform." *Id.* That is, the Act's terms cover minors and adults alike, within (and possibly even outside) Florida.[5]

## II.    The Act is not just "likely" unconstitutional; it's plainly unconstitutional on its face.

The Act plainly violates the First Amendment. As a starting point, the Act directly regulates both expressive activity itself and conduct with an expressive element. Even assuming for the sake of argument that the Act is content neutral, the Act fails intermediate scrutiny. Although the government's stated interest (reducing minors' compulsive social media use) may be important, the Act is far from narrowly tailored to serve that interest. Rather, it's remarkably *overinclusive*, so it burdens more speech than necessary to achieve the government's stated interests. And it does this not just

---

[5] The Act's scope isn't entirely clear here. It defines "account holder[s]" as "resident[s] . . . who live[] in [Florida] for more than 6 months of the year." Act, § (1)(a), (d). So the platforms are required to terminate only Florida residents' accounts. *See id.* § (2)–(3). But the age-verification process, by the terms of Florida's regulations, must be completed "with respect to *all who access* the social media platform," which seems to include users beyond the confines of Florida. Fla. Admin. Code Ann. r. 2-43.002(3) (emphasis added).

for minors, but also for adults—both within and (apparently) outside the state of Florida.

Besides its overinclusion problem, the Act doesn't even necessarily further the government's stated interest.  For one thing, the Act leaves in place a lot of other sites that satisfy Florida's "addictive" criteria but don't meet Florida's definition of "social media platforms."  So it's hard to say that the law is actually targeting negative secondary effects, versus regulating free expression.

More importantly, the Act doesn't impose a mere "incidental burden" on speech.  As it's written, the Act purports to regulate the speech of *everyone* who uses the covered social media websites.  For minors, it acts as a categorical ban on speech (and access to speech) on covered social media platforms.  And it forces the platform to demand identifying information from all users, including adults.  In doing so, it chills countless users' speech on deeply personal, political, religious, and familial matters—reaching the heart of what the First Amendment was designed to protect in the first place.

My discussion proceeds in two parts.  First, I describe how the Act implicates the First Amendment.  I show that it's content based and warrants strict scrutiny.  But then I explain how, even assuming intermediate scrutiny (rather than strict scrutiny) applies, the law is plainly unconstitutional.

### A.  The Act is a content-based restriction on speech.

I agree with the Majority Opinion that the Act clearly falls within the First Amendment's ambit.  But I disagree with the Ma-

jority Opinion's conclusion that the Act is a content-neutral regulation that indirectly regulates speech. It's not. Rather, it's a content-based direct regulation on speech that warrants strict scrutiny.

### 1. *The Act is a direct regulation on speech.*

A direct regulation on speech is one whose primary effect restricts the creation and dissemination of information, as distinct from a regulation that primarily targets conduct and has a merely incidental burden on speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see also U.S. v. O'Brien*, 391 U.S. 367, 376–378 (1968).

The Act directly regulates expression in at least two ways. First, the Act inserts the state of Florida into users' decisions about whether and how to speak online. The primary thing of value being exchanged under a contract between a user and a platform is the opportunity to engage in speech in a particular manner, in a particular venue, and to a particular audience. Joining a social media platform is, itself, an expressive act because social media platforms offer tools that permit users to engage in forms of speech that are not possible elsewhere on the internet. They allow their users to access networks and audiences that they otherwise can't. By preventing a user from accessing a platform, the State restricts the user's access to the unique features of that platform. In doing so, the State interferes with the message, form, and content of speech the user seeks to engage in. When a user can't join a platform, the user can't access speech that may be available on only

that platform or communicate with the audience that may be present on only that platform.

Second, the law interferes with the platforms' editorial choices about which users can join the platform and about what content to display to those users.

Social media sites have a right under the First Amendment to moderate the content users post to their platforms. *See Moody v. NetChoice, LLC,* 603 U.S. 707, 717 (2024). Decisions about terms of service and registration requirements, including decisions about which users may create and maintain accounts under which conditions, fall squarely under the umbrella of content moderation. A platform may want to make it easy for users to post pseudonymously to encourage them to engage in discussion of personal, political, religious, or otherwise sensitive, controversial, or stigmatized matters. Some platforms may prefer not to encourage pseudonymous posting and implement ID requirements to create a more heavily moderated setting.

Verification requirements can directly impact the content that the platform hosts. But platforms generally have the right to determine what kind of content users see and to organize that content. *See id.* at 731 ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own.").

The State's effort to restrict the speech of minors and to substitute its judgment on matters of content moderation for the judgment of the platforms directly regulates expression.

### 2. The Act is content based and warrants strict scrutiny.

Because the law regulates expression, we next assess whether the law is content based (in which case, strict scrutiny applies) or content neutral (warranting intermediate scrutiny). *See Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020).

To determine whether a law is content based or content neutral, we ask "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). A law that "singles out specific subject matter for differential treatment" qualifies as content-based discrimination, even if "it does not target viewpoints within that subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015).

When I apply those considerations here, I must conclude that the Act is content based because it draws a distinction based on the "social" subject matter of the speech occurring on particular platforms. The Social Media Groups point out that the Act excludes from its reach certain websites (such as streaming services) that share many of the same "features" the Act is purportedly concerned with—but *don't* involve uploading or viewing user content, or the public exchange of speech among individual users. In this

25-11881         Rosenbaum, J., Dissenting                13

way, they argue that the Act discriminates against speech based on its "'social' subject matter."

For instance, platforms like YouTube and Snapchat are covered, but websites like Hulu and Disney+ are not. And the Act determines whether a platform is covered based on what *content* that platform permits. Generally speaking, if a platform involves public user-to-user speech, then the platform is covered; if it doesn't, it's not. That's a content-based law, triggering strict scrutiny. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

And even if we disregard "social speech" as a "subject matter," the Act at least operates as a functional proxy for content. *See Reed*, 576 U.S. at 163–164 ("Some facial distinctions based on a message are [. . .] more subtle, defining regulated speech by its function or purpose."). In functionally defining covered "social media platforms" the way it does (i.e., as those that "[a]llow users to upload content or view [others' content or activity]"), the Act's restrictions serve as a proxy for a content-based regulation directly prohibiting *public, interactive, user-to-user social speech*. Of course, not every "classification that considers function or purpose is always content based," but "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 74–75 (2022).

Although the Act's language doesn't expressly carve out news sites and streaming services, for example, the restriction's coverage of only platforms that "[a]llow users to upload content or view [others' content or activity]" does effectively limit coverage to "social media platforms" in the ordinary sense. That is, it covers only apps or websites where individuals can engage in interactive, user-to-user speech, sharing or commenting publicly on one another's posts. That the Act doesn't affect streaming services and news websites, which don't support that kind of public, interactive "social speech," shows that the Act operates as a functional proxy for a more obviously content-based regulation.

In this respect, the Act goes beyond regulating merely a "*form* of expression," as the Majority Opinion concludes. Maj. Op. at 12 (emphasis in original). The Majority Opinion relies on *La-Croix v. Town of Fort Myers Beach*, 38 F.4th 941 (11th Cir. 2022), to support its incorrect conclusion. There, we said that an ordinance that banned portable signs entirely foreclose[d] a venerable form of speech," so it was content neutral. *Id.* at 943. But that's not what the Act does.

Banning speech on social media platforms doesn't ban speech of a particular "form." If Florida instead prohibited minors from posting on one limited type of user-to-user platform—say, public online message boards—that might be a form-based regulation. But here, Florida prohibits minors from holding accounts on *all* social media platforms that allow user-to-user expression. So minors can't participate in or contribute to discourse in the *entire*

*online forum*—whether through the "form" of liking or commenting on somebody's post, posting, contributing to a message board, or sending a direct message. That's the effect of the law's prohibition on minors from creating or holding accounts on these websites. Excluding individuals wholesale from a particular forum doesn't merely regulate one "form" of speech; it regulates *all* forms of speech in that forum.

Because the Act targets the subject matter of public, interactive, social speech—either directly or through a functional proxy that achieves the same result—it triggers strict scrutiny.

### B. The Act fails even intermediate scrutiny.

The Majority Opinion concludes that intermediate scrutiny is the appropriate test to apply to the Act. *See* Maj. Op. at 11 – 23 (applying the version of intermediate scrutiny that originated in *O'Brien*, 391 U.S. at 377). For the reasons I've explained, I disagree. Instead, we should review the Act under strict scrutiny. But the Act is drawn so broadly that it fails even under *O'Brien*'s version of intermediate scrutiny.

Under the *O'Brien* test, "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376; *see also Wise Enters., Inc. v. Unified Gov't of Athens-Clarke Cnty.*, 217 F.3d 1360, 1363 (11th Cir. 2000) ("The *O'Brien* standard applies 'when a governmental entity seeks to regulate non-communicative elements of an activity and

thereby imposes incidental burdens on protected expression.'" (citation omitted)).  The basic idea is that, when it comes to laws that regulate conduct with an expressive element, "nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (citation omitted).

Under *O'Brien*, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  391 U.S. at 376.

Tailoring under *"O'Brien* requires only that restrictions be 'no *greater* than is essential,' or . . . 'no *broader* than necessary.'" *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1190 (11th Cir. 2025) (internal citations omitted and emphases added by *Wacko's Too* Court); *see also Wise Enters.*, 217 F.3d at 1364 (*O'Brien* provides that a law can be valid if, on tailoring, "there is no less restrictive alternative").  And because generally, intermediate scrutiny asks us to "invalidate laws that 'burden substantially *more* speech than necessary'—not less," intermediate-scrutiny standards like *O'Brien*'s "aim[] to eliminate regulations that are overinclusive,

not underinclusive." *Wacko's Too*, 134 F.4th at 1190 (quoting *TikTok*, 604 U.S. at 74) (emphasis added by *Wacko's Too* Court). For the reasons I explain below, the Act fails even this more permissive test.[6]

> 1. *The Act substantially burdens minors' First Amend-ment rights.*

*First*, the Act imposes substantial burdens—above and be-yond mere "incidental restrictions," and far greater than what's necessary—on Florida minors' First Amendment rights. When it comes to speaking online, the Act effectively prohibits many mi-nors from speaking *at all*. As the district court observed, all the covered social media platforms "require users to hold accounts in order to share one's own content—in other words, to speak." If minors can't hold accounts there, they can't make their own posts,

---

[6] In contrast, if the Court were to conclude that the law *directly regulates* expressive activity—and for the reasons I've explained, it does—but isn't content based (it is), we would analyze the Act under a more demanding version of intermediate scrutiny. In that world, to pass muster, the Act "must be 'narrowly tailored to serve a significant governmental interest.'" *Packingham v. North Carolina*, 582 U.S. 98, 105–06 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). This means "the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 106 (quoting *McCullen*, 573 U.S. at 486); *see also McCullen*, 573 U.S. at 495 ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."). But because the law fails even *O'Brien*'s intermediate-scrutiny-light analysis, I analyze it under that standard of review here.

nor can they comment on others' posts or otherwise contribute to or participate in online discourse.

The parental-consent requirement can't save the Act, either. After all, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them" in general. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–213 (1975)). To be sure, "a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* And even if a state has "the power to *enforce* parental prohibitions," "it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3 (emphases in original).

Here, the Act doesn't enforce parental prohibitions. Rather, at best, it creates a "parental veto," after the state, on its own, prohibited minors' access to social media. *See id.* And for the Under-14 Provision, a parent can't even veto the state's decision that their child can't hold a social media account. We should be wary of governments supplanting parents in deciding which ideas children should and should not be exposed to. *See, e.g., Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state; those who nurture

him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.").

As Justice Scalia explained for the Supreme Court in *Brown*, these kinds of laws improperly substitute the *state's* judgment of what's appropriate for raising children for the *parent's*. "Such laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." 564 U.S. at 795 n.3 (emphases in original). "In the absence of any precedent for state control, uninvited by the parents, over a child's speech . . . and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional." *Id.* To hold otherwise would permit states, for example, to criminalize "admit[ting] persons under 18 to a political rally," or into a church, "without their parents' prior . . . consent." *Id.* But a law like that would be "obviously an infringement upon the religious freedom of young people and those who wish to proselytize young people." *Id.* Justice Scalia's reasoning applies in full force here.

The Supreme Court's recent decision in *Free Speech Coalition* upholding Texas's age-verification requirement for pornographic websites, on a child-protection rationale, doesn't justify a different answer.

Under the First Amendment, obscenity is different. *See, e.g.,* *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (discussing certain "categories" of speech that traditionally "have been understood to fall outside the scope of the First Amendment," such as

obscenity); *id.* at 487 n.9 (recognizing that statutes restricting other categories of speech, such as "'indecent' speech," target "a broader category than obscenity to minors and so [would be] entitled to greater First Amendment protection"). And in *Free Speech Coalition,* the Court expressly tied its reasoning and holding to the context of obscene speech. *See, e.g.*, *id.* at 466 (holding that "[t]he power to require age verification is within a State's authority to prevent children from accessing *sexually explicit content*" (emphasis added)).

Restricting a person's ability to access obscene, pornographic material is quite different from burdening a person's ability to engage in any speech, of any kind, at all, on a social media platform. And under Florida's Act, minors can't (either at all, or absent parental consent) engage in public discourse on religious or political matters, or anything else. *Cf. Meyer v. Grant*, 486 U.S. 414, 425 (1988) (explaining that, where a law trenches upon the ability to engage in robust political discussions, "the importance of First Amendment protections is 'at its zenith'"). In contrast to the obscenity context, then, the kinds of speech the Act prevents minors from engaging in go to the *core* of First Amendment protections. As a result, the Act differs markedly from the one the *Free Speech Coalition* Court encountered. And that case isn't instructive here.

> 2. *The Act, by its terms, poses substantial chilling concerns for all users.*

*Second*, the Act poses significant chilling concerns for *all users* of the covered platforms—not just those who are fifteen and under. Florida's law impacts adults, too. And at least on the face of the

Act, its impact doesn't even appear limited to *Florida's* adults. Rather, to implement the Act, social media platforms apparently must implement age-verification systems for *all users*. *See* Fla. Admin. Code Ann. r. 2-43.002(3) (requiring platforms to establish age-verification methods "with respect to *all who access the social media platform*" (emphasis added)).

It's not clear exactly what form Florida's "reasonable" verification processes will take. *See* Fla. Stat. Ann. §§ 501.1737, 501.1738; Fla. Admin. Code Ann. r. 2-43.001–43.002. Maybe these processes will be as simple as an "Are you age sixteen or older?" pop-up window. But it seems more likely the platform will request, as the regulations contemplate, the user's (or their parent's) "name, address, phone number, and e-mail address," or other methods that the government "regularly" uses "to verify . . . identity and age," like a government ID. *See* Fla. Admin. Code Ann. r. 2-43.001(12).

At first blush, this might again seem similar to the law the *Free Speech Coalition* Court confronted. But once again, the Act isn't tied to the obscenity context. Rather, it applies to all speaker content, meaning it applies to core subjects that the First Amendment protects. And notably, the chilling concerns of the Act are far greater than those that the Texas law in *Free Speech Coalition* posed.

In that case, the Court observed that, as under the Act, users had to submit their age verification to either the covered website or to a third-party service provider. *See Free Speech Coal.*, 606 U.S. at 497. The Court explained that "[b]oth those entities have every

incentive to assure users of their privacy." *Id.* at 497–499. Maybe so, but Florida's law goes a step further, for three reasons.

First, the Act concerns social media platforms—which are among "the most important places . . . for the exchange of views[] today[.]" *Packingham*, 582 U.S. at 104. "[U]sers can debate religion and politics with their friends and neighbors," or "petition their elected representatives and otherwise engage with them in a direct manner" on social media. *Id.* at 104–05. Social media users "engage in a wide array of protected First Amendment activity [on these platforms] on topics 'as diverse as human thought.'"[7] *Id.* (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997)).

In requiring all users to provide proof of age—and therefore, in practice, proof of identity—to the platform or third-party provider, users lose the ability to hold accounts anonymously and engage freely in these sensitive discussions. And a user may wish for their social media account to remain private for many reasons.[8]

---

[7] *See also* Brief for American Civil Liberties Union as Amicus Curiae Supporting Plaintiffs-Appellees, Court of Appeals Dkt. No. 33 at 7–10 (collecting sources to show how "[a]n estimated 5.24 billion people use social media for everything from expressing themselves politically and engaging with elected representatives to learning new dances and finding community").

[8] *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995) ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, . . . the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a

After all, some very significant political speech—think the Federalist Papers, for instance—has historically occurred anonymously (or pseudonymously). Free access to these online platforms is surely more worthy of protection under the First Amendment than accessing the pornographic websites at issue in *Free Speech Coalition*.

Second, the Act's records-sharing provisions raise far more significant chilling concerns than the *Free Speech Coalition* Court considered. Florida's Act provides that "[d]uring an active investigation" into alleged noncompliance, Florida's Department of Legal Affairs "may . . . disclose[]" information it collects either generally "[i]n the furtherance of its official duties and responsibilities," or "*[t]o another governmental entity* in the furtherance of its official duties and responsibilities." Act § (11)(b) (emphasis added). When an investigation is completed or "cease[s] to be active," any personal identifying information "shall remain confidential and exempt from" public-records laws. *Id.* § (11)(c). But the Act does not specify whether, or when, the Department of Legal Affairs must (if ever) destroy any personal identifying information it collects in connection with compliance investigations. Nor does the Act appear to limit the unspecified "governmental entit[ies]" that could receive this apparently indefinitely held information that the government collects.

In other words, it's unclear whether Florida has any limits—at least, through the text of the Act—on *with whom* it may share

---

condition of entry. Accordingly, an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment.").

information about who owns which social media accounts. If Florida's compliance investigation uncovers, say, that a particular social media account belongs to an international student, who has used that account to make posts critical of the Trump Administration, what's to stop Florida from sharing that information with Immigration and Customs Enforcement?

This potentially unlimited data-sharing poses substantial chilling concerns for all social media users who wish to speak—and especially, to voice dissent—on these platforms. By its terms, the Act seems to enable not just the platforms and third-party service providers (as in *Free Speech Coalition*), but also the *government* in turn to link at least some particular social media accounts with particular owners. So users may well be chilled from speaking on deeply personal issues online, including matters of religion, family life, and political beliefs—again, core First Amendment speech.

Even the Majority Opinion acknowledges that the "age verification requirement imposes some burden on adult speech." Maj. Op. at 22 n.11. But it minimizes the burden, characterizing it as "modest." *Id.* And to be sure, for adult users who seek to engage in online speech that Florida state officials and their political allies would approve of, the burden may be "modest." But for everyone else—especially those who wish to express dissatisfaction with Florida politics and officials—the Act's disclosure requirements impose a heavy burden. And its "compelled disclosure" will inevitably create the "practical effect of 'discouraging' the exercise of constitutionally protected political rights." *Nat'l Ass'n for Advancement*

*of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958).

> 3. *Florida hasn't made a strong showing that the Act furthers the government's interest.*

*Third*, beyond being vastly overinclusive, the Act doesn't appear to truly "further" the government's interest either. Or at least, Florida hasn't made a strong showing that it does. Many of these platforms' "addictive features" (like auto-scroll/auto-play, infinite scroll, and live-streaming) won't go away if the state prevents minors from holding social media accounts, even if the push notifications and content algorithms might. In other words, the "addictive features" by and large remain in force with the Act.

This isn't an "under-inclusion" issue; it goes to whether the Act operates to further the government's stated interest at all. If Florida's purpose was truly a "concern over secondary effects"—here, the harms of minors' compulsive social media use—then the law should *actually target those effects*, and not merely operate to limit expression. *See, e.g.*, *Wacko's Too*, 134 F.4th at 1188–89.

But that's not what the Act does. Under the Act, minors would still be subject to most of the "addictive features" the law purports to target even if they can't hold accounts on these platforms. With or without an account, many of these platforms will still utilize auto-scroll/auto-play and live-streaming. They'll still display "interactive metrics," like how many likes or reshares a post has, even if the user isn't logged into an account and can't themselves add a like or reshare. The only "addictive feature" the Act

identifies that seems to reliably disappear, if a user can't hold an account on the platform, is targeted push notifications and (to some extent[9]) algorithmically targeted content.  *See* Act § (1)(e)4. And for any fourteen- or fifteen-year-old user whose parent says it's okay, the secondary effects persist in full force.  So all that's lost, really, is users' (minors and adults alike) ability to speak (and access speech) on these platforms, or an ability to do so freely without the risk of considerable chilling.

The parental-consent provision helps illustrate the Act's furtherance problem.  The trigger for whether fourteen- and fifteen-year-old minors lose their ability to speak isn't the mere fact that the covered platforms have "addictive features."  Rather, in Florida's view, it's just fine for minors to access "addictive" content so long as a parent okays it.

But this feature of the law clashes with *Brown*, where the Supreme Court invalidated a law with a similar parental-permission provision.  As Justice Scalia, writing for the Court, explained, "The California Legislature is perfectly willing to leave this dangerous, mind-altering material [violent videogames] in the hands of children so long as one parent . . . says it's OK. . . . That is not how one addresses a serious social problem."  *Brown*, 564 U.S. at 802.

---

[9] Browser cookies may limit the effectiveness of prohibiting targeted content algorithms.  With or without a logged-in account, cookies can still track a user's activity and send them targeted content.

Similar reasoning applies here.  If Florida were truly concerned with the Act's "addictive features" causing compulsive social media use, it wouldn't have designed a law that allows kids to have access to the platforms so long as a parent okays it.  In other words, the Act's operation is disconnected from its asserted purpose.[10]  In practice, all the Act does is curtail speech, not further the government's stated interest.

For these reasons, even if the state's interest is important, the restrictions the Act imposes are "greater than [what's] essential" and "broader than [what's] necessary" (for both minors and adults) to achieve Florida's asserted goal.  *Wacko's Too*, 134 F.4th at 1190.  And it's questionable at best whether the law furthers the stated interest in the first place.

---

[10] The Court in *Brown* also found that California couldn't show that its law's "restrictions meet a substantial need of parents who wish to restrict their children's access to violent video games but cannot do so." *Id.* at 803.  And so the law in *Brown* was both "seriously underinclusive" because of the parental permission prong, *id.* at 802, and "vastly overinclusive," because not all the kids forbidden from buying violent videogames "have parents who *care* whether they purchase violent video games," *id.* at 804 (emphasis in original).  Of course, *Brown* applied strict scrutiny to the content-based no-violent-videogames law—so it could separately consider the distinct question of under-inclusivity.  Still, its reasoning here is persuasive.  *Cf. id.* ("While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want.  This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." (emphasis in original)).

### 4. *Less restrictive alternatives exist.*

Plus, "less restrictive alternative[s]" exist. *See Wise Enters.*, 217 F.3d at 1364–65. And that further shows that the burdens the Act poses are greater than what's necessary to achieve its stated purpose.

For example, the state could require companies to make parental controls available at the device or network level to limit the time kids spend on social media. Those alternative measures would burden substantially less speech and still achieve the government's stated interests—*without* implicating the free-speech rights of minors and adult users alike, within and outside the state of Florida. *Cf. Ashcroft*, 542 U.S. at 667 (stating that it would be "less restrictive" to restrict speech "at the receiving end" rather than "at the source," through applying filters on home computers).

And like in *Brown*, not all parents likely share Florida's concern here. So besides infringing the free-speech rights of "all who access" these platforms, *see* Fla. Admin. Code Ann. r. 2-43.002(3), the Act also veers into breaching parents' rights to decide what's best for their own children. As *Brown* told us, that goes beyond what the First Amendment generally permits. *See* 564 U.S. at 802–03.

That is, under the Act, even if a parent is fine with their thirteen-year-old having a Facebook account, and the mom shares her child's log-in information, or implements her own checks on her child's account, Facebook will have to delete that account *regardless* of what the mom or her child wants. To be sure, some parents

may share Florida's belief about the harmful effects of compulsive social media use among minors. But that doesn't mean Florida gets to enforce its childrearing views on all Florida's parents—overriding what they may want their own children to see, read, or access.

The Majority Opinion contends that Florida is likely to show that its legislature chose this regulation "not because it is *easier* . . . but because it is the most effective way of achieving its interest." Maj. Op. at 23. The most "effective way" of suppressing speech will always be to do what the state has done here—suppressing *all of it* (either entirely, for the minors under fourteen, or absent parental consent for the fourteen- and fifteen-year-old minors). But Florida can't just take the easiest, or "most effective" route. It can regulate speech to some extent, but it can't ban more speech than is necessary to achieve its interests. *Wacko's Too*, 134 F.4th at 1190. Yet this law does exactly that.

So the Act doesn't pass muster even under *O'Brien*'s version of intermediate scrutiny.

### III.    The Balance of Equities and Harms

Last, the balance of the equities and the harms in this case weigh against granting Florida's motion. No government has *any* "'legitimate interest' in enforcing an unconstitutional law." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). Allowing this Act to go into effect will cause substantial harm to the Social Media Groups and their members' users. After all, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427

U.S. 347, 373 (1976) (plurality opinion); *see also Honeyfund.com*, 94 F.4th at 1283 (stating that when plaintiffs suffer an "ongoing violation of the First Amendment," "even for a minimal period of time, [that] constitutes irreparable injury" (citation and internal quotation marks omitted)).

The public interest favors denying Florida's motion. The public has no interest in a government's enforcement of an unconstitutional law—particularly where doing so would carry expansive consequences for countless social media users, minors and adults alike. *See also Honeyfund.com*, 94 F.4th at 1283 ("[A] preliminary injunction is not contrary to the public interest because it is in the public interest to protect First Amendment rights.").

## IV.    Conclusion

For these reasons, I would deny Florida's motion for a stay of the preliminary injunction pending appeal. Florida hasn't made a strong showing of its likelihood of success on the merits. To the contrary, this law is plainly unconstitutional. And in granting Florida's motion today, the Court allows that unconstitutional Act to go into effect—burdening the First Amendment rights of not only Florida's minors, but apparently everyone who uses the covered social media platforms. I respectfully dissent.